**2022-1092**

# United States Court of Appeals for the Federal Circuit

ADASA INC.,

*Plaintiff-Appellee,*

– v. –

AVERY DENNISON CORPORATION,

*Defendant-Appellant.*

*On Appeal from the United States District Court for the District of Oregon, Mustafa T. Kasubhai, Magistrate Judge*

## BRIEF FOR DEFENDANT-APPELLANT

MARK YEH-KAI TUNG
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
(650) 801-5000
marktung@quinnemanuel.com

DEREK L. SHAFFER
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

JOSEPH MILOWIC III
OWEN ROBERTS
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
josephmilowic@quinnemanuel.com
owenroberts@quinnemanuel.com

*Counsel for Defendant-Appellant*

## PATENT CLAIM AT ISSUE

U.S. Patent No. 9,798,967, claim 1:

1. An RFID transponder comprising:

   a substrate;

   an antenna structure formed on the substrate; and

   an RFID integrated circuit chip which is electrically coupled to the antenna structure,

      wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space,

      wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits,

      wherein the unique serial number space comprises the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block and of remaining bits of lesser significance that together comprise the one serial number instance.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 22-1092

**Short Case Caption** Adasa Inc. v. Avery Dennison Corporation

**Filing Party/Entity** Avery Dennison Corporation

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/11/2021

Signature: /s/ Derek L. Shaffer

Name: Derek L. Shaffer

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Avery Dennison Corp. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| Brenna K. Legaard | Angela E. Addae | Schwabe, Williamson & Wyatt, P.C. |
| Cristin A. Wagner | Balazs Takacs | William F. Abrams |
| Jason A. Wrubleski | Elizabeth White | K&L Gates LLP |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

Form 9: Certificate of Interest
Additional Page

United States Court of Appeals for the Federal Circuit

Certificate of Interest

Case Number: 22-1092
Short Case Caption: Adasa Inc. v. Avery Dennison Corporation
Filing Party/Entity: Avery Dennison Corporation

Additional Page Attached to Section 4, Legal Representatives:

Katherine L. Allor
George Summerfield

I certify the information contained on this attached sheet is accurate and complete to the best of my knowledge.

Date: November 11, 2021

Signature: /s/ Derek L. Shaffer

Name: Derek L. Shaffer

# TABLE OF CONTENTS

**Page**


TABLE OF CONTENTS ....... i

TABLE OF AUTHORITIES ....... iii

STATEMENT OF RELATED CASES ....... vii

PRELIMINARY STATEMENT ....... 1

JURISDICTIONAL STATEMENT ....... 6

STATEMENT OF THE ISSUES ....... 7

STATEMENT OF THE CASE ....... 8

I. FACTS ....... 8

A. The Parties ....... 8

B. The ’967 Patent ....... 8

II. PROCEDURAL HISTORY ....... 10

A. Complaint And Early Motions Practice ....... 10

B. Summary Judgment And Pre-Trial Orders ....... 11

C. Trial ....... 14

D. Post-Trial Proceedings And Sanctions ....... 17

SUMMARY OF THE ARGUMENT ....... 21

ARGUMENT ....... 23

I. STANDARDS OF REVIEW ....... 23

II. THE ’967 PATENT CLAIMS INELIGIBLE SUBJECT MATTER AND IS INVALID UNDER SECTION 101 ....... 23

A. The Claimed Advance Over The Prior Art Consists Of Abstract Sub-Division Of An Already-Partitioned Data Field ....... 24

B. The ’967 Patent’s Claims Do Not Identify Any Inventive Concept In Sub-Dividing An Already-Partitioned Data Field............33

III. THE ’967 PATENT IS ALSO INVALID UNDER SECTIONS 102 AND 103.....................................................................................37

IV. ALTERNATIVELY, AVERY DENNISON IS ENTITLED TO VACATUR OF ALL DAMAGES AND A NEW TRIAL............................45

A. The District Court Committed Legal Error By Refusing To Instruct The Jury On Lump Sum Damages........................................46

B. The District Court Committed Reversible Error By Excluding Comparable Licenses ....................................................................50

V. THE $20 MILLION DISCOVERY SANCTION SHOULD BE VACATED BECAUSE IT REFLECTS LEGAL ERROR AND A CLEAR ABUSE OF DISCRETION ..............................................................54

CONCLUSION......................................................................................60

# TABLE OF AUTHORITIES

## Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ....................................................53

*Alice Corp Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014)........................................................ 11, 24, 30, 32, 37

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
841 F.3d 1288 (Fed. Cir. 2016) ....................................................32

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ....................................................40

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ....................................................53

*Atl. Thermoplastics Co. v. Faytex Corp.*,
5 F.3d 1477 (Fed. Cir. 1993) ....................................................48

*Bayer Healthcare LLC v. Baxalta Inc.*,
989 F.3d 964 (Fed. Cir. 2021) ....................................................57

*Bayer Healthcare Pharms., Inc. v. Watson Pharms., Inc.*,
713 F.3d 1369 (Fed. Cir. 2013) ............................................... 23, 38

*Bilski v. Kappos*,
561 U.S. 593 (2010)....................................................37

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020) ....................................................53

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014) ....................................................24

*C R Bard Inc. v. AngioDynamics, Inc.*,
979 F.3d 1372 (Fed. Cir. 2020) ............................................... 31, 33

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Assoc.*,
776 F.3d 1343 (Fed. Cir. 2014) ............................................... 28, 34

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*,
635 F.3d 1373 (Fed. Cir. 2011) ....................................................45

*Dang v. Cross*,
422 F.3d 800 (9th Cir. 2005) ............................................... 46, 47

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
758 F.3d 1344 (Fed. Cir. 2014) ............................................... 29, 30

*Dimick v. Schiedt*,
293 U.S. 474 (1935) ....................56

*Energy Transp. Grp., Inc. v. William Demant Hldg. A/S*,
697 F.3d 1342 (Fed. Cir. 2012) ....................48

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) .................... 32, 33

*Ericsson, Inc. v. D-Link Systems, Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) .................... 23, 47, 53

*Estrada v. Speno & Cohen*,
244 F.3d 1050 (9th Cir. 2001) ....................59

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
839 F.3d 1089 (Fed. Cir. 2016) ....................33

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
702 F.2d 770 (9th Cir. 1983) ....................56

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) ....................54

*Freedman Seating Co. v. Am. Seating Co.*,
420 F.3d 1350 (Fed. Cir. 2005) ....................38

*Fujifilm Corp. v. Benum*,
605 F.3d 1366 (Fed. Cir. 2010) ....................49

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) ....................46

*In re Gleave*,
560 F.3d 1331 (Fed. Cir. 2009) ....................38

*In re TLI Commc'ns LLC Pat. Litig.*,
823 F.3d 607 (Fed. Cir. 2016) ....................35

*In re Tutu Wells Contamination Litig.*,
120 F.3d 368 (3d Cir. 1997) ....................56

*Intellectual Ventures I LLC v. Capital One Financial Corp.*,
850 F.3d 1332 (Fed. Cir. 2017) .................... 28, 30, 31

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) .................... 34, 35

*Jones v. Williams*,
297 F.3d 930 (9th Cir. 2002) ....................46

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .................... 49, 53

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ....................49

*Maxwell v. J. Bake, Inc.*,
86 F.3d 1098 (Fed. Cir. 1996) ....................49

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
344 F.3d 1205 (Fed. Cir. 2003) .................... 38, 42

*Ober v. Cty. of Los Angeles*,
2014 WL 2504504 (C.D. Cal. Mar. 27, 2014) ....................57

*PersonalWeb Technologies LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) .................... 21, 23, 24, 26, 27, 28

*Praxair Distribution, Inc. v. Mallinckrodt Hosp. Prod. IP Ltd.*,
890 F.3d 1024 (Fed. Cir. 2018) ....................31

*Purdue Pharma L.P. v. Epic Pharma, LLC*,
811 F.3d 1345 (Fed. Cir. 2016) ....................39

*R&R Sails, Inc. v. Ins. Co. of Penns.*,
673 F.3d 1240 (9th Cir. 2012) .................... 23, 56, 57

*RecogniCorp, LLC v. Nintendo Co.*,
855 F.3d 1322 (Fed. Cir. 2017) ....................29

*Secured Mail Solutions LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) .................... 29, 33

*Sec. Nat'l Bank of Sioux City, Iowa v. Day*,
800 F.3d 936 (8th Cir. 2015) ....................56

*Smart Systems Innovations, LLC v. Chicago Transit Auth.*,
873 F.3d 1364 (Fed. Cir. 2017) ....................28

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
926 F.2d 1161 (Fed. Cir. 1991) ....................48

*SynQor, Inc. v. Artesyn Techs., Inc.*,
709 F.3d 1365 (Fed. Cir. 2013) .................... 23, 50, 55, 59

*Toro Co. v. Deere & Co.*,
355 F.3d 1313 (Fed. Cir. 2004) ....................38

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
69 F.3d 512 (Fed. Cir. 1995) ....................48

*Universal Secure Registry LLC v. Apple Inc.*,
10 F.4th 1342 (Fed. Cir. 2021) ....................29

*Voice Int'l Inc. v. Oppenheimer Cine Rentals LLC*,
2020 WL 1229735 (C.D. Cal. Feb. 4, 2020) ....................58

*Wagner v. Cty. of Maricopa*,
747 F.3d 1048 (9th Cir. 2013) .... 23, 50

*Wanderer v. Johnston*,
910 F.2d 652 (9th Cir. 1990) .... 59

*Winecup Gamble, Inc. v. Gordon Ranch LP*,
850 F. App'x 573 (9th Cir. 2021) .... 58

*Zenith Electronics Corp. v. PDI Communication Systems, Inc.*,
522 F.3d 1348 (Fed. Cir. 2008) .... 38

*ZUP, LLC v. Nash Mfg.*,
896 F.3d 1365 (Fed. Cir. 2018) .... 38

**Statutes and Rules**

28 U.S.C. § 1331 .... 6

28 U.S.C. § 1338 .... 6

28 U.S.C. § 1961 .... 19

35 U.S.C. § 101 .... passim

35 U.S.C. § 102 (2006) .... passim

35 U.S.C. § 103(a) (2006) .... passim

35 U.S.C. § 285 .... 19

Fed. R. Civ. Proc. 37 .... passim

**Other Authorities**

Int'l Org. for Standardization, *ISO 2108: Information and documentation—International Standard Book Number* (5th ed. 2017) .... 35

Int'l Org. for Standardization, *ISO 3779: Road vehicles—Vehicle identification number (VIN)—Content and structure* (4th ed. 2009) .... 35

Int'l Org. for Standardization, *ISO 7812-1: Identification cards—Identification of issuer* (5th ed. 2017) .... 35

U.S. Patent & Trademark Office, Manual of Patent Examining Procedure § 2111.05 (9th ed., rev. 2019) .... 32

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Avery Dennison states that: (a) no other appeal in or from the same proceeding was previously before any appellate court; and (b) no cases will be directly affected by the decision here.

## PRELIMINARY STATEMENT

According to the decisions below, Plaintiff-Appellee ADASA Inc. ("ADASA") stands to recover tens of millions of dollars for claiming patent rights over an obvious, abstract idea: subdividing the "serial number" portion of an already-divided "unique object number" encoded in binary on a conventional RFID tag. The purported invention in ADASA's U.S. Patent No. 9,798,967 ("the '967 Patent") does not claim a new type of RFID tag, but instead a conventional one in which some data is mentally—not physically—designated the "Most Significant Bits."

ADASA's own comparison of a "typical" identifier with its "inventive" one proves the point:






Appx228-230. In the very comparison that ADASA uses to illustrate its invention, the 96 bits of binary that ADASA recognizes as "typical" are ***identical*** to the 96 bits of binary that ADASA claims are "commissioned in accordance with the teaching of Claim 1 of the '967 Patent." Appx229. Every "0" is the same. Every "1" is the same. The only claimed difference distills to a purely mental exercise in how a subsection of the familiar data field is framed and understood: ADASA labels one part of the serial number the "Most Significant Bits," labels the remainder the "Least Significant Bits," and assigns fixed import to the former.

Under Section 101, abstract ideas about data organization are ineligible for patenting. Applying that restriction is imperative in this case, where ADASA seeks to monopolize one obvious way of implementing global standards for creating unique object numbers, like the long-recognized EPC SGTIN-96 standard that ADASA used to illustrate its invention and that every accused product implements. For this reason alone, the judgment against Defendant-Appellant Avery Dennison Corporation ("Avery Dennison") for infringing ADASA's claimed monopoly should fall.

Beyond ruling that ADASA's claim is eligible under Section 101, the Magistrate Judge who presided over this case by prior consent (Kasubhai, M.J.) committed further errors that profoundly prejudiced Avery Dennison at trial and yielded an infirm jury verdict for ADASA. In particular, the District Court granted summary judgment for ADASA under Sections 102 and 103, foreclosing Avery

Dennison from invoking two pieces of closely-related prior art to establish that ADASA's claim was anticipated and/or obvious. In fact, both references disclose all limitations of the asserted claim, as proved by the references themselves, detailed expert reports, and even sworn concessions from ADASA's own fact and expert witnesses, all of which the District Court summarily dismissed as though they posed no real issue. By summarily deciding validity for ADASA, the Distrit Court denied Avery Dennison the benefit of inferences that were at least reasonable, if not inescapable. Read fairly, the record surrounding this prior art should invalidate the '967 Patent's claimed monopoly over the idea of further sub-dividing identifier numbers. At the very least, however, a jury should decide for itself factual and testimonial questions that the cited prior art poses on invalidity.

In addition to denying the jury its fair say on invalidity, the District Court also skewed the jury's assessment of damages in two crucial respects. First, the court committed legal error when, after admitting *lump-sum* licenses offered by ADASA, it improperly refused Avery Dennison's requests that the the jury be instructed on the prospect of *lump-sum* damages. Therefore, despite learning that ADASA had entered into licenses for related technology in flat amounts of $500, $7,000, and $50,000, the jury was told that it *must* employ a per-unit royalty rate when calculating damages, which led it to award $26,640,876 for ADASA. Because the licenses that ADASA offered as comparable all involve lump sums, the jury arguably should have been

instructed *only* in terms of a lump sum; by no means, however, was it proper for the District Court to leave the jury blind to its ability to award a lump sum. Second, the prejudice was compounded by the District Court's exclusion of two comparable licenses that Avery Dennison and its expert offered. The jury was thus precluded from considering licenses that could have yielded a fractional award. These prejudicial errors inflated the damages and independently warrant a new trial.

Finally, the District Court further erred and abused its discretion when it sanctioned Avery Dennison **more than $20 million** post-trial for inadvertently overlooking a subset of accused RFID tags. Shortly following the jury's verdict, Avery Dennison discovered and self-reported the omitted tags (as calculated by Ernst & Young auditors whom Avery Dennison specially retained for this purpose), while protecting ADASA against any prejudice by stipulating to apply the jury's royalty rate to the expanded royalty base. Without any briefing as to the form or size of the sanction, without evidence of any prejudice to ADASA, and without any of the findings that the Ninth Circuit has held prerequisite to such a drastic sanction (which amounts to a terminating sanction that treats ADASA's claim as valid, infringed, and subject to a heightened running royalty), the District Court imposed a $20 million sanction, calculated on the basis of every tag deemed to be infringing, most of which had been properly disclosed. The court thereby compounded the jury's already-outsized award by more than 50%, designedly inflating the royalty rate chosen by the

jury and starkly departing from all precedent of which counsel is aware.

It bears emphasizing that no finding of willfulness, bad faith, or other misconduct accompanies this unprecedented sanction—nor could one, given that the oversight was self-reported and self-corrected by Avery Dennison at its own painstaking expense. To be clear, Avery Dennison continues to apologize for and regret its discovery lapse, and it has stipulated to pay for it so long as foundational premises of the jury's award stand. But settled law, including the U.S. Constitution, simply does not permit the District Court passingly to invoke Rule 37 as a basis for drastically compounding a jury's verdict. These sanctions would cry out for vacatur even if nothing else did.

## JURISDICTIONAL STATEMENT

This appeal was timely noticed on October 22, 2021 from the October 14, 2021 Final Judgment. The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338, and this Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1. Did the District Court commit legal error by summarily ruling that Claim 1 of ADASA's '967 Patent is eligible under Section 101 of the Patent Act, notwithstanding that it rests upon the abstract idea of further subdividing an already-divided serial number on a conventional RFID tag?

2. Did the District Court commit legal error by summarily ruling as a matter of law that Claim 1 of ADASA's '967 patent is not invalid over two cited pieces of prior art whose teachings incontestably, or at least plausibly, render it anticipated and/or obvious?

3. Did the District Court commit legal error by refusing to instruct the jury on its ability to award any damages in the form of a lump sum, notwithstanding that record evidence—in the form of purportedly comparable licenses—specifically supported lump-sum licensing?

4. Did the District Court abuse its discretion by excluding from evidence comparable licenses offered by Avery Dennison and its expert?

5. Did the District Court err by imposing a Rule 37 sanction of more than $20 million (calculated by crediting ADASA's claim and then applying an enhanced running royalty to it) to address the inadvertent omission of accused products from discovery, after Avery Dennison self-reported its omission and stipulated to remedy it by expanding the operative royalty base?

# STATEMENT OF THE CASE

## I. FACTS

### A. The Parties

Plaintiff-Appellee ADASA is a Eugene, Oregon corporation and the assignee of the '967 Patent. Appx1932-1933. By its own admission, it does not sell products that practice that patent. Appx14759-14760, Appx15034-15035. Defendant-Appellant Avery Dennison is a multinational manufacturer of RFID tags, labels, and graphic materials across a range of uses and customers, from retail tags on clothes to special labels affixed to blood bags in cold environments. Appx15611.

### B. The '967 Patent

Following reexamination in 2018, Claim 1 of the '967 Patent (the only claim asserted at trial) recites

> An RFID transponder comprising:
>
> a substrate;
>
> an antenna structure formed on the substrate; and
>
> an RFID integrated circuit chip which is electrically coupled to the antenna structure,
>
> wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space,
>
> wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits,

> wherein the unique serial number space comprises the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block and of remaining bits of lesser significance that together comprise the one serial number instance.

Appx101.

The Patent's Background section acknowledges that all elements of this claim until the second "wherein" clause were known in the prior art. Specifically, it describes "[r]adio-frequency identification (RFID) transponders, typically thin transceivers that include an integrated circuit chip having radio frequency circuits, control logic, memory and an antenna structure mounted on a supporting substrate," along with "[c]ommissioning, the process of encoding specific information (for example, data representing an object identifier, the date-code, batch, customer name, origin, destination, quantity, and items) associated with an object (for example, a shipping container), [which] associates a specific object with a unique RFID transponder." Appx81 col. 1:40-50.

At claim construction, the parties agreed on, and the District Court adopted, relevant constructions, including

| **Term** | **Construction** |
|---|---|
| object class information space | data field within the memory of the RFID integrated circuit chip for information identifying the class of an object, such as a company prefix, item reference code, partition value, and/or filter value |
| unique serial number space | data field within the memory of the RFID |

| | |
|---|---|
| | integrated circuit for information identifying a unique serial number |
| being assigned a limited number of most significant bits | includes a limited, predefined sequence of higher order bits at the leading end |
| remaining bits of lesser significance | the remaining lower order bits at the trailing end |

Appx831.

## II. PROCEDURAL HISTORY

### A. Complaint And Early Motions Practice

This litigation began in October 2017, when ADASA filed suit in the District of Oregon alleging that Avery Dennison infringed the ’967 Patent. Appx102. The case was assigned to Magistrate Judge Thomas Coffin, and the parties consented to the Magistrate Judge’s authority over all proceedings, subject to appeal directly to this Court. Appx158, Appx379-380.

The parties addressed their initial filings to Magistrate Judge Coffin. These included claim-construction submissions, *e.g.* Appx384, Appx480, and Avery Dennison’s Rule 12(c) motion contending that the ’967 Patent is ineligible for patenting under Section 101. Appx199-203, Appx225-233, Appx236-244, Appx262-268. After Magistrate Judge Coffin resolved claim construction, Appx829-837, the case was transferred to Magistrate Judge Mustafa Kasubhai. Appx838.

Following amendment by ADASA, Magistrate Judge Kasubhai denied Avery Dennison’s Rule 12(c) motion as moot. Appx839, Appx904. As discovery and motions practice proceeded, Avery Dennison filed additional motions under Rule

12(c) and Rule 56, all of which were denied. *See* Appx3200-3235. ADASA filed its own motions under Rules 12(c) and 56, each of which was granted. *See id.*

**B. Summary Judgment And Pre-Trial Orders**

Subsequently, both parties again sought summary judgment. ADASA moved for both a finding that all accused products infringed the '967 Patent and for a ruling that the '967 Patent was valid over two pieces of prior art, U.S. Patent No. 8,857,221 to Kuhno (the "Kuhno Patent") and the book *RFID for Dummies*. Appx3249-3274. Avery Dennison sought judgment of non-infringement and, alternatively, invalidity, both because the asserted claims were abstract ideas and because they were obvious in light of prior art that Paxar Corp. (now part of Avery Dennison) had used to assign unique serial numbers to Adidas shoes. Appx4260-4276.

The District Court granted the portions of ADASA's motion related to validity, granted ADASA's motion related to infringement almost entirely, and denied Avery Dennison's motion *in toto*. Appx6117-6149.

The District Court briefly explained, in three pages, why it was rejecting Avery Dennison's challenge under Section 101. Appx6129-6132. After reciting the test from *Alice Corp Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014), the District Court first ruled that it could read the specification and claims of the '967 Patent together to provide the requisite inventive content. Appx6130-6131. It then cited a portion of a declaration from Dr. Daniel Engels, one of ADASA's experts, which addressed

*infringement*, as "testi[mony] that the claims encompass binary encoding." Appx6131; *see* Appx5232-5234. After quoting from the '967 Patent's specification to rule "that the claims may effect quasi-autonomous encoding operations," the District Court concluded its analysis by again relying on Dr. Engels's testimony that the '967 Patent's "memory structure accommodat[es] a specific hardware-based number scheme." Appx6131-6132. Apart from citing precedent for the proposition that it could consider contents outside the patent claims, the District Court did not cite any decision to support its analysis under Section 101.

Following trial, the District Court announced that, by denying Avery Dennison's motion under Section 101, "the Court effectively granted summary judgment for Plaintiff as to the validity claim. Moreover, at oral argument, the Court made clear that its prior ruling answered the question of validity in Plaintiff's favor." Appx14615 (citation omitted). In other words, any argument under Section 101 was resolved against Avery Dennison on summary judgment, as further confirmed by an *in limine* order prohibiting Avery Dennison from questioning eligibility at trial. Appx7398-7399, Appx9476-9478.

The District Court likewise ruled on summary judgment that neither Kuhno nor *RFID for Dummies* could be used to challenge validity, granting ADASA's motion to remove both pieces of prior art from trial. Appx6132-6138. After reciting the standards for anticipation and obviousness under Sections 102(b) and 103, the District

Court devoted a couple of pages apiece to resolving all arguments about each reference. Appx6134-6138. For both, the District Court credited and quoted extensively from Dr. Engels' (ADASA's expert) report while dismissing the opinions from Patrick Sweeney (Avery Dennison's expert) as "conclusory." *Id.* In doing so, the District Court lumped together two distinct opinions that Mr. Sweeney offered about the two different pieces of prior art, ruling simply that his opinions about *RFID for Dummies*, a text that he wrote, were insufficient "[f]or the same reasons as discussed above under the [Kuhno] '221 Patent." Appx6137. Despite acknowledging that Avery Dennison had also cited concessions from ADASA's witnesses as posing genuine issues, the District Court credited ADASA's interpretations and explanations as basis for summary judgment.

The District Court simultaneously granted ADASA judgment on infringement as to one set of accused products in their entirety and as to the other set on all but one limitation of Claim 1. Appx6138-6148. The District Court rejected as "irrelevant" Avery Dennison's argument that it did not infringe by assigning serial numbers in decimal, not binary, format "because a fully encoded RFID tag can only physically be encoded in binary." Appx6140. In that same opinion, however, the District Court relied on precisely that distinction to establish the validity of Claim 1 over prior art, quoting ADASA's expert: "[i]n *RFID for Dummies*, the decimal serial number would be converted from decimal to binary for encoding on an RFID tag. The only

consideration of the binary numbers is the conversion from the decimal representation." Appx6136. With *RFID for Dummies* removed from trial, Avery Dennison was prevented from noting to the jury the inconsistency between ADASA's theories of infringement and validity.

Beyond granting ADASA summary judgment, the District Court also granted ADASA's motion to exclude the admission of, or any testimony about, two licenses that Avery Dennison's experts cited as comparable, one between Avery Dennison and Intermec and another between Avery Dennison and Round Rock. Appx9477. These licenses were addressed in reports by both Mr. Sweeney and David Yurkerwich, another Avery Dennison expert; the latter detailed and accounted for similarities and differences between the portfolios of intellectual property rights licensed in those agreements as compared to the '967 Patent. Appx6262-6270, Appx6270, Appx6284-6289. The District Court nonetheless excluded the licenses, based solely on "reasons outlined in plaintiff's briefing." Appx9477.

**C. Trial**

Following the pre-trial rulings, trial was largely limited to (1) whether an unadjudicated subset of accused RFID tags practiced one identified limitation of Claim 1 of the '967 Patent, and (2) damages. *See, e.g.*, Appx14753.

On damages, ADASA offered and the District Court admitted three comparable licenses, each between ADASA and a counterparty for rights to another patent in the

same family. *See* Appx15083. One, between ADASA and Agron, Inc., was for a flat sum of $7,000 and immunized Agron against any infringement claims for "past, present or future business activities … performed to meet the specifications, requests or requirements of a [Agron] customer." Appx15951. ADASA's damages expert called this a "lump-sum agreement" and admitted "there would be no royalty" associated with any future use of ADASA's covered intellectual property. Appx15210, Appx15212, Appx15231. A second license, between ADASA and Goodyear Tire & Rubber Company, was likewise for a flat sum of $50,000 and earned Goodyear "a perpetual, paid-in-full, non-exclusive license of the Patent Rights" in the '967 Patent's family. Appx15938. The third, between ADASA and Polk Audio Inc., was also for a flat sum of $500. Appx15944.

Avery Dennison's damages expert Mr. Yurkerwich explained how the fact that "each of the licenses was entered into for a single payment" informed his application of the *Georgia-Pacific* factors. Appx15646. He attested to the differences between "lump-sum licenses" and "running royalty" licenses, Appx15647, explained why the exclusively lump-sum licenses in the record meant "there is no evidence of a running royalty," Appx15655, and on cross-examination explained that he left "in the hands of the jury" "what the amount would be at this hypothetical negotiation," without "offer[ing] a running royalty opinion in [his] report." Appx15688.

Consistent with the evidence, Avery Dennison requested that the District Court

instruct the jury on the option of lump-sum damages and use a verdict form so allowing. Appx15716-15718. As the District Court recognized, Avery Dennison's request "rel[ied] on the licensing agreements and the plain languge of the licensing agreements." Appx15717. The next day, Avery Dennison reiterated its request, pointing out that "the documentary evidence in the case … is, … those three licenses. So the fact that the three licenses—Agron, Goodyear, and Polk Audio—are lump-sum licenses means that there is evidence … the jury … could use as a basis to award a lump-sum damage amount." Appx15736; *see* Appx15735-15747

But the District Court denied Avery Dennison's request, agreeing with ADASA that a bracketed comment in the Federal Circuit Bar Association's pattern instructions should be taken as barring the instruction unless an expert has expressly advocated for lump-sum damages. Appx15738, Appx15747. As a result, the *only* way this jury was instructed to award damages was through a running royalty. Appx15788-15795. And the Court gave the jury a verdict form that *required* it to calculate "Running Royalty" damages by multipying a "Total #" of infringing tags by a "Royalty Amount per RFID tag" to reach the "Total reasonable royalty." Appx11532-11534.

Following those instructions, on May 14, 2021 the jury returned a verdict awarding ADASA damages based on a per-unit royalty rate. Appx11533. While cutting in half the $.0090 royalty rate urged by ADASA, the jury applied its rate of $.0045 to the 5,920,417,056 tags determined to infringe (some by the District Court

and others by the jury) to arrive at an award of $26,641,876.60. *Id.*

### D. Post-Trial Proceedings And Sanctions

On June 10, 2021, four weeks after trial concluded, counsel for Avery Dennison wrote to counsel for ADASA to report that Avery Dennison had identified additional, previously-undiscovered, programs, or "schemas," that might have encoded additional RFID tags with the same features as those found to infringe. Appx14010-14011. Avery Dennison disclosed how it was identifying all such schemas and confirmed that it would stipulate "that any such transponders be included in the damages number." Appx14011, Appx14034.

Avery Dennison hired an independent auditor, Ernst & Young, to extract the data and analyze whether any transponders shared the qualities of the tags that the District Court or jury had deemed infringing. Appx14169-14173. That analysis was time- and resource-intensive, and led Ernst & Young to conclude that the late-discovered materials included 2,092,742,863 such tags. Appx14190-14194. Per instructions from Avery Dennison, Ernst & Young left undisturbed a substantial over-count that it identified in the calculation of 5,920,417,056 tags reflected in the trial record and relied upon by the jury, and instead simply added the newly-discovered 2,092,742,863 tags to that total. Avery Dennison submitted Ernst & Young's results to ADASA and the District Court as soon as they were available, in September 2021, and reiterated that it "consent[ed] to the addition of those [tags] to the judgment,

subject to the reservation of its rights to appeal." Appx14173.

Before Ernst & Young returned its analysis (which Avery Dennison had already stipulated would be used to increase the damages award), ADASA moved for sanctions. Appx13734-13736. In its briefing, ADASA did not specify the sanction it sought, but instead indicated it would do so after an evidentiary hearing. Appx13736. Elsewhere in its post-trial briefing, ADASA cited Avery Dennison's discovery oversight as a basis for (1) attorney's fees, Appx13750, (2) a 9% rate of post-judgment interest, Appx13802, and (3) an increased royalty rate for any infringement not covered by the jury's verdict, Appx13834—all of which the District Court proceeded to award, citing Avery Dennison's self-reported discovery lapse as part of its justification. Appx2-4, Appx14607, Appx14625.

The Court held two hearings to address sanctions, in September and October 2021. Appx14210, Appx14511. At the latter, Avery Dennison explained that it had produced in discovery what it believed to be "a complete list of every schema in use by Avery Dennison anywhere in the world since January 1st of 2018." Appx14518. Unfortunately, that list had been derived solely from an internal Avery Dennison database called Serialization Manager, which did not encompass a separate repository called D2Comm. Appx14518-14520. The omission of D2Comm schemas then passed unnoticed throughout discovery and trial, resulting in a spreadsheet that was used at trial to prove the royalty base and "only contain[ed] programs running on

Serialization Manager," without "includ[ing] programs running on D2Comm." Appx14518-14519. As submitted below and reiterated here, Avery Dennison and its counsel take "full responsibility for the failure to have performed an appropriate analysis of the D2Comm data during the litigation." Appx14519.

On October 14, 2021, the District Court entered Final Judgment for ADASA. Appx2-4. It adopted Avery Dennison's stipulation to increase the size of the jury's award by $9,417,343 to account for the late-discovered tags,[1] bringing the total award to $36,059,220, and it resolved all post-trial motions in favor of ADASA, subject to "a formal written opinion to follow." Designating this as an "exceptional case" under 35 U.S.C. § 285, the District Court awarded the full $2,250,000 ADASA sought in attorney's fees. It also granted ADASA an ongoing royalty rate of $0.009, twice the jury's rate and higher than the $0.0075 ADASA requested. It granted ADASA's request for pre-judgment interest at Oregon's statutory rate of 9%, rather than at the T-Bill rate that applies post-judgment under 28 U.S.C. § 1961. And the court further added sanctions in the amount of $20,032,889.80, indicating its precise justification would follow. Avery Dennison promptly noticed its appeal to this Court on October 22, 2021. Appx14591-14592.

---

[1] Avery Dennison's stipulation is subject to its express reservation of rights to continue challenging liability and damages post-trial and on appeal. Appx14173, Appx14588.

Two months later, on December 15, 2021, the District Court issued a post-judgment opinion explaining its decision on sanctions and other post-trial issues. Appx14601-14628. To help justify its award of attorney's fees to ADASA, it cited Avery Dennison's "conduct regarding discovery"; similarly, to justify enhancing the jury's royalty rate for purposes of the ongoing royalty, the court again cited Avery Dennison's "disclosure of substantially more infringing tags post-trial." Appx14607, Appx14625.

To justify its sanction, the District Court invoked Rule 37 and "conclude[d] that a sanction tied to the number of infringing tags determined to exist as of the date of the verdict is an appropriate, reasonable, and proportionate method for sanctioning Defendant." Appx14626-14627. But it did not explain why a discovery sanction would be tied to the ensuing liability determination. Nor did it specify how it arrived at its heightened royalty rate (which, at $0.0025 per tag, reflected more than a 50% increase above the jury's rate), identify any remaining prejudice to ADASA, or discuss whether lesser sanctions would suffice. Appx14625-14628. It justified its decision to calculate a sanction based on all tags deemed infringing (not just the late-discovered minority) by referencing an "unknown number of tags for which this Court has little confidence Defendant will confirm existed at the time of trial but did not produce," Appx14627—thereby defying uncontradicted record evidence, including Ernst & Young's rigorous, uncontested analysis and attestations, Appx14175-14209,

and the parties' "agreement on the number of tags and corresponding dollar amount that should be included in the final judgment based on the jury verdict and the additional tags identified by Avery Dennison and Ernst & Young." Appx14588. All told, three pages of analysis purport to explain why the District Court imposed a $20,032,889.80 sanction under Rule 37.

## SUMMARY OF THE ARGUMENT

This Court should reverse the judgment below because Claim 1 of the '967 Patent is invalid as a matter of law under Sections 101, 102, and 103. Alternatively, it should vacate the judgment and remand so a new jury can evaluate Avery Dennison's anticipation and obviousness arguments for the first time, evaluate crucial damages evidence that was improperly excluded, and decide damages in light of a correct statement of the law. Whatever else this Court decides, however, it should vacate the $20 million sanction under Rule 37, which is incompatible with controlling precedent and reflects an abuse of discretion.

Under Section 101, ADASA's abstract idea of sub-dividing one portion of an already-divided data field is ineligible for patenting. Abstract ideas like "dividing … data into sequences of bits" are "mental processes" and thus "a telltale sign of abstraction." *PersonalWeb Technologies LLC v. Google LLC*, 8 F.4th 1310, 1315-16 (Fed. Cir. 2021). The '967 Patent claims no invention beyond the type of data management that this Court has held cannot be monopolized, and the District Court

erred by ruling the opposite on summary judgment.

Under Section 102 and 103, the District Court further erred by granting ADASA summary judgment against two key pieces of prior art, Kuhno and *RFID for Dummies*. Both references include all elements of the ’967 Patent, as confirmed by testimony from Avery Dennison’s experts as well as ADASA’s own witnesses—all of which were improperly dismissed. At a minimum, this art presented genuine factual issues on anticipation and obviousness that should have gone to the jury.

The damages award is independently infirm. The District Court violated controlling precedent when, over Avery Dennison’s objections, it dictated that the jury award damages in the form of a running royalty rate, notwithstanding that the only licenses in the record are for lump sums. Compounding the prejudice, the District Court improperly excluded each of two comparable licenses offered by Avery Dennison’s experts, invoking grounds that go at most to weight, not admissibility.

In all events, this Court should vacate this unprecedented sanction under Rule 37. Not only did the court below fail to make findings that the Ninth Circuit has held prerequisite to such drastic sanctions, but the record cannot support such findings, especially given the ready availability of lesser penalties, including penalties (like attorney’s fees) that were in fact simultaneously imposed. Moreover, the District Court’s approach poses constitutional offense by denying Avery Dennison due process and effectuating additur that usurps the jury’s role. An acknowledged

discovery lapse that Avery Dennison self-reported and went to great lengths to rectify in good faith should not, absent any demonstrated prejudice to ADASA, be taken as adequate basis for imposing a Rule 37 sanction exceeding $20 million.

## ARGUMENT

### I. STANDARDS OF REVIEW

This Court reviews *de novo* all questions of law, including "the district court's ultimate patent-eligibility conclusion" under Section 101, *PersonalWeb*, 8 F.4th at 1315, grants of summary judgment, *see Bayer Healthcare Pharms., Inc. v. Watson Pharms., Inc.*, 713 F.3d 1369, 1373 (Fed. Cir. 2013), the sufficiency of jury instructions on issues of patent law, *see Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1225 (Fed. Cir. 2014), and legal issues underlying sanctions orders, *see SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1385 (Fed. Cir. 2013); *R&R Sails, Inc. v. Ins. Co. of Penns.*, 673 F.3d 1240, 1245 (9th Cir. 2012). This Court reviews evidentiary questions and standard rulings concerning discovery for abuse of discretion. *SynQor*, 709 F.3d at 1380; *Wagner v. Cty. of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013); *R&R Sails*, 673 F.3d at 1245.

### II. THE '967 PATENT CLAIMS INELIGIBLE SUBJECT MATTER AND IS INVALID UNDER SECTION 101

Because the '967 Patent claims the abstract idea of assigning one prescribed meaning to a sub-section of a data field, the District Court erred by ruling it valid as a matter of law under Section 101. Mentally partitioning data fields and assigning

different meaning to different portions is an idea that is every bit as abstract as it is familiar. Yet the ’967 Patent does nothing more than sub-divide a standard portion (the serial number) of a conventional data structure (a string of binary data) encoded in a conventional manner on a conventional device (an RFID tag). Nor does the fact that the ’967 Patent claims an apparatus change the analysis; the abstract idea remains no less abstract when interlaced with generic hardware like RFID tags. Section 101 simply does not permit ADASA or anyone else to monopolize such an abstract idea. Performing *de novo* review, this Court should hold the ’967 Patent invalid for failing to claim patent-eligible subject matter.

### A. The Claimed Advance Over The Prior Art Consists Of Abstract Sub-Division Of An Already-Partitioned Data Field

“[A]bstract ideas are not patentable.” *Alice*, 573 U.S. at 216. “This exception reflects the ‘concern that patent law not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity.’” *PersonalWeb*, 8 F.4th at 1314 (quoting *Alice*, 573 U.S. at 216). Abstract ideas are excluded from patent eligibility “even if the particular … abstract idea at issue is narrow.” *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014).

Under *Alice*, the Court employs a two-step process to determine whether a patent claims ineligible subject matter like an abstract idea. At the first step, the Court decides “whether the patent-ineligible concept is what the claim is directed to.” *PersonalWeb*, 8 F.4th at 1315 (quotations omitted). This entails “evaluat[ing] the

focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter." *Id.* (quotations omitted).

The '967 Patent's claimed advancement over the prior art consists of mentally sub-dividing one section of an already-divided piece of data. It is undisputed that RFID tags consisting of a substrate, an antenna, and a chip were utterly conventional prior to the '967 Patent. Appx81 col. 1:40-50. It was equally conventional, all agree, to encode those chips with "unique object numbers" divided into "an object class information space and a unique serial number space." *See* Appx14817. Per ADASA's owner and the '967 Patent's inventor, "EPC had taught us that here is a system and here is a serial number space … And they talked about ways that you could break things up in blocks or whatever." Appx15026. The only purported advancement of the asserted claims concerns *how* "the unique serial number space" is composed—specifically, the claim teaches further sub-dividing the serial number into some number of "most significant bits" at the left, leading edge, and "remaining bits of lesser significance" trailing to the right. Appx831.

Sub-dividing the sections of an "object number" does not yield any physical difference in an RFID tag: whether the "object number" is framed as having six, seven, or twenty separate partitions, a 96-bit data structure remains, physically, the same 96 bits encoded as ones or zeroes. *E.g.*, Appx228-230. Partitioning those locations into different sections is an abstract process, and a familiar one at that. In

the core case of the prior art EPC SGTIN-96 structure for creating "unique object numbers," the first 58 bits constitute the "object class information space," and the remaining 38 bits are the "unique serial number space." Appx84 col. 8:16-36. Under this industry-standard approach, the 58-bit "object class information space" has long been sub-divided: the first 8 bits are allocated as header, then 3 bits as filter, 3 bits as partition, between 20 and 40 bits for the company creating the product, and between 4 and 24 bits for the type of product. Appx228, Appx14865-14869, Appx14912-14914. Thus, such partitioning of serial numbers is a familiar abstraction that is baked into preexisting global standards.

All Claim 1 does is refine the abstraction. A sub-divided 38-bit "unique serial number space" is no less abstract as a means of arranging and understanding binary data than the sub-divided 58-bit "object class information space" has always been. This additional sub-division of data is what "the claim's character as a whole is directed to." *PersonalWeb*, 8 F.4th at 1315. Indeed, ADASA's counsel and witnesses consistently trumpeted this "additional hierarchy" in the serial number portion of an identifier as the defining advance over prior art. *E.g.*, Appx14890; *see also* Appx783 (Claim Construction Oral Argument) ("And so what he did was he split up the serial number into two different sections."). Likewise, ADASA's expert witness and the '967 Patent's inventor each testified that the invention was directed at communicating information by sub-dividing the serial number. *E.g.*, Appx14819 ("I want to be able

to store a little bit of information in the number itself"); Appx14890 (the subject invention was "partitioning the [serial number] space and specifically looking at storing information in the most significant bits and then having a separate partition in the least significant bits").

This Court has already held that assigning meaning to a sub-section of a data field is an abstract idea ineligible for patenting. Especially instructive is the Court's recent decision in *PersonalWeb Technologies LLC v. Google LLC*, 8 F.4th 1310 (Fed. Cir. 2021). There, the claims "relate[d] to data-processing systems that assign each data item a substantially unique name that depends on the item's content—a content-based identifier." *Id.* at 1312. This Court held the asserted claims unpatentably abstract even accepting the patentee's argument that the claims recited "(1) dividing the data into sequences of bits, (2) calculating content-based identifiers using the data in the data items, (3) comparing the identifiers against a plurality of other identifiers in the network, and (4) using the results to identify, access, authorize access, or manage the number of copies of data items within the network." *Id.* at 1315. Those, this Court noted, "are mental processes that can be performed in the human mind or using a pencil and paper—a telltale sign of abstraction." *Id.* at 1316 (cleaned up). Fortifying the Court's conclusion were three prior cases agreeing that "the use of a content-based identifier" is impermissibly abstract. *Id.* (collecting cases).

Not only does the same conclusion follow here, but the instant claims are, if

anything, *more* abstract. Whereas the claims invalidated in *PersonalWeb* related to the use of identifiers to manage data, the ’967 Patent claims only the first of the *PersonalWeb* patent’s multiple functions—“dividing the data into sequences of bits.” Given that dividing data into sequences of bits is abstract when done in service of claimed uses for that data, per *PersonalWeb*, such divisions are surely abstract when, as here, they are untethered to any particular use at all.

Serial precedents align. This Court has repeatedly “determined that claims directed to the collection, storage, and recognition of data are directed to an abstract idea.” *Smart Systems Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1372 (Fed. Cir. 2017) (collecting cases). In *Content Extraction & Transmission LLC v. Wells Fargo Bank, National Association*, 776 F.3d 1343 (Fed. Cir. 2014), the Court invalidated a patent that claimed extracting data from a document, entering the data into appropriate data fields, and storing the data in memory; along the way, the Court rejected any notion that claims are not abstract because human minds cannot process and recognize streams of bits. *See id.* at 1345-47. The ’967 Patent is directed, at most, to the latter two abstract ideas of encoding data into an appropriate memory location of a conventional RFID tag. *Id.* at 1347.

In *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 850 F.3d 1332 (Fed. Cir. 2017), the asserted claim “create[d a] dynamic document based upon ‘management record types’ (‘MRTs’) and ‘primary record types’ (‘PRTs’),” two

terms "[t]he inventor coined ... to describe the organizational structure of the data at issue." *Id.* at 1339. Just as those claims were "at their core, directed to the abstract idea of collecting, displaying, and manipulating data," *id.* at 1340, it is similarly abstract to divide a serial number into sections that the '967 Patent's inventor describes as "most significant bits" and "remaining bits of lesser significance."

In *Secured Mail Solutions LLC v. Universal Wilde, Inc.*, 873 F.3d 905 (Fed. Cir. 2017), this Court invalidated as abstract a patent that claimed a barcode identifier consisting of "a single set of encoded data that is generated by concatenating a sender-assigned unique identifier with sender data, recipient data, and shipping method data." *Id.* at 907, 910. The claimed invention of the '967 Patent is also concatenated content ("most significant bits" and "remaining bits of lesser significance"), which is no less abstract in the context of RFID tags than it is in the context of barcodes. *Cf.* Appx14811-14818 (ADASA's expert explaining how barcodes and RFID tags have each been used to communicate identifier numbers).

A wealth of precedent backs this basic accord. *See, e.g., Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1353 (Fed. Cir. 2021) (claims directed to the "abstract idea of collecting and examining data to enable authentication" are unpatentable); *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326-27 (Fed. Cir. 2017) (claims directed to the abstract idea of "encoding and decoding image data" are unpatentable); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344,

1350 (Fed. Cir. 2014) (claims directed to the abstract idea of "a process of organizing information through mathematical correlations" are unpatentable).[2]

Nor can ADASA transform mere sub-division of data into a concrete, patent-eligible invention merely by referencing the generic "hardware" involved. Although the '967 Patent claims an apparatus and describes the familiar elements of a conventional RFID tag, this "does little more than restrict the invention's field of use. Such limitations do not render an otherwise abstract concept any less abstract." *Intellectual Ventures I*, 850 F.3d at 1340. That the RFID tag recited in Claim 1 "necessarily exists in the physical, rather than purely conceptual, realm is beside the point." *Alice*, 573 U.S. at 224 (cleaned up). Accordingly, the District Court erred by relying on ADASA's expert's description of the claims as "directed to an encoded RFID transponder implemented with a memory structure accommodating a specific hardware-based number scheme" to rule for ADASA under Section 101. Appx6132.

Neither does it matter that the claims dub the leading bits of the sub-divided serial number to be the "most significant bits." Label notwithstanding, that partition need not correspond to any particular information, nor need it consist of any particular number of bits. Appx101, Appx14921. Even if designating a pre-existing section of

---

[2] Although *Digitech* predated *Alice* and did not expressly follow the resulting two-step analysis, it illuminates how and why any such abstract idea is ineligible for patent eligibility.

bits could qualify as including "data structures [that] add a degree of particularity to the claims," the key point is that "the underlying concept embodied by the limitations merely encompasses the abstract idea itself." *Intellectual Ventures I*, 850 F.3d at 1341.

Layered atop this consistent precedent is the printed-matter doctrine, whereby "a claim may be found patent ineligible under § 101 on the grounds that it is directed solely to non-functional printed matter and the claim contains no additional inventive concept." *C R Bard Inc. v. AngioDynamics, Inc.*, 979 F.3d 1372, 1383 (Fed. Cir. 2020). "Claim limitations directed to the content of information and lacking a requisite functional relationship are not entitled to patentable weight because such information is not patent eligible subject matter under 35 U.S.C. § 101." *Praxair Distribution, Inc. v. Mallinckrodt Hosp. Prod. IP Ltd.*, 890 F.3d 1024, 1032 (Fed. Cir. 2018).

The limitations of Claim 1 are directed exclusively to the content of information encoded into bits that make up the serial number space on an RFID tag. They do not disclose any new functionality or actions within any computer system; they simply require that the memory bits be allocated in a particular manner. There is no "interact[ion] with the other elements of the claim to create a new functionality in a claimed device or to cause a specific action in a claimed process," as would be required in order for informational content to merit patentable weight. *C R Bard*, 979

F.3d at 1381. Far from being changed by the claimed invention, the resulting RFID tag has the same function as any other; nothing in the '967 Patent claims using the "most significant bits" portion of a serial number to trigger some specific action. *See, e.g.*, U.S. Patent & Trademark Office, Manual of Patent Examining Procedure § 2111.05 (9th ed., rev. 2019) ("[W]here … the computer-readable medium merely serves as a support for information or data, no functional relationship exists.").

It follows that the District Court erred at *Alice* step one when it granted ADASA summary judgment of validity under Section 101. Notably, the court ruled as it did without citing *any* of this Court's precedent in similar Section 101 cases, notwithstanding this Court's recognition that "the decisional mechanism courts now apply [to the *Alice* analysis] is to examine earlier cases in which a similar or parallel descriptive nature can be seen—what prior cases were about, and which way they were decided." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016).

The closest the court below came to accounting for this Court's precedent was citing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), which the District Court cited simply as support for considering "both the claim language and the specification" in conducting its inquiry. Appx6130-6131. Even assuming the court meant to invoke *Enfish*'s substantive holding under *Alice*, that would have been misconceived, as *Enfish* involved a patentable improvement in how a computer

*functions*—precisely the sort of functional improvement that the ’967 Patent lacks. *See* 822 F.3d at 1335-36. This Court has already pinpointed why ADASA’s generic references to the “efficiency” of its claimed partitioning of a familiar binary field differ categorically from the inventive use of self-referential tables in *Enfish*. *See Secured Mail*, 873 F.3d at 910 (“The fact that an identifier can be used to make a process more efficient ... does not necessarily render an abstract idea less abstract.”).

### B. The ’967 Patent’s Claims Do Not Identify Any Inventive Concept In Sub-Dividing An Already-Partitioned Data Field

Because the ’967 Patent is directed at patent-ineligible subject matter, the dispositive question arises under *Alice*’s second step, which “‘examine[s] the elements of the claim to determine whether it contains an “inventive concept” sufficient to “transform”’ the claimed ineligible subject matter into a patent-eligible application.” *C R Bard*, 979 F.3d at 1382 (quoting *Alice*, 573 U.S. at 221). This step “looks with more specificity at what the claim elements add, in order to determine whether they identify an ‘inventive concept’ in the application of the ineligible subject matter to which the claim is directed.” *Id.* at 1382-83 (cleaned up). “This inventive concept must do more than simply recite well-understood, routine, conventional activity.” *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016) (cleaned up).

The inquiry is further narrowed by the specification of the ’967 Patent, which acknowledges that an RFID transponder and all of its components, encoded with a

unique object number, were already known. Appx81 col. 1:40-50. The only purportedly novel limitations involve partitioning the already-familiar serial number section of the unique object number. *See Content Extraction*, 776 F.3d at 1348 (using generic equipment to perform "well-understood, routine, and conventional activities commonly used in industry" does not supply an inventive concept). But that same partitioning is the very thing that is abstract at step one.

Nor, contrary to the District Court's premise, may ADASA resort to the "patent's specification … to find an inventive concept." *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1322 (Fed. Cir. 2016). According to the court below, the specification's teaching of "quasi-autonomous encoding" helps render the subject claims non-abstract. Appx6131. But while quasi-autonomous encoding may be one "preferred embodiment," *id.*, no such limitation is found in the asserted claim, which controls the patent-eligibility analysis. Moreover, ADASA successfully emphasized that "quasi-autonomous commissioning is not the focus here," Appx298, and persuaded the District Court *not* to require quasi-autonomous encoding at claim construction. *See* Appx832-836 (rejecting proposed construction that required product's serial number to be stored by an encoder capable of quasi-autonomous encoding, partially because ADASA's re-examination reflects "little to no discussion of continuous connection to a central database, autonomous or quasi-autonomous encoding, or how the allocated block is derived or assigned"). Because quasi-

autonomous encoding is not required by Claim 1, settled law forecloses it from altering the analysis under Section 101. *See, e.g.*, *Intellectual Ventures I*, 838 F.3d at 1322; *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016).

There is nothing new or inventive about sub-dividing "unique object numbers" of the sort contemplated by the '967 Patent. Cars have 17-digit VIN numbers, allocated into portions corresponding to, *e.g.*, the manufacturer, the plant where the car was manufactured, and a serial number.[3] Credit cards have between 8 and 19 digits, the first 6 or 8 of which identify the issuer, with most of the remainder identifying the user's account.[4] Books are identified by 13-digit ISBN numbers, including sections dedicated to the language or country of origin, the publisher, and the title.[5] But patent law does not invite someone to patent the idea, for instance, of a car bearing a VIN number in which the first digit of the serial number section is allocated to denote the car's original color; or of a credit card stamped with a card number in which the first digit of the account portion denotes whether there is an

---

[3] *See* Int'l Org. for Standardization, *ISO 3779: Road vehicles—Vehicle identification number (VIN)—Content and structure*, 2 (4th ed. 2009), *available at* https://liteks.pro/images/pdf/ISO_03779_2009.pdf.

[4] *See* Int'l Org. for Standardization, *ISO 7812-1: Identification cards—Identification of issuer*, 2 (5th ed. 2017), *available at* https://www.wulinn.com/usr/uploads/2020/04/1578095566.pdf.

[5] *See* Int'l Org. for Standardization, *ISO 2108: Information and documentation—International Standard Book Number*, 4 (5th ed. 2017), a*vailable at* https://www.sis.se/api/document/preview/80000187/.

annual fee; or of a book labeled with an ISBN number in which the first digit of the title field denotes whether the book is a hard-cover, a paperback, or an e-book. The sole invention of the '967 Patent is indistinguishable, and the instant claims cannot be held valid without opening floodgates that this Court and the Supreme Court have studiously closed.

Concerns are compounded by the way ADASA has leveraged an established standard. The EPC SGTIN-96 convention for creating unique object numbers—a convention followed by every product accused in this case—is a familiar, global standard for dividing 96 bits of memory, frequently encoded on RFID tags, into sections allocated to object and serial-number information. Appx14865-14867, Appx84 col. 8:16-36. The standard works because hundreds of thousands of companies around the world follow it, creating RFID tags that encode consistent portions of the 96-bit memory so as to specify the company creating the product, the type of product, and the unique serial number. What ADASA is doing with the '967 Patent is claiming a monopoly over one further sub-division, such that it can potentially accuse of infringement *anyone* who *sub*divides one of the six sections that much of the planet *already divides* according to the EPC SGTIN-96 global standard.

Such claims offend U.S. patent law, which does not invite anyone to monopolize the idea of designating sub-portions of encoded binary strings. As the Supreme Court instructed in *Alice*, "pre-emption" is "the concern that drives th[e]

exclusionary principle" barring attempts to patent laws of nature, natural phenomena, and abstract ideas. 573 U.S. at 216. That concern is especially acute here because ADASA claims exclusive rights to sub-divide binary serial numbers in the context of a global standard that requires all users always and necessarily to sub-divide strings of binary en route to creating unique identifiers. It would be anathema "effectively [to] grant [ADASA] a monopoly over [the] abstract idea" of sub-dividing an already-partitioned, standard data field. *Bilski v. Kappos*, 561 U.S. 593, 612 (2010).

## III. THE '967 PATENT IS ALSO INVALID UNDER SECTIONS 102 AND 103

The District Court further erred by barring Avery Dennison from arguing invalidity under Sections 102 or 103 in reference to Kuhno or *RFID For Dummies*. These references invalidate the '967 Patent as a matter of law, and at a minimum present genuine issues of material fact for a jury to resolve—as established not just by opinions from Avery Dennison's experts that the Court rejected, but also by testimony from ADASA's own witnesses.

This Court "appl[ies] regional circuit law, in this case the law of the Ninth Circuit, when reviewing a … summary judgment [ruling]. The Ninth Circuit reviews [such] rulings without deference, asking whether there are any genuine issues of material fact while viewing the evidence in the light most favorable to the nonmoving party." *Bayer Healthcare Pharms.*, 713 F.3d at 1373 (cleaned up).

A patent claim is anticipated and invalid if every limitation is found, either

expressly or inherently, in one prior art reference. *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009). Anticipation poses a question of fact. *Zenith Electronics Corp. v. PDI Communication Systems, Inc.*, 522 F.3d 1348, 1356-57 (Fed. Cir. 2008). A claim is obvious and invalid if "the differences between the subject matter ... patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a) (2006). Obviousness, too, "is based on underlying factual inquiries, including (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) any secondary considerations of nonobviousness." *ZUP, LLC v. Nash Mfg.*, 896 F.3d 1365, 1371 (Fed. Cir. 2018).

Consistent with the fact-intensive nature of these inquiries, disputes over anticipation and obviousness are classically resolved by juries, including because "what a reference teaches and whether it describes every element of a claim is a question for the finder of fact." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1221 (Fed. Cir. 2003) (reversing summary judgment for patentee on anticipation and obviousness where court improperly discounted defendant's expert); *see also Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1363-64 (Fed. Cir. 2005) (reversing summary judgment for patentee on obviousness); *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1321-22 (Fed. Cir. 2004) (same as to anticipation).

The District Court was wrong to treat this as the rare patent case in which closely related prior art does not even pose a factual dispute for the jury to resolve.

Indeed, it is especially dubious that ADASA's patent claim at issue can withstand comparison to prior art. ADASA is hard pressed to establish the validity of an apparatus claim that, as the specification confirms, replicates the structure found in prior art. In trying to overcome this problem, ADASA leaned heavily on a process or source limitation that cannot salvage its apparatus claim. Specifically, ADASA repeatedly emphasized the limitation requiring that the portion of the "unique serial number space is encoded with one serial number instance ***from*** an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits." Appx101, *see, e.g.*, Appx282, Appx628-629 (same argument on re-examination).

Yet any such source limitation is unavailing for present purposes. Because a process or source limitation of a product "has no effect on its structure ... [that] limitation ... cannot be a structural limitation." *Purdue Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345, 1353 (Fed. Cir. 2016). When a claimed invention requires a component be "derived from" a particular source, it describes "a process limitation," and courts properly "disregard[] the limitation in [their] obviousness analysis." *Id.* at 1354; *see also, e.g.*, *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354 n.20 (Fed. Cir. 2003) ("[W]hen considering obviousness and anticipation issues … the

district court should be cognizant of the rule that a claimed product shown to be present in the prior art cannot be rendered patentable solely by the addition of source or process limitations."). Analyzed properly, ADASA cannot overcome the cited prior art.

*RFID For Dummies*

Avery Dennison's expert, Mr. Sweeney, published *RFID For Dummies*, which teaches all limitations of the '967 Patent. In addition to the conventional RFID hardware, it teaches encoding a unique identifier that consists of a "product number (also called an Object Class)" and a serial number "effectively subdivided into a facility number, line number, and subserial number, in which the allocation hierarchy is maintained between facility number and line number." Appx3877-3878. As Charles Williams, one of *ADASA's* witnesses, testified pre-trial under questioning from *ADASA's* attorneys, "[m]ost significant bits is not specifically mentioned, but the first paragraph on page 240 [of *RFID For Dummies*] ***exactly describes what we've just been talking about.*** " Appx5311 (emphasis added); *see also* Appx5309-5310 (same witness agreeing that *RFID For Dummies* discloses "essentially the same thing as dividing a number into an encoder number and then a sub serial number"); Appx5313 ("[I]t's talking about partitioning the serial number ***bits*** into those distinct fields." (Emphasis added)). Mr. Williams explained that, in the example from *RFID from Dummies*, "the facility number would be a series of bits and it would probably go

at the beginning of the serial number space," such that "every serial number that came out of that facility would begin with the same facility number bits." *Id.*

That testimony by ADASA's witness by itself creates a triable issue of fact, if it does not require invalidation outright. But the proof of invalidity extended still further: Mr. Sweeney, author of *RFID For Dummies*, walked through how that text anticipated Claim 1 of the '967 Patent and pointed to obviousness. Appx3840-3843. Over the course of multiple pages of his report, Mr. Sweeney discussed how this prior art "described segmentation of the serial number space to define a limited number of most significant bits assigned to allocated blocks of serial numbers as a decentralized, hierarchical approach to allocating serial numbers specifically for use when a central server could not be used to manage serialization," charting specific passages that correspond to each asserted limitation in the '967 Patent. *Id.*

To overcome all this, the District Court improperly resolved factual disputes in ADASA's favor. In particular, it improperly credited ADASA's interpretation of Mr. Williams's testimony as supporting the view that "*RFID for Dummies* does not state the use of most significant bits," Appx6137, somehow overlooking his testimony that, although "[m]ost significant bits is not specifically mentioned, … the first paragraph on page 240 [of *RFID For Dummies*] ***exactly describes what we've just been talking about.***" Appx5311 (emphasis added). Such resolution of a disputed fact in the movant's favor jumps out as error. The jury could reasonably understand and credit

Mr. William's testimony by its terms, and the Magistrate Judge should not have taken it upon himself to ratify ADASA's spin on his testimony.

Likewise misplaced was the District Court's dismissal of Mr. Sweeney's testimony as "conclusory." Remarkably, the court itself offered no analysis other than to invoke "the same reasons as discussed above under the [Kuhno] '221 Patent." Appx6137. Reviewing Sweeney's disclosed opinions about *RFID For Dummies*, a prior art reference that *Sweeney himself had authored*, suffices to refute that characterization; by no fair account was Sweeney's testimony so "conclusory" that the court could properly disregard it just by referencing his opinions on a *different* prior art reference. *See* Appx3840-3843; *Med. Instrumentation*, 344 F.3d at 1220 (reversing grant of summary judgment to patentee on invalidity because, as here, the defendant's expert "connected [each claim limitation] with disclosures in the prior art that he believed taught each particular limitation").

Removing *RFID for Dummies* from the jury's consideration on invalidity was all the more problematic because it elided inconsistencies between ADASA's purported distinction of prior art, to establish validity, versus ADASA's accusations against Avery Dennison's products, to establish infringement. As discussed above, the District Court credited ADASA's expert's view that *RFID for Dummies* did not invalidate the '967 Patent because, in the former, "the decimal serial number would be converted from decimal to binary for encoding on an RFID tag. The only

consideration of the binary numbers is the conversion from the decimal representation." Appx6136. Yet Avery Dennison's accused products *also* assign serial numbers in decimal, which the District Court deemed "irrelevant" for infringement purposes "because a fully encoded RFID tag can only physically be encoded in binary," Appx6140—just as is true for the RFID tags discussed in *RFID for Dummies*. The upshot is that the District Court's erroneous grant of summary judgment left ADASA unconstrained by, and the jury unaware of, a fundamental inconsistency between ADASA's theories of validity and infringement.

<u>The Kuhno Patent</u>

In addition, the Kuhno Patent teaches both the conventional hardware of an RFID tag (substrate, antenna, and chip) claimed in the '967 Patent and the content and format of serial numbers encoded onto those RFID tags. Its specification discloses the same partitioning to create a serial number: "The system application defines a serial number for each carton that is the combination of a predetermined number (discussed above), production line number 366 and an end portion within a range defined within Serial Number Range Starting and Ending values entered by the user… The next carton number to be used as the least significant portion of the serial number is equal to a value entered by the operator …. As each carton in the production line is processed …, the system application increments the serial number end portion." Appx3963 col. 16:8-18. This describes the same concatenated creation of a serial

number, with consistent most significant bits at the leading edge (the "predetermined number" and/or "production line number") and a remaining space of less significant bits (the "end portion" and/or "least significant portion of the serial number"). *Id.*

In his report, Avery Dennison's expert Mr. Sweeney detailed, over multiple pages, precisely where the Kuhno Patent disclosed every limitation in the asserted claims. Appx3843-3847. As he explained, with citations to and quotations from Kuhno, this prior art disclosed that "[s]erial numbers are assigned in allocated blocks" and that "[t]he encoded unique serial number comprises a limited number of most significant bits that uniquely corresponds to a limited number of most significant bits assigned to the allocated block. Specifically, the patent discloses assigning a unique number to a pallet, and incorporating that pallet number into unique serial number assigned to each carton on that pallet." Appx3844.

In his own report, ADASA's expert Dr. Engels similarly opined that Kuhno teaches that "a number of decimal numbers are selected and concatenated together (e.g., calendar date, production line number, a serial number value selected from a preassigned range of decimal numbers) to form an overall decimal serial number." Appx3556. Dr. Engels also conceded at deposition that, in the example he cited from the Kuhno Patent, every serial number in that block would share the same leading digits. Appx5302 ("any serial numbers assigned on that calendar date would have the same decimal value at the leftmost side of that number").

Despite this evidence, the District Court somehow ruled that Avery Dennison could not show anticipation or obviousness at trial. To so rule, the District Court adopted Dr. Engels's view that Kuhno "does not disclose any particular format or data structure for such an encoding that may include data beyond a serial number," Appx6135, ignoring *both* Mr. Sweeney's contrary testimony *and* the plain language of the Kuhno Patent. Without explanation, the court below dismissed Mr. Sweeney's opinions as "conclusory." Appx6136. That dismissal squares neither with Mr. Sweeney's opinion nor with Avery Dennison's entitlement to have every inference drawn in its favor at summary judgment. *See, e.g.*, *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011) (reversing summary judgment on anticipation as "usually inappropriate" "[w]here there is a material dispute as to the credibility and weight that should be afforded to conflicting expert reports").

## IV. ALTERNATIVELY, AVERY DENNISON IS ENTITLED TO VACATUR OF ALL DAMAGES AND A NEW TRIAL

If the Court remands this case for a new trial on invalidity, a new jury should also decide any award of damages. Removing the Kuhno Patent and *RFID for Dummies* fundamentally altered the nature of the trial, both by obscuring important credibility issues (particularly stemming from ADASA's inconsistent positions on infringement and validity) and by denying the jury key evidence relevant to damages, including "[t]he utility and advantages of the patent property over the old modes or

devices, if any, that had been used for working out similar results." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

The District Court also made key errors that require vacatur of the damages award regardless of any invalidity ruling. While Avery Dennison is aggrieved by the District Court's post-trial rulings that excessively supplement damages (including its award of 9% pre-judgment interest and its doubling of the jury's royalty rate for any post-verdict infringement), all such rulings should be mooted by two fundamental defects that invalidate the entire damages award.

### A. The District Court Committed Legal Error By Refusing To Instruct The Jury On Lump Sum Damages

The District Court effectively commandeered the jury by directing it to award damages in the form of a running royalty, while withholding any instruction as to the availability of a lump sum. "A party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). "Failure to give an instruction on a party's theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable." *Dang v. Cross*, 422 F.3d 800, 811 (9th Cir. 2005) (cleaned up). In patent cases specifically, "courts must consider the facts of record when instructing the jury and should avoid rote reference to any particular damages formula." *Ericsson*, 773 F.3d at 1232. This Court "review[s] de novo the legal sufficiency of a jury instruction on an issue of patent law," and will reverse "if the

jury instructions were legally erroneous and the errors had prejudicial effect." *Id.* at 1225 (cleaned up); *see also Dang*, 422 F.3d at 804 (Ninth Circuit also "review[s] de novo whether the instructions misstated the law").

The trial record supported Avery Dennison's repeated requests for a jury instruction and verdict form allowing lump-sum damages. All three licenses that ADASA admitted into evidence were for lump-sum amounts. Appx15936-15959. ADASA's damages expert acknowledged that the evidence before him was of a "lump-sum agreement" and that "there would be no royalty" associated with any future use of ADASA's covered intellectual property under two of these licenses. Appx15210-15212, Appx15231. Likewise, Avery Dennison's expert identified each of those licenses as "single-payment" or "lump sum" license and opined it would be improper to derive a running royalty from such lump-sum licenses. App15646-15648, Appx15688.

Despite this evidence and Avery Dennison's repeated requests, the District Court refused to instruct the jury on any lump-sum option. Appx15747. Instead, the District Court adopted a verdict form that *required* the jury to calculate "Running Royalty" damages *solely* by multiplying the "Total #" of accused products by a "Royalty Amount per RFID tag," as the jury faithfully did. Appx11532-11534.

To justify its approach, the District Court relied upon its observation that Avery Dennison's damages expert had not specifically proposed a lump-sum amount.

Appx15747. Contrary to the Magistrate Judge's premise, however, no witness need endorse a particular form of damages before a jury deems it apt. A jury's "factual determination of a reasonable royalty … need not be supported, and indeed, frequently is not supported by the specific figures advanced by either party." *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1167 (Fed. Cir. 1991); *see id.* at 1168 (trier of fact "is not restricted in finding a reasonable royalty to a specific figure put forth by one of the parties"). Indeed, this Court has expressly rejected the notion "that a jury may only arrive at a royalty specifically articulated by the parties during trial." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995). "Rather, a jury's choice simply must be within the range encompassed by the record as a whole." *Id.*

Nor must expert calculations underlie a jury's damages award. To the contrary, a damages award can be properly grounded without any reference to expert testimony. *See, e.g.*, *Atl. Thermoplastics Co. v. Faytex Corp.*, 5 F.3d 1477, 1482 (Fed. Cir. 1993) (affirming damages solely by reference to license offers in the record). This Court has affirmed damages awards that take a form no expert advocated, provided the award is supported by the larger record. *See, e.g.*, *Energy Transp. Grp., Inc. v. William Demant Hldg. A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) (holding expert's opinion on royalty rate justified jury's lump-sum award); *Fujifilm Corp. v. Benum*, 605 F.3d 1366, 1372-73 (Fed. Cir. 2010) (affirming jury's award of both royalty-rate and lump-

sum damages after expert testified solely about royalty rate); *Maxwell v. J. Bake, Inc.*, 86 F.3d 1098, 1110 (Fed. Cir. 1996) (same). This Court's repeated holdings that royalty-rate testimony can support a lump-sum award suffice to establish legal error below.

Especially considering that this record contains comparable lump-sum licenses offered by ADASA, it manifestly supports a lump-sum award. "Actual licenses to the patents-in-suit are probative not only of the proper amount of a reasonable royalty, but also of the proper form of the royalty structure." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79-80 (Fed. Cir. 2012). If anything, the District Court should arguably have instructed *only* as to the lump sum, as this Court has long warned against using a lump-sum license as a basis for a running-royalty award, which is what happened here. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329-30 (Fed. Cir. 2009). Even assuming the District Court retained discretion to instruct the jury on both forms of damages, however, it surely erred by directing the jury solely down ADASA's desired path when it came to calculating damages.

This error was not only prejudicial, but profound. The licenses admitted at trial were for lump sums of $7,000 (Agron), $50,000 (Goodyear), and $500 (Polk Audio), Appx15083—all orders of magnitude less than the damages ADASA convinced the jury to award via a royalty rate. And the ultimate verdict demonstrates that the jury was concerned about the excessiveness of ADASA's damages claim, as it awarded

only half of what ADASA sought. Had the jury known it could consider a lump sum, its award might well have taken a different form and been only fractional. Accordingly, if the ’967 Patent is not invalid as a matter of law, the Court should remand for a new trial on damages before a properly-instructed jury.

### B. The District Court Committed Reversible Error By Excluding Comparable Licenses

The jury’s deliberations over damages were further skewed by the pre-trial preclusion of Avery Dennison’s damages expert, David Yurkerwich, from testifying about two licenses Avery Dennison had entered—with Intermec and Round Rock—involving the accused RFID tags. Appx9477. This disabled Avery Dennison from offering its own proof of comparable licensing. The District Court offered no explanation for its pivotal exclusion beyond citing ADASA’s briefing, *id.*, which argued that Avery Dennison’s licenses covering the accused products were insufficiently comparable to a license for the ’967 Patent, Appx6156-6166. This Court has instructed, however, that questions of comparability typically go to the sufficiency, not the admissibility, of evidence. By excluding Avery Dennison’s evidence of comparable licenses, the District Court abused its discretion.

“This court applies regional circuit law to evidentiary issues.” *SynQor*, 709 F.3d at 1380. The Ninth Circuit “review[s] evidentiary rulings for abuse of discretion and reverse if the exercise of discretion is both erroneous and prejudicial.” *Wagner v. Cty. of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013).

Multiple Avery Dennison witnesses disclosed and testified at deposition about the comparability of both preexisting licenses that wound up excluded. The Intermec license granted Avery Dennison the right to use 138 U.S. patents related to RFID products. Appx6262-6263, Appx6481-6482. In opining that "the Intermec/Avery Dennison License Agreement is instructive for purposes of determining a reasonable royalty for the '967 Patent," Avery Dennison's expert Mr. Yurkerwich observed that (1) the Intermec license covered the accused products; (2) the accused products could not be made or sold without Intermec's technology; (3) 18 patents covered by the Intermec license fell into the same "topic" of "RFID transponder" as does the '967 Patent; and (4) the '967 Patent family cited to one of the covered Intermec patents as prior art. Appx6263. The Round Rock license covered 3,600 U.S. patents, including hundreds of patents or pending applications related to RFID. Appx6264, Appx6462-6480. Again, Mr. Yurkerwich explained why it was comparable to a hypothetical license for the '967 Patent, including because (1) the Round Rock license covered the accused products; (2) the accused products could not be made or sold without Round Rock's technology; (3) hundreds of patents covered by the Round Rock license covered RFID transponders; and (4) ADASA had itself cited Round Rock patents to the PTO as informing the patentability of its own patents. Appx6266.

Another Avery Dennison witness, Mr. Sweeney, corroborated Mr. Yurkerwich's account of comparability. In his report, Mr. Sweeney similarly noted

the correspondence in subject matter between the Intermec and Round Rock portfolios and the ’967 Patent; ADASA’s reference to a patent in the Intermec portfolio as prior art relative to the ’967 Patent family; and the way that all of the tags accused of infringement by ADASA depended upon Intermec’s technology. Appx5765-5766.

Mr. Yurkerwich further explored both the similarities and differences between the portfolios of patents that Avery Dennison licensed from Intermec and Round Rock and the ’967 Patent. He provided pages of disclosed opinions—and was poised to provide corresponding testimony to the jury—detailing how these similarities and differences would inform a royalty negotiation between ADASA and Avery Dennison. Appx6270, Appx6284-6289. In sum, per this Court’s precedent, Avery Dennison’s experts specified why these licenses were comparable to the hypothetical license in this case and how the parties would account for relevant differences between the relevant technologies.

The District Court lacked a sound basis to exclude the Intermec and Round Rock licenses. “Prior licenses … are almost never perfectly analogous to the infringement action,” and “the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility.” *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014); *see also Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1373 (Fed. Cir. 2020) (collecting cases). And this Court has reversed exclusion of similar expert testimony where a qualified expert

reliably applied reliable principles and methods to the licenses before him. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014) (comparability question "goes to the weight of the evidence, not its admissibility"). The same reasoning and result should obtain here.

Under this Court's precedents, comparability depends on a "relationship to the patented technology or the accused infringing products." *LaserDynamics*, 694 F.3d at 79. Avery Dennison showed comparability as to *both*. The Intermec and Round Rock licenses undisputedly cover the accused RFID products—a hallmark of comparability. Appx6262-6270, Appx6284-6289, Appx5765-5766. Moreover, the licenses cover patents specifically cited in the prosecution or reexamination of ADASA's patent family. *Id.* The basis for admitting the licenses, therefore, was obvious and ample.

For purposes of exclusion, it should not matter that the licenses "did not involve the patents-in-suit and did not cover any of the technologies in the case," as distinct from closely-related technologies: "The degree of comparability … as well as any failure on the part of [the] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012).

Nor does the fact that the Round Rock and Intermec licenses cover portfolios of patents provide a basis to preclude testimony about them. Licenses to large portfolios of patents are admissible where, as here, *see* Appx6284-6289, expert testimony would

have explained the differences and "permitted the jury to properly discount the [portfolio] license." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010).

The resulting prejudice is demonstrable. Avery Dennison was prohibited from pointing to any comparable license to support a lower royalty, and from having Mr. Yurkerwich opine specifically that the rate should be vastly lower than ADASA urged. Admitting the Intermec and Round Rock licenses would have provided on-point evidence of real-world royalty rates; these licenses proved how vastly inflated ADASA's proposed rate was for this single Patent and its familiar abstract idea. Even without them, the jury *still* awarded ADASA significantly less than the $0.009/tag rate it sought, confirming it was skeptical of ADASA's damages case and looking for a lower bound. If only the jury could have heard about Avery Dennison's licenses with Intermec and Round Rock and how they supported an alternative $0.00015/tag running royalty rate, there is every reason to think it would have credited such evidence. A new trial would enable the jury to consider comparable licenses offered by the defense.

## V. THE $20 MILLION DISCOVERY SANCTION SHOULD BE VACATED BECAUSE IT REFLECTS LEGAL ERROR AND A CLEAR ABUSE OF DISCRETION

Finally, the Court should also vacate the $20,032,889.80 Rule 37 sanction against Avery Dennison for its self-reported discovery failure. This sanction came

atop a stipulated supplemental damages award of $9,417,343 for all late-discovered products, and also atop the award of ADASA's requested attorneys' fees in full, along with other generous supplementation. It simply does not square with the Constitution or governing precedent to award ADASA an additional $0.0025 for *all* tags deemed to infringe (via summary judgment, the jury's verdict, or the parties' post-trial stipulation), notwithstanding that the large majority were properly disclosed and adjudicated and the remainder were self-reported in good faith.

To the extent that this Court overturns the liability or damages judgments below, vacatur of the sanction follows *a fortiori*, as the District Court expressly ordered "a sanction tied to the number of infringing tags determined to exist as of the date of the verdict." Appx14626. Such a sanction inextricably depends on the asserted claim being valid, the accused products being found to infringe, and the proper form of damages being a running royalty. If this Court reverses or vacates the predicate—as it should, for the reasons discussed *supra*—it should also vacate the resulting sanction, which would lack the claimed foundation.

Even setting aside its defective foundation, the Magistrate Judge's sanction independently reflected legal errors and a clear abuse of discretion; it should therefore be vacated irrespective of how this Court resolves the issues posed above. "This court applies regional circuit law to sanctions rulings." *SynQor*, 709 F.3d at 1385. The Ninth Circuit "reviews … the imposition of discovery sanctions[] for abuse of

discretion." *R&R Sails*, 673 F.3d at 1245. "To the extent the imposition of sanctions turns on the resolution of an issue of law, review is de novo." *Id.* (cleaned up).

As an initial matter, "the use of Rule 37 sanctions must be tempered by due process" under the Fifth Amendment, *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 783 n.8 (9th Cir. 1983), yet Avery Dennison was denied any pre-argument notice of the form or amount of sanctions the Court was considering, which ADASA never specifically requested. *See In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 379 (3d Cir. 1997) (party facing sanctions "is entitled to notice of the legal rule on which the sanctions would be based, the reasons for the sanctions, and the *form* of the potential sanctions.") (emphasis in original); *Sec. Nat'l Bank of Sioux City, Iowa v. Day*, 800 F.3d 936, 945 (8th Cir. 2015) (reversing imposition of sanctions where "there was no real notice of the nature of the sanction the court had in mind"). Avery Dennison lacked fair opportunity to address a form of sanctions that ADASA failed to specify when moving.

Further still, the form of the District Court's sanction violates the Seventh Amendment by effectuating an impermissible additur to the jury's verdict. *See Dimick v. Schiedt*, 293 U.S. 474, 486 (1935) (holding additur violates the Seventh Amendment). To be sure, an award of additional damages for additional infringing products does not constitute additur if the calculation "merely require[s] applying the jury's royalty rate to the undisputed actual infringing sales base." *Bayer Healthcare*

*LLC v. Baxalta Inc.*, 989 F.3d 964, 986 (Fed. Cir. 2021). Here, however, the District Court did not merely apply the jury's royalty rate to the products discovered after trial, as Avery Dennison stipulated it should. To the contrary, even after supplementing the damages, it imposed an *additional* $20 million sanction "tied to the number of infringing tags determined to exist as of the date of the verdict." Appx14626. That is tantamount to finding that the jury *should* have awarded a royalty rate *higher* than it did, even for tags the jury specifically considered at trial. *Cf.* Appx14452 (ADASA's oral suggestion to "double the verdict as a sanction, because look what they did. They got the jury to discount Pellegrino. Not as an ongoing royalty. Just – just give us another $26 million."). Increasing the verdict in this fashion offends the Constitution and usurps the jury's role.

Constitutional transgressions aside, the District Court failed to adhere to other governing law. In the Ninth Circuit, if a Rule 37 sanction "amount[s] to dismissal of a claim, the district court [is] required to consider whether the claimed noncompliance involved willfulness, fault, or bad faith, and also to consider the availability of lesser sanctions." *R&R Sails*, 673 F.3d at 1247. These requirements apply whenever a sanction is dispositive "in practical terms," even if it does not literally dismiss a claim. *Id.* (reversing exclusion of essential evidence for failure to consider lesser sanctions); *see also, e.g.*, *Ober v. Cty. of Los Angeles*, 2014 WL 2504504, *1 (C.D. Cal. Mar. 27, 2014) (recognizing "sanctions that would result in a liability verdict in plaintiff's favor

[are] in effect a terminating sanction"); *Voice Int'l Inc. v. Oppenheimer Cine Rentals LLC*, 2020 WL 1229735, *3 (C.D. Cal. Feb. 4, 2020) (recognizing same in deciding exclusionary sanctions). This sanction qualifies as case-dispositive, as established both by its sheer size and how it was reached, with the District Court treating ADASA's patent claim as valid and infringed and then applying an increased royalty rate to the universe of accused products. Rather than peg the sanction to the costs or fees associated with the post-trial production or any other aspect of discovery, the District Court credited the merits of ADASA's liability and damages theories. Any such Rule 37 sanction must answer to the strictures limiting case-dipositive sanctions.

The instant sanction does not begin to satisfy those strictures. The District Court made no express finding of willfulness, fault, or bad faith; at most, certain characterizations of Avery Dennison might hint at such concerns, but no such finding was made, nor could one be squared with the good faith Avery Dennison showed in identifying the errors on its own initiative and then taking pains to rectify them. *See, e.g.*, *Winecup Gamble, Inc. v. Gordon Ranch LP*, 850 F. App'x 573, 574 (9th Cir. 2021) (vacating sanction where finding of intent was unsupported).

In any event, these orders awarding more than $20 million in sanctions nowhere contain "the type of explicit discussion of alternative sanctions [that Ninth Circuit] precedent demands." *Estrada v. Speno & Cohen*, 244 F.3d 1050, 1056 (9th Cir. 2001). The District Court failed to find that nothing short of a $20 million award

would suffice in the context of a judgment that *already* reflected $36 million jury verdict (as supplemented), more than $2 million in attorneys' fees, a 9% pre-judgment interest rate, and an enhanced post-trial running royalty rate. Notably, this Court has previously held that a $500,000 sanction—less than three percent of the sanction at issue—"bear[s] a 'reasonable relationship' to the harm" caused by post-trial disclosure of additional infringing products in a far more egregious case where the defendant "unilaterally made a conscious and willful decision to withhold" the data before trial. *SynQor*, 709 F.3d at 1386. Because the District Court did not, and could not, make any such findings about the relationship between Avery Dennison's inadvertent error and the sanction, it far exceeded its discretion by imposing a sanction that is *40 times* what this Court upheld in *SynQor*.

Finally, even if the District Court had purported to follow the controlling legal framework, it still would have abused its discretion. In evaluating a run-of-the-mill Rule 37 sanction, "the key factors are prejudice and availability of lesser sanctions." *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990). Yet the District Court made no reference to lesser sanctions. Nor did it identify any evidence of prejudice to ADASA. To the contrary, Avery Dennison identified the discovery failure itself, disclosed it immediately, investigated it thoroughly, and stipulated to increase the jury's award by an amount that both parties agreed accurately reflected the late-discovered products. Appx14588. Not only did Avery Dennison ensure against any

prejudice to ADASA, but it arrived at revised calculations that, as experts from Ernst & Young attested, *see* Appx14193-14914, *overstated* the total number of products that would be treated as infringing consistent with the jury's verdict.

Adequate justification for the sanction at issue simply cannot be found here. The District Court did not find (or have colorable basis to find) that Avery Dennison had engaged in spoliation, perjury, contumacious conduct, or anything of the like—any of the types of culpable and wrongful behavior that, even when found, have been punished with far less severe sanctions. No one has identified precedent supporting the form or severity of sanctions the District Court imposed for a self-reported discovery oversight. By no means do the three pages of reasoning below afford sound basis for a $20 million sanction on this record.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment for ADASA, vacate the sanctions, and remand with instructions.

DATED: January 28, 2022

By /s/ Derek L. Shaffer
Derek L. Shaffer
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

Joseph Milowic III
Owen Roberts
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

Mark Tung
QUINN EMANUEL
URQUHART
& SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065

*Attorneys for Appellant*

# Addendum

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ADASA INC.,<br><br>Plaintiff,<br><br>V.<br><br>AVERY DENNISON CORPORATION,<br><br>Defendant. | 6:17-cv-01685-MK<br><br>JUDGMENT |

Based on the record, judgment for Plaintiff.

Dated this 14th day of May 2021.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | | |
|---|---|---|
| ADASA INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.: 6:17-cv-01685-MK |
| | § | |
| AVERY DENNISON CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**FINAL RULE 58 JUDGMENT**

It is ORDERED and ADJUDGED that judgment be entered in favor of Plaintiff and against Defendant in accordance with the jury verdict on Plaintiff's claims of direct infringement of claim 1 of reexamined U.S. Patent No. 9,798,967, literally and under the doctrine of equivalents, by tags tried to the jury and encoded under Defendant's PCTag and Commissioning Authority schemas. For the avoidance of doubt, a Section 101 defense has been resolved in favor of Plaintiff on summary judgment and in JMOL rulings (ECF No. 205).

It is ORDERED and ADJUDGED that judgment be entered in favor of Plaintiff for damages in the amount of $36,059,220 for direct infringement through March 31, 2021. This amount is based on the amount found by the jury and includes $9,417,343 based on the additional infringing tags found by Defendant post-verdict as explained in the briefing on the Motion for Sanctions.

It is ORDERED and ADJUDGED that Defendant shall pay pre-judgment interest at the rate of 9% per annum without compounding in the amount of $4,010,267.

It is ORDERED and ADJUDGED that Defendant shall be taxed costs of $55,424.70.

For reasons entered on the record and as to be further set forth in a formal written opinion to follow, the Court finds this to be an exceptional case under 35 U.S.C. § 285, and thus it is

ORDERED and ADJUDGED that Defendant shall pay Plaintiff's attorneys' fees in the amount of $2,250,000.

For reasons entered on the record and as to be further set forth in a formal written opinion to follow, the Court finds conduct of the Defendant to have been sanctionable, finds that the appropriate sanction is $0.0025 per tag for the total number of tags included in the merits judgment above, and thus it is ORDERED and ADJUDGED that Defendant shall pay sanctions in the amount of $20,032,889.80.

The sum of the above lines is $62,407,801.50.

It is ORDERED and ADJUDGED that Defendant shall pay Plaintiff post-judgment interest on the above amounts in the amount statutorily required by 28 U.S.C. § 1961.

It is ORDERED and ADJUDGED that Defendant shall pay Plaintiff a royalty of $0.0045 per tag on revenues for ongoing sales made by Defendant of the infringing products listed above and any not colorably different from April 1, 2021 through May 14, 2021.

It is ORDERED and ADJUDGED that Defendant shall owe and pay Plaintiff, on a quarterly basis, an ongoing royalty of $.009 per tag on revenues for ongoing sales made by Defendant of the infringing products listed above and any not colorably different from May 15, 2021 until the expiration of the '967 Patent. Such payments shall be made no later than 30 days after the expiration of such quarter. For purposes of reporting, Defendant shall provide to Plaintiff on a quarterly basis statements disclosing the number of EPCs generated during that quarter using any schema found to result in infringement and any not colorably different ("Accused Schema") and transponder sales attributed to all corresponding retail brand owners. Royalty bearing sales shall be determined using the number of EPCs generated using an Accused Schema unless EPCs generated for a particular retail brand owner exceed the number of units sold attributed to that brand owner by more than 10% for that quarter, in which case the number of units sold apportioned by the percent of EPCs generated using an Accused Schema shall be used instead. The first such

report shall include calculations from April 1, 2021 through September 30, 2021. Such report shall be prepared by Ernst & Young, LLP as to the amount and the calculation, and if an apportionment is used, the basis for the 10% or more discrepancy. Any stay or forbearance of the payment obligation as ordered by the Court or agreed to by the parties shall not stay or forebear the reporting requirement set forth above.

Dated: October 14, 2021

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States Magistrate Judge

# The United States of America

## The Commissioner of Patents and Trademarks

*Has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.*

*Therefore, this*

## United States Patent

*Grants to the person or persons having title to this patent the right to exclude others from making, using or selling the invention throughout the United States of America for the term of seventeen years from the date of this patent, subject to the payment of maintenance fees as provided by law.*

Plaintiff's Exhibit No.
1
6:17-cv-01685-MK

Acting Commissioner of Patents and Trademarks

*Attest*

Plaintiff's Trial Exhibit No. 1
Page 1 of 43

US009798967B2

(12) **United States Patent**
**McAllister**

(10) **Patent No.: US 9,798,967 B2**
(45) **Date of Patent: *Oct. 24, 2017**

(54) **SYSTEMS, METHODS, AND DEVICES FOR COMMISSIONING WIRELESS SENSORS**

(71) Applicant: **ADASA INC.**, Eugene, OR (US)

(72) Inventor: **Clarke W. McAllister**, Eugene, OR (US)

(73) Assignee: **ADASA INC.**, Eugene, OR (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/042,993**

(22) Filed: **Feb. 12, 2016**

(65) **Prior Publication Data**

US 2016/0162773 A1 Jun. 9, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 13/526,520, filed on Jun. 19, 2012, now Pat. No. 9,272,805, which is a continuation-in-part of application No. 12/820,109, filed on Jun. 21, 2010, now Pat. No. 8,228,198, which is a continuation-in-part of application No. 11/465,712, filed on Aug. 18, 2006, now Pat. No. 7,830,258, and a continuation-in-part of application

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***H04Q 5/22*** | (2006.01) |
| ***G06K 19/077*** | (2006.01) |
| ***B65C 9/18*** | (2006.01) |
| ***B65C 11/00*** | (2006.01) |
| *B65C 9/00* | (2006.01) |
| *B65C 9/40* | (2006.01) |
| *G06K 17/00* | (2006.01) |

(52) **U.S. Cl.**

CPC ...... ***G06K 19/07716*** (2013.01); ***B65C 9/1865*** (2013.01); ***B65C 11/006*** (2013.01); ***G06K 19/077*** (2013.01); *B65C 2009/0003* (2013.01); *B65C 2009/404* (2013.01); *G06K 2017/0041* (2013.01)

(58) **Field of Classification Search**

CPC ... G06K 2017/0045; G06K 2017/0051; G06K 19/077; G06K 19/07716; B65C 9/1865; B65C 11/006

USPC ......... 340/572.1–572.9, 10.1–10.6; 709/217; 705/28

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

8,228,198 B2 * 7/2012 McAllister ........... B65C 9/1865 340/10.51
9,272,805 B2 * 3/2016 McAllister ........... B65C 9/1865

(Continued)

OTHER PUBLICATIONS

EPCTM Tag Data Standards Version 1.1 Rev.1.23, Last Call Working Draft on Feb. 16, 2004, pp. 11, 19-25.
RFID for Dummies, 5 pps., 2005.

*Primary Examiner* — Thomas Mullen
(74) *Attorney, Agent, or Firm* — Fay Kaplun & Marcin, LLP

(57) **ABSTRACT**

In one embodiment the present invention comprises a smartphone and encoders for commissioning RFID transponders. The present invention further includes novel systems, devices, and methods for commissioning RFID transponders with unique object class instance numbers without requiring a realtime connection to a serialization database.

**20 Claims, 19 Drawing Sheets**



**Related U.S. Application Data**

No. 12/124,768, filed on May 21, 2008, now abandoned.

(60) Provisional application No. 60/709,713, filed on Aug. 19, 2005, provisional application No. 60/939,603, filed on May 22, 2007.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2004/0046644 A1* | 3/2004 | Bauhahn | ............ | G06K 7/10019<br>340/10.42 |
| 2005/0007238 A1* | 1/2005 | Hartmann | ............ | G06K 7/0008<br>340/10.2 |
| 2007/0103314 A1* | 5/2007 | Geissler | ............... | A01K 11/004<br>340/572.8 |

* cited by examiner


10
20
11
Host or network computer
Database
Remote computer
13
30
Optical Reader
Encoder
Transponder commissioning means
Communication means
Supply of transponders
15
Entities with visual external label (e.g. bar code) – optically read label
Object needing identification
17
50

FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG 5


30
Mobile Applicator
36
External antenna
Operator output devices (Indicator LEDs)
37
38
39
61
On-board computer with Wi-Fi
60
On-board power source (battery)
63
RFID Interrogator Module
62
70
Electro-mechanical interface components
Internal antenna to program (commission) and verify transponders
44
42
Take-up reel (Take-up roll)
Supply reel (Supply roll)
43
Cartridge

FIG. 6




FIG. 7



64
61
On-board computer
63
Interrogator module
Contact image sensor
90
62
Drive motor
32
76
42
Source reel
43
Take-up reel
44
Cartridge
Power source
Power source
60
86
66


FIG. 8




Fig. 9


219
210
219b
219a
218
216c
216b
86
66
216a
215c
216f
212c
46
216d
217d
212a
212b
217e
42
43
44
211a
211b
63
76
60
213b

FIG. 10



Position Smartphone and capture image
111
Decode
112
Compute Transponder Payload
113
Encode Transponder
114


Fig. 11



Identify container to be tagged
121
Identify information to be encoded on RFID transponder
122
Commission RFID transponder
123
Tag container with commissioned RFID transponder
124


Fig. 12


131
Advance RFID transponders
133
Test RFID transponder
Good
Bad
132
Prepare to commission RFID transponder
135
Maintain tag on liner and advance to take-up reel
Fail
134
Verify encoding
Notify Fail or Bad condition
137
Pass
Remove liner and dispense transponder
136
Apply transponder to container
138

Fig. 13


140
Serial Number Database
141
Table GTIN A
141a
141b
141c
Start 10
Remaining
Start 11
Remaining
Start 12
Remaining
142
Table GTIN B
Start 12
Remaining
Start 14
Remaining
Start 16
Remaining
143
Table GTIN C
Start 35
Remaining
Start 36
Remaining
Start 37
Remaining
144
9
Block 0
0
145
11
Block 1
0
146
35
Block 2
0

Fig. 14


151
152
SQL Database
153
Script
154
Smartphone
155
RFID Encoder
156
RFID Transponder

FIG. 15


161
Biometric operator authentication
162
Match?
no
yes
163
Enable Transponder Encoding

FIG. 16



Host or Network Computer
Database
171
170
Remote Computer or Mobile Phone
154
Optical Reader
173
Headset
174
178
RF Transponder
Bar Code Symbols
179
176
177
Communi-cations
Optical Reader
Processing
Memory
Tag Transport
Tag Encoding
Tag Separation
Supply of Tags
Power Supply
Output Indicators
175A
175B
175C
175D
175E
175
175F
175G
175H
175J
175K
Card with Printed Symbols
RF Transponder
178A
178B


FIG. 17




FIG 18




FIG 19




FIG 20



220
225
226
221D
221C
221E
224A
224A2
222A
221
224B
222B
223B
221A
223A
221B
222C
221K
221F
221G
221H
221J
227D
227E
227A
227F
227B
227C
228


FIG 21




FIG. 22


240
Scan Bar Codes
241
Generate RF data payload
242
Encode RF Tag
245
Index to next tag if limit reached
243
Verify RF Tag
244
OK?
No
Yes
246
Pull release liner to detach tag
247
Catch tag in rotation

FIG 23

## SYSTEMS, METHODS, AND DEVICES FOR COMMISSIONING WIRELESS SENSORS

### RELATED APPLICATIONS

The present application is a continuation application based on U.S. application Ser. No. 13/526,520, filed on Jun. 19, 2012, now U.S. Pat. No. 9,272,805, which is a continuation-in-part application based on U.S. application Ser. No. 12/820,109, filed on Jun. 21, 2010, now U.S. Pat. No. 8,228,198, which is a continuation-in-part application of U.S. application Ser. No. 11/465,712, filed on Aug. 18, 2006, now U.S. Pat. No. 7,830,258, which claims the benefit of U.S. Provisional Application No. 60/709,713 filed on Aug. 19, 2005, and a continuation-in-part application of U.S. application Ser. No. 12/124,768, filed on May 21, 2008, now abandoned, which claims the benefit of U.S. Provisional Application No. 60/939,603 filed on May 22, 2007. The present application claims priority from these applications, the disclosures of which are hereby expressly incorporated herein by reference.

### BACKGROUND

The present invention relates to a system, including methods and devices, utilizing wireless sensor devices and RFID (radio-frequency identification) transponders. Specifically, the present invention relates to a system incorporating novel devices and methods that enable point-of-use and on-demand commissioning of RFID transponder-equipped wireless sensors.

Radio-frequency identification (RFID) transponders enable improved identification and tracking of objects by encoding data electronically in a compact tag or label. And, advantageously, the compact tag or label does not need external, optically recognizable or human-readable markings. In fact, using the Gen2 EPC specification, a three-meter read-distance for RFID transponders is common—even on high-speed material handling lines.

Radio-frequency identification (RFID) transponders, typically thin transceivers that include an integrated circuit chip having radio frequency circuits, control logic, memory and an antenna structure mounted on a supporting substrate, enable vast amounts of information to be encoded and stored and have unique identification. Commissioning, the process of encoding specific information (for example, data representing an object identifier, the date-code, batch, customer name, origin, destination, quantity, and items) associated with an object (for example, a shipping container), associates a specific object with a unique RFID transponder. The commissioned transponder responds to coded RF signals and, therefore, readily can be interrogated by external devices to reveal the data associated with the transponder.

Current classes of RFID transponders rank into two primary categories: active RFID transponders and passive RFID transponders. Active RFID transponders include an integrated power source capable of self-generating signals, which may be used by other, remote reading devices to interpret the data associated with the transponder. Active transponders include batteries and, historically, are considered considerably more expensive than passive RFID transponders. Passive RFID transponders backscatter incident RF energy to specially designed remote devices such as interrogators.

Combining the benefits of the latest technology in RFID transponders with sensing devices, a broader class of devices called wireless sensors is emerging. Wireless sensors have a unique identity, sense one or more attributes within its environment, and report its identity and data corresponding to the sensed attributes. For example, a wireless sensor interprets environmental conditions such as temperature, moisture, sunlight, seismic activity, biological, chemical or nuclear materials, specific molecules, shock, vibration, location, or other environmental parameters. Wireless sensors are distributed nodes of computing networks that are interconnected by wired and wireless interfaces.



Wireless sensors, made using silicon circuits, polymer circuits, optical modulation indicia, an encoded quartz crystal diode, or Surface Acoustic Wave (SAW) materials to affect radio frequency or other signaling methods, communicate wirelessly to other devices. For example, certain embodiments of wireless sensors communicate on a peer-to-peer basis to an interrogator or a mobile computer. Communication methods include narrow band, wide band, ultra wide band, or other means of radio or signal propagation methods.

Generating a unique serial number is imperative, and is required for EPCglobal RFID tagging implementations. Serialization requires a central issuing authority of numbers for manufacturers, products, and items to guarantee uniqueness and to avoid duplication of numbers. Blocks of numbers are distributed to remote locations globally. Unless a product (or SKU) is serialized at one location, the numbering space is usually partitioned according to some method, or each remote location receives each number one-by-one. Either way, there is eventually a reconciliation of serial number usage with a granularity of either one or several numbers at a time.

A preferred method of generating unique serial numbers is to assign unique numbers in a central location, such as in a label converter facility where unique bar coded labels are printed. Each unique label is then packed and shipped to remote locations, usually either in sheets or rolls. Upon arrival at a manufacturing facility, rolls are loaded onto high speed label applicators that apply one serialized label onto each carton. As those serialized cartons move through the supply chain, they may eventually arrive at a case pick location, a receiving dock, or similar location where a serialized carton is selected for having an RFID transponder applied to it. Using a bar code scanner to read one or more bar codes sufficient information can be collected to uniquely encode that data into an RFID transponder and apply it to that carton.

The uniqueness of an identifier is critical to the success of almost any tracking system. Assuring uniqueness is not necessarily simple. A generically descriptive bar code can be matched to authorizations for selected numbering systems that provide additional data fields including a unique serial number or using algorithms that assure uniqueness through numerical representations of time and space.

Certain prior art systems use printer encoders to merge the printing and RFID transponder encoding operations into a single atomic transaction. This method is more expensive in every respect. It requires mobile distributed printing with nearly perfect networking implementations in order to achieve a smooth, easy, and regular manual transponder application process. This all comes at a higher price, size, and weight. Prior art implementations tend not to be mobile, as represented by U.S. Pat. No. 7,066,667 issued to Chapman et al. on 27 Jun. 2006 and include U.S. Pat. No. 5,899,476 issued to Barrus et al. on 31 May 2005, or by U.S. Pat. No. 6,246,326 issued to Wiklof et al. on 12 Jun. 2001, describe a device that commissions an RFID transponder

with a printed label. This approach, however, introduces unnecessary waste, cost, and propensities for error. There is a growing category of applications that do not require anything other than a custom-encoded RFID transponder. This prior art calls for the inclusion of label printer hardware and related consumable materials that are not necessary for many RFID applications. Unneeded printer mechanisms create unnecessary complexities, size, and weight. In some instances this additional bulk hinders practical mobile applications. The result is that tagging solutions that include printing result in a higher total cost of ownership than a pure RF tag encoding system.

So, despite recent advances in RFID technology, the state-of-the-art does not fully address the needs of simple, efficient, economical, high-volume, reliable deployment and commissioning of RFID transponders and wireless sensors. Large-scale adoption of RFID transponders depends on systems utilizing reliable, low-cost transponders deployed at thousands of distributed locations that implement simple and efficient manual transponder commissioning means. Such systems should further include processes for efficient commissioning of batches of RFID transponders, without the need for realtime wireless connectivity.

## SUMMARY OF THE INVENTION

The present invention overcomes the shortcomings of the prior-art attempts and, accordingly, provides systems, methods, and devices that commission RFID transponders on-demand and at a point-of-use utilizing wireless data transfer in a compact package that is well-suited to portable, mobile, or fixed use in multiple applications. The present invention is used for reading data from or encoding data onto wireless transponder data carriers with no external authorizations or queries required on a transponder-by-transponder basis. Additionally this invention teaches a preferred method and apparatus for commissioning RFID transponders without requiring continuous use of a screen or keypad to control operations. Further advantages of the present invention will be well-appreciated by those skilled in the art upon reading this disclosure including the appended figures of the drawing.

Authorizations for one or more classes of objects are preferably loaded into the encoder; where such authorizations include data fields such as manufacturer ID, item reference, manufacturer code lengths, filter values (that designate packaging levels such as item, case, pallet, etc.), serial number starting point for a block, and other pre-determined parameters. Such information is preferably loaded into the memory of the encoder in advance of tag commissioning operations. Thus if loaded with information for more than one object class, the encoder does not have sufficient information to proceed with encoding a transponder until a single object class is selected for the present RFID transponder to receive; an ambiguity therefore exists that is preferably resolved with information entered by an operator using either a keypad or a bar code scanner. Reading printed indicia such as a bar code is a preferred method to resolve the ambiguity as to which object class the next RFID transponder is to receive a number from. Bar codes are used to eliminate errors and ambiguities that enable the encoder to locally generate or replicate data for encoding into a data carrier such as an RFID transponder.

This type of data production and/or replication process is very fast and efficient. There is no absolute need to query a database in real time; hence there is no need for continuous wireless network connectivity. This simplification eliminates the possibilities for non-deterministic network delays. Non-deterministic delays are delays that cannot be guaranteed, usually due to the probabilistic nature of packet collisions that are common in Ethernet and WiFi. By eliminating the need to access a network database, the variable non-deterministic delays caused by changing database sizes, changing record counts, and database user load fluctuations are completely circumvented. Reduction or outright elimination of non-deterministic delays helps manual labor operate at maximum efficiency, allowing them to achieve a regular and dependable cadence in their transponder application processes.

For example, in one embodiment the present invention consists of an encoder for commissioning RFID transponders. The encoder consists of an RFID interrogator module adapted to enable encoding predetermined data according to a commissioning algorithm and communicating with an internal antenna, the antenna being adapted to encode the predetermined data on the RFID transponder; a memory storage device for storing at least a portion of the predetermined data; a processing means for controlling and communicating with the memory storage device, the RFID interrogator and the internal antenna; a means for providing a supply of RFID transponders, the transponders configured for tensile extraction from the encoder or, preferably from means for providing a supply of RFID transponders comprising a cartridge; and a means for presenting the RFID transponder within an operable range of the internal antenna or near field coupler to enable encoding of the predetermined data.

In further embodiments, the present invention includes a method for commissioning RFID transponders comprising: providing a roll or sheet of RFID transponders; providing a cartridge or other pre-packaged self-contained supply of RFID transponders; providing an encoder; inserting the roll or sheet in the cartridge or other pre-packaged self-contained supply of RFID transponders; coupling the cartridge to the encoder; acquiring information to encode from printed indicia; encoding the information on at least one RFID transponder; and adapting the process of attachment of the encoded transponder to the target surface along a vector that is nearly parallel to the target surface based upon real time feedback from the surrounding environment.

## DRAWINGS

FIG. **1** is a block diagram of the system and environment according to one embodiment of the present invention.

FIG. **2** is a top view of a possible RFID transponder according to one embodiment of the present invention.

FIG. **3** is a schematic end-view of the RFID transponder of FIG. **2**.

FIG. **4** is a top view schematic drawing of a sheet or roll of a plurality of RFID transponders of FIG. **3**.

FIG. **5** is an offset orthogonal view of a mobile encoder according to one embodiment of the present invention.

FIG. **6** is a schematic block diagram showing some components of the mobile encoder of FIG. **5**.

FIG. **7** is a schematic cross section view showing electro-mechanical components of one embodiment of a mobile encoder.

FIG. **8** is a schematic cross section of an encoder according to the present invention.

FIG. **9** is a frontal-offset view of a hand-held, mobile encoder according to the present invention.

FIG. **10** is a schematic cross section of another encoder according to the present invention.

FIG. **11** is a flow chart of a smartphone scan and transponder encode method according to the present invention.

FIG. **12** is a flow chart of a tagging method according to the present invention.

FIG. **13** is a flow chart of a commissioning method according to the present invention.

FIG. **14** is a diagram of a serialization method according to the present invention.

FIG. **15** is a system block diagram according to the present invention.

FIG. **16** is a flow chart of a biometric authentication method according to the present invention.

FIG. **17** is a block diagram of the system and environment according to one embodiment of the present invention.

FIG. **18** is a top view of a possible RFID transponder according to one embodiment of the present invention.

FIG. **19** is a material stack specification of an RFID transponder according to one embodiment of the present invention.

FIG. **20** is a side view of a web of release liner containing RFID transponders, provided on a source roll, stretched tight around a peel device, and advanced forward onto a take-up reel according to one embodiment of the present invention.

FIG. **21** is a side view of a handheld mobile encoder with an integrated bar code scanner according to one embodiment of the present invention.

FIG. **22** is a diagram of a smartphone with FIPS 140-2 module and near field couplers according to one embodiment of the present invention.

FIG. **23** is a flow chart of a first method according to the present invention.

## DESCRIPTION OF THE INVENTION

Making reference to various figures of the drawing, possible embodiments of the present invention are described and those skilled in the art will understand that alternative configurations and combinations of components may be substituted without subtracting from the invention. Also, in some figures certain components are omitted to more clearly illustrate the invention. In some figures similar features share common reference numbers.

To clarify certain aspects of the present invention, certain embodiments are described in a possible environment—as identification means for containers. In these instances, certain methods make reference to containers such as loaded pallets, paperboard boxes, corrugated cartons, pharmaceutical containers, and conveyable cases, but other containers may be used by these methods. Certain embodiments of the present invention are directed for use with steel drums, commercial corrugated shipping cartons, tagged pallet-loads of shrink-wrapped cases, consumer-goods packaging, consumer goods, automobile windshields, industrial components, or other methods of identifying objects using RFID transponders or wireless sensors, or both. In certain embodiments the target surface to which a transponder will be attached is a container. In some applications the target surface is moving while the encoder device is stationary. Furthermore the moving target surface may be objects on a conveyor. In yet other embodiments the target surface may be a web of release liner from which encoded transponders will be later removed and applied to an object for identification.

Some terms are used interchangeably as a convenience and, accordingly, are not intended as a limitation. For example, transponders is a term for wireless sensors that is often used interchangeably with the term tags and the term inlay, which is used interchangeably with inlet. This document generally uses the term tag or RF tag to refer to passive inlay transponders, which do not include a battery, but include an antenna structure coupled to an RFID chip to form an inlay which is generally thin and flat and substantially co-planar and may be constructed on top of a layer of foam standoff, a dielectric material, or a folded substrate. One common type of passive inlay transponder further includes a pressure-sensitive adhesive backing positioned opposite an inlay carrier layer. However, certain aspects of the present invention work equally well with active inlay transponders. A third type: a battery-assist tag is a hybrid RFID transponder that uses a battery to power the RFID chip and a backscatter return link to the interrogator. Further, this document uses programmable RFID transponders interchangeably with RFID transponders. Programmable transponders enable data to be written or stored more than once.

Suitable environments or applications for certain aspects of the present invention include: traditional conveyor line or other high-speed machinery with automated transponder printing, encoding, and attachment; hand attachment of transponders (a method that often is referred to as "slap and ship"); and a novel category of mobile transponder encoders (as will be more fully described herein); shipside receiving of automobiles; case picking operations that include selective tagging process steps; and receiving untagged cartons into an RFID-enabled retail store or a manufacturing plant.

The systems, methods, and devices of the present invention utilize an RFID transponder or wireless sensors as a component. Certain RFID transponders and wireless sensors operate at Low Frequencies (LF), High Frequencies (HF), Ultra High Frequencies (UHF), and microwave frequencies. HF is the band of the electromagnetic spectrum that is centered around 13.56 MHz. UHF for RFID applications spans globally from about 860 MHz to 960 MHz. Transponders and tags responsive to these frequency bands generally have some form of antenna. For LF or HF there is typically an inductive loop. For UHF there is often an inductive element and one or more dipoles or a microstrip patch or other microstrip elements in their antenna structure. Such RFID transponders and wireless sensors utilize any range of possible modulation schemes including: amplitude modulation, amplitude shift keying (ASK), double-sideband ASK, phase-shift keying, phase-reversal ASK, frequency-shift keying (FSK), phase jitter modulation, time-division multiplexing (TDM), or Ultra Wide Band (UWB) method of transmitting radio pulses across a very wide spectrum of frequencies spanning several gigahertz of bandwidth. Modulation techniques may also include the use of Orthogonal Frequency Division Multiplexing (OFDM) to derive superior data encoding and data recovery from low power radio signals. OFDM and UWB provide a robust radio link in RF noisy or multi-path environments and improved performance through and around RF absorbing or reflecting materials compared to narrowband, spread spectrum, or frequency-hopping radio systems. Wireless sensors are reused according to certain methods disclosed herein. UWB wireless sensors may be combined with narrowband, spread spectrum, or frequency-hopping inlays or wireless sensors.

System and Encoder Overview

Referring to FIG. **1** the present invention includes a system for commissioning wireless sensors at a point of use and on-demand. For example, in one embodiment, the present invention incorporates a mobile encoder device **30**, which may be attached to a belt of an operator and powered by rechargeable batteries **60**. The mobile encoder is in wireless communication with a remotely located host com-

puter. The operator can selectively (on-demand) enable the mobile encoder to commission a transponder based on various criteria, including input received from a mobile bar code scanner, for example.

FIG. **1** shows one system **10** according to the present invention in a typical environment, such as a packaging facility wherein a collection of entities with visual external labels **15** exist and a sub-set (or all entities) need to be associated with a wireless RFID transponder, tag, or label. The object **17** needing an RFID transponder could be a packing container having an assorted collection of entities **15**. As entities **15** are pulled from collection **176**, a traditional optical reader 13 (human or machine) interprets the visual external label. Information from the external, visual label is correlated to information stored in a centralized location, represented by a network computer **11** having a database. The information taken by the optical reader **13** is transmitted to the network computer **11**. System **10** includes a wireless connection between the remote computer **20** and the mobile encoder **30** either directly or through a common wireless access point. Additionally, a wireless connection could occur between the remote computer **20** and the host computer **11**, and in this embodiment, the remote computer **20** is in physical connection with the mobile encoder. In yet another embodiment, the remote computer **20** wirelessly connects to both the mobile encoder **30** and the host computer **11**. Optionally, the optical reader **13** can be incorporated in the encoder **30**.

Referring to FIGS. **3** and **4**, in further embodiments, the present invention incorporates a mobile encoder device **175**, **30**, or **220** which may be held in the hand of an operator. Mobile encoder device **175**, **30**, or **220** is preferably powered by rechargeable batteries or a fuel cell. System **170** includes at least four possible intermittently connected entities if they are present and connected: mobile encoder **175**, remote computer or mobile phone **154**, optical reader **173**, and headset **174**. A preferred short range wireless connection means **175A** such as a WLAN (Wireless Local Area Network) or PAN (Personal Area Network) may be established from time to time between mobile encoder **175** and remote computer or mobile phone **154**, optical reader **173**, and/or headset **174**. There is a preference for low power wireless connection apparatus within mobile encoder **175** so as to realize the greatest possible battery life in light weight mobile encoder **175**. Mobile encoder 175, **30**, or **220** is in intermittent wireless communication with a mobile phone or computer **154** typically at close range through wireless communication means **175A**. Database and associated host computer **171** may be housed at a remotely located facility that may optionally be accessed over a large distance through remote computer or mobile phone **154**. A mobile phone is a preferred bridge between two or more wireless networks, for example a PAN and a wireless subscriber network that supports wireless data services for ultra mobile and remote tagging applications. Continuous wireless connection to a host database is not required for ongoing tag commissioning process steps disclosed herein.

RFID tags such as those using EPCglobal numbers requires uniqueness of the numbers that are encoded. GS1 is a central authority that prescribes a set of hierarchies for each key type (type of identity such as an SGTIN) whereby GS1 designates itself as the central issuing authority for each key type. Authority is passed down in a hierarchical manner to member companies. Each member company has the authority to further allocate numbers from its upper level database to as many lower database levels as it deems necessary to distribute number authority throughout its enterprise.

Quasi-autonomous RFID transponder encoding authority is achieved when an external number issuance authority allocates to the encoder blocks of numbers for specific object classes. A preferred embodiment for quasi-autonomous transponder encoding authority is realized when large pre-authorized blocks of serial numbers are made available to encoder **175** or **30** to utilize on object classes as objects of a class are presented for tagging. A preferred method of providing pre-authorized blocks of object class serial numbers is to subdivide the entire object class serial number space into sectors that are defined by a limited number of MSB's (Most Significant Bits) of the serial number field. The object class serial number space is defined by the number of serial number bits that are used in a specific standard, such as a particular EPCglobal key type, for example an SGTIN-96 and is defined in a corresponding specification such as the GS1 EPCglobal EPC Tag Data Standard. Again using the SGTIN-96 as an example, there are a total of 38 bits used to define the entire serial number space which contains $2^{38}$ unique numbers. For example the upper 14 bits could be designated as the most significant bits for a particular embodiment. In that case the object class serial number space would be comprised of 16,384 sectors. Since in this example there are 14 most significant bits within a 38 bit serial number field, there must be 38 minus 14 bits of lesser significance, which equals 24 bits. Therefore the lower 24 bits represent 16,777,216 unique serial number values. Once a sector is allocated to a lower level within an authority hierarchy, it is referred to as a block. Each allocated block of serial numbers represents authority for encoding objects of an object class that can either be used by an encoder for encoding transponders, or allocated to a lower level in the authority hierarchy.

In a preferred embodiment serial number block sizes are sufficient to operate encoder 175 or **30** for extended periods of time without any further external authorization steps. For example autonomous operation for a week or more is possible with sufficiently large block sizes. In the previous example the encoder could encode over 16 million objects of an object class without the need to reconnect with a higher level authority. If 10,000 objects of an object class are encoded each day, then the encoder could operate in a quasi-autonomous mode for up to 1677 days or over four years without receiving further authorizations from a higher level authority. Block allocations are preferably assigned with reference to how many encoders **175** or **30** are authorized to operate within the facilities of the owner of certain object class numbers.

Authorizations for one or more classes of objects are preferably loaded into encoder **175**, **30**, or **220** from an external authority where such authorizations include data fields such as manufacturer ID, item reference, manufacturer code lengths, filter values (that designate packaging levels such as item, case, pallet, etc.), serial number starting point for a block, and other pre-determined parameters. Such information is preferably loaded into the memory of the encoder in advance of tag commissioning operations. Thus if loaded with information for more than one object class, encoder **175**, **30**, or **220** does not have sufficient information to proceed with encoding a transponder until a single object class is selected for the present RFID transponder to receive; an ambiguity therefore exists that is preferably resolved with information entered by an operator using either a keypad or a bar code scanner. Reading printed indicia such as a bar

code is a preferred method to resolve the ambiguity as to which object class the next RFID transponder is to receive a number from. Bar codes are used to eliminate errors and ambiguities that enable encoder **175**, **30**, or **220** to locally generate or replicate data for encoding into a data carrier such as an RFID transponder.

GS1 is a leading global organization dedicated to the design and implementation of global standards and solutions to improve the efficiency and visibility of supply and demand chains. GS1 defines EPCglobal SGTIN number fields as having a company prefix, an item reference, a partition value, and a filter value that comprise the object class information. A unique serial number is then added to that information to create each unique instance within each object class.

In a preferred embodiment, a block is allocated and managed using three numbers: a starting number that is the first serialized instance of a block, a block size which represents the total number of instances in the block, and a counter or index that represents how much of the block has been used during an encoding process. Using these three numbers and an optional lock bit, a simple database of object class authorizations can be built.

A preferred embodiment utilizes RFID authorization transponder **178**A and a printed substrate **178**B to physically handle object class serial number issuance authorizations. Authorization transponder **178**A is interrogated by transponder reading/encoding means **175**H. Preferred embodiments use the 96-bit EPC memory bank for specifying the block starting number, including the company prefix, item reference, partition value, filter value, and base serial number. The User Memory bank is used to hold and transfer the block size (preferably 16-bits), counter or index value (preferably 16-bits), a 16-bit header to identify the transponder as a valid member of a class of authorization transponder, a lock bit, and a CRC value to detect errors in all of the data fields. For example a CRC error would detect errors in storage, transponder selection, or data transmission. In preferred embodiments reading of data blocks from more than one RFID transponder would be avoided by selecting a transponder, checking that it is the correct type, contains valid authorization data, contains a valid header that signifies that it is an RFID authorization transponder **178**A, and that all data read correctly verifies with a dedicated error detection field such as a CRC.

RFID authorization transponder **178**A is preferably adhered to printed substrate **178**B so that an operator can visually identify what object class or SKU is managed by the affixed authorization transponder **178**A. A picture, icon, bar code, or human readable symbols are all useful for identifying the object class. An operator presses a button or scans a bar code that prompts encoder **175** to read and store the tagging authorization held by authorization transponder **178**A. Once read, authorization transponder **178**A is preferably electronically marked as 'consumed' or 'locked' by transponder encoding means **175**H. EPC transponder ID fields that identify a specific type of chip are preferred for selecting the proper transponder, even when other RFID transponders are within range of the antenna or near field coupler of transponder encoding means **175**H.

A collection of authorization transponders **178**A comprises a database that can be physically transported without the need for a wireless communications link to encoder **175**. Once read, database records are preferably stored in internal memory means **175**G. In a preferred embodiment 12 to 14 bytes of Flash memory is used for each record to allocate 250 to 65536 instances of an object class, whereby the first



byte of an EPC number is a fixed header value can be replaced in Flash memory by 8 bits of the allowable block size. One or two bytes in RAM are used to count or index through the block allocation as it is used. Thousands of data records of this type can easily fit into the memory space of an economical 8-bit microcontroller. In a preferred embodiment, where the GS1 SGTIN-96 header is replaced in memory with an 8-bit block size authorization, **300** records for authorizing up to 255 instances per record, can be used to safely manage at least 500,000 tagging records using 24,000 bytes of Flash memory and **2000** bytes of RAM. Other embodiments using more bits to authorize and control larger blocks of numbers is possible at a slightly larger expense of memory.

A preferred embodiment uses a computer, preferably a smartphone such as an iPhone from Apple Inc. of Cupertino, Calif. as a lower database level to transfer encoding authorizations from upper level database authorities to RFID encoders. A smartphone such as the iPhone or an Android phone using software from Google would be a preferred embodiment of a lower database level and or an encoder using an antenna or near field coupler similar to near field coupler **224A2** of FIG. **21** or **238***a* or **238***b* of FIG. **22** to couple with RFID transponders for encoding and verification. The iPhone also has cellular data transmission radios and software stack to enable the iPhone to access remotely located servers in a cloud computing architecture.

The smartphone establishes a connection with a cloud-based server using JavaScript, ASP, JSP, PHP, Perl, Tcl or Python scripts to access a database such as mySQL that is available from Oracle Corporation of Redwood Shores, Calif. Using structured query language, SQL database tables are preferably used to store tag commissioning data, configuration information, and serial number block allocation records. SQL queries provide information from database tables to the script, passing the result over the Internet, to the smartphone, which also then routes information to designated RFID encoders. Encoders are preferably identified by their media access control (MAC) address or a UUID which is guaranteed to be unique and is used by the smartphone as a lower database level to transfer encoding authorization to a specific encoder.

Preferred embodiments of encoder **175**, **30**, or **220** will encode all of the GS1 identity types. Such types include the General Identifier (GID-96), Serialized Global Trade Item Number (SGTIN), Serial Shipping Container Code (SSCC), Serialized Global Location Number (SGLN), Global Returnable Asset Identifier (GRAD, and the Global Individual Asset Identifier (GIAI). Other preferred embodiments are used to encode numbers that are a part of other numbering systems.

Data records are preferably loaded and stored through commands that are transmitted over wireless communication means **175**A. In preferred embodiments, batch mode commands can be used in any of three ways: (1) to immediately affect the current operation by starting a batch tagging process for a specified SKU or object class; (2) to store authorizations in memory means **175**G; and (3) to store authorizations in stored-value RFID transponder **178**A.

When external connection is necessary, wired or wireless communication with an external host or numbering authority is established. Wireless communication means **175**A is preferably a Wi-Fi or Bluetooth connection. A wireless node of a Bluetooth personal area network is used according one embodiment of the present invention. Model 100-SER manufactured by EmbeddedBlue of Poway, Calif. and the BISMS02 from EZURiO Ltd., a subsidiary of Laird Tech-

nologies, Inc. of Chesterfield, Mo. are examples of preferred OEM Serial Bluetooth modules. Other wireless interfaces may alternatively be used to achieve Serial Port Profile and other types of connectivity between encoder **175** and remote computer or mobile phone **154** and/or optical reader **173**.

Other preferred embodiments of mobile encoder **175** and system **170** replace wireless communication means **175**A with a cable, resulting in an embodiment of mobile encoder **175** with a tethered bar code scanner. A key advantage of an alternative embodiment of system **170** that utilizes a wired connection to optical reader **173** instead of wireless communication means **175**A is a very simple solution having virtual immunity to any surrounding RF interference that might raise the noise floor hindering wireless communications.

The operator can cause mobile encoder **175**, **30**, or **220** to commission a transponder by scanning certain printed bar code symbols received through optical reader **173** which is connected to encoder **175** through wireless communication means **175**A. Or alternatively internal optical reader **175**F is used to scan printed bar code symbols. In either case data from optical reader **173** or **175**F is delivered to processing means **175**B. Certain preferred embodiments of system **170** use optical scanners with self-contained symbol decoding capabilities to deliver decoded symbol information to processing means **175**B. Certain other embodiments of system **170** relies on processing means **175**B to conduct some or all decoding operations to derive information from scanned symbols.

The information derived from the optical reader **173** or **175**F is used by mobile encoder **175** to either directly or indirectly encode data into RF transponder **178** while it is still physically within mobile encoder **175**. Mobile encoder **30** uses external optical reader **173**, and alternatively mobile encoder **220** uses internal optical reader **175**F, as embodied in reader **226** of FIG. **21**. Preferred embodiments of optical reader **226** are mechanically aligned relative to transponder encoding means **175**H or more specifically with the antenna or near field coupler of RFID interrogator **224**A. Spatial alignment assures that an operator will be able to comfortably scan bar codes and then encode and apply RFID transponders along a line of movement such that the operator can easily assure proper placement of encoded transponders.

Symbol decoding functions may be physically, electrically, or logically separated from symbol scanning operations. One preferred embodiment of optical reader **173** is a model CHS-7M, CHS-7P, CRS-9M or CRS-9P Bluetooth ring scanner.

Processing scanned commands involves a processing step to determine that a bar code should be interpreted as a command or configuration instructions rather than as bar code **179** that identifies an object that is to be tagged. Commands are used to alter the flow and operation of mobile encoder **175**.

FIG. **21** is a preferred embodiment of a mobile encoder wherein optical reader **226** is an OEM bar code scanner manufactured by such companies as Intermec or Motorola and is a preferred embodiment of optional internal optical reader **175**F shown in FIG. **17**.

In a preferred embodiment one or more bar codes are pre-printed and applied as symbol **179** on entity **177** in a manufacturing facility or other suitable location. Such bar codes are described in ISO/IEC draft document PDTR 24729-1 and are more generally referred to as one or more bar codes having Application Identifiers (AI) 01 and 21 encoded into them, and preferably include header information and other control bits that are required for certain protocols. AI 01 is used to represent the Stock Keeping Unit (SKU) as a GS1 Global Trade Item Number (GTIN). AI 21 is used to serialize the SKU. Together the two AI's are used to specify a GS1 serialized GTIN (SGTIN). Bar codes can also be used to specify data payloads that use numbering systems other than the EPC numbering system. The Application Family Identifier (AFI) also plays an important role in designating alternative numbering authorities.

This preferred method that is described by the flow chart in FIG. **23** will allow batch mode operation where there are at best intermittent connections with remote computer **154**. This preferred method allows existing label application and/or printing hardware located on existing manufacturing lines to provide in printed symbolic form all data that would be encoded into an RF transponder. By providing printed symbols, manufacturers do not have to incur either the cost of that transponder or the special equipment that is required to encode and apply RF transponders.

Optical reader **173** or **226** is described above and is used as the primary source of real time data input for the mobile encoding system that uses an embodiment such as mobile encoder **30** or **220**. Optical reader **173** or **226** is also preferably used to scan special bar codes that instruct mobile encoder **175**, **30**, or **220** to perform certain prescribed functions which will be described below.

Certain preferred embodiments of system **170** include headset **174** which may be a headset worn by the operator or a Bluetooth-linked loud speaker that is mounted to a pallet jack or fork lift truck. Headset **174** is optionally used by system **170** to give instructions, confirmation signals, or warnings to the operator. Synthesized speech or audible tones are used to interact with the operator through headset **174**.

In these aforementioned embodiments, the mobile encoder **30** is a portable device that can be easily mounted in a fixed location, carried such as mobile encoder **220**, or worn by a human operator such as mobile encoder **30**, or hung from a suspended retractable tool cable. As such, the mobile encoder **30** includes an internal power source **175**E such as a rechargeable lithium-ion battery and would further include a handle or a belt-clip for ease of use. In another embodiment, the mobile encoder can be attached to a high-speed conveyor line. In such an application, the on-board battery could be replaced or augmented by a physical connection to a remote power source. Further, the computer **20** could have wired connects to the host network **11**. Further details of possible configurations of the mobile encoder will be further detailed in subsequent sections of this disclosure.

In the system **10** of FIG. **1**, the mobile encoder **30** carries a supply of un-commissioned (or blank), or securely encodable RFID transponders **175**J, **185**, **42**, or **221**E. Once the desired data is accumulated and presented to the encoder **30** from the computer **20**, the encoder commissions an RFID transponder, using transponder transport means **175**C and transponder encoding means **175**H and any one of several preferred encoding algorithms to program, creating an RFID tag or label **50** for the object **177**. Transponder separation means **175**D is used to separate a properly encoded transponder **178** from release liner conveyance web **182** by breaking the bond at adhesive layer **181**D on the leading edge of transponder **178**. Transponder separation means **175**D is preferably a peel device **183** as shown in FIG. **20** or peel device **222**B in mobile encoder **220**. Peel devices **183** or **222**B are preferably made from anti-static plastic, metal, or other material that will conduct electrostatic charge away from transponder **178** and release liner **182**. The commis-

sioned tag or label **50** can then be applied, linked, or otherwise associated with the object by known means including a human operator or a machine transfer.

RFID Transponders

FIG. **2** shows a preferred embodiment of an RFID transponder **50**. RFID transponders, in some embodiments, comprise an RFID integrated circuit (IC) device (or "chip") **56** of FIG. **3** or **180** of FIG. **18** bonded to an antenna apparatus, formed on a substrate that is often plastic such as Mylar®, polyester, or PET. One way to form an antenna structure is to etch copper from a substrate. An alternate printed transponder includes printing multiple layers of conductive ink onto a substrate. One additional method includes stamping UHF antennae from thin sheets of aluminum, or by selective aluminum deposition onto a substrate. In certain embodiments, RFID transponders and wireless sensors are recovered from waste streams for reconditioning, reprogramming, and reuse.

Other suitable RFID transponders include designs that combine a dielectric spacer behind the antenna by separating the metallic antenna inlay **181**C from surrounding metals that may detune it, or liquids that may absorb RF energy from it. The dielectric spacer creates a transponder that performs well over a broad range of packaging conditions. The dielectric material is a foam standoff material or an expanding mechanical structure that provides lift from the target object and also a more robust design also includes features to protect the transponder from damage.

In certain embodiments, the RFID transponder is both programmable and mechanically configured for tensile extraction from a protective enclosure.

In preferred embodiments, hundreds or thousands of instances of RFID transponder **178** are manufactured on a continuous web of flexible material with a spatial separation between them, preferably at regular intervals. Certain preferred embodiments use adhesive-backed transponders **178** adhered to release liner **182** as shown in FIG. **20**, while other embodiments use the transponder material as its own conveyance that is severed from the rest of the web at predetermined locations, preferably after encoding and verifying transponder **178** is properly functioning.

In preferred embodiments of the present invention, the face stock material has a physical outline that is not much larger than the physical outline of the inlay itself. This is in contrast to labels which can have at least twice the surface area of the inlay or a direct-printed antenna structure in order to provide space for printed information. By having a label outline that is so much larger than the inlay surface area, there are a many possible combinations of inlay placement within the boundaries of a large printable label. This creates a problem and a challenge for printer/encoders that have to find and locate an inlay before attempting to encode it. By contrast, the present invention uses the detectable optical characteristics of the tag's minimal physical outline to position the transponder for encoding. This transponder positioning method is superior and an improvement over prior art that uses printed label stock as a carrier for RFID inlays wherein the physical dimensions of printed labels are not in any way a reliable indication of the location of the RFID inlay within the label. This is another example of how demand label printing further complicates RFID transponder encoding.

In one embodiment that is an exception to the minimal outline transponder design and positioning method described above, transponders that have a very long physical shape can be used to create a loop to secure an encoded transponder to a tree, a bush, or the handle of a piece of luggage. Preferred embodiments of such transponders are folded or rolled in order to package them onto a dispensing roll or packaged into a magazine or cartridge in a fan fold pattern. The resulting bundle of back-and-forth 'Z' folded or fan folded face stock material results in a compact package that minimizes the amount of release liner that needs to be wasted for each tag. Each z-folded transponder is then easily encoded and dispensed from encoder **175**, **30** or **220**. Transponders that can be encoded, verified, dispensed, and unfolded are advantageously used in forestry, ornamental nurseries, and airline baggage tracking applications where manual tagging is required.

In another embodiment, transponder **178** is pushed out of encoder **175** instead of being pulled out through tensile extraction. A transport mechanism for pushing transponders utilizes a gripping method such as friction or teeth that penetrate the webbing. Although there is a risk of jamming or mutilating the webbing, the advantage is that there is no need for a release liner to pull the transponder supply through encoder **175** using tensile extraction. A preferred 'tractor feed' embodiment mitigates the risk of web mutilation by utilizing a regular pattern of precut holes along one or both edges of the webbing, into which cog members of a drive mechanism engage to advance the webbing. A tractor feed embodiment is part of Transponder Transport Means **175**C of FIG. **17** whereby a motor and gear train delivers drive torque to the web through friction rollers, penetrating teeth, cogs, or other mechanical engagement means. In such an embodiment, the preferred transponder separation means is a web cutter that is used to separate encoded transponders from unencoded tags. A web cutter can be either active or passive, in other words cutting force can originate with a motorized mechanism or with an operator's handling during dispensing and transponder detachment. A row of plastic or metal saw teeth is a preferred embodiment of a passive transponder separation device.

In another preferred embodiment, transponder **178** is manufactured on a high speed press, a bar code is printed onto face stock of transponder **178** and information that is representative of that bar coded information is also encoded into microchip **180**. Then encoder **30** or encoder **220** preferably read that information from RFID microchip **180** and associate it with a transponder commissioning process that may or may not include the programming of additional information into RFID microchip **180**. This is a novel method of reading bar coded information on transponder **178** without using a bar code scanner to do so within encoder **30** or **220**.

In one embodiment, additional transponder layers include a thin and flexible energy cell comprising two non-toxic, widely-available commodities: zinc and manganese dioxide. One suitable energy cell is developed by Power Paper Ltd. of 21 Yegia Kapayim Street, Kiryat Arye, Petah Tikva, P.O.B. 3353, ISRAEL 49130, and incorporates an innovative process that enables the printing of caseless, thin, flexible and environment-friendly energy cells on a polymer film substrate, by means of a simple mass-printing technology and proprietary inks. The cathode and anode layers are fabricated from proprietary ink-like materials that can be printed onto virtually any substrate, including specialty papers. The cathode and anode are produced as different mixes of ink, so that the combination of the two creates a 1.5-volt battery that is thin and flexible. Unlike conventional batteries, this type of power source does not require casing.

A top layer of an RFID transponder assembly optionally comprises a paper face-stock **181**A, which is a very low-cost material but also is the least environmentally resilient.

UV-resistant plastic face-stock **181**A generally provides the best survivability in outdoor and rough-service environments, and also provides the best protection for the RFID transponder assembly.

A bottom layer of pressure-sensitive adhesive (PSA) **181**D often is used for attachment of transponders to objects and often is referred to as a wet inlay or a wet tag or a wet transponder because of adhesion layer **181**B. Alternatively, a layer of clear, translucent, or opaque adhesive-backed film or tape is used to attach the transponder or wireless sensor to object or container. The tape, any thin, low cost, flexible material with a self-adhesive backing, such as a conventional packing tape, is well-suited for this method of attachment. The tape may be formed into various shapes to achieve the requirements of this method. Certain embodiments may use tape that is preprinted with certain logos, marks, symbols, bar codes, colors, and designs. Suitable adhesive-backed tape must not—or at least minimally—absorb radio frequencies within the range of frequencies used by the transponder or tag. The tape material, also, must not corrode the device or otherwise hamper its functionality.

Certain embodiments use a type of packing manufactured specifically for a given encoder. Packing tape can be single-coated pressure-sensitive adhesive tape or, alternatively, media constructed with multiple layers including a backing layer. Certain backing layers are constructed on a plastic film having one or more layers. Certain backing layers are made from plastic resins such as polypropylene (PP), polyethylene (PE), or copolymers of PP, PE, PVC, polyesters, or vinyl acetates. Certain embodiments of PP are mono-axially oriented polypropylene (MOPP), bi-axially oriented polypropylene (BOPP), or sequentially and bi-axially oriented polypropylene (SBOPP). Certain backing layers are biodegradable. Certain backing layers are coated with a pressure sensitive adhesive on one side and a low adhesion release coating on the other side to reduce the amount of power required for the encoder to unroll the tape for application.

FIG. **3** shows a possible embodiment of an RFID transponder **50** that does not include an encapsulation layer comprising a separate tape. In this example, an adhesive layer **52** bonds with antenna layer **54** that is bonded to inlay substrate layer **58** and integrated circuit **56**. Inlay substrate layer **58** and face-stock layer **51** provide resistance against electrostatic discharge (ESD) into antenna layer **54** or chip **56**.

Other constructions for RFID transponders include one or more additional layers of high-dielectric material that encapsulate or substantially cover the inlay. In general, the thicker the dielectric layer the higher the voltage must be to initiate a flow of electrons through a dielectric layer. This results in higher ESD voltage ratings. Also, it is well known to those skilled in the art that thicker dielectric layers between antenna layer **54** and any other metal or liquid also tends to reduce parasitic loading of the antenna whereby maintaining antenna tuning for proper coupling to interrogators within a specified UHF band. In such embodiments, the integrated circuit chip and antenna bond to an adhesive layer and are protected from a discharge path through the tape layer by its particular thickness of dielectric material. A second dielectric layer bonds to the inlay substrate by a second adhesive layer, so that a low voltage discharge path is nonexistent around the two layers of tape substrate.

In another possible embodiment of an RFID transponder, the inlay substrate provides a second layer of ESD resistance against a discharge path through an outward-facing tape layer and associated adhesive layer. This construction protects the antenna and chip from electrostatic discharge originating from any direction. The encapsulation tape layer bonds to the antenna and chip via an adhesive layer and provides no adhesive bond to the transport container when the transponder is commissioned, and therefore depends on separate adhesive zones to attach to the container of interest.

In another possible embodiment, an RFID transponder includes multiple layers of ESD resistant material. For example, an outer layer substrate bonds to an inner substrate by an intermediate adhesive layer. A second adhesive layer bonds with the chip and antenna. The inlay substrate faces inward and presses against a transport container when the transponder is commissioned.

The contemplated adhesives in the various RFID transponder embodiments create strong and permanent bonds between tapes and inlay layers over a certain practical range of operating temperatures.

Because RFID transponders are designed to adhere to a container, one face of an external layer includes a pressure-sensitive adhesive. This external adhesive, however, must not cause mechanisms associated with the commissioning devices to jam. To prevent unwanted sticking of the RFID transponder, a transport layer protects the sticky, external adhesive. The transport layer is either a release liner such as a silicone-treated paper liner or a net (or mesh) web. A net or mesh web offers two principal advantages: less weight and being recyclable or reusable. A comparison of the weight of a net with a higher percentage of open area to a typical sheet of release liner reveals that the netting is lighter for any given section of comparable size. Environmental problems of disposal of release liner are well known. Mesh or netting, comprised of recyclable resins, is recovered after each use so that the mesh or net can be either reused or recycled for its constituent materials.

In one possible embodiment the mesh or netting is made of plastic such as nylon, polypropylene, polyethylene, HDPE, Teflon, or other resins. In other embodiments the mesh or netting is fabricated from metal or carbon-impregnated plastic to provide a conductive path to bleed electric charge away from points of accumulation.

Other advantages of a net or mesh transport layer include a substantial percentage of the adhesive not in contact with anything during storage and commissioning. When stored in a roll, a small percentage of the adhesive layer makes contact with the backside of the roll through the openings in the mesh. Thus, a small amount of energy is required to unroll the spool during transponder commissioning, yet there exists a certain amount of adhesion to prevent a converted spool from unraveling.

In other possible embodiments, the RFID transponders can include a surface suitable for human or machine readable, visible, external markings including bar-code symbols or alpha-numeric sequences.

FIG. **4** shows another embodiment of RFID transponders **50** grouped on sheet stock **59** such as rolls or z-folded sheets that enables a plurality of transponders to be carried on a continuous web or traditional release liner. Other certain embodiments use transponders that are stacked and loaded into magazines for transport, handling, and automated dispensing. In certain embodiments, the magazines contain metallic shielding to protect transponders and inlays from electrostatic discharges (ESD).

In certain embodiments an RFID encoder is combined with a sensor suite **218** as shown in FIG. **10** to enable semi-automated tag application to desired objects. In one embodiment, a semi-automatic encoder/applicator is created by integrating a single sensor device. The sensor responds to

changes in light, capacitance, pressure, acoustics, or optical path length to a transport container. In another embodiment a suite of sensors are used to detect the attachment location of a commissionable transponder.

For example, changes in capacitance are detectable using certain QProx charge transfer capacitance sensors available from Quantum Research Group Ltd. of Hamble, England. Ultrasonic range sensors are available from supplier such as muRata Manufacturing Co., Ltd. of Kyoto Japan under the trade name Piezotite. Optical path length sensors are available from Keyence Corporation of Osaka, Japan. Sharp manufactures a compact distance-measuring sensor GP2D02 that is responsive in the range from 5 to 100 cm. Thus, when a predetermined set of conditions is realized, the sensor triggers, enables, or selects a desired action. In one embodiment, proximity or contact of sensor suite with the targeted transport container causes a second type of Trigger Event, resulting in the commissioning and dispensing of a transponder by an encoder.

In other embodiments, sensor **218** is designed to determine the distance an encoder resides from an object that is to be tagged. Range information is acquired and processed in real time to determine if the encoder is in Close Proximity, Near, or Far from a transport container. In certain embodiments a controller is programmed to alter threshold distances between each range category and to associate a function with each range. In certain embodiments, range category Close Proximity is associated with transponder programming and application functions. For example, the range category Near is reserved for transponder verification and/or reading functions; and Far is reserved for bar code scanning functions to verify that bar code information aligns properly with RFID transponder data.

In other embodiments a sensor suite is responsive to certain colors or patterns and uses that information to instruct the placement or detect the correct locations for applying good transponders and separate locations for discharging bad transponders.

FIG. **20** also shows how transponders **178** are rolled onto reels in preparation for encoding. Source roll **185** contains a supply of transponders ready for encoding. Release liner **182** conveys transponders **178** around peel device **183**. Unless transponders **178** are mechanically prevented from rotating around peel device **183**, they are conveyed onto take-up roll **184**. Take-up reel **184** advances forward while source roll **185** lags behind due to drag created by a clutch, brake, motor or other back-torque generating device. Opposing torques of take-up reel **184** and source reel **185** result in tension in release liner web **182**. Shape memory in face stock **181**A preferably prevents transponder **178** from remaining adhered to release liner **182** as it passes over peel device **183**, resulting in the leading edge lifting off and separating from webbing **182**. If take-up reel **184** continues to advance, and transponder **178** does not collide with another object, its attachment to release liner **182** on its trailing edge will result in that transponder being passed completely around peel device **183** onto take-up reel **184**. Full path rotation is preferably reserved for transponders that fail to properly encode desired information; and is therefore intended to be a reject process for failed transponders. Preferred embodiments result in tension created in web **182** in a process of tensile extraction of transponders from a source reel and selective transfer of good transponders onto an object or a person's finger. Mobile encoder **30** depends on a person's finger to prevent transponders **178** from rotating around peel device **183**. Mobile encoder **220** depends on a target object such as carton face **228** to prevent transponder **223**B from rotating around peel plate **222**B on a path toward take-up reel **221**J.

When the conveyance of RFID transponders results in the positioning of a transponder relative to a near field coupler within a signal null, the transponder and transport webbing are preferably nudged forward or backward to improve the signal coupling. This is preferably accomplished by momentarily activating the motor and transponder transport means **175**C.

Mobile Encoder

FIG. **17** shows a system **170** according to one embodiment of the present invention including a mobile encoder **175**. FIG. **5** shows a preferred embodiment for a mobile encoder. Mobile encoder **30** is comprised of housing **32**, belt clip **34**, antenna **36**, on/off switch **33**, system ready LED **37**, data ready LED **38**, and transponder ready LED **39**. It is further comprised of auxiliary switch **40**, and charger plug **41**. A cartridge or other pre-packaged self-contained supply of transponders **42** is preferably latched, snapped, clicked, popped, inserted, slid, or releasably mounted to the body of housing **32**. The cartridge preferably includes a take-up reel **44** for non-dispensed RFID transponders, and a port through which blank or securely encodable transponders emerge from source reel **43**. The source reel is preferably comprised of a core which may be made from plastic or a recyclable kraft paper fiber to form a wound tube. A tube extends from the walls of cartridge **42** to form an axle around which release liner and transponders are wound and subsequently unwound.

In certain preferred embodiments source reel or roll **43** is constructed using materials such as non-petroleum-based plastics, laminated paper layers, and materials primarily comprised of natural fibers. In another preferred embodiment the entire pre-packaged self-contained supply of unused transponders is transported to mobile encoder **175**, loaded into it, consumed, and disposed of preferably without generating landfill waste.

A key aspect of this invention is a complete pre-packaged, pre-assembled, pre-threaded, self-contained supply of encodable transponders, preferably unlocked with cryptographic access methods. The supply is preferably configured for efficient transportation and shipping, conveyance to a work site, and easy loading into mobile encoder **175**, preferably in a single fluid motion.

FIG. **21** is a preferred embodiment of system **170** wherein printed symbols are optically scanned by internal optical reader **226**. The embodiment shown in FIG. **21** uses a preferred method of sensing the linear motion of mobile encoder **220** across a target surface by using an optical mouse sensor **225**. Such devices are commonly used to track the hand movements of the operator of a computer. Motion in either the X or Y direction is translated into numerical displacement representations which when timed are converted into linear velocities. Tracking and processing the primary axis of motion parallel to the major axis of the release liner, the web speed is preferably controlled by processing means **175**B and transponder transport means **1750** such that transponder **223**A advances at a rate of speed that matches the velocity of the entire mobile encoder across the target surface. Optical mouse **225** tracks displacement across the target surface and also acts as a tamp head to strengthen the adhesive bond of each freshly applied tag. The process of attachment of the encoded transponder to the target surface is along a vector that is nearly parallel to the target surface at a speed that is based on real time feedback from the surrounding environment as sensed by the optical

mouse or other sensor. Optical mouse sensor **225** preferably illuminates its target surface with either a LED (Light Emitting Diode) or a laser. Avago Technologies of San Jose, Calif. manufactures a variety of mouse sensors, both LED-based and laser-based. Laser illumination provides smooth and accurate motion sensing across a variety of surfaces. The model ADNS-6150 small form factor lens working in conjunction with the ADNS-6530 integrated chip-onboard laser sensor and single-mode vertical-cavity surface emitting laser can be used to not only detect motion in the X and Y directions, but also to some degree in the Z direction. Displacement along the Z (depth) vector is reported by the decrease in the number of resolvable features within the field of view as the target surface fades away from the optical focal point. That measurement is reported in the surface quality (SQUAL) register.

Optical mouse sensor **224**B is used to measure the linear velocity of transponders as they move along the path of the release liner toward peel device **222**B, as well as sense the gaps and edges between transponders **223**A and those adjacent to them. The physical outline **178** of transponders **223**A are a reliable indication of the location of RFID inlay **181**C located within each transponder **223**A and enhance system performance with reliable positioning relative to near field coupler **224**A**2**. The angular velocity of motor **227**B and gear train **227**A are controlled to achieve a linear transponder velocity that matches the velocity of the mobile encoder itself as it moves across the target surface. Therefore an operator with a fast hand motion is just as successful as a person with a slower hand motion, both will result in a transponder that lays flat, co-planar with the target surface, void of kinks or wrinkles that are characteristic of a poorly controlled transponder application process. In either case, transponder dispensing by transponder transport means **175**C will not initiate until optical mouse sensor **225** preferably illuminates the target surface and detects a minimum number of valid features as reported by the SQUAL register internal to the ADNS-6530.

RFID Interrogator **224**A encodes RF transponders using either LF (Low Frequency), HF (High Frequency), UHF (Ultra High Frequency), or microwave radio energy. Transponders may be powered by radio energy, light, or stored energy from a source such as a battery. RF coupling is preferably through a near field coupler, an inductive loop or other suitable transducer **224**A**2** connected to interrogator **224**A to focus RF energy on a small area within mobile encoder **175**, **30**, or **220**.

Certain preferred mobile encoder embodiments will not encode RF transponders that fail authenticity tests. In a like manner, RF transponders will preferably not allow themselves to be programmed unless the interrogator can successfully unlock its secured memory banks. This is a preferred method of protecting transponder cartridge and mobile encoder supply chains from counterfeits and knock-offs. Mobile encoder **175** and the transponders loaded into it will only be successful in exchanging certain data if certain data encryption and challenge response protocols are adhered to. In a preferred embodiment each authorized RFID transponder converter company uses one or more encryption keys to generate passwords that lock the RF tags, whereby preventing them from being programmed unless they are unlocked using the same password. Passwords of this type are specified in the EPC Gen 2 specification and in ISO standards. The passwords are preferably generated by processing means **175**B using a public key from publicly readable data such as an asset number or a transponder serial number. A shared private key is then used by an encryption algorithm such as AES in order to create a password or a collection of passwords that can be used to lock or unlock one or several RF tags. Other methods may be used that provide a high degree of certainty that the both the transponders and the mobile encoders are from legitimate sources. Individual failures or patterns of authentication failures are preferably reported to a central database through wireless communications means **175A** for subsequent fraud investigation.

Peel device **222**B is part of the mobile encoder and preferably rotates or pivots about pivot point **222**A into position **222**C and a corresponding position (not shown) in FIG. **21**. Peg **221**K helps guide the web to peel device **222**B. When cartridge **221** is inserted into applicator body **227**F the web is held in a non-interfering position by guide post **221**F and its accompanying cartridge guide post such that peel device **222**C can self-thread around the transport web without human effort. This is an improvement over prior art where a peel device is an integral part of the pre-packaged self-contained supply of transponders and requires threading during the cartridge manufacturing process.

Peel device **222**B preferably contains a shield on the outer face of the blade, through which radio energy will not pass to encode or interact with a rejected transponder **223**B. The dielectric material of the peel device **222**B provides sufficient separation from a transponder within the encoding zone and the shield on the back side of the peel device. This is another advantage over a peel device that is part of the cartridge, where the cost sensitivity is much more acute. The shielding on the back side of peel device **222**B may be any suitable metal attached or adhered in any reliable or economical manner against the non-conductive dielectric structure of the peel device.

Rejecting transponder **223**B requires that mobile encoder transponder peel device **222**B have sufficient clearance from target surface **228** as determined by optical mouse sensor **225** using either the SQUAL reading or the shutter readings. Such readings are used to determine if there is sufficient space to advance and rotate a bad transponder **223**B around the distal end of peel device **222**B.

FIG. **1** shows a system **10** according to one embodiment of the present invention including a mobile encoder **30**. And, FIG. **5** details one possible mobile encoder **30**. In this embodiment, the encoder can attach to the belt of an operator, accordingly, mounted on the housing **32** is a belt mounting means such as belt-clip **34**, which easily adjusts for left-handed or right-handed operation and corresponding mounting on the belt (not shown) of the operator. An external antenna **36** enhances wireless connectivity to a host or network computer (not shown in this view), or to a remote-mounted computer device such as a PDA or bar code reader. Several operator indicator lights **227**E including a system-ready LED **37**, data-ready LED **38**, and tag-ready LED **39** mounted on the housing enabling the operator an easy view of the device status.

Also included on the exterior of the housing are an external, power-cord receptacle **41** so that the on-board lithium-ion, nickel metal hydride, or other appropriate battery **227**D may be charged as required. A combination on/off-next switch **33** enables the operator to selectively power up the encoder. A reset port, such as a recessed reset button (not shown in this view), enables an operator to reset the software settings of the device circuitry on control board **227**C as may be required.

A cartridge **42** containing a plurality of RFID transponders releasably mounts to a face of the housing **32**. The cartridge further includes a take-up reel **44** for non-dis-

pensed RFID transponders, a port **46** (above take-up reel **44** but not shown in FIG. **5**) for dispensing commissioned transponders, and a supply reel **43** for holding blank RFID transponders prior to commissioning.

In further embodiments, a cartridge **221** containing a plurality of RFID transponders releasably mounts to the body of housing **227**F. The cartridge further includes a take-up reel **221**J for collecting release liner and non-dispensed RFID transponders, and a port through which blank or securely encodable transponders emerge from source reel **221**E. The source reel is comprised of core **221**A which may be made from plastic or a recyclable kraft paper fiber to form a wound tube. A tube extends from the walls of cartridge **221** to form axle **221**B around which core **221**A rotates. Brake shoes **221**C create drag, resulting in back torque on the source core, the magnitude of which is controlled by screw **221**D which with a knob (not shown) is used to adjust the force applied by brake shoes **221**C. The back torque for cartridge **221** is alternatively developed through a motor or an expandable friction coupling into a brake mechanism attached to encoder body **227**F.

Take-up core **221**H is driven by a tight coupling with drive hub **221**G. This tight coupling is achieved through a combination or selection of tight fit, expandable coupling, and sharp teeth. The result is a hub that will easily slide in or out of core **221**H with little effort, but still be capable of delivering a substantial amount of drive torque through that connection without slippage. Drive torque is delivered from gear motor **227**B to hub **221**G through drive gear **227**A the teeth of which engage with each other as cartridge **221** is set into position and locked into place.

In a preferred embodiment, mobile encoder **30** cryptographically unlocks, encodes, and verifies each transponder one by one. In preferred embodiments, transponders are verified more than once. One time immediately after programming with a desired data payload, and then again a second time after encoder **220** automatically dispenses an RFID transponder **223**A onto target surface **228**. This second verification step insures that the properties of target surface **228** or other nearby materials do not adversely affect the performance of transponder **223**A.

In another preferred embodiment, encoder **220** is used to encode and dispense a pattern of several transponders **223**A onto a target surface **228** at regular intervals in order to map the surface of a container for example in order to determine an optimal location for a placement of transponders. This information is then preferably used for engineering and planning purposes for high-volume transponder application in a production or distribution facility. Transponders may be designed for operation in any or all of the UHF, HF, LF, or microwave frequency bands.

In one alternative embodiment, the mobile encoder **64** includes a handle (as FIG. **9** shows, for example) for hand operation of the encoder. In another contemplated embodiment, the mobile encoder is fixed to an assembly line in a stationary manner. Accordingly, the stationary-mounted encoder further includes machine-controlled devices for extracting a commissioned RFID transponder from the encoder and places the transponder on the container of interest by means well understood in the art.

In the aforementioned embodiments of the mobile encoder **30** (or hand-held encoder **64** of FIG. **8** or FIG. **9**, for example) key features commonly shared include means for enable Gent EPC or ISO standards compliance and multiple printer-emulation modes. On-board power source **60**, such as a rechargeable lithium-ion, Nickel Metal Hydride, or other battery enables freedom of movement as does means for wireless connectivity to a data network, such as the 802.11 wireless LAN (Wi-Fi), Bluetooth, or other standards-based communications protocol. However, a conventional power source that requires connectivity to a power-grid and a cable-based data network connectivity link would work under certain circumstances.

Further, in contemplated embodiments, the fixed or mobile encoder enables selective mounting to a magazine or cartridge filled with un-commissioned RFID transponders, which facilitates rapid and easy loading of the encoder with ready-to-use RFID transponders and further enables re-use, re-commissioning, and recycling of un-dispensed transponders and the associated cartridge. The mobile encoder can be monitored and controlled by virtually any handheld or mobile device, a host computer in a central location, or over the Internet.

Certain features and methods described and explained with relation to handheld applicators are also relevant to non-mobile RFID tag applicators that use a magazine, cartridge, reel, or roll to handle, transport, and dispense RFID tags, inlays, transponders, or wireless sensors. Magazines, cartridges, reels, and rolls are preferably capable of carrying either new or used tags and are preferably capable of being used in either mobile or non-mobile applicators. Magazines, cartridges, and reels are preferably refilled and reused. Magazines and cartridges preferably protect RFID tags from ESD.

Cartridges preferably indicate their empty/full status with a visible indicator such as: an LED, an LCD, a mechanical flag, a window with a view into the source reel, or other such indicators that help an operator choose which cartridge from which to next consume tags.

The mobile encoder **30** is activated (turned on) when an operator selectively depresses the combination on/off-next switch **33**. However, depressing the on/off-next switch for about three seconds or longer results in a sleep-mode cycle that can be interrupted by re-pressing the on/off-next switch. In sleep mode the operator indicators (LEDS **37**, **38**, and **39**) will turn off. If active, the mobile encoder system-ready LED **37** illuminates and connects to the assigned network. Network connectivity results in the illumination of both the system-ready LED **37** and the data-ready LED **38**.

Mobile encoders **175** and **30** optionally receive commands and data via the wireless link from the remote computer **154** or optical reader **173**. Special bar code commands are scanned by optical reader **173**, passed through wireless communication means **175**A, and interpreted by processing means **175**B mobile encoder **175** to perform certain pre-programmed functions. Commands originating from either computer **154**, optical reader **173**, or internal bar code scanner **226** (also designated in FIG. **1** as internal optical reader **175**F) perform functions in categories that include power management, data management, wireless configuration, security, configuration options, and utilization of internal resources.

The encoder receives commands and data via the wireless link from the remote computer **20** or host network computer **11** (of FIG. **1**). The data represents information to be encoded on an RFID transponder. The information is stored in the encoder's on-board memory and the tag-ready LED **39** or **175**K rapidly blinks green (cycles on/off to pulsate). An RFID transponder is moved from within the cartridge **42** to a position on the top edge of the cartridge for encoding in the encoder and the transponder is encoded with the appropriate information. The transponder is tested and if it is good—contains the data and encoding was successful—all three indicator LEDs indicate a solid-green color. The opera-

tor removes the encoded RFID transponder from the encoder and places it on the container of interest.

In the event that the encoding process failed, the bad transponder is detected and retained by the encoder, where it remains on the take up reel **44** inside the cartridge **42**. The take up reel also collects the release liner as the encoder **30** dispenses good transponders (properly encoded RFID transponders). The take up reel returns to a re-cycling center where components are re-used or recycled as necessitated. Further, the re-cycling center can perform failure analysis on returned transponders.

FIG. **7** is a schematic diagram of additional electromechanical components **70** (as generally referred to in FIG. **6**) and logic components of a possible encoder **30**. An RFID Module **63**, such as a MP9311 UHF reader module available from Sirit Technologies, 1321 Valwood Parkway, Suite 620, Carrollton, Tex., 75006, USA, communicates with a vertical polarized YAGI antenna **62** with a downward side lobe to low-power program (commission) RFID transponders to create an RFID transponder, and the same downward side lobe and verify transponders at low power also can read far-field transponders at a higher, second power. Additional components include a mechanical paddle trigger **86** for operator-selected override of the reel of RFID transponder stored in the supply or source reel **43** in the cartridge **42**. A drive motor **76** coupled to a dual output shaft gearbox drives the source transponder reel **43** via an intermediate take-up reel gear interface **78** at the cartridge mouth. Another gear assembly along with a spring couple **85** advances and positions the tag feeder paddle **84** with feedback from paddle position sensor **88**. A tag sensor **74** detects the location of the RFID transponder to-be commissioned by the YAGI antenna **62**. As the reel of RFID transponder advances inside the encoder, the lead edge passes the ratchet post **82**. If the now-commissioned transponder is read by the antenna **62** as "good", a ratcheting-back torque spring **83** enables a peel device, such as the shield and tag peel edge **73**, to engage, forcing the commissioned tag to peel away from the carrier layer, which continues on to the take up reel **44**. In the event of a "bad" tag—that is, the antenna **62** reads the RFID transponder and determines an error has occurred—the shield **73** does not engage, allowing the defective transponder to remain on the carrier layer and proceed to the take-up reel. Once the good transponder is removed from the encoder, the tag sensor **74** detects the condition and enables the encoder to stand-by for the next event. Transponders are read, written, and verified when an operator initiates an action such pulling a trigger **86**, pushing a button, or some other command sequence.

Certain protective enclosures, such as cartridges **42** or magazines, are part of a family of interchangeable magazines of similar size, shape, and functionality, which are capable of housing and dispensing certain types, styles, shapes, and sizes of new or used RFID transponders. Transponder sizes typically range from 4 mm-thick foam-backed transponders measuring 12 mm wide down to thin transponders that are 15 mm wide on 19 mm pitch.

In at least one embodiment, the magazine or cartridge **42** includes a unique and embedded, RFID transponder which enables automatic interrogation and tracking of cartridge **42**. In certain embodiments, to minimize interference, the cartridge-specific and unique RFID tag or RFID transponder operates in a frequency band that is different than the supply of RFID transponders contained within the protective enclosure. Alternatively, other embodiments selectively interrogate cartridge identification transponders that operate in the same band as transponders within the cartridge that are to be applied.

Certain encoders require replenishment of the battery or other internal, on-board power source **60**, such as a fuel cell, or other energy storage technology. Accordingly, in some embodiments, an encoder **30** (or encoder **64** or encoder **210** of FIGS. **8**, **9**, and **10**) further includes a remote, selectively coupling base unit. The base unit enables a replenishment of magazines or cartridges, provides replaceable power sources, recharges the on-board power source, serves as a communications gateway, and provides a user interface for programming and maintenance of the encoder. For example, spare transponder magazines/cartridges are retained in cartridge pockets where they are protected from damage. Cartridges indicate their empty/full status with a visible indicator such as: an LED, an LCD, a mechanical flag, a window with a view into the source reel, or other such indicators that help an operator choose which cartridge from which to next consume transponders. The encoder, also, is retained by a protective pocket to prevent damage and to make any required electrical or mechanical connections to the base unit. In some embodiments a base unit mounts to diverse operating locations including various models of fork lift trucks. In such applications, the base unit includes a variety of wired and wireless communications options to enable omni directional communication with the encoder, cartridges, a host computer, vehicle mount terminal, a fork truck computer, or other relevant computing devices. The base unit includes a power system that is suitable for the application, including power filtering and energy storage capabilities such as batteries or fuel cells.

As with all ESD-sensitive equipment, care must be taken to avoid a build-up of damaging electrostatic charges. Accordingly, in certain embodiments charge is removed using a variety of conduction methods including wiping, air, and humidity controls, or use of special materials that contain short conductive elements optionally arranged within a flexible elastic cord.

In some embodiments, the encoder adapts to use a particular type of RFID transponder. One type of suitable RFID transponder is model number AD-220 from Avery Dennison of Brea, Calif. or, alternatively, Raflatac model 300846 from Tampere, Finland, or a Spider transponder or FT-33 FAT tag from RSI ID Technologies of Chula Vista, Calif. Such a transponder is die cut and adhered to release liner. Additionally, wireless sensors are manufactured to specifications that are compatible with the specific encoder, including such specifications as core diameter, outer diameter, and web width. Alternatively, certain steps are required to prepare a standard roll of ALL-9338-02 tags for use in an automated encoder, including unrolling from a large roll (up to about 6-inches in core diameter) onto several smaller rolls having a smaller core diameter (of about 1-inch to about 2-inches in core diameter).

Encoder **30** communicates with a remote computer and includes options to physically, electrically, and communicatively integrate with a portable data terminal (PDT) or a mobile computing platform. Certain PDT's have a variety of wireless connections including PAN and WLAN. Certain PDT's include a bar code scanner comprising a laser, an imager, or other means. In other suitable PDT's an RFID interrogator and antenna are built-in, while certain others have a card slot manufactured to a standard such as PCMCIA, CompactFlash, or Secure Digital, into which interrogator/antenna is plugged into. An example of such a card is the MPR 5000 that plugs into a PCMCIA Type II slot and is

available from WJ Communications of San Jose, Calif. The MPR 5000 is compatible with handheld computers such as the Hewlett Packard iPAQ5550 or other models that accommodate smaller card-form factors, enabling them to read and write EPCglobal or ISO 18000 compatible UHF RFID transponders.

Other events, information, and status—such as changes in transponder readiness, transponders remaining on the source roll, remaining charge in the battery, changes in range-status between certain predefined states such as Close, Near, and Far—are communicated to the associated PDT. Other possible information, including certain power management functions, commands, status, and data-to-be-encoded into each readied transponder, is provided to the PDT over a wireless connection. Such a configuration puts the encoder in the role of a peripheral device to the PDT **219**, with PDT **219** managing the primary user interface and most computation functions.

In some embodiments the encoder adapts to exchange information with a host device, including a PDT, in either a batch-mode or through a real time connection. Batch mode uses a periodically connected data transfer channel such as a wired connection. Certain wired connections include serial data, infrared, optical, Universal Serial Bus, a parallel port, or other physical data connection. Certain real-time connections include wireless data links including Personal Area Network (PAN), Wireless Local Area Network (WLAN), and Wide Area Network (WAN). Certain PAN connections include Bluetooth and Zigbee. Certain suitable WLAN connections include IEEE 802.11a, IEEE 802.11b, and IEEE 802.11g.

For certain encoder embodiments passwords are encoded into transponders or wireless sensors when they are commissioned. Passwords are safeguarded using cloaking, obfuscation, cryptographic techniques, secure and trusted channels, locked memory, and other methods that are commonly used to protect confidential information. Passwords are generated or retrieved from data encoded in an RFID transponder to generate an index into one or more databases that contain a one dimensional array of passwords, a two dimensional array of passwords, a multidimensional array of passwords, or an array of actual or pointers to algorithms used to generate passwords from transponder data, for example. Alternatively, cryptographic algorithms are used to generate passwords from transponder data.

Although this disclosure makes specific reference to a mobile encoder, it is understood that the encoder can easily adapt and be readily configured to a fixed operating environment. For example, it can be mounted to a forklift truck or a high-speed conveyer line and maintain advantages of wireless communication, rapid change-over and other qualities as discussed and developed more fully in this disclosure.

Interrogator Apparatus

Working as a stand-alone device, or combined with an encoder, certain embodiments of the present invention include an RFID transponder reader, also called an interrogator. The interrogator, in one embodiment, is a physically separate device that is solely in wireless communication with the encoder. In another embodiment the interrogator includes a wired connection to the encoder. In yet another embodiment, the interrogator connects to the encoder via an intermediate processor, such as a remote computer, or some other intermediate device. In yet another embodiment, the intermediate device is a shared processor in a physically integrated encoder/interrogator apparatus.

Regardless of the physical configuration of the interrogator, its function is to encode and/or verify a RFID transponder's (including wireless sensors) functionality. Certain embodiments use a mobile handheld reader to verify transponder functionality after carton attachment. Certain handheld readers also read bar codes that either partially or completely specify the data that is to be programmed into a transponder. Accordingly, an optical path from the interrogator to a location for reading bar code labels is used to identify certain information about the objects or containers that are to be tagged. Additional transponder encoding instructions and data is acquired through an integral network interface or a batch mode memory in the interrogator.

In certain embodiments, a shield structure incorporated in a combined interrogator/encoder prevents RF fields from interrogating or reprogramming RFID transponders yet-to-be-commissioned that are resident in the combined interrogator/encoder device.

In one embodiment, shown as a cross-sectional schematic in FIG. **8**, a contact image sensor (CIS) **90** or a linear optical array is used to scan along the length of an RFID transponder before it is applied to a container. CIS **90** produces a video stream that is decoded and then interpreted and stored by an on-board Computer **61**. CIS or a similar linear array sensor is capable of reading both linear and two-dimensional bar codes. In certain embodiments, CIS reads two-dimensional bar codes before attachment to inlay or transponder. The on-board computer creates a logical association between bar codes and the commissioned RFID transponder. Encoder **64** reads and associates all bar code symbols on a single segment with the RFID transponder or inlay adhered to it.

In FIG. **10** when an operator pulls the trigger **86**, which is either a mechanical trigger or an electro-mechanical device, the on-demand commissioning of the RFID transponder occurs and nearly simultaneously is pressed against a container within a fraction of a second. In certain embodiments, mechanisms internal to encoder **64** transfer mechanical force to the RFID transponder tag through the use of air, springs, motors, plungers, elastomers, or other energy storing or delivering methods. Reloading of the next tag (next transponder) and readying of the system are performed within a time interval that is acceptable to the operator and enables a high degree of productivity for tagging cartons, pallets, or other transport containers.

In certain embodiments of a combined interrogator/application, a trigger **86** couples to an electrical switch having one or more stable positions that are detectable by a controller. In certain modes of operation trigger-switch state is coupled with range information from a sensor suite **218** to execute functions at predetermined ranges at predetermined times. The result is a trigger that functions based upon detected range from a container or other object of interest. This advantageously improves operator efficiency and productivity as one trigger executes several different functions that are typically involved with RFID tagging including the tagging of bar-coded cartons that have been selected to receive wireless sensors.

Verification of bar code occurs either before or after an RFID transponder is commissioned and the tag applied to the container by merely stepping back to a point where the sweep angle of a laser beam or field of view of an imager can read a bar code label. In certain embodiments ranges shorter than that, but not in Close Proximity, are used for sweeping a radio frequency interrogation signal across the faces of multiple cartons to assure that the correct tags, the correct number of transponders, and the correct data within that transponders were all properly programmed.

In certain embodiments Close Proximity range is reserved exclusively for programming, applying, and verifying one transponder, all in a single pull of trigger. In other embodiments, the interrogator includes programmable conditions that enable Trigger Events to interact with external devices or nearby equipment. For example, at a predetermined range from the interrogator, activation of the trigger causes the encoder to transmit a coded signal to an external device as an indication of an operator action: at a Far-range the signal to requests an external device to read a bar code and the bar code information is decoded and transmitted back to encoder. In another embodiment, decoded barcode information is processed by a portable data terminal (PDT), a vehicle mount terminal, or other computing device.

The on-board computer **61** controls the operation of the RFID Interrogator Module **63** to read, write, and verify RFID tags, inlays, transponders, and wireless sensors that are applied or are within range of the interrogation fields produced by antenna **62**. The encoder **30**, capable of reading multiple RFID transponders near it, can, in certain embodiments, produce a linearly polarized radio field via the internal antenna **62**. In another embodiment, the internal antenna produces a horizontally polarized RF field. A commissioned transponder can be read both before and after it is applied to a transport container. When multiple transponders are within the interrogation field of the encoder **30** with an interrogator module **63** the on-board computer **61** determines which transponders are commissioned and dispensed versus those transponder that have not. In certain embodiments, the on-board computer maintains records of transponders recently applied in order to properly determine how to interact with each transponder in the field of the internal antenna or other antennae under the control of RFID Interrogator.

In one possible embodiment, the interrogator/encoder utilizes preprinted information on a set of RFID transponders. The pre-printed information includes one or more logos, an EPC-global Seal, and other informative alphanumeric or bar-code data. Certain preferred embodiments of encoder/applicators **30**, **64**, and **210** correlate RFID tag data with data encoded in certain preferred bar codes. In certain preferred embodiments, applicators such as applicator **30** read the bar code preferably using a sensor such as OS **90** as the tape is unrolled from a spool. In certain other preferred embodiments, an RFID tag is located on cartridge **42** and contains a numerical value that is directly or indirectly representative of the numerical values optically encoded into the bar codes preferably at least indicating the starting numerical values of a number sequence. Other additional information is also encoded in the RFID tag in certain preferred embodiments, including the number of tag positions, the number of good tags, the ending sequence number, the date, time and place of tag conversion or other preferred commercial, logistic, or manufacturing information. In certain preferred embodiments of applicators **30**, or **210** certain wireless tags attached to cartridge **42** are capable of being read. In certain preferred embodiments the interrogator such as interrogator **63** is capable of reading an RFID tag mounted to the loaded cartridge, and is also preferably capable of filtering out its response to interrogation or programming of RFID tags.

Certain embodiments have a motorized tape drive and dispensing system. Certain embodiments contain some or all of the following: a rechargeable battery, an operator display, a wireless interface, a network stack, an IP address, a PCMCIA port, a Compact Flash port, a USB cable, a serial cable, a dock port, a window to allow the operator to view the transponder attachment process, or a bar code scanner.

One suitable interrogator includes model MP9311 available from Sirit Technologies of 1321 Valwood Parkway, Suite 620 Carrollton, Tex. 75006, USA. Other RFID transponder or wireless sensor interrogator modules with other feature sets are also possible for use in the interrogator/encoder.

FIGS. **8** and **9** show one possible interrogator/encoder **64** according to the present invention. The interrogator/encoder **64** comprises a housing **65** having a user input device **67**, such as a key pad or key board, and a user output device, such as an LCD screen **68**, for displaying optically scanned label data, RF interrogated data from a transponder, and other information including on-board diagnostic functions, bios status, and external information provided from a remote computer as sent over a wireless network, for example. A handle structure **66** enables point-of-use deployment while cartridge **42** enables on-demand commissioning of RFID transponders, which are dispensed from the transponder port **46**. In this embodiment, an integrated YAGI antenna **62** creates a large forward-looking main lobe of radio frequency energy for interrogation of commissioned RFID transponders. The internal antenna also produces side lobes of RF energy that although attenuated from the main lobe by several dB, couple enough power into nearby readied transponder to interrogate and write to it.

As further depicted in FIG. **10**, a reflector **219***b* passively reflects RF signals from an upper side lobe downward toward readied tag **216***f*. Backscatter from tag **216***f* propagates to both antenna **219***a* and reflector **219***b* for processing by the interrogator. Having such an antenna embedded in PDT **219** and mounted to the structure of the encoder housing enables the PDT **219** to encode and verify readied transponder **216***f* while commanding the encoder to commission and dispense a tag when a particular Trigger Event or a predetermined range status change occurs.

An antenna, or alternatively, leaky coax **212***a* or a near-field coupler is located outside of protective enclosure of cartridge **42** in a location very close to the tag attachment zone in front of a tamp head or tag application roller and holding rollers **216***d* or hammer **216***a*.

In some embodiments antenna **212***b* is a patch antenna with a radiation pattern toward the tag attachment zone. In other embodiments the antenna is a near field coupler. Alternatively, leaky coax, a type of coaxial cable having slits, slots, or perforations that allow radio frequencies to leak in or out, is used in encoders according to the present invention. A coupled-mode cable, which does not radiate as well as radiating-mode cable, is constructed with closely spaced slots in a corrugated outer conductor. Radiating-mode cable typically has a foil outer conductor with non-uniformly spaced slots arranged in a periodic pattern. Coupled-mode cable is a slow-wave structure. In free space its external fields are closely bound to the cable and do not radiate, except for minor end effects according to "Prediction of Indoor Wireless Coverage by Leaky Coaxial Cable Using Ray Tracing" by Samuel P. Morgan of Bell Laboratories, Lucent Technologies.

In certain embodiments an interrogator drives a signal into a leaky coax that is terminated in a purely resistive load of about 50 ohms. An RF-switch selects between radiating and non-radiating loads including an antenna or leaky coax and, therefore, avoids mismatched load impedance.

In other embodiments internal antenna **212***b* or **212***c* is a patch antenna with its strongest lobes oriented toward the tag holding and placement area in the region of holding

rollers **216***d*. Antenna **212***c* or leaky coax **212***a* work with an interrogator to produce electromagnetic fields to interrogate, program, and verify wireless sensors. Shield **217***e* prevents interrogation or programming of RFID transponders until they arrive at separation roller or tag peel edge **217***d*. A reflector is used in certain embodiments to reflect RF radiation toward a readied transponder. In the event that verification fails, the operator is informed that the bad tag (or inoperable transponder) is to be discharged onto a surface of a third object other than the encoder or the transport container, for post-mortem analysis.

Referring to FIG. **10** drive motor **76** is preferably located inside the center of source reel **43** within the circular walls of applicator housing **211***b*, around which cartridge **42** is nested when mated to interrogator/encoder/applicator **210**.

Motor **76** is mounted to the structural frame of applicator **210** and preferably transfers mechanical power to certain drive points preferably using gears, belts, or drive shafts within applicator housing **201***a* or **211***a*. In certain preferred embodiments of applicator **210** certain preferred drive points include take-up reel **44**, source reel **43**, or hammer arm **216***a*.

Trigger **86**, preferably embedded within trigger handle **66** is actuated by an operator, preferably causing a Trigger Event. In certain preferred embodiments, there is more than one kind of Trigger Event. In certain preferred embodiments of applicator **210** certain types of either mechanical or electromechanical actuators are preferably used to cause hammer mechanism **216***a* to trip, being driven toward readied tag **216***f*, through port **46** for placement on a transport container at the face of bulkhead **211***a*.

Another means of electromechanical actuation from a Trigger Event initiated by sensor suite **218** is illustrated in FIG. **10** whereby DC motor **215***c* runs in a reverse direction causing ratchet **216***b* to become disengaged, allowing hammer **216***a* to accelerate toward tag **216***f* due to the torque exerted by spring **216***c*. Hammer **216***a* passes between holding rollers **216***d* to press tag **216***f* against the face of a transport container.

Interrogator **212***d* is preferably capable of working with controller **213***b* to recognize which tags have been recently programmed or applied so as to filter out their response to interrogations of other tags, especially those tags that are being prepared for attachment. Interrogator **212***d* is preferably capable of modulating its transmitted radio power to affect the range and signal to noise ratio of its coupling to wireless tags.

Method of Using Smartphone for Encoding

FIG. **11** shows a method for using a smartphone for encoding RFID tags by using the built-in camera as a barcode scanner. In step **111** a smartphone is positioned to capture the image of a barcode. The barcode can be 1D or 2D, it can carry GTIN or other information. It can already have a serial number such as a serialized Data Matrix barcode for a pharmaceutical item or container. In step **112** the image is decoded and processed by software. In step **113** the payload for a transponder is computed, preferably using serialization algorithms that are presently described. In step **114** a transponder is encoded with the transponder data payload. The transponder encoding apparatus is either built into the smartphone or attached to it as a peripheral device.

Referring to FIG. **22**, smartphone **154** is shown as an Apple iPhone with a peripheral encoding device attached to the accessory port. A peripheral device such as this is one embodiment, in other embodiments the components described herein are contained with the enclosure of smartphone **154**. Near field couplers **238***a* and **238***b* are used to couple magnetic fields with a nearby transponder for RFID transponder and wireless sensor authentication. Certain preferred embodiments use one coupler to transmit and the other to receive. Such embodiments therefore require close proximity of both couplers to a transponder in order to read or write transponder data, or to verify transponder authenticity. FIPS 140-2 module **239** has a cryptographic boundary that is preferably compliant with U.S. Government Federal Information Processing Standard 140-2 which is incorporated by reference herein. Module **239** detects temperature variations that are outside of upper and lower temperature limits which is one possible mode of cryptographic attack. It also has tamper detection that detect a physical breach of a mesh or other detection barrier. FIPS 140-2 compliant cryptographic module **239** is used to hold cryptographic keys and to perform cryptographic functions. If the module detects an attack, the memory for storing cryptographic keys is immediately cleared. Module **239** preferably uses non-imprinting memory and therefore leaves no trace of the cryptographic information after being cleared.

Method of Tagging Containers

FIG. **12** is a block diagram representing a second method according to the present invention including applying RFID transponders to objects of interest. One suitable object of interest comprises transport containers such as corrugated cartons or shrink-wrapped cases on a shipping pallet, which is inadequately addressed by the prior-art, particularly for solutions for manually operated automatic encoding and attachment to a container.

Block **121** represents a process step including the identification and selection of a container to be tagged with an RFID transponder or wireless sensor. In one embodiment this step includes a manual selection and verification processes that consists of manual handling, visual sighting, and scanning bar codes with a hand-held optical reader device. This method contemplates that a transponder encoding scheme is ready in advance and synchronized with a pick list, customer purchase order, advanced shipping notice, and other such records to assure that goods are properly moved and accounted for. Preferred bar code scanners include those that allow an operator to freely handle cartons with two hands. Such scanners include laser bar code scanners or imagers that are worn on either that back of the operator's hand or near the top knuckle of a finger. Such scanners are described above, and preferably have a Bluetooth or similar wireless interface to connect to mobile encoder **175** or **30**. Bar code scanner **226** of FIG. **21** is a preferred embodiment of an alternative device that combines manual bar code scanning and RFID transponder encoding into a single handheld device. The operator may choose to scan bar codes that contain data, application identifiers, commands, or other elements commonly found in automatic data capture applications.

Block **122** represents the process step of processing bar code information to derive the underlying data. Depending on the type of bar code, how it is encoded, and its purpose, different processing steps will be used. In preferred embodiments the bar code may contain SKU information, a GTIN, an SGTIN, EPC data structures, a military UID, an SSSC, an asset number, a file identifier, or other such identifying information. In certain preferred embodiments, the bar code (either one or two dimensional) contains a partial or complete description of the data that is to be encoded into the RF transponder. Such bar codes are described in ISO/IEC draft document PDTR 24729-1. Application identifiers 01 and 21 are combined with additional encoded printed information to fully specify a serialized GTIN (or SGTIN). Using such bar codes does not require the use of additional data in order to

generate RF transponder payload data. Mobile encoder **175** may therefore independently receive and process the RF transponder payload information. One type of bar code is used to signal mobile encoder **175**, **30**, or **220** that it should enter a mode whereby it performs a serialization algorithm without using an AI 21 bar code. This process step of identifying the information to be encoded may be included in the step represented by Block **121**. In this step (Block **122**), an operator may use a bar code reader or an encoder/interrogator of this disclosure. Alternatively, the operator may receive instructions delivered to a hand-held PDT or other mobile data terminal connected to a wireless network. This information is delivered to an encoder, such as encoder **30**.

Block **123** represents another process step whereby, using a mobile encoder, the operator then commissions an RFID transponder with the information of the previous step (Block **122**). Optionally, successful commissioning of the RFID transponder is verified by the encoder. In one embodiment, the encoder tests the next transponder and determines if it is operating within certain predefined specifications including parameters such as activation energy, backscatter signal strength, sensor performance, and other indications of the quality of the transponder. If the encoder determines that the transponder is not likely to result in a successful transponder deployment as may be determined by failure on multiple encoding and verification attempts or due to either physical or electronic deficiencies or abnormalities, then the operator is informed and the failed or bad transponder is discarded automatically or when an operator pulls a trigger under an operator-acknowledged transponder failure condition.

This step (Block **123**) also includes processes to read or determine by dead reckoning the information encoded into certain preprinted optically encoded symbols on the outward facing non-adhesive surface of the adhesive tape. In certain embodiments the adhesive tape is printed with information. In other embodiments the printed information is a machine-readable symbol such as a bar-code symbol. For example, one or more machine-readable symbols are read when the tape is prepared for use in an automated encoder or, alternatively, during the inlay conversion process and conveyed to an encoder through other data storage means, such as an RFID transponder. In one embodiment, an information encoding method uses either one-dimensional or two-dimensional bar codes. In some embodiments a linear imager is used to read either linear or two-dimensional bar codes as the tape is being unrolled from a spool. Some encoding schemes preprint machine-readable symbols at regular intervals along the length of a roll of adhesive tape. In certain embodiments the spacing of the preprinted symbols is at an interval of one half of the nominal length of each section of adhesive tape. In certain embodiments, the encoded information is used as a reference to one or more data storage locations. In other embodiments the data storage locations are accessible through a computer network. In some embodiments, the encoded information is a series of sequential numbers. Information relating to data stored in the RFID transponder is stored in data storage locations that are referenced by one or more of the preprinted symbols. In an alternative embodiment more than one type of machine-readable symbols can be read from the surface of a segment of tape. In certain embodiments, more than one machine-readable symbol is used as a reference to the same or closely related data records of information stored in the RFID transponder or inlay, and either can be successfully used to access stored data.

In some encoders used in this step (Block **123**) a Trigger Event occurs, which results in the verification that a particular commissioned RFID transponder has been tagged and associated with a specific container. This Trigger Event occurs, in certain embodiments, when an operator pulls a trigger on the encoder. In other embodiments the Trigger Event occurs when certain sensors detect preprogrammed conditions relating to the proximity of the encoder face to an object that is to be tagged.

Finally, (Block **124**) the operator applies the RFID transponder on the container and, thus, commissions the transponder. In certain embodiments, the location of the targeted placement of the RFID transponder or wireless sensor on the container is stored in a database, which is referenced or pointed to by information that is stored in the memory of the encoder. In one embodiment, the operator holds the encoder against the face of the container based on the tagging requirements for that particular container. The tagging requirements including the location and orientation of the RFID transponder to be placed is conveyed visually or aurally. For example, the operator receives visual information via a screen or display on the encoder. In certain embodiments, physical indicators are attached to the encoder and extend from its body in a direction and manner so as to assist the operator in the positioning of the transponder onto the carton. In other embodiments, transponders are applied to the interior of a carton, before it is sealed.

Method of Commissioning RFID Transponders Using a Mobile Applicator.

FIG. **13** is a block diagram showing a method according to the present invention for commissioning RFID transponders using an encoder, such as the encoder **30**, couples to a cartridge or protective enclosure containing a plurality of RFID transporters releasably mounted on a transport sheet or roll. The encoder enables the roll of RFID transponders to advance one position (Block **131**), placing the Next Tag in a test 1 position. The Next Tag is tested (Block **133**) to ensure that it performs within predetermined parameters such as activation energy, backscatter signal strength, sensor performance, and other indications of the quality of the transponder. One possible method includes encoding a transponder using only a minimal amount of radio-frequency energy. Since transponder encoding requires more energy than reading a transponder, this low power test constitutes a basic test of both minimal activation energy and backscatter signal strength.

An RFID transponder that fails this test (Block **133**) results in a "Bad Tag" status and proceeds to the take-up reel of the encoder (Block **135**). Thus, any failed transponder remains captive in the cartridge and cannot be released from the encoder by an operator. Optionally, the operator is notified of the failed transponder so the operator can request a newly encoded transponder (Block **137**). However, in one embodiment, the notification step occurs automatically, and a newly encoded next transponder is generated without input from the operator.

Block **132** shows that a "good" transponder is positioned in the encoder for the encoding process. The RFID transponder that passes the test 1 position is commissioned with predetermined data based on the container to be tagged. Methods of obtaining, storing, encoding, and commissioning this information on the RFID transponder are discussed elsewhere in this disclosure.

The commissioned transponder undergoes a verification process (Block **134**) to determine if the intended information was successfully encoded on the RFID transponder. Certain embodiments combine the verification step with the encod-

ing step to gain operational efficiencies. If this verification test results in a fail condition, the transponder remains in the encoder and ultimately winds on the take-up reel in the cartridge for subsequent post-mortem failure analysis.

Block **136** represents a pass condition. The encoder removes the commissioned RFID transponder from the transport web or release liner, enabling the operator to retrieve the transponder from the encoder and in Block **138** apply the transponder to the container. In an alternative embodiment for Block **138**, the operator or a fixture holds the encoder against a surface of the container and the encoder places the commissioned RFID transponder directly on the container without operator intervention.

FIG. **14** is a system diagram that illustrates a preferred serial number allocation system according to the present invention. Blocks of serial numbers are allocated to RFID printers and encoding devices such as RFID encoder **155** of FIG. **15** as described in more detail below. Each object class, represented in FIG. **14** as GTIN's, has its own separate serial numbering space. As described above, the entire object class serial number space is subdivided into sectors that are defined by a limited number of most significant bits of the serial number field. In the case of a GS1 SGTIN-96 key type, the serial number field is 38 bits long.

To show how this is accomplished in Serial Number Database **140**, a representative object class is managed by Table GTIN A **141** and is shown to have three serial number block sizes of lengths 10, 11, and 12 bits. Within table **141** are three rows, or tuples **141***a*-*c*. Each row or tuple contains two columns or attributes: a starting serial number and the amount of remaining space until the next serial number block. In preferred embodiments, the remaining space is expressed in units of blocks of the selected block size.

Now by way of a more detailed example, allocation of blocks of serial numbers of different sizes is shown as requests are encountered over a period of time. An initial request is made for serial number Block **0** **144** for GTIN A that is 10-bits long. At that time then all of the rows of table **141** show the same starting number of 000000. When the initial request for a 10-bit block is granted for block **144**, the starting number for the next block of that size is increased to the end of the first 10-bit block and the remaining blocks is computed based on the following algorithm: the starting point for the 11-bit block **141***b* is adjusted to the next greatest unused number that contains all zeros in the bits that represent the next assignable block of that size. The same is done for 12-bit block **141***c* and so forth unless those blocks have already been assigned to an RFID encoder **155** using for example Block **1** **145**, in which case they are not changed. The remaining counts values for each block will remain at zero for each block that is not bounded on the upper side by an assigned block of another size. If a serial number block is bounded, then the remaining count value is adjusted to accurately describe the number of serial number blocks that can be assigned. If additional blocks of that size are subsequently required, then, space permitting, a new block starting number is assigned and the process continues until the entire serial numbering space is fully allocated.

In preferred embodiments, a request is made by smartphone **154** as shown in FIG. **15**. The smartphone preferably performs biometric authentication as shown in step **161** of FIG. **16**. In step **162**, using smartphone **154** devices such as camera **237** of FIG. **22** a biometric match for a face, iris, voice, or fingerprints breaks the retry loop with an authorization to continue to step **163**. In step **163** transponder encoding is enabled and smartphone **154** is authorized to request, as a lower database level, blocks of serial numbers for specific object classes, such as certain GTIN's. RFID printers and encoders **155** are preferably then readied for encoding. Biometric security enables brand owners to enforce security procedures within their own plants and at contract manufacturing locations all over the world.

Table GTIN B **142** and Table GTIN C **143** show that each GTIN is managed separately to provide unique serial number blocks such as Block **2** **146**, possibly according to different rules. In fact since GTIN's are typically purchased and owned by brand owners, and database **140** may be used to manage serial number allocation for multiple brand owners, then the rules that are applied to the various GTIN object classes in FIG. **14** may be different. Retail brand owners may want linear serial number assignments within each block while a pharmaceutical brand owner may want to have randomly assigned serial numbers within each serial number block. In a preferred embodiment allocated block **141***c* is issued to a lower database level or directly to an encoder's internal memory for commissioning transponders with randomly assigned serial numbers from within the range of numbers that are defined by that allocate block **141***c*.

Brand owner A with GTIN A may also have serial number blocks managed with a finer granularity than brand owner C with GTIN C. Furthermore a possible reason for brand owner C to select very large block sizes as shown in Table GTIN C **143** is to allow serial number allocation to be managed according to a different method such as chip-based serialization from chip manufacturers Impinj, Alien, or NXP for example.

FIG. **15**, a block diagram, shows the essential parts of a system to manage unique serial numbers on a global scale using smartphones as mobile remote computers. Server **151** is a computer running a server application such as an Apache HTTP web server on an operating system such as Unix, FreeBSD, Linux, Solaris, Novell NetWare, Mac OS X, Microsoft Windows, OS/2, or TPF. Web server **151** can be owned, borrowed, or rented by the slice from cloud service providers.

SQL database **152** preferably conforms to ISO/IEC 9075 and its various parts. In other embodiments, a database other than SQL is used to perform the data storage and retrieval functions described herein. SQL queries are preferably performed with the declarative SELECT statement which retrieves data from one or more tables, or expressions.

Script **153** preferably executes on server **151** and is written in a general-purpose server-side scripting language such as PHP to produce dynamic web pages.

A segment of PHP code that is used to store RFID tag commissioning data is:

```
$stmt=$this→db→prepare("INSERT INTO SGTINs (CommissioningReport_EncStatus_SessionNum, SGTIN, GTIN) VALUES (?, ?, ?, ?)");
$stmt→bind_param("ssii", $attrSession, $sgtinN, $attrGtin);
$stmt→execute( );
$stmt→close( );
```

Smartphone **154** preferably uses asynchronous data transfer techniques in a multi-threaded computing environment to communicate with script **153** in server **151** to prevent thread-blocking that gives the appearance of the program seizing up while waiting for a database transaction to be completed. Certain preferred embodiments use ASIHTTPRequest on Apple iOS smartphones to request a transaction with a remote database without blocking a major

program thread. Below is an example of an iOS function to store an XML commissioning report from RFID encoder **155**:

```
-(void)SQLStoreRecentTaggingForString:(NSString *)recentTagging
{
   NSURL *url = [NSURL
URLWithString:@"http://www.adasainc.com/update.php"];
   ASIFormDataRequest *request = [ASIFormDataRequest
requestWithURL:url];
   NSString *comTagStrTrimPhp =[recentTagging
stringByReplacingOccurrencesOfString:@" " withString:@""];
   NSLog(@"SQLStoreRecentTaggingForString: '%@'",
comTagStrTrimPhp);
   [request setPostValue:comTagStrTrimPhp forKey:@"comTags"];
   [request setDelegate:self];
   [request startAsynchronous];
}
```

The method startAsynchronous is used on the request to start a database transfer on a separate computing thread. This is one important aspect of asynchronous data transfer in periodically connected system nodes. Another example is in the collection of XML report data from RFID encoder **155**, piece by piece to assemble a complete string. The iOS code line [scanner.readRecentString appendString:trimStr]; illustrates how trimStr is appended onto a string, in this case named readRecentString that is an NSMutableString that is allocated as part of an instance that coordinates communications with a particular RFID encoder. Once the end tag is received, then iOS program assembles a request to store tag commissioning data. The iOS program is also ready to receive authorizations from server **151** as responses are returned from it. The authorizations are preferably able to be stored and retrieved when the same RFID encoder **155** reconnects with smartphone **154**. This system design therefore illustrates a preferred method for collecting commissioning data, storing it in an SQL database, and delivering new encoding authorizations to RFID encoders like RFID encoder **155** without requiring any realtime connections to a remote database.

RFID Transponder **156** receives and stores a globally unique identifier such as an SGTIN-96 through an intermittently connected chain of computers and programs as described above and as illustrated in FIG. **15**.

In FIG. **23**, Block **240** is used to scan a barcode, such as a GTIN. In Block **241** the RFID transponder payload is computed, preferably using serialization algorithms and methods that are disclosed herein.

Block **242** represents the process step whereby mobile encoder **175**, **30**, or **220** encodes an RFID transponder with the information of the previous step (Block **241**).

Successful commissioning of the RFID transponder is preferably verified by the encoder as shown in Block **243**. In one embodiment, the encoder tests the immediate transponder and determines if it is operating within certain predefined specifications including parameters such as activation energy, backscatter signal strength, sensor performance, and other indications of the quality of the transponder.

If in Block **244** the encoder determines that the transponder is not likely to result in a successful transponder deployment as may be determined by failure on multiple encoding and verification attempts or due to other evidence of physical or electronic deficiencies or abnormalities, then the operator is optionally informed and the failed or bad transponder is discarded automatically as shown in Block **245**.

Block **246** is the process of using motor **227**B and/or transponder transport means **175**C to pull release liner **182**



tighter and tighter such that webbing **182** advances forward to the point that the leading edge of transponder **178** extends past the distal end of peel device **183** or **222**B.

In Block **247** web **182** is pulled forward to the point that transponder **178** or **223**A begins to rotate around peel device **183** or **222**B. It is in this step that either a human finger or some target object needs to be presented in the rotational path of the tipping transponder **178** or **223**A must be located. In the case of mobile encoder **30** where the operator is required to handle the encoded tag, it is important that their finger be present as transponder **178** begins to tip, allowing adhesive layer **181**D of transponder **178** to make contact and be removed for placement on a target object such as a shipping container, trackable asset, automobile windshield, or other object of interest. In cases where the operator scans a bar code and applies encoded transponder **178** in a single motion, mobile encoder **220** is preferred, wherein as transponder **178** tips as it rotates around peel device **222**B adhesive layer **181**D sticks directly onto target surface **228**. In either case, encoded transponder **178** is caught mid-rotation and adhesive layer **181**D provides adhesive forces sufficient to completely detach transponder **178** from release liner **182**, thus completing the function of Block **247** where work flow returns to Block **240** for another transponder encoding cycle to begin.

While the invention has been particularly shown and described with reference to certain embodiments, it will be understood by those skilled in the art that various changes in form and detail may be made without departing from the spirit and scope of the invention.

I claim:

**1**. An RFID transponder comprising:

a substrate;

an antenna structure formed on the substrate; and

an RFID integrated circuit chip which is electrically coupled to the antenna structure,

wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space,

wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and

wherein the unique serial number space comprises the limited number of most significant bits corresponding to the allocated block and remaining bits of lesser significance that together comprise the one serial number instance.

**2**. The RFID transponder of claim **1**, wherein the object class information space is encoded with information comprising a company prefix, an item reference, a partition value, and a filter value.

**3**. The RFID transponder of claim **1**, wherein the unique object number is a portion of a serialized global trade item number.

**4**. The RFID transponder of claim **3**, wherein the serialized global trade item number is an EPC SGTIN-96 encoding.

**5**. The RFID transponder of claim **1**, wherein the unique serial number space is at least 38 bits.

**6**. The RFID transponder of claim **1**, wherein the allocated block is defined by at least 3 most significant bits.

**7**. The RFID transponder of claim **1**, wherein the allocated block is one of a plurality of allocations intermittently received by an encoder.

8. The RFID transponder of claim 1, wherein the RFID integrated circuit chip is comprised of silicon.

9. The RFID transponder of claim 1, wherein the RFID integrated circuit chip is comprised of polymer.

10. The RFID transponder of claim 1, wherein the substrate, antenna structure, and RFID integrated circuit chip are covered by a face stock material.

11. The RFID transponder of claim 1, wherein the RFID integrated circuit chip is disposed on the substrate.

12. The RFID transponder of claim 1, wherein the limited number of most significant bits that correspond to the allocated block further correspond to an encoder that encodes the RFID transponder.

13. A RFID transponder comprising:

a substrate;

an antenna structure formed on the substrate; and

an RFID integrated circuit chip which is electrically coupled to the antenna structure,

wherein the RFID integrated circuit chip is encoded with a global trade item number including a unique object number, the unique object number comprising an object class information space including a block of at least 50 bits and a unique serial number space including a block of at least 38 bits,

wherein the unique serial number space has one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and

wherein the unique serial number space comprises at least 3 most significant bits corresponding to the allocated block.

14. The RFID transponder of claim 13, wherein the unique serial number space further comprises remaining bits of lesser significance that together with the at least 3 most significant bits comprise the one serial number instance.

15. The RFID transponder of claim 13, wherein the at least 3 most significant bits that correspond to the allocated block further correspond to an encoder that encodes the RFID transponder.

16. An integrated circuit, comprising:

a radio frequency circuit configured to backscatter a return link signal for processing by an RFID interrogator;

control logic; and

a memory,

wherein the memory is configured with a unique object number space, the unique object number space comprising an object class information space and a unique serial number space,

wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and

wherein the unique serial number space comprises the limited number of most significant bits corresponding to the allocated block and remaining bits of lesser significance that together comprise the one serial number instance.

17. The integrated circuit of claim 16, wherein the object class information space is encoded with information comprising a company prefix, an item reference, a partition value, and a filter value.

18. The integrated circuit of claim 16, wherein the unique object number is a portion of a serialized global trade item number.

19. The integrated circuit of claim 18, wherein the serialized global trade item number is an EPC SGTIN-96 encoding.

20. The integrated circuit of claim 16, wherein the limited number of most significant bits that correspond to the allocated block further correspond to an encoder that encodes the memory of the integrated circuit.

* * * * *

US009798967C1

(12) EX PARTE REEXAMINATION CERTIFICATE (11358th)

**United States Patent** (10) Number: **US 9,798,967 C1**

**McAllister** (45) Certificate Issued: ***Jul. 30, 2018**

(54) **SYSTEMS, METHODS, AND DEVICES FOR COMMISSIONING WIRELESS SENSORS**

(71) Applicant: **ADASA INC.**, Eugene, OR (US)

(72) Inventor: **Clarke W. McAllister**, Eugene, OR (US)

(73) Assignee: **ADASA INC.**, Eugene, OR (US)

**Reexamination Request:**
No. 90/014,052, Nov. 29, 2017

**Reexamination Certificate for:**
Patent No.: **9,798,967**
Issued: **Oct. 24, 2017**
Appl. No.: **15/042,993**
Filed: **Feb. 12, 2016**

( * ) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(63) Continuation of application No. 13/526,520, filed on Jun. 19, 2012, now Pat. No. 9,272,805, which is a continuation-in-part of application No. 12/820,109, filed on Jun. 21, 2010, now Pat. No. 8,228,198, which is a continuation-in-part of application No. 11/465,712, filed on Aug. 18, 2006, now Pat. No. 7,830,258, said application No. 12/820,109 is a continuation-in-part of application No. 12/124,768, filed on May 21, 2008, now abandoned.

(60) Provisional application No. 60/709,713, filed on Aug. 19, 2005, provisional application No. 60/939,603, filed on May 22, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| ***H04Q 5/22*** | (2006.01) |
| ***G06K 19/077*** | (2006.01) |
| ***B65C 9/18*** | (2006.01) |
| ***B65C 11/00*** | (2006.01) |
| ***B65C 9/40*** | (2006.01) |
| ***B65C 9/00*** | (2006.01) |
| ***G06K 17/00*** | (2006.01) |

(52) **U.S. Cl.**
CPC ...... ***G06K 19/07716*** (2013.01); ***B65C 9/1865*** (2013.01); ***B65C 11/006*** (2013.01); ***G06K 19/077*** (2013.01); *B65C 2009/0003* (2013.01); *B65C 2009/404* (2013.01); *G06K 2017/0041* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/014,052, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Christina Y Leung

(57) **ABSTRACT**

In one embodiment the present invention comprises a smartphone and encoders for commissioning RFID transponders. The present invention further includes novel systems, devices, and methods for commissioning RFID transponders with unique object class instance numbers without requiring a realtime connection to a serialization database.



# EX PARTE REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **1**, **13** and **16** are determined to be patentable as amended.

Claims **2-12**, **14**, **15** and **17-20**, dependent on an amended claim, are determined to be patentable.

**1**. An RFID transponder comprising:
a substrate;
an antenna structure formed on the substrate; and
an RFID integrated circuit chip which is electrically coupled to the antenna structure,
wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space,
wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits,
wherein the unique serial number space comprises the limited number of most significant bits *uniquely* corresponding to *the limited number of most significant bits of* the allocated block and of remaining bits of lesser significance that together comprise the one serial number instance.



**13**. A RFID transponder comprising:
a substrate;
an antenna structure formed on the substrate; and
an RFID integrated circuit chip which is electrically coupled to the antenna structure,
wherein the RFID integrated circuit chip is encoded with a global trade item number including a unique object number, the unique object number comprising an object class information space including a block of at least 50 bits and a unique serial number space including a block of at least 38 bits,
wherein the unique serial number space has one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and
wherein the unique serial number space comprises at least 3 most significant bits *uniquely* corresponding to *the limited number of most significant bits of* the allocated block.

**16**. An integrated circuit, comprising:
a radio frequency circuit configured to backscatter a return link signal for processing by an RFID interrogator;
control logic; and
a memory,
wherein the memory is configured with a unique object number space, the unique object number space comprising an object class information space and a unique serial number space,
wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits,
wherein the unique serial number space comprises the limited number of most significant bits *uniquely* corresponding to *the limited number of most significant bits of* the allocated block and of remaining bits of lesser significance that together comprise the one serial number instance.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-1092

**Short Case Caption:** ADASA Inc. v. Avery Dennison Corporation

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13935 words.
- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 01/28/2022

Signature: /s/ Derek L. Shaffer

Name: Derek L. Shaffer