**Volume I of III (Pages AppxI-5261)**
**2022-1092**

# United States Court of Appeals for the Federal Circuit

ADASA INC.,

*Plaintiff-Appellee,*

– v. –

AVERY DENNISON CORPORATION,

*Defendant-Appellant.*

*On Appeal from the United States District Court for the District of Oregon, Mustafa T. Kasubhai, Magistrate Judge*

## NON-CONFIDENTIAL JOINT APPENDIX

ROBERT GREENSPOON
WILLIAM W. FLACHSBART
DUNLAP BENNETT & LUDWIG PLLC
333 N. Michigan Avenue, Suite 2700
Chicago, Illinois 60601
(312) 551-9500
rgreenspoon@dbllawyers.com
wflachsbart@dbllawyers.com

– and –

GLENN S. ORMAN
JONATHAN T. SUDER
FRIEDMAN, SUDER & COOKE, P.C.
604 East Fourth Street, Suite 200
Fort Worth, Texas 76102
(817) 334-0400
orman@fsclaw.com
jts@fsclaw.com

*Counsel for Plaintiff-Appellee*

DEREK L. SHAFFER
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

– and –

JOSEPH MILOWIC III
OWEN ROBERTS
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Avenue
New York, New York 10010
(212) 849-7000
josephmilowic@quinnemanuel.com
owenroberts@quinnemanuel.com

*Counsel for Defendant-Appellant*

*(For Continuation of Appearances See Inside Cover)*

CP  COUNSEL PRESS, LLC                                                      (888) 277-3259

MARK YEH-KAI TUNG
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
(650) 801-5000
marktung@quinnemanuel.com

*Counsel for Defendant-Appellant*

## JOINT APPENDIX
## TABLE OF CONTENTS

### STIPULATED PROTECTIVE ORDER

| Dkt. | Description | Page(s) |
|---|---|---|
| 46 | Stipulated Protective Order Governing Discovery, dated July 12, 2018 | AppxI |

### JUDGMENT AND ORDER

| Dkt. | Description | Page(s) |
|---|---|---|
| 335 | Judgment, dated May 14, 2021 | Appx1 |
| 430 | Final Rule 58 Judgment, dated October 14, 2021 | Appx2 |

### DOCKET OF PROCEEDINGS BELOW

| Description | Page(s) |
|---|---|
| Civil Docket for Case No. 6:17-cv-01685-MK (D. Or.) | Appx5 |

### PATENT AT ISSUE

| Exh. | Description | Page(s) |
|---|---|---|
| 001 | United States Patent No. 9,798,967 | Appx59 |

### DISTRICT COURT FILINGS

| Dkt. | Description | Page(s) |
|---|---|---|
| 1 | Adasa Complaint for Patent Infringement, dated October 24, 2017 | Appx102 |
| 2 | Notice of Case Assignment, dated October 25, 2017 | Appx158 |
| 17 | Avery Dennison's Motion for Judgment on the Pleadings, dated February 22, 2018 | Appx189 |
| 19 | Adasa's Opposition to Avery Dennison's Motion for Judgment on the Pleadings, dated March 8, 2018 | Appx216 |
| 20 | Williams Declaration, dated March 7, 2018 | Appx246 |
| 23 | Avery Dennison's Reply in Support of Avery Dennison's Motion for Judgment on the Pleadings, dated April 5, 2018 | Appx260 |
| 185 | Transcript of Proceedings, dated May 9, 2018 | Appx270 |
| 27 | Transcript re Motion for Judgment, dated May 9, 2018 | Appx327 |
| 29 | Parties' Consent to Magistrate, dated May 10, 2018 | Appx379 |
| 57 | Adasa Opening Claim Construction Brief, dated September 27, 2018 | Appx384 |
| 58 | Avery Opening Claim Construction Brief, dated September 27, 2018 | Appx480 |
| 59 | Addae Declaration in Support of Avery Opening Claim Construct Brief, dated September 27, 2018 | Appx616 |
| 67 | Transcript of Proceedings, dated December 7, 2018 | Appx773 |
| 68 | Opinion and Order (Claim Construction), dated January 22, 2019 | Appx829 |
| 69 | Notice of Case Reassignment, dated January 29, 2019 | Appx838 |

| 71 | Adasa First Amended Complaint, dated February 15, 2019 | Appx839 |
|---|---|---|
| 78 | Order Denying as Moot Avery Motion for Judgment, dated March 19, 2019 | Appx904 |
| 96 | Adasa Emergency Motion to Compel Discovery, dated July 24, 2019 (SEALED) | Appx1346 |
| 102 | Adasa Motion to Compel Discovery, dated September 6, 2019 | Appx1823 |
| 106 | Avery Opposition to Motion to Compel Discovery, dated September 20, 2019 | Appx1844 |
| 112 | Adasa Second Amended Complaint, dated October 2, 2019 | Appx1931 |
| 114 | Avery Answer, Counterclaims to Second Amend Complaint, dated October 16, 2019 | Appx1956 |
| 165 | Opinion and Order (Avery Dennison's Motion for Judgment on the Pleadings as to Adasa's Infringement Claim) , dated April 30, 2020 | Appx3200 |
| 166 | Opinion and Order (Adasa's Motion for Judgment on the Pleadings and Avery Dennison's Motion for Judgment on the Pleadings as to Intervening Rights) , dated April 30, 2020 | Appx3210 |
| 167 | Opinion and Order (Avery Dennison's Motion for Summary Judgment of Invalidity and Adasa's Cross Motion for Partial Summary Judgment of No Invalidity) , dated April 30, 2020 | Appx3220 |
| 168 | Adasa's Motion for Summary Judgment and Attachments Thereto, dated May 14, 2020 | Appx3236 |
| 169 | Avery Dennison's Motion for Summary Judgment of Noninfringement and Contingent Motion for Judgment of Invalidity , dated May 14, 2020 | Appx4256 |
| 170 | Legaard Declaration in Support of Motion for Summary Judgment of Non-Infringement, dated May 14, 2020 (SEALED) | Appx4282 |
| 171 | Declaration of Raymond Blanchard in Support of Avery Motion for Summary Judgment, dated May 14, 2020 | Appx4556 |
| 172 | Adasa's Response to Avery Dennison's Motion for Summary Judgment of Noninfringement and Contingent Motion for Judgment of Invalidity , dated June 4, 2020 | Appx4558 |
| 174 | Declaration of Daniel Engels in Support of Adasa Opposition to Motion for Summary Judgment, dated June 4, 2020 (SEALED) | Appx5231 |
| 175 | Avery Opposition to Adasa Motion for Summary Judgment, dated June 4, 2020 | Appx5265 |
| 176 | Legaard Declaration and Attachments Thereto, dated June 4, 2020 | Appx5294 |
| 180 | Wojcio Declaration in Support of Adasa Motion for Summary Judgment Reply, dated June 18, 2020 (SEALED) | Appx5483 |

| 182 | Avery Reply in Support of Motion for Summary Judgment, dated June 18, 2020 (SEALED) | Appx5575 |
|---|---|---|
| 189 | Sweeney Declaration and Attachments Thereto, dated June 24, 2020 | Appx5750 |
| 194 | Transcript re Motions for Summary Judgment, dated July 8, 2020 | Appx5780 |
| 205 | Opinion and Order (Adasa's Motion for Summary Judgment and Avery Dennison's Motion for Summary Judgment of Noninfringement and Contingent Motion for Judgment of Invalidity) , dated September 14, 2020 | Appx6117 |
| 206 | Adasa's Motion to Exclude, dated September 16, 2020 | Appx6150 |
| 207 | Wojcio Declaration and Attachments Thereto, dated September 16, 2020 | Appx6171 |
| 212 | Legaard Declaration and Attachments Thereto, dated September 30, 2020 | Appx6231 |
| 220 | Joint Amended Proposed Pretrial Order, dated October 30, 2020 | Appx6937 |
| 233 | Adasa Motion to Sever, dated November 16, 2020 | Appx7380 |
| 234 | Adasa Motion in Limine, dated November 17, 2020 (SEALED) | Appx7384 |
| 286 | Omnibus Order , dated March 26, 2021 | Appx9476 |
| 315 | Avery Supplemental Expert Reports, dated May 7, 2021 (SEALED) | Appx10533 |
| 331 | Jury Verdict May 14, 2021 | Appx11532 |
| 351 | Adasa Mot. for Attorney Fees, dated May 28, 2021 (SEALED) | Appx11600 |
| 362 | Avery Dennison's Renewed Motion for Judgment as a Matter of Law, dated June 11, 2021 | Appx11929 |
| 366 | Adasa's Motion for Imposition of Sanctions , dated June 22, 2021 | Appx13733 |
| 367 | Suder Declaration in Support of Motion for Sanctions and Hearing, dated June 22, 2021 | Appx13738 |
| 368 | Adasa Reply in Support of Motion for Attorney Fees, dated June 23, 2021 (SEALED) | Appx13749 |
| 369 | Suder Declaration in Support of Reply re Attorney Fees, dated June 23, 2021 (SEALED) | Appx13763 |
| 370 | Adasa Reply in Support of Motion for Pre & Post Judgment Interest, dated June 23, 2021 (SEALED) | Appx13796 |
| 372 | Adasa's Reply in Support of Adasa's Motion for Ongoing Royalty, dated June 23, 2021 | Appx13833 |
| 374 | Adasa's Response to Avery Dennison's Renewed Motion for Judgment as a Matter of Law, dated June 24, 2021 | Appx13866 |
| 380 | Legaard Declaration in Support of Opposition to Motion for Sanctions, dated July 6, 2021 (SEALED) | Appx14007 |
| 387 | Adasa's Reply in Support of Adasa's Motion for Imposition of Sanctions , dated July 14, 2021 | Appx14081 |
| 390 | (Redacted) Avery Renewed Motion for Judgment as a Matter of Law, dated June 11, 2021 | Appx14088 |
| 391 | (Redacted) Avery Renewed Motion for Judgment as a Matter of Law, dated July 8, 2021 | Appx14118 |

| 404 | Avery Supplemental Response to Motion for Sanctions, dated September 14, 2021 (SEALED) | Appx14169 |
| 405 | Declaration of J. Pochron in Support of Supplemental Response, dated September 14, 2021 (SEALED) | Appx14175 |
| 406 | Declaration of B. Malmlund in Support of Supplemental Response, dated September 13, 2021 (SEALED) | Appx14190 |
| 409 | Transcript of Proceedings, dated September 16, 2021) | Appx14210 |
| 414 | Transcript of Proceedings, dated October 1, 2021 | Appx14511 |
| 415 | Avery Dennison's Objections to Increasing the Judgment via Sanctions, dated October 4, 2021 | Appx14581 |
| 416 | Legaard Declaration, dated October 4, 2021 | Appx14584 |
| 432 | Stipulated Order of Dismissal, dated October 20, 2021 | Appx14589 |
| 433 | Avery Notice of Appeal, dated October 22, 2021 | Appx14591 |
| 438 | Opinion and Order, dated December 15, 2021 | Appx14601 |

## TRIAL TRANSCRIPTS

| Dkt. | Description | Page(s) |
| --- | --- | --- |
| 425 | Trial Transcript Day 1 - PM, dated May 10, 2021 | Appx14698 |
| 417 | Trial Transcript Day 2 - AM, dated May 11, 2021 | Appx14843 |
| 426 | Trial Transcript Day 2 - PM, dated May 11, 2021 | Appx14978 |
| 418 | Trial Transcript Day 3 - AM, dated May 12, 2021 | Appx15154 |
| 427 | Trial Transcript Day 3 – PM, dated May 12, 2021 | Appx15266 |
| 419 | Trial Transcript Day 4 - AM, dated May 13, 2021 | Appx15423 |
| 428 | Trial Transcript Day 4 - PM, dated May 13, 2021 | Appx15611 |
| 420 | Trial Transcript Day 5 - AM, dated May 14, 2021 | Appx15722 |
| 429 | Trial Transcript Day 5 - PM, dated May 14, 2021 | Appx15849 |

## PLAINTIFF'S EXHIBITS ADMITTED AT TRIAL

| Exh. | Description | Page(s) |
| --- | --- | --- |
| 007 | Settlement and Licensing Agreement Between ADASA In. and Goodyear Tire & Rubber Company | Appx15936 |
| 008 | Settlement and Licensing Agreement Between ADASA Inc and Polk Audio | Appx15944 |
| 009 | Settlement and Licensing Agreement Between ADASA Inc. and Agron, inc. | Appx15950 |
| 037 | EPC Generation 1 Tag Data Standards Version 1.1 Rev. 1.27 | Appx16750 |

## DEFENDANT'S EXHIBITS ADMITTED AT TRIAL

| Exh. | Description | Page(s) |
|---|---|---|
| 262 | Chart Identifying Infringing Schemas from Dr. Engels' Declaration | Appx17896 |

**ADDITIONAL PERTINENT MATERIAL**

| Dkt. | Description | Page(s) |
|---|---|---|
| | Email from Katherine Allor, dated May 14, 2021, 1:09 AM | Appx17898 |
| | Attachment to Allor Email: Word document titled "Adasa v Avery Verdict Form – Avery Dennison's Proposal – 05 13 21.docx" | Appx17905 |
| | Attachment to Allor Email: Word document titled "Adasa v Avery Jury Instructions – Avery Dennison's Proposal – 05 13 21.docx" | Appx17908 |

CONFIDENTIAL MATERIAL OMITTED

Pursuant to the Federal Circuit Rule 28(d)(1)(B), material subject to a protective order entered by the United States District Court for the District of Oregon has been redacted.

Pages Appx1346-1357, Appx6462-6482, Appx10546, Appx10559-10565, Appx10569-10571, Appx14179-14181, Appx14274, Appx14355, Appx14357-14358, Appx14360, Appx14367, Appx14408, Appx14424, Appx14432-14434, and Appx14442 contain Appellant's confidential business information, including competitive information.    Pages Appx1354, Appx14355, Appx14377-14381, Appx14399, Appx14405, Appx14411-14412, Appx14417-14418, Appx14436-14437, Appx14448-14450, Appx14454, Appx14458, Appx14460, Appx14466-14467, Appx14515-144517, Appx14519-14526, Appx14561, and Appx14570

contain information that should remain confidential due to implications for employee safety.

**Brenna K. Legaard,** OSB #001658
Email: blegaard@schwabe.com
**Angela E. Addae,** OSB #163335
Email: aaddae@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: (503) 222-9981

*Attorneys for Defendant*
*Avery Dennison Corporation*

**John Mansfield,** OSB # 055390
HARRIS BRICKEN
121 SW Morrison, Suite 400
Portland, OR 97204
(503) 207-7313
john@harrisbricken.com

**Jonathan T. Suder** (*pro hac vice*)
**Brett M. Pinkus** (*pro hac vice*)
**Glenn S. Orman** (*pro hac vice*)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX 76102
(817) 334-0400
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com

*Attorneys for Plaintiff*
*Adasa, Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ADASA INC., | Case No. 6:17-cv-01685-TC |
| Plaintiff, Counterclaim Defendant, | **STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY** |
| v. | |
| AVERY DENNISON CORPORATION, | |
| Defendant, Counter Claimant. | |

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY  Page 1

Appxl

## STIPULATION

IT IS HEREBY STIPULATED by and among Plaintiff ADASA, Inc. and Defendant Avery Dennison Corp. (each a "party" and collectively "the parties"), by and through their attorneys of record, that this Court may enter the following Stipulated Protective Order ("Protective Order") to safeguard confidential and attorneys' eyes only information produced or disclosed in this litigation.

This Protective Order is necessary because this case involves the parties' confidential and proprietary information. The parties may make requests for information that would call for confidential, proprietary and/or trade secret information, and this information could lose its value if disclosed to the public or improperly used outside of this litigation. During the course of this litigation, it is also likely that the parties' confidential, proprietary and/or trade secret information will be submitted to the Court to assist in ruling on various motions. This information could lose its value and legally protected status if disclosed to the public.

## PROTECTIVE ORDER

IT IS HEREBY ORDERED that the following Protective Order be entered in this matter and that the Parties shall follow the procedures set forth below with respect to information, documents, or things produced in this litigation:

To protect the confidentiality of proprietary and trade secret information contained in documents and other information disclosed in this litigation, the Court orders as follows:

1.    This Protective Order shall be applicable to and govern all depositions, documents, information or things produced in response to requests for production of documents, answers to interrogatories, responses to requests for admissions and all other discovery taken pursuant to the Federal Rules of Civil Procedure, as well as testimony adduced at trial or other hearings, matters in evidence and other information that the disclosing party designates as "CONFIDENTIAL,"

AppxII

"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" hereafter furnished, directly or indirectly, by or on behalf of any party or any non-party witness in connection with this action.

2. As used herein, "disclosing party" shall refer to the parties to this Protective Order and to other parties (whether other parties to this action or third parties) who give testimony or produce documents or other information.

3. The following information may be designated as CONFIDENTIAL: any trade secret or other confidential, proprietary, or commercially sensitive information, including, but not limited to, research, design, development, financial, or commercial information contained in any document, discovery response, or testimony, the disclosure of which is likely to cause harm to the competitive position of the disclosing party;

4. The following information may be designated as HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY: information that would fall within the scope of paragraph 3 but that the disclosing party in good faith reasonably believes to comprise particularly sensitive confidential material that warrants further restricted disclosure. Information may only be designated HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY if the disclosing party believes in good faith that designation as CONFIDENTIAL will not provide adequate protection.

5. If inspection or production of source code is necessary, a disclosing party may designate it as HIGHLY CONFIDENTIAL – SOURCE CODE if it is, or includes, confidential, proprietary, or trade secret source code.

6. A disclosing party may also designate materials as CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, HIGHLY CONFIDENTIAL – SOURCE

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY Page 3

AppxIII

CODE if it contains information that the disclosing party, in good faith, believes is confidential or proprietary to a third party.

7. A disclosing party who designates information or items for protection as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" must only designate specific material that qualifies under the appropriate standards. To the extent practicable, only those parts of documents, items or oral or written communications that require protection shall be designated. Designations with a higher confidentiality level when a lower level would suffice are prohibited. Mass, indiscriminate, or routinized designations are prohibited. Designation are allowed only if the designation is necessary to protect material that, if disclosed to persons not authorized to view it, would cause competitive or other recognized harm. Material may not be designated if it has been made public, or if designation is otherwise unnecessary to protect a secrecy interest. If a designator learns that information or items that it designated for protection do not qualify for protection at all or do not qualify for the level of protection initially asserted, that designator must promptly notify all parties that it is withdrawing the mistaken designation.

8. Disclosing parties shall designate CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE information as follows:

(a) In the case of documents or discovery responses, and the information contained therein, designation shall be made by placing the following legend on every page of any such document or on each page of the document that contains protected material prior to production: CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, HIGHLY CONFIDENTIAL – SOURCE CODE. In the event that a party inadvertently fails to stamp or otherwise designate a document or other information as CONFIDENTIAL or HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY at the time of its production, that party shall have ten (10) business days after such production to so stamp or otherwise designate the document or other information.

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY   Page 4

AppxIV

(b)    In the case of depositions, designation of the portion of the transcript (including exhibits) which contains CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE information shall be made by a statement to such effect on the record in the course of the deposition or, upon review of such transcript, by counsel for the party to whose CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE information the deponent has had access. If a party wishes to designate portions of a deposition transcript under this Protective Order after a deposition, that party's counsel shall make such designation within twenty-one (21) days after counsel's receipt of the final transcript by emailing to all counsel the page and line numbers containing CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, HIGHLY CONFIDENTIAL – SOURCE CODE information. Pending such designation by counsel, the entire deposition transcript shall be deemed HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, except exhibits shall maintain their existing designations. If no designation is made during the deposition or within twenty-one (21) days after receipt of the transcript, the transcript shall be considered not to contain any CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE information.

(c)    Transcripts of depositions will not be filed with the Court unless it is necessary to do so for purposes of hearings, trial, motions for summary judgment, or other matters. If a deposition transcript is filed and if it contains CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE information, the transcript shall bear the appropriate legend on the caption page and shall be filed under seal in accordance with governing rules.

(d)    Any CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE information produced in a non-paper media (e.g., videotape, audiotape, computer disk, etc.) may be designated as such by labeling the outside of such non-paper media as CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE. In the event such non-paper media is transmitted via email the producing party may designate the information produced as CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE by so identifying such media in the email or other cover correspondence. In the event a receiving party generates any "hard copy," transcription, or printout from any such designated non-paper media, such party must stamp each page CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE and the hard copy, transcription or printout shall be treated as it is designated.

9.    Any HIGHLY CONFIDENTIAL – SOURCE CODE produced in discovery shall be made available for inspection, in a format allowing it to be reasonably reviewed and searched, during normal business hours or at other mutually agreeable times, at an office of the designating

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY  Page 5

AppxV

party's counsel or another mutually agreeable location. The source code shall be made available for inspection on a secured computer in a secured room, and the inspecting party shall not copy, remove or otherwise transfer any portion of the source code onto any recordable media or recordable device. The designator may visually monitor the activities of the inspecting party's representatives during any source code review, but only to ensure that there is no unauthorized recording, copying or transmission of the source code. The inspecting party may request paper copies of portions of source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, other papers or for deposition or trial. The producing party shall provide all such source code in paper form, including Bates numbers and designated with the label HIGHLY CONFIDENTIAL – SOURCE CODE.

10.    If portions of documents or other materials deemed CONFIDENTIAL or any papers containing or making reference to such materials are filed with the Court, they shall be filed under seal and marked as follows or in substantially similar form:

CONFIDENTIAL

FILED UNDER SEAL: THIS DOCUMENT SHALL NOT BE SHOWN TO ANY PERSON OTHER THAN THOSE PERSONS DESIGNATED IN PARAGRAPH 12 OF THE STIPULATED PROTECTIVE ORDER

If portions of documents or other materials deemed HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY or any papers containing or making reference to such materials are filed with the Court, they shall be filed under seal and marked as follows or in substantially similar form:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

FILED UNDER SEAL: THIS DOCUMENT SHALL NOT BE SHOWN TO ANY PERSON OTHER THAN THOSE PERSONS DESIGNATED IN PARAGRAPH 13 OF THE STIPULATED PROTECTIVE ORDER

AppxVI

If portions of documents or other materials deemed HIGHLY CONFIDENTIAL – SOURCE CODE or any papers containing or making reference to such materials are filed with the Court, they shall be filed under seal and marked as follows or in substantially similar form:

HIGHLY CONFIDENTIAL – SOURCE CODE

FILED UNDER SEAL: THIS DOCUMENT SHALL NOT BE SHOWN TO ANY PERSON OTHER THAN THOSE PERSONS DESIGNATED IN PARAGRAPH 13 OF THE STIPULATED PROTECTIVE ORDER

The Clerk is directed to make available to all counsel of record, via remote electronic access, all documents filed under seal using the Court's CM/ECF system.

11.    All CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE information shall be used solely for the purposes of this litigation, including discovery, motions, trial and hearing preparation, and during trial or hearings and not for any other purpose, excepting that such information may also be used in other adversarial proceedings between the parties, including proceedings before the United States Patent and Trademark Office.

12.    Disclosure of all CONFIDENTIAL information shall be limited to:

(a)    The outside attorneys of record working on this action on behalf of any party, and any paralegal assistants, stenographic and clerical employees working under the direct supervision of such counsel of record;

(b)    The Court and supporting personnel or any appellate court to which an appeal may be taken in this litigation or in which review is sought, including necessary stenographic and clerical personnel (e.g. court reporters);

(c)    Other qualified reporters taking and videographers recording testimony involving such information and necessary stenographic and clerical personnel thereof;

(d)    Any person who is an author or recipient of that CONFIDENTIAL material. Any employee of the party producing such materials may be shown copies of such material during his or her testimony, but may not retain a copy of such information following the deposition;

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY  Page 7

AppxVII

(e)    Any expert who is expressly retained or sought to be retained by any outside attorney described in paragraph 12(a) to assist in preparation of this action for trial, who is not employed by, affiliated with (whether as a consultant or otherwise), controlled by, agents of, or materially interested in any party or any competitor of any party, with disclosure only to the extent necessary to perform such work;

(f)    The in-house counsel, officers, directors, and employees of the receiving party to whom disclosure is reasonably necessary and are required in good faith to provide assistance in the conduct of this litigation, including any settlement discussions, with each such officer, director, or employee identified in writing to counsel for the designating party in advance of the disclosure.

(g)    Persons (including employees of vendors) who are engaged by the parties for outside litigation support relating to this action, including for copy services, electronic discovery services, microfilming or database services, contract attorney services, trial support, jury consultant services, mock juries, graphics, sample analysis or testing, and/or translation, but only to the extent reasonably necessary to support outside counsel or otherwise further this litigation.

13.    HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY and HIGHLY CONFIDENTAL – SOURCE CODE information shall not be disclosed, except by the prior written consent of the disclosing party or third party, or pursuant to an order of this Court, to any person other than the following:

(a)    The outside attorneys of record working on this action on behalf of any party, and any paralegal assistants, stenographic and clerical employees working under the direct supervision of such counsel of record.

(b)    The Court and supporting personnel or any appellate court to which any appeal may be taken in this litigation or in which review is sought, including necessary stenographic and clerical personnel (e.g. court reporters).

(c)    Other qualified reporters taking and videographers recording testimony involving such information and necessary stenographic and clerical personnel thereof;

(d)    Any person who is an author or recipient of that HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY material. Any employee of the party producing such materials may be shown copies of such material during his or her testimony, but may not retain a copy of such information following the deposition;

(e)    Any consulting or testifying expert who is expressly retained or sought to be retained by any outside attorney described in paragraph 13(a) to assist in preparation of this action for trial, who is not employed by, affiliated with (whether as a consultant or

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY  Page 8

AppxVIII

otherwise), controlled by, agents of, or materially interested in any party or any competitor of any party, with disclosure only to the extent necessary to perform such work;

(f)    One in-house counsel who is required in good faith to provide assistance in the conduct of this litigation, including any settlement discussions, with such in-house counsel, identified in writing to counsel for the designating party in advance of the disclosure.

(g)    Persons (including employees of vendors) who are engaged by the parties for outside litigation support relating to this action, including for copy services, electronic discovery services, microfilming or database services, contract attorney services, trial support, jury consultant services, mock juries, graphics, sample analysis or testing, and/or translation, but only to the extent reasonably necessary to support outside counsel or otherwise further this litigation.

14.    Nothing herein shall restrict the use of CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE information of the disclosing party by the disclosing party.

15.    Prior to disclosure of any CONFIDENTIAL information to any persons in paragraphs 12(e), 12(f), 12(g), and prior to disclosure of any HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL – SOURCE CODE information to any persons in paragraphs 13(e), 13(f), and 13(g), the procedure set forth in paragraph 16 and, if applicable, paragraph 17 shall be followed.

16.    Prior to the disclosure of CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE information to persons in paragraphs 12(e), 12(f), 12(g), 13(e), 13(f), or 13(g), the outside counsel of record in this litigation for the party making the disclosure shall advise each person that the information is CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE, can only be discussed with persons authorized by this Protective Order to view the material and can only be used for purposes of this litigation. Counsel shall be responsible for the adherence to the terms of this Order by persons to whom disclosure is

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY    Page 9

AppxIX

made under paragraphs 12(g) and 13(g), which obligation may be fulfilled by obtaining and retaining a copy of a signed Confidentiality Undertaking of each person or entity to whom disclosure is made under paragraphs 12(g) or 13(g). Counsel shall retain and disclose to the other party a copy of a signed Confidentiality Undertaking of each person to whom disclosure is made under paragraph 12(e), 12(f), 1(e), and 13(f). The written undertaking, which shall be in the form as illustrated in Appendix A hereto, shall acknowledge that he or she has read and understands this Protective Order, agrees to comply with this Protective Order, agrees that the CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE information will be used only to assist in this litigation, and agrees not to disclose or discuss CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE information with any person other than those authorized by this Order to view the material and to use it only for the purposes of this litigation.

17.    At least 7 calendar days before disclosure of information designated as CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY , or HIGHLY CONFIDENTIAL – SOURCE CODE to an expert or party employee under paragraph 12(e), 12(f), 13(e), or 13(f), the party intending to disclose such information must provide to the producing party the person's name and title, and, in the case of an expert under paragraphs 12(e) or 13(e), the person's (1) current curriculum vitae or resume, (2) current employment and (3) list of any prior work for any party (including any parents or subsidiaries). If the producing party does not object to the disclosure in writing within 7 calendar days of receiving the foregoing information, then the producing party is deemed to have consented to the disclosure. However, a producing party may promptly object in writing to the expert's or party employee's continued access to or use of CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY , or HIGHLY

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY  Page 10

AppxX

CONFIDENTIAL – SOURCE CODE information where subsequently obtained facts provide the basis for a good faith objection. Any objection to disclosure of information to an expert or party employee must set forth the specific factual basis for the objection. If an objection is not resolved by way of informal conferences or correspondence, the producing party objecting to disclosure of information designated as CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY , or HIGHLY CONFIDENTIAL – SOURCE CODE to an expert or party employee may file a motion for a protective order within 7 calendar days of the informal conferences or correspondence not resolving the objection and shall bear the burden of showing why disclosure should not be permitted. Once such a motion for a protective order is filed, CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY , or HIGHLY CONFIDENTIAL – SOURCE CODE information shall not be disclosed to the expert or party employee at issue absent consent by the producing party or an order of the Court allowing the disclosure. If such a motion is not timely filed, the objection on those grounds shall be deemed waived.

18.   Prosecution Bar.

(a)   Any person reviewing any HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL – SOURCE CODE information produced under this Protective Order shall not engage in any Prosecution Activity (as defined below), and shall not share any HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL – SOURCE CODE information with any individual who is engaged in any Prosecution Activity.

(b)   Prosecution Activity shall mean any activity related to drafting or amendment of claims in reexamination Serial No. 90/014,052 and US Patent Application Serial no. 15/707,828, any and all patent applications that have been filed or may be filed in the future

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY  Page 11

AppxXI

claiming priority to any patent filing to which US 9,798,967 also claims priority, and any reexaminations, post grant reviews, or reissue applications that may be filed in the future pertaining to the '967 patent or any patent that claims priority to any patent filing to which US 9,798,967 also claims priority.

(c)    To ensure compliance with the purpose of this provision, each party shall take appropriate action necessary to ensure that persons involved in Prosecution Activity, as described above, shall not have direct or indirect access to any documents or information designated under this Protective Order as HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL – SOURCE CODE information.

19.    A party shall not be obligated to challenge the propriety of a CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE designation at the time made, and failure to do so shall not preclude a subsequent challenge thereto. In the event that any party to this litigation disagrees at any stage of these proceedings with such designation, such party shall provide to the producing party written notice of its disagreement with the designation. The parties shall first try to dispose of such dispute in good faith on an informal basis. If the dispute cannot be resolved, the party challenging the designation may request appropriate relief from the Court, but in any event, such relief from the Court shall not be requested before five (5) business days after the producing party is served with said written notice.

20.    Failure of counsel to designate or mark any document, thing, or testimony as CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE information as provided above shall not preclude the disclosing party from thereafter in good faith making such designation and requesting the receiving

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY  Page 12

AppxXII

party to so mark and treat such documents and things so designated even after the expiration of the "ten (10) business days" designation period described in paragraph 8(a), provided the disclosing party notifies the receiving party promptly after becoming aware of the failure to make such a designation. The disclosing party shall provide replacement materials bearing appropriate designations. The receiving party shall make reasonable efforts to assure that the materials are treated in accordance with the provisions of this Order, but shall not incur liability for disclosures made prior to notice of such designations.

21.    If CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, or HIGHLY CONFIDENTIAL – SOURCE CODE information is disclosed to any person other than in the manner authorized by this Protective Order, the person responsible for the disclosure shall immediately bring all pertinent facts relating to such disclosure to the attention of counsel of record for all parties, without prejudice to other rights and remedies of any party, and shall make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

22.    Whenever information designated as CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY , or HIGHLY CONFIDENTIAL – SOURCE CODE pursuant to this Protective Order is to be discussed by a party or otherwise disclosed in a deposition or pre-trial proceeding, the producing party may exclude from the room any person, other than persons designated in paragraphs 12 or 13, as appropriate, for that portion of the deposition or pretrial proceeding. Before discussing or otherwise disclosing any CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY , or HIGHLY CONFIDENTIAL – SOURCE CODE information at any hearing or at trial, any party other than the producing party for that information must give advance written notice to the producing party.

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY  Page 13

AppxXIII

Upon request by the producing party, and subject to applicable legal standards relating to the right of access to in-court proceedings, the Court may exclude such persons from all or part of a hearing or trial. Nothing in this Protective Order is intended to prevent a producing party or its employees from having access to or being examined regarding the producing party's own documents and information.

23.    Pursuant to Fed. R. Civ. P. 26(b)(5)(B) and Fed. R. Evid. 502(d), the disclosure by one party (through inadvertence, mistake, accident, or other error) of the substance of any document or communication entitled to protection under the attorney-client privilege or attorney work product doctrine shall not constitute a waiver of such protection as to the subject matter of that, or related, documents or communications. If during the discovery process in this case either party mistakenly produces a document entitled to protection as being privileged or work product, the producing party shall promptly request the return or destruction of the document and all copies thereof. Such a request must be made in writing and must identify the basis for the privilege or work product claimed.

24.    In the case of documents, if the party that received the document agrees that it is privileged or work product (without regard to its production), then the document and all copies shall promptly be returned to the producing party or destroyed, and no reference to such document shall be made in connection with the proof of the facts in this dispute. If the party that received the document does not agree that the document was protected by privilege or work product, then it shall so notify the producing party within ten (10) calendar days of receiving written notice of the asserted privilege or work product protection. In such event, the producing party may move the Court to resolve the question. Unless the parties otherwise agree in writing, any such motion must be made within twenty-one (21) calendar days of receiving notification that the recipient of the

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY   Page 14

AppxXIV

document disputes the claim of privilege or work product. If the Court rules that the document is protected (without regard to the fact of production), then the party that received the document shall promptly return the document and all known copies to the producing party (except that counsel of record may retain copies as needed for the sole purpose of seeking reconsideration or appellate review of the Court's ruling on the question of privilege) and shall make no reference to the document in connection with the proof of the facts or pursuit of judgment or settlement in this case.

25.    In the event that a party is required, by a valid discovery request to produce information in its possession, custody, or control that is subject to a confidentiality obligation to or a confidentiality agreement with a non-party, then the party from whom discovery is sought shall:

(a)    Promptly notify in writing the requesting party and the non-party that some or all of the information requested is subject to a confidentiality agreement with a non-party;

(b)    Promptly provide the non-party with a copy of the Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(c)    Make the information requested available for inspection by the non-party.

If the non-party fails to object or seek a protective order from this Court within five (5) business days of receiving the notice and accompanying information, the receiving party shall produce the non-party's information responsive to the discovery request, subject to other appropriate, good faith objections. If the non-party timely objects and thereafter seeks a protective order, the receiving party shall not produce any information in its possession, custody, or control that is subject to the confidentiality agreement or obligation with the non-party before a determination by the Court. The non-party shall bear the burden or persuasion and expense of seeking protection in this Court of its protected material. Nothing in this Protective Order shall be deemed to supersede

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY  Page 15

AppxXV

notice or disclosure obligations contained in any non-disclosure or other confidentiality agreement entered into by a disclosing party.

26.     Upon the request of the producing party or third party, within 60 days after the entry of a final judgment or dismissal no longer subject to appeal on the merits of this case, the parties and any person who received confidential information as authorized by this Protective Order shall return to the producing party or third party, or destroy, all information and documents subject to this Protective Order. A producing party may require the return of original materials (not copies) and shall pay the reasonable costs to do so. Notwithstanding anything else in this Protective Order, outside counsel of record for a party may retain archival copies of all documents and information subject to this Protective Order.

27.     Nothing in this Protective Order shall restrict the disclosure or use of any information or documents lawfully obtained by the receiving party (a) through means or sources outside of this litigation, (b) for this litigation from a person not asserting or under a duty to assert confidentiality, or (c) from publicly accessible sources (including information disclosed in open court or actually obtained by reverse engineering or analysis). Should a dispute arise as to any specific information or document, the burden shall be on the party claiming that such information or document was lawfully obtained through means and sources outside of this litigation, to show that the information was in fact so lawfully obtained.

28.     Nothing herein shall prevent any party from moving the court for modification of this Protective Order for good cause.

29.     Except as specifically provided herein, the terms, conditions, and limitations of this Protective Order shall survive the termination of this action.

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY   Page 16

AppxXVI

30.    Nothing herein shall be deemed to constitute a waiver of any objection a producing party may have to any discovery request or deposition question. Nothing herein shall prevent any party from objecting to production of documents or objecting to other discovery requests on any available grounds, or from seeking alternative protective orders from the Court.

Respectfully submitted,

Dated: July 10, 2018

HARRIS BRICKEN

s/ John Mansfield
John Mansfield, OSB #055390
121 SW Morrison, Suite 400
Portland, OR 97204
(503) 207-7313

FRIEDMAN, SUDER & COOKE

s/ Jonathan T. Suder
Jonathan T. Suder (*pro hac vice*)
Brett M. Pinkus (*pro hac vice*)
Glenn S. Orman (*pro hac vice*)
604 E. Fourth Street, Suite 200
Fort Worth, TX 76102
(817) 334-0400

Attorneys for Plaintiff
ADASA, Inc.

Dated: July 10, 2018

SCHWABE, WILLIAMSON & WYATT, P.C.

s/ Brenna K. Legaard
Brenna K. Legaard, OSB #001658
Angela E. Addae, OSB #163335
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Facsimile: 503.796.2900

Attorneys for Defendant
Avery Dennison Corp.

## ORDER

IT IS SO ORDERED.

DATED this 12 day of July, 2018.

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY  Page 17

AppxXVII

## APPENDIX A

[Follows on next page]

AppxXVIII

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ADASA INC., | Case No.  6:17-cv-01685-TC |
| Plaintiff, Counterclaim Defendant, | **CONFIDENTIAL UNDERTAKING** |
| v. | |
| AVERY DENNISON CORPORATION, | |
| Defendant, Counter Claimant. | |

I, _____, declare that:

1.    My address is _____.

2.    My present employer is _____.

3.    My present occupation or job description is _____

_____

_____.

4.    I have carefully read and received a copy of the Protective Order entered in this

action on _____.

5.    I hereby agree to be bound by and comply with the terms of the Protective Order,

and not to disseminate or disclose any information contained in the Protective Order that I either

review or about which I am told, to any person, entity, party, or agency for any reason, except in

accordance with the terms of the Protective Order.

STIPULATED PROTECTIVE ORDER GOVERNING DISCOVERY  Page 19

AppxXIX

6.    I will return all confidential material that comes into my possession, and documents or things that I have prepared relating thereto, to counsel for the party by whom I am employed or retained.

7.    I further agree to submit to the jurisdiction of this Court for the purposes of enforcement of the terms of this Protective Order.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

EXECUTED this _____ day of _____, 2018.


_____
(Signature)


_____
(Name)

AppxXX

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ADASA INC.,

                              Plaintiff,

        V.

AVERY DENNISON CORPORATION,

                            Defendant.

6:17-cv-01685-MK

JUDGMENT

Based on the record, judgment for Plaintiff.

Dated this <u>14th</u> day of May 2021.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States Magistrate Judge

Appx1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | | |
|---|---|---|
| ADASA INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.: 6:17-cv-01685-MK |
| | § | |
| AVERY DENNISON CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**FINAL RULE 58 JUDGMENT**

It is ORDERED and ADJUDGED that judgment be entered in favor of Plaintiff and against Defendant in accordance with the jury verdict on Plaintiff's claims of direct infringement of claim 1 of reexamined U.S. Patent No. 9,798,967, literally and under the doctrine of equivalents, by tags tried to the jury and encoded under Defendant's PCTag and Commissioning Authority schemas. For the avoidance of doubt, a Section 101 defense has been resolved in favor of Plaintiff on summary judgment and in JMOL rulings (ECF No. 205).

It is ORDERED and ADJUDGED that judgment be entered in favor of Plaintiff for damages in the amount of $36,059,220 for direct infringement through March 31, 2021. This amount is based on the amount found by the jury and includes $9,417,343 based on the additional infringing tags found by Defendant post-verdict as explained in the briefing on the Motion for Sanctions.

It is ORDERED and ADJUDGED that Defendant shall pay pre-judgment interest at the rate of 9% per annum without compounding in the amount of $4,010,267.

It is ORDERED and ADJUDGED that Defendant shall be taxed costs of $55,424.70.

For reasons entered on the record and as to be further set forth in a formal written opinion to follow, the Court finds this to be an exceptional case under 35 U.S.C. § 285, and thus it is

Final Rule 58 Judgment on the Jury Verdict After Post-Trial Motions – Page 1

Appx2

ORDERED and ADJUDGED that Defendant shall pay Plaintiff's attorneys' fees in the amount of $2,250,000.

For reasons entered on the record and as to be further set forth in a formal written opinion to follow, the Court finds conduct of the Defendant to have been sanctionable, finds that the appropriate sanction is $0.0025 per tag for the total number of tags included in the merits judgment above, and thus it is ORDERED and ADJUDGED that Defendant shall pay sanctions in the amount of $20,032,889.80.

The sum of the above lines is $62,407,801.50.

It is ORDERED and ADJUDGED that Defendant shall pay Plaintiff post-judgment interest on the above amounts in the amount statutorily required by 28 U.S.C. § 1961.

It is ORDERED and ADJUDGED that Defendant shall pay Plaintiff a royalty of $0.0045 per tag on revenues for ongoing sales made by Defendant of the infringing products listed above and any not colorably different from April 1, 2021 through May 14, 2021.

It is ORDERED and ADJUDGED that Defendant shall owe and pay Plaintiff, on a quarterly basis, an ongoing royalty of $.009 per tag on revenues for ongoing sales made by Defendant of the infringing products listed above and any not colorably different from May 15, 2021 until the expiration of the '967 Patent. Such payments shall be made no later than 30 days after the expiration of such quarter. For purposes of reporting, Defendant shall provide to Plaintiff on a quarterly basis statements disclosing the number of EPCs generated during that quarter using any schema found to result in infringement and any not colorably different ("Accused Schema") and transponder sales attributed to all corresponding retail brand owners. Royalty bearing sales shall be determined using the number of EPCs generated using an Accused Schema unless EPCs generated for a particular retail brand owner exceed the number of units sold attributed to that brand owner by more than 10% for that quarter, in which case the number of units sold apportioned by the percent of EPCs generated using an Accused Schema shall be used instead. The first such

Final Rule 58 Judgment on the Jury Verdict After Post-Trial Motions – Page 2

Appx3

report shall include calculations from April 1, 2021 through September 30, 2021. Such report shall

be prepared by Ernst & Young, LLP as to the amount and the calculation, and if an apportionment

is used, the basis for the 10% or more discrepancy. Any stay or forbearance of the payment

obligation as ordered by the Court or agreed to by the parties shall not stay or forebear the reporting

requirement set forth above.

Dated: October 14, 2021

> s/ Mustafa T. Kasubhai
> MUSTAFA T. KASUBHAI (He / Him)
> United States Magistrate Judge

Appx4

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

APPEAL,CONSENT,JT,PROTECTIVE ORD,TERMINATED

# U.S. District Court
## District of Oregon (Eugene (6))
## CIVIL DOCKET FOR CASE #: 6:17-cv-01685-MK

| | |
|---|---|
| Adasa Inc. v. Avery Dennison Corporation | Date Filed: 10/24/2017 |
| Assigned to: Magistrate Judge Mustafa T. Kasubhai | Date Terminated: 05/14/2021 |
| Case in other court: United States Court of Appeals for the | Jury Demand: Both |
| Federal Cir, 22-01092 | Nature of Suit: 830 Patent |
| Cause: 35:271 Patent Infringement | Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **Adasa Inc.** | represented by | **Jonathan T. Suder** |

Friedman Suder & Cooke
604 E. 4th Street
Suite 200
Fort Worth, TX 76102
(817) 334-0400
Fax: (817) 334-0401
Email: jts@fsclaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alan J. Thayer , Jr.**
Perrin & Thayer, LLP
975 Oak Street
Suite 785
P.O. Box 1268
Eugene, OR 97401
(541) 345-2325
Fax: (541) 345-2456
Email: alan@thinkilg.com
*ATTORNEY TO BE NOTICED*

**Brett M. Pinkus**
Wick Phillips Gould & Martin, LLP
3131 McKinney Ave
Ste 100
Dallas, TX 75204
214-692-6200
Fax: 214-692-6200
Email: Brett.Pinkus@wickphillips.com
*TERMINATED: 01/30/2020*
*PRO HAC VICE*

Appx5

https://ecf.ord.uscourts.gov/cgi-bin/DktRpt.pl?144011304740048-L_1_0-1

**Glenn S. Orman**
Friedman, Suder & Cooke
604 E. 4th Street, Suite 200
Ft. Worth, TX 76102
(817) 334-0400
Fax: (817) 344-0401
Email: orman@fsclaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Johnathan E. Mansfield**
MansfieldLaw
3439 NE Sandy Blvd., #230
Portland, OR 97232
United Sta
503-7374717
Email: John@mansfieldlaw.net
*TERMINATED: 10/25/2018*

**Richard A. Wojcio , Jr.**
Friedman, Suder & Cooke
604 E 4th Street
Suite 200
Forth Worth, TX 76102-4074
817-334-0400
Fax: 817-334-0401
Email: wojcio@fsclaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert Greenspoon**
Dunlap Bennett & Ludwig PLLC
333 N. Michigan Ave.
Ste 2700
Chicago, IL 60601
312-551-9500
Email: rgreenspoon@dbllawyers.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William W Flachsbart**
Dunlap Bennett & Ludwig PLLC
333 N. Michigan Ave.
27th Floor
Chicago, IL 60601
312-551-9500
Email: wflachsbart@dbllawyers.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Appx6

V.

**Defendant**

**Avery Dennison Corporation**         represented by     **Brenna K. Legaard**
K & L Gates LLP
1 SW Columbia St
Ste 1900
97204
Portland, OR 97204
503-226-5736
Email: brenna.legaard@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Angela E. Addae**
Schwabe, Williamson & Wyatt
1211 SW 5th Ave
Ste. 1900
Portland, OR 97204
503-796-2096
Fax: 503-796-2900
*TERMINATED: 02/19/2019*

**Balazs Takacs**
Schwabe, Williamson & Wyatt
1211 SW 5th Ave
Ste. 1900
Portland, OR 97204
503-796-2077
Fax: 503-796-2900
Email: takacsblzs@gmail.com
*TERMINATED: 01/15/2021*

**Cristin A. Wagner**
Schwabe, Williamson & Wyatt
1211 SW 5th Ave
Ste. 1900
Portland, OR 97204
503-796-2948
Fax: 503-796-2900
*TERMINATED: 11/21/2019*

**Elizabeth H. White**
K&L Gates LLP
One SW Columbia Street
Suite 1900
Portland, OR 97204
503-226-5729
Email: elizabeth.white@klgates.com
*ATTORNEY TO BE NOTICED*

Appx7

**George C Summerfield , I**
K&L Gates LLP
70 W. Madison St.
Suite 3100
Chicago, IL 60602
312-807-4376
Email: george.summerfield@klgates.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jason A. Wrubleski**
Schwabe, Williamson & Wyatt
1211 SW 5th Ave
Ste. 1900
Portland, OR 97204
503-796-2847
Fax: 503-796-2900
Email: jwrubleski@schwabe.com
*TERMINATED: 01/15/2021*

**Katherine Allor**
K&L Gates LLP
70 W. Madison St., Suite 3300
Chicago, IL 60602
312-807-4325
Email: katy.allor@klgates.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William F. Abrams**
Schwabe, Williamson & Wyatt, P.C.
1420 5th Avenue
Suite 3400
Seattle, WA 98101
206-826-7779
Email: wabrams@schwabe.com
*TERMINATED: 01/15/2021*
*PRO HAC VICE*

**Counter Claimant**

**Avery Dennison Corporation**          represented by **Brenna K. Legaard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Angela E. Addae**
(See above for address)
*TERMINATED: 02/19/2019*

1/20/2022, 10:31 AM

Appx8

**Cristin A. Wagner**
(See above for address)
*TERMINATED: 11/21/2019*

**Jason A. Wrubleski**
(See above for address)
*TERMINATED: 01/15/2021*

**Katherine Allor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William F. Abrams**
(See above for address)
*TERMINATED: 01/15/2021*
*PRO HAC VICE*

V.

**Counter Defendant**

**Adasa Inc.**                          represented by  **Jonathan T. Suder**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brett M. Pinkus**
(See above for address)
*TERMINATED: 01/30/2020*
*PRO HAC VICE*

**Glenn S. Orman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johnathan E. Mansfield**
(See above for address)
*TERMINATED: 10/25/2018*

**Richard A. Wojcio , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Avery Dennison Corporation**          represented by  **Brenna K. Legaard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

1/20/2022, 10:31 AM

Appx9

**Angela E. Addae**
(See above for address)
*TERMINATED: 02/19/2019*

**Balazs Takacs**
(See above for address)
*TERMINATED: 01/15/2021*

**Cristin A. Wagner**
(See above for address)
*TERMINATED: 11/21/2019*

**Elizabeth H. White**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason A. Wrubleski**
(See above for address)
*TERMINATED: 01/15/2021*

**Katherine Allor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William F. Abrams**
(See above for address)
*TERMINATED: 01/15/2021*
*PRO HAC VICE*

V.

**Counter Defendant**

**Adasa Inc.**                     represented by   **Jonathan T. Suder**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alan J. Thayer , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brett M. Pinkus**
(See above for address)
*TERMINATED: 01/30/2020*
*PRO HAC VICE*

**Glenn S. Orman**

Appx10

(See above for address)
*ATTORNEY TO BE NOTICED*

**Johnathan E. Mansfield**
(See above for address)
*TERMINATED: 10/25/2018*

**Richard A. Wojcio , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

| | | |
|---|---|---|
| **Avery Dennison Corporation** | represented by | **Brenna K. Legaard** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Angela E. Addae**
(See above for address)
*TERMINATED: 02/19/2019*

**Cristin A. Wagner**
(See above for address)
*TERMINATED: 11/21/2019*

**Jason A. Wrubleski**
(See above for address)
*TERMINATED: 01/15/2021*

**Katherine Allor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William F. Abrams**
(See above for address)
*TERMINATED: 01/15/2021*
*PRO HAC VICE*

V.

**Counter Defendant**

| | | |
|---|---|---|
| **Adasa Inc.** | represented by | **Jonathan T. Suder** |

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alan J. Thayer , Jr.**
(See above for address)

Appx11

*ATTORNEY TO BE NOTICED*

**Brett M. Pinkus**
(See above for address)
*TERMINATED: 01/30/2020*
*PRO HAC VICE*

**Glenn S. Orman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johnathan E. Mansfield**
(See above for address)
*TERMINATED: 10/25/2018*

**Richard A. Wojcio , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Avery Dennison Corporation**                    represented by    **Brenna K. Legaard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Angela E. Addae**
(See above for address)
*TERMINATED: 02/19/2019*

**Cristin A. Wagner**
(See above for address)
*TERMINATED: 11/21/2019*

**Elizabeth H. White**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason A. Wrubleski**
(See above for address)
*TERMINATED: 01/15/2021*

**Katherine Allor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William F. Abrams**
(See above for address)
*TERMINATED: 01/15/2021*
*PRO HAC VICE*

Appx12

V.

**Counter Defendant**

| | | |
|---|---|---|
| **Adasa Inc.** | represented by | **Jonathan T. Suder** |

                                                    (See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alan J. Thayer , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brett M. Pinkus**
(See above for address)
*TERMINATED: 01/30/2020*
*PRO HAC VICE*

**Glenn S. Orman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johnathan E. Mansfield**
(See above for address)
*TERMINATED: 10/25/2018*

**Richard A. Wojcio , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/24/2017 | 1 | Complaint. Filing fee in the amount of $400 collected. Agency Tracking ID: 0979-5197798 Filer is subject to the requirements of Fed. R. Civ. P. 7.1. Jury Trial Requested: Yes. Included patents/trademarks: 9798967--10/24/2017--ADASA INC.. Filed by ADASA INC. against AVERY DENNISON CORPORATION (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit, # 3 Proposed Summons). (Mansfield, Johnathan) (Entered: 10/24/2017) |
| 10/25/2017 | 2 | Notice of Case Assignment to Magistrate Judge Thomas M. Coffin and Discovery and Pretrial Scheduling Order. **NOTICE: Counsel shall print and serve the summonses and all documents issued by the Clerk at the time of filing upon all named parties in accordance with Local Rule 3-5**. Discovery is to be completed by 2/22/2018. Joint Alternate Dispute Resolution Report is due by 3/26/2018. Pretrial Order is due by 3/26/2018. Ordered by Magistrate Judge Thomas M. Coffin. (Attachments: # 1 Summons Issued) (kf) (Entered: 10/25/2017) |
| 10/25/2017 | 3 | Notice of Appearance of Johnathan E. Mansfield appearing on behalf of ADASA INC. Filed by on behalf of ADASA INC.. (Mansfield, Johnathan) (Entered: 10/25/2017) |

Appx13

| 10/25/2017 | 4 | **Patent Report:** This report is submitted pursuant to 35 U.S.C. section 290, which requires the clerks of the courts of the United States, within one month after the filing of an action under this title shall give notice thereof in writing to the Commissioner, setting forth so far as known the names and addresses of the parties, name of the inventor, and the designating number of the patent upon which the action has been brought. If any other patent is subsequently included in the action he shall give like notice thereof. Within one month after the decision is rendered or a judgment issued the clerk of the court shall give notice thereof to the Director. The Director shall, on receipt of such notices, enter the same in the file of such patent.. (kf) (Entered: 10/25/2017) |
| --- | --- | --- |
| 10/25/2017 | 5 | Motion for Leave to Appear Pro Hac Vice *for Attorney Glenn S. Orman* . Filing fee in the amount of $300 collected; Agency Tracking ID: 0979-5199034. Filed by Adasa Inc.. (Mansfield, Johnathan) (Entered: 10/25/2017) |
| 10/25/2017 | 6 | Motion for Leave to Appear Pro Hac Vice *for Attorney Brett M. Pinkus* . Filing fee in the amount of $300 collected; Agency Tracking ID: 0979-5199066. Filed by Adasa Inc.. (Mansfield, Johnathan) (Entered: 10/25/2017) |
| 10/25/2017 | 7 | Motion for Leave to Appear Pro Hac Vice *for Attorney Jonathan T. Suder* . Filing fee in the amount of $300 collected; Agency Tracking ID: 0979-5199081. Filed by Adasa Inc.. (Mansfield, Johnathan) (Entered: 10/25/2017) |
| 10/30/2017 | 8 | **ORDER:** Granting Application for Special Admission *Pro Hac Vice* of Jonathan T. Suder for Adasa Inc. Application Fee in amount of $300 collected. Receipt No. 0979-5199081 issued. Ordered by Magistrate Judge Thomas M. Coffin. (cp) Modified on 10/30/2017 to correct Judge Name - Resent NEF(cp). (Entered: 10/30/2017) |
| 10/30/2017 | 9 | **ORDER:** Granting Application for Special Admission *Pro Hac Vice* of Brett M. Pinkus for Adasa Inc. Application Fee in amount of $300 collected. Receipt No. 0979-5199066 issued. Signed on 10/30/2017 by Magistrate Judge Thomas M. Coffin. (cp) Modified on 10/30/2017 to correct Judge - Resent NEF(cp). (Entered: 10/30/2017) |
| 10/30/2017 | 10 | **ORDER:** Granting Application for Special Admission *Pro Hac Vice* of Glenn S. Orman for Adasa Inc. Application Fee in amount of $300 collected. Receipt No. 0979-5199034 issued. Signed on 10/30/2017 by Magistrate Judge Thomas M. Coffin. (cp) (Entered: 10/30/2017) |
| 10/31/2017 | 11 | Waiver of Service of Summons Returned Executed by Avery Dennison Corporation waiver sent on 10/30/2017. Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 10/31/2017) |
| 11/02/2017 | 12 | Corporate Disclosure Statement . Filed by Adasa Inc.. (Mansfield, Johnathan) (Entered: 11/02/2017) |
| 12/29/2017 | 13 | Answer to 1 Complaint, with Jury Demand Filer is subject to the requirements of Fed. R. Civ. P. 7.1, Counterclaim Adasa Inc.. Filed by Avery Dennison Corporation. (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 12/29/2017) |
| 12/29/2017 | 14 | Corporate Disclosure Statement . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 12/29/2017) |
| 12/29/2017 | 15 | Individual Party Consent to Jurisdiction by U.S. Magistrate Judge. (Entered: 12/29/2017) |

Appx14

| | | |
|---|---|---|
| 01/16/2018 | 16 | Answer to 13 Answer to Complaint, Counterclaim with Jury Demand . Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 01/16/2018) |
| 02/22/2018 | 17 | Motion for Judgment on the Pleadings . Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 02/22/2018) |
| 02/22/2018 | 18 | Declaration of Brenna K. Legaard . Filed by Avery Dennison Corporation. (Related document(s): Motion for Judgment on the Pleadings 17 .) (Attachments: # 1 Exhibit 1) (Legaard, Brenna) (Entered: 02/22/2018) |
| 03/08/2018 | 19 | Response in Opposition to Motion for Judgment on the Pleadings 17 . Filed by All Plaintiffs. (Mansfield, Johnathan) (Entered: 03/08/2018) |
| 03/08/2018 | 20 | Declaration of Charles B. Williams *in Support of Plaintiff's Opposition to Defendant's Motion for Judgment*. Filed by All Plaintiffs. (Related document(s): Response in Opposition to Motion 19 .) (Mansfield, Johnathan) (Entered: 03/08/2018) |
| 03/21/2018 | 21 | Motion for Extension of Time to File a Response/Reply to Motion for Judgment on the Pleadings 17 . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 03/21/2018) |
| 03/26/2018 | 22 | **ORDER:** Granting Motion for Extension of Time to File Reply to Motion for Judgment on the Pleadings 17 filed by Avery Dennison Corporation. Reply is due by 4/5/2018. Motion is taken under advisement as of 4/9/2018. Ordered by Magistrate Judge Thomas M. Coffin. (plb) (Entered: 03/26/2018) |
| 04/05/2018 | 23 | Reply to Motion for Judgment on the Pleadings 17 Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 04/05/2018) |
| 04/09/2018 | 24 | Scheduling Order by Magistrate Judge Thomas M. Coffin regarding Motion for Judgment on the Pleadings 17 . Oral Argument is set for 4/25/2018 at 10:00AM in Eugene Courtroom 4 before Magistrate Judge Thomas M. Coffin. Ordered by Magistrate Judge Thomas M. Coffin. (plb) (Entered: 04/09/2018) |
| 04/17/2018 | 25 | Scheduling Order by Magistrate Judge Thomas M. Coffin regarding Motion for Judgment on the Pleadings 17 . At the request of the parties, Oral Argument is set from 4/25/2018 to 5/9/2018 at 10:00AM in Eugene Courtroom 4 before Magistrate Judge Thomas M. Coffin. Ordered by Magistrate Judge Thomas M. Coffin. (plb) (Entered: 04/17/2018) |
| 04/27/2018 | 26 | Joint Rule 26(f) Report and Discovery Plan . Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 04/27/2018) |
| 05/09/2018 | 27 | **MINUTES of Proceedings:** Motion Hearing Held. Motion for Judgment on the Pleadings 17 is stayed and may be renewed after claim construction briefing which shall include at a minimum the terms in plaintiff's Opposition at p. 28 and an additional analysis of the Bascom and DDR Holdings cases discussed on last page of the Synopsis case. Brett Pinkus; Johnathan Mansfield present as counsel for plaintiff. Angela Addae; Brenna Legaard present as counsel for defendant. Court Reporter: Eleanor G. Knapp. Magistrate Judge Thomas M. Coffin presiding. (jk) (Entered: 05/10/2018) |
| 05/10/2018 | 28 | Individual Party Consent to Jurisdiction by U.S. Magistrate Judge. (Entered: 05/10/2018) |

Appx15

| 05/15/2018 | 29 | Full Consent by all Parties to Jurisdiction by US Magistrate Judge. (bd) (Entered: 05/15/2018) |
| 05/29/2018 | 30 | Motion for Stay *Pending Reexamination*. Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 05/29/2018) |
| 05/29/2018 | 31 | Declaration of Brenna K. Legaard . Filed by Avery Dennison Corporation. (Related document(s): Motion for Stay 30 .) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Legaard, Brenna) (Entered: 05/29/2018) |
| 06/05/2018 | 32 | Scheduling Order by Magistrate Judge Thomas M. Coffin regarding Motion for Stay *Pending Reexamination* 30 . Oral Argument is set for 7/11/2018 at 02:00PM in Eugene by telephone before Magistrate Judge Thomas M. Coffin. The Court will initiate the call. Ordered by Magistrate Judge Thomas M. Coffin. (plb) (Entered: 06/05/2018) |
| 06/08/2018 | 33 | Proposed Notice *Plaintiff's Claim Construction and Discovery Schedule* Filed by Adasa Inc.. (Mansfield, Johnathan) (Entered: 06/08/2018) |
| 06/12/2018 | 34 | Brief *in Opposition to Defendant's Motion to Stay Pending Reexamination*. Filed by Adasa Inc.. (Related document(s): Motion for Stay 30 .) (Pinkus, Brett) (Entered: 06/12/2018) |
| 06/12/2018 | 35 | Declaration of Brett M. Pinkus *in Support of Plaintiff's Brief in Opposition to Defendant's Motion to Stay Pending Reexamination*. Filed by Adasa Inc.. (Related document(s): Brief 34 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J) (Pinkus, Brett) (Entered: 06/12/2018) |
| 06/26/2018 | 36 | Reply to Motion for Stay *Pending Reexamination* 30 Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 06/26/2018) |
| 06/26/2018 | 37 | Declaration of Brenna K. Legaard . Filed by Avery Dennison Corporation. (Related document(s): Motion for Stay 30 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Legaard, Brenna) (Entered: 06/26/2018) |
| 07/03/2018 | 38 | Unopposed Motion *for Leave for Plaintiff to FIle a Surreply in Opposition to Defendant's Motion to Stay Pending Reexamination*. Expedited Hearing requested. Filed by All Plaintiffs. (Mansfield, Johnathan) (Entered: 07/03/2018) |
| 07/06/2018 | 39 | **ORDER:** Granting Motion for Leave to File Sur-Response 38 . Sur-Response to Motion for Stay is due by 7/9/2018. Ordered by Magistrate Judge Thomas M. Coffin. (plb) (Entered: 07/06/2018) |
| 07/06/2018 | 40 | Sur-Response *Plaintiff's Surreply in Opposition* to Motion for Stay *Pending Reexamination* 30 . Filed by All Plaintiffs. (Mansfield, Johnathan) (Entered: 07/06/2018) |
| 07/06/2018 | 41 | Declaration of Brett M. Pinkus *in Support of Plaintiff's Brief in Opposition to Defendant's Motion to Stay Pending Reexamination*. Filed by All Plaintiffs. (Related document(s): Sur-Response to Motion 40 .) (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D) (Mansfield, Johnathan) (Entered: 07/06/2018) |
| 07/06/2018 | 42 | Notice re Sur-Response to Motion 40 *Notice of Final Resolution of Ex Parte Reexamination* Filed by All Plaintiffs. (Related document(s): Sur-Response to Motion 40 .) (Mansfield, Johnathan) (Entered: 07/06/2018) |

Appx16

| | | |
|---|---|---|
| 07/06/2018 | 43 | Declaration of Brett M. Pinkus *in Support of Plaintiff's Notice of Final Resolution of Ex Parte Reexamination*. Filed by All Plaintiffs. (Related document(s): Notice 42 .) (Attachments: # 1 Exhibit Exhibit A) (Mansfield, Johnathan) (Entered: 07/06/2018) |
| 07/10/2018 | 44 | **ORDER:** The Court having been informed by the parties that Defendant, without objection by plaintiff, wishes to withdraw the pending Motion for Stay 30 , it is ordered that the pending Motion for Stay is withdrawn. Oral Argument set for 7/11/2018 is vacated. The parties are ordered to meet and confer regarding a proposed schedule and to submit the proposed schedule in writing to the Court. If the parties are unable to agree on a schedule after meeting and conferring, they may submit their proposed schedules in writing to the Court and a telephone hearing will be set. The parties are advised that the Court will not consider discovery disputes unless they have previously met and conferred. If the parties are unable to resolve any discovery disputes, they may submit requests for a discovery hearing in writing outlining the dispute and the parties respective arguments. Ordered by Magistrate Judge Thomas M. Coffin. (plb) (Entered: 07/10/2018) |
| 07/10/2018 | 45 | Stipulated Motion for Protective Order *Governing Discovery*. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 07/10/2018) |
| 07/12/2018 | 46 | **ORDER:** Granting Stipulated Motion for Protective Order Governing Discovery 45 . Signed on 7/12/2018 by Magistrate Judge Thomas M. Coffin. (ck) (Entered: 07/13/2018) |
| 07/31/2018 | 47 | Motion *Plaintiff's Proposed Claim Construction and Discovery Schedule*. Filed by All Plaintiffs. (Mansfield, Johnathan) (Entered: 07/31/2018) |
| 08/09/2018 | 48 | Motion for Leave to Appear Pro Hac Vice *for Attorney Richard A. Wojcio Jr* . Filing fee in the amount of $300 collected; Agency Tracking ID: 0979-5512689. Filed by All Plaintiffs. (Mansfield, Johnathan) (Entered: 08/09/2018) |
| 08/15/2018 | 49 | Proposed Joint Case Management Schedule *Joint Claim Construction and Discovery Schedule*. Filed by All Plaintiffs. (Mansfield, Johnathan) (Entered: 08/15/2018) |
| 09/12/2018 | 50 | Motion for Leave to File Amended Complaint/Petition . Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 09/12/2018) |
| 09/12/2018 | 51 | **ORDER:** Granting Application for Special Admission *Pro Hac Vice* of Richard A. Wojcio, Jr for Adasa Inc. Application Fee in amount of $300 collected. Receipt No. 0979-5512689 issued. Signed on 9/12/2018 by Magistrate Judge Thomas M. Coffin. (cp) (Entered: 09/13/2018) |
| 09/13/2018 | 52 | Notification of CM/ECF Account for Richard Wojcio, Jr (*Pro Hac Vice* admission). Your login is: **rwojcio**. Go to the CM/ECF login page to set your password. (cp) (Entered: 09/13/2018) |
| 09/26/2018 | 53 | **ORDER:** Adopting the parties' Joint Claim Construction and Discovery Schedule. Contemporaneous opening claim construction briefs are due by 9/27/2018. Contemporaneous responsive claim construction briefs are due by 10/19/2018. Claim Construction Hearing is set for 11/6/2018 at 10:00AM in Eugene Courtroom 4 before Magistrate Judge Thomas M. Coffin. Plaintiff's Motion for Briefing Schedule 47 is denied as moot. Ordered by Magistrate Judge Thomas M. Coffin. (plb) (Entered: 09/26/2018) |

Appx17

| 09/26/2018 | 54 | Response to Motion for Leave to File Amended Complaint/Petition 50 . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 09/26/2018) |
| 09/26/2018 | 55 | Declaration of Brenna K. Legaard . Filed by Avery Dennison Corporation. (Related document(s): Motion for Leave to File Amended Complaint/Petition 50 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Legaard, Brenna) (Entered: 09/26/2018) |
| 09/27/2018 | 56 | Joint Notice *Claim Construction Chart* Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 09/27/2018) |
| 09/27/2018 | 57 | Brief *Plaintiff's Opening Claim Construction Brief*. Filed by Adasa Inc.. (Attachments: # 1 Attachment Declaration of Brett M. Pinkus in Support of Plaintiff's Opening Claim Construction Brief, # 2 Exhibit A - USP9798967, # 3 Exhibit B - Amendment in Response to Final OA) (Pinkus, Brett) (Entered: 09/27/2018) |
| 09/27/2018 | 58 | Brief *Avery Dennison Corporation's Opening Claim Construction Brief*. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 09/27/2018) |
| 09/27/2018 | 59 | Declaration of Angela E. Addae . Filed by Avery Dennison Corporation. (Related document(s): Brief 58 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J) (Legaard, Brenna) Modified text on 10/1/2018 from Brenna K. Legaard to Angela E. Addae to match the document; attorneys noticed. (kf) (Entered: 09/27/2018) |
| 10/10/2018 | 60 | Reply *Brief in Support of Plaintiff's Motion for Leave to Amend Pleadings* to Motion for Leave to File Amended Complaint/Petition 50 . Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 10/10/2018) |
| 10/19/2018 | 61 | Brief *Plaintiff's Responsive Claim Construction Brief*. Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 10/19/2018) |
| 10/19/2018 | 62 | Brief *Avery Dennison Corporation's Response to Adasa's Opening Claim Construction Brief*. Filed by Avery Dennison Corporation. (Related document(s): Brief, 57 .) (Legaard, Brenna) (Entered: 10/19/2018) |
| 10/22/2018 | 63 | **ORDER:** The Court is in receipt of Defendant's request to allow testimony regarding RFID technology and Plaintiff's response. It is ordered that the Court will not hear any testimony at the claim construction hearing. However, within fourteen (14) days of this order, Defendant may file a brief that outlines the proposed testimony. Fourteen (14) days after Defendant has filed its brief, Plaintiff may file a response. It is further ordered that the claim construction hearing is reset from 11/6/2018 to 12/7/2018 at 10:00AM in Eugene Courtroom 4 before Magistrate Judge Thomas M. Coffin. Ordered by Magistrate Judge Thomas M. Coffin. (plb) (Entered: 10/22/2018) |
| 10/24/2018 | 64 | Motion to Substitute Attorney . Filed by Adasa Inc.. (Thayer, Alan) (Entered: 10/24/2018) |
| 10/25/2018 | 65 | **ORDER:** Granting Motion to Substitute Attorney 64 . Alan Thayer is substituted for Johnathan Mansfield as counsel for Adasa, Inc. Ordered by Magistrate Judge Thomas M. Coffin. (plb) (Entered: 10/25/2018) |
| 12/07/2018 | 66 | **MINUTES of Proceedings:** Claim Construction Hearing Held before Magistrate Judge Thomas M. Coffin. Plaintiff's Motion for Leave to File Amended Complaint/Petition 50 is GRANTED for reasons stated on the record. Amended Complaint is due 12/21/2018. The remaining Claim Construction motions are taken |

Appx18

| | | under advisement today. Brett Pinkus, Richard Wojcio, Alan Thayer present as counsel for plaintiff. Brenna Legaard, Angela Addae present as counsel for defendant. (Court Reporter Kristi Anderson.) (ck) (Entered: 12/07/2018) |
|---|---|---|
| 12/21/2018 | 67 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Hearing held on 12/7/2018 before Judge Thomas M. Coffin, Court Reporter Kristi Anderson, telephone number 541-431-4112. <span style="color:red">Transcript may be viewed at Court's public terminal or purchased from the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through PACER-See Policy at ord.uscourts.gov.</span> Notice of Intent to Redact Transcript is due by 12/28/2018. Redaction Request due 1/11/2019. Redacted Transcript Deadline set for 1/22/2019. Release of Transcript Restriction set for 3/21/2019. (Anderson, Kristi) (Entered: 12/21/2018) |
| 01/22/2019 | 68 | Opinion and Order. The claims in this action are construed as discussed in this Opinion and Order. Signed on 1/22/2019 by Magistrate Judge Thomas M. Coffin. (plb) (Entered: 01/22/2019) |
| 01/29/2019 | 69 | Notice of Case Reassignment: This case has been reassigned from Magistrate Judge Thomas M. Coffin to Magistrate Judge Mustafa T. Kasubhai. (plb) (Entered: 01/29/2019) |
| 02/07/2019 | 70 | **ORDER:** Parties shall issue a status report addressing the status of filing an Amended Complaint, and submit a joint Proposed Scheduling Order. The status report is due within 30 days of the date of this Order. Ordered by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 02/07/2019) |
| 02/15/2019 | 71 | Amended Complaint . Filed by Adasa Inc. against Avery Dennison Corporation (Attachments: # 1 Exhibit A - Patent 967). (Pinkus, Brett) (Entered: 02/15/2019) |
| 02/19/2019 | 72 | Notice of Attorney Substitution:Attorney Cristin A. Wagner is substituted as counsel of record in place of Attorney Angela E. Addae Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 02/19/2019) |
| 03/01/2019 | 73 | Answer to 71 Amended Complaint with Jury Demand , Counterclaim Adasa Inc.. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 03/01/2019) |
| 03/08/2019 | 74 | Joint Status Report *and Proposed Scheduling Order*. Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 03/08/2019) |
| 03/15/2019 | 75 | Motion for Leave *Proposed Stipulation to File First Amended Answer and Counterclaims* by Adasa Inc. Filed by Adasa Inc. (Wojcio, Richard) Modified to correct event and docket text (NEF not regenerated) on 3/18/2019 (jk). (Entered: 03/15/2019) |
| 03/18/2019 | 76 | **ORDER:** Granting Stipulated Motion to File First Amended Answer and Counterclaims 75 . Defendant's first amended answer and counterclaims is due 3/22/2019. Plaintiff's previous deadline of 3/22/2019 to file an answer to defendant's original answer is vacated. Plaintiff's answer to defendant's first amended answer and counterclaims is due 14 days after service is executed. Ordered by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 03/18/2019) |
| 03/18/2019 | 77 | **ORDER:** The Court is in receipt of the parties' Joint Status Report and Proposed Scheduling Order 74 . The proposed scheduling order is adopted as follows: Discovery is to be completed by 6/13/2019; Disclosure of Expert Witness Reports must be completed by 7/3/2019; Disclosure of Rebuttal Expert Witnesses must be completed |

Appx19

| | | |
|---|---|---|
| | | by 8/2/2019; Expert Discovery must be completed by 9/6/2019; Joint Alternate Dispute Resolution Report is due by 9/20/2019; Dispositive Motions are due by 10/4/2019; Pretrial Order is due by 2/10/2020. Defendant's proposed dates for Final Pretrial Conference and Trial is adopted. The Court will determine the date, if any, of oral arguments. Ordered by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 03/18/2019) |
| 03/19/2019 | 78 | **ORDER:** Denying as Moot Motion for Judgment on the Pleadings 17 as the parties have stipulated to filing new pleadings in this matter. Ordered by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 03/19/2019) |
| 03/22/2019 | 79 | Amended Answer to 71 Amended Complaint with Jury Demand , Counterclaim Adasa Inc.. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 03/22/2019) |
| 04/05/2019 | 80 | Answer to 79 Answer to Amended Complaint, Counterclaim with Jury Demand *Plaintiff's Answer to Defendant's First Amended Counterclaims*. Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 04/05/2019) |
| 05/08/2019 | 81 | Request *Plaintiff's Request for Discovery and Scheduling Hearing*. Oral argument requested. Filed by Adasa Inc. (Attachments: # 1 Exhibit A - ADASA's First Set of Interrogatories to Avery, # 2 Exhibit B - ADASA's First Set of Requests for Production to Avery, # 3 Exhibit C - Plaintiff's Second Set of Interrogatories, # 4 Exhibit D - Plaintiff's Second Set of Requests for Production) (Pinkus, Brett) Modified to correct event type and add oral argument text (NEF not regenerated) on 5/9/2019 (jk). (Entered: 05/08/2019) |
| 05/10/2019 | 82 | **Scheduling Order:** Status Conference is set for 5/21/2019 at 10:45AM in Eugene by telephone before Magistrate Judge Mustafa T. Kasubhai. The parties are ordered to call into the Court's conference line at least five (5) minutes prior to the scheduled hearing. Call-in information will be sent by separate order. **Please use a land line connection without external noise. The court prohibits speaker phones due to the greatly diminished sound quality.** Ordered by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 05/10/2019) |
| 05/15/2019 | 83 | Unopposed Motion for Extension of Discovery & PTO Deadlines . Filed by Avery Dennison Corporation. (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 05/15/2019) |
| 05/15/2019 | 84 | Corrected Motion for Extension of Discovery & PTO Deadlines . Filed by Avery Dennison Corporation. (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 05/15/2019) |
| 05/17/2019 | 85 | **ORDER:** The court is in receipt of defendant's Corrected Motion for Extension of Discovery & PTO Deadlines 84 . In light of the upcoming scheduled status conference set for 5/21/2019, defendant's motion is granted in part as to the following: the parties shall confer regarding discovery and scheduling no later than 5/24/2019 and file a Joint Status Report with an update of the remaining disputes and proposed deadlines no later than 6/4/2019. The parties may request a status conference in the JSR or the court may set a status conference based on the filing of the JSR. The status conference set for 5/21/2019 is vacated. Defendant's Motion for Extension of Discovery & PTO Deadlines 83 is denied as moot. Ordered by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 05/17/2019) |

Appx20

| 06/04/2019 | 86 | Joint Status Report *and Proposed Scheduling Order*. Filed by Adasa Inc.. (Wojcio, Richard) (Entered: 06/04/2019) |
|---|---|---|
| 06/07/2019 | 87 | **Scheduling Order:** Status Conference is set for 6/10/2019 at 10:30AM in Eugene by telephone before Magistrate Judge Mustafa T. Kasubhai. The parties are ordered to call into the court's conference line at least 5 minutes prior to the scheduled hearing. Call-in information will be sent by separate order. **Please use a land line connection without external noise. The court prohibits speaker phones due to the greatly diminished sound quality.** Ordered by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 06/07/2019) |
| 06/10/2019 | 88 | **MINUTES of Proceedings:** Status Conference held. The Court is in receipt of the parties' Joint Status Report and Proposed Scheduling Order 86 . The proposed scheduling order is adopted. The deposition of Michael Kuhno is ordered to take place on 7/17/2019. Richard Wojcio (by telephone); Alan Thayer (by telephone); Brett Pinkus (by telephone) present as counsel for plaintiff. Brenna Legaard (by telephone) present as counsel for defendant. Magistrate Judge Mustafa T. Kasubhai presiding. (jk) (Entered: 06/10/2019) |
| 06/13/2019 | 89 | Emergency Request *for Discovery Hearing*. Filed by Adasa Inc.. (Attachments: # 1 Attachment Declaration of Brett M. Pinkus, # 2 Exhibit Ex. A - Avery Dennison's Objections and Responses to Fifth Set of Requests for Production, # 3 Exhibit Ex. B - Email Correspondence) (Wojcio, Richard) (Entered: 06/13/2019) |
| 06/17/2019 | 90 | Response to Motion for Hearing 81 Oral Argument requested. Filed by All Defendants. (Legaard, Brenna) (Entered: 06/17/2019) |
| 06/17/2019 | 91 | Declaration of Brenna K. Legaard . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by All Defendants. (Related document(s): Response to Discovery Motion 90 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J) (Legaard, Brenna) (Entered: 06/17/2019) |
| 06/18/2019 | 92 | Plaintiff's Reply in Support of its Emergency Request for Supplemental Discovery Hearing to Motion for Hearing 81 . Expedited Consideration Requested. Filed by Adasa Inc. (Pinkus, Brett) Modified to match document title on 6/19/2019. (kf). (Entered: 06/18/2019) |
| 06/18/2019 | 93 | **ORDER:** Plaintiff's request for an emergency hearing 89 is denied. Defendant's motion for protective order contained in its response 90 is denied without prejudice. See formal order attached. Signed on 6/18/2019 by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 06/18/2019) |
| 07/02/2019 | 94 | Motion for Protective Order . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 07/02/2019) |
| 07/09/2019 | 95 | Response in Opposition to Motion for Protective Order 94 . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 07/09/2019) |
| 07/24/2019 | 96 | Motion to Compel *Plaintiff's Emergency Motion to Compel Discovery, and to Extend the Discovery Deadline*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Oral Argument requested.Expedited Hearing requested. Filed by Adasa Inc.. (Attachments: # 1 Exhibit Declaration of Brett M. Pinkus in |

Appx21

| | | |
|---|---|---|
| | | Support of Plaintiff's Emergency Motion to Compel, # 2 Exhibit A - Deposition Excerpts, # 3 Exhibit B - Avery Objections and Responses to Adasa 30(b)(6) Notice, # 4 Exhibit C - Kuhno Depo Topics, # 5 Exhibit D - Kuhno Depo Demo, # 6 Exhibit E - Illustration of Schema, # 7 Exhibit F - ADASA Avery Meet and Confer) (Pinkus, Brett) (Entered: 07/24/2019) |
| 07/31/2019 | 97 | **ORDER:** The Court is in receipt of Plaintiff's Emergency Motion to Compel Discovery and to Extend the Discovery Deadline 96 . Plaintiff's Motion to Extend the Discovery Deadline is granted and the deadline for discovery is extended to 10/8/2019. The Court will address Plaintiff's Motion to Compel following Defendant's response or after 8/7/2019 if no response filed. Ordered by Magistrate Judge Mustafa T. Kasubhai. (jk) Modified to add text (NEF regenerated) on 7/31/2019 (jk). (Entered: 07/31/2019) |
| 08/07/2019 | 98 | Response to Motion to Compel *Plaintiff's Emergency Motion to Compel Discovery, and to Extend the Discovery Deadline* 96 . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 08/07/2019) |
| 08/07/2019 | 99 | Declaration of Brenna K. Legaard . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Response to Discovery Motion 98 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G) (Legaard, Brenna) (Entered: 08/07/2019) |
| 08/09/2019 | 100 | Reply *Plaintiff's Reply in Support of* to Motion to Compel *Plaintiff's Emergency Motion to Compel Discovery, and to Extend the Discovery Deadline* 96 Oral Argument requested. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 08/09/2019) |
| 08/29/2019 | 101 | Joint Motion for Extension of Time *Plaintiff ADASA, Inc.'s Joint Motion for Extension of Case Schedule*. Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 08/29/2019) |
| 09/06/2019 | 102 | Motion to Compel *Plaintiff's Motion to Compel Discovery*. Oral Argument requested.Expedited Hearing requested. Filed by Adasa Inc.. (Attachments: # 1 Exhibit A - Table of ADASA's Requests for Production and Status of Avery's Responses) (Pinkus, Brett) (Entered: 09/06/2019) |
| 09/13/2019 | 103 | **ORDER:** Granting Joint Motion for Extension of Time 101 . Disclosure of Expert Witness Reports to be completed by 11/8/2019. Disclosure of Rebuttal Expert Witness Reports to be completed by 12/6/2019. Joint Alternate Dispute Resolution Report is due by 1/17/2020. Dispositive Motions are due by 2/7/2020. Ordered by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 09/13/2019) |
| 09/13/2019 | 104 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: Oral Argument regarding Motion for Protective Order 94 , Motion to Compel 96 , and Motion to Compel 102 is set for 1/14/2020 at 09:30AM in Eugene Courtroom 3 before Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 09/13/2019) |
| 09/13/2019 | 105 | **Scheduling Order:** Status Conference is set for 10/1/2019 at 10:45AM in Eugene by telephone before Magistrate Judge Mustafa T. Kasubhai. The parties are ordered to call into the court's conference line at least 5 minutes prior to the scheduled hearing. Call-in information will be sent by separate order. **Please use a land line connection without external noise. The court prohibits speaker phones due to the greatly diminished sound quality.** Ordered by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 09/13/2019) |

Appx22

| 09/20/2019 | 106 | Response to Motion to Compel *Plaintiff's Motion to Compel Discovery* 102 Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 09/20/2019) |
| 09/20/2019 | 107 | Declaration of Brenna K. Legaard . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Response to Discovery Motion 106 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Legaard, Brenna) (Entered: 09/20/2019) |
| 09/24/2019 | 108 | Reply *Plaintiff's Reply in Support of* to Motion to Compel *Plaintiff's Motion to Compel Discovery* 102 Oral Argument requested. Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 09/24/2019) |
| 09/26/2019 | 109 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: Status Conference set for 10/1/2019 is reset for 10/2/2019 at 09:30AM in Eugene by telephone before Magistrate Judge Mustafa T. Kasubhai. The parties are ordered to call into the court's conference line at least 5 minutes prior to the scheduled hearing. Call-in information previously sent by separate order on 9/13/2019. **Please use a land line connection without external noise. The court prohibits speaker phones due to the greatly diminished sound quality.** (jk) (Entered: 09/26/2019) |
| 10/01/2019 | 110 | Unopposed Motion for Leave to File Amended Complaint/Petition . Filed by Adasa Inc.. (Attachments: # 1 Exhibit Second Amended Complaint, # 2 Exhibit Redline of Second Amended Complaint) (Wojcio, Richard) (Entered: 10/01/2019) |
| 10/02/2019 | 111 | **MINUTES of Proceedings:** Telephone Status Conference. Joint Status Report is due by 10/9/2019. Motions to Compel 96 and 102 are denied as MOOT. Oral Argument set for 1/14/2020 is VACATED. Unopposed Motion for Leave to File Amended Complaint/Petition 110 is GRANTED. Document production is to be completed by 11/1/2019. Discovery is to be completed by 12/9/2019. Expert Reports to be exchanged by 1/9/2020. Rebuttal Expert Reports to be exchanged by 2/7/2020. Joint Alternate Dispute Resolution Report is due by 3/17/2020. Dispositive Motions are due by 4/7/2020. An estimated eight-day (8) Jury Trial is set for 9/9/2020 at 09:00AM in Eugene Courtroom 3 before Magistrate Judge Mustafa T. Kasubhai. Alan Thayer (by telephone); Brett Pinkus (by telephone); Glenn Orman (by telephone) present as counsel for plaintiff. Brenna Legaard (by telephone) present as counsel for defendant. Magistrate Judge Mustafa T. Kasubhai presiding. (jk) (Entered: 10/02/2019) |
| 10/02/2019 | 112 | Second Amended Complaint . Filed by Adasa Inc. against Avery Dennison Corporation. (Pinkus, Brett) (Entered: 10/02/2019) |
| 10/09/2019 | 113 | Joint Status Report *Pursuant to Dkt. No. 111*. Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 10/09/2019) |
| 10/16/2019 | 114 | Answer to 112 Amended Complaint with Jury Demand , Counterclaim Adasa Inc.. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 10/16/2019) |
| 10/17/2019 | 115 | Motion for Judgment on the Pleadings *as to Adasa's Infringement Claim*. Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 10/17/2019) |
| 10/21/2019 | 116 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: Status Conference is set for 11/4/2019 at 10:15AM in Eugene by telephone before Magistrate Judge Mustafa T. Kasubhai. The Court will initiate the call. **Please use a land line connection without external noise. The court prohibits speaker phones due to the greatly diminished** |

Appx23

| | | |
|---|---|---|
| | | **sound quality.** (jk) (Entered: 10/21/2019) |
| 10/30/2019 | 117 | **AMENDED Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: Status Conference set for 11/4/2019 at 10:15AM is reset to 02:00PM in Eugene by telephone before Magistrate Judge Mustafa T. Kasubhai. The parties are ordered to call into the court's conference line at least 5 minutes prior to the scheduled hearing. Call-in information will be sent by separate order. **Please use a land line connection without external noise. The court prohibits speaker phones due to the greatly diminished sound quality.** (jk) (Entered: 10/30/2019) |
| 10/31/2019 | 118 | Response *Plaintiff's Response* to Motion for Judgment on the Pleadings *as to Adasa's Infringement Claim* 115 . Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 10/31/2019) |
| 11/04/2019 | 119 | **MINUTES of Proceedings:** Status Conference. Defendant / Counter Claimant Avery Dennison's limited summary judgment motion is due by 11/8/2019. Plaintiff / Counter Defendant Adasa's response and cross-motion for summary judgment are due by 12/2/2019. Defendant / Counter Claimant Avery Dennison's reply to its motion and response to Plaintiff / Counter Defendant Adasa's cross-motion are due by 12/23/2019. Plaintiff / Counter Defendant Adasa's reply to its cross-motion is due by 1/6/2020. Alan Thayer (by telphone); Brett Pinkus (by telephone); Glenn Orman (by telephone) present as counsel for plaintiff. Brenna Legaard (by telephone) present as counsel for defendant. Magistrate Judge Mustafa T. Kasubhai presiding. (FTR - Eugene Courtroom 3.) (jk) (Entered: 11/04/2019) |
| 11/06/2019 | 120 | Answer to 114 Answer to Amended Complaint, Counterclaim with Jury Demand *Plaintiff's Answer to Defendant's Second Amended Counterclaims*. Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 11/06/2019) |
| 11/08/2019 | 121 | Motion for Judgment on the Pleadings . Filed by Adasa Inc.. (Attachments: # 1 Attachment Declaration of Brett M. Pinkus in Support of Plaintiff's Motion for Judgment on the Pleadings, # 2 Exhibit A - emails about meet and confer for striking affirmative defenses) (Pinkus, Brett) (Entered: 11/08/2019) |
| 11/08/2019 | 122 | Motion for Summary Judgment *of Invalidity*. Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/08/2019) |
| 11/08/2019 | 123 | Declaration of Brenna K. Legaard . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Motion for Summary Judgment 122 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J) (Legaard, Brenna) (Entered: 11/08/2019) |
| 11/14/2019 | 124 | Reply to Motion for Judgment on the Pleadings *as to Adasa's Infringement Claim* 115 Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/14/2019) |
| 11/21/2019 | 125 | Notice of Attorney Withdrawal: *Cristin A. Wagner* Filed by Avery Dennison Corporation. (Wagner, Cristin) (Entered: 11/21/2019) |
| 11/22/2019 | 126 | Response to Motion for Judgment on the Pleadings 121 Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/22/2019) |

Appx24

| 11/22/2019 | 127 | Declaration of Brenna K. Legaard . Filed by Avery Dennison Corporation. (Related document(s): Response to Motion 126 .) (Attachments: # 1 Errata A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H) (Legaard, Brenna) (Entered: 11/22/2019) |
| 11/27/2019 | 128 | Motion for Judgment on the Pleadings *with Respect to Intervening Rights*. Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/27/2019) |
| 12/02/2019 | 129 | Unopposed Motion for Extension of Time to File a Response/Reply to Motion for Summary Judgment *of Invalidity* 122 . Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 12/02/2019) |
| 12/05/2019 | 130 | Response in Opposition to Motion for Summary Judgment *of Invalidity* 122 and Cross-Motion for Partial Summary Judgment of No Invalidity. Filed by Adasa Inc.. (Attachments: # 1 Declaration of Glenn S. Orman, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit C1, # 6 Exhibit C2, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit E1, # 10 Exhibit E2, # 11 Exhibit E3, # 12 Exhibit E4, # 13 Exhibit E5, # 14 Exhibit F, # 15 Exhibit G) (Pinkus, Brett) Modified to correct event type on 1/7/2020 (NEF not regenerated) (jk). (Entered: 12/05/2019) |
| 12/05/2019 | 131 | **ORDER:** Granting Motion for Extension of Time to File Response/Reply 129 . Ordered by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 12/05/2019) |
| 12/06/2019 | 132 | Reply to Motion for Judgment on the Pleadings 121 . Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 12/06/2019) |
| 12/11/2019 | 133 | Response in Opposition to Motion for Judgment on the Pleadings *with Respect to Intervening Rights* 128 . Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 12/11/2019) |
| 12/23/2019 | 134 | Motion for Leave to Appear Pro Hac Vice *for Attorney William F. Abrams* . Filing fee in the amount of $300 collected; Agency Tracking ID: 0979-6132094. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 12/23/2019) |
| 12/23/2019 | 135 | Reply to Motion for Judgment on the Pleadings *with Respect to Intervening Rights* 128 Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 12/23/2019) |
| 12/26/2019 | 136 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: Oral Argument regarding Motion for Judgment on the Pleadings *as to Adasa's Infringement Claim* 115 , Motion for Judgment on the Pleadings 121 , Motion for Summary Judgment *of Invalidity* 122 , and Motion for Judgment on the Pleadings *with Respect to Intervening Rights* 128 is set for 2/4/2020 at 09:00AM in Eugene Courtroom 3 before Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 12/26/2019) |
| 12/26/2019 | 137 | Reply to Motion for Summary Judgment *of Invalidity* 122 and Response to Cross-Motion for Partial Summary Judgment of No Invalidity 130 . Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) Modified to link motion on 1/7/2020 (NEF not regenerated) (jk). (Entered: 12/26/2019) |
| 12/26/2019 | 138 | Declaration of Brenna K. Legaard . Filed by Avery Dennison Corporation. (Related document(s): Reply to Motion 137 .) (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 12/26/2019) |

Appx25

| 01/06/2020 | 139 | Reply *Plaintiff's Reply in Support of its Motion for Summary Judgment* 130 . Filed by Adasa Inc. (Attachments: # 1 Attachment Declaration of Richard A. Wojcio, Jr. in Support of Plaintiff's Reply in Support of its Motion for Summary Judgment of No Invalidity, # 2 Exhibit A - Excerpts from Request for Ex Parte Reexam, # 3 Exhibit B - Excerpts from Avery Response to Adasa Third Set of ROGs (No. 13), # 4 Exhibit C - Excerpts from Williams Depo Tr) (Pinkus, Brett) Modified to correct linked document on 1/7/2020 (NEF not regenerated) (jk). (Entered: 01/06/2020) |
|---|---|---|
| 01/06/2020 | 140 | **ORDER:** Granting Application for Special Admission *Pro Hac Vice* of William F. Abrams for Avery Dennison Corporation. Application Fee in amount of $300 collected. Receipt No. 0979-6132094 issued. Signed on 1/6/2020 by Magistrate Judge Mustafa T. Kasubhai. (ck) (Entered: 01/07/2020) |
| 01/07/2020 | 141 | Notification of CM/ECF Account for William F. Abrams (*Pro Hac Vice* admission). Your login is: **wfabrams**. Go to the CM/ECF login page to set your password. (ck) (Entered: 01/07/2020) |
| 01/07/2020 | 142 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai: Plaintiff's Cross-Motion for Partial Summary Judgment of No Invalidity 130 is DENIED for failure to comply with LR 7-1(b) with leave to re-file. For the same reason, the response to Plaintiff's Cross-Motion for Partial Summary Judgment of No Invalidity 137 and the reply 139 are stricken with leave to re-file upon Plaintiff's refiling of the motion. The Court notes the importance of complying with the local rules, especially in light of the multiple pending motions in this matter. (jk) (Entered: 01/07/2020) |
| 01/09/2020 | 143 | Unopposed Motion for Leave *to File a Cross-Motion for Partial Summary Judgment of No Invalidity*. Filed by Adasa Inc.. (Attachments: # 1 Exhibit A - Cross Motion for Partial Summary Judgment of No Invalidity) (Pinkus, Brett) (Entered: 01/09/2020) |
| 01/10/2020 | 144 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai granting Unopposed Motion for Leave *to File a Cross-Motion for Partial Summary Judgment of No Invalidity* 143 . (jk) (Entered: 01/10/2020) |
| 01/10/2020 | 145 | Cross Motion for Partial Summary Judgment *of No Invalidity*. Filed by Adasa Inc.. (Pinkus, Brett) (Entered: 01/10/2020) |
| 01/10/2020 | 146 | Response to Cross Motion for Partial Summary Judgment *of No Invalidity* 145 Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 01/10/2020) |
| 01/10/2020 | 147 | Declaration of Brenna K. Legaard . Filed by Avery Dennison Corporation. (Related document(s): Response to Motion 146 .) (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 01/10/2020) |
| 01/13/2020 | 148 | Reply *Plaintiff's Reply in Support of its Motion for Summary Judgment* to Cross Motion for Partial Summary Judgment *of No Invalidity* 145 . Filed by Adasa Inc.. (Attachments: # 1 Attachment Declaration of Richard A. Wojcio, Jr. in Support of Plaintiff's Reply in Support of its Motion for Summary Judgment of No Invalidity, # 2 Exhibit A - Excerpts from Request for Ex Parte Reexam, # 3 Exhibit B - Excerpts from Avery Response to Adasa Third Set of ROGs (No. 13), # 4 Exhibit C - Excerpts from Williams Depo Tr) (Pinkus, Brett) (Entered: 01/13/2020) |
| 01/14/2020 | 149 | **Amended Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: Oral Argument regarding Motion for Judgment on the Pleadings *as to Adasa's Infringement Claim* 115 , Motion for Judgment on the Pleadings 121 , Motion for Summary |

Appx26

| | | |
|---|---|---|
| | | Judgment *of Invalidity* 122 , Motion for Judgment on the Pleadings *with Respect to Intervening Rights* 128 , and Cross Motion for Partial Summary Judgment *of No Invalidity* 145 is set for 2/4/2020 at 09:00AM in Eugene Courtroom 3 before Magistrate Judge Mustafa T. Kasubhai. Ordered by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 01/14/2020) |
| 01/17/2020 | 150 | Motion *to Exclude Portions of the Expert Report of Patrick J. Sweeney II*. Oral Argument requested. Filed by Adasa Inc.. (Attachments: # 1 Declaration of Brett M. Pinkus, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E) (Pinkus, Brett) (Entered: 01/17/2020) |
| 01/27/2020 | 151 | Notice of Appearance of Balazs Takacs appearing on behalf of Avery Dennison Corporation Filed by on behalf of Avery Dennison Corporation. (Takacs, Balazs) (Entered: 01/27/2020) |
| 01/27/2020 | 152 | Notice re Motion - Miscellaneous, 150 *of Withdrawal of Motion to Exclude Portions of the Expert Report of Patrick J. Sweeney II [Dkt. 150]* Filed by Adasa Inc.. (Related document(s): Motion - Miscellaneous, 150 .) (Suder, Jonathan) (Entered: 01/27/2020) |
| 01/28/2020 | 153 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: Oral Argument regarding Motion for Judgment on the Pleadings *as to Adasa's Infringement Claim* 115 , Motion for Judgment on the Pleadings 121 , Motion for Summary Judgment *of Invalidity* 122 , Motion for Judgment on the Pleadings *with Respect to Intervening Rights* 128 , and Cross Motion for Partial Summary Judgment *of No Invalidity* 145 is set for 2/25/2020 at 09:00AM in Eugene Courtroom 3 before Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 01/28/2020) |
| 01/30/2020 | 154 | Notice of Attorney Withdrawal *Brett M. Pinkus* Filed by Adasa Inc.. (Pinkus, Brett) . (Entered: 01/30/2020) |
| 02/25/2020 | 155 | **MINUTES of Proceedings:** Motion Hearing Held regarding Motion for Judgment on the Pleadings 115 , Motion for Judgment on the Pleadings 121 , Motion for Summary Judgment 122 , Motion for Judgment on the Pleadings 128 , and Motion for Partial Summary Judgment 145 . Motions are taken under advisement as of 3/2/2020. Glenn Orman; Jonathan Suder; Alan Thayer, Jr. present as counsel for plaintiff. Brenna Legaard; Balazs Takacs present as counsel for defendant. Court Reporter: Cheryl Guthrie. FTR - Eugene Courtroom 3. Magistrate Judge Mustafa T. Kasubhai presiding. (jk) (Entered: 02/25/2020) |
| 02/26/2020 | 156 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai: Motion for a Protective Order 94 is denied as MOOT. (jk) (Entered: 02/26/2020) |
| 03/03/2020 | 157 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai: Plaintiff filed a Notice of Withdrawal of Motion to Exclude Portions of the Expert Report of Patrick J. Sweeney II 152 . The Court construes the notice as a Motion to Withdraw and grants Plaintiff's motion 152 . Plaintiff's Motion to Exclude Portions of the Expert Report of Patrick J. Sweeney II 150 is withdrawn. (jk) (Entered: 03/03/2020) |
| 03/13/2020 | 158 | Motion for Extension of Time *Regarding Dispositive Motion Deadline*. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 03/13/2020) |
| 03/16/2020 | 159 | Response in Opposition to Motion for Extension of Time *Regarding Dispositive Motion Deadline* 158 . Filed by Adasa Inc.. (Orman, Glenn) (Entered: 03/16/2020) |
| 03/17/2020 | 160 | Joint ADR Report . Filed by Adasa Inc..(Orman, Glenn) (Entered: 03/17/2020) |

Appx27

| | | |
|---|---|---|
| 03/17/2020 | 161 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai granting Motion for Extension of Time 158 . Dispositive Motions are due by 6/8/2020. (jk) (Entered: 03/17/2020) |
| 03/18/2020 | 162 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai: Defendant filed a Motion for Extension of Time 158 requesting that dispositive motion deadline to be extended from 4/7/2020 to 6/7/2020. The Court extends the dispositive motion deadline to 5/7/2020. The Court's Order (ECF No. 161) is WITHDRAWN. (jk) (Entered: 03/18/2020) |
| 04/13/2020 | 163 | Motion for Extension of Time *Regarding Dispositive Motion Deadline*. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 04/13/2020) |
| 04/14/2020 | 164 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai GRANTING Unopposed Motion for Extension of Time 163 . Dispositive Motions are due by 5/14/2020. (jk) (Entered: 04/14/2020) |
| 04/30/2020 | 165 | **Opinion and Order** signed on 4/30/2020 by Magistrate Judge Mustafa T. Kasubhai: Defendant's Motion for Judgment on the Pleadings as to Plaintiff's claim under 35 U.S.C. § 271(f) (ECF No. 115 ) is DENIED. (jk) (Entered: 04/30/2020) |
| 04/30/2020 | 166 | **Opinion and Order** signed on 4/30/2020 by Magistrate Judge Mustafa T. Kasubhai: Plaintiff's Motion for Judgment on the Pleadings (ECF No. 121 ) is GRANTED. Defendant's Request for Judicial Notice (ECF No. 128 ) is GRANTED. Defendant's Motion for Judgment on the Pleadings Regarding Intervening Rights (ECF No. 128 ) is DENIED. (jk) (Entered: 04/30/2020) |
| 04/30/2020 | 167 | **Opinion and Order** signed on 4/30/2020 by Magistrate Judge Mustafa T. Kasubhai: Defendant's Motion for Summary Judgment of Invalidity (ECF No. 122 ) is DENIED. Plaintiff's Motion for Partial Summary Judgment of No Invalidity (ECF No. 145 ) is GRANTED. (jk) (Entered: 04/30/2020) |
| 05/14/2020 | 168 | Motion for Summary Judgment . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Oral Argument requested. Filed by Adasa Inc.. (Attachments: # 1 Declaration of Richard A. Wojcio, Jr., # 2 Index of Exhibits, # 3 Exhibit A - United States Patent No. 9,798,967 B2 (Dkt. 71-1), # 4 Exhibit B - Claim Construction Order (Dkt No 68), # 5 Exhibit C - Second Amended Complaint (Dkt No 112), # 6 Exhibit D - Answer to Second Amended Complaint (Dkt No 114), # 7 Exhibit E1 - CA + PCTag schemas (annotated) highly confidential AEO, # 8 Exhibit E2 - Comm Auth only Schemas highly confidential AEO, # 9 Exhibit F - KUHNO Depo Excerpts, # 10 Exhibit G - Avery Reply ISO 102b MSJ (Dkt No 137 and 138), # 11 Exhibit H - Engels Declaration, # 12 Exhibit H1 - Infringing Schema Table, # 13 Exhibit H2 - CA + PCTag Bit Mapping highly confidential AEO, # 14 Exhibit H3 - NB EPC Schema, # 15 Exhibit I - 04.30.20 Opinion and Order (Dkt No 167), # 16 Exhibit J - GS1 EPC Tag Data Standard (ADASA-004308), # 17 Exhibit K - Opening Expert Report of Patrick J. Sweeney II, # 18 Exhibit L - Avery Updated Responses to First Set of ROG (1) and Third Set of ROG (13), # 19 Exhibit M - US7857221 (Kuhno), # 20 Exhibit N - Maier Depo Excerpts, # 21 Exhibit O - RFID for Dummies excerpt, # 22 Exhibit P - GSO 05 07 20 Email exchange, # 23 Exhibit Q - RFID Inlay datasheets confidential AEO, # 24 Exhibit R - AD005872 (annotated) confidential AEO, # 25 Exhibit S1 - Walmart Proposal (AD005566)(annotated) confidential AEO, # 26 Exhibit S2 - Jockey RFI (AD005250) (annotated) highly confidential AEO, # 27 Exhibit S3 - Ralph Lauren RFI (AD005328) (annotated) confidential AEO, # 28 Exhibit S4 - Levis RFID Encoding and Serialization Specification dated July 18, 2011 (AD003060 to AD003064) confidential, # 29 Exhibit S5 - Avery Dennison Response |

Appx28

| | | |
|---|---|---|
| | | to Kohls 2013 RFID Tag Bid dated February 27, 2013 (AD005267 to AD005287) confidential AEO, # 30 Exhibit T - Blanchard Depo Excerpts, # 31 Exhibit U - Order on 12c (Dkt No 166) (annotated), # 32 Exhibit V - Request for Ex Parte Reexam, # 33 Exhibit W - Notice of Intent to Issue Reexam Certificate (annotated), # 34 Exhibit X - Excerpts from the oral deposition of Gustavo Gomez Iglesias taken December 4, 2019) (Orman, Glenn) (Entered: 05/14/2020) |
| 05/14/2020 | 169 | Motion for Summary Judgment *of Noninfringement*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 05/14/2020) |
| 05/14/2020 | 170 | Declaration of Brenna K. Legaard . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Motion for Summary Judgment 169 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit K) (Legaard, Brenna) (Entered: 05/14/2020) |
| 05/14/2020 | 171 | Declaration of Ray Blanchard . Filed by Avery Dennison Corporation. (Related document(s): Motion for Summary Judgment 169 .) (Legaard, Brenna) (Entered: 05/14/2020) |
| 06/04/2020 | 172 | Response in Opposition to Motion for Summary Judgment *of Noninfringement* 169 Oral Argument requested. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Orman, Glenn) (Entered: 06/04/2020) |
| 06/04/2020 | 173 | Declaration of Richard A. Wojcio, Jr. *in Support of Plaintiff ADASA Inc.'s Opposition to Defendant's Motion for Summary Judgment*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Response in Opposition to Motion 172 .) (Attachments: # 1 Exhibit A - A chart presenting the elements of the independent claims from the 967 Patent asserted in this case, # 2 Exhibit B - United States Patent No. 9,798,967 B2, # 3 Exhibit C - Declaration of Daniel Engels dated May 14, 2020, # 4 Exhibit D - Encoding schemas (AD007331 to AD007387) Highly Confidential AEO, # 5 Exhibit E - Avery Dennison RFID Proposal for Macys Private Brand RFID Item Marketing dated February 21, 2012 (AD002914 to AD003277, AD010451) Highly Confidential AEO, # 6 Exhibit F - Rebuttal Expert Report of Daniel W. Engels, Ph.D. dated February 7, 2020, # 7 Exhibit G - National Brand EPC Schema for Macys MMG (AD010453) AEO, # 8 Exhibit H - Expert Report of Raymond A. Blanchard, # 9 Exhibit I - Expert Report of Patrick J. Sweeney II, # 10 Exhibit J - Paxar, PCMate Software Proposed Changes (AD003167 to AD003169), # 11 Exhibit K - Excerpts from the oral deposition of Raymond Blanchard taken August 29, 2019, # 12 Exhibit L - Excerpts from the oral deposition of Michael Kuhno taken July 17, 2019 (AEO), # 13 Exhibit M - EPCglobal Tag Data Standards Version 1.3.1, # 14 Exhibit N - GS1 EPC Tag Data Standard 1.6 dated September 9, 2011 (ADASA-004308 to ADASA-004525), # 15 Exhibit O - Settlement and Licensing Agreement between ADSA, Inc. and Polk Audio, Inc. (ADASA-011709 to ADASA-011714), Settlement and Licensing Agreement between ADASA, Inc. and The Goodyear Tire & Rubber Company (ADASA-011715 to ADASA-011721) and Settlement and Licensing Agreement between ADASA, Inc. and Agron, Inc. (ADASA-011722 to ADASA-011731), # 16 Exhibit P - Avery Dennison Response to Kohls 2013 RFID Tag Bid (AD005267; AD005278) Avery Dennison RFID Capabilities Overview re: Chicos (AD005309; AD005322) Avery Dennison Response Ralph Lauren PFS RFID RFP (AD005328; AD005339), # 17 Exhibit Q - |

Appx29

| | | |
|---|---|---|
| | | Excerpts from the oral deposition of Michael Meier taken December 4, 2019, # 18 Exhibit R - Private Brand Serialization Requirements from Walmart (AD000001; AD000004), # 19 Exhibit S - Defendant Avery Dennison Corporations Updated Responses to Plaintiff Adasa Inc.s First Set of Interrogatories (No. 1) and Third Set Of Interrogatories (No. 13) dated January 27, 2020, # 20 Exhibit T - Declaration of Ray Blanchard dated May 14, 2020) (Orman, Glenn) (Entered: 06/04/2020) |
| 06/04/2020 | 174 | Declaration of *Daniel W. Engels, Ph.D. in Support of ADASA Inc.'s Opposition to Avery's Motion for Summary Judgment.* **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Response in Opposition to Motion 172 .) (Orman, Glenn) (Entered: 06/04/2020) |
| 06/04/2020 | 175 | Response to Motion for Summary Judgment 168 Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 06/04/2020) |
| 06/04/2020 | 176 | Declaration of Brenna K. Legaard . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Response to Motion 175 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (Legaard, Brenna) (Entered: 06/04/2020) |
| 06/10/2020 | 177 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: Status Conference is set for 6/11/2020 at 09:30AM in Eugene by telephone before Magistrate Judge Mustafa T. Kasubhai. The parties are ordered to call into the Court's conference line at least 5 minutes prior to the scheduled hearing. Call-in information will be sent by separate order. **Please use a land line connection without external noise. The Court prohibits speaker phones due to the greatly diminished sound quality.** (jk) (Entered: 06/10/2020) |
| 06/11/2020 | 178 | **MINUTES of Proceedings:** Status Conference. Oral Argument regarding Motion for Summary Judgment 168 , and Motion for Summary Judgment 169 is set for 7/8/2020 at 09:00AM in Eugene by videoconference before Magistrate Judge Mustafa T. Kasubhai. Pretrial Conference is set for 9/1/2020 at 09:00AM in Eugene by videoconference before Magistrate Judge Mustafa T. Kasubhai. Alan Thayer, Jr. (by telephone); Glenn Orman (by telephone); Jonathan Suder (by telephone) present as counsel for plaintiff. Brenna Legaard (by telephone) present as counsel for defendant. (FTR - Eugene Courtroom 3) Magistrate Judge Mustafa T. Kasubhai presiding. (jk) (Entered: 06/11/2020) |
| 06/18/2020 | 179 | Reply to Motion for Summary Judgment 168 Oral Argument requested. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Orman, Glenn) (Entered: 06/18/2020) |
| 06/18/2020 | 180 | Declaration of Richard A. Wojcio, Jr. *in Support of Plaintiff ADASA INC.s Reply in Support of its Motion for Summary Judgment of Infringement and No Invalidity.* **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Reply to Motion 179 .) (Attachments: # 1 Exhibit Y - Excerpts from the oral deposition of Charles B. Williams taken December 5, 2019, # 2 Exhibit Z - Declaration of Charles B. Williams in Support of Plaintiffs Brief in Opposition to Defendants Motion for Judgment on the Pleadings, # 3 Exhibit AA - Rebuttal Expert Report of Daniel W. Engels, Ph.D. dated February 7, 2020, # 4 Exhibit BB - Declaration of Daniel W. Engels, Ph.D. in support of ADASAs Reply Brief, dated June 18, 2020) (Orman, Glenn) (Entered: 06/18/2020) |

Appx30

| 06/18/2020 | 181 | Declaration of Daniel W. Engels, Ph.D. *in Support of ADASA, Inc.'s Reply in Support of its Motion for Summary Judgment*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Reply to Motion 179 .) (Orman, Glenn) (Entered: 06/18/2020) |
| --- | --- | --- |
| 06/18/2020 | 182 | Reply to Motion for Summary Judgment *of Noninfringement* 169 Oral Argument requested. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 06/18/2020) |
| 06/18/2020 | 183 | Declaration of Brenna K. Legaard . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Motion for Summary Judgment 169 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Legaard, Brenna) (Entered: 06/18/2020) |
| 06/24/2020 | 184 | Notice of Appearance of Jason A. Wrubleski appearing on behalf of Avery Dennison Corporation Filed by on behalf of Avery Dennison Corporation. (Wrubleski, Jason) (Entered: 06/24/2020) |
| 06/25/2020 | 185 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Oral Argument held on 5/9/2018 before Judge Thomas M. Coffin, Court Reporter Eleanor G. Knapp, telephone number 541-485-0111. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through PACER. See Policy at ord.uscourts.gov. Notice of Intent to Redact Transcript is due by 7/2/2020. Redaction Request due 7/16/2020. Redacted Transcript Deadline set for 7/27/2020. Release of Transcript Restriction set for 9/23/2020. (plb) (Entered: 06/25/2020) |
| 06/25/2020 | 186 | Motion for Leave . Filed by Avery Dennison Corporation. (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 06/25/2020) |
| 06/25/2020 | 187 | Sur-Reply to Motion for Summary Judgment 168 Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 06/25/2020) |
| 06/25/2020 | 188 | Declaration of Raymond A. Blanchard . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Sur-Reply to Motion 187 .) (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 06/25/2020) |
| 06/25/2020 | 189 | Declaration of Patrick J. Sweeney II . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Sur-Reply to Motion 187 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Legaard, Brenna) (Entered: 06/25/2020) |
| 06/29/2020 | 190 | Response in Opposition to Motion for Leave 186 Oral Argument requested. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Orman, Glenn) (Entered: 06/29/2020) |
| 06/29/2020 | 191 | Declaration of Glenn S. Orman *in Support of Response to Motion for Leave to File a Sur-Reply*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Response in Opposition to Motion 190 .) (Attachments: # 1 Exhibit A - Opening Expert Report of Daniel W. Engels, Ph.D. dated January 9, 2020, # 2 Exhibit B - Rebuttal Expert Report of Daniel W. Engels, Ph.D. dated February 7, 2020, # 3 Exhibit C - Excerpts from the oral deposition of Daniel Engels dated May 8, 2020) (Orman, Glenn) (Entered: |

Appx31

| | | 06/29/2020) |
|---|---|---|
| 06/29/2020 | 192 | **Trial Management Order** signed on 6/29/2020 by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 06/29/2020) |
| 07/06/2020 | 193 | Reply *in Support of Motion for Leave to File A Sur-Reply* to Motion for Leave 186 . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 07/06/2020) |
| 07/08/2020 | 194 | **MINUTES of Proceedings:** Motion Hearing Held regarding Motion for Summary Judgment 168 , Motion for Summary Judgment 169 as stated on the record. Motions are taken under advisement as of 7/13/2020. Jonathan Suder (by videoconference); Glenn Orman (by videoconference); Alan Thayer, Jr. (by videoconference) present as counsel for plaintiff. Brenna Legaard (by videoconference); Jason Wrubleski (by videoconference) present as counsel for defendant. Court Reporter: Ryan White (by videoconference). Magistrate Judge Mustafa T. Kasubhai presiding. (jk) (Entered: 07/08/2020) |
| 07/15/2020 | 195 | Notice *of Recent Supplemental Authority* Filed by Adasa Inc.. (Attachments: # 1 Exhibit A) (Suder, Jonathan) (Entered: 07/15/2020) |
| 07/24/2020 | 196 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: Status Conference is set for 8/4/2020 at 10:15AM in Eugene by telephone before Magistrate Judge Mustafa T. Kasubhai. The parties are ordered to call into the Court's conference line at least 5 minutes prior to the scheduled hearing. Call-in information will be sent by separate order. **Please use a land line connection without external noise. The Court prohibits speaker phones due to the greatly diminished sound quality.** The parties are advised the Court will be unable to accommodate a jury trial in September due to the COVID-19 pandemic. The Court requests the parties be prepared to discuss proceeding by way of a bench trial in September or rescheduling the jury trial at the status conference. Under either circumstance the deadlines set out in the Trial Management Order 192 remain in effect. (jk) Modified to add text on 7/24/2020 (NEF regenerated) (jk). (Entered: 07/24/2020) |
| 07/29/2020 | 197 | Joint Request *to Extend Exhibit Submission Deadline.* Filed by Adasa Inc.. (Orman, Glenn) (Entered: 07/29/2020) |
| 08/03/2020 | 198 | Witness List , Witness Statement . Filed by Adasa Inc.. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Attachments: # 1 Exhibit A - Engels Opening Report, # 2 Exhibit B - Engels Rebuttal Report, # 3 Exhibit C - Opening Expert Declaration of Dr. Engels in Support of ADASA MSJ, # 4 Exhibit D - Reply Expert Declaration - Engels - In Support of ADASA MSJ, # 5 Exhibit E - Response Engels Dec - Response to Avery MSJ, # 6 Exhibit F - Pellegrino Report) (Orman, Glenn) (Entered: 08/03/2020) |
| 08/03/2020 | 199 | Exhibit List . Filed by Adasa Inc.. (Orman, Glenn) (Entered: 08/03/2020) |
| 08/03/2020 | 200 | Joint Proposed Pretrial Order Lodged . Filed by Adasa Inc.. (Orman, Glenn) (Entered: 08/03/2020) |
| 08/04/2020 | 201 | **MINUTES of Proceedings:** Status Conference. Pretrial Conference set for 9/1/2020 is RESET for 12/1/2020 at 09:00AM in Eugene by videoconference before Magistrate Judge Mustafa T. Kasubhai. An estimated five-day (5) Jury Trial is set for 12/14/2020 at 09:00AM in Eugene Courtroom 3 before Magistrate Judge Mustafa T. Kasubhai. Jury Instructions are due 8/18/2020. All other deadlines established in the Trial Management Order 192 are STAYED pending the Court's ruling on the Motions for |

Appx32

| | | |
|---|---|---|
| | | Summary Judgment 168 and 169 . Glenn Orman (by telephone); Jonathan Suder (by telephone) present as counsel for plaintiff. Brenna Legaard (by telephone) present as counsel for defendant. Magistrate Judge Mustafa T. Kasubhai presiding. (jk) (Entered: 08/04/2020) |
| 08/18/2020 | 202 | Joint Proposed Jury Instructions . Filed by Adasa Inc.. (Orman, Glenn) (Entered: 08/18/2020) |
| 08/18/2020 | 203 | Proposed Jury Instructions *[Plaintiff's]*. Filed by Adasa Inc.. (Attachments: # 1 Exhibit A - An Instruction on What a Patent Is and How One is Obtained, # 2 Exhibit B - A Proposed Preliminary Instruction on the Summary of Contentions of the Parties, # 3 Exhibit C - A Proposed Preliminary Instruction on the Overview of Applicable Law, # 4 Exhibit D - A Proposed Preliminary Instruction Regarding The Outline of Trial, # 5 Exhibit E - Key Preliminary Instructions Should Be Included At the Outset of the Final Instructions So As To Remind the Jury of Their Role and Important Aspects of Their Charged Duties, # 6 Exhibit F - A Final Instruction Summarizing The Parties Contentions, # 7 Exhibit G - Final Instructions Related To Patent Damages And ADASAs Right To Receive A Reasonable Royalty For Avery Dennisons Infringement, # 8 Exhibit H - Final Instructions Related To Patent Damages And ADASAs Right To Receive A Reasonable Royalty For Avery Dennisons Infringement, # 9 Exhibit I - Final Instructions Related To Patent Damages And ADASAs Right To Receive A Reasonable Royalty For Avery Dennisons Infringement, # 10 Exhibit J - If The Court Finds That Avery Dennison Can Present an Enablement or Other Invalidity Defense, An Instruction on Avery Dennisons Clear and Convincing Burden Would Be Necessary) (Orman, Glenn) (Entered: 08/18/2020) |
| 08/18/2020 | 204 | Proposed Jury Instructions *Defendant Avery Dennison Corporation's Proposed Jury Instructions*. Filed by Avery Dennison Corporation. (Wrubleski, Jason) (Entered: 08/18/2020) |
| 09/14/2020 | 205 | **Opinion and Order** signed on 9/14/2020 by Magistrate Judge Mustafa T. Kasubhai: Both parties' evidentiary objections are overruled. Defendant's Motion to File Sur-Reply (ECF No. 186 ) is GRANTED. Defendant's Alternative Motion for Summary Judgment of Invalidity Under 35 U.S.C. §§ 101 and 103 (ECF No. 169 ) is DENIED. Plaintiff's Motion for Summary Judgment (ECF No. 168 ) is GRANTED except as to infringement of element F by the Commissioning Authority Schemas, which is DENIED. Defendant's Motion for Summary Judgment of Non-Infringement (ECF No. 169) is DENIED. (jk) (Entered: 09/14/2020) |
| 09/16/2020 | 206 | Motion *Plaintiff ADASA, Inc.'s Motion to Exclude Portions of Defendant's Expert Testimony*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Oral Argument requested. Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 09/16/2020) |
| 09/16/2020 | 207 | Declaration of Richard A. Wojcio *in Support of Plaintiff ADASA, Inc.'s Motion to Exclude Portions of Defendant's Expert Testimony*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Motion - Miscellaneous, 206 .) (Attachments: # 1 Exhibit 1 - Pellegrino Damages Report, # 2 Exhibit 2 - Feb 7 2020 Yurkerwich Report, # 3 Exhibit 3 - Feb 7 2020 Sweeney Rebuttal Report, # 4 Exhibit 4 - Jan 9 2020 Sweeney Report) (Suder, Jonathan) (Entered: 09/16/2020) |

Appx33

| | | |
|---|---|---|
| 09/17/2020 | 208 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: The estimated five-day (5) Jury Trial set for 12/14/2020 is reset for 3/8/2021 at 09:00AM in Eugene Courtroom 3 before Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 09/17/2020) |
| 09/24/2020 | 209 | Motion for Reconsideration of Opinion and Order,, 205 . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 09/24/2020) |
| 09/24/2020 | 210 | Declaration of Brenna K. Legaard . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Motion for Reconsideration 209 .) (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 09/24/2020) |
| 09/30/2020 | 211 | Response in Opposition to Motion *Plaintiff ADASA, Inc.'s Motion to Exclude Portions of Defendant's Expert Testimony* 206 Oral Argument requested. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 09/30/2020) |
| 09/30/2020 | 212 | Declaration of Brenna K. Legaard . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Response in Opposition to Motion,, 211 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F) (Legaard, Brenna) (Entered: 09/30/2020) |
| 10/08/2020 | 213 | Response to Motion for Reconsideration of Opinion and Order,, 205 209 . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Orman, Glenn) (Entered: 10/08/2020) |
| 10/14/2020 | 214 | Reply *[in Support of]* to Motion *Plaintiff ADASA, Inc.'s Motion to Exclude Portions of Defendant's Expert Testimony* 206 Oral Argument requested. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Orman, Glenn) (Entered: 10/14/2020) |
| 10/16/2020 | 215 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai: The Court is receipt of Defendants' Motion for Clarification and Reconsideration 209 of the Court's Opinion and Order 205 . "Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993). After considering Defendants' motion, Plaintiff's response, and the file in this case, the Court finds no valid reason to alter its prior ruling. As such, the motion is DENIED. (jk) (Entered: 10/16/2020) |
| 10/26/2020 | 216 | Joint Notice *of Mediation* Filed by Adasa Inc.. (Orman, Glenn) (Entered: 10/26/2020) |
| 10/26/2020 | 217 | Joint Stipulation re Opinion and Order,, 205 *Regarding Additional Schemas Under to the Court's Summary Judgment Order (Dkt. 205)* by Adasa Inc.. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Orman, Glenn) (Entered: 10/26/2020) |
| 10/30/2020 | 218 | Amended Witness List . Filed by Adasa Inc.. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Attachments: # 1 Exhibit A - Engels Opening Report, # 2 Exhibit B - Engels Rebuttal Report, # 3 Exhibit C - Opening Expert Declaration of Dr. Engels in Support of ADASA MSJ, # 4 Exhibit D - Reply |

Appx34

| | | |
|---|---|---|
| | | Expert Declaration - Engels - In Support of ADASA MSJ, # 5 Exhibit E - Response Engels Dec - Response to Avery MSJ, # 6 Exhibit F - Pellegrino Report) (Orman, Glenn) (Entered: 10/30/2020) |
| 10/30/2020 | 219 | Amended Exhibit List . Filed by Adasa Inc.. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Orman, Glenn) (Entered: 10/30/2020) |
| 10/30/2020 | 220 | Amended Joint Proposed Pretrial Order Lodged . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Orman, Glenn) (Entered: 10/30/2020) |
| 11/10/2020 | 221 | Designation of Deposition Testimony . Filed by Adasa Inc.. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Attachments: # 1 Exhibit A - Blanchard highlights, # 2 Exhibit B - Iglesias highlights, # 3 Exhibit C - Kuhno highlights, # 4 Exhibit D - Maier highlights) (Orman, Glenn) (Entered: 11/10/2020) |
| 11/10/2020 | 222 | Trial Memorandum . Filed by Adasa Inc.. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Orman, Glenn) (Entered: 11/10/2020) |
| 11/10/2020 | 223 | Amended Proposed Jury Instructions *[JOINT]*. Filed by Adasa Inc.. (Orman, Glenn) (Entered: 11/10/2020) |
| 11/10/2020 | 224 | Amended Proposed Jury Instructions *[Plaintiff's]*. Filed by Adasa Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L) (Orman, Glenn) (Entered: 11/10/2020) |
| 11/10/2020 | 225 | Proposed Jury Verdict Form. Filed by Adasa Inc.. (Orman, Glenn) (Entered: 11/10/2020) |
| 11/10/2020 | 226 | Exhibit List . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/10/2020) |
| 11/10/2020 | 227 | Witness List . Filed by Avery Dennison Corporation. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Attachments: # 1 Exhibit A - Expert Report of Blanchard, # 2 Exhibit B - Expert Report of Sweeney, # 3 Exhibit C - Rebuttal Expert Report of Sweeney, # 4 Exhibit D - Expert Report of Yurkerwich) (Legaard, Brenna) (Entered: 11/10/2020) |
| 11/10/2020 | 228 | Designation of Deposition Testimony . Filed by Avery Dennison Corporation. (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 11/10/2020) |
| 11/10/2020 | 229 | Trial Memorandum . Filed by Avery Dennison Corporation. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Legaard, Brenna) (Entered: 11/10/2020) |
| 11/10/2020 | 230 | Proposed Jury Verdict Form. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/10/2020) |
| 11/10/2020 | 231 | Supplemental Proposed Jury Instructions . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/10/2020) |
| 11/11/2020 | 232 | Supplemental Exhibit List . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/11/2020) |

Appx35

| | | |
|---|---|---|
| 11/16/2020 | 233 | Motion to Sever *and Stay Certain Claims*. Filed by Adasa Inc.. (Orman, Glenn) (Entered: 11/16/2020) |
| 11/17/2020 | 234 | Motion in limine . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Orman, Glenn) (Entered: 11/17/2020) |
| 11/17/2020 | 235 | Objection(s) *to Defendant's Proposed Jury Instructions*. Filed by Adasa Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H) (Orman, Glenn) (Entered: 11/17/2020) |
| 11/17/2020 | 236 | Objection(s) *to Defendant's Proposed Verdict Form*. Filed by Adasa Inc.. (Attachments: # 1 Exhibit A) (Orman, Glenn) (Entered: 11/17/2020) |
| 11/17/2020 | 237 | Objection to Trial Exhibit *[to Defendant's Exhibits]*. Filed by Adasa Inc.. (Orman, Glenn) (Entered: 11/17/2020) |
| 11/17/2020 | 238 | Objection(s) *to Defendant's Witness List, Witness Statements, and Proposed Deposition Designations*. Filed by Adasa Inc.. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Orman, Glenn) (Entered: 11/17/2020) |
| 11/17/2020 | 239 | Objection(s) to 225 Jury Verdict Form - Proposed . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/17/2020) |
| 11/17/2020 | 240 | Objection(s) to 219 Exhibit List . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/17/2020) |
| 11/17/2020 | 241 | Objection(s) to 221 Deposition Testimony Designation, . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/17/2020) |
| 11/17/2020 | 242 | Objection(s) to 218 Witness List,, . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/17/2020) |
| 11/17/2020 | 243 | Objection(s) to 224 Jury instructions - Proposed, . Filed by Avery Dennison Corporation. (Attachments: # 1 Appendix A, # 2 Appendix B, # 3 Appendix C) (Legaard, Brenna) (Entered: 11/17/2020) |
| 11/17/2020 | 244 | Motion in limine *(Nos. 1-4) Witness List*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/17/2020) |
| 11/17/2020 | 245 | Declaration of David Yurkerwich . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 11/17/2020) |
| 11/17/2020 | 246 | Declaration of Brenna K. Legaard *in Support of Pretrial Filings*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J) (Legaard, Brenna) (Entered: 11/17/2020) |
| 11/17/2020 | 247 | Motion in limine *to Exclude Testimony of Michael Pellegrino*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Legaard, Brenna) Modified on 11/18/2020 to restrict document pursuant to protective order. (eo) (Entered: 11/17/2020) |

Appx36

| 11/18/2020 | 248 | Notice of Correction by Clerk regarding # 247 Motion in Limine. A Clerical error has been discovered in the case record: The document was inadvertently filed without the appropriate restriction level. The following corrections were made to the record: The clerk has updated the restriction level and has corrected the docket text to indicate the document is restricted pursuant to protective order. (eo) (Entered: 11/18/2020) |
|---|---|---|
| 11/24/2020 | 249 | Response *in Opposition*. Filed by Avery Dennison Corporation. (Related document(s): Motion in Limine 234 .) (Legaard, Brenna) (Entered: 11/24/2020) |
| 11/24/2020 | 250 | Response *to Plaintiff's Objections to Defendant's Proposed Verdict Form*. Filed by Avery Dennison Corporation. (Related document(s): Objection 236 .) (Legaard, Brenna) (Entered: 11/24/2020) |
| 11/24/2020 | 251 | Response *to Plaintiff's Objections to Defendant's Exhibits*. Filed by Avery Dennison Corporation. (Related document(s): Objection to Trial Exhibit 237 .) (Legaard, Brenna) (Entered: 11/24/2020) |
| 11/24/2020 | 252 | Response *to Plaintiff's Objections to Defendant's Witness List, Witness Statements and Proposed Deposition Designations*. Filed by Avery Dennison Corporation. (Related document(s): Objection 238 .) (Legaard, Brenna) (Entered: 11/24/2020) |
| 11/24/2020 | 253 | Response *to Defendant's Objections to Plaintiff's Proposed Verdict Form*. Filed by Adasa Inc.. (Related document(s): Objection 239 .) (Orman, Glenn) (Entered: 11/24/2020) |
| 11/24/2020 | 254 | Declaration of Glenn S. Orman *in Support of Plaintiff's Response to Defendant's Objections to Plaintiff's Proposed Verdict Form*. Filed by Adasa Inc.. (Related document(s): Response 253 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Orman, Glenn) (Entered: 11/24/2020) |
| 11/24/2020 | 255 | Response *to Defendant's Objections to Plaintiff's Deposition Designations 241* . Filed by Adasa Inc.. (Orman, Glenn) Modified on 11/25/2020 to add document link (jw). (Entered: 11/24/2020) |
| 11/24/2020 | 256 | Response *to Defendant's Objections to Plaintiff's Proposed Jury Instructions 243* . Filed by Adasa Inc.. (Orman, Glenn) Modified on 11/25/2020 to add document link (jw). (Entered: 11/24/2020) |
| 11/24/2020 | 257 | Declaration of Glenn S. Orman *in Support of Plaintiff's Response to Defendant's Objections to Plaintiff's Proposed Jury Instructions*. Filed by Adasa Inc.. (Related document(s): Response 256 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Orman, Glenn) (Entered: 11/24/2020) |
| 11/24/2020 | 258 | Response *to Defendant's Objections to Plaintiff's Witnesses*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Objection 242 .) (Orman, Glenn) (Entered: 11/24/2020) |
| 11/24/2020 | 259 | Declaration of Glenn S. Orman *in Support of Plaintiff's Response to Defendant's Objections to Plaintiff's Witnesses*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Response 258 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Orman, Glenn) (Entered: 11/24/2020) |
| 11/24/2020 | 260 | Response *to Defendant's Motion in Limine to Exclude Testimony of Michael Pellegrino*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Motion in Limine, 247 .) |

Appx37

| | | |
|---|---|---|
| | | (Orman, Glenn) (Entered: 11/24/2020) |
| 11/24/2020 | 261 | Declaration of Glenn S. Orman *in Support of Plaintiff's Response to Defendant's Motion in Limine to Exclude Testimony of Michael Pellegrino*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Response, 260 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F) (Orman, Glenn) (Entered: 11/24/2020) |
| 11/24/2020 | 262 | Response *in Opposition*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Motion in Limine 244 .) (Orman, Glenn) (Entered: 11/24/2020) |
| 11/24/2020 | 263 | Declaration of Glenn S. Orman *in Support of Plaintiff's Response to Defendant's Motion in Limine Numbers 1-4*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Response 262 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F) (Orman, Glenn) (Entered: 11/24/2020) |
| 11/24/2020 | 264 | Response *to Plaintiff's Objections to Defendant's Proposed Jury Instructions*. Filed by Avery Dennison Corporation. (Related document(s): Objection, 235 .) (Legaard, Brenna) (Entered: 11/24/2020) |
| 11/24/2020 | 265 | Response *to Defendant's Objections to Plaintiff's Exhibits*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Objection 240 .) (Orman, Glenn) (Entered: 11/24/2020) |
| 11/24/2020 | 266 | Declaration of Glenn S. Orman *in Support of Plaintiff's Response to Defendant's Objections to Plaintiff's Exhibits*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Response 265 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Orman, Glenn) (Entered: 11/24/2020) |
| 11/24/2020 | 267 | Amended Exhibit List *[Second Amended]*. Filed by Adasa Inc.. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Orman, Glenn) (Entered: 11/24/2020) |
| 11/24/2020 | 268 | Corrected Response *to Plaintiff's Objections to Defendant's Proposed Jury Instructions*. Filed by Avery Dennison Corporation. (Related document(s): Objection, 235 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Legaard, Brenna) (Entered: 11/24/2020) |
| 11/25/2020 | 269 | Response to Motion to Sever *and Stay Certain Claims* 233 Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 11/25/2020) |
| 11/30/2020 | 270 | Reply *[in Support of Its]* to Motion to Sever *and Stay Certain Claims* 233 . Filed by Adasa Inc.. (Orman, Glenn) (Entered: 11/30/2020) |
| 12/01/2020 | 271 | **MINUTES of Proceedings:** Pretrial Conference. The Court will issue a formal order regarding its ruling on Plaintiff's Motion in Limine 234 and Defendant's Motion in Limine 244 . Plaintiff is ordered to file an amended disclosure regarding the testimony of Mr. McAllister within seven (7) days from the date of this Order. The estimated five-day (5) Jury Trial is extended by an additional five (5) days. Pretrial Conference is continued to 1/12/2021 at 09:00AM in Eugene by videoconference before Magistrate Judge Mustafa T. Kasubhai. Jonathan Suder (by videoconference); Glenn Orman (by videoconference); Alan Thayer, Jr. (by videoconference) present as counsel for plaintiff. Brenna Legaard (by videoconference); Jason Wrubleski (by telephone) |

Appx38

| | | present as counsel for defendant. (FTR - Eugene Courtroom 3) Magistrate Judge Mustafa T. Kasubhai presiding. (jk) (Entered: 12/01/2020) |
|---|---|---|
| 12/04/2020 | 273 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Oral Argument held on 2/25/2020 before Judge Mustafa T. Kasubhai, Transcriber Cheryl L. Guthrie, telephone number 503-260-4216. Tape Number: FTR - Eugene Courtroom 3. **Transcript may be viewed at Court's public terminal or purchased from the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through PACER. See Policy at ord.uscourts.gov.** Notice of Intent to Redact Transcript is due by 12/11/2020. Redaction Request due 12/28/2020. Redacted Transcript Deadline set for 1/4/2021. Release of Transcript Restriction set for 3/4/2021. (jk) (Entered: 12/08/2020) |
| 12/07/2020 | 272 | Amended Witness List *[Second Amended]*, Amended Witness Statement *[Second Amended]*. Filed by Adasa Inc.. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I) (Orman, Glenn) (Entered: 12/07/2020) |
| 12/14/2020 | 274 | Objection(s) to 272 Witness List,, Witness statement, . Filed by Avery Dennison Corporation. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Legaard, Brenna) (Entered: 12/14/2020) |
| 12/16/2020 | 275 | OFFICIAL COURT TRANSCRIPT OF AUDIO-RECORDED PROCEEDINGS FILED Pretrial Conference (Via Video) held on 12-01-2020 before Judge Mustafa T. Kasubhai, Transcriber Kelly Polvi, telephone number 541-431-4112. Tape Number: FTR 9:08-10:24 A.M.; 10:37-11:54 A.M.. **Transcript may be viewed at Court's public terminal or purchased from the transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be purchased from the transcriber or obtained through PACER. See Policy at ord.uscourts.gov.** Notice of Intent to Redact Transcript is due by 12/23/2020. Redaction Request due 1/6/2021. Redacted Transcript Deadline set for 1/19/2021. Release of Transcript Restriction set for 3/16/2021. (Polvi, Kelly) (Entered: 12/16/2020) |
| 01/11/2021 | 276 | Notice *of Change of Address* Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 01/11/2021) |
| 01/11/2021 | 277 | Notice of Appearance of Elizabeth White appearing on behalf of Avery Dennison Corporation. Filed on behalf of Avery Dennison Corporation. (Legaard, Brenna) Modified docket text on 1/12/2021 to read Notice of Appearance of Elizabeth White instead of Brenna K. Legaard. NEF not regenerated. (jw) (Entered: 01/11/2021) |
| 01/12/2021 | 278 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Katherine Allor. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-7762778. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 01/12/2021) |
| 01/12/2021 | | **NOTICE OF REGISTRATION REQUIREMENT.** Katherine Allor is required to submit a request to e-file in the District of Oregon via PACER before this motion may be ruled upon or filing privileges granted. For instructions visit ord.uscourts.gov/prohac. (Related document(s): Motion for Leave to Appear Pro Hac Vice 278 .) (ck) (Entered: 01/12/2021) |

Appx39

| 01/12/2021 | 279 | **MINUTES of Proceedings:** Pretrial Conference. Defendant's Objections 274 are DENIED. Jonathan Suder (by videoconference); Glenn Orman (by videoconference); Alan Thayer, Jr. (by videoconference) present as counsel for plaintiff. Brenna Legaard (by videoconference); Elizabeth White (by videoconference); Katherine Allor (by videoconference) present as counsel for defendant. Magistrate Judge Mustafa T. Kasubhai presiding. (FTR - Eugene Courtroom 3) (jk) (Entered: 01/13/2021) |
|---|---|---|
| 01/13/2021 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice. Pro Hac Vice* admission requested by attorney Katherine Allor. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-7762778 278 : **Reviewed and Ready for Ruling. (ck) (Entered: 01/13/2021)** |
| 01/15/2021 | 280 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai GRANTING Motion for Leave to Appear *Pro Hac Vice* 278 requested by attorney Katherine Allor. (jk) (Entered: 01/15/2021) |
| 01/15/2021 | 281 | Notice of Attorney Substitution:Attorney Elizabeth White is substituted as counsel of record in place of Attorney Jason A. Wrubleski; William F. Abrams and Balazs Takacs Filed by Avery Dennison Corporation. (Wrubleski, Jason) (Entered: 01/15/2021) |
| 01/20/2021 | 282 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai: Jury Trial set to begin 3/8/2021 is VACATED and will be reset. (jk) (Entered: 01/20/2021) |
| 02/03/2021 | 283 | OFFICIAL COURT TRANSCRIPT OF AUDIO-RECORDED PROCEEDINGS FILED Pretrial Hearing - Videoconference held on 01-12-2021 before Judge Mustafa T. Kasubhai, Transcriber Kelly Polvi, telephone number 541-431-4112. Tape Number: FTR 9:03 - 9:59; 10:24 - 12:14. Transcript may be viewed at Court's public terminal or purchased from the Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be purchased from the Transcriber or obtained through PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Notice of Intent to Redact Transcript is due by 2/10/2021. Redaction Request due 2/24/2021. Redacted Transcript Deadline set for 3/8/2021. Release of Transcript Restriction set for 5/4/2021. (Polvi, Kelly) (Entered: 02/03/2021) |
| 03/12/2021 | 284 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: Status Conference is set for 3/18/2021 at 09:30AM in Eugene by telephone before Magistrate Judge Mustafa T. Kasubhai. The parties are ordered to call into the Court's conference line at least 5 minutes prior to the scheduled hearing. Call-in information will be sent by separate order. **Please use a land line connection without external noise. The Court prohibits speaker phones due to the greatly diminished sound quality.** (jk) (Entered: 03/12/2021) |
| 03/18/2021 | 285 | **MINUTES of Proceedings:** Status Conference. Joint submissions of the exhibit list, jury instruction, and jury verdict form are due by 4/16/2021. The estimated ten-day (10) Jury Trial is set for 5/10/2021 at 09:00AM in Eugene Courtroom 3 before Magistrate Judge Mustafa T. Kasubhai. Jonathan Suder (by telephone); Glenn Orman (by telephone) present as counsel for plaintiff. Brenna Legaard (by telephone); Elizabeth White (by telephone); Katherine Allor (by telephone) present as counsel for defendant. Magistrate Judge Mustafa T. Kasubhai presiding. (FTR - Eugene Courtroom 3) (jk) (Entered: 03/18/2021) |
| 03/26/2021 | 286 | **Omnibus Order on Motions in Limine and Daubert Motion** signed on 3/26/2021 by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 03/29/2021) |

   

Appx40

| | | |
|---|---|---|
| 04/13/2021 | 287 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai: After considering the parties' briefs and arguments, the Court grants Plaintiff's Motion to Sever *and Stay Certain Claims* 233 . The motion is granted on the condition that Plaintiff has represented it will not pursue the stayed claims unless the case is remanded from the Ninth Circuit Court of Appeals through the Defendant's appeal of the Court's Opinion and Order 205 of the parties' summary judgment motions. (jk) (Entered: 04/13/2021) |
| 04/16/2021 | 288 | Joint Exhibit List . Filed by Adasa Inc.. (Orman, Glenn) (Entered: 04/16/2021) |
| 04/16/2021 | 289 | Objection to Trial Exhibit *[Plaintiff's Objections to Defendant's Exhibits on the Parties' Joint Exhibit List*. Filed by Adasa Inc.. (Orman, Glenn) (Entered: 04/16/2021) |
| 04/16/2021 | 290 | Objection to Trial Exhibit 288 Exhibit List . Filed by All Defendants. (Legaard, Brenna) (Entered: 04/16/2021) |
| 04/19/2021 | 291 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: At the request of counsel, Pretrial Conference is set for 4/26/2021 at 02:00PM in Eugene by videoconference before Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 04/19/2021) |
| 04/19/2021 | 292 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: At the request of counsel, Pretrial Conference set for 4/26/2021 is RESET for 4/28/2021 at 02:00PM in Eugene by videoconference before Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 04/19/2021) |
| 04/23/2021 | 293 | Amended Proposed Jury Instructions . Filed by Adasa Inc.. (Attachments: # 1 Exhibit A - Stipulated Facts, # 2 Exhibit B - Claim Constructions, # 3 Exhibit C - Glossary) (Orman, Glenn) (Entered: 04/23/2021) |
| 04/23/2021 | 294 | Amended Proposed Jury Verdict Form*[Joint]*. Filed by Adasa Inc.. (Orman, Glenn) (Entered: 04/23/2021) |
| 04/26/2021 | 295 | Unopposed Motion for Leave *to File Supplemental Trial Exhibits*. Filed by Adasa Inc.. (Attachments: # 1 Exhibit A - Plaintiff's Supplemental Exhibit List) (Orman, Glenn) (Entered: 04/26/2021) |
| 04/26/2021 | 296 | Unopposed Motion for Leave *to File Supplemental Trial Exhibit*. Filed by All Defendants. (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 04/26/2021) |
| 04/27/2021 | 297 | Amended Designation of Deposition Testimony . Filed by Adasa Inc.. (Attachments: # 1 Exhibit A - Blanchard highlights, # 2 Exhibit B - Iglesias highlights, # 3 Exhibit C - Kuhno highlights, # 4 Exhibit D - Maier highlights, # 5 Exhibit E - Iglesias 02 highlights) (Orman, Glenn) (Entered: 04/27/2021) |
| 04/27/2021 | 298 | Joint Stipulation *Regarding Trial Procedures* by All Defendants. Filed by All Defendants. (Legaard, Brenna) (Entered: 04/27/2021) |
| 04/27/2021 | 299 | Unopposed Motion for Leave *to Restore Trial Exhibits*. Filed by All Defendants. (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 04/27/2021) |
| 04/27/2021 | 300 | **ORDER:** Granting Motion for Leave to File Supplemental Trial Exhibits 295 ; Granting Motion for Leave to File Supplemental Trial Exhibit 296 ; Granting Motion for Leave to Restore Trial Exhibits 299 . Ordered by Magistrate Judge Mustafa T. Kasubhai. (plb) (Entered: 04/27/2021) |

| 04/27/2021 | 301 | Objection(s) *To Plaintiff's Supplemental Exhibits*. Filed by All Defendants. (Legaard, Brenna) (Entered: 04/27/2021) |
|---|---|---|
| 04/28/2021 | 302 | Objection to Trial Exhibit *[Objections to Defendant's Supplemental and "Restored" Exhibits]*. Filed by Adasa Inc.. (Orman, Glenn) (Entered: 04/28/2021) |
| 04/28/2021 | 303 | **MINUTES of Proceedings:** Final Pretrial Conference. Exhibits will be ruled on during trial. Lay witnesses will be excluded from the Courtroom, expert witnesses will be allowed in the Courtroom. The attorneys will provide each witness and the court a binder, which will include all exhibits relevant to that witnesses testimony. Alan Thayer Jr. and Jonathan Suder present as counsel for plaintiff. Brenna Legaard, Elizabeth White and Kathering Allor present as counsel for defendant. Court Reporter: Kellie Humiston. Magistrate Judge Mustafa T. Kasubhai presiding. (cp) (Entered: 04/29/2021) |
| 04/30/2021 | 304 | Amended Designation of Deposition Testimony *[Second Amended]*. Filed by Adasa Inc.. (Attachments: # 1 Exhibit A - Blanchard highlights, # 2 Exhibit B - Iglesias highlights, # 3 Exhibit C - Kuhno highlights, # 4 Exhibit D - Maier highlights) (Orman, Glenn) (Entered: 04/30/2021) |
| 04/30/2021 | 305 | Notice *of Service of Supplemental Expert Reports* Filed by Adasa Inc.. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Attachments: # 1 Exhibit A - Pellegrino Revised Supplemental Damages Report, # 2 Exhibit B - Engels Supplement to Opening Expert Report) (Orman, Glenn) (Entered: 04/30/2021) |
| 05/03/2021 | 306 | Amended Proposed Jury Verdict Form*[Joint]*. Filed by Adasa Inc.. (Orman, Glenn) (Entered: 05/03/2021) |
| 05/03/2021 | 307 | Amended Proposed Jury Instructions *[Amending Dkt. 293 - Exhibit A - Stipulated Facts]*. Filed by Adasa Inc.. (Orman, Glenn) (Main Document 307 replaced on 5/4/2021) (cw). (Entered: 05/03/2021) |
| 05/04/2021 | 308 | Amended Designation of Deposition Testimony *[Third Amended]*. Filed by Adasa Inc.. (Attachments: # 1 Exhibit A - Blanchard highlights, # 2 Exhibit B - Iglesias highlights, # 3 Exhibit C - Kuhno highlights, # 4 Exhibit D - Maier highlights, # 5 Exhibit E - Iglesias 02 highlights) (Orman, Glenn) (Entered: 05/04/2021) |
| 05/04/2021 | 309 | Notice of Correction by Clerk regarding 307 Jury instructions - Proposed. A Clerical error has been discovered in the case record: The document was missing a case caption cover page. The following corrections were made to the record: A corrected PDF has been uploaded and has replaced the incorrect attachment.The Notice of Electronic Filing will be regenerated to all parties. (cw) (Entered: 05/04/2021) |
| 05/06/2021 | 310 | Objection(s) *to Plaintiff's Third Amended Deposition Designations 308* . Filed by All Defendants. (Legaard, Brenna) Modified on 5/7/2021 to add document link. (jw) (Entered: 05/06/2021) |
| 05/07/2021 | 311 | Motion for Leave *[Partially Opposed Motion for Leave to File Replacement Redacted Trial Exhibits and to Withdraw Certain Exhibits*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Orman, Glenn) (Entered: 05/07/2021) |
| 05/07/2021 | 312 | Amended Exhibit List *[The Parties' Amended Joint Exhibit List]*. Filed by Adasa Inc.. (Attachments: # 1 Appendix A, # 2 Appendix B, # 3 Appendix C, # 4 Appendix D, # 5 |

Appx42

| | | Appendix E) (Orman, Glenn) (Entered: 05/07/2021) |
|---|---|---|
| 05/07/2021 | 313 | Objection to Trial Exhibit *[Objections to Defendant's Third Supplemental Exhibits (DX257-DX265)*. Filed by Adasa Inc.. (Orman, Glenn) (Entered: 05/07/2021) |
| 05/07/2021 | 314 | Proposed Statement of Case . Filed by All Defendants. (Legaard, Brenna) (Entered: 05/07/2021) |
| 05/07/2021 | 315 | Notice *of Service of Supplemental Expert Reports* Filed by All Defendants. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Attachments: # 1 Exhibit A - Yurkerwich, # 2 Exhibit B - Sweeney II, # 3 Exhibit C - Blanchard) (Legaard, Brenna) (Entered: 05/07/2021) |
| 05/07/2021 | 316 | Unopposed Motion for Leave *to Supplement Trial Exhibits on Joint Exhibit List*. Filed by All Defendants. (Attachments: # 1 Exhibit A) (Legaard, Brenna) (Entered: 05/07/2021) |
| 05/07/2021 | 317 | Response *in Opposition*. Filed by All Defendants. (Related document(s): Motion for Leave, 311 .) (Legaard, Brenna) (Entered: 05/07/2021) |
| 05/08/2021 | 318 | Emergency Motion to Strike *Defendant's Supplemental Expert Reports*. Oral Argument requested.Expedited Hearing requested. Filed by Adasa Inc.. (Orman, Glenn) (Entered: 05/08/2021) |
| 05/08/2021 | 319 | Response in Opposition to Emergency Motion to Strike *Defendant's Supplemental Expert Reports* 318 . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Attachments: # 1 Exhibit A to Opposition) (White, Elizabeth) (Entered: 05/08/2021) |
| 05/10/2021 | 320 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai: Plaintiff's Partially Opposed Motion for Leave to File Replacement Redacted Trial Exhibits and to Withdraw Certain Exhibits 311 is GRANTED. Defendant's Unopposed Motion for Leave to Supplement Trial Exhibits on Joint Exhibit List 316 is GRANTED. (jk) (Entered: 05/11/2021) |
| 05/10/2021 | 321 | **MINUTES of Proceedings:** First Day of Jury Trial. Voir dire conducted. Eight (8) jurors selected and sworn. Order GRANTING in Part and DENYING in part Plaintiff's Emergency Motion to Strike Defendant's Supplemental Expert Report 318 as stated on the record. Opening statements given. Witness sworn and evidence adduced. Witness: Daniel Engles. Jury Trial is continued to 05/11/2021 at 9:00AM in Eugene Courtroom 3 before Magistrate Judge Mustafa T. Kasubhai. Jonathan Suder; Glenn Orman; Richard Wojcio, Jr.; Alan Thayer, Jr. present as counsel for plaintiff. Brenna Legaard; Elizabeth White; Katherine Allor present as counsel for defendant. Court Reporter: Kelly Polvi; Kellie Humiston. Magistrate Judge Mustafa T. Kasubhai presiding. (jk) (Entered: 05/11/2021) |
| 05/11/2021 | 322 | **MINUTES of Proceedings:** Jury Trial - Day 2. Witnesses sworn and evidence adduced. Witnesses: Daniel Engles, Michael Maier by deposition, Clark McAllister, Michael Kuhno by deposition, Michael Pellegrino. Jury Trial is continued to 05/11/2021 at 9:00AM in Eugene Courtroom 3 before Magistrate Judge Mustafa T. Kasubhai. Jonathan Suder; Glenn Orman; Richard Wojcio, Jr.; Alan Thayer, Jr. present as counsel for plaintiff. Brenna Legaard; Elizabeth White; Katherine Allor present as counsel for defendant. Court Reporters: Kelly Polvi; Kellie Humiston. Magistrate Judge Mustafa T. Kasubhai presiding. (jk) (Entered: 05/12/2021) |

Appx43

| 05/12/2021 | 323 | Motion for Judgment *Defendant Avery Dennison Corporation's Motion for Judgment as a Matter of Law*. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 05/12/2021) |
|---|---|---|
| 05/12/2021 | 324 | **MINUTES of Proceedings:** Jury Trial - Day 3. Order Denying Motion for Judgment as a Matter of Law 323 . Witnesses sworn and evidence adduced. Witnesses: Michael Pellegrino, Patrick Sweeney, II, Daniel Engles, Raymond Blanchard. Plaintiff rests. Jury Trial is continued to 05/13/2021 at 9:00AM in Eugene Courtroom 3 before Magistrate Judge Mustafa T. Kasubhai. Jonathan Suder; Glenn Orman; Richard Wojcio, Jr.; Alan Thayer, Jr. present as counsel for plaintiff. Brenna Legaard; Elizabeth White; Katherine Allor present as counsel for defendant. Court Reporters: Kelly Polvi; Kellie Humiston. Magistrate Judge Mustafa T. Kasubhai presiding. (jk) Modified to add text on 5/17/2021 (NEF regenerated) (jk). (Entered: 05/13/2021) |
| 05/13/2021 | 325 | **MINUTES of Proceedings:** Jury Trial - Day 4. Witnesses sworn and evidence adduced. Witnesses: Raymond Blanchard, Clark McAllister by deposition, Gustavo Gomez Iglesias, Michael Terapane, David Yurkerwich. Defense rests. Jury Trial is continued to 05/14/2021 at 9:00AM in Eugene Courtroom 3 before Magistrate Judge Mustafa T. Kasubhai. Jonathan Suder; Glenn Orman; Richard Wojcio, Jr.; Alan Thayer, Jr. present as counsel for plaintiff. Brenna Legaard; Elizabeth White; Katherine Allor present as counsel for defendant. Court Reporters: Kelly Polvi; Kellie Humiston. Magistrate Judge Mustafa T. Kasubhai presiding. (jk) Modified to add text on 5/17/2021 (NEF regenerated) (jk). (Entered: 05/14/2021) |
| 05/14/2021 | 326 | Trial Memorandum *Defendant Avery Dennison Corporation's Offer of Proof*. Filed by Avery Dennison Corporation. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11) (Legaard, Brenna) (Entered: 05/14/2021) |
| 05/14/2021 | 327 | **Order to Retain Custody of Exhibits** signed on 5/14/2021 by Magistrate Judge Mustafa T. Kasubhai. (jk) (Additional attachment(s) added on 5/19/2021: # 1 Attachment Signed by Plaintiff, # 2 Attachment Signed by Defendant) (jk). (Entered: 05/17/2021) |
| 05/14/2021 | 328 | **MINUTES of Proceedings:** Last Day of Jury Trial - Day 5. Order GRANTING Plaintiff's oral Motion for Directed Verdict of Defendant's Counterclaims and Affirmative Defenses as stated on the record. Order DENYING Plaintiff's oral Motion for Directed Verdict as stated on the record. Order DENYING Defendant's oral Motion for Judgment as a Matter of Law as stated on the record. Jury instructed. Bailiff sworn. Jury retires to deliberate. The Clerk is directed to order 8 lunches from Jersey Mike's during jury deliberation. Jury returns a verdict in favor of Plaintiff. Jury Panel is released. The Clerk is directed to file the verdict and enter judgment. Jonathan Suder; Glenn Orman; Richard Wojcio, Jr.; Alan Thayer, Jr. present as counsel for plaintiff. Brenna Legaard; Elizabeth White; Katherine Allor present as counsel for defendant. Court Reporters: Kelly Polvi; Kellie Humiston. Magistrate Judge Mustafa T. Kasubhai presiding. (jk) (Entered: 05/17/2021) |
| 05/14/2021 | 329 | Court's Instructions to the Jury. (jk) (Entered: 05/17/2021) |
| 05/14/2021 | 330 | Clerks List of Exhibits & Witnesses. (jk) (Entered: 05/17/2021) |
| 05/14/2021 | 331 | Jury Verdict. (jk) (Entered: 05/17/2021) |

Appx44

| 05/14/2021 | 332 | Jury Verdict. (Unredacted Version Filed Under Seal) (jk) (Entered: 05/17/2021) |
|---|---|---|
| 05/14/2021 | 333 | Jury Notes. (jk) (Entered: 05/17/2021) |
| 05/14/2021 | 334 | Jury Notes. (Unredacted Version Filed Under Seal) (jk) (Entered: 05/17/2021) |
| 05/14/2021 | 335 | **JUDGMENT** signed on 5/14/2021 by Magistrate Judge Mustafa T. Kasubhai: Based on the record, judgment for Plaintiff. (jk) (Entered: 05/17/2021) |
| 05/18/2021 | 336 | **Patent Report:** This report is submitted pursuant to 35 U.S.C. section 290, which requires the clerks of the courts of the United States, within one month after the filing of an action under this title shall give notice thereof in writing to the Commissioner, setting forth so far as known the names and addresses of the parties, name of the inventor, and the designating number of the patent upon which the action has been brought. If any other patent is subsequently included in the action he shall give like notice thereof. Within one month after the decision is rendered or a judgment issued the clerk of the court shall give notice thereof to the Director. The Director shall, on receipt of such notices, enter the same in the file of such patent. (jk) (Entered: 05/18/2021) |
| 05/18/2021 | 337 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Jury Trial, Day 1, AM Session, held on 05-10-2021, before Judge Mustafa T. Kasubhai. Court Reporter, Kelly Polvi; telephone number, 541-431-4112. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards, it may be purchased from the Court Reporter or obtained through PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Notice of Intent to Redact Transcript is due by 5/25/2021. Redaction Request due 6/8/2021. Redacted Transcript Deadline set for 6/18/2021. Release of Transcript Restriction set for 8/16/2021. (Polvi, Kelly) (Entered: 05/18/2021) |
| 05/18/2021 | 338 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Jury Trial, Day 2, AM Session, held on 05-11-2021, before Judge Mustafa T. Kasubhai. Court Reporter, Kelly Polvi; telephone number, 541-431-4112. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards, it may be purchased from the Court Reporter or obtained through PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Notice of Intent to Redact Transcript is due by 5/25/2021. Redaction Request due 6/8/2021. Redacted Transcript Deadline set for 6/18/2021. Release of Transcript Restriction set for 8/16/2021. (Polvi, Kelly) (Entered: 05/18/2021) |
| 05/18/2021 | 339 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Jury Trial, Day 3, AM Session, held on 05-12-2021, before Judge Mustafa T. Kasubhai. Court Reporter, Kelly Polvi; telephone number, 541-431-4112. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards, it may be obtained through PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Notice of Intent to Redact Transcript is due by 5/25/2021. Redaction Request due 6/8/2021. Redacted Transcript Deadline set for 6/18/2021. Release of Transcript Restriction set for 8/16/2021. (Polvi, Kelly) (Entered: 05/18/2021) |

Appx45

| | | |
|---|---|---|
| 05/18/2021 | 340 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Jury Trial, Day 4, AM Session, held on 05-13-2021, before Judge Mustafa T. Kasubhai. Court Reporter, Kelly Polvi; telephone number, 541-431-4112. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards, it may be obtained through PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Notice of Intent to Redact Transcript is due by 5/25/2021. Redaction Request due 6/8/2021. Redacted Transcript Deadline set for 6/18/2021. Release of Transcript Restriction set for 8/16/2021. (Polvi, Kelly) (Entered: 05/18/2021) |
| 05/18/2021 | 341 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Jury Trial, Day 5, AM Session, held on 05-14-2021, before Judge Mustafa T. Kasubhai. Court Reporter Kelly Polvi; telephone number 541-431-4112. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards, it may be purchased from the Court Reporter or obtained through PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Notice of Intent to Redact Transcript is due by 5/25/2021. Redaction Request due 6/8/2021. Redacted Transcript Deadline set for 6/18/2021. Release of Transcript Restriction set for 8/16/2021. (Polvi, Kelly) (Entered: 05/18/2021) |
| 05/24/2021 | 342 | Unopposed Motion for Leave *to Extend the Page Limit Under LR54-3(E)*. Filed by Adasa Inc.. (Orman, Glenn) (Entered: 05/24/2021) |
| 05/25/2021 | 343 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED jury trial day one, p.m. session held on 5/10/2021 before Judge Judge Mustafa T. Kasubhai, Court Reporter Kellie Humiston, telephone number 503-326-8186 or Kellie_Humiston@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the court reporter or PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Notice of Intent to Redact Transcript is due by 6/1/2021. Redaction Request due 6/15/2021. Redacted Transcript Deadline set for 6/25/2021. Release of Transcript Restriction set for 8/23/2021. (Humiston, Kellie) Modified docket text on 5/25/2021 to indicate this is the p.m. session. (eo) (Entered: 05/25/2021) |
| 05/25/2021 | 344 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED jury trial day two, p.m. session held on 5/11/2021 before Judge Judge Mustafa T. Kasubhai, Court Reporter Kellie Humiston, telephone number 503-326-8186 or Kellie_Humiston@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the court reporter PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Notice of Intent to Redact Transcript is due by 6/1/2021. Redaction Request due 6/15/2021. Redacted Transcript Deadline set for 6/25/2021. Release of Transcript Restriction set for 8/23/2021. (Humiston, Kellie) Modified docket text on 5/25/2021 to indicate this is day two, p.m. session. (eo) (Entered: 05/25/2021) |

Appx46

| | | |
|---|---|---|
| 05/25/2021 | 345 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED jury trial day three p.m. session held on 5/12/2021 before Judge Judge Mustafa T. Kasubhai, Court Reporter Kellie Humiston, telephone number 503-326-8186 or Kellie_Humiston@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the court reporter or PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Notice of Intent to Redact Transcript is due by 6/1/2021. Redaction Request due 6/15/2021. Redacted Transcript Deadline set for 6/25/2021. Release of Transcript Restriction set for 8/23/2021. (Humiston, Kellie) (Entered: 05/25/2021) |
| 05/25/2021 | 346 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED jury trial day 4 p.m. session held on 5/13/2021 before Judge Judge Mustafa T. Kasubhai, Court Reporter Kellie Humiston, telephone number 503-326-8186 or Kellie_Humiston@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the court reporter or PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Notice of Intent to Redact Transcript is due by 6/1/2021. Redaction Request due 6/15/2021. Redacted Transcript Deadline set for 6/25/2021. Release of Transcript Restriction set for 8/23/2021. (Humiston, Kellie) (Entered: 05/25/2021) |
| 05/25/2021 | 347 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED jury trial day 5 p.m. session held on 5/14/2021 before Judge Judge Mustafa T. Kasubhai, Court Reporter Kellie Humiston, telephone number 503-326-8186 or Kellie_Humiston@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the court reporter or PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Notice of Intent to Redact Transcript is due by 6/1/2021. Redaction Request due 6/15/2021. Redacted Transcript Deadline set for 6/25/2021. Release of Transcript Restriction set for 8/23/2021. (Humiston, Kellie) (Entered: 05/25/2021) |
| 05/25/2021 | 348 | Notice of Intent to Redact Transcript by Brenna K. Legaard re Transcript of Proceedings,, 339 , Transcript of Proceedings,,, 338 , Transcript of Proceedings,,, 340 , Transcript of Proceedings,,, 345 , Transcript of Proceedings,,, 341 , Transcript of Proceedings,,, 346 , Transcript of Proceedings,,, 347 , Transcript of Proceedings,,, 343 , Transcript of Proceedings,,, 344 , Transcript of Proceedings,,, 337 Filed by on behalf of All Defendants. (Related document(s): Transcript of Proceedings,, 339 , Transcript of Proceedings,,, 338 , Transcript of Proceedings,,, 340 , Transcript of Proceedings,,, 345 , Transcript of Proceedings,,, 341 , Transcript of Proceedings,,, 346 , Transcript of Proceedings,,, 347 , Transcript of Proceedings,,, 343 , Transcript of Proceedings,,, 344 , Transcript of Proceedings,,, 337 .) (Legaard, Brenna) (Entered: 05/25/2021) |
| 05/27/2021 | 349 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai GRANTING Unopposed Motion for Leave to Extend the Page Limit Under LR54-3(E) 342 . (jk) (Entered: 05/27/2021) |
| 05/28/2021 | 350 | Bill of Costs . Filed by Adasa Inc.. (Attachments: # 1 Attachment Declaration of Jonathan T. Suder in Support of Plaintiff's Bill of Costs, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # |

Appx47

| | | |
|---|---|---|
| | | 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22) (Suder, Jonathan) (Entered: 05/28/2021) |
| 05/28/2021 | 351 | Motion for Attorney Fees *Plaintiff's Motion for Attorneys' Fees Under 35 U.S.C. Section 285*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Attachments: # 1 Attachment Declaration of Glenn S. Orman in Support of Plaintiff's Motion for Attorney's Fees, # 2 Exhibit A - May 9 email ruling, # 3 Exhibit B - Transcript, # 4 Exhibit C - May 13 GSO email - UNDER SEAL, # 5 Exhibit D - Second RFP, # 6 Exhibit E - Notice to Issue Reexam, # 7 Exhibit F - Original Answer, # 8 Exhibit G - Amended Answer, # 9 Attachment Declaration of Jonathan T. Suder in Support of Plaintiff's Motion for Attorney's Fees) (Suder, Jonathan) (Entered: 05/28/2021) |
| 05/28/2021 | 352 | Motion *Plaintiff's Motion for Prejudgment and Postjudgment Interest*. Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 05/28/2021) |
| 05/28/2021 | 353 | Motion *Plaintiff's Motion for Ongoing Royalty*. Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 05/28/2021) |
| 06/01/2021 | 354 | Unopposed Motion for Extension of Time *to File Motion to Redact Transcripts*. Filed by All Defendants. (Legaard, Brenna) (Entered: 06/01/2021) |
| 06/03/2021 | 355 | Unopposed Motion to File Excess Pages *Under LR 7-2(b) (RJMOL)*. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 06/03/2021) |
| 06/03/2021 | 356 | Unopposed Motion to File Excess Pages *Under LR 54-3(e) (Opposition)*. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 06/03/2021) |
| 06/04/2021 | 357 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai GRANTING Unopposed Motion for Extension of Time 354 . Defendant may file its statement of redaction or motion to redact additional information to all transcripts by 6/29/2021. (jk) Modified to correct text on 6/4/2021 (NEF regenerated) (jk). (Entered: 06/04/2021) |
| 06/08/2021 | 358 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai GRANTING Unopposed Motion to File Excess Pages Under LR 7-2(b) (RJMOL) 355 , and Unopposed Motion to File Excess Pages Under LR 54-3(e) (Opposition) 356 . (jk) (Entered: 06/08/2021) |
| 06/11/2021 | 359 | Response in Opposition to Motion *Plaintiff's Motion for Ongoing Royalty* 353 . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Attachments: # 1 Attachment Legaard Declaration ISO of Opp'n, # 2 Exhibit 1) (Legaard, Brenna) (Entered: 06/11/2021) |
| 06/11/2021 | 360 | Response in Opposition to Motion *Plaintiff's Motion for Prejudgment and Postjudgment Interest* 352 . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 06/11/2021) |
| 06/11/2021 | 361 | Response in Opposition to Motion for Attorney Fees *Plaintiff's Motion for Attorneys' Fees Under 35 U.S.C. Section 285* 351 Oral Argument requested. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Attachments: # 1 Attachment Legaard Declaration ISO of Opp'n to Mot. for Fees, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3) (Legaard, Brenna) (Entered: 06/11/2021) |

Appx48

| 06/11/2021 | 362 | Motion for Judgment *Defendant Avery Dennison Corporation's Renewed Motion for Judgment as a Matter of Law*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Oral Argument requested. Filed by Avery Dennison Corporation. (Attachments: # 1 Attachment Legaard Declaration ISO of RJMOL, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4 - Part 1, # 6 Exhibit 4 - Part 2, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11) (Legaard, Brenna) (Entered: 06/11/2021) |
|---|---|---|
| 06/11/2021 | 363 | Objections to Bill of Costs 350 . Filed by Avery Dennison Corporation. (Attachments: # 1 Attachment Allor Decl ISO Objs. to Bill of Costs, # 2 Exhibit A) (Legaard, Brenna) (Entered: 06/11/2021) |
| 06/14/2021 | 364 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Motion for Summary Judgment held on 7/8/2020 before Judge Mustafa T. Kasubhai, Court Reporter Ryan White, telephone number 503-326-8184 or ryan_white@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained from the Court Reporter or through PACER. See Policy at ord.uscourts.gov. Notice of Intent to Redact Transcript is due by 6/21/2021. Redaction Request due 7/6/2021. Redacted Transcript Deadline set for 7/15/2021. Release of Transcript Restriction set for 9/13/2021. (White, Ryan) (Entered: 06/14/2021) |
| 06/17/2021 | 365 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Telephonic Status Conference held on June 11, 2020, before Judge Mustafa T. Kasubhai, Transcriber Jill L. Jessup, telephone number (503)326-8191 or email at jill_jessup@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the Court Reporter at (503)326-8191 or email at jill_jessup@ord.uscourts.gov or PACER. See Policy at ord.uscourts.gov. Notice of Intent to Redact Transcript is due by 6/24/2021. Redaction Request due 7/8/2021. Redacted Transcript Deadline set for 7/19/2021. Release of Transcript Restriction set for 9/15/2021. (jjcr) (Entered: 06/17/2021) |
| 06/22/2021 | 366 | Motion for Imposition of Sanctions *and a Hearing Based on Newly Discovered Evidence*. Oral Argument requested. Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 06/22/2021) |
| 06/22/2021 | 367 | Declaration of Jonathan T. Suder *IN SUPPORT OF PLAINTIFFS MOTION FOR SANCTIONS AND A HEARING BASED ON NEWLY DISCOVERED EVIDENCE*. Filed by Adasa Inc.. (Related document(s): Motion for Imposition of Sanctions 366 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Suder, Jonathan) (Entered: 06/22/2021) |
| 06/23/2021 | 368 | Reply to Motion for Attorney Fees *Plaintiff's Motion for Attorneys' Fees Under 35 U.S.C. Section 285* 351 . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 06/23/2021) |

Appx49

| | | |
|---|---|---|
| 06/23/2021 | 369 | Declaration of Jonathan T. Suder *in Support of Plaintiff's Reply to Motion for Attorneys' Fees Under 35 U.S.C. Section 285.* **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Reply to Motion, 368 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Suder, Jonathan) (Entered: 06/23/2021) |
| 06/23/2021 | 370 | Reply to Motion *Plaintiff's Motion for Prejudgment and Postjudgment Interest 352* . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 06/23/2021) |
| 06/23/2021 | 371 | Declaration of Jonathan T. Suder *in Support of Plaintiff's Reply to Motion for Prejudgment Interest and Postjudgment Interest.* **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Reply to Motion 370 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F) (Suder, Jonathan) (Entered: 06/23/2021) |
| 06/23/2021 | 372 | Reply to Motion *Plaintiff's Motion for Ongoing Royalty 353* . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 06/23/2021) |
| 06/23/2021 | 373 | Declaration of Jonathan T. Suder *in Support of Plaintiff's Reply to Motion for Ongoing Royalty.* **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Reply to Motion 372 .) (Attachments: # 1 Exhibit A) (Suder, Jonathan) (Entered: 06/23/2021) |
| 06/24/2021 | 374 | Response in Opposition to Motion for Judgment *Defendant Avery Dennison Corporation's Renewed Motion for Judgment as a Matter of Law 362* . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 06/24/2021) |
| 06/24/2021 | 375 | Declaration of Jonathan T. Suder *in Support of Plaintiff's Response to Defendant's Motion for Judgment as a Matter of Law.* **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Adasa Inc.. (Related document(s): Response in Opposition to Motion, 374 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Suder, Jonathan) (Entered: 06/24/2021) |
| 06/25/2021 | 376 | Reply to Bill of Costs 350 . Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 06/25/2021) |
| 06/29/2021 | 377 | Motion to Redact Transcript of Proceedings,, 339 , Transcript of Proceedings,,, 338 , Transcript of Proceedings,,, 340 , Transcript of Proceedings,,, 345 , Transcript of Proceedings,,, 341 , Transcript of Proceedings,,, 346 , Transcript of Proceedings,,, 347 , Transcript of Proceedings,,, 343 , Transcript of Proceedings,,, 344 . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 06/29/2021) |
| 06/29/2021 | 378 | Declaration of Brenna Legaard *In Support of Motion to Redact Additional Information.* **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Motion to Redact Transcript, 377 .) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9) (Legaard, Brenna) (Entered: 06/29/2021) |

Appx50

| 07/06/2021 | 379 | Response in Opposition to Motion for Imposition of Sanctions *and a Hearing Based on Newly Discovered Evidence* 366 Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 07/06/2021) |
|---|---|---|
| 07/06/2021 | 380 | Declaration of Brenna K. Legaard *In Support of Response in Opposition to Motion for Sanctions and a Hearing Based on Newly Discover Evidence*. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Response in Opposition to Motion 379 .) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6) (Legaard, Brenna) (Entered: 07/06/2021) |
| 07/08/2021 | 381 | Reply *to Motion for Judgment or, in the alternative, for new trial* to Motion for Judgment *Defendant Avery Dennison Corporation's Renewed Motion for Judgment as a Matter of Law* 362 Oral Argument requested. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 07/08/2021) |
| 07/08/2021 | 382 | Declaration of Brenna Legaard . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Reply to Motion, 381 .) (Attachments: # 1 Exhibit 12, # 2 Exhibit 13) (Legaard, Brenna) (Entered: 07/08/2021) |
| 07/12/2021 | 383 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: Status Conference is set for 8/25/2021 at 09:00AM in Eugene by telephone before Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 07/12/2021) |
| 07/13/2021 | 384 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: Oral Argument regarding Bill of Costs 350 , Motion for Attorney Fees *Plaintiff's Motion for Attorneys' Fees Under 35 U.S.C. Section 285* 351 , Motion *Plaintiff's Motion for Prejudgment and Postjudgment Interest* 352 , Motion *Plaintiff's Motion for Ongoing Royalty* 353 , Motion for Judgment *Defendant Avery Dennison Corporation's Renewed Motion for Judgment as a Matter of Law* 362 , and Motion for Imposition of Sanctions *and a Hearing Based on Newly Discovered Evidence* 366 is set for 9/16/2021 at 09:00AM in Eugene by videoconference before Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 07/13/2021) |
| 07/13/2021 | 385 | Response to Motion to Redact Transcript of Proceedings,, 339 , Transcript of Proceedings,,, 338 , Transcript of Proceedings,,, 340 , Transcript of Proceedings,,, 345 , Transcript of Proceedings,,, 341 , Transcript of Proceedings,,, 346 , Transcript 377 . Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 07/13/2021) |
| 07/13/2021 | 386 | **Amended Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: Oral Argument regarding Bill of Costs 350 , Motion for Attorney Fees *Plaintiff's Motion for Attorneys' Fees Under 35 U.S.C. Section 285* 351 , Motion *Plaintiff's Motion for Prejudgment and Postjudgment Interest* 352 , Motion *Plaintiff's Motion for Ongoing Royalty* 353 , Motion for Judgment *Defendant Avery Dennison Corporation's Renewed Motion for Judgment as a Matter of Law* 362 , and Motion for Imposition of Sanctions *and a Hearing Based on Newly Discovered Evidence* 366 is set for 9/16/2021 at 09:00AM in Eugene Courtroom 3 before Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 07/13/2021) |
| 07/14/2021 | 387 | Reply to Motion for Imposition of Sanctions *and a Hearing Based on Newly Discovered Evidence* 366 Oral Argument requested. Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 07/14/2021) |

Appx51

| 08/10/2021 | 388 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney George C Summerfield, I. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8187005. Filed by Avery Dennison Corporation. (Summerfield, George) (Entered: 08/10/2021) |
|---|---|---|
| 08/10/2021 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney George C Summerfield, I. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8187005 388 : **Reviewed and Ready for Ruling. (ck) (Entered: 08/10/2021)** |
| 08/11/2021 | 389 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai GRANTING Motion for Leave to Appear *Pro Hac Vice* 388 requested by attorney George C Summerfield. (jk) (Entered: 08/11/2021) |
| 08/12/2021 | 390 | Redacted Motion for Judgment *Defendant Avery Dennison Corporation's Renewed Motion for Judgment as a Matter of Law*. Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 08/12/2021) |
| 08/12/2021 | 391 | Redacted Reply *In Support Of* to Redacted Motion for Judgment *Defendant Avery Dennison Corporation's Renewed Motion for Judgment as a Matter of Law* 390 Oral Argument requested. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 08/12/2021) |
| 08/12/2021 | 392 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Robert Greenspoon. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8191182. Filed by Adasa Inc.. (Greenspoon, Robert) (Entered: 08/12/2021) |
| 08/12/2021 | 393 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney William W Flachsbart. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8191198. Filed by Adasa Inc.. (Flachsbart, William) (Entered: 08/12/2021) |
| 08/12/2021 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney William W Flachsbart. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8191198 393 ; Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Robert Greenspoon. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8191182 392 : **Reviewed and Ready for Ruling. (ck) (Entered: 08/12/2021)** |
| 08/13/2021 | 394 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai: Motion for Leave to Appear *Pro Hac Vice* 392 requested by attorney Robert Greenspoon, and Motion for Leave to Appear *Pro Hac Vice* 393 requested by attorney William W Flachsbart are GRANTED. (jk) (Entered: 08/13/2021) |
| 08/16/2021 | 395 | Response in Opposition to Redacted Motion for Judgment *Defendant Avery Dennison Corporation's Renewed Motion for Judgment as a Matter of Law* 390 . Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 08/16/2021) |
| 08/25/2021 | 396 | **MINUTES of Proceedings:** Telephone Status Conference. Jonathan Suder; Glenn Orman; Richard Wojcio, Jr.; Alan Thayer, Jr.; Robert Greenspoon; William Flachsbart present as counsel for plaintiff. Brenna Legaard; Elizabeth White; Katherine Allor; George Summerfield present as counsel for defendant. Magistrate Judge Mustafa T. Kasubhai presiding. (FTR - Eugene Courtroom 3) (jk) (Entered: 08/25/2021) |

Appx52

| | | |
|---|---|---|
| 08/25/2021 | 397 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai GRANTING Motion to Redact Transcript 377 regarding Transcript of Proceedings 338 , Transcript of Proceedings 339 , Transcript of Proceedings 340 , Transcript of Proceedings 341 , Transcript of Proceedings 343 , Transcript of Proceedings 344 , Transcript of Proceedings 345 , Transcript of Proceedings 346 , and Transcript of Proceedings 347 . Redacted Transcript Deadline set for 9/27/2021. (jk) (Entered: 08/25/2021) |
| 08/25/2021 | 398 | Transcript Designation and Order Form for the hearing held on 08/25/2021 before Judge Mustafa T. Kasubhai. Court Reporter: FTR. . Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 08/25/2021) |
| 09/03/2021 | 399 | Notice re Opinion and Order,, 205 *of Supplemental Authority* Filed by Adasa Inc.. (Related document(s): Opinion and Order,, 205 .) (Suder, Jonathan) (Entered: 09/03/2021) |
| 09/07/2021 | 400 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Telephonic Status Conference held on November 4, 2019, before Judge Mustafa T. Kasubhai, Transcriber Jill L. Jessup, telephone number (503)326-8191 or email at jill_jessup@ord.uscourts.gov. <span style="color:red">Transcript may be viewed at Court's public terminal or purchased from the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the Court Reporter at (503)326-8191 or email at jill_jessup@ord.uscourts.gov or PACER. See Policy at ord.uscourts.gov.</span> Notice of Intent to Redact Transcript is due by 9/14/2021. Redaction Request due 9/28/2021. Redacted Transcript Deadline set for 10/8/2021. Release of Transcript Restriction set for 12/6/2021. (jjcr) (Entered: 09/07/2021) |
| 09/07/2021 | 401 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Motion Hearing - P.M. Session held on February 25, 2020, before Judge Mustafa T. Kasubhai, Transcriber Jill L. Jessup, telephone number (503)326-8191 or email at jill_jessup@ord.uscourts.gov. <span style="color:red">Transcript may be viewed at Court's public terminal or purchased from the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the Court Reporter at (503)326-8191 or email at jill_jessup@ord.uscourts.gov or PACER. See Policy at ord.uscourts.gov.</span> Notice of Intent to Redact Transcript is due by 9/14/2021. Redaction Request due 9/28/2021. Redacted Transcript Deadline set for 10/8/2021. Release of Transcript Restriction set for 12/6/2021. (jjcr) Modified on 9/7/2021 (jjcr). (Entered: 09/07/2021) |
| 09/07/2021 | 402 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Telephonic Status Conference held on March 18, 2021, before Judge Mustafa T. Kasubhai, Transcriber Jill L. Jessup, telephone number (503)326-8191 or email at jill_jessup@ord.uscourts.gov. <span style="color:red">Transcript may be viewed at Court's public terminal or purchased from the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the Court Reporter at (503)326-8191 or email at jill_jessup@ord.uscourts.gov or PACER. See Policy at ord.uscourts.gov.</span> Notice of Intent to Redact Transcript is due by 9/14/2021. Redaction Request due 9/28/2021. Redacted Transcript Deadline set for 10/8/2021. Release of Transcript Restriction set for 12/6/2021. (jjcr) (Entered: 09/07/2021) |
| 09/07/2021 | 403 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Telephonic Status Conference held on August 25, 2021, before Judge Mustafa T. Kasubhai, Transcriber Jill L. Jessup, telephone number (503)326-8191 or email at jill_jessup@ord.uscourts.gov. <span style="color:red">Transcript may be viewed at Court's public terminal or</span> |

Appx53

| | | |
|---|---|---|
| | | purchased from the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the Court Reporter at (503)326-8191 or email at jill_jessup@ord.uscourts.gov or PACER. See Policy at ord.uscourts.gov. Notice of Intent to Redact Transcript is due by 9/14/2021. Redaction Request due 9/28/2021. Redacted Transcript Deadline set for 10/8/2021. Release of Transcript Restriction set for 12/6/2021. (jjcr) (Entered: 09/07/2021) |
| 09/14/2021 | 404 | Supplemental Response to Motion for Imposition of Sanctions *and a Hearing Based on Newly Discovered Evidence* 366 Oral Argument requested. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 09/14/2021) |
| 09/14/2021 | 405 | Declaration of Joseph Pochron *in Support of Defendant's Supplemental Response to Plaintiff's Motion for Sanctions and a Hearing Bases on Newly Discovered Evidence.* **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Response to Motion 404 .) (Legaard, Brenna) Modified on 9/16/2021 to update docket text. NEF not regenerated. (bd) (Entered: 09/14/2021) |
| 09/14/2021 | 406 | Declaration of Bjorn L. Malmlund *ISO Defendant's Supplemental Response to Plaintiff's Motion for Sanctions and a Hearing Based on Newly Discovered Evidence.* **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Response to Motion 404 .) (Legaard, Brenna) Modified on 9/16/2021 to update docket text. NEF not regenerated. (bd) (Entered: 09/14/2021) |
| 09/16/2021 | 408 | **MINUTES of Proceedings:** Motion Hearing Held regarding Bill of Costs 350 , Motion for Attorney Fees *Plaintiff's Motion for Attorneys' Fees Under 35 U.S.C. Section 285* 351 , Motion *Plaintiff's Motion for Prejudgment and Postjudgment Interest* 352 , Motion *Plaintiff's Motion for Ongoing Royalty* 353 , Motion for Judgment *Defendant Avery Dennison Corporation's Renewed Motion for Judgment as a Matter of Law* 362 , Motion for Imposition of Sanctions *and a Hearing Based on Newly Discovered Evidence* 366 , Redacted Motion for Judgment *Defendant Avery Dennison Corporation's Renewed Motion for Judgment as a Matter of Law* 390 . Witnesses sworn and evidence adduced. Witnesses: Joseph Pochron; Bjorn L. Malmlund. The parties shall submit additional briefing, not to exceed ten (10) pages, to the Court by 9/24/2021. Oral Argument is set for 10/1/2021 at 09:00AM in Eugene by videoconference before Magistrate Judge Mustafa T. Kasubhai. Jonathan Suder; Glenn Orman; Richard Wojcio, Jr.; Robert Greenspoon; William Flachsbart present as counsel for plaintiff. Brenna Legaard; Elizabeth White; George Summerfield present as counsel for defendant. Court Reporter: Kellie Humiston. Magistrate Judge Mustafa T. Kasubhai presiding. (jk) (Entered: 09/17/2021) |
| 09/17/2021 | 407 | Transcript Designation and Order Form for the hearing held on 09.16.21 before Judge Kasubhai. Court Reporter: Kellie M. Humiston. . Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 09/17/2021) |
| 09/21/2021 | 409 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED oral argument held on 9/16/21 before Judge Mustafa T. Kasubhai, Court Reporter Kellie Humiston, telephone number 503-326-8186 or Kellie_Humiston@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the court reporter or PACER. See Policy at ord.uscourts.gov. Notice of Intent to Redact Transcript is due by 9/28/2021. Redaction Request due 10/12/2021. |

Appx54

| | | |
|---|---|---|
| | | Redacted Transcript Deadline set for 10/22/2021. Release of Transcript Restriction set for 12/20/2021. (Humiston, Kellie) (Entered: 09/21/2021) |
| 09/28/2021 | 410 | *DEFENDANT AVERY DENNISON CORPORATION'S* Notice of Intent to Redact Transcript by Brenna K. Legaard re Transcript of Proceedings,, 409 *TRANSCRIPTS OF 09/16/2021 ORAL ARGUMENT PROCEEDINGS FILED 09/21/2021* Filed by on behalf of Avery Dennison Corporation. (Related document(s): Transcript of Proceedings,, 409 .) (Legaard, Brenna) (Entered: 09/28/2021) |
| 09/30/2021 | 411 | **Scheduling Order** by Magistrate Judge Mustafa T. Kasubhai: At the request of counsel, Status Conference is set for 9/30/2021 at 01:00PM in Eugene by telephone before Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 09/30/2021) |
| 09/30/2021 | 412 | **MINUTES of Proceedings:** Status Conference. Jonathan Suder; Glenn Orman; Richard Wojcio, Jr. present as counsel for plaintiff. Brenna Legaard; George Summerfield present as counsel for defendant. Magistrate Judge Mustafa T. Kasubhai presiding. (FTR - Eugene Courtroom 3) (jk) (Entered: 09/30/2021) |
| 10/01/2021 | 413 | Transcript Designation and Order Form for the hearing held on 10/01/2021 before Judge Kasubhai. . Filed by Adasa Inc.. (Suder, Jonathan) (Entered: 10/01/2021) |
| 10/01/2021 | 414 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED oral argument held via videoconference on 10/1/21 before Judge Mustafa T. Kasubhai, Court Reporter Kellie Humiston, telephone number 503-326-8186 or Kellie_Humiston@ord.uscourts.gov. <span style="color:red">Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the court reporter or PACER. See Policy at ord.uscourts.gov.</span> Notice of Intent to Redact Transcript is due by 10/8/2021. Redaction Request due 10/22/2021. Redacted Transcript Deadline set for 11/1/2021. Release of Transcript Restriction set for 12/30/2021. (Humiston, Kellie) (Entered: 10/01/2021) |
| 10/01/2021 | 421 | **MINUTES of Proceedings:** Motion Hearing Held by videoconference. The Court rules as follows: Plaintiff's Bill of Costs 350 is granted. Plaintiff's motion for attorney fees 351 pursuant to 35 U.S.C. § 285 is granted. The Court further finds that Plaintiff may supplement their fees to include post-trial motions. Plaintiff's motion for prejudgment interest 352 is granted. Post-judgment interest will be set pursuant to statute. The Court finds a prejudgment interest rate of 9% simple interest appropriate. The Court finds a post-judgment interest rate of 9% per annum without compounding interest appropriate. Plaintiff's motion for ongoing royalties 353 is granted. The Court finds an ongoing royalty rate of $.009 is appropriate. Defendant's renewed motion for judgment as a matter of law or in the alternative for a new trial 362 and redacted motion for judgment 390 are denied. Plaintiff's motion for sanctions 366 is granted. The Court finds financial sanctions in the amount of $.0025 per tag is appropriate for tags identified at trial and as stipulated by the parties. The Court declines to award expert costs and declines to make any factual findings as a sanction pursuant to FRCP 37(c). Full opinion to follow. Jonathan Suder; Glenn Orman; Richard Wojcio, Jr.; Alan Thayer, Jr.; Robert Greenspoon; William Flachsbart present as counsel for plaintiff. Brenna Legaard; George Summerfield present as counsel for defendant. Court Reporter: Kellie Humiston (by videoconference). (Interpreter for Witness Present: I Ching Ng (by videoconference)) (Cantonese) (Oath administered in open court.) Magistrate Judge Mustafa T. Kasubhai presiding. (jk) (Entered: 10/07/2021) |

Appx55

| | | |
|---|---|---|
| 10/04/2021 | 415 | Objections to Magistrate Judge's Order: *Defendant's Opposition to Increasing the Judgment via Sanctions* Motion Hearing Held,,,,, 408 . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 10/04/2021) |
| 10/04/2021 | 416 | Declaration of Brenna K. Legaard *In Support of Defendant's Opposition to Increasing the Judgment via Sanctions*. Filed by Avery Dennison Corporation. (Related document(s): Scheduling,, 386 .) (Legaard, Brenna) (Entered: 10/04/2021) |
| 10/06/2021 | 417 | REDACTED TRANSCRIPT OF PROCEEDINGS FILED Jury Trial, Day 2, AM Session, held on 5/11/2021 before Judge Mustafa T. Kasubhai, Court Reporter Kelly Polvi, telephone number 503-779-7406. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through PACER. See Policy at ord.uscourts.gov Related Documents: 338 Transcript of Proceedings. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (plb) (Entered: 10/06/2021) |
| 10/06/2021 | 418 | REDACTED TRANSCRIPT OF PROCEEDINGS FILED Jury Trial, Day 3, AM Session, held on 5/12/2021 before Judge Mustafa T. Kasubhai, Court Reporter Kelly Polvi, telephone number 503-779-7406. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through PACER. See Policy at ord.uscourts.gov Related Documents: 339 Transcript of Proceedings. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (plb) (Entered: 10/06/2021) |
| 10/06/2021 | 419 | REDACTED TRANSCRIPT OF PROCEEDINGS FILED Jury Trial, Day 4, AM Session, held on 5/13/2021 before Judge Mustafa T. Kasubhai, Court Reporter Kelly Polvi, telephone number 503-779-7406. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through PACER. See Policy at ord.uscourts.gov Related Documents: 340 Transcript of Proceedings. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (plb) (Entered: 10/06/2021) |
| 10/06/2021 | 420 | REDACTED TRANSCRIPT OF PROCEEDINGS FILED Jury Trial, Day 5, AM Session, held on 5/14/2021 before Judge Mustafa T. Kasubhai, Court Reporter Kelly Polvi, telephone number 503-779-7406. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through PACER. See Policy at ord.uscourts.gov Related Documents: 341 Transcript of Proceedings,,,. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (plb) (Entered: 10/06/2021) |
| 10/08/2021 | 422 | Notice of Intent to Redact Transcript by Brenna K. Legaard re Transcript of Proceedings,, 414 Filed by on behalf of Avery Dennison Corporation. (Related document(s): Transcript of Proceedings,, 414 .) (Legaard, Brenna) (Entered: 10/08/2021) |
| 10/12/2021 | 423 | Motion to Redact Transcript of Proceedings,, 409 . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 10/12/2021) |

Appx56

| | | |
|---|---|---|
| 10/12/2021 | 424 | Declaration of Brenna K. Legaard . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Motion to Redact Transcript 423 .) (Legaard, Brenna) (Entered: 10/12/2021) |
| 10/12/2021 | 425 | REDACTED TRANSCRIPT OF PROCEEDINGS FILED for date of 5/10/21 before Judge Mustafa T. Kasubhai, Court Reporter Kellie Humiston, telephone number 503-326-8186 or Kellie_Humiston@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the court reporter or PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Humiston, Kellie) (Entered: 10/12/2021) |
| 10/12/2021 | 426 | REDACTED TRANSCRIPT OF PROCEEDINGS FILED for date of 5/11/21 before Judge Mustafa T. Kasubhai, Court Reporter Kellie Humiston, telephone number 503-326-8186 or Kellie_Humiston@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the court reporter or PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Humiston, Kellie) (Entered: 10/12/2021) |
| 10/12/2021 | 427 | REDACTED TRANSCRIPT OF PROCEEDINGS FILED for date of 5/12/21 before Judge Mustafa T. Kasubhai, Court Reporter Kellie Humiston, telephone number 503-326-8186 or Kellie_Humiston@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the court reporter PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Humiston, Kellie) (Entered: 10/12/2021) |
| 10/12/2021 | 428 | REDACTED TRANSCRIPT OF PROCEEDINGS FILED for date of 5/13/21 before Judge Mustafa T. Kasubhai, Court Reporter Kellie Humiston, telephone number 503-326-8186 or Kellie_Humiston@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the court reporter or PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Humiston, Kellie) (Entered: 10/12/2021) |
| 10/12/2021 | 429 | REDACTED TRANSCRIPT OF PROCEEDINGS FILED for date of 5/14/21 before Judge Mustafa T. Kasubhai, Court Reporter Kellie Humiston, telephone number 503-326-8186 or Kellie_Humiston@ord.uscourts.gov. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the court reporter or PACER. See Policy at ord.uscourts.gov. **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** (Humiston, Kellie) (Entered: 10/12/2021) |
| 10/14/2021 | 430 | **FINAL RULE 58 JUDGMENT** signed on 10/14/2021 by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 10/14/2021) |

1/20/2022, 10:31 AM

Appx57

| 10/18/2021 | 431 | Stipulated Proposed Form of Order Submitted *Dismissal of Previously-severed Claims Without Prejudice*. Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 10/18/2021) |
| --- | --- | --- |
| 10/20/2021 | 432 | **Stipulated Order of Dismissal of Previously-Severed Claims Without Prejudice** signed on 10/20/2021 by Magistrate Judge Mustafa T. Kasubhai. (jk) (Entered: 10/20/2021) |
| 10/22/2021 | 433 | Notice of Appeal to the Federal Circuit Filing fee $505 collected; Receipt No. AORDC-8280710: . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 10/22/2021) |
| 10/22/2021 | 434 | Motion to Redact Transcript of Proceedings,, 414 . Filed by Avery Dennison Corporation. (Legaard, Brenna) (Entered: 10/22/2021) |
| 10/22/2021 | 435 | Declaration of Brenna K. Legaard . **(DOCUMENT RESTRICTED ACCORDING TO PROTECTIVE ORDER)** Filed by Avery Dennison Corporation. (Related document(s): Motion to Redact Transcript 434 .) (Legaard, Brenna) (Entered: 10/22/2021) |
| 10/25/2021 | 436 | Appeal Information Sheet transmitted to Federal Circuit Court of Appeals re Notice of Appeal 433 . (Attachments: # 1 Notice of Appeal to Federal Circuit, # 2 Judgment 5/14/2021, # 3 Final Rule 58 Judgment 10/14/2021) (jw) (Entered: 10/25/2021) |
| 10/28/2021 | | USCA Case Number and Notice confirming Docketing Record on Appeal re Notice of Appeal # 433 . **Case Appealed to United States Court of Appeals for the Federal Circuit. Case Number 22-1092** assigned. (eo) (Entered: 10/28/2021) |
| 11/23/2021 | 437 | Notice *of Agreement Regarding Forbearance of Execution of Judgment* Filed by Adasa Inc.. (Attachments: # 1 Exhibit A) (Suder, Jonathan) (Entered: 11/23/2021) |
| 12/15/2021 | 438 | **Opinion and Order** signed on 12/15/2021 by Magistrate Judge Mustafa T. Kasubhai: Plaintiff's Bill of Costs (ECF No. 350 ) is GRANTED in part. Plaintiff's Motion for Attorney Fees (ECF No. 351 ) pursuant to 35 U.S.C. § 285 is GRANTED. Plaintiff's Motion for Pre- and Post-Judgment Interest (ECF No. 352 ) is GRANTED. The Court finds a pre-judgment interest rate of 9% simple interest appropriate. Post-judgment interest will be set pursuant to statute. Plaintiff's Motion for Ongoing Royalties (ECF No. 353 ) is GRANTED. The Court finds an ongoing royalty rate of $.009 is appropriate. Defendant's renewed Motion for Judgment as a Matter of Law or in the Alternative for a New Trial (ECF No. 362 ) is DENIED. Plaintiff's Motion for Sanctions (ECF No. 366 ) is GRANTED. The Court finds financial sanctions in the amount of $.0025 per tag is appropriate and applied to the number of for tags identified at trial and as stipulated by the parties. (jk) (Entered: 12/15/2021) |
| 12/15/2021 | 439 | **ORDER** by Magistrate Judge Mustafa T. Kasubhai GRANTING Unopposed Motion to Redact Transcript 423 regarding Transcript of Proceedings 409 , and Unopposed Motion to Redact Transcript 434 regarding Transcript of Proceedings 414 . Redacted Transcript Deadline set for 1/18/2022. In light of the Court's Opinion and Order 438 , Objections to Magistrate Judges Order 415 is denied as MOOT. (jk) (Entered: 12/15/2021) |

Appx58



The United States of America

## The Commissioner of Patents and Trademarks

*Has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.*

*Therefore, this*

## United States Patent

*Grants to the person or persons having title to this patent the right to exclude others from making, using or selling the invention throughout the United States of America for the term of seventeen years from the date of this patent, subject to the payment of maintenance fees as provided by law.*

Acting Commissioner of Patents and Trademarks

Attest

**Plaintiff's Exhibit No.**

**1**

6:17-cv-01685-MK

exhibitsticker.com

Plaintiff's Trial Exhibit No. 1
Page 1 of 43

Appx59



US009798967B2

## (12) United States Patent
### McAllister

(10) **Patent No.:**    **US 9,798,967 B2**
(45) **Date of Patent:**    **\*Oct. 24, 2017**

(54) **SYSTEMS, METHODS, AND DEVICES FOR COMMISSIONING WIRELESS SENSORS**

(71) Applicant: **ADASA INC.**, Eugene, OR (US)

(72) Inventor: **Clarke W. McAllister**, Eugene, OR (US)

(73) Assignee: **ADASA INC.**, Eugene, OR (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/042,993**

(22) Filed: **Feb. 12, 2016**

(65) **Prior Publication Data**

US 2016/0162773 A1    Jun. 9, 2016

### Related U.S. Application Data

(63) Continuation of application No. 13/526,520, filed on Jun. 19, 2012, now Pat. No. 9,272,805, which is a continuation-in-part of application No. 12/820,109, filed on Jun. 21, 2010, now Pat. No. 8,228,198, which is a continuation-in-part of application No. 11/465,712, filed on Aug. 18, 2006, now Pat. No. 7,830,258, and a continuation-in-part of application

(Continued)

(51) **Int. Cl.**
| | | |
|---|---|---|
| *H04Q 5/22* | (2006.01) | |
| *G06K 19/077* | (2006.01) | |
| *B65C 9/18* | (2006.01) | |
| *B65C 11/00* | (2006.01) | |
| *B65C 9/00* | (2006.01) | |
| *B65C 9/40* | (2006.01) | |
| *G06K 17/00* | (2006.01) | |

(52) **U.S. Cl.**
CPC ...... ***G06K 19/07716*** (2013.01); ***B65C 9/1865*** (2013.01); ***B65C 11/006*** (2013.01); ***G06K 19/077*** (2013.01); *B65C 2009/0003* (2013.01); *B65C 2009/404* (2013.01); *G06K 2017/0041* (2013.01)

(58) **Field of Classification Search**
CPC ... G06K 2017/0045; G06K 2017/0051; G06K 19/077; G06K 19/07716; B65C 9/1865; B65C 11/006
USPC ......... 340/572.1–572.9, 10.1–10.6; 709/217; 705/28
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,228,198 B2 \* | 7/2012 | McAllister ............ | B65C 9/1865 340/10.51 |
| 9,272,805 B2 \* | 3/2016 | McAllister ............ | B65C 9/1865 |

(Continued)

#### OTHER PUBLICATIONS

EPCTM Tag Data Standards Version 1.1 Rev.1.23, Last Call Working Draft on Feb. 16, 2004, pp. 11, 19-25.
RFID for Dummies, 5 pps., 2005.

*Primary Examiner* — Thomas Mullen
(74) *Attorney, Agent, or Firm* — Fay Kaplun & Marcin, LLP

(57) **ABSTRACT**

In one embodiment the present invention comprises a smartphone and encoders for commissioning RFID transponders. The present invention further includes novel systems, devices, and methods for commissioning RFID transponders with unique object class instance numbers without requiring a realtime connection to a serialization database.

**20 Claims, 19 Drawing Sheets**



Plaintiff's Trial Exhibit No. 1
Page 2 of 43
ADASA-007419

Appx60

**US 9,798,967 B2**

Page 2

**Related U.S. Application Data**

No. 12/124,768, filed on May 21, 2008, now abandoned.

(60)   Provisional application No. 60/709,713, filed on Aug. 19, 2005, provisional application No. 60/939,603, filed on May 22, 2007.

(56)                        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2004/0046644 A1* | 3/2004 | Bauhahn ............ | G06K 7/10019 |
| | | | 340/10.42 |
| 2005/0007238 A1* | 1/2005 | Hartmann ............ | G06K 7/0008 |
| | | | 340/10.2 |
| 2007/0103314 A1* | 5/2007 | Geissler ............... | A01K 11/004 |
| | | | 340/572.8 |

* cited by examiner

Appx61



FIG. 1

Plaintiff's Trial Exhibit No. 1
Page 4 of 43
ADASA-007421

Appx62



50    FIG. 2



FIG. 3

Plaintiff's Trial Exhibit No. 1
Page 5 of 43
ADASA-007422

Appx63



FIG. 4

Plaintiff's Trial Exhibit No. 1
Page 6 of 43
ADASA-007423

Appx64



FIG 5

Plaintiff's Trial Exhibit No. 1
Page 7 of 43
ADASA-007424

Appx65



FIG. 6

Plaintiff's Trial Exhibit No. 1
Page 8 of 43
ADASA-007425

Appx66



FIG. 7

Plaintiff's Trial Exhibit No. 1
Page 9 of 43
ADASA-007426

Appx67



FIG. 8

Plaintiff's Trial Exhibit No. 1
Page 10 of 43
ADASA-007427



Fig. 9

Plaintiff's Trial Exhibit No. 1
Page 11 of 43
ADASA-007428

Appx69



FIG. 10

Plaintiff's Trial Exhibit No. 1
Page 12 of 43
ADASA-007429

Appx70



Fig. 11

Fig. 12

Plaintiff's Trial Exhibit No. 1
Page 13 of 43
ADASA-007430

Appx71



Fig. 13

Plaintiff's Trial Exhibit No. 1
Page 14 of 43
ADASA-007431

Appx72



Fig. 14

Plaintiff's Trial Exhibit No. 1
Page 15 of 43
ADASA-007432

Appx73



FIG. 15

Plaintiff's Trial Exhibit No. 1
Page 16 of 43
ADASA-007433

Appx74



FIG. 16

Plaintiff's Trial Exhibit No. 1
Page 17 of 43
ADASA-007434

Appx75



FIG. 17

Plaintiff's Trial Exhibit No. 1
Page 18 of 43
ADASA-007435

Appx76



FIG 18



FIG 19



FIG 20

Plaintiff's Trial Exhibit No. 1
Page 19 of 43
ADASA-007436

Appx77



FIG 21

Plaintiff's Trial Exhibit No. 1
Page 20 of 43
ADASA-007437

Appx78



FIG. 22

Plaintiff's Trial Exhibit No. 1
Page 21 of 43
ADASA-007438

Appx79



FIG 23

Plaintiff's Trial Exhibit No. 1
Page 22 of 43
ADASA-007439

Appx80

US 9,798,967 B2

**1**

## SYSTEMS, METHODS, AND DEVICES FOR COMMISSIONING WIRELESS SENSORS

### RELATED APPLICATIONS

The present application is a continuation application based on U.S. application Ser. No. 13/526,520, filed on Jun. 19, 2012, now U.S. Pat. No. 9,272,805, which is a continuation-in-part application based on U.S. application Ser. No. 12/820,109, filed on Jun. 21, 2010, now U.S. Pat. No. 8,228,198, which is a continuation-in-part application of U.S. application Ser. No. 11/465,712, filed on Aug. 18, 2006, now U.S. Pat. No. 7,830,258, which claims the benefit of U.S. Provisional Application No. 60/709,713 filed on Aug. 19, 2005, and a continuation-in-part application of U.S. application Ser. No. 12/124,768, filed on May 21, 2008, now abandoned, which claims the benefit of U.S. Provisional Application No. 60/939,603 filed on May 22, 2007. The present application claims priority from these applications, the disclosures of which are hereby expressly incorporated herein by reference.

### BACKGROUND

The present invention relates to a system, including methods and devices, utilizing wireless sensor devices and RFID (radio-frequency identification) transponders. Specifically, the present invention relates to a system incorporating novel devices and methods that enable point-of-use and on-demand commissioning of RFID transponder-equipped wireless sensors.

Radio-frequency identification (RFID) transponders enable improved identification and tracking of objects by encoding data electronically in a compact tag or label. And, advantageously, the compact tag or label does not need external, optically recognizable or human-readable markings. In fact, using the Gen2 EPC specification, a three-meter read-distance for RFID transponders is common—even on high-speed material handling lines.

Radio-frequency identification (RFID) transponders, typically thin transceivers that include an integrated circuit chip having radio frequency circuits, control logic, memory and an antenna structure mounted on a supporting substrate, enable vast amounts of information to be encoded and stored and have unique identification. Commissioning, the process of encoding specific information (for example, data representing an object identifier, the date-code, batch, customer name, origin, destination, quantity, and items) associated with an object (for example, a shipping container), associates a specific object with a unique RFID transponder. The commissioned transponder responds to coded RF signals and, therefore, readily can be interrogated by external devices to reveal the data associated with the transponder.

Current classes of RFID transponders rank into two primary categories: active RFID transponders and passive RFID transponders. Active RFID transponders include an integrated power source capable of self-generating signals, which may be used by other, remote reading devices to interpret the data associated with the transponder. Active transponders include batteries and, historically, are considered considerably more expensive than passive RFID transponders. Passive RFID transponders backscatter incident RF energy to specially designed remote devices such as interrogators.

Combining the benefits of the latest technology in RFID transponders with sensing devices, a broader class of devices called wireless sensors is emerging. Wireless sensors have a unique identity, sense one or more attributes within its environment, and report its identity and data corresponding to the sensed attributes. For example, a wireless sensor interprets environmental conditions such as temperature, moisture, sunlight, seismic activity, biological, chemical or nuclear materials, specific molecules, shock, vibration, location, or other environmental parameters. Wireless sensors are distributed nodes of computing networks that are interconnected by wired and wireless interfaces.

Wireless sensors, made using silicon circuits, polymer circuits, optical modulation indicia, an encoded quartz crystal diode, or Surface Acoustic Wave (SAW) materials to affect radio frequency or other signaling methods, communicate wirelessly to other devices. For example, certain embodiments of wireless sensors communicate on a peer-to-peer basis to an interrogator or a mobile computer. Communication methods include narrow band, wide band, ultra wide band, or other means of radio or signal propagation methods.

Generating a unique serial number is imperative, and is required for EPCglobal RFID tagging implementations. Serialization requires a central issuing authority of numbers for manufacturers, products, and items to guarantee uniqueness and to avoid duplication of numbers. Blocks of numbers are distributed to remote locations globally. Unless a product (or SKU) is serialized at one location, the numbering space is usually partitioned according to some method, or each remote location receives each number one-by-one. Either way, there is eventually a reconciliation of serial number usage with a granularity of either one or several numbers at a time.

A preferred method of generating unique serial numbers is to assign unique numbers in a central location, such as in a label converter facility where unique bar coded labels are printed. Each unique label is then packed and shipped to remote locations, usually either in sheets or rolls. Upon arrival at a manufacturing facility, rolls are loaded onto high speed label applicators that apply one serialized label onto each carton. As those serialized cartons move through the supply chain, they may eventually arrive at a case pick location, a receiving dock, or similar location where a serialized carton is selected for having an RFID transponder applied to it. Using a bar code scanner to read one or more bar codes sufficient information can be collected to uniquely encode that data into an RFID transponder and apply it to that carton.

The uniqueness of an identifier is critical to the success of almost any tracking system. Assuring uniqueness is not necessarily simple. A generically descriptive bar code can be matched to authorizations for selected numbering systems that provide additional data fields including a unique serial number or using algorithms that assure uniqueness through numerical representations of time and space.

Certain prior art systems use printer encoders to merge the printing and RFID transponder encoding operations into a single atomic transaction. This method is more expensive in every respect. It requires mobile distributed printing with nearly perfect networking implementations in order to achieve a smooth, easy, and regular manual transponder application process. This all comes at a higher price, size, and weight. Prior art implementations tend not to be mobile, as represented by U.S. Pat. No. 7,066,667 issued to Chapman et al. on 27 Jun. 2006 and include U.S. Pat. No. 5,899,476 issued to Barrus et al. on 31 May 2005, or by U.S. Pat. No. 6,246,326 issued to Wiklof et al. on 12 Jun. 2001, describe a device that commissions an RFID transponder

Plaintiff's Trial Exhibit No. 1
Page 23 of 43
ADASA-007440

US 9,798,967 B2

**3**

with a printed label. This approach, however, introduces unnecessary waste, cost, and propensities for error. There is a growing category of applications that do not require anything other than a custom-encoded RFID transponder. This prior art calls for the inclusion of label printer hardware and related consumable materials that are not necessary for many RFID applications. Unneeded printer mechanisms create unnecessary complexities, size, and weight. In some instances this additional bulk hinders practical mobile applications. The result is that tagging solutions that include printing result in a higher total cost of ownership than a pure RF tag encoding system.

So, despite recent advances in RFID technology, the state-of-the-art does not fully address the needs of simple, efficient, economical, high-volume, reliable deployment and commissioning of RFID transponders and wireless sensors. Large-scale adoption of RFID transponders depends on systems utilizing reliable, low-cost transponders deployed at thousands of distributed locations that implement simple and efficient manual transponder commissioning means. Such systems should further include processes for efficient commissioning of batches of RFID transponders, without the need for realtime wireless connectivity.

SUMMARY OF THE INVENTION

The present invention overcomes the shortcomings of the prior-art attempts and, accordingly, provides systems, methods, and devices that commission RFID transponders on-demand and at a point-of-use utilizing wireless data transfer in a compact package that is well-suited to portable, mobile, or fixed use in multiple applications. The present invention is used for reading data from or encoding data onto wireless transponder data carriers with no external authorizations or queries required on a transponder-by-transponder basis. Additionally this invention teaches a preferred method and apparatus for commissioning RFID transponders without requiring continuous use of a screen or keypad to control operations. Further advantages of the present invention will be well-appreciated by those skilled in the art upon reading this disclosure including the appended figures of the drawing.

Authorizations for one or more classes of objects are preferably loaded into the encoder; where such authorizations include data fields such as manufacturer ID, item reference, manufacturer code lengths, filter values (that designate packaging levels such as item, case, pallet, etc.), serial number starting point for a block, and other predetermined parameters. Such information is preferably loaded into the memory of the encoder in advance of tag commissioning operations. Thus if loaded with information for more than one object class, the encoder does not have sufficient information to proceed with encoding a transponder until a single object class is selected for the present RFID transponder to receive; an ambiguity therefore exists that is preferably resolved with information entered by an operator using either a keypad or a bar code scanner. Reading printed indicia such as a bar code is a preferred method to resolve the ambiguity as to which object class the next RFID transponder is to receive a number from. Bar codes are used to eliminate errors and ambiguities that enable the encoder to locally generate or replicate data for encoding into a data carrier such as an RFID transponder.

This type of data production and/or replication process is very fast and efficient. There is no absolute need to query a database in real time; hence there is no need for continuous wireless network connectivity. This simplification elimi-

**4**

nates the possibilities for non-deterministic network delays. Non-deterministic delays are delays that cannot be guaranteed, usually due to the probabilistic nature of packet collisions that are common in Ethernet and WiFi. By eliminating the need to access a network database, the variable non-deterministic delays caused by changing database sizes, changing record counts, and database user load fluctuations are completely circumvented. Reduction or outright elimination of non-deterministic delays helps manual labor operate at maximum efficiency, allowing them to achieve a regular and dependable cadence in their transponder application processes.

For example, in one embodiment the present invention consists of an encoder for commissioning RFID transponders. The encoder consists of an RFID interrogator module adapted to enable encoding predetermined data according to a commissioning algorithm and communicating with an internal antenna, the antenna being adapted to encode the predetermined data on the RFID transponder; a memory storage device for storing at least a portion of the predetermined data; a processing means for controlling and communicating with the memory storage device, the RFID interrogator and the internal antenna; a means for providing a supply of RFID transponders, the transponders configured for tensile extraction from the encoder or, preferably from means for providing a supply of RFID transponders comprising a cartridge; and a means for presenting the RFID transponder within an operable range of the internal antenna or near field coupler to enable encoding of the predetermined data.

In further embodiments, the present invention includes a method for commissioning RFID transponders comprising: providing a roll or sheet of RFID transponders; providing a cartridge or other pre-packaged self-contained supply of RFID transponders; providing an encoder; inserting the roll or sheet in the cartridge or other pre-packaged self-contained supply of RFID transponders; coupling the cartridge to the encoder; acquiring information to encode from printed indicia; encoding the information on at least one RFID transponder; and adapting the process of attachment of the encoded transponder to the target surface along a vector that is nearly parallel to the target surface based upon real time feedback from the surrounding environment.

DRAWINGS

FIG. **1** is a block diagram of the system and environment according to one embodiment of the present invention.

FIG. **2** is a top view of a possible RFID transponder according to one embodiment of the present invention.

FIG. **3** is a schematic end-view of the RFID transponder of FIG. **2**.

FIG. **4** is a top view schematic drawing of a sheet or roll of a plurality of RFID transponders of FIG. **3**.

FIG. **5** is an offset orthogonal view of a mobile encoder according to one embodiment of the present invention.

FIG. **6** is a schematic block diagram showing some components of the mobile encoder of FIG. **5**.

FIG. **7** is a schematic cross section view showing electro-mechanical components of one embodiment of a mobile encoder.

FIG. **8** is a schematic cross section of an encoder according to the present invention.

FIG. **9** is a frontal-offset view of a hand-held, mobile encoder according to the present invention.

FIG. **10** is a schematic cross section of another encoder according to the present invention.

Plaintiff's Trial Exhibit No. 1
Page 24 of 43
ADASA-007441

US 9,798,967 B2

5

FIG. 11 is a flow chart of a smartphone scan and transponder encode method according to the present invention.

FIG. 12 is a flow chart of a tagging method according to the present invention.

FIG. 13 is a flow chart of a commissioning method according to the present invention.

FIG. 14 is a diagram of a serialization method according to the present invention.

FIG. 15 is a system block diagram according to the present invention.

FIG. 16 is a flow chart of a biometric authentication method according to the present invention.

FIG. 17 is a block diagram of the system and environment according to one embodiment of the present invention.

FIG. 18 is a top view of a possible RFID transponder according to one embodiment of the present invention.

FIG. 19 is a material stack specification of an RFID transponder according to one embodiment of the present invention.

FIG. 20 is a side view of a web of release liner containing RFID transponders, provided on a source roll, stretched tight around a peel device, and advanced forward onto a take-up reel according to one embodiment of the present invention.

FIG. 21 is a side view of a handheld mobile encoder with an integrated bar code scanner according to one embodiment of the present invention.

FIG. 22 is a diagram of a smartphone with FIPS 140-2 module and near field couplers according to one embodiment of the present invention.

FIG. 23 is a flow chart of a first method according to the present invention.

DESCRIPTION OF THE INVENTION

Making reference to various figures of the drawing, possible embodiments of the present invention are described and those skilled in the art will understand that alternative configurations and combinations of components may be substituted without subtracting from the invention. Also, in some figures certain components are omitted to more clearly illustrate the invention. In some figures similar features share common reference numbers.

To clarify certain aspects of the present invention, certain embodiments are described in a possible environment—as identification means for containers. In these instances, certain methods make reference to containers such as loaded pallets, paperboard boxes, corrugated cartons, pharmaceutical containers, and conveyable cases, but other containers may be used by these methods. Certain embodiments of the present invention are directed for use with steel drums, commercial corrugated shipping cartons, tagged pallet-loads of shrink-wrapped cases, consumer-goods packaging, consumer goods, automobile windshields, industrial components, or other methods of identifying objects using RFID transponders or wireless sensors, or both. In certain embodiments the target surface to which a transponder will be attached is a container. In some applications the target surface is moving while the encoder device is stationary. Furthermore the moving target surface may be objects on a conveyor. In yet other embodiments the target surface may be a web of release liner from which encoded transponders will be later removed and applied to an object for identification.

Some terms are used interchangeably as a convenience and, accordingly, are not intended as a limitation. For example, transponders is a term for wireless sensors that is often used interchangeably with the term tags and the term inlay, which is used interchangeably with inlet. This document generally uses the term tag or RF tag to refer to passive inlay transponders, which do not include a battery, but include an antenna structure coupled to an RFID chip to form an inlay which is generally thin and flat and substantially co-planar and may be constructed on top of a layer of foam standoff, a dielectric material, or a folded substrate. One common type of passive inlay transponder further includes a pressure-sensitive adhesive backing positioned opposite an inlay carrier layer. However, certain aspects of the present invention work equally well with active inlay transponders. A third type: a battery-assist tag is a hybrid RFID transponder that uses a battery to power the RFID chip and a backscatter return link to the interrogator. Further, this document uses programmable RFID transponders interchangeably with RFID transponders. Programmable transponders enable data to be written or stored more than once.

Suitable environments or applications for certain aspects of the present invention include: traditional conveyor line or other high-speed machinery with automated transponder printing, encoding, and attachment; hand attachment of transponders (a method that often is referred to as "slap and ship"); and a novel category of mobile transponder encoders (as will be more fully described herein); shipside receiving of automobiles; case picking operations that include selective tagging process steps; and receiving untagged cartons into an RFID-enabled retail store or a manufacturing plant.

The systems, methods, and devices of the present invention utilize an RFID transponder or wireless sensors as a component. Certain RFID transponders and wireless sensors operate at Low Frequencies (LF), High Frequencies (HF), Ultra High Frequencies (UHF), and microwave frequencies. HF is the band of the electromagnetic spectrum that is centered around 13.56 MHz. UHF for RFID applications spans globally from about 860 MHz to 960 MHz. Transponders and tags responsive to these frequency bands generally have some form of antenna. For LF or HF there is typically an inductive loop. For UHF there is often an inductive element and one or more dipoles or a microstrip patch or other microstrip elements in their antenna structure. Such RFID transponders and wireless sensors utilize any range of possible modulation schemes including: amplitude modulation, amplitude shift keying (ASK), double-sideband ASK, phase-shift keying, phase-reversal ASK, frequency-shift keying (FSK), phase jitter modulation, time-division multiplexing (TDM), or Ultra Wide Band (UWB) method of transmitting radio pulses across a very wide spectrum of frequencies spanning several gigahertz of bandwidth. Modulation techniques may also include the use of Orthogonal Frequency Division Multiplexing (OFDM) to derive superior data encoding and data recovery from low power radio signals. OFDM and UWB provide a robust radio link in RF noisy or multi-path environments and improved performance through and around RF absorbing or reflecting materials compared to narrowband, spread spectrum, or frequency-hopping radio systems. Wireless sensors are reused according to certain methods disclosed herein. UWB wireless sensors may be combined with narrowband, spread spectrum, or frequency-hopping inlays or wireless sensors.

System and Encoder Overview

Referring to FIG. 1 the present invention includes a system for commissioning wireless sensors at a point of use and on-demand. For example, in one embodiment, the present invention incorporates a mobile encoder device 30, which may be attached to a belt of an operator and powered by rechargeable batteries 60. The mobile encoder is in wireless communication with a remotely located host com-

Plaintiff's Trial Exhibit No. 1
Page 25 of 43
ADASA-007442

Appx83

US 9,798,967 B2

7                                                           8

puter. The operator can selectively (on-demand) enable the mobile encoder to commission a transponder based on various criteria, including input received from a mobile bar code scanner, for example.

FIG. 1 shows one system 10 according to the present invention in a typical environment, such as a packaging facility wherein a collection of entities with visual external labels 15 exist and a sub-set (or all entities) need to be associated with a wireless RFID transponder, tag, or label. The object 17 needing an RFID transponder could be a packing container having an assorted collection of entities 15. As entities 15 are pulled from collection 176, a traditional optical reader 13 (human or machine) interprets the visual external label. Information from the external, visual label is correlated to information stored in a centralized location, represented by a network computer 11 having a database. The information taken by the optical reader 13 is transmitted to the network computer 11. System 10 includes a wireless connection between the remote computer 20 and the mobile encoder 30 either directly or through a common wireless access point. Additionally, a wireless connection could occur between the remote computer 20 and the host computer 11, and in this embodiment, the remote computer 20 is in physical connection with the mobile encoder. In yet another embodiment, the remote computer 20 wirelessly connects to both the mobile encoder 30 and the host computer 11. Optionally, the optical reader 13 can be incorporated in the encoder 30.

Referring to FIGS. 3 and 4, in further embodiments, the present invention incorporates a mobile encoder device 175, 30, or 220 which may be held in the hand of an operator. Mobile encoder device 175, 30, or 220 is preferably powered by rechargeable batteries or a fuel cell. System 170 includes at least four possible intermittently connected entities if they are present and connected: mobile encoder 175, remote computer or mobile phone 154, optical reader 173, and headset 174. A preferred short range wireless connection means 175A such as a WLAN (Wireless Local Area Network) or PAN (Personal Area Network) may be established from time to time between mobile encoder 175 and remote computer or mobile phone 154, optical reader 173, and/or headset 174. There is a preference for low power wireless connection apparatus within mobile encoder 175 so as to realize the greatest possible battery life in light weight mobile encoder 175. Mobile encoder 175, 30, or 220 is in intermittent wireless communication with a mobile phone or computer 154 typically at close range through wireless communication means 175A. Database and associated host computer 171 may be housed at a remotely located facility that may optionally be accessed over a large distance through remote computer or mobile phone 154. A mobile phone is a preferred bridge between two or more wireless networks, for example a PAN and a wireless subscriber network that supports wireless data services for ultra mobile and remote tagging applications. Continuous wireless connection to a host database is not required for ongoing tag commissioning process steps disclosed herein.

RFID tags such as those using EPCglobal numbers requires uniqueness of the numbers that are encoded. GS1 is a central authority that prescribes a set of hierarchies for each key type (type of identity such as an SGTIN) whereby GS1 designates itself as the central issuing authority for each key type. Authority is passed down in a hierarchical manner to member companies. Each member company has the authority to further allocate numbers from its upper level

database to as many lower database levels as it deems necessary to distribute number authority throughout its enterprise.

Quasi-autonomous RFID transponder encoding authority is achieved when an external number issuance authority allocates to the encoder blocks of numbers for specific object classes. A preferred embodiment for quasi-autonomous transponder encoding authority is realized when large pre-authorized blocks of serial numbers are made available to encoder 175 or 30 to utilize on object classes as objects of a class are presented for tagging. A preferred method of providing pre-authorized blocks of object class serial numbers is to subdivide the entire object class serial number space into sectors that are defined by a limited number of MSB's (Most Significant Bits) of the serial number field. The object class serial number space is defined by the number of serial number bits that are used in a specific standard, such as a particular EPCglobal key type, for example an SGTIN-96 and is defined in a corresponding specification such as the GS1 EPCglobal EPC Tag Data Standard. Again using the SGTIN-96 as an example, there are a total of 38 bits used to define the entire serial number space which contains $2^{38}$ unique numbers. For example the upper 14 bits could be designated as the most significant bits for a particular embodiment. In that case the object class serial number space would be comprised of 16,384 sectors. Since in this example there are 14 most significant bits within a 38 bit serial number field, there must be 38 minus 14 bits of lesser significance, which equals 24 bits. Therefore the lower 24 bits represent 16,777,216 unique serial number values. Once a sector is allocated to a lower level within an authority hierarchy, it is referred to as a block. Each allocated block of serial numbers represents authority for encoding objects of an object class that can either be used by an encoder for encoding transponders, or allocated to a lower level in the authority hierarchy.

In a preferred embodiment serial number block sizes are sufficient to operate encoder 175 or 30 for extended periods of time without any further external authorization steps. For example autonomous operation for a week or more is possible with sufficiently large block sizes. In the previous example the encoder could encode over 16 million objects of an object class without the need to reconnect with a higher level authority. If 10,000 objects of an object class are encoded each day, then the encoder could operate in a quasi-autonomous mode for up to 1677 days or over four years without receiving further authorizations from a higher level authority. Block allocations are preferably assigned with reference to how many encoders 175 or 30 are authorized to operate within the facilities of the owner of certain object class numbers.

Authorizations for one or more classes of objects are preferably loaded into encoder 175, 30, or 220 from an external authority where such authorizations include data fields such as manufacturer ID, item reference, manufacturer code lengths, filter values (that designate packaging levels such as item, case, pallet, etc.), serial number starting point for a block, and other pre-determined parameters. Such information is preferably loaded into the memory of the encoder in advance of tag commissioning operations. Thus if loaded with information for more than one object class, encoder 175, 30, or 220 does not have sufficient information to proceed with encoding a transponder until a single object class is selected for the present RFID transponder to receive; an ambiguity therefore exists that is preferably resolved with information entered by an operator using either a keypad or a bar code scanner. Reading printed indicia such as a bar

Plaintiff's Trial Exhibit No. 1
Page 26 of 43
ADASA-007443

US 9,798,967 B2

9

code is a preferred method to resolve the ambiguity as to which object class the next RFID transponder is to receive a number from. Bar codes are used to eliminate errors and ambiguities that enable encoder **175**, **30**, or **220** to locally generate or replicate data for encoding into a data carrier such as an RFID transponder.

GS1 is a leading global organization dedicated to the design and implementation of global standards and solutions to improve the efficiency and visibility of supply and demand chains. GS1 defines EPCglobal SGTIN number fields as having a company prefix, an item reference, a partition value, and a filter value that comprise the object class information. A unique serial number is then added to that information to create each unique instance within each object class.

In a preferred embodiment, a block is allocated and managed using three numbers: a starting number that is the first serialized instance of a block, a block size which represents the total number of instances in the block, and a counter or index that represents how much of the block has been used during an encoding process. Using these three numbers and an optional lock bit, a simple database of object class authorizations can be built.

A preferred embodiment utilizes RFID authorization transponder **178**A and a printed substrate **178**B to physically handle object class serial number issuance authorizations. Authorization transponder **178**A is interrogated by transponder reading/encoding means **175**H. Preferred embodiments use the 96-bit EPC memory bank for specifying the block starting number, including the company prefix, item reference, partition value, filter value, and base serial number. The User Memory bank is used to hold and transfer the block size (preferably 16-bits), counter or index value (preferably 16-bits), a 16-bit header to identify the transponder as a valid member of a class of authorization transponder, a lock bit, and a CRC value to detect errors in all of the data fields. For example a CRC error would detect errors in storage, transponder selection, or data transmission. In preferred embodiments reading of data blocks from more than one RFID transponder would be avoided by selecting a transponder, checking that it is the correct type, contains valid authorization data, contains a valid header that signifies that it is an RFID authorization transponder **178**A, and that all data read correctly verifies with a dedicated error detection field such as a CRC.

RFID authorization transponder **178**A is preferably adhered to printed substrate **178**B so that an operator can visually identify what object class or SKU is managed by the affixed authorization transponder **178**A. A picture, icon, bar code, or human readable symbols are all useful for identifying the object class. An operator presses a button or scans a bar code that prompts encoder **175** to read and store the tagging authorization held by authorization transponder **178**A. Once read, authorization transponder **178**A is preferably electronically marked as 'consumed' or 'locked' by transponder encoding means **175**H. EPC transponder ID fields that identify a specific type of chip are preferred for selecting the proper transponder, even when other RFID transponders are within range of the antenna or near field coupler of transponder encoding means **175**H.

A collection of authorization transponders **178**A comprises a database that can be physically transported without the need for a wireless communications link to encoder **175**. Once read, database records are preferably stored in internal memory means **175**G. In a preferred embodiment 12 to 14 bytes of Flash memory is used for each record to allocate 250 to 65536 instances of an object class, whereby the first

10

byte of an EPC number is a fixed header value can be replaced in Flash memory by 8 bits of the allowable block size. One or two bytes in RAM are used to count or index through the block allocation as it is used. Thousands of data records of this type can easily fit into the memory space of an economical 8-bit microcontroller. In a preferred embodiment, where the GS1 SGTIN-96 header is replaced in memory with an 8-bit block size authorization, 300 records for authorizing up to 255 instances per record, can be used to safely manage at least 500,000 tagging records using 24,000 bytes of Flash memory and 2000 bytes of RAM. Other embodiments using more bits to authorize and control larger blocks of numbers is possible at a slightly larger expense of memory.

A preferred embodiment uses a computer, preferably a smartphone such as an iPhone from Apple Inc. of Cupertino, Calif. as a lower database level to transfer encoding authorizations from upper level database authorities to RFID encoders. A smartphone such as the iPhone or an Android phone using software from Google would be a preferred embodiment of a lower database level and or an encoder using an antenna or near field coupler similar to near field coupler **224**A2 of FIG. **21** or **238***a* or **238***b* of FIG. **22** to couple with RFID transponders for encoding and verification. The iPhone also has cellular data transmission radios and software stack to enable the iPhone to access remotely located servers in a cloud computing architecture.

The smartphone establishes a connection with a cloud-based server using JavaScript, ASP, JSP, PHP, Perl, Tcl or Python scripts to access a database such as mySQL that is available from Oracle Corporation of Redwood Shores, Calif. Using structured query language, SQL database tables are preferably used to store tag commissioning data, configuration information, and serial number block allocation records. SQL queries provide information from database tables to the script, passing the result over the Internet, to the smartphone, which also then routes information to designated RFID encoders. Encoders are preferably identified by their media access control (MAC) address or a UUID which is guaranteed to be unique and is used by the smartphone as a lower database level to transfer encoding authorization to a specific encoder.

Preferred embodiments of encoder **175**, **30**, or **220** will encode all of the GS1 identity types. Such types include the General Identifier (GID-96), Serialized Global Trade Item Number (SGTIN), Serial Shipping Container Code (SSCC), Serialized Global Location Number (SGLN), Global Returnable Asset Identifier (GRAD, and the Global Individual Asset Identifier (GIAI). Other preferred embodiments are used to encode numbers that are a part of other numbering systems.

Data records are preferably loaded and stored through commands that are transmitted over wireless communication means **175**A. In preferred embodiments, batch mode commands can be used in any of three ways: (1) to immediately affect the current operation by starting a batch tagging process for a specified SKU or object class; (2) to store authorizations in memory means **175**G; and (3) to store authorizations in stored-value RFID transponder **178**A.

When external connection is necessary, wired or wireless communication with an external host or numbering authority is established. Wireless communication means **175**A is preferably a Wi-Fi or Bluetooth connection. A wireless node of a Bluetooth personal area network is used according one embodiment of the present invention. Model 100-SER manufactured by EmbeddedBlue of Poway, Calif. and the BISMS02 from EZURiO Ltd., a subsidiary of Laird Tech-

Plaintiff's Trial Exhibit No. 1
Page 27 of 43
ADASA-007444

US 9,798,967 B2

11                                                    12

nologies, Inc. of Chesterfield, Mo. are examples of preferred OEM Serial Bluetooth modules. Other wireless interfaces may alternatively be used to achieve Serial Port Profile and other types of connectivity between encoder 175 and remote computer or mobile phone 154 and/or optical reader 173.

Other preferred embodiments of mobile encoder 175 and system 170 replace wireless communication means 175A with a cable, resulting in an embodiment of mobile encoder 175 with a tethered bar code scanner. A key advantage of an alternative embodiment of system 170 that utilizes a wired connection to optical reader 173 instead of wireless communication means 175A is a very simple solution having virtual immunity to any surrounding RF interference that might raise the noise floor hindering wireless communications.

The operator can cause mobile encoder 175, 30, or 220 to commission a transponder by scanning certain printed bar code symbols received through optical reader 173 which is connected to encoder 175 through wireless communication means 175A. Or alternatively internal optical reader 175F is used to scan printed bar code symbols. In either case data from optical reader 173 or 175F is delivered to processing means 175B. Certain preferred embodiments of system 170 use optical scanners with self-contained symbol decoding capabilities to deliver decoded symbol information to processing means 175B. Certain other embodiments of system 170 relies on processing means 175B to conduct some or all decoding operations to derive information from scanned symbols.

The information derived from the optical reader 173 or 175F is used by mobile encoder 175 to either directly or indirectly encode data into RF transponder 178 while it is still physically within mobile encoder 175. Mobile encoder 30 uses external optical reader 173, and alternatively mobile encoder 220 uses internal optical reader 175F, as embodied in reader 226 of FIG. 21. Preferred embodiments of optical reader 226 are mechanically aligned relative to transponder encoding means 175H or more specifically with the antenna or near field coupler of RFID interrogator 224A. Spatial alignment assures that an operator will be able to comfortably scan bar codes and then encode and apply RFID transponders along a line of movement such that the operator can easily assure proper placement of encoded transponders.

Symbol decoding functions may be physically, electrically, or logically separated from symbol scanning operations. One preferred embodiment of optical reader 173 is a model CHS-7M, CHS-7P, CRS-9M or CRS-9P Bluetooth ring scanner.

Processing scanned commands involves a processing step to determine that a bar code should be interpreted as a command or configuration instructions rather than as bar code 179 that identifies an object that is to be tagged. Commands are used to alter the flow and operation of mobile encoder 175.

FIG. 21 is a preferred embodiment of a mobile encoder wherein optical reader 226 is an OEM bar code scanner manufactured by such companies as Intermec or Motorola and is a preferred embodiment of optional internal optical reader 175F shown in FIG. 17.

In a preferred embodiment one or more bar codes are pre-printed and applied as symbol 179 on entity 177 in a manufacturing facility or other suitable location. Such bar codes are described in ISO/IEC draft document PDTR 24729-1 and are more generally referred to as one or more bar codes having Application Identifiers (AI) 01 and 21 encoded into them, and preferably include header informa-

tion and other control bits that are required for certain protocols. AI 01 is used to represent the Stock Keeping Unit (SKU) as a GS1 Global Trade Item Number (GTIN). AI 21 is used to serialize the SKU. Together the two AI's are used to specify a GS1 serialized GTIN (SGTIN). Bar codes can also be used to specify data payloads that use numbering systems other than the EPC numbering system. The Application Family Identifier (AFI) also plays an important role in designating alternative numbering authorities.

This preferred method that is described by the flow chart in FIG. 23 will allow batch mode operation where there are at best intermittent connections with remote computer 154. This preferred method allows existing label application and/or printing hardware located on existing manufacturing lines to provide in printed symbolic form all data that would be encoded into an RF transponder. By providing printed symbols, manufacturers do not have to incur either the cost of that transponder or the special equipment that is required to encode and apply RF transponders.

Optical reader 173 or 226 is described above and is used as the primary source of real time data input for the mobile encoding system that uses an embodiment such as mobile encoder 30 or 220. Optical reader 173 or 226 is also preferably used to scan special bar codes that instruct mobile encoder 175, 30, or 220 to perform certain prescribed functions which will be described below.

Certain preferred embodiments of system 170 include headset 174 which may be a headset worn by the operator or a Bluetooth-linked loud speaker that is mounted to a pallet jack or fork lift truck. Headset 174 is optionally used by system 170 to give instructions, confirmation signals, or warnings to the operator. Synthesized speech or audible tones are used to interact with the operator through headset 174.

In these aforementioned embodiments, the mobile encoder 30 is a portable device that can be easily mounted in a fixed location, carried such as mobile encoder 220, or worn by a human operator such as mobile encoder 30, or hung from a suspended retractable tool cable. As such, the mobile encoder 30 includes an internal power source 175E such as a rechargeable lithium-ion battery and would further include a handle or a belt-clip for ease of use. In another embodiment, the mobile encoder can be attached to a high-speed conveyor line. In such an application, the on-board battery could be replaced or augmented by a physical connection to a remote power source. Further, the computer 20 could have wired connects to the host network 11. Further details of possible configurations of the mobile encoder will be further detailed in subsequent sections of this disclosure.

In the system 10 of FIG. 1, the mobile encoder 30 carries a supply of un-commissioned (or blank), or securely encodable RFID transponders 175J, 185, 42, or 221E. Once the desired data is accumulated and presented to the encoder 30 from the computer 20, the encoder commissions an RFID transponder, using transponder transport means 175C and transponder encoding means 175H and any one of several preferred encoding algorithms to program, creating an RFID tag or label 50 for the object 177. Transponder separation means 175D is used to separate a properly encoded transponder 178 from release liner conveyance web 182 by breaking the bond at adhesive layer 181D on the leading edge of transponder 178. Transponder separation means 175D is preferably a peel device 183 as shown in FIG. 20 or peel device 222B in mobile encoder 220. Peel devices 183 or 222B are preferably made from anti-static plastic, metal, or other material that will conduct electrostatic charge away from transponder 178 and release liner 182. The commis-

Plaintiff's Trial Exhibit No. 1
Page 28 of 43
ADASA-007445

Appx86

US 9,798,967 B2

13                                                                                    14

sioned tag or label **50** can then be applied, linked, or otherwise associated with the object by known means including a human operator or a machine transfer.

RFID Transponders

FIG. **2** shows a preferred embodiment of an RFID transponder **50**. RFID transponders, in some embodiments, comprise an RFID integrated circuit (IC) device (or "chip") **56** of FIG. **3** or **180** of FIG. **18** bonded to an antenna apparatus, formed on a substrate that is often plastic such as Mylar®, polyester, or PET. One way to form an antenna structure is to etch copper from a substrate. An alternate printed transponder includes printing multiple layers of conductive ink onto a substrate. One additional method includes stamping UHF antennae from thin sheets of aluminum, or by selective aluminum deposition onto a substrate. In certain embodiments, RFID transponders and wireless sensors are recovered from waste streams for reconditioning, reprogramming, and reuse.

Other suitable RFID transponders include designs that combine a dielectric spacer behind the antenna by separating the metallic antenna inlay **181**C from surrounding metals that may detune it, or liquids that may absorb RF energy from it. The dielectric spacer creates a transponder that performs well over a broad range of packaging conditions. The dielectric material is a foam standoff material or an expanding mechanical structure that provides lift from the target object and also a more robust design also includes features to protect the transponder from damage.

In certain embodiments, the RFID transponder is both programmable and mechanically configured for tensile extraction from a protective enclosure.

In preferred embodiments, hundreds or thousands of instances of RFID transponder **178** are manufactured on a continuous web of flexible material with a spatial separation between them, preferably at regular intervals. Certain preferred embodiments use adhesive-backed transponders **178** adhered to release liner **182** as shown in FIG. **20**, while other embodiments use the transponder material as its own conveyance that is severed from the rest of the web at predetermined locations, preferably after encoding and verifying transponder **178** is properly functioning.

In preferred embodiments of the present invention, the face stock material has a physical outline that is not much larger than the physical outline of the inlay itself. This is in contrast to labels which can have at least twice the surface area of the inlay or a direct-printed antenna structure in order to provide space for printed information. By having a label outline that is so much larger than the inlay surface area, there are a many possible combinations of inlay placement within the boundaries of a large printable label. This creates a problem and a challenge for printer/encoders that have to find and locate an inlay before attempting to encode it. By contrast, the present invention uses the detectable optical characteristics of the tag's minimal physical outline to position the transponder for encoding. This transponder positioning method is superior and an improvement over prior art that uses printed label stock as a carrier for RFID inlays wherein the physical dimensions of printed labels are not in any way a reliable indication of the location of the RFID inlay within the label. This is another example of how demand label printing further complicates RFID transponder encoding.

In one embodiment that is an exception to the minimal outline transponder design and positioning method described above, transponders that have a very long physical shape can be used to create a loop to secure an encoded transponder to a tree, a bush, or the handle of a piece of luggage. Preferred embodiments of such transponders are folded or rolled in order to package them onto a dispensing roll or packaged into a magazine or cartridge in a fan fold pattern. The resulting bundle of back-and-forth 'Z' folded or fan folded face stock material results in a compact package that minimizes the amount of release liner that needs to be wasted for each tag. Each z-folded transponder is then easily encoded and dispensed from encoder **175**, **30** or **220**. Transponders that can be encoded, verified, dispensed, and unfolded are advantageously used in forestry, ornamental nurseries, and airline baggage tracking applications where manual tagging is required.

In another embodiment, transponder **178** is pushed out of encoder **175** instead of being pulled out through tensile extraction. A transport mechanism for pushing transponders utilizes a gripping method such as friction or teeth that penetrate the webbing. Although there is a risk of jamming or mutilating the webbing, the advantage is that there is no need for a release liner to pull the transponder supply through encoder **175** using tensile extraction. A preferred 'tractor feed' embodiment mitigates the risk of web mutilation by utilizing a regular pattern of precut holes along one or both edges of the webbing, into which cog members of a drive mechanism engage to advance the webbing. A tractor feed embodiment is part of Transponder Transport Means **175**C of FIG. **17** whereby a motor and gear train delivers drive torque to the web through friction rollers, penetrating teeth, cogs, or other mechanical engagement means. In such an embodiment, the preferred transponder separation means is a web cutter that is used to separate encoded transponders from unencoded tags. A web cutter can be either active or passive, in other words cutting force can originate with a motorized mechanism or with an operator's handling during dispensing and transponder detachment. A row of plastic or metal saw teeth is a preferred embodiment of a passive transponder separation device.

In another preferred embodiment, transponder **178** is manufactured on a high speed press, a bar code is printed onto face stock of transponder **178** and information that is representative of that bar coded information is also encoded into microchip **180**. Then encoder **30** or encoder **220** preferably read that information from RFID microchip **180** and associate it with a transponder commissioning process that may or may not include the programming of additional information into RFID microchip **180**. This is a novel method of reading bar coded information on transponder **178** without using a bar code scanner to do so within encoder **30** or **220**.

In one embodiment, additional transponder layers include a thin and flexible energy cell comprising two non-toxic, widely-available commodities: zinc and manganese dioxide. One suitable energy cell is developed by Power Paper Ltd. of 21 Yegia Kapayim Street, Kiryat Arye, Petah Tikva, P.O.B. 3353, ISRAEL 49130, and incorporates an innovative process that enables the printing of caseless, thin, flexible and environment-friendly energy cells on a polymer film substrate, by means of a simple mass-printing technology and proprietary inks. The cathode and anode layers are fabricated from proprietary ink-like materials that can be printed onto virtually any substrate, including specialty papers. The cathode and anode are produced as different mixes of ink, so that the combination of the two creates a 1.5-volt battery that is thin and flexible. Unlike conventional batteries, this type of power source does not require casing.

A top layer of an RFID transponder assembly optionally comprises a paper face-stock **181**A, which is a very low-cost material but also is the least environmentally resilient.

Plaintiff's Trial Exhibit No. 1
Page 29 of 43
ADASA-007446

Appx87

US 9,798,967 B2

15 16

UV-resistant plastic face-stock 181A generally provides the best survivability in outdoor and rough-service environments, and also provides the best protection for the RFID transponder assembly.

A bottom layer of pressure-sensitive adhesive (PSA) 181D often is used for attachment of transponders to objects and often is referred to as a wet inlay or a wet tag or a wet transponder because of adhesion layer 181B. Alternatively, a layer of clear, translucent, or opaque adhesive-backed film or tape is used to attach the transponder or wireless sensor to object or container. The tape, any thin, low cost, flexible material with a self-adhesive backing, such as a conventional packing tape, is well-suited for this method of attachment. The tape may be formed into various shapes to achieve the requirements of this method. Certain embodiments may use tape that is preprinted with certain logos, marks, symbols, bar codes, colors, and designs. Suitable adhesive-backed tape must not—or at least minimally—absorb radio frequencies within the range of frequencies used by the transponder or tag. The tape material, also, must not corrode the device or otherwise hamper its functionality.

Certain embodiments use a type of packing manufactured specifically for a given encoder. Packing tape can be single-coated pressure-sensitive adhesive tape or, alternatively, media constructed with multiple layers including a backing layer. Certain backing layers are constructed on a plastic film having one or more layers. Certain backing layers are made from plastic resins such as polypropylene (PP), polyethylene (PE), or copolymers of PP, PE, PVC, polyesters, or vinyl acetates. Certain embodiments of PP are mono-axially oriented polypropylene (MOPP), bi-axially oriented polypropylene (BOPP), or sequentially and bi-axially oriented polypropylene (SBOPP). Certain backing layers are biodegradable. Certain backing layers are coated with a pressure sensitive adhesive on one side and a low adhesion release coating on the other side to reduce the amount of power required for the encoder to unroll the tape for application.

FIG. 3 shows a possible embodiment of an RFID transponder 50 that does not include an encapsulation layer comprising a separate tape. In this example, an adhesive layer 52 bonds with antenna layer 54 that is bonded to inlay substrate layer 58 and integrated circuit 56. Inlay substrate layer 58 and face-stock layer 51 provide resistance against electrostatic discharge (ESD) into antenna layer 54 or chip 56.

Other constructions for RFID transponders include one or more additional layers of high-dielectric material that encapsulate or substantially cover the inlay. In general, the thicker the dielectric layer the higher the voltage must be to initiate a flow of electrons through a dielectric layer. This results in higher ESD voltage ratings. Also, it is well known to those skilled in the art that thicker dielectric layers between antenna layer 54 and any other metal or liquid also tends to reduce parasitic loading of the antenna whereby maintaining antenna tuning for proper coupling to interrogators within a specified UHF band. In such embodiments, the integrated circuit chip and antenna bond to an adhesive layer and are protected from a discharge path through the tape layer by its particular thickness of dielectric material. A second dielectric layer bonds to the inlay substrate by a second adhesive layer, so that a low voltage discharge path is nonexistent around the two layers of tape substrate.

In another possible embodiment of an RFID transponder, the inlay substrate provides a second layer of ESD resistance against a discharge path through an outward-facing tape layer and associated adhesive layer. This construction protects the antenna and chip from electrostatic discharge originating from any direction. The encapsulation tape layer bonds to the antenna and chip via an adhesive layer and provides no adhesive bond to the transport container when the transponder is commissioned, and therefore depends on separate adhesive zones to attach to the container of interest.

In another possible embodiment, an RFID transponder includes multiple layers of ESD resistant material. For example, an outer layer substrate bonds to an inner substrate by an intermediate adhesive layer. A second adhesive layer bonds with the chip and antenna. The inlay substrate faces inward and presses against a transport container when the transponder is commissioned.

The contemplated adhesives in the various RFID transponder embodiments create strong and permanent bonds between tapes and inlay layers over a certain practical range of operating temperatures.

Because RFID transponders are designed to adhere to a container, one face of an external layer includes a pressure-sensitive adhesive. This external adhesive, however, must not cause mechanisms associated with the commissioning devices to jam. To prevent unwanted sticking of the RFID transponder, a transport layer protects the sticky, external adhesive. The transport layer is either a release liner such as a silicone-treated paper liner or a net (or mesh) web. A net or mesh web offers two principal advantages: less weight and being recyclable or reusable. A comparison of the weight of a net with a higher percentage of open area to a typical sheet of release liner reveals that the netting is lighter for any given section of comparable size. Environmental problems of disposal of release liner are well known. Mesh or netting, comprised of recyclable resins, is recovered after each use so that the mesh or net can be either reused or recycled for its constituent materials.

In one possible embodiment the mesh or netting is made of plastic such as nylon, polypropylene, polyethylene, HDPE, Teflon, or other resins. In other embodiments the mesh or netting is fabricated from metal or carbon-impregnated plastic to provide a conductive path to bleed electric charge away from points of accumulation.

Other advantages of a net or mesh transport layer include a substantial percentage of the adhesive not in contact with anything during storage and commissioning. When stored in a roll, a small percentage of the adhesive layer makes contact with the backside of the roll through the openings in the mesh. Thus, a small amount of energy is required to unroll the spool during transponder commissioning, yet there exists a certain amount of adhesion to prevent a converted spool from unraveling.

In other possible embodiments, the RFID transponders can include a surface suitable for human or machine readable, visible, external markings including bar-code symbols or alpha-numeric sequences.

FIG. 4 shows another embodiment of RFID transponders 50 grouped on sheet stock 59 such as rolls or z-folded sheets that enables a plurality of transponders to be carried on a continuous web or traditional release liner. Other certain embodiments use transponders that are stacked and loaded into magazines for transport, handling, and automated dispensing. In certain embodiments, the magazines contain metallic shielding to protect transponders and inlays from electrostatic discharges (ESD).

In certain embodiments an RFID encoder is combined with a sensor suite 218 as shown in FIG. 10 to enable semi-automated tag application to desired objects. In one embodiment, a semi-automatic encoder/applicator is created by integrating a single sensor device. The sensor responds to

Plaintiff's Trial Exhibit No. 1
Page 30 of 43
ADASA-007447

US 9,798,967 B2

17 | 18

changes in light, capacitance, pressure, acoustics, or optical path length to a transport container. In another embodiment a suite of sensors are used to detect the attachment location of a commissionable transponder.

For example, changes in capacitance are detectable using certain QProx charge transfer capacitance sensors available from Quantum Research Group Ltd. of Hamble, England. Ultrasonic range sensors are available from supplier such as muRata Manufacturing Co., Ltd. of Kyoto Japan under the trade name Piezotite. Optical path length sensors are available from Keyence Corporation of Osaka, Japan. Sharp manufactures a compact distance-measuring sensor GP2D02 that is responsive in the range from 5 to 100 cm. Thus, when a predetermined set of conditions is realized, the sensor triggers, enables, or selects a desired action. In one embodiment, proximity or contact of sensor suite with the targeted transport container causes a second type of Trigger Event, resulting in the commissioning and dispensing of a transponder by an encoder.

In other embodiments, sensor **218** is designed to determine the distance an encoder resides from an object that is to be tagged. Range information is acquired and processed in real time to determine if the encoder is in Close Proximity, Near, or Far from a transport container. In certain embodiments a controller is programmed to alter threshold distances between each range category and to associate a function with each range. In certain embodiments, range category Close Proximity is associated with transponder programming and application functions. For example, the range category Near is reserved for transponder verification and/or reading functions; and Far is reserved for bar code scanning functions to verify that bar code information aligns properly with RFID transponder data.

In other embodiments a sensor suite is responsive to certain colors or patterns and uses that information to instruct the placement or detect the correct locations for applying good transponders and separate locations for discharging bad transponders.

FIG. **20** also shows how transponders **178** are rolled onto reels in preparation for encoding. Source roll **185** contains a supply of transponders ready for encoding. Release liner **182** conveys transponders **178** around peel device **183**. Unless transponders **178** are mechanically prevented from rotating around peel device **183**, they are conveyed onto take-up roll **184**. Take-up reel **184** advances forward while source roll **185** lags behind due to drag created by a clutch, brake, motor or other back-torque generating device. Opposing torques of take-up reel **184** and source reel **185** result in tension in release liner web **182**. Shape memory in face stock **181A** preferably prevents transponder **178** from remaining adhered to release liner **182** as it passes over peel device **183**, resulting in the leading edge lifting off and separating from webbing **182**. If take-up reel **184** continues to advance, and transponder **178** does not collide with another object, its attachment to release liner **182** on its trailing edge will result in that transponder being passed completely around peel device **183** onto take-up reel **184**. Full path rotation is preferably reserved for transponders that fail to properly encode desired information; and is therefore intended to be a reject process for failed transponders. Preferred embodiments result in tension created in web **182** in a process of tensile extraction of transponders from a source reel and selective transfer of good transponders onto an object or a person's finger. Mobile encoder **30** depends on a person's finger to prevent transponders **178** from rotating around peel device **183**. Mobile encoder **220** depends on a target object

such as carton face **228** to prevent transponder **223**B from rotating around peel plate **222**B on a path toward take-up reel **221**J.

When the conveyance of RFID transponders results in the positioning of a transponder relative to a near field coupler within a signal null, the transponder and transport webbing are preferably nudged forward or backward to improve the signal coupling. This is preferably accomplished by momentarily activating the motor and transponder transport means **175**C.

Mobile Encoder

FIG. **17** shows a system **170** according to one embodiment of the present invention including a mobile encoder **175**. FIG. **5** shows a preferred embodiment for a mobile encoder. Mobile encoder **30** is comprised of housing **32**, belt clip **34**, antenna **36**, on/off switch **33**, system ready LED **37**, data ready LED **38**, and transponder ready LED **39**. It is further comprised of auxiliary switch **40**, and charger plug **41**. A cartridge or other pre-packaged self-contained supply of transponders **42** is preferably latched, snapped, clicked, popped, inserted, slid, or releasably mounted to the body of housing **32**. The cartridge preferably includes a take-up reel **44** for non-dispensed RFID transponders, and a port through which blank or securely encodable transponders emerge from source reel **43**. The source reel is preferably comprised of a core which may be made from plastic or a recyclable kraft paper fiber to form a wound tube. A tube extends from the walls of cartridge **42** to form an axle around which release liner and transponders are wound and subsequently unwound.

In certain preferred embodiments source reel or roll **43** is constructed using materials such as non-petroleum-based plastics, laminated paper layers, and materials primarily comprised of natural fibers. In another preferred embodiment the entire pre-packaged self-contained supply of unused transponders is transported to mobile encoder **175**, loaded into it, consumed, and disposed of preferably without generating landfill waste.

A key aspect of this invention is a complete pre-packaged, pre-assembled, pre-threaded, self-contained supply of encodable transponders, preferably unlocked with cryptographic access methods. The supply is preferably configured for efficient transportation and shipping, conveyance to a work site, and easy loading into mobile encoder **175**, preferably in a single fluid motion.

FIG. **21** is a preferred embodiment of system **170** wherein printed symbols are optically scanned by internal optical reader **226**. The embodiment shown in FIG. **21** uses a preferred method of sensing the linear motion of mobile encoder **220** across a target surface by using an optical mouse sensor **225**. Such devices are commonly used to track the hand movements of the operator of a computer. Motion in either the X or Y direction is translated into numerical displacement representations which when timed are converted into linear velocities. Tracking and processing the primary axis of motion parallel to the major axis of the release liner, the web speed is preferably controlled by processing means **175**B and transponder transport means **175**O such that transponder **223**A advances at a rate of speed that matches the velocity of the entire mobile encoder across the target surface. Optical mouse **225** tracks displacement across the target surface and also acts as a tamp head to strengthen the adhesive bond of each freshly applied tag. The process of attachment of the encoded transponder to the target surface is along a vector that is nearly parallel to the target surface at a speed that is based on real time feedback from the surrounding environment as sensed by the optical

Plaintiff's Trial Exhibit No. 1
Page 31 of 43
ADASA-007448

Appx89

US 9,798,967 B2

19 20

mouse or other sensor. Optical mouse sensor **225** preferably illuminates its target surface with either a LED (Light Emitting Diode) or a laser. Avago Technologies of San Jose, Calif. manufactures a variety of mouse sensors, both LED-based and laser-based. Laser illumination provides smooth and accurate motion sensing across a variety of surfaces. The model ADNS-6150 small form factor lens working in conjunction with the ADNS-6530 integrated chip-onboard laser sensor and single-mode vertical-cavity surface emitting laser can be used to not only detect motion in the X and Y directions, but also to some degree in the Z direction. Displacement along the Z (depth) vector is reported by the decrease in the number of resolvable features within the field of view as the target surface fades away from the optical focal point. That measurement is reported in the surface quality (SQUAL) register.

Optical mouse sensor **224**B is used to measure the linear velocity of transponders as they move along the path of the release liner toward peel device **222**B, as well as sense the gaps and edges between transponders **223**A and those adjacent to them. The physical outline **178** of transponders **223**A are a reliable indication of the location of RFID inlay **181**C located within each transponder **223**A and enhance system performance with reliable positioning relative to near field coupler **224**A2. The angular velocity of motor **227**B and gear train **227**A are controlled to achieve a linear transponder velocity that matches the velocity of the mobile encoder itself as it moves across the target surface. Therefore an operator with a fast hand motion is just as successful as a person with a slower hand motion, both will result in a transponder that lays flat, co-planar with the target surface, void of kinks or wrinkles that are characteristic of a poorly controlled transponder application process. In either case, transponder dispensing by transponder transport means **175**C will not initiate until optical mouse sensor **225** preferably illuminates the target surface and detects a minimum number of valid features as reported by the SQUAL register internal to the ADNS-6530.

RFID Interrogator **224**A encodes RF transponders using either LF (Low Frequency), HF (High Frequency), UHF (Ultra High Frequency), or microwave radio energy. Transponders may be powered by radio energy, light, or stored energy from a source such as a battery. RF coupling is preferably through a near field coupler, an inductive loop or other suitable transducer **224**A2 connected to interrogator **224**A to focus RF energy on a small area within mobile encoder **175**, **30**, or **220**.

Certain preferred mobile encoder embodiments will not encode RF transponders that fail authenticity tests. In a like manner, RF transponders will preferably not allow themselves to be programmed unless the interrogator can successfully unlock its secured memory banks. This is a preferred method of protecting transponder cartridge and mobile encoder supply chains from counterfeits and knockoffs. Mobile encoder **175** and the transponders loaded into it will only be successful in exchanging certain data if certain data encryption and challenge response protocols are adhered to. In a preferred embodiment each authorized RFID transponder converter company uses one or more encryption keys to generate passwords that lock the RF tags, whereby preventing them from being programmed unless they are unlocked using the same password. Passwords of this type are specified in the EPC Gen 2 specification and in ISO standards. The passwords are preferably generated by processing means **175**B using a public key from publicly readable data such as an asset number or a transponder serial number. A shared private key is then used by an encryption

algorithm such as AES in order to create a password or a collection of passwords that can be used to lock or unlock one or several RF tags. Other methods may be used that provide a high degree of certainty that the both the transponders and the mobile encoders are from legitimate sources. Individual failures or patterns of authentication failures are preferably reported to a central database through wireless communications means **175**A for subsequent fraud investigation.

Peel device **222**B is part of the mobile encoder and preferably rotates or pivots about pivot point **222**A into position **222**C and a corresponding position (not shown) in FIG. **21**. Peg **221**K helps guide the web to peel device **222**B. When cartridge **221** is inserted into applicator body **227**F the web is held in a non-interfering position by guide post **221**F and its accompanying cartridge guide post such that peel device **222**C can self-thread around the transport web without human effort. This is an improvement over prior art where a peel device is an integral part of the pre-packaged self-contained supply of transponders and requires threading during the cartridge manufacturing process.

Peel device **222**B preferably contains a shield on the outer face of the blade, through which radio energy will not pass to encode or interact with a rejected transponder **223**B. The dielectric material of the peel device **222**B provides sufficient separation from a transponder within the encoding zone and the shield on the back side of the peel device. This is another advantage over a peel device that is part of the cartridge, where the cost sensitivity is much more acute. The shielding on the back side of peel device **222**B may be any suitable metal attached or adhered in any reliable or economical manner against the non-conductive dielectric structure of the peel device.

Rejecting transponder **223**B requires that mobile encoder transponder peel device **222**B have sufficient clearance from target surface **228** as determined by optical mouse sensor **225** using either the SQUAL reading or the shutter readings. Such readings are used to determine if there is sufficient space to advance and rotate a bad transponder **223**B around the distal end of peel device **222**B.

FIG. **1** shows a system **10** according to one embodiment of the present invention including a mobile encoder **30**. And, FIG. **5** details one possible mobile encoder **30**. In this embodiment, the encoder can attach to the belt of an operator, accordingly, mounted on the housing **32** is a belt mounting means such as belt-clip **34**, which easily adjusts for left-handed or right-handed operation and corresponding mounting on the belt (not shown) of the operator. An external antenna **36** enhances wireless connectivity to a host or network computer (not shown in this view), or to a remote-mounted computer device such as a PDA or bar code reader. Several operator indicator lights **227**E including a system-ready LED **37**, data-ready LED **38**, and tag-ready LED **39** mounted on the housing enabling the operator an easy view of the device status.

Also included on the exterior of the housing are an external, power-cord receptacle **41** so that the on-board lithium-ion, nickel metal hydride, or other appropriate battery **227**D may be charged as required. A combination on/off-next switch **33** enables the operator to selectively power up the encoder. A reset port, such as a recessed reset button (not shown in this view), enables an operator to reset the software settings of the device circuitry on control board **227**C as may be required.

A cartridge **42** containing a plurality of RFID transponders releasably mounts to a face of the housing **32**. The cartridge further includes a take-up reel **44** for non-dis-

Plaintiff's Trial Exhibit No. 1
Page 32 of 43
ADASA-007449

Appx90

US 9,798,967 B2

21                                                22

pensed RFID transponders, a port 46 (above take-up reel 44 but not shown in FIG. 5) for dispensing commissioned transponders, and a supply reel 43 for holding blank RFID transponders prior to commissioning.

In further embodiments, a cartridge 221 containing a plurality of RFID transponders releasably mounts to the body of housing 227F. The cartridge further includes a take-up reel 221J for collecting release liner and non-dispensed RFID transponders, and a port through which blank or securely encodable transponders emerge from source reel 221E. The source reel is comprised of core 221A which may be made from plastic or a recyclable kraft paper fiber to form a wound tube. A tube extends from the walls of cartridge 221 to form axle 221B around which core 221A rotates. Brake shoes 221C create drag, resulting in back torque on the source core, the magnitude of which is controlled by screw 221D which with a knob (not shown) is used to adjust the force applied by brake shoes 221C. The back torque for cartridge 221 is alternatively developed through a motor or an expandable friction coupling into a brake mechanism attached to encoder body 227F.

Take-up core 221H is driven by a tight coupling with drive hub 221G. This tight coupling is achieved through a combination or selection of tight fit, expandable coupling, and sharp teeth. The result is a hub that will easily slide in or out of core 221H with little effort, but still be capable of delivering a substantial amount of drive torque through that connection without slippage. Drive torque is delivered from gear motor 227B to hub 221G through drive gear 227A the teeth of which engage with each other as cartridge 221 is set into position and locked into place.

In a preferred embodiment, mobile encoder 30 cryptographically unlocks, encodes, and verifies each transponder one by one. In preferred embodiments, transponders are verified more than once. One time immediately after programming with a desired data payload, and then again a second time after encoder 220 automatically dispenses an RFID transponder 223A onto target surface 228. This second verification step insures that the properties of target surface 228 or other nearby materials do not adversely affect the performance of transponder 223A.

In another preferred embodiment, encoder 220 is used to encode and dispense a pattern of several transponders 223A onto a target surface 228 at regular intervals in order to map the surface of a container for example in order to determine an optimal location for a placement of transponders. This information is then preferably used for engineering and planning purposes for high-volume transponder application in a production or distribution facility. Transponders may be designed for operation in any or all of the UHF, HF, LF, or microwave frequency bands.

In one alternative embodiment, the mobile encoder 64 includes a handle (as FIG. 9 shows, for example) for hand operation of the encoder. In another contemplated embodiment, the mobile encoder is fixed to an assembly line in a stationary manner. Accordingly, the stationary-mounted encoder further includes machine-controlled devices for extracting a commissioned RFID transponder from the encoder and places the transponder on the container of interest by means well understood in the art.

In the aforementioned embodiments of the mobile encoder 30 (or hand-held encoder 64 of FIG. 8 or FIG. 9, for example) key features commonly shared include means for enable Gent EPC or ISO standards compliance and multiple printer-emulation modes. On-board power source 60, such as a rechargeable lithium-ion, Nickel Metal Hydride, or other battery enables freedom of movement as does means

for wireless connectivity to a data network, such as the 802.11 wireless LAN (Wi-Fi), Bluetooth, or other standards-based communications protocol. However, a conventional power source that requires connectivity to a power-grid and a cable-based data network connectivity link would work under certain circumstances.

Further, in contemplated embodiments, the fixed or mobile encoder enables selective mounting to a magazine or cartridge filled with un-commissioned RFID transponders, which facilitates rapid and easy loading of the encoder with ready-to-use RFID transponders and further enables re-use, re-commissioning, and recycling of un-dispensed transponders and the associated cartridge. The mobile encoder can be monitored and controlled by virtually any handheld or mobile device, a host computer in a central location, or over the Internet.

Certain features and methods described and explained with relation to handheld applicators are also relevant to non-mobile RFID tag applicators that use a magazine, cartridge, reel, or roll to handle, transport, and dispense RFID tags, inlays, transponders, or wireless sensors. Magazines, cartridges, reels, and rolls are preferably capable of carrying either new or used tags and are preferably capable of being used in either mobile or non-mobile applicators. Magazines, cartridges, and reels are preferably refilled and reused. Magazines and cartridges preferably protect RFID tags from ESD.

Cartridges preferably indicate their empty/full status with a visible indicator such as: an LED, an LCD, a mechanical flag, a window with a view into the source reel, or other such indicators that help an operator choose which cartridge from which to next consume tags.

The mobile encoder 30 is activated (turned on) when an operator selectively depresses the combination on/off-next switch 33. However, depressing the on/off-next switch for about three seconds or longer results in a sleep-mode cycle that can be interrupted by re-pressing the on/off-next switch. In sleep mode the operator indicators (LEDS 37, 38, and 39) will turn off. If active, the mobile encoder system-ready LED 37 illuminates and connects to the assigned network. Network connectivity results in the illumination of both the system-ready LED 37 and the data-ready LED 38.

Mobile encoders 175 and 30 optionally receive commands and data via the wireless link from the remote computer 154 or optical reader 173. Special bar code commands are scanned by optical reader 173, passed through wireless communication means 175A, and interpreted by processing means 175B mobile encoder 175 to perform certain pre-programmed functions. Commands originating from either computer 154, optical reader 173, or internal bar code scanner 226 (also designated in FIG. 1 as internal optical reader 175F) perform functions in categories that include power management, data management, wireless configuration, security, configuration options, and utilization of internal resources.

The encoder receives commands and data via the wireless link from the remote computer 20 or host network computer 11 (of FIG. 1). The data represents information to be encoded on an RFID transponder. The information is stored in the encoder's on-board memory and the tag-ready LED 39 or 175K rapidly blinks green (cycles on/off to pulsate). An RFID transponder is moved from within the cartridge 42 to a position on the top edge of the cartridge for encoding in the encoder and the transponder is encoded with the appropriate information. The transponder is tested and if it is good—contains the data and encoding was successful—all three indicator LEDs indicate a solid-green color. The opera-

Plaintiff's Trial Exhibit No. 1
ADASA-007450

Appx91

US 9,798,967 B2

23            24

tor removes the encoded RFID transponder from the encoder and places it on the container of interest.

In the event that the encoding process failed, the bad transponder is detected and retained by the encoder, where it remains on the take up reel **44** inside the cartridge **42**. The take up reel also collects the release liner as the encoder **30** dispenses good transponders (properly encoded RFID transponders). The take up reel returns to a re-cycling center where components are re-used or recycled as necessitated. Further, the re-cycling center can perform failure analysis on returned transponders.

FIG. **7** is a schematic diagram of additional electro-mechanical components **70** (as generally referred to in FIG. **6**) and logic components of a possible encoder **30**. An RFID Module **63**, such as a MP9311 UHF reader module available from Sirit Technologies, 1321 Valwood Parkway, Suite 620, Carrollton, Tex., 75006, USA, communicates with a vertical polarized YAGI antenna **62** with a downward side lobe to low-power program (commission) RFID transponders to create an RFID transponder, and the same downward side lobe and verify transponders at low power also can read far-field transponders at a higher, second power. Additional components include a mechanical paddle trigger **86** for operator-selected override of the reel of RFID transponder stored in the supply or source reel **43** in the cartridge **42**. A drive motor **76** coupled to a dual output shaft gearbox drives the source transponder reel **43** via an intermediate take-up reel gear interface **78** at the cartridge mouth. Another gear assembly along with a spring couple **85** advances and positions the tag feeder paddle **84** with feedback from paddle position sensor **88**. A tag sensor **74** detects the location of the RFID transponder to-be commissioned by the YAGI antenna **62**. As the reel of RFID transponder advances inside the encoder, the lead edge passes the ratchet post **82**. If the now-commissioned transponder is read by the antenna **62** as "good", a ratcheting-back torque spring **83** enables a peel device, such as the shield and tag peel edge **73**, to engage, forcing the commissioned tag to peel away from the carrier layer, which continues on to the take up reel **44**. In the event of a "bad" tag—that is, the antenna **62** reads the RFID transponder and determines an error has occurred—the shield **73** does not engage, allowing the defective transponder to remain on the carrier layer and proceed to the take-up reel. Once the good transponder is removed from the encoder, the tag sensor **74** detects the condition and enables the encoder to stand-by for the next event. Transponders are read, written, and verified when an operator initiates an action such pulling a trigger **86**, pushing a button, or some other command sequence.

Certain protective enclosures, such as cartridges **42** or magazines, are part of a family of interchangeable magazines of similar size, shape, and functionality, which are capable of housing and dispensing certain types, styles, shapes, and sizes of new or used RFID transponders. Transponder sizes typically range from 4 mm-thick foam-backed transponders measuring 12 mm wide down to thin transponders that are 15 mm wide on 19 mm pitch.

In at least one embodiment, the magazine or cartridge **42** includes a unique and embedded, RFID transponder which enables automatic interrogation and tracking of cartridge **42**. In certain embodiments, to minimize interference, the cartridge-specific and unique RFID tag or RFID transponder operates in a frequency band that is different than the supply of RFID transponders contained within the protective enclosure. Alternatively, other embodiments selectively interro-

gate cartridge identification transponders that operate in the same band as transponders within the cartridge that are to be applied.

Certain encoders require replenishment of the battery or other internal, on-board power source **60**, such as a fuel cell, or other energy storage technology. Accordingly, in some embodiments, an encoder **30** (or encoder **64** or encoder **210** of FIGS. **8**, **9**, and **10**) further includes a remote, selectively coupling base unit. The base unit enables a replenishment of magazines or cartridges, provides replaceable power sources, recharges the on-board power source, serves as a communications gateway, and provides a user interface for programming and maintenance of the encoder. For example, spare transponder magazines/cartridges are retained in cartridge pockets where they are protected from damage. Cartridges indicate their empty/full status with a visible indicator such as: an LED, an LCD, a mechanical flag, a window with a view into the source reel, or other such indicators that help an operator choose which cartridge from which to next consume transponders. The encoder, also, is retained by a protective pocket to prevent damage and to make any required electrical or mechanical connections to the base unit. In some embodiments a base unit mounts to diverse operating locations including various models of fork lift trucks. In such applications, the base unit includes a variety of wired and wireless communications options to enable omni directional communication with the encoder, cartridges, a host computer, vehicle mount terminal, a fork truck computer, or other relevant computing devices. The base unit includes a power system that is suitable for the application, including power filtering and energy storage capabilities such as batteries or fuel cells.

As with all ESD-sensitive equipment, care must be taken to avoid a build-up of damaging electrostatic charges. Accordingly, in certain embodiments charge is removed using a variety of conduction methods including wiping, air, and humidity controls, or use of special materials that contain short conductive elements optionally arranged within a flexible elastic cord.

In some embodiments, the encoder adapts to use a particular type of RFID transponder. One type of suitable RFID transponder is model number AD-220 from Avery Dennison of Brea, Calif. or, alternatively, Raflatac model 300846 from Tampere, Finland, or a Spider transponder or FT-33 FAT tag from RSI ID Technologies of Chula Vista, Calif. Such a transponder is die cut and adhered to release liner. Additionally, wireless sensors are manufactured to specifications that are compatible with the specific encoder, including such specifications as core diameter, outer diameter, and web width. Alternatively, certain steps are required to prepare a standard roll of ALL-9338-02 tags for use in an automated encoder, including unrolling from a large roll (up to about 6-inches in core diameter) onto several smaller rolls having a smaller core diameter (of about 1-inch to about 2-inches in core diameter).

Encoder **30** communicates with a remote computer and includes options to physically, electrically, and communicatively integrate with a portable data terminal (PDT) or a mobile computing platform. Certain PDT's have a variety of wireless connections including PAN and WLAN. Certain PDT's include a bar code scanner comprising a laser, an imager, or other means. In other suitable PDT's an RFID interrogator and antenna are built-in, while certain others have a card slot manufactured to a standard such as PCMCIA, CompactFlash, or Secure Digital, into which interrogator/antenna is plugged into. An example of such a card is the MPR 5000 that plugs into a PCMCIA Type II slot and is

Plaintiff's Trial Exhibit No. 1
Page 34 of 43
ADASA-007451

US 9,798,967 B2

25

available from WJ Communications of San Jose, Calif. The MPR 5000 is compatible with handheld computers such as the Hewlett Packard iPAQ5550 or other models that accommodate smaller card-form factors, enabling them to read and write EPCglobal or ISO 18000 compatible UHF RFID transponders.

Other events, information, and status—such as changes in transponder readiness, transponders remaining on the source roll, remaining charge in the battery, changes in range-status between certain predefined states such as Close, Near, and Far—are communicated to the associated PDT. Other possible information, including certain power management functions, commands, status, and data-to-be-encoded into each readied transponder, is provided to the PDT over a wireless connection. Such a configuration puts the encoder in the role of a peripheral device to the PDT 219, with PDT 219 managing the primary user interface and most computation functions.

In some embodiments the encoder adapts to exchange information with a host device, including a PDT, in either a batch-mode or through a real time connection. Batch mode uses a periodically connected data transfer channel such as a wired connection. Certain wired connections include serial data, infrared, optical, Universal Serial Bus, a parallel port, or other physical data connection. Certain real-time connections include wireless data links including Personal Area Network (PAN), Wireless Local Area Network (WLAN), and Wide Area Network (WAN). Certain PAN connections include Bluetooth and Zigbee. Certain suitable WLAN connections include IEEE 802.11a, IEEE 802.11b, and IEEE 802.11g.

For certain encoder embodiments passwords are encoded into transponders or wireless sensors when they are commissioned. Passwords are safeguarded using cloaking, obfuscation, cryptographic techniques, secure and trusted channels, locked memory, and other methods that are commonly used to protect confidential information. Passwords are generated or retrieved from data encoded in an RFID transponder to generate an index into one or more databases that contain a one dimensional array of passwords, a two dimensional array of passwords, a multidimensional array of passwords, or an array of actual or pointers to algorithms used to generate passwords from transponder data, for example. Alternatively, cryptographic algorithms are used to generate passwords from transponder data.

Although this disclosure makes specific reference to a mobile encoder, it is understood that the encoder can easily adapt and be readily configured to a fixed operating environment. For example, it can be mounted to a forklift truck or a high-speed conveyer line and maintain advantages of wireless communication, rapid change-over and other qualities as discussed and developed more fully in this disclosure.

Interrogator Apparatus

Working as a stand-alone device, or combined with an encoder, certain embodiments of the present invention include an RFID transponder reader, also called an interrogator. The interrogator, in one embodiment, is a physically separate device that is solely in wireless communication with the encoder. In another embodiment the interrogator includes a wired connection to the encoder. In yet another embodiment, the interrogator connects to the encoder via an intermediate processor, such as a remote computer, or some other intermediate device. In yet another embodiment, the intermediate device is a shared processor in a physically integrated encoder/interrogator apparatus.

Regardless of the physical configuration of the interrogator, its function is to encode and/or verify a RFID transpon-

26

der's (including wireless sensors) functionality. Certain embodiments use a mobile handheld reader to verify transponder functionality after carton attachment. Certain handheld readers also read bar codes that either partially or completely specify the data that is to be programmed into a transponder. Accordingly, an optical path from the interrogator to a location for reading bar code labels is used to identify certain information about the objects or containers that are to be tagged. Additional transponder encoding instructions and data is acquired through an integral network interface or a batch mode memory in the interrogator.

In certain embodiments, a shield structure incorporated in a combined interrogator/encoder prevents RF fields from interrogating or reprogramming RFID transponders yet-to-be-commissioned that are resident in the combined interrogator/encoder device.

In one embodiment, shown as a cross-sectional schematic in FIG. 8, a contact image sensor (CIS) 90 or a linear optical array is used to scan along the length of an RFID transponder before it is applied to a container. CIS 90 produces a video stream that is decoded and then interpreted and stored by an on-board Computer 61. CIS or a similar linear array sensor is capable of reading both linear and two-dimensional bar codes. In certain embodiments, CIS reads two-dimensional bar codes before attachment to inlay or transponder. The on-board computer creates a logical association between bar codes and the commissioned RFID transponder. Encoder 64 reads and associates all bar code symbols on a single segment with the RFID transponder or inlay adhered to it.

In FIG. 10 when an operator pulls the trigger 86, which is either a mechanical trigger or an electro-mechanical device, the on-demand commissioning of the RFID transponder occurs and nearly simultaneously is pressed against a container within a fraction of a second. In certain embodiments, mechanisms internal to encoder 64 transfer mechanical force to the RFID transponder tag through the use of air, springs, motors, plungers, elastomers, or other energy storing or delivering methods. Reloading of the next tag (next transponder) and readying of the system are performed within a time interval that is acceptable to the operator and enables a high degree of productivity for tagging cartons, pallets, or other transport containers.

In certain embodiments of a combined interrogator/application, a trigger 86 couples to an electrical switch having one or more stable positions that are detectable by a controller. In certain modes of operation trigger-switch state is coupled with range information from a sensor suite 218 to execute functions at predetermined ranges at predetermined times. The result is a trigger that functions based upon detected range from a container or other object of interest. This advantageously improves operator efficiency and productivity as one trigger executes several different functions that are typically involved with RFID tagging including the tagging of bar-coded cartons that have been selected to receive wireless sensors.

Verification of bar code occurs either before or after an RFID transponder is commissioned and the tag applied to the container by merely stepping back to a point where the sweep angle of a laser beam or field of view of an imager can read a bar code label. In certain embodiments ranges shorter than that, but not in Close Proximity, are used for sweeping a radio frequency interrogation signal across the faces of multiple cartons to assure that the correct tags, the correct number of transponders, and the correct data within that transponders were all properly programmed.

Plaintiff's Trial Exhibit No. 1
Page 35 of 43
ADASA-007452

Appx93

US 9,798,967 B2

27                                              28

In certain embodiments Close Proximity range is reserved exclusively for programming, applying, and verifying one transponder, all in a single pull of trigger. In other embodiments, the interrogator includes programmable conditions that enable Trigger Events to interact with external devices or nearby equipment. For example, at a predetermined range from the interrogator, activation of the trigger causes the encoder to transmit a coded signal to an external device as an indication of an operator action: at a Far-range the signal to requests an external device to read a bar code and the bar code information is decoded and transmitted back to encoder. In another embodiment, decoded barcode information is processed by a portable data terminal (PDT), a vehicle mount terminal, or other computing device.

The on-board computer 61 controls the operation of the RFID Interrogator Module 63 to read, write, and verify RFID tags, inlays, transponders, and wireless sensors that are applied or are within range of the interrogation fields produced by antenna 62. The encoder 30, capable of reading multiple RFID transponders near it, can, in certain embodiments, produce a linearly polarized radio field via the internal antenna 62. In another embodiment, the internal antenna produces a horizontally polarized RF field. A commissioned transponder can be read both before and after it is applied to a transport container. When multiple transponders are within the interrogation field of the encoder 30 with an interrogator module 63 the on-board computer 61 determines which transponders are commissioned and dispensed versus those transponder that have not. In certain embodiments, the on-board computer maintains records of transponders recently applied in order to properly determine how to interact with each transponder in the field of the internal antenna or other antennae under the control of RFID Interrogator.

In one possible embodiment, the interrogator/encoder utilizes preprinted information on a set of RFID transponders. The pre-printed information includes one or more logos, an EPC-global Seal, and other informative alphanumeric or bar-code data. Certain preferred embodiments of encoder/applicators 30, 64, and 210 correlate RFID tag data with data encoded in certain preferred bar codes. In certain preferred embodiments, applicators such as applicator 30 read the bar code preferably using a sensor such as OS 90 as the tape is unrolled from a spool. In certain other preferred embodiments, an RFID tag is located on cartridge 42 and contains a numerical value that is directly or indirectly representative of the numerical values optically encoded into the bar codes preferably at least indicating the starting numerical values of a number sequence. Other additional information is also encoded in the RFID tag in certain preferred embodiments, including the number of tag positions, the number of good tags, the ending sequence number, the date, time and place of tag conversion or other preferred commercial, logistic, or manufacturing information. In certain preferred embodiments of applicators 30, or 210 certain wireless tags attached to cartridge 42 are capable of being read. In certain preferred embodiments the interrogator such as interrogator 63 is capable of reading an RFID tag mounted to the loaded cartridge, and is also preferably capable of filtering out its response to interrogation or programming of RFID tags.

Certain embodiments have a motorized tape drive and dispensing system. Certain embodiments contain some or all of the following: a rechargeable battery, an operator display, a wireless interface, a network stack, an IP address, a PCMCIA port, a Compact Flash port, a USB cable, a serial cable, a dock port, a window to allow the operator to view the transponder attachment process, or a bar code scanner.

One suitable interrogator includes model MP9311 available from Sirit Technologies of 1321 Valwood Parkway, Suite 620 Carrollton, Tex. 75006, USA. Other RFID transponder or wireless sensor interrogator modules with other feature sets are also possible for use in the interrogator/encoder.

FIGS. 8 and 9 show one possible interrogator/encoder 64 according to the present invention. The interrogator/encoder 64 comprises a housing 65 having a user input device 67, such as a key pad or key board, and a user output device, such as an LCD screen 68, for displaying optically scanned label data, RF interrogated data from a transponder, and other information including on-board diagnostic functions, bios status, and external information provided from a remote computer as sent over a wireless network, for example. A handle structure 66 enables point-of-use deployment while cartridge 42 enables on-demand commissioning of RFID transponders, which are dispensed from the transponder port 46. In this embodiment, an integrated YAGI antenna 62 creates a large forward-looking main lobe of radio frequency energy for interrogation of commissioned RFID transponders. The internal antenna also produces side lobes of RF energy that although attenuated from the main lobe by several dB, couple enough power into nearby readied transponder to interrogate and write to it.

As further depicted in FIG. 10, a reflector 219b passively reflects RF signals from an upper side lobe downward toward readied tag 216f. Backscatter from tag 216f propagates to both antenna 219a and reflector 219b for processing by the interrogator. Having such an antenna embedded in PDT 219 and mounted to the structure of the encoder housing enables the PDT 219 to encode and verify readied transponder 216f while commanding the encoder to commission and dispense a tag when a particular Trigger Event or a predetermined range status change occurs.

An antenna, or alternatively, leaky coax 212a or a near-field coupler is located outside of protective enclosure of cartridge 42 in a location very close to the tag attachment zone in front of a tamp head or tag application roller and holding rollers 216d or hammer 216a.

In some embodiments antenna 212b is a patch antenna with a radiation pattern toward the tag attachment zone. In other embodiments the antenna is a near field coupler. Alternatively, leaky coax, a type of coaxial cable having slits, slots, or perforations that allow radio frequencies to leak in or out, is used in encoders according to the present invention. A coupled-mode cable, which does not radiate as well as radiating-mode cable, is constructed with closely spaced slots in a corrugated outer conductor. Radiating-mode cable typically has a foil outer conductor with non-uniformly spaced slots arranged in a periodic pattern. Coupled-mode cable is a slow-wave structure. In free space its external fields are closely bound to the cable and do not radiate, except for minor end effects according to "Prediction of Indoor Wireless Coverage by Leaky Coaxial Cable Using Ray Tracing" by Samuel P. Morgan of Bell Laboratories, Lucent Technologies.

In certain embodiments an interrogator drives a signal into a leaky coax that is terminated in a purely resistive load of about 50 ohms. An RF-switch selects between radiating and non-radiating loads including an antenna or leaky coax and, therefore, avoids mismatched load impedance.

In other embodiments internal antenna 212b or 212c is a patch antenna with its strongest lobes oriented toward the tag holding and placement area in the region of holding

Plaintiff's Trial Exhibit No. 1
Page 36 of 43
ADASA-007453

US 9,798,967 B2

29

rollers 216d. Antenna 212c or leaky coax 212a work with an interrogator to produce electromagnetic fields to interrogate, program, and verify wireless sensors. Shield 217e prevents interrogation or programming of RFID transponders until they arrive at separation roller or tag peel edge 217d. A reflector is used in certain embodiments to reflect RF radiation toward a readied transponder. In the event that verification fails, the operator is informed that the bad tag (or inoperable transponder) is to be discharged onto a surface of a third object other than the encoder or the transport container, for post-mortem analysis.

Referring to FIG. 10 drive motor 76 is preferably located inside the center of source reel 43 within the circular walls of applicator housing 211b, around which cartridge 42 is nested when mated to interrogator/encoder/applicator 210.

Motor 76 is mounted to the structural frame of applicator 210 and preferably transfers mechanical power to certain drive points preferably using gears, belts, or drive shafts within applicator housing 201a or 211a. In certain preferred embodiments of applicator 210 certain preferred drive points include take-up reel 44, source reel 43, or hammer arm 216a.

Trigger 86, preferably embedded within trigger handle 66 is actuated by an operator, preferably causing a Trigger Event. In certain preferred embodiments, there is more than one kind of Trigger Event. In certain preferred embodiments of applicator 210 certain types of either mechanical or electromechanical actuators are preferably used to cause hammer mechanism 216a to trip, being driven toward readied tag 216f, through port 46 for placement on a transport container at the face of bulkhead 211a.

Another means of electromechanical actuation from a Trigger Event initiated by sensor suite 218 is illustrated in FIG. 10 whereby DC motor 215c runs in a reverse direction causing ratchet 216b to become disengaged, allowing hammer 216a to accelerate toward tag 216f due to the torque exerted by spring 216c. Hammer 216a passes between holding rollers 216d to press tag 216f against the face of a transport container.

Interrogator 212d is preferably capable of working with controller 213b to recognize which tags have been recently programmed or applied so as to filter out their response to interrogations of other tags, especially those tags that are being prepared for attachment. Interrogator 212d is preferably capable of modulating its transmitted radio power to affect the range and signal to noise ratio of its coupling to wireless tags.

Method of Using Smartphone for Encoding

FIG. 11 shows a method for using a smartphone for encoding RFID tags by using the built-in camera as a barcode scanner. In step 111 a smartphone is positioned to capture the image of a barcode. The barcode can be 1D or 2D, it can carry GTIN or other information. It can already have a serial number such as a serialized Data Matrix barcode for a pharmaceutical item or container. In step 112 the image is decoded and processed by software. In step 113 the payload for a transponder is computed, preferably using serialization algorithms that are presently described. In step 114 a transponder is encoded with the transponder data payload. The transponder encoding apparatus is either built into the smartphone or attached to it as a peripheral device.

Referring to FIG. 22, smartphone 154 is shown as an Apple iPhone with a peripheral encoding device attached to the accessory port. A peripheral device such as this is one embodiment, in other embodiments the components described herein are contained with the enclosure of smartphone 154. Near field couplers 238a and 238b are used to couple magnetic fields with a nearby transponder for RFID

30

transponder and wireless sensor authentication. Certain preferred embodiments use one coupler to transmit and the other to receive. Such embodiments therefore require close proximity of both couplers to a transponder in order to read or write transponder data, or to verify transponder authenticity. FIPS 140-2 module 239 has a cryptographic boundary that is preferably compliant with U.S. Government Federal Information Processing Standard 140-2 which is incorporated by reference herein. Module 239 detects temperature variations that are outside of upper and lower temperature limits which is one possible mode of cryptographic attack. It also has tamper detection that detect a physical breach of a mesh or other detection barrier. FIPS 140-2 compliant cryptographic module 239 is used to hold cryptographic keys and to perform cryptographic functions. If the module detects an attack, the memory for storing cryptographic keys is immediately cleared. Module 239 preferably uses non-imprinting memory and therefore leaves no trace of the cryptographic information after being cleared.

Method of Tagging Containers

FIG. 12 is a block diagram representing a second method according to the present invention including applying RFID transponders to objects of interest. One suitable object of interest comprises transport containers such as corrugated cartons or shrink-wrapped cases on a shipping pallet, which is inadequately addressed by the prior-art, particularly for solutions for manually operated automatic encoding and attachment to a container.

Block 121 represents a process step including the identification and selection of a container to be tagged with an RFID transponder or wireless sensor. In one embodiment this step includes a manual selection and verification processes that consists of manual handling, visual sighting, and scanning bar codes with a hand-held optical reader device. This method contemplates that a transponder encoding scheme is ready in advance and synchronized with a pick list, customer purchase order, advanced shipping notice, and other such records to assure that goods are properly moved and accounted for. Preferred bar code scanners include those that allow an operator to freely handle cartons with two hands. Such scanners include laser bar code scanners or imagers that are worn on either that back of the operator's hand or near the top knuckle of a finger. Such scanners are described above, and preferably have a Bluetooth or similar wireless interface to connect to mobile encoder 175 or 30. Bar code scanner 226 of FIG. 21 is a preferred embodiment of an alternative device that combines manual bar code scanning and RFID transponder encoding into a single handheld device. The operator may choose to scan bar codes that contain data, application identifiers, commands, or other elements commonly found in automatic data capture applications.

Block 122 represents the process step of processing bar code information to derive the underlying data. Depending on the type of bar code, how it is encoded, and its purpose, different processing steps will be used. In preferred embodiments the bar code may contain SKU information, a GTIN, an SGTIN, EPC data structures, a military UID, an SSSC, an asset number, a file identifier, or other such identifying information. In certain preferred embodiments, the bar code (either one or two dimensional) contains a partial or complete description of the data that is to be encoded into the RF transponder. Such bar codes are described in ISO/IEC draft document PDTR 24729-1. Application identifiers 01 and 21 are combined with additional encoded printed information to fully specify a serialized GTIN (or SGTIN). Using such bar codes does not require the use of additional data in order to

Plaintiff's Trial Exhibit No. 1
Page 37 of 43
ADASA-007454

Appx95

US 9,798,967 B2

<table>
<tr><td>31</td><td>32</td></tr>
</table>

generate RF transponder payload data. Mobile encoder 175 may therefore independently receive and process the RF transponder payload information. One type of bar code is used to signal mobile encoder 175, 30, or 220 that it should enter a mode whereby it performs a serialization algorithm without using an AI 21 bar code. This process step of identifying the information to be encoded may be included in the step represented by Block 121. In this step (Block 122), an operator may use a bar code reader or an encoder/ interrogator of this disclosure. Alternatively, the operator may receive instructions delivered to a hand-held PDT or other mobile data terminal connected to a wireless network. This information is delivered to an encoder, such as encoder 30.

Block 123 represents another process step whereby, using a mobile encoder, the operator then commissions an RFID transponder with the information of the previous step (Block 122). Optionally, successful commissioning of the RFID transponder is verified by the encoder. In one embodiment, the encoder tests the next transponder and determines if it is operating within certain predefined specifications including parameters such as activation energy, backscatter signal strength, sensor performance, and other indications of the quality of the transponder. If the encoder determines that the transponder is not likely to result in a successful transponder deployment as may be determined by failure on multiple encoding and verification attempts or due to either physical or electronic deficiencies or abnormalities, then the operator is informed and the failed or bad transponder is discarded automatically or when an operator pulls a trigger under an operator-acknowledged transponder failure condition.

This step (Block 123) also includes processes to read or determine by dead reckoning the information encoded into certain preprinted optically encoded symbols on the outward facing non-adhesive surface of the adhesive tape. In certain embodiments the adhesive tape is printed with information. In other embodiments the printed information is a machine-readable symbol such as a bar-code symbol. For example, one or more machine-readable symbols are read when the tape is prepared for use in an automated encoder or, alter-natively, during the inlay conversion process and conveyed to an encoder through other data storage means, such as an RFID transponder. In one embodiment, an information encoding method uses either one-dimensional or two-di-mensional bar codes. In some embodiments a linear imager is used to read either linear or two-dimensional bar codes as the tape is being unrolled from a spool. Some encoding schemes preprint machine-readable symbols at regular inter-vals along the length of a roll of adhesive tape. In certain embodiments the spacing of the preprinted symbols is at an interval of one half of the nominal length of each section of adhesive tape. In certain embodiments, the encoded infor-mation is used as a reference to one or more data storage locations. In other embodiments the data storage locations are accessible through a computer network. In some embodiments, the encoded information is a series of sequen-tial numbers. Information relating to data stored in the RFID transponder is stored in data storage locations that are referenced by one or more of the preprinted symbols. In an alternative embodiment more than one type of machine-readable symbols can be read from the surface of a segment of tape. In certain embodiments, more than one machine-readable symbol is used as a reference to the same or closely related data records of information stored in the RFID transponder or inlay, and either can be successfully used to access stored data.

In some encoders used in this step (Block 123) a Trigger Event occurs, which results in the verification that a par-ticular commissioned RFID transponder has been tagged and associated with a specific container. This Trigger Event occurs, in certain embodiments, when an operator pulls a trigger on the encoder. In other embodiments the Trigger Event occurs when certain sensors detect preprogrammed conditions relating to the proximity of the encoder face to an object that is to be tagged.

Finally, (Block 124) the operator applies the RFID tran-sponder on the container and, thus, commissions the tran-sponder. In certain embodiments, the location of the targeted placement of the RFID transponder or wireless sensor on the container is stored in a database, which is referenced or pointed to by information that is stored in the memory of the encoder. In one embodiment, the operator holds the encoder against the face of the container based on the tagging requirements for that particular container. The tagging requirements including the location and orientation of the RFID transponder to be placed is conveyed visually or aurally. For example, the operator receives visual informa-tion via a screen or display on the encoder. In certain embodiments, physical indicators are attached to the encoder and extend from its body in a direction and manner so as to assist the operator in the positioning of the tran-sponder onto the carton. In other embodiments, transponders are applied to the interior of a carton, before it is sealed.

Method of Commissioning RFID Transponders Using a Mobile Applicator.

FIG. 13 is a block diagram showing a method according to the present invention for commissioning RFID transpon-ders using an encoder, such as the encoder 30, couples to a cartridge or protective enclosure containing a plurality of RFID transporters releasably mounted on a transport sheet or roll. The encoder enables the roll of RFID transponders to advance one position (Block 131), placing the Next Tag in a test 1 position. The Next Tag is tested (Block 133) to ensure that it performs within predetermined parameters such as activation energy, backscatter signal strength, sensor performance, and other indications of the quality of the transponder. One possible method includes encoding a tran-sponder using only a minimal amount of radio-frequency energy. Since transponder encoding requires more energy than reading a transponder, this low power test constitutes a basic test of both minimal activation energy and backscatter signal strength.

An RFID transponder that fails this test (Block 133) results in a "Bad Tag" status and proceeds to the take-up reel of the encoder (Block 135). Thus, any failed transponder remains captive in the cartridge and cannot be released from the encoder by an operator. Optionally, the operator is notified of the failed transponder so the operator can request a newly encoded transponder (Block 137). However, in one embodiment, the notification step occurs automatically, and a newly encoded next transponder is generated without input from the operator.

Block 132 shows that a "good" transponder is positioned in the encoder for the encoding process. The RFID tran-sponder that passes the test 1 position is commissioned with predetermined data based on the container to be tagged. Methods of obtaining, storing, encoding, and commission-ing this information on the RFID transponder are discussed elsewhere in this disclosure.

The commissioned transponder undergoes a verification process (Block 134) to determine if the intended information was successfully encoded on the RFID transponder. Certain embodiments combine the verification step with the encod-

Plaintiff's Trial Exhibit No. 1
Page 38 of 43
ADASA-007455

Appx96

US 9,798,967 B2

33

ing step to gain operational efficiencies. If this verification test results in a fail condition, the transponder remains in the encoder and ultimately winds on the take-up reel in the cartridge for subsequent post-mortem failure analysis.

Block **136** represents a pass condition. The encoder removes the commissioned RFID transponder from the transport web or release liner, enabling the operator to retrieve the transponder from the encoder and in Block **138** apply the transponder to the container. In an alternative embodiment for Block **138**, the operator or a fixture holds the encoder against a surface of the container and the encoder places the commissioned RFID transponder directly on the container without operator intervention.

FIG. **14** is a system diagram that illustrates a preferred serial number allocation system according to the present invention. Blocks of serial numbers are allocated to RFID printers and encoding devices such as RFID encoder **155** of FIG. **15** as described in more detail below. Each object class, represented in FIG. **14** as GTIN's, has its own separate serial numbering space. As described above, the entire object class serial number space is subdivided into sectors that are defined by a limited number of most significant bits of the serial number field. In the case of a GS1 SGTIN-96 key type, the serial number field is 38 bits long.

To show how this is accomplished in Serial Number Database **140**, a representative object class is managed by Table GTIN A **141** and is shown to have three serial number block sizes of lengths 10, 11, and 12 bits. Within table **141** are three rows, or tuples **141**a-c. Each row or tuple contains two columns or attributes: a starting serial number and the amount of remaining space until the next serial number block. In preferred embodiments, the remaining space is expressed in units of blocks of the selected block size.

Now by way of a more detailed example, allocation of blocks of serial numbers of different sizes is shown as requests are encountered over a period of time. An initial request is made for serial number Block **0 144** for GTIN A that is 10-bits long. At that time then all of the rows of table **141** show the same starting number of 000000. When the initial request for a 10-bit block is granted for block **144**, the starting number for the next block of that size is increased to the end of the first 10-bit block and the remaining blocks is computed based on the following algorithm: the starting point for the 11-bit block **141**b is adjusted to the next greatest unused number that contains all zeros in the bits that represent the next assignable block of that size. The same is done for 12-bit block **141**c and so forth unless those blocks have already been assigned to an RFID encoder **155** using for example Block **1 145**, in which case they are not changed. The remaining counts values for each block will remain at zero for each block that is not bounded on the upper side by an assigned block of another size. If a serial number block is bounded, then the remaining count value is adjusted to accurately describe the number of serial number blocks that can be assigned. If additional blocks of that size are subsequently required, then, space permitting, a new block starting number is assigned and the process continues until the entire serial numbering space is fully allocated.

In preferred embodiments, a request is made by smartphone **154** as shown in FIG. **15**. The smartphone preferably performs biometric authentication as shown in step **161** of FIG. **16**. In step **162**, using smartphone **154** devices such as camera **237** of FIG. **22** a biometric match for a face, iris, voice, or fingerprints breaks the retry loop with an authorization to continue to step **163**. In step **163** transponder encoding is enabled and smartphone **154** is authorized to request, as a lower database level, blocks of serial numbers

34

for specific object classes, such as certain GTIN's. RFID printers and encoders **155** are preferably then readied for encoding. Biometric security enables brand owners to enforce security procedures within their own plants and at contract manufacturing locations all over the world.

Table GTIN B **142** and Table GTIN C **143** show that each GTIN is managed separately to provide unique serial number blocks such as Block **2 146**, possibly according to different rules. In fact since GTIN's are typically purchased and owned by brand owners, and database **140** may be used to manage serial number allocation for multiple brand owners, then the rules that are applied to the various GTIN object classes in FIG. **14** may be different. Retail brand owners may want linear serial number assignments within each block while a pharmaceutical brand owner may want to have randomly assigned serial numbers within each serial number block. In a preferred embodiment allocated block **141**c is issued to a lower database level or directly to an encoder's internal memory for commissioning transponders with randomly assigned serial numbers from within the range of numbers that are defined by that allocate block **141**c.

Brand owner A with GTIN A may also have serial number blocks managed with a finer granularity than brand owner C with GTIN C. Furthermore a possible reason for brand owner C to select very large block sizes as shown in Table GTIN C **143** is to allow serial number allocation to be managed according to a different method such as chip-based serialization from chip manufacturers Impinj, Alien, or NXP for example.

FIG. **15**, a block diagram, shows the essential parts of a system to manage unique serial numbers on a global scale using smartphones as mobile remote computers. Server **151** is a computer running a server application such as an Apache HTTP web server on an operating system such as Unix, FreeBSD, Linux, Solaris, Novell NetWare, Mac OS X, Microsoft Windows, OS/2, or TPF. Web server **151** can be owned, borrowed, or rented by the slice from cloud service providers.

SQL database **152** preferably conforms to ISO/IEC 9075 and its various parts. In other embodiments, a database other than SQL is used to perform the data storage and retrieval functions described herein. SQL queries are preferably performed with the declarative SELECT statement which retrieves data from one or more tables, or expressions.

Script **153** preferably executes on server **151** and is written in a general-purpose server-side scripting language such as PHP to produce dynamic web pages.

A segment of PHP code that is used to store RFID tag commissioning data is:

```
$stmt=$this→db→prepare("INSERT INTO SGTINs
(CommissioningReport_EncStatus_SessionNum, SGTIN,
GTIN) VALUES (?, ?, ?, ?)");
$stmt→bind_param("ssii", $attrSession, $sgtinN, $attrGtin);
$stmt→execute( );
$stmt→close( );
```

Smartphone **154** preferably uses asynchronous data transfer techniques in a multi-threaded computing environment to communicate with script **153** in server **151** to prevent thread-blocking that gives the appearance of the program seizing up while waiting for a database transaction to be completed. Certain preferred embodiments use ASIHTTPRequest on Apple iOS smartphones to request a transaction with a remote database without blocking a major

Plaintiff's Trial Exhibit No. 1
Page 39 of 43
ADASA-007456

US 9,798,967 B2

35                                          36

program thread. Below is an example of an iOS function to store an XML commissioning report from RFID encoder **155**:

```
-(void)SQLStoreRecentTaggingForString:(NSString *)recentTagging
{
    NSURL *url = [NSURL
URLWithString:@"http://www.adasainc.com/update.php"];
    ASIFormDataRequest *request = [ASIFormDataRequest
requestWithURL:url];
    NSString *comTagStrTrimPhp =[recentTagging
stringByReplacingOccurrencesOfString:@" " withString:@""];
    NSLog(@"SQLStoreRecentTaggingForString: '%@'",
comTagStrTrimPhp);
    [request setPostValue:comTagStrTrimPhp forKey:@"comTags"];
    [request setDelegate:self];
    [request startAsynchronous];
}
```

The method startAsynchronous is used on the request to start a database transfer on a separate computing thread. This is one important aspect of asynchronous data transfer in periodically connected system nodes. Another example is in the collection of XML report data from RFID encoder **155**, piece by piece to assemble a complete string. The iOS code line [scanner.readRecentString appendString:trimStr]; illustrates how trimStr is appended onto a string, in this case named readRecentString that is an NSMutableString that is allocated as part of an instance that coordinates communications with a particular RFID encoder. Once the end tag is received, then iOS program assembles a request to store tag commissioning data. The iOS program is also ready to receive authorizations from server **151** as responses are returned from it. The authorizations are preferably able to be stored and retrieved when the same RFID encoder **155** reconnects with smartphone **154**. This system design therefore illustrates a preferred method for collecting commissioning data, storing it in an SQL database, and delivering new encoding authorizations to RFID encoders like RFID encoder **155** without requiring any realtime connections to a remote database.

RFID Transponder **156** receives and stores a globally unique identifier such as an SGTIN-96 through an intermittently connected chain of computers and programs as described above and as illustrated in FIG. **15**.

In FIG. **23**, Block **240** is used to scan a barcode, such as a GTIN. In Block **241** the RFID transponder payload is computed, preferably using serialization algorithms and methods that are disclosed herein.

Block **242** represents the process step whereby mobile encoder **175**, **30**, or **220** encodes an RFID transponder with the information of the previous step (Block **241**).

Successful commissioning of the RFID transponder is preferably verified by the encoder as shown in Block **243**. In one embodiment, the encoder tests the immediate transponder and determines if it is operating within certain predefined specifications including parameters such as activation energy, backscatter signal strength, sensor performance, and other indications of the quality of the transponder.

If in Block **244** the encoder determines that the transponder is not likely to result in a successful transponder deployment as may be determined by failure on multiple encoding and verification attempts or due to other evidence of physical or electronic deficiencies or abnormalities, then the operator is optionally informed and the failed or bad transponder is discarded automatically as shown in Block **245**.

Block **246** is the process of using motor **227B** and/or transponder transport means **175C** to pull release liner **182**

tighter and tighter such that webbing **182** advances forward to the point that the leading edge of transponder **178** extends past the distal end of peel device **183** or **222B**.

In Block **247** web **182** is pulled forward to the point that transponder **178** or **223A** begins to rotate around peel device **183** or **222B**. It is in this step that either a human finger or some target object needs to be presented in the rotational path of the tipping transponder **178** or **223A** must be located. In the case of mobile encoder **30** where the operator is required to handle the encoded tag, it is important that their finger be present as transponder **178** begins to tip, allowing adhesive layer **181D** of transponder **178** to make contact and be removed for placement on a target object such as a shipping container, trackable asset, automobile windshield, or other object of interest. In cases where the operator scans a bar code and applies encoded transponder **178** in a single motion, mobile encoder **220** is preferred, wherein as transponder **178** tips as it rotates around peel device **222B** adhesive layer **181D** sticks directly onto target surface **228**. In either case, encoded transponder **178** is caught mid-rotation and adhesive layer **181D** provides adhesive forces sufficient to completely detach transponder **178** from release liner **182**, thus completing the function of Block **247** where work flow returns to Block **240** for another transponder encoding cycle to begin.

While the invention has been particularly shown and described with reference to certain embodiments, it will be understood by those skilled in the art that various changes in form and detail may be made without departing from the spirit and scope of the invention.

I claim:

1. An RFID transponder comprising:
   a substrate;
   an antenna structure formed on the substrate; and
   an RFID integrated circuit chip which is electrically coupled to the antenna structure,
   wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space,
   wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and
   wherein the unique serial number space comprises the limited number of most significant bits corresponding to the allocated block and remaining bits of lesser significance that together comprise the one serial number instance.

2. The RFID transponder of claim **1**, wherein the object class information space is encoded with information comprising a company prefix, an item reference, a partition value, and a filter value.

3. The RFID transponder of claim **1**, wherein the unique object number is a portion of a serialized global trade item number.

4. The RFID transponder of claim **3**, wherein the serialized global trade item number is an EPC SGTIN-96 encoding.

5. The RFID transponder of claim **1**, wherein the unique serial number space is at least 38 bits.

6. The RFID transponder of claim **1**, wherein the allocated block is defined by at least 3 most significant bits.

7. The RFID transponder of claim **1**, wherein the allocated block is one of a plurality of allocations intermittently received by an encoder.

Plaintiff's Trial Exhibit No. 1
Page 40 of 43
ADASA-007457

US 9,798,967 B2

37    38

**8**. The RFID transponder of claim **1**, wherein the RFID integrated circuit chip is comprised of silicon.

**9**. The RFID transponder of claim **1**, wherein the RFID integrated circuit chip is comprised of polymer.

**10**. The RFID transponder of claim **1**, wherein the substrate, antenna structure, and RFID integrated circuit chip are covered by a face stock material.

**11**. The RFID transponder of claim **1**, wherein the RFID integrated circuit chip is disposed on the substrate.

**12**. The RFID transponder of claim **1**, wherein the limited number of most significant bits that correspond to the allocated block further correspond to an encoder that encodes the RFID transponder.

**13**. A RFID transponder comprising:

a substrate;

an antenna structure formed on the substrate; and

an RFID integrated circuit chip which is electrically coupled to the antenna structure,

wherein the RFID integrated circuit chip is encoded with a global trade item number including a unique object number, the unique object number comprising an object class information space including a block of at least 50 bits and a unique serial number space including a block of at least 38 bits,

wherein the unique serial number space has one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and

wherein the unique serial number space comprises at least 3 most significant bits corresponding to the allocated block.

**14**. The RFID transponder of claim **13**, wherein the unique serial number space further comprises remaining bits of lesser significance that together with the at least 3 most significant bits comprise the one serial number instance.

**15**. The RFID transponder of claim **13**, wherein the at least 3 most significant bits that correspond to the allocated block further correspond to an encoder that encodes the RFID transponder.

**16**. An integrated circuit, comprising:

a radio frequency circuit configured to backscatter a return link signal for processing by an RFID interrogator;

control logic; and

a memory,

wherein the memory is configured with a unique object number space, the unique object number space comprising an object class information space and a unique serial number space,

wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and

wherein the unique serial number space comprises the limited number of most significant bits corresponding to the allocated block and remaining bits of lesser significance that together comprise the one serial number instance.

**17**. The integrated circuit of claim **16**, wherein the object class information space is encoded with information comprising a company prefix, an item reference, a partition value, and a filter value.

**18**. The integrated circuit of claim **16**, wherein the unique object number is a portion of a serialized global trade item number.

**19**. The integrated circuit of claim **18**, wherein the serialized global trade item number is an EPC SGTIN-96 encoding.

**20**. The integrated circuit of claim **16**, wherein the limited number of most significant bits that correspond to the allocated block further correspond to an encoder that encodes the memory of the integrated circuit.

* * * * *

Plaintiff's Trial Exhibit No. 1
Page 41 of 43
ADASA-007458

Appx99



US009798967C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (11358th)

# United States Patent
McAllister

(10) **Number:** US 9,798,967 C1
(45) **Certificate Issued:** *Jul. 30, 2018

(54) **SYSTEMS, METHODS, AND DEVICES FOR COMMISSIONING WIRELESS SENSORS**

(71) Applicant: **ADASA INC.**, Eugene, OR (US)

(72) Inventor: **Clarke W. McAllister**, Eugene, OR (US)

(73) Assignee: **ADASA INC.**, Eugene, OR (US)

**Reexamination Request:**
No. 90/014,052, Nov. 29, 2017

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **9,798,967** |
| Issued: | **Oct. 24, 2017** |
| Appl. No.: | **15/042,993** |
| Filed: | **Feb. 12, 2016** |

( * ) Notice: This patent is subject to a terminal disclaimer.

### Related U.S. Application Data

(63) Continuation of application No. 13/526,520, filed on Jun. 19, 2012, now Pat. No. 9,272,805, which is a continuation-in-part of application No. 12/820,109, filed on Jun. 21, 2010, now Pat. No. 8,228,198, which is a continuation-in-part of application No. 11/465,712, filed on Aug. 18, 2006, now Pat. No. 7,830,258, said application No. 12/820,109 is a continuation-in-part of application No. 12/124,768, filed on May 21, 2008, now abandoned.

(60) Provisional application No. 60/709,713, filed on Aug. 19, 2005, provisional application No. 60/939,603, filed on May 22, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| *H04Q 5/22* | (2006.01) |
| *G06K 19/077* | (2006.01) |
| *B65C 9/18* | (2006.01) |
| *B65C 11/00* | (2006.01) |
| *B65C 9/40* | (2006.01) |
| *B65C 9/00* | (2006.01) |
| *G06K 17/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ...... *G06K 19/07716* (2013.01); *B65C 9/1865* (2013.01); *B65C 11/006* (2013.01); *G06K 19/077* (2013.01); *B65C 2009/0003* (2013.01); *B65C 2009/404* (2013.01); *G06K 2017/0041* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/014,052, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Christina Y Leung

(57) **ABSTRACT**

In one embodiment the present invention comprises a smartphone and encoders for commissioning RFID transponders. The present invention further includes novel systems, devices, and methods for commissioning RFID transponders with unique object class instance numbers without requiring a realtime connection to a serialization database.



Plaintiff's Trial Exhibit No. 1
Page 42 of 43
ADASA-007459

Appx100

US 9,798,967 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **1**, **13** and **16** are determined to be patentable as amended.

Claims **2-12**, **14**, **15** and **17-20**, dependent on an amended claim, are determined to be patentable.

1. An RFID transponder comprising:
a substrate;
an antenna structure formed on the substrate; and
an RFID integrated circuit chip which is electrically coupled to the antenna structure,
wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space,
wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits,
wherein the unique serial number space comprises the limited number of most significant bits *uniquely* corresponding to *the limited number of most significant bits of* the allocated block and of remaining bits of lesser significance that together comprise the one serial number instance.

**2**

13. A RFID transponder comprising:
a substrate;
an antenna structure formed on the substrate; and
an RFID integrated circuit chip which is electrically coupled to the antenna structure,
wherein the RFID integrated circuit chip is encoded with a global trade item number including a unique object number, the unique object number comprising an object class information space including a block of at least 50 bits and a unique serial number space including a block of at least 38 bits,
wherein the unique serial number space has one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and
wherein the unique serial number space comprises at least 3 most significant bits *uniquely* corresponding to *the limited number of most significant bits of* the allocated block.

16. An integrated circuit, comprising:
a radio frequency circuit configured to backscatter a return link signal for processing by an RFID interrogator;
control logic; and
a memory,
wherein the memory is configured with a unique object number space, the unique object number space comprising an object class information space and a unique serial number space,
wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits,
wherein the unique serial number space comprises the limited number of most significant bits *uniquely* corresponding to *the limited number of most significant bits of* the allocated block and of remaining bits of lesser significance that together comprise the one serial number instance.

\*   \*   \*   \*   \*

ADASA-007460

Appx101

John Mansfield, OSB No. 055390
john@harrisbricken.com
HARRIS BRICKEN
511 SE 11th Avenue, Suite 201
Portland, OR  97214
Telephone:  503-207-7313

Jonathan T. Suder (pro hac vice to be filed)
Brett M. Pinkus (pro hac vice to be filed)
Glenn S. Orman (pro hac vice to be filed)
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX 76102
Telephone:  817-334-0400

ATTORNEYS FOR PLAINTIFF
ADASA INC.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# EUGENE DIVISION

| | |
|---|---|
| **ADASA Inc.,** | Case No.:  6:17-cv-1685 |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| **AVERY DENNISON CORPORATION,** | |
| Defendant. | |

Plaintiff ADASA INC. ("Plaintiff" or ADASA") files this Complaint against Defendant

AVERY DENNISON CORPORATION alleging as follows:

## I.  THE PARTIES

Page 1 - COMPLAINT

Appx102

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**ADASA INC.**                                          **Case No.: 6:17–cv–01685–TC**
    **Plaintiff(s),**

v.

**AVERY DENNISON CORPORATION**
    **Defendant(s).**

---

## Civil Case Assignment Order

**1.    Presiding Judge:** The above referenced case has been filed in the Eugene Division of the U.S. District Court for the District of Oregon and assigned to:

Presiding Judge . . . . . . . . . . . . . . . . . . . . . . . Hon. Thomas M. Coffin
Presiding Judge's Suffix Code* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TC

*These letters must follow the case number on all future filings.*

**2.    Courtroom Deputy Clerk:** Questions about the status or scheduling of this case should be directed to:

        Paul Bruch
        Telephone:  541–431–4111
        Email:  paul_bruch@ord.uscourts.gov

**3.    Case Administrator/Docket Clerk:** Questions about filings or docket entries in this case should be directed to:

        Telephone:  541–431–4100

**4.    Place of Filing:** Any paper filings must be submitted to the Clerk of Court, Wayne L. Morse Courthouse, 405 East Eighth Ave., Eugene, OR, 97401. (*See* LR 3–1, LR 5–5.)

**5.    District Court Website:** Information about local rules of practice, CM/ECF electronic filing requirements, responsibility to redact personal identifiers from filings, and other related information can be found on the Court's website at ord.uscourts.gov.

**6.    Jurisdictional Authority of Magistrate Judges:**

    a.    **Pretrial Administration:** Pursuant to LR 72, the assigned United States Magistrate Judge is authorized to conduct all pretrial proceedings contemplated by 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72 without further designation of the Court.

    b.    **Trial by Consent and Appeal Options:** Pursuant to LR 73, 28 U.S.C. § 636(c), and Fed. R. Civ. P. 73, all United States Magistrate Judges in this district are certified to exercise civil jurisdiction in assigned cases and, with the consent of the parties, enter final orders on dispositive motions, conduct trial, and enter final judgment which may be appealed directly to the Ninth Circuit Court of Appeals (instead of a district judge).

Appx158

**Brenna K. Legaard,** OSB #001658
Email: blegaard@schwabe.com
**Angela E. Addae,** OSB #163335
Email: aaddae@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: (503) 222-9981
Facsimile: (503) 796-2900

*Attorneys for Defendant and Counterclaimant,*
*Avery Dennison Corporation*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ADASA INC., | Case No.  6:17-cv-01685-TC |
| Plaintiff, Counterclaim Defendant, | **DEFENDANT AVERY DENNISON CORPORATION'S MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)** |
| **v.** | |
| **AVERY DENNISON CORPORATION**, | |
| Defendant, Counter Claimant. | **REQUEST FOR ORAL ARGUMENT** |

## <u>LR 7-1 CERTIFICATION</u>

Pursuant to Local Rule 7-1(a)(1)(A), Defendant and Counter Claimant Avery Dennison

Corporation ("Avery") certifies that its counsel of record has conferred in good faith with

counsel for Plaintiff and Counterclaim Defendant Adasa, Inc. ("Adasa") regarding the subject

matter of this motion in an effort to resolve the issues raised herein, but that the parties have been

unable to resolve this matter.

Page 1 -   DEFENDANT AVERY DENNISON CORPORATION'S
            MOTION FOR JUDGMENT ON THE PLEADINGS
            PURSUANT TO FED. R. CIV. P. 12(c)

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx189

570 (2007).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  Similarly, dismissal is proper where the claim "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

### B.    Standards for Patent Eligibility under § 101

According to § 101 of the Patent Act, patent-eligible subject matter is "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  The Supreme Court has articulated a notable exception: "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013).

To determine whether a claim falls outside the scope of § 101, courts apply the two-step framework described in *Alice Corp. Pty. v. CLS Bank Int'l.* 134 S. Ct. 2347, 2355 (2014).  Courts examine "(1) whether the claim is directed to a patent-ineligible concept, i.e., a law of nature, a natural phenomenon, or an abstract idea, and if so, (2) whether the elements of the claim, considered both individually and as an ordered combination, add enough to transform the nature of the claim into a patent-eligible application." *Affinity Labs of Texas, LLC v. DIRECTV, LLC,* 838 F.3d 1253, 1257 (Fed. Cir. 2016).

Under the first step of the *Alice* inquiry, courts must "look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter." *Id.* at 1257. In step two, courts determine whether the claim elements identify an "inventive concept." *Id.* at 1258.  To be deemed inventive, the concept "must do more

Page 10 -   DEFENDANT AVERY DENNISON CORPORATION'S
             MOTION FOR JUDGMENT ON THE PLEADINGS
             PURSUANT TO FED. R. CIV. P. 12(c)

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

than simply recite 'well-understood, routine, conventional activity.'" *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016).

Because whether a claim recites patent-eligible subject matter under § 101 is a question of law, the Federal Circuit has routinely recognized that it is appropriate to determine patent eligibility under § 101 on a motion for judgment on the pleadings. *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014) ("Section 101 patent eligibility is a question of law[.]"). *See, e.g., RecogniCorp., LLC v. Nintendo Co.*, 855 F.3d 1322, 1324 (Fed. Cir. 2017); *Amdocs*, 841 F.3d at 1293; *Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014). So too has this Court found claims to be invalid under Section 101 at the judgment on the pleadings stage of litigation. *See, e.g.*, *E-Tool Development, Inc. v. Maxim Integrated Products, Inc.*, 3:17-CV-720-PK, Dkt. 44 (D. Or. Jan. 11, 2018) (Papak, J.). Moreover, where "no claim construction dispute relevant to the eligibility issue" exists, the court may determine patent eligibility under § 101 without engaging in a claim construction procedure. *E-Tool Development,* 3:17-CV-720-PK, Dkt 44 at 13 n.2; *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1373-74 (Fed. Cir. 2016); *see also Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)* 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[C]laim construction is not an inviolable prerequisite to a validity determination under § 101.").

IV.    **ARGUMENT**

A.    **Adasa's Claims are Directed to an Abstract Idea.**

The analysis of claim 1 begins with step one of the *Alice* inquiry. The Court must first "consider the claims in their entirety to ascertain whether they are directed to ineligible subject matter." *Secured Mail Sols., LLC v. Universal Wilde, Inc.,* 873 F.3d 905, 909 (Fed. Cir. 2017) (*quoting Internet Patents Corp. v. Active Network, Inc.,* 790 F.3d 1343, 1346 (Fed. Cir. 2015)).

Page 11 -    DEFENDANT AVERY DENNISON CORPORATION'S
             MOTION FOR JUDGMENT ON THE PLEADINGS
             PURSUANT TO FED. R. CIV. P. 12(c)

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

This Court must consider whether the focus of the claims is on an improved RFID technology, or instead, "on a process that qualifies as an 'abstract idea' for which [RFID transponders] are merely invoked as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016); *see also Rapid Litig. Mgmt. v. CellzDirect, Inc.*, 827 F.3d 1042 (Fed. Cir. 2016).

A method of allocating blocks of serial numbers defined by a common sequence of bits is not patentable because it is a mental process. An individual could perform this method in his or her mind, or with pencil and paper, by simply deciding that encoder no. 1 shall use serial numbers beginning with 111, encoder number 2 shall use serial numbers beginning with 110, encoder number 3 shall use serial numbers beginning with 101, etc.

Mental processes are processes that can be performed entirely in a person's mind or with a pencil and a pad of paper. *Synopsys, Inc. v. Mentor Graphics Corp.,* 839 F.3d 1138, 1145 (Fed. Cir. 2016). Mental processes are a subcategory of unpatentable abstract idea. *Id.* (*citing CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011)). No one may patent a thought process. "Methods which can be performed entirely in the human mind are unpatentable" because "computational methods that can be performed entirely in the human mind are the types of methods that embody the basic tools of scientific and technological work that are free to all men and reserved exclusively to none." *CyberSource Corp.*, 654 F.3d at 1373. In *Synopsys*, the Federal Circuit held that "[w]hile the Supreme Court has altered the *§ 101* analysis since *CyberSource* in cases like *Mayo* and *Alice*, we continue to 'treat[] analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category." 839 F.3d at 1146 (*quoting Elec. Power Grp., LLC v. Alstom S.A.,*830 F.3d 1350, 1354 (Fed. Cir. 2016)).

Page 12 -   DEFENDANT AVERY DENNISON CORPORATION'S
MOTION FOR JUDGMENT ON THE PLEADINGS
PURSUANT TO FED. R. CIV. P. 12(c)

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx200

The claims of the '967 patent are not directed to new or improved RFID technology, because it is undisputed that the claimed RFID transponder functions identically whether the serial number saved on it is one of a block of serial numbers or not. Nothing in the claims defines an improvement in the way that RFID transponder's memory stores or retrieves information, in how the transponder sends signals, or in how the transponder otherwise functions from a technical perspective. The allegedly novel, patentable subject matter invented by Mr. McAllister is the part of the claim that requires that the number stored on the RFID transponder be one of an allocated block of serial numbers, as defined by most significant bits. Adasa seeks to patent this mental process by patenting its result, but the claim is still directed toward the mental process.[2]

Adasa may argue that it is possible or even desirable to allocate blocks of serial numbers with a computer-based design tool or other technology, rather than with paper and pencil. However, the claims of the patent are not limited to any such technology, and "[t]he §101 inquiry must focus on the language of the Asserted Claims themselves." *Synopsys*, 839 F.3d at 1149. In *Synopsys*, the Federal Circuit held that "[w]hile Synopsys may be correct that the inventions of the Gregory Patents were intended to be used in conjunction with computer-based design tools, the Asserted Claims are *not confined to that conception*," and therefore were invalid under §101 as unpatentable mental processes. 839 F.3d at 1149 (emphasis added).

Under *Alice* step one, the claims are directed to the abstract idea of allocating blocks of serial numbers using sequences of bits. This is what the Complaint contends was Mr. McAllister's invention.

---

[2] Should Adasa argue and should the Court determine that the claims are directed to the tag itself, Avery Dennison moves herein in the alternative for summary judgment that the claims are invalid as lacking novelty. RFID tags predated the patent by years, as is described in the Complaint and the '967 patent itself.

Page 13 -   DEFENDANT AVERY DENNISON CORPORATION'S
            MOTION FOR JUDGMENT ON THE PLEADINGS
            PURSUANT TO FED. R. CIV. P. 12(c)

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

**B.    The Claims do not Contain an Inventive Concept.**

In step two, the Court must examine the elements of the claims both individually and as an ordered combination to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. Simply "'appending conventional steps, specified at a high level of generality,' which are 'well known in the art' and consist of 'well-understood, routine, conventional activities' previously engaged in by workers in the field" is insufficient to supply the inventive concept. *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016).

The only allegedly novel aspect of these claims is the idea of defining and allocating blocks of serial numbers via common sequence of bits, which is an abstract idea. All of the other requirements of the claims are either attributes of generic RFID transponders or requirements of the EPC SGTIN-96 standard, as described in Paragraph 15 of the Complaint. The specification of the '967 patent itself makes it clear that the features of RFID transponders recited in the claims are generic to RFID transponders and existed long before the '967 patent was filed. The Background section of the '967 patent, 1:40-43, describes RFID transponders as having integrated circuit chips containing memory space and an antenna structure mounted on a supporting substrate as recited in claims 1, 11, 12, 13, and 16. Claims 8 and 9 require that the integrated circuit be comprised of silicon or polymer, respectively. The Complaint does not contend that Mr. McAllister invented silicon or polymer integrated circuit chips. Claims 2, 3, 4, 5, 17, 18, and 19 were copied from the EPC SGTIN-96 standard, which also predates the '967 patent and was not invented by Mr. McAllister. (Compl. ¶¶ 11, 12, 15; '967 patent, 8:20-22). There is simply nothing else in the claims.

Page 14 -    DEFENDANT AVERY DENNISON CORPORATION'S
MOTION FOR JUDGMENT ON THE PLEADINGS
PURSUANT TO FED. R. CIV. P. 12(c)

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx202

The Supreme Court has held that recitation of generic devices, like computers or RFID transponders, "cannot transform a patent-eligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358. Using generic RFID transponders to number items in trade, which is their intended use, is no more inventive than using Post-It notes to label items. Nor can a generic RFID transponder be made patentable by encoding a number on it, whatever the number. To find otherwise would be to find that one could make a legal pad patentable by writing a number on it.

The recitation of the transponder and the chip are no more than "drafting effort[s] designed to monopolize" Mr. McAllister's method of allocating blocks of serial numbers to different encoders. *Alice*, 134 S. Ct. at 2358. The functions performed by the transponders and chips are "purely conventional." *Id.* As the Federal Circuit has previously noted, "[i]n order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed." *DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1334 (Fed. Cir. 2012). A machine that functions "solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations" does not fulfill this requirement. *Id.* (quotations omitted). As the Complaint illustrates, Adasa has not sued Avery Dennison for tagging consumer goods with RFID tags encoded in accordance with the EPC SGTIN-96 standard, which is something that Avery Dennison has every right to do. Instead, it has sued Avery Dennison for encoding at least one RFID transponder with a serial number that Adasa contends is one of a block of serial numbers which all share a common sequence of most significant bits. In other words, Adasa has sued Avery Dennison for using an abstract idea. There is no inventive concept in the claims beyond this abstract idea, and therefore the claims are all invalid.

Page 15 -   DEFENDANT AVERY DENNISON CORPORATION'S
MOTION FOR JUDGMENT ON THE PLEADINGS
PURSUANT TO FED. R. CIV. P. 12(c)

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx203

## V.    CONCLUSION

For the foregoing reasons, judgment on the pleadings of invalidity of all claims of the

'967 patent is appropriate.

Dated this 22nd day of February 2018.        Respectfully submitted,

SCHWABE, WILLIAMSON & WYATT, P.C.

By: s/ Brenna K. Legaard
    Brenna K. Legaard, OSB #001658
    Email: blegaard@schwabe.com
    Angela E. Addae, OSB #163335
    Email: aaddae@schwabe.com
    1211 SW 5th Avenue, Suite 1900
    Portland, OR 97204
    Telephone: 503-222-9981
    Facsimile: 503-796-2900

    *Of Attorneys for Defendant*
    *Avery Dennison Corporation*

Page 16 -    DEFENDANT AVERY DENNISON CORPORATION'S
           MOTION FOR JUDGMENT ON THE PLEADINGS
           PURSUANT TO FED. R. CIV. P. 12(c)

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx204

John Mansfield, OSB No. 055390
HARRIS BRICKEN
121 SW Morrison, Suite 400
Portland, OR  97204
(503) 207-7313
john@harrisbricken.com

Jonathan T. Suder (admitted *pro hac vice*)
Brett M. Pinkus (admitted *pro hac vice*)
Glenn S. Orman (admitted *pro hac vice*)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX  76102
(817) 334-0400
(817) 334-0401 fax
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION**

| | |
|---|---|
| **ADASA INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**AVERY DENNISON CORPORATION,**<br><br>Defendant. | Case No.: 6:17-CV-01685-TC<br><br>**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGEMENT ON THE PLEADINGS**<br><br>**JURY TRIAL DEMANDED** |

Page 1 -    PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
            MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx216

corresponding to an allocated block of serial numbers and "remaining bits of lesser significance." *See* Dkt. No. 1-2 at Claims 1, 13, 16. Prior art RFID transponders, including those cited by Avery in connection with the illustrative example of RFID systems for pet identification and from *RFID for Dummies*, did not comprise a serial number portion partitioned in this manner and it is the implementation of such a configuration, in accordance with the language of the challenged claims, that results in an improvement to RFID technology related to the commissioning of transponders. Williams Decl. at ¶12-15, 19, 22-24

Avery's Motion should be denied in its entirety and all claims of the '967 Patent should be found to be directed to patent eligible subject matter.

## II.    THE '967 PATENT

The '967 Patent relates, in part, to systems comprising commissioned wireless radio frequency identification ("RFID") devices. Dkt. 1-2 at 1:25-31. More specifically, the '967 Patent discloses and claims improvements to RFID systems "that enable point-of-use and on-demand commissioning[4] of RFID transponder-equipped wireless sensors" which solved a problem faced in the industry while accommodating improvements in RFID transponder commissioning efficiency. Dkt. No. 1-2 at 1:27-31. Before discussing the '967 Patent, a brief discussion of RFID technology is provided for context.

RFID systems have been in use in consumer applications since at least the 1990s and over the past decades have grown in popularity, slowly replacing bar codes and other identification implements for item tracking, inventorying, warehousing, and other applications.

---

[4] Commissioning, the process of encoding specific information (for example, data representing an object identifier, the date-code, batch, customer name, origin, destination, quantity, and items) associated with an object (for example, a shipping container), associates a specific object with a unique RFID transponder. Dkt. No. 1-2 at 1:45-50.

Page 10 -    PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
             MOTION FOR JUDGEMENT ON THE PLEADINGS

RFID tags, or transponders, are affixed to items to identify and track those items as they move through the stream of commerce. Williams Decl. at ¶4. RFID has become preferable and is slowly augmenting prior art tagging systems, such as bar codes, because RFID can accommodate *specific* identification of the item to which it is affixed, rather than merely identifying items by class or type. Williams Decl. at ¶5. Due to the item-specific nature of RFID tagging, a critical aspect to proper function of RFID systems, therefore, is ensuring that every RFID transponder, throughout the entirety of the stream of commerce, is assigned a unique Electronic Product Code ("EPC"). Williams Decl. at ¶5.

Global standards have developed which define the format and allocation of EPCs. For example, EPCs may be encoded in accordance with data standards set by GS1 for a serialized identifier, such as a Serialized Global Trade Item Number (SGTIN), which includes object class information in combination with a serial number for a specific item. Williams Decl. at ¶5-7.

The information within the object code portion is the same as contained in a typical barcode, identifying the brand owner (via a string of data representing an assigned company prefix) and the class of the tagged item (via a string of data representing an item reference code). Williams Decl. at ¶8. The object class data for all EPCs allocated within a particular object class and for a particular brand owner will have the same object class information. Williams Decl. at ¶8. The object class data within an EPC will be different, however, for other items of other classes tagged by the same brand owner or for items of the same class produced by other brand owners. Williams Decl. at ¶8. The object class data is represented in hexadecimal form as an unserialized Uniform Resource Identifier ("URI") of an EPC. Williams Decl. at ¶8. For example, an unserialized URI of the EPC may read as:

Page 11 -    PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
             MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx226

EPC Pure URI
urn:epc:id:sgtin:012345.67890

Williams Decl. at ¶8.

A serial number is then assigned by the brand owner and appended to the unserialized URI to create a serialized URI for identifying the particular item tagged. Williams Decl. at ¶9. Serial numbers, as assigned, generally comprise an integer value in decimal form. Williams Decl. at ¶9. Each serial number assigned is unique from all others for that class of items to ensure uniqueness of every resulting serialized URI and EPC. Williams Decl. at ¶9. This is critical to proper function of an RFID system. The GS1 serialization guideline places the responsibility on the brand owner for implementing strategies ensuring uniqueness of its EPCs. Williams Decl. at ¶9. A serialized URI which may read as:

EPC Pure URI
urn:epc:id:sgtin:012345.67890.10479832

Williams Decl. at ¶10.

Serialized URIs were typically constructed at a database level within the operations of a brand owner upon request prior to the conception and implementation of the inventions disclosed and claimed in the '967 Patent. Williams Decl. at ¶11. The serialized URI was then transmitted to an RFID encoder in decimal or hexadecimal form, where it is then converted to a binary representation of the data string. Williams Decl. at ¶11-14. The binary version of the serialized URI was formatted according to applicable standards and stored in the memory of an RFID transponder to "commission" the transponder. Williams Decl. at ¶11. The final binary format of the EPC may be formatted in accordance with the SGTIN-96 standards, shown below, which includes an 8-bit for a header indicating the EPC format used followed by a 50-bit string of

Page 12 -    PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
             MOTION FOR JUDGEMENT ON THE PLEADINGS

object class information including a filter value, partition value, company prefix, and an item reference number, and finally a 38-bit unique serial number. Williams Decl. at ¶11.

A typical EPC SGTIN-96 Structure:



EPC SGTIN−96 Binary

Williams Decl. at ¶11.

Several approaches for managing and assigning EPCs have developed.  Conventional approaches, those in place prior to the '967 Patent, data representing the entire EPC, in the decimal EPC Pure URI form shown in the graphic above, was issued directly from a database to individual RFID encoders to generate an EPC and commission a transponder on demand. Williams Decl. at ¶11-13. The database coordinated EPC allocation across the operations of an entire entity, which may comprise many local and/or remote continuously operating product lines.  This scheme ensured that no redundant serial numbers were assigned because all serial numbers were assigned sequentially by the database and upon request. Williams Decl. at ¶12. Disadvantageously, this scheme required constant communication between the encoder devices commissioning RFID transponders on the product lines with the database to ensure uniqueness. Williams Decl. at ¶15. The inventions disclosed and claimed in the '967 Patent improved the operation of RFID systems to eliminate this disadvantageous feature.  Williams Decl. at ¶16-24.

Page 13 -    PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
             MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx228

The claimed invention of the '967 Patent provides a distinct hardware-based approach for generating serialized URIs and, correspondingly, EPCs at the encoder level which simultaneously ensures uniqueness across all operations of a company and eliminates the need for constant communication with a database. Dkt. No. 1-2 at 3:27-35; Williams Decl. at ¶22.  To accomplish this, the '967 Patent teaches manipulation of the binary bits of the serial number portion of the EPC to partition the serial number space into a first section comprising a limited number of most significant bits along with a second section comprising bits of lesser significance. Dkt. No. 1-2 at 8:4-15, 8:21-32, 33:20-23; Williams Decl. at ¶22.  A unique string of most significant bits is assigned for encoding into the first section, which delineates the size and range of a block of serial numbers and which can also be used to identify each encoder. Dkt. No. 1-2 at 8:11-15, 8:23-32; Williams Decl. at ¶22. The encoder, itself, then generates unique strings of bits of lesser significance to create unique serial numbers within the block for encoding into the second section, without having to coordinate with the database. Dkt. No. 1-2 at 8:32-37; Williams Decl. at ¶22. The RFID transponders commissioned using this approach comprise a data configuration not previously known in the RFID field, comprising a partitioned serial number configuration. Williams Decl. at ¶24.

The hardware-based approach taught by the '967 Patent is accomplished by managing assignment of the serial number *at the binary bit* level, rather than sequential allocation of decimal or hexadecimal number strings later implemented in machine-readable binary form. Williams Decl. at ¶24.  Assignment and commissioning both occur in the binary realm.  By way of example, the partitioned data arrangement implemented on RFID transponders commissioned in accordance with the teaching of the '967 Patent may be represented as shown below, with the

Page 14 -   PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
            MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx229

first 14 bits of the serial number comprising the "most significant bits" and the remaining 24 comprising the "least significant bits":



Williams Decl. at ¶23.

Expanding this to the operations of an entire company across the commerce stream, each encoder is assigned a set of most significant bits to use for a particular class or classes of items for a particular brand owner. Dkt. No. 1-2 at 8:48-51; Williams Decl. at ¶22. The encoder encodes its assigned set of most significant bits for each item of that particular class into the leading bits of the serial number space and generates a serial number that is encoded in the remaining bits of the serial number space. Williams Decl. at ¶22. By partitioning the leading bits of the serial number and assigning fixed most significant bits to encoders from different assembly lines, facilities, or parties, the brand owner can enable each of the encoders to operate quasi-autonomously within its own numbering space to uniquely encode tags *without connecting to a database*. Williams Decl. at ¶22. The uniqueness of the serial number is ensured within and across the ranges of numbers that are assigned to each encoder throughout the stream of commerce. Williams Decl. at ¶22.

An exemplary embodiment discussed in the '967 Patent partitions the serial number space into a 14-bit section of most significant bits and a 24-bit section of lesser significant bits. Dkt. 1-2 at 8:21-31. According to this scheme, 16,384 blocks of serial numbers are available for assignment to encoders. Dkt. No. 1-2 at 8:25-26. Each encoder may then generate and assign

Page 15 -   PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
            MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx230

16,777,216 unique serial numbers for commissioning RFID transponders, implementing them with the partitioned serial number arrangement. Dkt. 1-2 at 8:29-31.  An encoder may be implemented with one or more such blocks of most significant bits and potentially operate *without need to communicate with a database for weeks up to several years*, depending on the rate of commissioning, to commission transponders configured with EPCs comprising partitioned serial numbers.  Dkt. No. 1-2 at 8:37-51.

The claimed solutions of the '967 Patent were not well-known, routine, or conventional in the RFID field at the time of invention.  Conventional schemes involved a database generating and allocating one or more serial numbers at a time, sequentially, in their entirety, and in decimal form, and then transmitting a complete serialized EPC, either in decimal or hexadecimal form, to individual encoders for commissioning of RFID transponders. Williams Decl. at ¶12-19. Critically, reliance on constant communication with a database introduced vulnerabilities including network failure and "non-deterministic network delays."[5]  Dkt. No. 1-2 at 3:65-4:12; Williams Decl. at ¶15-16. These vulnerabilities could slow or outright halt commissioning of RFID transponders simply because of deficiencies in one or more communication networks accommodating communication between the database and on-the-line components within the RFID commissioning systems.  Dkt. No. 1-2 at 8-12.

Even in a scheme such as cited by Avery from *RFID for Dummies*, in which a block of serial numbers is assigned to each manufacturing facility, the entire serial number for each instance within the block is being allocated by the database in decimal form.  Williams Decl. at ¶12, 19. As a result, each encoder is supplied with blocks of serialized EPCs – each being the

---

[5] These are defined as delays due to the probabilistic nature of packet collisions that are common in Ethernet and WiFi network connections.  Dkt. No. 1-2 at 4:2-4.

Page 16 -    PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx231

complete EPC including the object class information and a serial number in decimal or its converted hexadecimal form – from which the encoder simply selects the next available sequential EPC. Williams Decl. at ¶19. The database manages the issuance of the EPC blocks based on the decimal or hexadecimal identity of the complete serialized EPC.  Likewise, despite Avery's inaccurate explanation to the contrary in the example it provided, RFID chips used for pet identification utilize a manufacturer code that is a decimal number (not binary bits) that is separate and apart from the serial number, and which is more akin to the object class information of an EPC.  *See* Dkt. 18-1, Exh. 1 at 4 ("the 3-digit country code can contain an assigned ISO country code or a manufacturer code **from 900 to 998** *plus its identifying* **serial number**.").[6]

In contrast, implementation of the partitioned serial number arrangement of the '967 Patent entails active management of the most significant bits of the binary encoding of the serial at the bit level. Williams Decl. at ¶22-24. This yields a different hardware-based approach in which the database merely tracks the most significant bits designations for each encoder, assigned in binary form, while the encoders generate and assign serial numbers, in binary form, to create unique EPCs in real time as it commissions transponders. The only required communication between database and encoders is *after* commissioning operations are complete for recordation of data from the commissioned transponders.

Additionally, the teachings of the '967 Patent, namely the implementation of the partitioned serial number configuration within the memories of the RFID transponders, accommodate assignment of serial numbers in an unconventional manner (i.e., non-sequentially). Conventional schemes assigned serial numbers in a sequential manner, either individually or in

---

[6] Avery did not include the actual ISO 11784 standard governing pet ID chip protocols in its pleadings or with its motion, but rather only provided a Wikipedia article which providing its own brief explanation of the standard as an exhibit to its motion.  *See* Dkt. No. 18-1.

Page 17 -     PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
              MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx232

groups, upon requests from encoders, within a particular object class.  For example, for each EPC generated using a database, the next available serial number within the object class is assigned and transmitted.  Conversely, the assignment scheme taught by the '967 Patent is divorced from reliance on a central database for coordination and, as such, serial numbers need not be assigned in sequential order within a particular object code.

By way of example, in a simplified system of two encoders in which the serial number portion comprises just two most significant bits and two least significant bits, the first encoder may use "00" as its most significant bits while the second uses "01."  Commissioning of tags may proceed for each simultaneously as follows (showing serial number portion only):

|  | Encoder 1 ("00"): | Encoder 2 ("01"): |
|---|---|---|
| Tag 1 | 00-00 | 01-00 |
| Tag 2 | 00-01 | 01-01 |
| Tag 3 | 00-10 | 01-10 |
| Tag 2 | 00-11 | 01-11 |

Notably, the simultaneous operation of Encoders 1 and 2 in this simple example demonstrate non-sequential assignment, as serial number 01-00 is assigned by Encoder 2 prior to 00-01 through 00-11 being assigned by Encoder 1.  Such non-sequential assignment across a businesses operation within a particular object code was not conventional in the prior art which relied upon a central database for on-demand assignment of serial numbers.

## III.   LEGAL STANDARDS

### A.  The Applicable Burden of Proof

Avery points out that a motion under Fed. R. Civ. P. 12(c) is "functionally identical" to, and carries the same standard as, a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Dkt. No. 17 at 9.  "A judgment on the pleadings is properly granted [only] when, taking all the allegations in

Page 18 -      PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
               MOTION FOR JUDGEMENT ON THE PLEADINGS

convincing evidence of ineligibility. For those reasons … *dismissal for lack of eligible subject matter will be the exception, not the rule." Ultramercial*, 722 F.3d at 1338-39 (internal citations omitted) (emphasis added).  Indeed, "an abstract idea should exhibit itself so manifestly as to override the broad statutory categories of eligible subject matter [processes, machines, manufactures, compositions of matter, or any new and useful improvement thereof] and the statutory context that directs primary attention on the patentability criteria of the rest of the Patent Act." *Research Corp.,* 627 F.3d at 868.

## IV.    THE CHALLENGED CLAIMS ARE DIRECTED TOWARD PATENT ELIGIBLE SUBJECT MATTER AT STEP ONE OF *ALICE*

The Supreme Court has noted that "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 566 U.S. at 71. "We must therefore ensure at step one that we articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful." *Thales Visionix, Inc. v. U.S.*, 850 F.3d 1343, 1347 (Fed. Cir. 2017) (citing to *Alice*, 134 S. Ct. at 2354) ("[W]e tread carefully in construing this exclusionary principle lest it swallow all of patent law."). Claims directed to specific improvements in computing systems are patent eligible, ending the inquiry at the first step of the *Mayo* test. *See, e.g., Enfish, LLC  v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 2018 U.S. App. LEXIS 601 (Fed. Cir. Jan. 10, 2018); *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 2018 U.S. App.  LEXIS 1931 (Fed. Cir. Jan. 25, 2018).

In *Enfish*, the Federal Circuit found claims directed to self-referential logical model for a computer database as directed to patent eligible subject matter at the first step of the *Mayo* test. The Court noted that the invention represented improvements over conventional computer databases  resulting  in  increased  flexibility,  faster  search  times,  and  smaller  memory

Page 21 -        PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
                 MOTION FOR JUDGEMENT ON THE PLEADINGS

requirements. The challenged claims were deemed "not simply directed to *any* form of storing tabular data, but instead [were] specifically directed to a *self-referential* table for a computer database" so that they functioned differently and better than conventional databases. *Enfish*, 822 F.3d at 1337. Importantly, the Court reasoned that "software can make non-abstract improvements to computer technology just as hardware improvements can… Therefore, we find it relevant to ask whether the claims are directed to an improvement in computer functionality versus being directed to an abstract idea, even at the first step of the *Alice* analysis." *Enfish*, 822 F.3d at 1335. The Court cautioned against "oversimplifying" computer-related inventions and noted that "[m]uch of the advancement made in computer technology consists of improvements to software that, by their very nature, may not be defined by particular physical features but rather by logical structures and processes." *Enfish*, 822 F.3d at 1337-38.

Similarly, in *Visual Memory*, the Federal Circuit reversed a district court holding which found the challenged claims directed to ineligible subject matter, citing favorably to its prior decision in *Enfish*. *Visual Memory*, 867 F.3d at 1258-59. The challenged claims were directed to the use of conventional memory components within a computer and purported to improve upon existing memory hierarchical structures through implementation of a "programmable operational characteristic" which, effectively, tailored the allocation scheme of data to be stored based upon characteristics of a processor. The Federal Circuit disagreed with the district court's conclusion that the claims were directed to the "'abstract idea of categorical data storage" and instead concluded that the challenged claims were directed to "an improved computer memory system." *Id.* at 1257, 1259. The Court relied on statements in the specification explaining the benefits of the memory structures claimed therein, such as "obviate[ing] the need to design a separate memory system for each type of processor, which proved to be costly and inefficient, and, at the

Page 22 - PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx237

same time, avoid the performance problems of prior art memory systems." *Visual Memory* at 1259.

In *Core Wireless*, the Federal Circuit affirmed a finding of several claims directed to an improved display interfaces as being patent eligible. The Court reasoned that the claims included terms like "application," "summary window," and "unlaunched state" which rendered the claims as specifically directed to cell phone and computer settings. *Core Wireless*, 2018 U.S. App. LEXIS 1931 at *4. Because of this, the claims were directed to a specific improvement in the capabilities of such devices, rather than to merely computerizing a process. *Id*, at *8-10 ("The asserted claims in this case are directed to an improved user interface for computing devices, not to the abstract idea of an index ... Although the generic idea of summarizing information certainly existed prior to the invention, these claims are directed to a particular manner of summarizing and presenting information in electronic devices."). The Federal Circuit noted that the specification teaches several deficiencies in the prior art interfaces which are purported to be remedied by the claimed invention. *Id*, at *11 (direct access to common functions via claimed interface improved efficiency of device usage).

Here, similarly, the disclosure and claims of the '967 Patent are directed toward effecting improvements to RFID transponders whereby efficiency improvements during commissioning are realized through implementation of transponders with a particular serial number configuration. Williams Decl. at ¶22, 24.  Specifically, the inventions claimed effect improved RFID transponders through implementation of a partitioned serial number. Williams Decl. at ¶22. The partitioned serial numbers comprise a limited number of most significant bits at its lead end that are used to correlate transponders to a particular product line, plant, product type, or RFID encoding device. Williams Decl. at ¶22. Allocation of blocks serial numbers through

Page 23 -      PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
                    MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx238

assignment of a particular sequence of most significant bits enables quasi-autonomous commissioning of EPCs without the need to request EPCs individually from a database. Williams Decl. at ¶22. The remaining bits of lesser significance comprising the serial number portion of an EPC may then be assigned sequentially or in another desired order. Williams Decl. at ¶22.

This represents an improvement in RFID transponders commissioned according to the methods comprising the prior art. Prior art transponders were not implemented with partitioned serial numbers. Williams Decl. at ¶24. Unique commissioning instead relied upon continuous communication between RFID encoders and a database to coordinate transponder commissioning activities throughout operations of one or more manufacturing and/or warehousing facilities. Williams Decl. at ¶12-15. Oftentimes these operations spanned several plants or warehouses comprising numerous product lines and products of various types.

Critically, reliance on constant communication with a database introduced vulnerabilities including network failure and/or delay. Dkt. No. 1-2 at 3:2-12. Conversely, use of RFID transponders implemented with the partitioned serial number configuration disclosed and claimed in the '967 Patent eliminated the need for continuous communication between RFID encoders and a database and, correspondingly, eliminated the vulnerabilities of the RFID system to network delays. *Id.* Rather, each encoder is operated quasi-autonomously to commission RFID transponders while still avoiding the possibility of redundant EPCs. Dkt. No. 1-2 at 8:4-15.

The means for effecting this solution are manifest in the claims of the '967 Patent.[7] For example, independent claim 1 recites:

---

[7] ADASA hereby objects to treatment of any claim, or claims, of the '967 Patent as being representative of any other claim or claims for the purpose of determination of patent eligibility under 35 U.S.C. § 101 and *Alice* subject to the following exceptions. Claim 1 may be treated as

Page 24 -    PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
             MOTION FOR JUDGEMENT ON THE PLEADINGS

**1.** An RFID transponder comprising:

a substrate;

an antenna structure formed on the substrate; and

an RFID integrated circuit chip which is electrically coupled to the antenna structure,

wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space,

wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, *the allocated block being assigned a limited number of most significant bits*, and

wherein *the unique serial number space comprises the limited number of most significant bits corresponding to the allocated block and remaining bits of lesser significance that together comprise the one serial number instance*."

Dkt. No. 1-2 at Claim 1 (emphasis added).

The emphasized portions of claim 1 place limitations on the serial number encoded on the claimed RFID transponder which directly relate to the solution disclosed in the '967 Patent and demonstrate that the focus of the claim is on an RFID transponder comprising a particular configuration suitable to addressing the problem disclosed in the '967 Patent. These limitations are addressed to a specific hardware-based approach for *how* the desired result of generating a unique serial number, and thus a unique object number (e.g., EPC) may be achieved, rather than being merely directed to the result itself.

Further, dependent claims 6, 7, and 12 provide additional limitations expanding upon the claimed serial number configuration, requiring respectively, that the limited number of most

representative of claims 2-5, 8-11, and 16-19. Claim 6 and claims 13-14 may be treated as representative of each other. Otherwise, the remaining claims are directed to unique subject matter of varying scope such that none are representative of one another. They comprises further narrowing limitations specifically toward aspects of the unique serial number partitioning configuration disclosed and its application, whereby each of these remaining claims comprises additional "transformative" subject matter pertinent to at least step two of *Alice*.

Page 25 -    PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
             MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx240

significant bits comprise three bits of data (claim 6), that the allocated block of serial numbers defined by its most significant bits be intermittently received (claim 7), and that the limited number of most significant bits defining an allocated block correspond to a particular encoder (claim 12). These limitations provide additional detail regarding *how* the solution disclosed is implemented. As such, the claims are not directed merely to an abstract idea or mental process but, rather, are directed to a specific configuration solving unique problem faced in the RFID transponder commissioning context. *Compare*, e.g., *Automated Tracking Sols., LLC v. Coca-Cola Co.*, 2018 U.S. App. LEXIS 3779 at *9-11 (Fed. Cir. Feb. 16, 2018).

### V.    THE CHALLENGED CLAIMS INCLUDE AN "INVENTIVE CONCEPT" FOR STEP TWO OF *ALICE*

For claims directed to a judicial exception at step one, courts then "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Finjan, Inc. v. Blue Coat Sys.*, 879 F.3d 1299 (Fed. Cir. 2018) (quoting *Mayo*, 132 S. Ct. at 1298). The "inventive concept" must be something sufficient to ensure that the claim amounts to "significantly more" than the abstract idea itself. *Id.* (quoting *Mayo*, 132 S.Ct. at 1294). To satisfy this prong, the claims must include additional features which are significantly beyond "well understood, routine, conventional activity" or a simple "instruction to implement or apply the abstract idea on a computer." *Ultramercial,* 772 F.3d at 715 (quoting *Mayo,* 132 S.Ct. at 1298.); *Bascom,* 827 F.3d 1341, 1349.

In *DDR Holdings II*, the Federal Circuit has explicitly differentiated abstract, ineligible subject matter "executed on a generic computer" and "fundamental economic and conventional business practices" from those rooted in the advancement of computer technology, stating:

Page 26 -    PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
               MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx241

[T]hese claims stand apart [ and are thus eligible for patent protection] because they do not merely recite the performance of some business practice known from the pre-internet world along with the requirement to perform it on the Internet. Instead, *the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."*

*DDR Holdings, LLC v. Hotels.com, L.P.,* 773 F.3d 1245, 1257 (Fed. Cir. 2014) *(DDR Holdings II)* (emphasis added).

Several cases subsequent to *DDR Holdings II* have recognized and applied the "computer improvement" principle. The court in *Cal. Inst. of Tech. v. Hughes Communs., Inc.,* 2014 U.S. Dist. LEXIS 156763 at *20 (C.D. Cal. 2014), explained the principle as follows: "The Supreme Court [in *Alice]* clarified some aspects of the doctrine ... perhaps most significantly, it left open the possibility that claims which improve the functioning of the computer itself or any other technology are patentable." The court then found the claims at issue eligible for patentability in part because they present a "unique computing solution that addresses a unique computing problem." *Id.* at *62.

Here, the claimed RFID transponders are implemented with a unique data structure partitioning serial numbers encoded therein at the binary level with serial numbers comprising a "limited number of most significant bits" along with "bits of lesser significance" to address a specific problem encountered during RFID transponder commissioning.  As such, the claimed transponders are specially adapted to accommodate quasi-autonomous commissioning, an improvement over the prior art for at least the reasons discussed in the prior sections.  Further, the specification of the '967 Patent describes and distinguishes from assignment of blocks of un-partitioned serial numbers from a central location such as was implemented within RFID systems prior to the time of invention. Dkt. No. 1-2 at 2:21-26; 3:27-35.  Avery provides nothing to refute this beyond its example of RFID systems for pet identification and to the

Page 27 -          PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
                        MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx242

approach described in *RFID for Dummies* which, as noted *supra*, do not bear on whether the claimed portioned serial number configuration of the '967 Patent was routine, known, or conventional. *Berkheimer*, 881 F.3d 1360 at \*17-\*18.  On the present record, therefore, and in consideration of Avery's present burden, the challenged claims must be found to include an "inventive concept."

To the extent that the "inventive concepts" manifest in the claims are not readily apparent, construction of several claim terms may be required.  District courts have denied *Alice* motions as premature when filed before claim construction for this very reason.  *See, e.g., VaporStream, Inc. v. Snap Inc.*, Case No. 2:17-CV-00220-MLH (C.D. Cal. June 12, 2017); *Bancorp Services, LLC v. Sun Life Assurance Co. of Canada (U.S.), et. al.*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2011) ("it will ordinarily be desirable – and often necessary – to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter."); *see also Data Distrib. Techs., LLC v. Brer Affiliates, Inc.*, 2014 U.S. Dist. LEXIS 115543, at \*23 (D.N.J. Aug. 19, 2014).  The Federal Circuit has endorsed this course of action.  *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 2018 U.S. App. LEXIS 3463 at \*6 (Fed. Cir. Feb. 14, 2018) (reversing finding of patent ineligibility, in part, because 12(b)(6) motion granted without claim construction).

Here, construction of at least the terms "unique serial number space," "allocated block of serial numbers," "assigned," "most significant bits," and "bits of lesser significance" bear on whether the claims of the '967 Patent are directed to use of the claimed components in routine, conventional, and well-understood ways according to those of ordinary skill in the art. Accordingly, if the Court finds analysis of the challenged claims under step two of *Alice*

Appx243

necessary, at all, ADASA respectfully requests that the Court adopt a similar prudent course of action at this early stage so that it may be informed by the parties' claim construction briefs and expert opinions prior to ruling on patent eligibility.

## VI.   CONCLUSION

For at least the reasons discussed herein, Avery's Motion is without merit and should be denied in its entirety.

DATED:  March 8, 2018.                              Respectfully submitted,

By: */s/ Brett M. Pinkus*

John Mansfield
HARRIS BRICKEN
121 SW Morrison, Suite 400
Portland, OR  97204
(503) 207-7313
john@harrisbricken.com

Brett M. Pinkus (admitted *pro hac vice*)
Jonathan T. Suder (admitted *pro hac vice*)
Glenn S. Orman (admitted *pro hac vice*)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX  76102
(817) 334-0400
(817) 334-0401 fax
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.

Page 29 -        PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
                 MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx244

John Mansfield, OSB No. 055390
HARRIS BRICKEN
121 SW Morrison, Suite 400
Portland, OR  97204
(503) 207-7313
john@harrisbricken.com

Jonathan T. Suder (admitted *pro hac vice*)
Brett M. Pinkus (admitted *pro hac vice*)
Glenn S. Orman (admitted *pro hac vice*)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX  76102
(817) 334-0400
(817) 334-0401 fax
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| **ADASA INC.,** <br><br> Plaintiff, <br><br> v. <br><br> **AVERY DENNISON CORPORATION,** <br><br> Defendant. | Case No.: 6:17-CV-01685-TC <br><br> **DECLARATION OF CHARLES B. WILLIAMS IN SUPPORT OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGEMENT ON THE PLEADINGS** |

Page 1 -       DECLARATION OF CHARLES B. WILLIAMS IN SUPPORT
               OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
               MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx246

I, Charles B. Williams, hereby declare as follows:

1.      I have been retained by Friedman, Suder & Cooke, counsel for Plaintiff ADASA, INC. ("ADASA") in this matter. I am over twenty-one years of age and of sound mind.  The facts stated herein are known to me of my own personal knowledge.  If called upon, I would to testify to as to the matters stated herein and I am competent to do so.

2.      My curriculum vitae ("CV") is attached hereto as Exhibit 1 and is incorporated by reference. It sets forth the details of my educational history, work history, patents, and other related experience. A brief summary of some of my relevant background is provided below.

3.      I have a BS from Dickinson College (1984), some advanced degree work at George Mason University (not completed) and numerous professional courses. I have been employed as a software engineer, holding various titles and responsibilities since 1984. I was a co-founder and CTO of epcSolutions in 2003. epcSolutions developed a RFID application and platform that I designed and architected and largely implemented. epcSolutions sold over 300 copies of our RFIDTagManager software and worked on over 50 custom RFID projects. The RFID application grew into a complete RFID platform capable of managing any type of asset with a RFID tag. In 2008, I authored a Patent Application that combined RFID with Biometric Facial Recognition for identification purposes that was granted but never issued due to non-payment of fees required to issue the patent. In 2010, epcSolutions became the sole RFID provider for iGPS and built the largest RFID track/trace system managing over 15 million reusable black plastic pallets. I have remained active in the RFID industry and I am currently building a new RFID platform based on the work I did at epcSolutions.

4.      RFID technology has been in use since World War II where it was first used as

Page 2 -      DECLARATION OF CHARLES B. WILLIAMS IN SUPPORT
              OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
              MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx247

Friend or Foe identification technology. The first consumer uses of RFID happened in the 1990's, where Mobile's Speedpass technology initially utilized near-field RFID. The first uses of the Electronic Product Code ("EPC") Gen2 RFID for item tracking, inventorying, warehousing, and other applications occurred in the early 2000's and began to take off when Walmart and the U.S. Department of Defense mandated their use around 2003.

5.      RFID tags, or transponders, are affixed to items to identify and track those items as they move through the stream of commerce. RFID has become preferable and is slowly augmenting the prior art tagging systems, such as bar codes, because RFID can accommodate specific identification of the item to which it is affixed, rather than merely identifying items by class or type.  Due to the item-specific nature of RFID tagging, a critical aspect to proper function of RFID systems, therefore, is ensuring that every RFID transponder, throughout the entirety of the stream of commerce, is assigned a unique EPC.

6.      EPC Gen2 RFID tags have a memory bank that is encoded with a tag ID of either 96 or 128 binary bits (0's and 1's) that are represented as 24 or 32 hexadecimal characters to enable humans to read them and compare with other values. The pattern of bits encoded into tags is specified in RFID tag encoding standards written and maintained by EPCGlobal under the auspices of GS1.

7.      For merchandise tracking applications, the memory bank of an RFID tag is encoded with a tag ID known as an EPC, which is an identifier for an item in the supply chain to uniquely identify that particular item.  The EPC can be  encoded in accordance with one of various EPC tag data standards set by GS1 for a serialized identifier, such as a Serialized Global Trade Item Number ("SGTIN") number, which includes a combination of object class information and a serial number.

Page 3 -        DECLARATION OF CHARLES B. WILLIAMS IN SUPPORT
                OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
                MOTION FOR JUDGEMENT ON THE PLEADINGS

8.    Within the object class information of the EPC, each brand owner is provided with a company prefix to identify the brand owner and an item reference code to identify the class of the items being tagged.  As such, all the EPCs within a particular class for a particular brand owner will have the same object class information but will be different from other classes of items provided by that same brand owner or other classes of items from other companies. This information correlates to that of a Global Trade Item Number ("GTIN") as would be contained within a barcode.  For RFID applications, this information would be written in decimal form and referred to as an unserialized identity Uniform Resource Identifier ("URI") for an EPC.  For example, the unserialized identity URI of the EPC may read as:

EPC Pure URI
urn:epc:id:sgtin:012345.67890

9.    A serial number is then issued for a particular item within the class of items for that brand owner as an integer in decimal form.  By issuing a unique serial number for each item, the serialized EPC of each item within the class for that brand owner will be unique.  However, the EPC is only truly unique if the brand owner ensures that the serial number of the EPC is unique within all the tags encoded for the class of items. The GS1 serialization guideline states that it is the brand owner's responsibility to ensure that each serial number, and therefore each EPC, is unique.

10.    The serial number is then combined with the object class information from the unserialized URI to provide a serialized identity URI of an EPC (e.g., the SGTIN).  The serialized identity URI of the EPC may read as:

EPC Pure URI
urn:epc:id:sgtin:012345.67890.10479832

Page 4 -    DECLARATION OF CHARLES B. WILLIAMS IN SUPPORT
            OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
            MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx249

11.    This serialized identity of the EPC is provided from the database to the encoder, which converts the EPC to binary format in which the bits of each field are concatenated in the proper order for the chosen format of the EPC for encoding to the RFID tag. The binary format of the EPC may be SGTIN-96, which includes 8 bits for the header identifying the EPC format, 50 bits for object class information including a filter value, partition value, company prefix, and item reference number, and 38 bits for a serial number.

A typical EPC SGTIN-96 Structure:

| Header | Filter / Object Type | Partition | Company Prefix | Item Ref and Indicator | Serial |
|--------|---------------------|-----------|----------------|------------------------|--------|
| 8 bits | 3 bits | 3 bits | 20- 40 bits | 24 - 4 bits | 38 bits |



12.    Typically, the process of providing the EPC to the encoder is performed by a software application that uses a database to retrieve the base values required to encode a RFID tag as well as saving the values of the generated RFID tag IDs. For some of the encoding standards, one of the fields is a serial number. The serial numbers are typically stored and tracked in the database in decimal form and can be retrieved individually or in blocks by the software that generates the tag IDs that need to be encoded into a collection of RFID tags.

13.    In most cases, one serial number or a set of serial numbers is retrieved from the database at any given time, and in most cases an encoder is only encoding tags for one specific

Page 5 -        DECLARATION OF CHARLES B. WILLIAMS IN SUPPORT
                OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
                MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx250

product (identified by a GTIN, which is also encoded in the object class information of the tag ID.)

14.    A second process to encode RFID tags involves using a barcode scan to read a UPC, software to convert the UPC to a GTIN, use the GTIN to lookup the next serial number in the database and use those two values to encode the RFID tag. This process involves fetching one serial number at a time from the database and then updating the database with the resulting RFID tag ID.

15.    Neither of these scenarios provide for disconnected or semiautonomous operation. This means that all components of the ecosystem (reader/encoder, software application and database) must be running and connected for the encoding RFID tags to take place.

16.    One of the larger challenges to using RFID to track inventory in the supply chain is item level tagging. The initial Walmart and U.S. Department of Defense RFID mandate focused on using RFID tags on cases and pallets of goods being shipped to either entity. Item level tagging places an RFID tag on every individual item, not just the cases and pallets. The benefit of item level tagging is that it allows front-of-store inventory to be done much faster as the shelves would only need to be scanned with an RFID reader and not have each item hand counted.

17.    In the mid 2000's, epcSolutions and ADASA worked together on an Item Level Tagging project for Walmart Canada. The project would use epcSolutions' RFID Tag Manager software and ADASA's RFID printer encoder to achieve an item level tagging solution for Walmart Canada.

18.    One of the requirements for this project was the ability to print/encode RFID item tags while disconnected from the network. To meet this requirement, ADASA developed the capability for the ADASA printer/encoder to store a block of serial numbers for multiple different

Page 6 -    DECLARATION OF CHARLES B. WILLIAMS IN SUPPORT
OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGEMENT ON THE PLEADINGS

products (Batch mode), as well the capability to encode independently for ad hoc items that did not have a block of reserved serial numbers (Ad Hoc mode). This Ad Hoc mode is the essence of the '967 Patent as I understand it.

19.    For Batch mode, prior to performing an item level tagging operation, the ADASA printer/encoder was connected to a host computer. The epcSolutions software would allow the operator to choose which classes of products were to be tagged. The epcSolutions software would access the database and reserve a block (or batch) of serial numbers for the classes of selected items in decimal form and load the EPCs formed from the serial numbers in the block into the ADASA printer/encoder in hexadecimal form. The printer/encoder was then disconnected from the host system/network and could be used in a disconnected manner to print/encode item level RFID tags for items of those selected classes. When the printer/encoder generated a tag for an item type, the count of that item type was incremented to use the next available EPC. Once all the RFID tags were printed/encoded, the printer/encoder would be reconnected to the host system/network and the epcSolutions software would read the number of tags that have been printed/encoded for each item type and stores that information in the database.  This Batch Mode is similar to the approach described in *RFID for Dummies* cited by Avery Dennison's motion.

20.    For Ad Hoc mode, as in accordance with the '967 Patent, the printer/encoder was assigned a 7-bit binary number that was unique to that printer/encoder within a company, enterprise, or location.  For items that were not the type of one of the selected classes for which blocks of serial numbers were stored, the printer/encoder would then self-generate an EPC in SGTIN-96 format, which included object class information read from the bar code and a serial number in which the most significant bits were assigned the 7-bit unique number of that

Page 7 -    DECLARATION OF CHARLES B. WILLIAMS IN SUPPORT
OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx252

printer/encoder.  The trailing bits of the serial number would utilize a first serial number of the block allocated for that printer/encoder. The count of the serial numbers of this block was then incremented and stored in the printer/encoder's memory. For additional items of that same type that were encountered, the printer/encoder would generate an SGTIN-96 utilizing the next stored serial number in the allocated block.  Once all the RFID tags for the ad hoc items were printed/encoded, the printer/encoder would be reconnected to the host system/network and the epcSolutions software reads the number of tags that have been printed/encoded for the ad hoc items and stores that information in the database.

21.     The benefit of Ad Hoc mode, and the '967 Patent, is the ability to perform the item level tagging operation wherever the items are without being connected to and receiving authorizations of complete EPC or serial numbers from the database. For example, the items of the unselected classes could be tagged in the front of the store or in the back of the store and the encoding would still be ensured to be unique due to the unique number assigned to the printer/encoder. If there was not an available means to uniquely encode/print tags, the items would need to be removed from the shelf and taken to a different location to be tagged or the people tagging the items would need to be able to properly place pre-printed/encoded tags on the proper items.  This is time consuming and fraught with risk, as there would not be any checks and balances to ensure the correct tags were placed on the proper items.

22.     As reflected in the '967 Patent and with Ad Hoc mode, the claimed invention is directed to RFID tags which are commissioned using a partitioned serial number portion of a binary representation of the EPC to ensure uniqueness of the EPC encoded in the tag without the need to maintain constant communication with a database.  The partitioned serial number portion

Page 8 -        DECLARATION OF CHARLES B. WILLIAMS IN SUPPORT
                OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
                MOTION FOR JUDGEMENT ON THE PLEADINGS

Appx253

includes a first section of a limited number of most significant bits and a second section of bits of lesser significance. The most significant bits are assigned a unique string of binary bits to define a block of serial numbers to be used for a particular encoder and the second section of bits of lesser significance are generated by the encoder to complete a unique serial number. This concept described in the '967 Patent of assigning the most significant bits of the serial number space for ensuring uniqueness can be applied to in-store encoding equipment (such as with Ad Hoc mode) but can also be implemented for encoders of different manufacturing lines, manufacturing facilities, distribution facilities, retail stores, and by third party encoders across the stream of commerce.

23.     An example of a partitioned serial number of an EPC comprising 14 "most significant bits" and the remaining 24 comprising the "least significant bits" according to the Ad Hoc mode and the '967 Patent is shown below:



24.     Generally, at its core, the tag encoding process is the same from the point of when the RFID tag data reaches the encoder. That is: Tag ID to encoder => encoder to chip in RFID tag. However, the way the tag ID itself is created differs greatly from system to system and this is where the hardware-based system of the claimed invention of the '967 Patent differentiates itself from the conventional methods.   The partitioned serial number approach in the '967 Patent manages assignment of the serial number *at the binary bit* level, rather than sequential allocation

Page 9 -        DECLARATION OF CHARLES B. WILLIAMS IN SUPPORT
                OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
                MOTION FOR JUDGEMENT ON THE PLEADINGS

of decimal or hexadecimal number strings from a database.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: March 7, 2018.

Charles B. Williams

Page 10 -   DECLARATION OF CHARLES B. WILLIAMS IN SUPPORT
            OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
            MOTION FOR JUDGEMENT ON THE PLEADINGS

# EXHIBIT 1

Nashua, NH
Phone 703-338-5162 (cell)
E-mail cbwilliamsva@gmail.com

# Charles B. Williams

**Overview**

Experienced software engineer with 30+ years of experience in project management, Agile software development, software architecture, design and implementation who desires to use his customer facing and technical skills in an exciting dynamic company.

**Education**

1980 – 1984 Dickinson College, Carlisle, PA
BS Computer Science

**Professional Experience**

November 2017 – Present – Rightpoint
**Contractor**
- Responsible for backend design/development/implementation for a Java/Play Framework application for a medical data management application.

July 2017 – Present – rfidCollect
**Chief Technology Officer**
- Responsible for all software development for a RFID application to manage time out of environment for items that have temperature sensitivity.
- Responsible for technical aspects of all projects.
- Responsible for SoW development and proposal responses.

August 2014 – November 2017 – Metova Federal, LLC
**Senior Software Engineer**
- Responsible for growing Metova's presence and capabilities in the RFID space. Focus is on inventory tracking and asset management. Initial RFID capabilities were purchased from epcSolutions' Bankruptcy Trustee by Metova. RFID capabilities are built on the solid and proven technology base from epcSolutions. Currently working with several commercial and federal government customers to provide RFID solutions.
- Mobile application development on Android (Java) and iOS (Swift) platforms.
- Web application development in Sinatra (build on Ruby on Rails) and Rails
- Java Team Lead for SEAS Education's SEAS Reimbursement platform. Platform focuses on Medicaid claims processing and reimbursement for various school systems across the country.
- SEAS Maintenance for several VB.net web applications. Responsible for completing and tracking JIRA bug reports for SmartEval and ARM applications.
- Deployment of solutions AWS and management of AWS resources, EC2, storage, automatic scaling and other AWS components.

August 2011 – August 2014 – EBSCO Information Services
**Software Architect**
- Architected, desiged and implemented EIS' Production Automation

Appx257

Framework. The framework is responsible for building and publishing all customer facing databases under the ebscohost.com website. Production currently processes over 20 TB of data from hundreds of different publishers worldwide. Framework is built with Automic, Inc.'s One Automation platform.
- Certified SCRUM Master Professional

October 2003 – April 2011 – epcSolutions, Inc. (no longer in business)
**Chief Technology Officer**
- Responsible for all engineering and pre-sales/post-sales activities for epcSolutions' RFID products. Managed a team of 15 developers to produce a suite of end-user RFID products. Closed 300+ deals, many of which included professional services for product integration with existing back-end systems. RFID products were built with **Java**, **SQL Server** and include hooks for integration to backend systems such as **Oracle Applications**, **SAP** and other **ERP/WMS** systems. The platform includes a hardware interface layer which makes extensive use of **TCP/IP Sockets/Socket Servers** to communicate with networked devices.
- Architected, Designed and Implemented RFID platform that in today's terms would be considered a **PaaS system**. System collected and analyzed RFID and other sensor based data and applied in-context business rules to the various collected data elements. Currently working on a new iteration of this platform.
- Closed task order contract with large reusable plastic pallet pool company to deploy and manage a distributed network to control the pallet supply chain. Contract value exceeded $5,000,000. Architected and implemented the system which is built with **Java**, **J2EE** and other **Java Technologies Platform** components and makes extensive use of **EDI**, **XML**, **AS2**, **SQL Server, Glassfish** and **Web 2.0** technologies.
- Closed company's initial contract worth $1,500,000 to develop and deploy a Fortune 100 company's RFID compliance platform
- Managed all technical aspects of epcSolutions' product platform including architecture, design and implementation.

February 2001 – September 2003 - Vitria Technology, Inc.
**Lead Architect – Doc Switch Team**
- Lead Architect for the Doc Switch Team. Responsible for overall system architecture, design, implementation, testing and documentation of the Vitria Document Switch solution. The Vitria Document Switch provides document-based Inter-Enterprise Integration (IEI) between trading partners and Enterprise Application Integration (EAI) to back office systems. Responsible for all pre-sales and post-sales technical activities for the Document Switch product. DocSwitch was built on the BusinessWare platform with integration hooks into many popular ERP/WMS systems.
- Responsible for the technical content of sales opportunities for EDI/B2B Collaboration working with the Doc Switch Team. Responsible for both pre & post sales activities, demonstrations, presentations, prototype development, project management, implementation, and documentation using the BusinessWare product family.
- Completed several projects over a 15 month period. Lead all aspects of the project including Proof of Concept, project management, system architecture, implementation, testing and documentation. Projects involved small teams of three to six people including developers/programmers, database admins, web developers and technical writers.

Appx258

August 1999 – January 2001 - ObjectSpace, Inc.
**Senior Systems Engineer**

- Lead Proof of Concept team for developing enterprise-wide integration projects for several large clients. Lead small teams of two to three people on Proof of Concept efforts. Architected enterprise systems and worked with customers to complete the implementation and delivery of the system.

- Lead SE for the North America Sales Force. Responsible for the technical content of sales opportunities in deals working together with Account Managers. Responsible for both pre and post sales activities, demonstrations, presentations, prototype development, team building, and interviewing new SE candidates.

April 1995 – May 1999 - Template Software, Inc.
**Director, Federal Pre-Sales**

- Responsible for all aspects of the Federal SE Team including hiring decisions, resource planning, resource allocation, demonstration planning and design, technical presentations, and proposal responses. Moved to Federal group after building commercial team from scratch to a team of six SE's then built the Federal SE team to four.

1993 – March 1995 - Virtual Software Factory (No longer in business)
**Chief Consultant**

- Lead SE for the US sales force. Responsible for the technical content of sales opportunities in the United States working together with Account Managers. Responsible for both pre and post sales activities, demonstrations, presentations, and prototype development. Became second US employee and helped build the US operation to a team of eight.

**Technologies**

Swift, Objective-C, Android, Flex, JavaScript, Spring Framework, Atlassian Suite (JIRA, Confluence, BitBucket, HipChat), SOA, SaaS, Ruby on Rails, Ruby, Cloud Computing, RFID, GWT, Google App Engine, Vitria BusinessWare, Java, J2EE, Glassfish, WebLogic, WebSphere, JBoss, Apache Tomcat, XML, SNAP, Windows(Windows, 10, Windows7, Vista, XP), Unix, Linux, SQL, PostgreSQL, MySQL, Oracle, MS SQL Server, HTTP, XSL, XSD, EDI, B2B, Portals, Eclipse, netBeans

**Patents and Publications**

"Use Cases Combined With Booch/OMT/UML: Process and Products" – Prentice Hall Professional Technical Reference Series 1998

RFID & Biometric Facial Recognition – Patent approved, but abandoned (company did not pay fees to complete the patent process.)

**References**

Available upon request

Appx259

**Brenna K. Legaard,** OSB #001658
Email: blegaard@schwabe.com
**Angela E. Addae,** OSB #163335
Email: aaddae@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: (503) 222-9981
Facsimile: (503) 796-2900

*Attorneys for Defendant and Counterclaimant,*
*Avery Dennison Corporation*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **ADASA INC.,** | Case No.  6:17-cv-01685-TC |
| Plaintiff, Counterclaim Defendant, | **DEFENDANT'S REPLY TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)** |
| **v.** | |
| **AVERY DENNISON CORPORATION**, | |
| Defendant, Counter Claimant. | **REQUEST FOR ORAL ARGUMENT** |

Page 1 -    DEFENDANT'S REPLY TO PLAINTIFF'S BRIEF IN
OPPOSITION TO DEFENDANT'S MOTION FOR
JUDGMENT ON THE PLEADINGS

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx260

I.    INTRODUCTION

At the heart of the claims of the '967 patent is a method of allocating blocks of serial numbers which can be performed entirely in the human mind.  That method is unpatentable, regardless of whether those serial numbers are then encoded into RFID tags, and regardless of how novel, useful, or unconventional it is alleged to be.

In its Opposition, Adasa makes no effort to dispute the fact that nothing more than a human mind is required to assign a sequence of most significant bits to an RFID encoder.  Indeed, page 18 of Adasa's brief includes a table that does just that and which was presumably created using nothing more than a human mind and a word processing program.  Instead, Adasa argues that the fact that the claim requires these serial numbers to be encoded onto RFID tags means that even if the serial numbers were allocated mentally, the claim is still patentable because the focus of the claim is the RFID tag.  But as the Federal Circuit held in *Synopsys Inc. v. Mentor Graphics Corp,* 839 F.3d 1138 (Fed. Cir. 2016), a technological context cannot make a mental process patentable.  In *Synopsys*, a claimed mental process was used to design a logic circuit, and the fact that the claims included limitations describing the logic circuit did not save them.  Here, Adasa's claimed mental process is used to allocate serial numbers which are then encoded on generic RFID tags, and under *Synopsys,* the RFID tags cannot save the claims.  The claims are invalid because they are directed toward a mental process and contain no inventive concept that saves them.

The bulk of Adasa's response amounts to an argument and testimony that allocating blocks of serial numbers to RFID tag encoders using sequences of most significant bits is unconventional and useful.  But a mental process is unpatentable regardless of how unconventional and useful it is.  All of this argument and testimony is simply irrelevant.

Page 2 -    DEFENDANT'S REPLY TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx261

## II.      ARGUMENT

### A.      Judgment on the pleadings is appropriate.

Adasa mischaracterizes the law regarding eligibility under § 101, citing *Ultramercial, Inc. v. Hulu, LLC,* 722 F.3d 1335, 1338-39 (Fed. Cir. 2013) for the proposition that dismissal for lack of subject matter eligibility will be the exception and not the rule.  *See* Opp'n at pp. 20-21. But Adasa does not inform the Court that the *Ultramercial* opinion it cites was vacated by the Supreme Court and the case was remanded to the Federal Circuit for further consideration in light of *Alice Corp. v. CLS Bank Int'l,*134 S. Ct. 2347 (2014).  *WildTangent, Inc. v. Ultramercial, LLC,* 134 S. Ct. 2870 (2014).  Upon remand, following *Alice,* the Federal Circuit affirmed the district court's grant of a motion to dismiss on the grounds that the claims were unpatentable under § 101.  *Ultramercial, Inc. v. Hulu, LLC,* 772 F.3d 709 (Fed. Cir. 2014).  The other case Adasa cites for this proposition, *Research Corp Techs. v. Microsoft Corp.,* 627 F.3d 859 (Fed. Cir. 2010) also pre-dates *Alice.*  After *Alice,* courts have frequently found patent claims invalid under § 101 at the pleadings stage.  Section 101 invalidity is a question of law, and early resolution is feasible because "not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry."  *Berkheimer v. HP, Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) (citing cases).  "When there is no genuine issue of material fact regarding whether the claim element or claimed combination is well-understood, routine, conventional to a skilled artisan in the relevant field, this issue can be decided . . . as a matter of law." *Id.*

### B.      Adasa's claims are directed to an unpatentable mental process.

#### 1.      The claims are directed to a process for allocating blocks of serial numbers.

Under *Alice* step 1, courts must "look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter."

Page 3 -      DEFENDANT'S REPLY TO PLAINTIFF'S BRIEF IN
          OPPOSITION TO DEFENDANT'S MOTION FOR
          JUDGMENT ON THE PLEADINGS

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx262

*Affinity Labs of Texas, LLC v. DIRECTV, LLC,* 838 F.3d 1253, 1257 (Fed. Cir. 2016). Adasa fairly and accurately characterizes the advance defined in its claims as the "allocation of blocks of serial numbers through assignment of a particular sequence of most significant bits." Opp'n at pp. 23-24.

Adasa argues in its Opposition that this claimed process amounts to patentable "improvements to RFID transponders." Opp'n at p. 23. It does not. Mr. McAllister's alleged invention is not an improvement in the RFID transponder itself. It is a method for allocating blocks of serial numbers which are then encoded onto generic RFID transponders used for their conventional purpose. Adasa's claims do not define any technological improvement in how RFID tags store or transmit data, *e.g.*, how their circuits are designed or how their antennae function. The innovation defined in Adasa's claims is focused on how serial numbers are allocated. Adasa's Complaint makes this clear. Adasa does not allege that Avery Dennison uses any sort of specialized or improved RFID tag. It alleges that it uses generic RFID tags in accordance with the EPC SGTIN-96 standard. The crux of Adasa's infringement allegation is that Avery encodes these generic RFID tags using serial numbers containing a common sequence of most significant bits.

Adasa's suggestion that a generic RFID tag can be technologically improved by encoding a serial number on it is no different than arguing that a legal pad can be technologically improved by writing a serial number on it. Encoding a serial number on a tag does not improve the function of the RFID tag as an RFID tag any more than writing a number on a legal pad improves the function of the legal pad as a legal pad. That serial number may make the tag more useful, and may be part of an improved way of using RFID tags, but the tag itself is still the same tag.

Page 4 -     DEFENDANT'S REPLY TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx263

### 2.      Adasa's process for allocating blocks of serial numbers is an unpatentable mental process.

Adasa argues that its claims are "drawn to implementation of a specific data configuration for commissioning RFID transponders which improves the overall efficiency of their use." Opp'n at p.7. But this "implementation of a specific data configuration" is the allocation of blocks of serial numbers, which can be done either mentally or with a pencil and paper, and that makes it unpatentable under § 101. The fact that an assignment of a particular sequence of most significant bits can be done mentally is clearly exemplified by the table on page 18 of Adasa's Opposition brief, which was created mentally. Indeed, Adasa does not disclose any other way a sequence of most significant bits could be assigned.

The fact that these allocated blocks of  serial numbers  are then encoded onto RFID transponders does not change the fact that the allocation process is an unpatentable mental process, as the Federal Circuit made clear in *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138 (Fed. Cir. 2016). In *Synopsys*, the claims at issue were drawn to a "method for converting a hardware independent user description of a logic circuit . . . into logic circuit hardware components." 839 F.3d at 1147. The Federal Circuit found that "[t]he claim recites a method of changing one description of a level sensitive latch (i.e., a functional description) into another description of the level sensitive latch (i.e., a hardware component description) of that very same level sensitive latch (i.e., assignment conditions)." *Id.* The claim was invalid because "the method can be performed mentally or with pencil and paper. The skilled artisan must simply analyze a four-line snippet of HDL code." *Id.* Thus, the technological context of the mental process did not change the legal conclusion that it was unpatentable. The fact that the process was intended to be used in conjunction with computer-based design tools did not save the claims because the claims on their face did not call for any form of computer implementation. *Id.* at

Page 5 -    DEFENDANT'S REPLY TO PLAINTIFF'S BRIEF IN
            OPPOSITION TO DEFENDANT'S MOTION FOR
            JUDGMENT ON THE PLEADINGS

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx264

1149.  The fact that the patents provided an improved way to design a logic circuit did not save the claims.  *Id.* at 1140.  Nor did the fact that the claims specifically required that the claimed process be used to create a logic circuit.  *Id.*

"Mental processes are a subcategory of unpatentable abstract ideas."  *Synopsys*, 839 F.3d at 1145 (quoting *Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011)).  "Computational methods which can be performed entirely in the human mind are the types of methods that embody the basic tools of scientific and technological work that are free to all men and reserved exclusively to none."  *Id.*  Mental processes are unpatentable regardless of how innovative, advantageous, inventive, or important they may be.  Patent rights in thoughts are simply unavailable.  Here, as in *Synopsys*, the use of a mental process to allocate serial numbers to RFID tags is no less a mental process. The advantages or efficiencies of that mental process are irrelevant, as is the degree to which it is innovative or unconventional.

Adasa has offered no response on this point.  Its table of authorities demonstrates that its opposition brief contains no discussion of the *Synopsys* case whatsoever.  It offers extensive argument and even testimony that its method is or was unconventional and advantageous, but all of that is simply irrelevant.  "[A] claim for a *new* abstract idea is still an abstract idea."  *Synopsys*, 839 F.3d at 1151; *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1352 (Fed. Cir. 2014) (abstract ideas are unpatentable "no matter how '[g]roundbreaking, innovative, or even brilliant'" they may be.).

Adasa cites to *Core Wireless* and *Visual Memory* to support the patentability of its claims, but the claims at issue in those cases defined improvements in how computers operate. They did not find patentable claims to a mental process that could be applied with computer equipment.  For that reason, these cases do not help Adasa.  For the same reason, the Federal

Page 6 -    DEFENDANT'S REPLY TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Circuit found that Synopsys could not "rely on our decisions in *Enfish* and *McRO* to support the patentability of the Asserted Claims." *Synopsys¸* 839 F.3d at 1149.

Adasa does not even attempt to dispute the fact that its claimed allocation of blocks of serial numbers can be performed mentally.  Therefore, the claims of the '967 patent are directed to an unpatentable mental process under *Alice* step 1.

### C.    There is no inventive concept under *Alice* step 2.

In *Alice* step 2, the Court must examine the elements of the claims both individually and as an ordered combination to determine whether they contain an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."  *Alice*, 134 S. Ct. at 2357.  Simply "'appending conventional steps, specified at a high level of generality,' which are 'well known in the art' and consist of 'well-understood, routine, conventional activities' previously engaged in by workers in the field" is insufficient to supply the inventive concept. *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016).  Adasa cannot rely on the alleged novelty of an abstract idea to supply the inventive concept necessary for patentability.  *Genetic Techs. Ltd. v. Merial, LLC*, 818 F.3d 1369, 1376 (Fed. Cir. 2016).

As an inventive concept, Adasa cites to the same subject matter it pointed to under *Alice* step 1 (RFID transponders encoded with serial numbers comprising a limited number of most significant bits along with bits of lesser significance).  *See* Opp'n at p. 27.  But the claimed RFID transponders were known in the art well before the priority date of the '967 patent, as the specification itself makes clear, and cannot supply an inventive concept.  ('967 patent at 1:40-43).  The claim elements that are directed to requirements of the EPC SGTIN-96 standard cannot provide an inventive concept for the same reason. (*See* Opening Brief at p. 14.).  It is entirely conventional to encode RFID tags with serial numbers, and Adasa does not argue otherwise.

Page 7 -    DEFENDANT'S REPLY TO PLAINTIFF'S BRIEF IN
            OPPOSITION TO DEFENDANT'S MOTION FOR
            JUDGMENT ON THE PLEADINGS

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

The only inventive aspect of the claims is the allocation of blocks of serial numbers using most significant bits.  But a mental process cannot provide an inventive step.  *Genetic Techs.,* 818 F.3d at 1376;  *Ariosa Diagnostics Inc. v. Sequenom Inc.,* 788 F.3d 1371 1378 (Fed. Cir. 2015) (the addition of a mental process step to the routine and conventional physical activity of amplification and analysis of DNA did not constitute an inventive step); *In re BRCA1- & BRCA2-Based Hereditary Cancer Test*, 774 F.3d 755 (Fed. Cir. 2014) (combining conventional physical implementation of a law of genetics with a simple mental process step of "comparing," was held to be patent-ineligible.).

Adasa states that claim 1 can be considered representative of claims 2-5, 8-11, and 16-19, and that claim 6 can be considered representative of 13 and 14.  Claim 6 adds the requirement that there be three most significant bits, but that is no less a mental process.  Claim 15 adds the requirement that the most significant bits correspond to an encoder, but that is still a mental process.  Of all of the claims, only claim 7, which requires that the allocated block is one of a plurality of allocations intermittently received by the encoder, speaks to the technological function of an RFID system.  But claim 7 has not been asserted against Avery.  The remaining claims contain nothing more than the mental process plus standard features of RFID tags or requirements of the EPC SGTIN-96 standard, none of which was invented by Mr. McAllister.

Adasa argues that "to the extent the inventive concepts manifest in the claims are not readily apparent, construction of several claim terms may be required."  Opp'n at p. 28.  But Adasa does not proffer any construction of any claim term, or explain how a different construction might make an inventive concept any more apparent.  "Although it is defendants' burden to show ineligibility, a court should look to the plaintiff to show some factual dispute requiring claim construction."  *Boar's Head Corp. v. Directapps, Inc.*, 2015 U.S. Dist. LEXIS

Page 8 -    DEFENDANT'S REPLY TO PLAINTIFF'S BRIEF IN
            OPPOSITION TO DEFENDANT'S MOTION FOR
            JUDGMENT ON THE PLEADINGS

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx267

98502 at *18 (E.D. Cal. Jul. 27, 2015*); see also Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 Fed. App'x. 988, 992 (Fed. Cir. 2014) (noting that plaintiff "d[id] not explain which terms require construction or how the analysis would change").

Adasa's claims are ineligible under any potential construction.  Although Adasa suggests that there are claim construction disputes to be resolved, its Opposition notably omits any specific constructions that would change the patent-eligibility analysis.  No matter the meaning of those terms, the concept is the same: mental processes used to generate and assign serial numbers.  And that is not an inventive concept.

**CONCLUSION**

Avery Dennison's motion demonstrated how the '967 patent failed the two-step *Alice* test for patent eligibility.  Adasa's response fails to distinguish these cases or undermine their reasoning. As a result, the Court should invalidate the '967 patent.[1]

///

///

///

///

///

///

///

---

[1] Adasa asks that "Avery's Motion should be denied… and all claims of the '967 patent should be found to be directed to patentable subject matter."  Opp'n at p. 10.  But a denial of Avery's motion to invalidate the claims does not result in a determination that they are valid.  *In re Swanson*, 540 F.3d 1368, 1377 (Fed. Cir. 2008) (explaining that if a party in litigation has not met its burden of proving a patent invalid, "courts do not find patents 'valid,' only that the patent challenger did not carry the burden of establishing invalidity . . . .").

Page 9 -    DEFENDANT'S REPLY TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx268

Adasa v Avery-Dennison

May 09, 2018

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ADASA, INC.,                          )

                Plaintiff,            )

    v.                                ) No. 6:17-cv-01685

AVERY DENNISON CORPORATION,     )

                Defendant.            )


ORAL ARGUMENT

BEFORE THE HONORABLE THOMAS M. COFFIN

May 9, 2018

Wednesday

10:10 A.M.

Eugene, Oregon


Appearances:

    For Plaintiff:  MR. BRETT M. PINKUS,

                        FRIEDMAN, SUDER & COOKE

                    MR. JOHN MANSFIELD

                    HARRIS BRICKEN

    For Defendant:  MS. BRENNA LEGAARD and

                    MS. ANGELA ADDAE

                        SCHWABE WILLIAMSON & WYATT


ccreporting.com


Appx270

Adasa v Avery-Dennison

May 09, 2018

2

Wednesday, 10:10 A.M.

THE CLERK:  Now is the time set for Civil Case No. 17-1685, Adasa, Inc., v. Avery Dennison Corporation for oral argument.

THE COURT:  All right.  Good morning, everyone.  This is the defendant's motion, so I'll hear from the defendant first.

MS. LEGAARD:  Thank you, Your Honor. My name is Brenna Legaard from the law firm of Schwabe Williamson & Wyatt, and Angela Addae, on behalf of Avery Dennison.

THE COURT:  Where do you both come from?

MS. LEGAARD:  Portland.

THE COURT:  Portland?  Okay.

MS. LEGAARD:  So we've prepared a slide deck that's up on the screens.  And then I've got --

THE COURT:  That's fine.  Let me give you my preliminary thoughts.  It seems to me that the leading case from the federal circuit relied on by the plaintiff is Enfish and the leading case relied upon by Defendant from the federal circuit is Synopsys.  And I note that both those cases were decided on summary judgment motions.

Appx271

Adasa v Avery-Dennison

May 09, 2018

3

Here you are asking me to decide this on the pleadings without discovery.  So tell me why, in your view, discovery and evidence that would be forthcoming from discovery is irrelevant and won't be helpful to me on the technical issues that are being presented.

MS. LEGAARD:  Because there's nothing in the asserted claims that is neither an abstract idea nor conventional.

THE COURT:  So you're saying they could have done this in Enfish and Synopsys and it was just a waste of time to go through discovery there?

MS. LEGAARD:  Absolutely not, Your Honor.

THE COURT:  Help me out with this. Why do you want to do this on the pleadings and not go through discovery?

MS. LEGAARD:  So in Enfish there were things in the claims -- there were provisions in the claims that were alleged to be unconventional.  And here the only thing in the claim that is alleged to be unconventional is the abstract idea.

THE COURT:  Okay.  But unconventional is unconventional.  What's the distinction, then,

Appx272

4

between Enfish and here?

MS. LEGAARD:  So in Enfish -- I think Enfish was the database case.  Right?

THE COURT:  Okay.  I don't want to get ahead of you.  Why don't you go ahead with your slide presentation and maybe that will be --

MS. LEGAARD:  Fair enough.  You know, if you want me to slow down, go faster, skip ahead, address an issue, please let me know.

So RFID systems.  Right?  We're talking about RFID systems that are used to track goods through the chain of commerce.  Right?  So they used to be bar codes.  Bar codes can identify individual items.  They just identify, like, the manufacturer, the brand, things like that.

RFID systems are -- in this context are supposed to be used to identify each individual item.  So an RFID code doesn't just say this is a pair of pants made by Haggar, size 36, gray wool. They are supposed to identify the exact pair of pants.  Right?

And then further, by way of jargon, so RFID chips, they come as just a blank integrated circuit that you save a number to.  And you use something called an encoder to actually encode that

Appx273

Adasa v Avery-Dennison

May 09, 2018

5

number in the chip.  So you will probably hear encoder.  That's what it is.

So the other thing to understand, right, is that RFID chips store machine-readable numbers.  So they are binary.  They are ones and zeroes.

And so -- this is from the complaint at paragraph 14.  Right?  So it gives you an example of, like, a human-readable number, you know, 17457, right, translated into a binary number which is a bunch of zeros and ones.  You can convert them back and forth.  That's what they're for.

And then each zero or one is referred to as a bit.  So when we talk about significant bits, right, we're talking about a chunk of zeroes and ones in that machine-readable number.

So, I mean, you can imagine, right, the tremendous variety of goods and services that move around the world.  Right?  And so in order to structure these numbers so that everybody can agree what they mean and so that they are usable in this, you know, incredibly complex system, there are standards organizations that basically tell people, you know, how they are going to carve up this number, what kind of information they are going to

Appx274

Adasa v Avery-Dennison

May 09, 2018

6

store and how.

THE COURT:  Okay.

MS. LEGAARD:  So this comes from -- I think this is in the complaint, but it's also in Plaintiff's response brief.  So to give you an example -- so the primary standard that we are kind of issuing here -- or dealing with here is called the EPC SGTIN-96.  That's put out by an organization called GS1, and it tells all the people using the system all around the world, "Okay, you've got 96 bits on your tags.  You're going to make the first eight into the header, and then you're going to make the next three into the filter object type.  The next three are partitioned.  And then you've got 20 to 40 bits for your customer prefix.  So tell us who you are using those bits.  Then the next 24 bits you use as your item reference indicator.  Right?  What kind of item is this?  And then the last 38 bits are the serial number."

So everybody conforms to the standards.  They all agree to divvy up the bits in this way so that one system reads another system and it all works together.  So again, Adasa has given you the same version of that below.  Right? Kind of divvying up the bits.

Appx275

THE COURT:  So the most significant bits identify essentially the assembly line point of origin --

MS. LEGAARD:  Whatever it is.

THE COURT:  -- so that each, then, separate assembly line doesn't need to consult the database to issue a serial number.

MS. LEGAARD:  Well, that's one application.  Right.

THE COURT:  That's one application.

MS. LEGAARD:  That's one application.  So stepping ahead, right --

THE COURT:  Okay.  So that saves time.

MS. LEGAARD:  So each number's got to be different.  Right?  Each number's got to be unique.  The encoder encodes the numbers.  So the encoder can either consult the database every time it needs a new number --

THE COURT:  You don't have to with this system.

MS. LEGAARD:  Or it can be given a bunch of numbers to encode.  And they are calling that semiautonomous commissioning.  Right?

THE COURT:  When they don't have to consult a database to come up with a serial number,

Appx276

8

because they don't want to --  I mean, the idea is not to have duplicated serial numbers.  They have to be unique.

MS. LEGAARD:  Right.  Right.

THE COURT:  So this system allows each assembly line point of origin, so to speak --

MS. LEGAARD:  Yeah.

THE COURT:  -- to issue its own serial number.

MS. LEGAARD:  Right.

THE COURT:  That's what it does.

MS. LEGAARD:  Encode without talking to the mother ship.  And so this specification, the '967 patent, says, "Well, we've invented this.  It's awesome.  It'll take over" --

THE COURT:  You're speaking too fast.

MS. LEGAARD:  I apologize.

So the specifications of the patent articulate exactly what you just said.  And so this is the advance that they are making over the prior art.  You're giving each encoder a block of serial numbers so it doesn't have to ask the mother ship.  Right?  And here's another illustration --

THE COURT:  I want to read this quote to you from Enfish, and tell me why this case

Appx277

Adasa v Avery-Dennison

May 09, 2018

9

doesn't present a similar issue.  Enfish -- they are distinguishing a relational model from a self-referential model.  And the patent was issued on the self-referential model.  And in part they -- quote -- the patent will teach that multiple benefits flow from this design.  First, the patents disclose an indexing technique that allows for faster searching for data than would be possible with the relational model.

So just stop right there.  Doesn't this technique allow for faster issuance of serial numbers on the item being produced because they don't have to consult with a database?

MS. LEGAARD:  You know, on the pleadings -- we'll assume yes.  We'll assume that invention that you've just articulated is novel and --

THE COURT:  So the answer to that question is yes.

MS. LEGAARD:  The problem is it's not what their claims say.  The problem is the thing that they are telling you is inventive and patentable isn't in their claims, and that's the difference between this case and Enfish.

In Enfish the Court said, "Look, right

Appx278

Adasa v Avery-Dennison

May 09, 2018

10

here in the claim, self-referential database, that's

new and different and technological, and we

certainly can't decide on the pleadings that this

isn't patentable, so off we go."  Right?

But here what they are telling you is

patentable, right -- that quasiautonomous

commissioning -- isn't in their claims.  They don't

accuse Avery Dennison in their complaint of

quasiautonomous commissioning.  Right?  They only

accuse Avery Dennison of using the mental step of

allocating blocks of serial numbers because that's

all that's in their claim.  That's why you can

decide this case right now on a 101 basis.

THE COURT:  They only accuse your

client of allocating the identification numbers for

the point of origin?  Is that what you're saying?

MS. LEGAARD:  Yeah.  So here's sort of

the most pertinent paragraph of the complaint --

right -- paragraph 20.  There's nothing in here

accusing Avery Dennison of intermittently sending

out numbers to its encoders or autonomously

commissioning or anything like that.

THE COURT:  They accuse your client of

using the format of most significant bits.

MS. LEGAARD:  Right.  But that doesn't

Appx279

Adasa v Avery-Dennison

May 09, 2018

11

mean autonomously commissioning.  Right?

THE COURT:  Pardon?

MS. LEGAARD:  That doesn't mean autonomously commissioning.  That just means that some of the serial numbers have the same bits in them.  That's all it means.  They have no idea whether Avery Dennison takes a batch of serial numbers and encodes before calling the mother ship again.  And, indeed, Avery Dennison doesn't.

See, claim 7 in the patent actually talks about quasiautonomous commissioning.  And they don't assert claim 7 because they can't because that's not what Avery Dennison does.  They don't have any facts that Avery Dennison does that.

So I don't think we're entitled to judgment on the pleadings as to claim 7, but claim 7 isn't asserted.

The claims that are asserted have two things in them:  the mental process and standard, conventional RFID stuff.  And that's it.  That's why you can decide this motion in our favor.

THE COURT:  Okay.  Do you have anything else you want to present before I hear from the plaintiff?

MS. LEGAARD:  So that's the crux of

Appx280

it.  I don't know if you have any other questions.  You know, we can go through Alice.  I don't know how much will be helpful to you.

THE COURT:  So let me hear from the plaintiff, and then I can get back to you.

MS. LEGAARD:  Okay.

MR. PINKUS:  Thank you, Your Honor.  Brett Pinkus, Friedman Suder & Cooke, from Fort Worth, Texas, on behalf of Plaintiff along with John Mansfield, with Harris Bricken, from Portland.

Your Honor, I think you've got it exactly right in your questioning to the defendant here.  The defendant is mischaracterizing both the claims and the concept that's covering the claims and what's alleged in the complaint.

The claims do not focus on allocation of the block of numbers.  It doesn't focus on intermittent connection or quasiautonomous -- look, quasiautonomous connection or encoding, that's a benefit.  That's one of the benefits you can get from this.  You don't have to have that.

I'm going to put the claims up on the screen.  Claim 1, which is representative of both independent claims.  See here, this is an RFID transponder.  Right?  That's what the focus of the

Appx281

Adasa v Avery-Dennison

May 09, 2018

13

claim is, what it comprises.  We're not going to dispute the substrate, the antenna structure, RFID integrated circuit chip.  Those are conventional components.

Everything else that's highlighted here is what is different.  You've got the RFID integrated circuit.  It's got a memory bank in it.  And you've encoded -- it is encoded, so past tense.  You've encoded the memory bank.

Again, the next paragraph, unique serial number space is encoded with one serial number instance from an allocated block.  So it is encoded already.

Last paragraph, just talking further about -- that's where you get -- the most significant bits come in.  Those leading bits of the serial number space have already been allocated.  That happens upstream from our claim.

Our claim focuses on the actual encoding of the chip, not the allocation of the block that Avery's trying to say.  We focus on the actual encoding from the encoder to the chip of the RFID tag resulting in a serial number space that's partitioned with most significant bits and then least significant bits.  Once you've got that

Appx282

Adasa v Avery-Dennison

May 09, 2018

14

encoded tag, that's what this claim covers.

I'll show you a further example.  For further example, in the specification, column 8 of the patent at about line -- paragraph starting at line 4, it talks about quasiautonomous transponder encoding.  What it says here is that for quasiautonomous transponder encoding, the authority is realized when a large preauthorized block of serial numbers are made available to the encoder.  So here we're talking about blocks that are authorized somewhere upstream and given to the encoder.

We're focusing on what the encoder does.  The encoder actually encodes the tag with those serial numbers where it's got the blocks.

In the prior art what happened, the database would feed those numbers in a decimal form -- so what Defendant was showing earlier where it's, you know, zero through nine in each digit -- and the encoder would actually translate that to the binary.

What we talking about here is that we're talking about working solely at the binary level.  The encoder has preauthorized these blocks to encode these tags with.  The encoder then has those most significant bits already programmed into

Appx283

Adasa v Avery-Dennison

May 09, 2018

15

it, and it can then generate a serial number on its own and finish the encoding of the tag. That's the process we are talking about in our claims.

THE COURT: The process that is subject to the patent?

MR. PINKUS: Correct. Correct. In fact, in the complaint, paragraph 20, that's not talking about allocating -- allocating the blocks. That's nowhere in here.

This says here encoding tags with the format having the most significant bits within the serial number space.

So if they tag and encode it that way, it infringes. It doesn't matter how it's allocated. That's not in the claim.

THE COURT: So you're saying that they wouldn't be violating the patent, according to your complaint, if they didn't use the format of most significant bits. Is that what you're saying?

MR. PINKUS: Yes. We're not trying to claim all encoding with an RFID encoder. There are prior art ways of encoding that are different.

We've done a specific way of encoding that they didn't do in the past where you've identified the most significant bits in the binary

Appx284

Case: 22-1092    Document: 17-1    Page: 197    Filed: 04/01/2022
Case 6:17-cv-01685-MK   Document 185   Filed 06/25/20   Page 16 of 51
Adasa v Avery-Dennison
May 09, 2018

16

number, the ones and zeroes of that serial number space, and you've set those in a fixed block in advance.  And then you encode it that way so you can see the pattern of fixed most significant bits encoded in multiple tags with serial numbers in the same class of objects, same product type.

So that's what we are alleging is the infringement.  It doesn't matter what they are talking about, the abstract idea of how you allocate the block.  That's outside the scope of our claim. We don't care how it's allocated as long as it's been allocated already.

THE COURT:  Tell me your view on the issue of this stage of the case in Defendant's motion on just the pleadings.  Do you agree or disagree that discovery is not going to help flesh out the issues in the case on the application of your patent to Defendant?

MR. PINKUS:  I think that discovery and claim construction both would help.  We obviously have a dispute on how to interpret these claims.

THE COURT:  Well, that leaps out at me right now.  Clearly you have a dispute over the construction of your claims.

Appx285

Case: 22-1092   Document: 17-1   Page: 198   Filed: 04/01/2022

Case 6:17-cv-01685-MK   Document 185   Filed 06/25/20   Page 17 of 51

Adasa v Avery-Dennison

May 09, 2018

17

                    MR. PINKUS:  Right.  So I think --

                    THE COURT:  How do I resolve that at the pleadings stage?

                    MR. PINKUS:  Right, Your Honor.  I believe there were two recent cases, the Aatrix case and I think the Berkheimer case, discussed in our response brief.  They say if you have claim construction issues and/or discovery issues that could help resolve that or that need to be resolved first, you need to do that.  A 12(B)6 motion or a 12(C) motion, as is the case here, is not the proper time to handle this, to decide this.

                    And in fact, if you were to decide it now -- we have unrebutted allegations in the complaint -- you have to take our pleadings as true at this stage, the 12(C) stage.  And we've alleged here earlier in the complaint the exact things that we're saying -- that I was just saying.

                    If you look at -- so paragraph 13.  In the past there wasn't a reliable way to ensure the EPC number that's encoded in these tags -- that's ultimately what you're -- that SGTIN-96 they were talking about, that's what's being encoded in these tags.

                    The serial number has to be unique.

Appx286

That's got to be -- you've got to make -- the brand owner who is responsible for the product has to ensure those serial numbers are unique. So they can do that themselves or delegate that to somebody else. In the past the way they did that was rely solely on the database to ensure uniqueness.

Mr. McAllister, when he was working -- he was doing a project for Walmart, a pilot project -- and this is in the declaration of Charles Williams that's been submitted with our response brief -- he realized that he had encoders, they were not connecting to the network when he needed it. He'd be out in the store trying to encode things; he couldn't always connect and get a number. So he came up with a bypass for the prior art system which was that he would preallocate these blocks to the encoder and the encoder could then self-encode these RFID tags.

THE COURT: To come up with a unique serial number.

MR. PINKUS: Right, a unique serial number. And they can ensure it's unique without having that connection to the database because you knew you were already preassigned --

THE COURT: And it's your position

Appx287

that that is exactly what the patent gives you ownership of, is that design that he came up with.

MR. PINKUS:  Yes, Your Honor.

THE COURT:  And you disagree with that, that that's -- that's what they're claiming the patent is.

MS. LEGAARD:  That's fine.  So as I understand it --

THE COURT:  By the way, you can both be seated.  It kind of helps with our microphone system here.

MS. LEGAARD:  So as I understand it, Avery Dennison has one customer that wants to know what manufacturing line a given product came off of. And it puts that information in the serial number, right, by designating a few bits.

THE COURT:  Right.

MS. LEGAARD:  That manufacturing line, 011, we'll stick that in the serial number and then we'll know.

Now, Avery Dennison doesn't autonomously or quasiautonomously encode things. Right?  Like, their encoders are in constant contact with the source of the numbers.  They are not sent in batches.  That stuff he's talking about, my

Appx288

client doesn't do.  They don't do the things that they say they invented.  Right?

But there are some numbers in the serial numbers that are the same.  And therefore Avery got sued.

So what they are saying is we want to drag this through hundreds of thousands of dollars worth of discovery.  But in order to get there, they need to -- a patent needs to be valid on its face. Right?  That's the problem that we are having here. The claims that they have are a lot broader than what they say their innovation was.

And so I don't argue about their innovation.  I mean, I can't at the pleading stage. We've got to take, you know, their factual allegations as true on their face.  Right?  But their claims are so broad they encompass a mental process implemented with standard RFID technology. And that's why they are invalid, and that's why my client shouldn't be dragged through hundreds of thousands of dollars worth of discovery.  We should be done today.

THE COURT:  I'm again reading from Enfish.  The Supreme Court does not establish a definitive rule to determine what constitutes an

Appx289

Adasa v Avery-Dennison

May 09, 2018

21

abstract idea sufficient to satisfy the first step

of the Alice inquiry.

All right.  So thank you very much.

So that's kind of unclear.

The "directed to" inquiry, therefore,

cannot simply ask whether the claims involve a

patent-ineligible concept because essentially every

routinely patent-eligible claim involving physical

products and actions involves a law of nature and/or

natural phenomenon.  After all, they all take place

in the physical world for all inventions at some

level embody use, rest upon, or apply laws of nature

or natural phenomena or abstract ideas.  The Supreme

Court has suggested that claims purporting to

improve the functioning of the computer itself or

improving an existing technological process might

not succumb to the abstract idea exception.

So again, thank you very much.  Might

not succumb to the abstract idea exception.  So that

gets me back to one of the questions I asked you.

Doesn't this significant bits invention, so to

speak, improve the functioning of the computer

system at issue here in applying these serial

numbers in the sense that it speeds it up?  They

don't have to consult the database at each point of

Appx290

Adasa v Avery-Dennison

May 09, 2018

22

assembly to assign their own serial number.

MS. LEGAARD:  For claim 7, sure.  But -- could I have the control back?  But if you look at claim 1, right -- so here's claim 1.  So to answer that question, what I'm telling you is you have to look at the claim itself.  Right?

So you look at claim 1, an RFID transponder comprising a substrate.  Everyone acknowledges they had them well before Adasa came along.  Totally conventional.

An antenna structure, conventional.

An integrated circuit chip, standard issue.

The integrated circuit chip is encoded with a unique number object.  That's what they're for.

Each object number comprises an object class information space and unique serial number space.  That's the SGTIN standard.

And then you get to the last two clauses of that claim wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers. That allocated block of serial numbers is assigned a limited number of most significant bits.

ccreporting.com

Appx291

Adasa v Avery-Dennison

May 09, 2018

23

That's something that happens mentally.  You could sit there -- you know, I could sit there and say, "Okay, there's 011.  He's 001.  She's 111."  Right?  And I would be practicing that allocation.  It's a mental step.  And so, because it's a mental step, it's abstract.  It doesn't matter how good it is.

THE COURT:  Are you talking about your example of pen and paper, pencil and paper?

MS. LEGAARD:  It's  a mental step.  Right?

THE COURT:  It's a mental step if you can put it on a piece of paper with a pencil?

MS. LEGAARD:  If you can go do it in your head --

THE COURT:  Take a look at England -- Enfish.  Isn't the referential model -- self-referential model -- they reduce it to pencil and paper right there in their opinion.  They put it out there in that format.

MS. LEGAARD:  Their claim --

THE COURT:  Is that all it takes?  I think this is an oversimplification, quite frankly.  If you can put something on a piece of paper with a pencil, then it's not protected?

Appx292

Adasa v Avery-Dennison

May 09, 2018

24

MS. LEGAARD:  If it's a method you can perform in your mind --

THE COURT:  Here's a method they performed in their mind and --

MS. LEGAARD:  But they didn't.

THE COURT:  What do you mean, they didn't?  No one performed this in their mind?

MS. LEGAARD:  So Enfish's claim was a data storage and retrieval system for computer memory comprising means for configuring the memory according to a logical table, the logical table including a plurality of logical rows each having object identification numbers assigned to each logical row, the logical row corresponding to record of information, the logical columns intersecting with the logical rows to find a plurality --

THE COURT:  If you skip through all that -- I mean, the objective here is to simplify the complex, not to complicate the simple.

I think the bottom line is it can be reduced to something that you put on a piece of paper.  And that's just not enough to say that it's therefore not protected because it's an abstract thought process.

MS. LEGAARD:  You could not create a

Appx293

Adasa v Avery-Dennison

May 09, 2018

25

self-referential database with pen and paper.  It can't be done.

THE COURT:  Why do you say that?

MS. LEGAARD:  Because you've got to have heuristics that link cell to cell.  And if you've got paper and pencil, you can't link cell to cell logically.  You'd have to flip through and look.  Right?  And that's kind of the opposite of database logic.

THE COURT:  Well, it seems to me that in Enfish they organized the table differently.

MS. LEGAARD:  They did.  They did. And they needed a computer to do it.  It was a technical solution to a technical problem.  Right? That's why Enfish -- that's why it was, at least at the stage, considered patentable.

THE COURT:  I don't know that I follow you there.  I suppose that even without a computer -- in the old days when they didn't have a computer, you could probably come up with a table that had a different organizational structure to it to keep track of the same information that these tables in Enfish were keeping track of.

MS. LEGAARD:  You couldn't -- computers organize data in fundamentally different

Appx294

Adasa v Avery-Dennison
May 09, 2018

26

ways.  That was the point of Enfish.  Right?  I mean, if you've got a database, you can draw links between cells and cells.  You can make them refer to each other in different ways.  If you've got an Excel -- you know, if you've got a table on a piece of paper, you've got to flip through and go, okay, this one relates to -- no, wait.  You know?  You can't do it.  That's why database technology is so powerful.

THE COURT:  Okay.  I must confess I'm by no means a software expert.  But computers, to my understanding, speed up the process and -- with the links, et cetera, et cetera.  But that doesn't mean that the process itself in a precomputer age could not have been more laboriously done by hand, somebody sitting down and creating all of this in written form, does it?

MS. LEGAARD:  I don't -- again, I don't think so.

THE COURT:  It would take a lot longer, but I just don't see why that would be impossible.

MS. LEGAARD:  Yeah, I think that the point of a database -- you've got logic built into the database that can combine and relate information

Appx295

Adasa v Avery-Dennison

May 09, 2018

27

that you couldn't do on pen and paper.

THE COURT:  That's why I say it speeds up the process tremendously, obviously.

MS. LEGAARD:  Maybe if you had a small database and a supersmart person very familiar with it, they could deduce the same relationships that were kind of wired into the program.  But the point is --

THE COURT:  Let me observe that Albert Einstein basically expressed his theory of relativity on a blackboard.

MS. LEGAARD:  But see --

THE COURT:  Probably we couldn't understand it, but he was able to do it.

MS. LEGAARD:  He couldn't have patented that.

THE COURT:  I know.

MS. LEGAARD:  Right?

THE COURT:  I understand.

MS. LEGAARD:  That's kind of the point, you know?  So if they want to patent a method for quasiautonomously commissioning serial numbers, they can do that and then we wouldn't be sitting here today, I don't think.  That's not what they did.

Appx296

Adasa v Avery-Dennison

May 09, 2018

28

THE COURT:  I heard you say that the plaintiff's theory of the case is not encompassed by claim 1.  All right?  And I heard them say that essentially that involves claim construction.  Am I wrong about that?

MS. LEGAARD:  So I haven't heard them identify a term or tell you how they want to construe it.  If they did, I might say, "Sure." Right?

THE COURT:  Let me hear from the plaintiff again on that issue.  Would claim construction help in this matter?

MR. PINKUS:  Yes, Your Honor.  We didn't identify construction, but we did identify several terms that may help.  And they are all in these last two limitations that we're discussing. Let me find them in our brief.  Yeah, the last paragraph here:  Construction of at least the terms unique serial number space, allocated block of serial numbers assigned, most significant bits, bits of lesser significance.

And in fact, I think even the definition of allocated block -- oh, we already said that, allocated block of serial numbers within that larger phrase.  What's an allocated block?  I think

ccreporting.com

Appx297

Case: 22-1092   Document: 17-1   Page: 210   Filed: 04/01/2022
Case 6:17-cv-01685-MK   Document 185   Filed 06/25/20   Page 29 of 51
Adasa v Avery-Dennison
May 09, 2018

29

all of those would clarify whether our position is correct or theirs.

In fact, claim 7 they keep talking about where it says allocated blocks received intermittently, that's a pending claim.  Right?  So that is something -- we didn't -- claim 1 isn't limited to that.

If they keep saying that's our -- we can claim structure of the most significant bits, which we did, without claiming it being intermittently received from the database.  That's a benefit you can get from our invention.  That's not in the independent claim.

If they are going to try to argue that that's what our independent claim covers, we would argue claim differentiation or claim construction in claim 7 is more narrow than claim 1 -- that that's what covers the quasiautonomous commissioning, not claim 1.  Claim 1 can have it, but it doesn't have to have it.

MS. LEGAARD:  See, yes.  Absolutely.

MR. PINKUS:  The point is quasiautonomous commissioning is not the focus here. I keep saying that.  As I said earlier, this is already -- the block has already been allocated.

Appx298

The mental process or pencil and paper or computer or whatever you're going to do to get that allocated block, that's upstream from our claim.  That's outside the bounds of our claim.

Our claim focuses on once you've got that block, once it's already been allocated, you then encode that into the claim -- into the RFID tag.  I'm sorry.  That's what we're focused on here.

So it's the RFID tag, which is hardware that's been encoded a certain way to have this serial number space split up into the most significant bits and the least significant bits.  And if it's got that, that infringes claim 1.

The quasiautonomous stuff, that's a benefit.  That's great.  That's definitely something on the Alice eligibility standards that's a benefit.  Right?  That's one of the benefits, and that's claimed in claim 7.  But you don't have to have that benefit.

Other benefits are just -- you can more easily track these items back to who encoded it.  If you know the most significant bits, you can say, "Oh, I know this encoder is assigned to these most significant bits and I can see which encoder encoded that."  That way, if there are errors you

Appx299

Adasa v Avery-Dennison

May 09, 2018

31

can figure that out.  If a product is counterfeited and they have a similar tag but it doesn't have that -- you know, if you've got that most significant bits in there, you can track it back to that encoder:  "We didn't encode that tag.  That's counterfeit."

So there are many benefits to the way this is done.  They are focusing solely on the quasiautonomous and the way the block is allocated.  Again, that's not in our claim.  Our claim is the actual encoding of that allocated block into the tag.

So even if that was a mental process, that's not in our claim.  That's not the concept of our claim.  Our concept is how these tags are encoded a specific way.

THE COURT:  Okay.  Does that help you?

MS. LEGAARD:  How to unpack that.  I mean, we are in complete agreement that claim 1 doesn't encompass any kind of quasiautonomous requirement.  All it requires is that you've got -- I mean, essentially, to demonstrate infringement they would have to pull up two tags -- or more tags and say, "Look, these sections of bits are the same. That's our thing.  That's our invention."  And

Appx300

that's where they get into -- I mean, all you need to get there is a mental process and a standard encoder and a standard RFID tag, and they have a 101 problem.  I mean, it -- you know, like, I don't know that we disagree about -- well, let me back up.

Could I have the electronic floor?

So -- so -- let me see.  So just start with Alice.  Right?  Are the claims directed to an abstract idea?  Do the claims contain an inventive concept sufficient to transform the idea into a patent eligible application?

THE COURT:  That's step 2.

MS. LEGAARD:  So starting with step 1, are the claims directed to an abstract idea?  And so "directed to" is weird language that the federal circuit acknowledged the court struggled with. Right?  So what -- Affinity Labs vs. DirecTV said, "You asked what is the focus of the claimed advance over the prior art?"  Right?  You are asking yourself, what are the claims directed to?  What's the leap?  What's the inventive things that they say that they did?  Is that an abstract idea or not?

THE COURT:  What you are saying is that step 1, are the claims directed to an abstract idea, you are saying that the abstract idea is of

Appx301

the significant bits being assigned to the assembly line.

MS. LEGAARD:  Allocating a block of serial numbers by assigning them all a common number of significant -- or a common --

THE COURT:  Significant bits.

MS. LEGAARD:  -- that's the abstract idea.

THE COURT:  You say that's an abstract idea.

MS. LEGAARD:  Yeah, that's what I'm saying, exactly.  Right?

THE COURT:  And then in step 2 --

MS. LEGAARD:  In step 2 -- so, yeah, you go through, again, the claim.  Everything's conventional except for that part.  Right?

THE COURT:  Okay.

MS. LEGAARD:  Right?  And this is their example of that part.  Right?  This is from their brief, page 18.  This is a table.  And again, like, that's -- if they can put their method on a table in their brief, then that pretty much tells you it's a mental process, right, if that's all it takes.

So you get to Synopsys, right, that

Appx302

Adasa v Avery-Dennison

May 09, 2018

34

says, again, there are things computers do that you could argue about whether or not they are conventional or not, right, but if you're talking about something that can occur entirely in somebody's mind, like in Synopsys, then that's an abstract idea.

So then our question today is, is the inventive part of their claim something you could do in your head?  Right?

And so what I understood Adasa's response to the briefing to be was they don't dispute that allocating blocks of serial numbers through assignment of a particular sequence of most significant bits can be performed entirely within the human mind.  We don't seem to disagree about that.

What we seem to be arguing about is whether there's anything else in their claims.  And what I'm asking you to do is to hold them to their claim language because that's what they sued us on.  Right?  So if this is it, this table in their own briefing, then they shouldn't be entitled to drag us through discovery.

THE COURT:  Speaking of Synopsys, Synopsys cited Enfish and stated that Synopsys

Appx303

Adasa v Avery-Dennison

May 09, 2018

35

cannot rely on our decisions in Enfish to support the patentability of the asserted claims.  In Enfish we held that claims directed to a specific improvement in the way computers operate to store and retrieve data were not unpatentably abstract.

Isn't this claim directed to a specific improvement in the way the computers operate?

MS. LEGAARD:  It's directed --

THE COURT:  In other words, the significant bits that allow each assembly line to assign a specific serial number without consulting the database?

MS. LEGAARD:  It's a thought process that can be --

THE COURT:  Before you get there, doesn't -- isn't this directed to a specific improvement in the way computers operate?

MS. LEGAARD:  So quasiautonomous commissioning sounds to me like a specific improvement in the way computers operate.

THE COURT:  I'm talking about the significant bits part.

MS. LEGAARD:  I don't believe it's a significant improvement in the way computers

Appx304

Case: 22-1092    Document: 17-1    Page: 217    Filed: 04/01/2022
Case 6:17-cv-01685-MK    Document 185    Filed 06/25/20    Page 36 of 51
Adasa v Avery-Dennison
May 09, 2018

36

operate.  I think it's something you do in your head.

THE COURT:  Let me stop you right there.  You don't think it's a significant improvement in the way computers operate.  Doesn't it help speed up the process of serializing the product because they don't have to consult the data bank?  The data bank may be down when they are making the product and they have to wait otherwise.

MS. LEGAARD:  It enables quasiautonomous commissioning, which sounds to me like an improvement, right, but it is not in and of itself quasiautonomous commissioning.  Right?  It doesn't matter whether two serial numbers have the same bits in them or not, right, unless it means a change in how you're using them.  But the claims don't cover a change in how you're using them.  All the claims cover is two serial numbers with the same bits in them.

THE COURT:  And then going on in Synopsys, they also cite BASCOM:  In BASCOM we likewise felt that claims directed to filtering content on the internet contained an inventive concept.  We recognize the limitations of the claims taken individually recite generic computer and

Appx305

network and internet components, none of which is inventive by itself.  We explain, however, that an inventive concept can be found in the nonconventional and nongeneric arrangement of known conventional pieces.

Can that apply here?

MS. LEGAARD:  I don't think so.

THE COURT:  I don't think you talked about this.  Did you talk about BASCOM in your brief?

MS. LEGAARD:  We probably cited it.  I don't think we talked about it.

So here, if you go back to claim 1, you've got a bunch of entirely conventional things, and then you've got an arguably unconventional thought process.

THE COURT:  An inventive concept?

MS. LEGAARD:  Well, an abstract idea -- an abstract idea can't be an inventive concept.  Right?

THE COURT:  Well, again, as Enfish says, the Supreme Court hasn't really given us firm guidance on abstract concepts.

MS. LEGAARD:  Yeah.  But if you've got something --

Appx306

Adasa v Avery-Dennison

May 09, 2018

38

THE COURT:  Your idea if you can put it on a piece of paper, it can't be -- it has to be an abstract process, but they put it on a piece of paper in Enfish, their self-referential table.

MS. LEGAARD:  So if you just assume with me for just a second that I'm right that this is an abstract concept, the most significant bits things, right -- just assume with me for a second -- then it can't be an inventive concept for step 2. You've got to point to something else.

THE COURT:  Okay.

MS. LEGAARD:  Right?  So again, your job, honestly, is to look at the claim language and identify something in there that is something other than the abstract process of going, okay, that encoder is 011, that one is 111, that one is 000.

But since there's nothing in here other than that and conventional stuff, they shouldn't be allowed to drag my client through discovery.

THE COURT:  My job, since you brought it up, in my mind is to be convinced that you've met your burden of proof that this case should be dismissed on the pleadings and that nothing in discovery would help me make that decision.

Appx307

MS. LEGAARD:  You're right.

THE COURT:  It wouldn't inform me of anything I need to know.

MS. LEGAARD:  That's absolutely right. That's absolutely right.

But again, the patent -- I mean, 101 is a question of law.  Nothing that Avery Dennison does is relevant to 101.  Right?  Nothing that Adasa practices is relevant to 101.  Like, the patent -- 101 is decided within the four corners of the patent.

THE COURT:  Okay.

MR. PINKUS:  May I address that, Your Honor?

THE COURT:  Yes, you may.

MR. PINKUS:  Under step 2 analysis, you only go there because you found it to be an abstract idea.  If it's not abstract, it's not patentable in step 1, that's the end of the inquiry. That's a question of law.

Step 2 is whether you transform the nature of the claims into patent-eligible subject matter by -- it's not just other elements.  You consider if the elements of each claim both individually and as an ordered combination transform

Appx308

Adasa v Avery-Dennison

May 09, 2018

40

the nature of the claim into a patentable-eligible
application.

If you look at the whole claim, the
whole claim itself -- and again, we go back to their
slide here.  It's on the screen.  They keep saying
-- on the right side -- allocation of blocks.
That's like an active, present tense action.  The
claim is allocated.  It's already been done.

So they are talking about an abstract
process of something that -- they are saying the
allocation is an abstract process.  But that's
already been done in our claim.  That's not in our
claim.  It's not present tense.  It's already
happened.

Once it happens, it's been encoded.
Their whole abstract idea, the way they're
describing it, that's not our claim.  They keep
talking about the claim language is how you are
supposed to interpret this.  That's not what our
claim says.  It doesn't say allocation; it says
allocated.

Then going back to step 2, that -- so
even though it's a question of law, there are
underlying factual questions in step 2.  You have to
determine whether these elements, individually or in

Appx309

combination, are conventional, routine, or well-known.

And as of the current time -- this is the 12(C) motion -- our pleadings say they are not well-known.  It was a new invention.  Our declaration of our expert, Charles Williams, says this is not well-known.  This is a new invention.  At this stage, that's unrebutted evidence.  You have to take that as true at this point in time.

Later, if we go through discovery and they find -- they show facts that you can only find in their favor, that's fine.  But at this point you can't because they haven't done that.  You have to determine this factual question of what's routine or conventional, and the only evidence says it's not, the encoding process here.

So, right, they haven't even alleged -- haven't alleged noninfringement at this point in this motion.  They haven't alleged invalidity under anticipation or obviousness.  Those are separate inquiries.  That's not for today.

If they wanted to raise that issue, anticipation or obviousness under 102 or 103 -- Sections 35 USC 102 or 103,  they'd have to ask for that specifically and show prior art.  That can't be

Appx310

Adasa v Avery-Dennison

May 09, 2018

42

decided now on the pleadings.  That has to be summary judgment.  They didn't do that.

They would have to move for summary judgment of noninfringement.  So you cannot find in their favor at this point in time.

THE COURT:  Do you -- I believe I heard you say previously you think claim construction would be helpful.

MR. PINKUS:  Yes, Your Honor.  It appears this allocated -- what does that allocated block mean?  That's a perfect instance of what needs to be construed.

THE COURT:  Okay.  Anything else?  From the defendant?

I'm going to make a suggestion to you.  I'm going to take a 15-minute recess, and I suggest -- you mentioned earlier about the cost of going forward through discovery, et cetera, and so forth, and the burden that that puts on your client.  I'm going to take a 15-minute recess, and I'm going to ask the two of you to confer about whether or not you think that it might be appropriate to put your motion on hold while you work on claim construction.  And then you can renew it after that, or not, before you go forward with the discovery.

Appx311

Adasa v Avery-Dennison

May 09, 2018

43

Do you think you could do claim construction without doing discovery or not?

MR. PINKUS:  I would like to at least begin discovery, but I don't think we have to complete discovery before we could do claim construction.

THE COURT:  How long do you think it would take you to do the latter, claim construction?

MR. PINKUS:  Claim construction, how long would it take?

THE COURT:  Yeah.

MR. PINKUS:  I don't know if you saw our 26(f) report that we submitted.

THE COURT:  No, I haven't.

MR. PINKUS:  We put in a briefing schedule for that.  I can't remember -- I think I have it here.  I think it was -- I basically said we would start exchanging terms for construction on August 19th of 2018 and then we would have our claim construction hearing December 11th.  So that's about two months -- three months -- four months.  Sorry.  So I'd say take about three, four months, three months if we really push it.

THE COURT:  Why don't you folks talk about that during the recess, because if you are

Appx312

looking to save costs -- I understand that and I'm happy to accommodate you.  But as you can probably infer from my comments today, my questions, I'm uncomfortable with deciding the issue presented in this case just on the pleadings at this stage.

MS. LEGAARD:  Understood, Your Honor.

THE COURT:  Okay.  We'll take a 15-minute recess.

THE CLERK:  This Court is in recess.

(Recess:  11:00 to 11:17 a.m.)

THE COURT:  So how do you want to proceed?

MS. LEGAARD:  So I have a proposal based on a case I'm litigating in front of Judge Simon called Prolacta v. Ni-Q.  I don't have the case number with me.  So in that case we filed a 101 motion.  Judge Simon also was uncomfortable deciding that without claim construction.  So I am --

THE COURT:  Great minds think alike.

MS. LEGAARD:  Judge (inaudible), on the other hand, granted our motion.

But anyway -- but, yeah, so he -- he was also sensitive to the concern about dragging everybody through discovery without sorting out the fractionability of the issue.  So he stayed -- you

Appx313

know, sort of delayed discovery.  He allowed only claim construction discovery, put the parties on -- it's been about five, six months-ish of a claim construction schedule.  And then we'll take up the 101 issue upon completion of claim construction if we end up in a place where that's still appropriate.

So my client's been shielded from the burden of doing discovery, and the judge has been afforded a more orderly claim construction process in order to help with the 101 issue.  From our perspective, it's been a good plan.

THE COURT:  Do you agree with that?

MR. PINKUS:  Not entirely, Your Honor. We're okay with doing claim construction sooner than later.  We already had that four-month schedule in the 26(f) order.  We can move that up.  We're okay with doing that.

But we would also like to at least start discovery.  We can hold off on damages and things like that, but we'd like to at least look at infringement.  They are saying they don't infringe the patent, so we'd like to know why.  They haven't shown us that they don't infringe yet.  So I think that would also help, at least some limited discovery on infringement at this point in time, at

Appx314

a minimum, in order to vet that out.  We haven't
seen any documents or anything on why they don't
infringe.

So if we could do that in conjunction
with claim construction now, I think we would be
okay with that.

The only other caveat is I think that
if you were going to find that this was patent
eligible -- so not abstract -- under step 1, I think
you could find that now.

Step 2, really there is a question of
fact on whether it's routine or conventional where I
think that that would be -- discovery would be
necessary for that.

And I don't know that necessarily
realleging their motion on the pleadings would be
appropriate after claim construction and/or
discovery.  I think they should go ahead and do a
summary judgment motion at that time.

THE COURT:  Okay.  Let me ask a
question.  In your view, how do I find that it is or
is not patent eligible under step 1 under 101 --

MR. PINKUS:  I think --

THE COURT:  Wait.  I haven't finished.

-- before you do a claim construction

Appx315

if the issue of the patent is an issue that involves claim construction?  How do I put the cart before the horse?

MR. PINKUS:  I think claim construction could be helpful, certainly, for step 2.  Step 1, I guess it could be helpful.  But I think that -- their abstract idea, the way they've characterized that, that is on its face not what the claims say or cover at all.  And so that is beyond the bounds.  Their argument is basically that's a Synopsys case.  But that's not -- as I said, that's not in the claims at all.

Maybe claim construction would clarify that.  I think there may be some help there from claim construction, but I think you could find as a matter of law, step 1, that that's the case and just deny it on the pleadings.  And if they want to reallege it in summary judgment later, they can do that.

THE COURT:  What's your proposed timetable?  You want to do claim construction.  We already have a briefing schedule for that.  And you're fine with that briefing schedule.

MR. PINKUS:  Yes, Your Honor.

THE COURT:  And in terms of discovery

Appx316

on the infringement, what's your proposal there?

MR. PINKUS:  Well, I assume we -- I mean, we can get discovery requests out soon.  It'll take at least 30 days, probably longer, for them -- to get responses from them and for us to go through them.  So probably that same -- I guess four months would probably be sufficient.  And we could do the same thing for claim construction.  So by the time we had the claim construction hearing, we would have at least limited discovery.

THE COURT:  You know, I certainly don't have any problem with you doing discovery requests and you responding.  I don't think that's overly burdensome.  But come back to court before you schedule the depositions that follow.

MS. LEGAARD:  I mean, document collection I think in this case is going to be pretty difficult.  I mean, this is a global operation.  So I think -- discovery is going to be expensive and it's going to be difficult, even short of depositions, just collecting all this stuff.

So I could write them responses, I suppose, to discovery requests, but I don't want to start collecting documents until we've sorted out what the claims mean and whether they are valid or

Appx317

Adasa v Avery-Dennison

May 09, 2018

49

not.

THE COURT: Okay. So what's your response to that issue?

MR. PINKUS: If we narrowly tailor our requests to documentation of how the system works with respect to encoding, most significant bits, things like that -- I'm not going to be searching for universal, broad discovery at this point. I just want -- they say they don't infringe. I would like to see it.

THE COURT: He says he is going to be able to narrow the request.

MS. LEGAARD: If they are narrow and tailored, if they are not all documents pertaining to -- if they are narrowed and pertinent, I think we can handle that.

THE COURT: Okay. I'm always available if you have a problem. Let's do that. In the meantime, we will stay this motion to dismiss. It can be renewed, then, at the end of this process after you do construction of the claims. So in the meantime it won't be under submission.

MS. LEGAARD: So the schedule in front of the Court puts claim construction really commencing in August and finishing in November -- no

Appx318

Adasa v Avery-Dennison

May 09, 2018

50

wait -- December of --

MR. PINKUS:  December 11th is the hearing.

MS. LEGAARD:  Right.  So I understand us to be talking about a more expedited claim construction process than that.

MR. PINKUS:  Your Honor, if we could maybe submit a proposed schedule for claim construction briefing starting sooner than that.  And then you can --

THE COURT:  I encourage you to work it out.  The more abbreviated you can do, the better it is.

Okay.  Thank you for your presentations.

MR. PINKUS:  Thank you, Your Honor.

THE CLERK:  This court is adjourned.

(Conclusion of proceedings.)

Appx319

Adasa v Avery-Dennison

May 09, 2018

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ADASA, INC.,                     )

            Plaintiff,           )

    v.                           ) No. 6:17-cv-01685

AVERY DENNISON CORPORATION,      )

            Defendant.           )


ORAL ARGUMENT

BEFORE THE HONORABLE THOMAS M. COFFIN

May 9, 2018

Wednesday

10:10 A.M.

Eugene, Oregon


Appearances:

    For Plaintiff:  MR. BRETT M. PINKUS,

                        FRIEDMAN, SUDER & COOKE

                    MR. JOHN MANSFIELD

                    HARRIS BRICKEN

    For Defendant:  MS. BRENNA LEGAARD and

                    MS. ANGELA ADDAE

                        SCHWABE WILLIAMSON & WYATT

Appx327

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

ADASA, Inc.

_____

Plaintiff(s),

**v.**

Avery Dennison Corp.

_____

Defendant(s).

_____/

**Case No.:** 6:17-cv-01685-TC

## Consent to Jurisdiction by a Magistrate Judge and Designation of the Normal Appeal Route

Pursuant to Fed. R. Civ. P 73(b), as counsel for the party (parties) identified below, I consent to have a United States Magistrate Judge conduct any and all proceedings in this case, including entry of orders on dispositive motions, trial, and entry of final judgment. I understand that withholding consent will not result in any adverse consequences. Pursuant to Fed. R. Civ. P. 73(c), I agree that an appeal from a judgment entered at a Magistrate Judge's direction may be taken to the court of appeals as would any other appeal from a district court judgment.

**DATED:** 05/10/2018

| | |
|---|---|
| **Signature:** | /s/ Brett M. Pinkus |
| **Name and OSB ID:** | Brett Pinkus |
| **E-mail Address:** | pinkus@fsclaw.com |
| **Firm Name:** | Friedman Suder & Cooke |
| **Mailing Address:** | 604 E. 4th Street, Suite 200 |
| **City, State, Zip:** | Fort Worth, TX 76102 |
| **Parties Represented:** | ADASA, Inc. |

Appx379

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

ADASA INC.                                          Case No.: 6:17-cv-01685-TC
    Plaintiff(s),

v.

AVERY DENNISON CORPORATION
    Defendant(s).

_____

### Consent to Jurisdiction by a Magistrate Judge and Designation of the Normal Appeal Route

Pursuant to Fed. R. Civ. P 73(b), as counsel for the party (parties) identified below, I consent to have a United States Magistrate Judge conduct any and all proceedings in this case, including entry of orders on dispositive motions, trial, and entry of final judgment. I understand that withholding consent will not result in any adverse consequences. Pursuant to Fed. R. Civ. P. 73(c), I agree that an appeal from a judgment entered at a Magistrate Judge's direction may be taken to the court of appeals as would any other appeal from a district court judgment.

DATED: _____December 29, 2017_____

Signature: _____s/ Brenna K. Legaard_____

Name and OSB ID: _____Brenna K. Legaard OSB #001658_____

E-mail Address: _____blegaard@schwabe.com_____

Firm Name: _____Schwabe, Williamson & Wyatt, P.C._____

Mailing Address: _____1211 SW 5th Avenue, Suite 1900_____

City, State, Zip: _____Portland, OR 97204_____

Parties Represented: _____Defendant AVERY DENNISON CORPORATION_____

Appx380

John Mansfield, OSB No. 055390
HARRIS BRICKEN
511 S.E. 11th Avenue, Suite 201
Portland, Oregon 97214
(503) 207-7313
john@harrisbricken.com

Jonathan T. Suder (*pro hac vice*)
Brett M. Pinkus (*pro hac vice*)
Glenn S. Orman (*pro hac vice*)
Richard A. Wojcio, Jr. (*pro hac vice*)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX 76102
(817) 334-0400
(817) 334-0401 fax
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com
wojcio@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON**

**Eugene Division**

| | |
|---|---|
| **ADASA INC.,** | Case No.: 6:17-CV-01685-TC |
| Plaintiff, | |
| v. | **PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** |
| **AVERY DENNISON CORPORATION,** | |
| Defendant. | **Hearing: November 6, 2018 at 10:00am** |

Appx384

include product-by-process limitations, arguments that were raised and then rejected during reexamination of the asserted claims, in order to manufacture otherwise nonexistent non-infringement positions. As discussed below, the Court should, instead, adopt Plaintiff's constructions which are supported by the intrinsic record and clarify the true meaning and scope of each disputed term.

### A.   "is encoded with one serial number instance"

| Claim Term | Plaintiff's Proposed Construction | Avery's Proposed Construction |
|---|---|---|
| Is encoded with one serial number instance | has stored within it one serial number instance | Has stored within it one serial number instance by an encoder that does not need to communicate with a central database to ensure that the serial number is unique |

In their respective proposals for the present term, both parties initially propose similar constructions for the terms actually present in the disputed terms, recognizing that "is encoded" should be construed to mean "has stored within it" and that the information stored within encoding must include "one serial number instance." However, Avery's construction then goes further to add a limitation that the encoding must be done "by an encoder that does not need to communicate with a central database to ensure that the serial number is unique." This additional limitation improperly narrows the scope of the claim by attempting to incorporate a step from the process by which the claimed transponder is encoded, rather than focusing on characteristics of the encoded transponder itself.

The asserted claims are apparatus claims directed to an RFID transponder encoded with a serial number instance comprising a limited number of most significant bits along with remaining bits of lesser significance. '967 Patent at 42 (claims 1 and 13). Blocks of serial numbers are

Appx396

delineated from a pool of available serial numbers by assigning a sequence of most significant bits within the serial number field to a particular block. '967 Patent at 8:11-36. The serial numbers in the block will thus include all serial numbers beginning with the same sequence of most significant bits. *Id.* When the block is allocated, it ensures that all serial numbers from that allocated block are reserved out of the larger pool of available serial numbers and are encoded only once, and therefore each serial number is unique. *Id.* An RFID transponder is then encoded with one serial number from the allocated block (a serial number instance), which contains this same sequence of most significant bits as in the allocated block. As such, the most significant bits of the serial number encoded in the transponder uniquely correspond to those of the allocated block.

The object of this disputed term "is encoded with one serial number instance" is the one serial number that has already been encoded in the serial number space of the RFID transponder. In other words, this particular claim term addresses the encoded serial number, not the process for how it is encoded or even the additional characteristics for how the serial number is partitioned which are set forth later in the claim (and which are discussed further herein with regard to those respective limitations). Quite simply, this is as far as the scope of this present term goes.

Avery attempts to incorporate into this straightforward term a process limitation that the encoding of the serial number is performed by an encoder that does not connect to a central database during the commissioning process. While use of the novel partitioned serial number subsequently claimed is described in the specification of the '967 Patent as advantageously ensuring uniqueness of serial numbers assigned, this is an insufficient basis for including the additional process related limitation proposed by Avery to only situations in which the encoder does not communicate with a central database. It is certainly one stated potential advantage of an RFID transponder that has been encoded with this partitioned serial number that the encoder does

10

not need to be continuously connected to a central database.  However, the '967 Patent discloses several other advantages over prior art transponders and encoding systems resulting from this novel encoded transponder, such as improvements in efficiency and reliability, commissioning without requiring continuous use of a screen or keypad, and accommodating systems capable of operating without a continuous wireless connection to a higher-level serial number assigning authority.  '967 Patent at 3:13-35.  There is no requirement in the claim language nor is there any disclaimer in the specification or the prosecution history that would limit the claimed invention to the one potential advantage highlighted by Avery.  That an invention may accommodate certain functionality in an embodiment, however, in insufficient basis to include limitations directed to that functionality in the claims of the patent.  *Phillips*, 415 F.3d at 1314-15, 1323; *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).  Claims should only be interpreted in such a restricted manner if patentee has demonstrated a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction," which is not the case here.  *Liebel-Flarsheim v. Medrad*, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004).

Further, Avery's proposed construction must be rejected because it reads out certain embodiments of the invention described in the '967 Patent.  For example, the embodiments depicted in Fig. 1 (reproduced below) and Fig. 17 depict systems for encoding a transponder which contemplate continuous communication between an encoder device and a host computer storing a database during commissioning.

Fig. 1 is a block diagram of the system and environment according to one embodiment of the inventions disclosed in the '967 Patent which comprises a mobile encoder (30) that "is in wireless communication with a remotely located host computer" (11). '967 Patent at 6:66-7:1. As seen in the figure, this system unmistakably shows an encoder comprising transponder

11

Appx398

commissioning means that is connected to host or network computer which includes a central database.



Fig. 1 of '967 Patent

Several embodiments of the system such as shown in Fig. 1 are disclosed which contemplate various schemes for effecting communication between the encoder (30), remote computer (20), and a host or network computer (11) that includes a serial number database. '967 Patent at 7:14-30.

12

Appx399

visual external label. Information from the external, visual label is correlated to information stored in a centralized location, represented by a network computer **11** having a database. The information taken by the optical reader **13** is transmitted to the network computer **11**. System **10** includes a wireless connection between the remote computer **20** and the mobile encoder **30** either directly or through a common wireless access point. Additionally, a wireless connection could occur between the remote computer **20** and the host computer **11**, and in this embodiment, the remote computer **20** is in physical connection with the mobile encoder. In yet another embodiment, the remote computer **20** wirelessly connects to both the mobile encoder **30** and the host computer **11**. Optionally, the optical reader **13** can be incorporated in the encoder **30**.

The system of Fig. 1 can be configured to allocate blocks of serial numbers delineated from the available serial numbers by assigning a sequence of most significant bits within the serial number field from the higher-level database to a lower-level assigning authority or directly to encoder. For example, the lower level authority can be one or more intermediary database maintained throughout an enterprise. '967 Patent at 7:60-8:3, 8:31-36.

RFID tags such as those using EPCglobal numbers requires uniqueness of the numbers that are encoded. GS1 is a central authority that prescribes a set of hierarchies for each key type (type of identity such as an SGTIN) whereby GS1 designates itself as the central issuing authority for each key type. Authority is passed down in a hierarchical manner to member companies. Each member company has the authority to further allocate numbers from its upper level

database to as many lower database levels as it deems necessary to distribute number authority throughout its enterprise.

values. Once a sector is allocated to a lower level within an authority hierarchy, it is referred to as a block. Each allocated block of serial numbers represents authority for encoding objects of an object class that can either be used by an encoder for encoding transponders, or allocated to a lower level in the authority hierarchy.

13

Notably, even when operated in this manner, the encoder must communicate directly or indirectly with the higher-level database (central database) at some point prior to commissioning transponder to receive authorization for use of numbers within an allocated block. '967 Patent at 8:52-60.

> Authorizations for one or more classes of objects are preferably loaded into encoder **175**, **30**, or **220** from an external authority where such authorizations include data fields such as manufacturer ID, item reference, manufacturer code lengths, filter values (that designate packaging levels such as item, case, pallet, etc.), serial number starting point for a block, and other pre-determined parameters. Such information is preferably loaded into the memory of the encoder in advance of tag commissioning operations. Thus

In another embodiment, the disclosed encoding process requires use of an intermediary computer, which may be a smartphone, as a lower level database functioning as a go-between for communication between and encoder and an upper level database. The lower level authority is communicatively coupled to an encoder and continuously or regularly accesses an upper level database to obtain authorizations for serial numbers for the allocated block. '967 Patent at 10:15-42, reproduced below.

> A preferred embodiment uses a computer, preferably a smartphone such as an iPhone from Apple Inc. of Cupertino, Calif. as a lower database level to transfer encoding authorizations from upper level database authorities to RFID encoders. A smartphone such as the iPhone or an Android phone using software from Google would be a preferred embodiment of a lower database level and or an encoder using an antenna or near field coupler similar to near field coupler **224A2** of FIG. **21** or **238a** or **238b** of FIG. **22** to couple with RFID transponders for encoding and verification. The iPhone also has cellular data transmission radios and software stack to enable the iPhone to access remotely located servers in a cloud computing architecture.

14

Appx401

The smartphone establishes a connection with a cloud-based server using JavaScript, ASP, JSP, PHP, Perl, Tcl or Python scripts to access a database such as mySQL that is available from Oracle Corporation of Redwood Shores, Calif. Using structured query language, SQL database tables are preferably used to store tag commissioning data, configuration information, and serial number block allocation records. SQL queries provide information from database tables to the script, passing the result over the Internet, to the smartphone, which also then routes information to designated RFID encoders. Encoders are preferably identified by their media access control (MAC) address or a UUID which is guaranteed to be unique and is used by the smartphone as a lower database level to transfer encoding authorization to a specific encoder.

The specification of the '967 Patent therefore contemplates communication of encoders with both lower level assigning authorities and with a higher-level authority (or central database) to obtain serial numbers or blocks of serial numbers during tagging operations. Avery's proposed construction would disregard that each block that has been allocated from the higher-level authority must also must be unique. The uniqueness of the blocks of serial numbers obtained throughout the commissioning process would contribute to the overall scheme for ensuring uniqueness of the serial numbers.[4] The claimed partitioned serial number within the encoded transponder affords an additional level for ensuring uniqueness beyond that of other encoded transponders and commissioning systems. Thus, while a continuous connection to a higher-level

---

[4] Plaintiff notes, however, that the process of how the blocks are allocated is outside of the scope of the claims. The parties agreed constructions and proposed constructions for the disputed terms solidify this conclusion. The parties have agreed that within the construction of this term, that the phrase "is encoded" should be construed to mean "has stored within." The parties also have agreed to the construction of "being assigned a limited number of most significant bits," in which the phrase "being assigned" is construed to mean "includes." These constructions center the context of the claim around a commissioned transponder that has already been encoded with serial number. Therefore, what matters for the scope of the claim is that the blocks have been allocated so that a unique, partitioned serial number can be used in the encoding, not the process for how the blocks are allocated.

15

Appx402

authority (such as a central database) during the commissioning process is not required to practice the claimed invention, the claim must not be construed to exclude commissioned transponders which were encoded when the encoder was connected to a central database or a lower level database throughout or at various points during the commissioning process. Ultimately, Avery's additional proposed process limitation is of no significance whatsoever to the serial number encoded within the claimed transponder at issue, and its attempt to import this extraneous process limitation into this claim term must be rejected.

### B.   "an allocated block of serial numbers"

| Claim Term | Plaintiff's Proposed Construction | Avery's Proposed Construction |
|---|---|---|
| An allocated block of serial numbers | A pre-authorized range of serial numbers | A pre-authorized range of serial numbers that has been assigned to an encoder<br><br>(with an "encoder" being a device that encodes RFID tags with serial numbers) |

Here, again, the parties initially propose the same construction for "an allocated block of serial numbers" as meaning "a pre-authorized range of serial numbers," but Avery appends to it the additional limitation "that has been assigned to an encoder" which is addressed to an aspect of the commissioning process rather than to a feature of the claimed RFID transponder. This appended portion of Avery's proposed construction must be rejected for similar reasons to those of the preceding section. Namely, Avery seeks to import a limitation manifest in only certain disclosed embodiments of the invention into the claims thereby reading out other embodiment of the invention from being covered by the asserted claim.

Referring to the specification of the '967 Patent, an allocated block of serial numbers is described:

16

Appx403

**Brenna K. Legaard,** OSB #001658
Email: blegaard@schwabe.com
**Angela E. Addae,** OSB #163335
Email: aaddae@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: (503) 222-9981
Facsimile: (503) 796-2900

*Attorneys for Defendant and Counterclaimant,*
*Avery Dennison Corporation*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **ADASA INC.,** | Case No.  6:17-cv-01685-TC |
| Plaintiff, Counterclaim Defendant, | **AVERY DENNISON CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF** |
| **v.** | |
| **AVERY DENNISON CORPORATION**, | |
| Defendant, Counter Claimant. | |

## I.   INTRODUCTION

As the parties' joint claim construction chart shows, the parties have been able to agree

on the appropriate constructions for most of the claim terms at issue.  The parties dispute the

proper construction of three terms.  The first two are:

1.    "is encoded with one serial number instance," and

2.    "an allocated block of serial numbers."

Avery Dennison's proposed constructions of these terms reflect the fact that during

reexamination, ADASA characterized the technology claimed in U.S. Patent No. 9,798,967 ("the

Page 1 -   AVERY DENNISON CORPORATION'S OPENING
CLAIM CONSTRUCTION BRIEF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx480

PATENT
Attorney Docket No.: 30139/00105

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re *Ex Parte* Reexaminaton of: | ) | |
| | ) | |
| U.S. Patent No. **9,798,967** | ) | |
| | ) | |
| Control No.: 90/014,052 | ) | Group Art Unit: 3992 |
| | ) | |
| Filed: November 29, 2017 | ) | Examiner: Christina Y. Leung |
| | ) | |
| For: SYSTEMS, METHODS, AND | ) | |
| DEVICES FOR COMMISSIONING | ) | |
| WIRELESS SENSORS | ) | |
| | ) | |
| Confirmation No.: 4770 | ) | |

Mail Stop: *Ex Parte* Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## AMENDMENT IN RESPONSE TO FINAL OFFICE ACTION

## DATED MAY 14, 2018

In response to the Final Office Action mailed May 14, 2018 in the above-referenced

reexamination, please enter the following amendments and consider the following remarks.

1

Appx616

bits uniquely corresponding to the limited number of most significant bits of the allocated block."

Accordingly, the proper interpretation of claim 1 requires that the serial number space must include a serial number instance that was selected from an allocated block that was specifically assigned (or allocated) based on a limited number of most significant bits and the serial number space is encoded with this data such that the limited number of most significant bits *uniquely* corresponds to the limited number of most significant bits of the allocated block.

### The Differences Between the Claims of the '967 Patent and the Cited References

Initially, the Examiner has admitted that the '684 publication does not disclose the above highlighted claim elements of the '967 patent. *See* Office Action, pp. 5 and 18-19. However, the Examiner has asserted that both the '200 patent and the '545 patent cure these deficiencies of the '684 publication. *See* Office Action, pp. 5-6 and 19-22. The patent owner respectfully disagrees.

The patent owner will discuss each of the references individually below. However, the patent owner can summarize the teachings of the '200 patent and the '545 patent as the selection of a series of decimal ranges to be used for the serial numbers. Further, from the Examiner's rejection and the discussion held with the Examiner, it appears to the patent owner that the Examiner's argument is that one could select a decimal range that corresponds to the most significant bits recited in the claim and therefore, it would be obvious, to encode the most significant bits as recited in the claims.

The patent owner disagrees with this analysis. As described above, the properly interpreted claims of the '967 patent require a serial number instance that was selected from an allocated block that was specifically assigned (or allocated) based on a limited number of most significant bits. Selecting a series of decimal numbers is not the same as assigning an allocated block based on a

13

Appx628

limited number of most significant bits. In the prior art, a range of decimal numbers is selected and then the decimal numbers in the range are converted from decimal to binary for storage on the RFID tag. However, the only consideration of the binary numbers is the conversion from the decimal. The patent owner asserts that assigning a range of decimal numbers in no way discloses or suggests assigning an allocated block based on a limited number of most significant bits. With respect to the prior art, there would be no reason to assign a series of sequential serial numbers based on a binary system. It would not provide any different outcome from the decimal range. Whereas, in contrast, the entire point of claim 1 is to require a serial number instance that was selected from an allocated block that was specifically assigned (or allocated) based on a limited number of most significant bits and the serial number space is encoded with this data such that the limited number of most significant bits *uniquely* corresponds to the limited number of most significant bits of the allocated block.

The mere fact that a highly unlikely scenario exists where one could randomly pick a series of decimal numbers that corresponds to some number of most significant bits in binary is irrelevant. The question is why would such numbers be picked. What would be the motivation for selecting numbers in such a way. The patent owner cannot think of any motivation within the prior art that suggests such a selection method. As described above, the recitations of the '967 patent are nonobvious because of the unique manner of partitioning the serial number space into most significant bits and bits of lesser significance. Once this is done, as recited in the claims, then allocating blocks based on the most significant bits becomes useful. The prior art neither teaches nor suggests such a scheme of having RFID transponders encoded.

14

Appx629

1

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

THE HON. THOMAS M. COFFIN, JUDGE PRESIDING

ADASA INC.,                         )
                                    )
                  Plaintiff,        )
         Counterclaim Defendant,    )
                                    )
         v.                         ) No. 6:17-cv-01685-TC
                                    )
AVERY DENNISON CORPORATION,         )
                                    )
                  Defendant,        )
         Counter Claimant.          )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

EUGENE, OREGON

FRIDAY, DECEMBER 7, 2018

PAGES 1 - 56


                    Kristi L. Anderson
                    Official Federal Reporter
                    United States Courthouse
                    405 East Eighth Avenue
                    Eugene, Oregon 97401
                    (541) 431-4112
                    Kristi_Anderson@ord.uscourts.gov


Appx773

so you could connect to the database that supplied the numbers.

So he said, well, I would like to have a system where I could be connected to that database or I didn't have to be connected to the database and I could still encode.

And so what he did was he split up the serial number into two different sections.  So here we have got the first section of the serial number is what we call the most significant bits.  So these are the leading bits of the serial number.  Then you have the least significant bits, which are the trailing bits of the serial number.

So you can specify -- it doesn't really matter how many bits you specify in the most significant bits.  It's got to be more than two.  Otherwise it would be meaningless information.  But if you do -- let's say you do 6 or 8 or 14, so those 14 bits or 8 bits would be the most significant bits.  And then the last -- the remaining bits would be the least significant bits.

So by doing that, you can -- you can assign those most significant bits to a particular entity such as -- let's say you are a brand owner of Levi's and you have four manufacturing plants or distribution plants.  You could give each distribution plant a set of most significant bits, and that sets off the range of serial numbers they can use.  So they can encode any serial number that begins with those

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ADASA INC.,                          )
                                     )
                Plaintiff,           )         6:17-cv-01685-TC
                                     )
                v.                   )       Opinion and Order
                                     )
AVERY DENNISON CORPORATION,          )
                                     )
                Defendant.           )
_____     )

   This is a patent action in which this court has full consent.

   Presently before the court is the construction of the claims.

There have been no filings of motions for summary judgment at this

point in the litigation.

1 - OPINION AND ORDER

Appx829

FACTUAL BACKGROUND

Plaintiff and counter defendant ADASA Inc.'s (plaintiff Adasa) and defendant and counter claimant Avery Dennison Corporation (Defendant Avery) seek construction of the terms of plaintiff Adasa's '967 patent.

The '967 Patent is related to merchandise tracking. As alleged by plaintiff Adasa, in merchandising tracking applications, the memory bank of an RFID[1] tag is encoded with an Electronic Product Code.  The Electronic Product Code is an identifier for an item in the  supply chain to uniquely identify that particular item.  This identifier is  serialized to be unique for avoidance of duplicate numbers among items in the supply chain.

Plaintiff alleges that "[t]he '967 Patent generally speaking, relates in part, to systems for encoded and commissioned wireless radio frequency identification ('RFID') devices."  Paragraph 7 of Complaint.

The parties are familiar with the complex underlying technology in this field and it is addressed as needed below.

A Claim Construction Hearing was held after extensive briefing on the issues.[2]

_____

[1]RFID stands for "Radio Frequency Identification Device."

[2]This court granted plaintiff's motion to amend the complaint at the beginning of the hearing.

2 - OPINION AND ORDER

Appx830

<u>DISCUSSION</u>

The applicable Claim Terms as presented by the parties and this court's constructions thereof follow.

I.    <u>TERMS WITH  AGREED UPON CONSTRUCTIONS</u>

1.    <u>object class information space</u>

The parties agree such phrase  should be construed as "data field  within the memory of the RFID integrated circuit chip for information identifying the class of an  object, such as a company prefix, item reference code, partition value, and/or filter value."

2.    <u>unique serial number space</u>

The parties agree such phrase should be construed as " data field within the memory of the RFID integrated circuit for information identifying a unique serial number."

3.    <u>being assigned a limited number of most significant bits</u>

The parties agree such phrase should be construed as "includes a limited, predefined sequence of higher order bits at the leading end."

4. <u>remaining bits of lesser significance</u>

The parties agree such phrase should be construed as "the remaining lower order bits at the trailing end."

3 - OPINION AND ORDER

## II.   TERMS WITH DISPUTED CONSTURCTIONS

As explained in further detail below, this court ultimately construes the terms with disputed constructions in accordance  the language proposed by plaintiff Adasa.

### 1.   is encoded with one serial number instance

Plaintiff Adasa argues that this phrase should be construed as "[h]as stored within  it one serial number instance."

Defendant Avery initially argued that the phrase should be construed with plaintiff's language and the addition of " stored by an encoder that does not need to communicate with a central database to ensure that the serial number is unique."  P.2 of Defendant Avery Response (#62).  Defendant Avery subsequently conceded that its proposed construction was not appropriate as it did not take into consideration the fact that "an RFID encoding scheme may use a variety of computers to host serial number databases, not just a 'central database.'"  Id . Defendant Avery than proposed a different construction as follows: "Has stored within it one serial number instance, stored by an encoder that does not need a continuous connection with any serial number database to ensure that the serial number is unique."  Id.

In support of its constructions, defendant Avery argues that plaintiff Adasa's constructions are improper because plaintiff Adasa disavowed claim scope during the reexamination of its claims.

4 – OPINION AND ORDER

Appx832

However, find from the material before the court that Adasa did not disavow its claim scope during the reexamination proceedings: Adasa, for example, did not disavow all uses of a central database for its hardware-based numbering scheme -such hardware-based numbering scheme can be used in direct connection with a central data base or in a less direct, ad hoc mode.

As explained in detail by plaintiff Adasa, the '967 Patent was reviewed for patentability in an Ex Parte Reexamination. During reexamination, plaintiff Adasa filed briefs and supporting declarations with the Patent and Trademark Office (PTO) arguing against the Examiner's rejections arising from two prior art combinations. Plaintiff Adasa made the same arguments to overcome the Examiner's rejections consistently throughout the reexamination proceedings. Plaintiff Adasa repeatedly pointed to the partitioned memory structure within the claimed RFID transponders, accommodating a serial number instance with most significant bits along with bits of lesser significance, as a novel feature within the claims of the '967 Patent not in any prior art combinations. In its response to the PTO, plaintiff Adasa was explaining that the prior art was focused on a centralized scheme operated entirely by a central database, which was the sole manner of ensuring uniqueness of the Electronic Product Codes that were to be later encoded to RFID transponders, but the asserted claims require and utilize a hardware - based approach that is used on top of any

5 - OPINION AND ORDER

Appx833

central database scheme for uniqueness.  Plaintiff Adasa then went on to describe to the PTO the hardware based numbering scheme in greater detail , noting that "[t]his hardware- based approach of the '967 Patent manages assignments of the serial number at the binary level by partitioning the bits of the serial number space into a limited number of most significant bits and a remaining number of least significant bits."  P. 14 of #59-3.

I agree with plaintiff Adasa that a proper reading of the arguments to the PTO reveals that the novel feature within the challenged claims is the use of a "hardware-based numbering scheme" which is manifest in the claims through inclusion of requiring that the serial number space comprises a limited number of most significant bits which corresponds to the most significant bits of an allocated block.  This scheme adds an additional layer of insurance that  all serial numbers assigned will be unique,  which is a fundamental requirement of RFID systems. Plaintiff Adasa explicitly stated that it is the "hardware -based numbering scheme" feature that is missing from the prior art, and that such prior art relies only on continuous connections to a central database to ensure uniqueness. Importantly, neither plaintiff Adasa nor its expert declarant before the PTO declared these two schemes for ensuring uniqueness as being mutually exclusive such that an RFID

6 - OPINION AND ORDER

Appx834

tagging system could not or would not implement both.[3]  Rather, it was noted that the use of the claimed scheme merely "allows" for commissioning of RFID tags without continuous connection to a database.  P.p. 4, 16 of #59-3; Paragraphs 43, 50 of # 59-2. Prior art systems utilized only a single means for ensuring uniqueness- constant connection to a central database- rather than a layered scheme also utilizing serial numbers comprising a limited number of most significant bits.

Some of plaintiff Adasa's arguments were not initially found persuasive by the Examiner and the non-final rejections of the claims of the '967 Patent were maintained in the subsequent Final Office Action.  The Examiner posited that the distinctions made by Adasa relating to the hardware -based numbering scheme could not be a basis for novelty because they related only to the process by which the claimed RFID transponders were made rather than the structural elements of the RFID transponders. In plaintiff Adasa's Amendment in Response to Final Office Action dated May 14, 2018, Adasa successfully argued against this position asserting that " claim 1 should be interpreted to include the structural limitation that the encoded serial number space must include a serial number instance that was selected from an allocated block

---

[3]  Plaintiff Adasa has  demonstrated that despite the occasional use of the phrase "in essence" in conjunction with the ad hoc mode , there is  not claim disavowal.

7 - OPINION AND ORDER

that was specifically assigned (or allocated) based on a limited number of most significant bits" p. 10 of #59-7.  To that end, Adasa made a clarifying amendment to the claims of the '967 Patent for the purpose of clarifying that the most significant bits uniquely correspond to the allocated block in support of Adasa's position that the claimed serial number structure is a structural limitation of the claimed RFID transponders.[4]

The positions taken by both Adasa and the Examiner with respect to the final rejection, clarifying amendment , and subsequent confirmation of validity of the claims of the '967 Patent as presented in the Reexamination Certificate do not relate at all to limitations of the process for how the claimed RFID transponders are encoded.  There is little to no discussion of continuous connection to a central database, autonomous or quasi-autonomous encoding, or how the allocated block is derived or assigned.  The discussion focuses solely on the novel feature advanced throughout the reexamination by Adasa  – that the claimed RFID transponders utilize a partitioned serial number space comprising most significant bits that was not present in any prior art references.

---

[4]In support of its disavowal argument, defendant Avery cites Poly-America, L.P. v. API Indus., Inc., 839 F.3d 1131, 1136 (Fed Cir.2016) and Krippelz v. Ford Motor Co., 667 F.3d 1261, 1267 (Fed. Cir. 2012).  However, I find that such cases are distinguishable and, as Adasa argued to the PTO, the patent at issue is more akin to In Re Nordt, 881 F.3d 1371 (Fed Cir. 2018). See p.p. 50-54 of Transcript (#67).

8 - OPINION AND ORDER

Appx836

2. an allocated block of serial numbers

Plaintiff Adasa argues that this phrase should be construed as "a pre-authorized range of serial numbers." Defendant Avery argues this phrase should be construed as plaintiff Adasa suggests with the addition of the phrase " that has been assigned to an encoder." Defendant Avery makes an argument similar to one above regarding disavowal of claim scope. Such argument is not persuasive for the reasons stated above.

3. Uniquely Corresponding

Defendant Avery acknowledges that the parties' differing constructions may mean the same thing, p. 11 of Response (#62). Based on the above discussion, the phrase "uniquely corresponding" is construed as having its plain and ordinary meaning as plaintiff Adasa suggests.

### CONCLUSION

The claims in this action are construed as discussed above.

DATED this __22__ day of January, 2019.

THOMAS M. COFFIN
United States Magistrate Judge

9 - OPINION AND ORDER

Appx837



*UNITED STATES DISTRICT COURT*
District of Oregon

# NOTICE OF JUDICIAL REASSIGNMENT

Date of Reassignment:                                             January 29, 2019

Case Number:                                                    6:17−cv−01685−MK

Case Title:                          Adasa Inc. v. Avery Dennison Corporation

**(A)     Case Reassignment:**  In accordance with the Court's Case Management Plan, the above−captioned case has been reassigned from the Honorable Thomas M. Coffin to the Honorable Mustafa T. Kasubhai, United States District Judge Information on this case may be obtained from the following:

| | |
|---|---|
| Courtroom Deputy: | Jackie Klein<br>Telephone:  541−431−4119<br>Email:  jackie_klein@ord.uscourts.gov |
| Docket Information: | Telephone:  541−431−4100 |

**(B)     Place of Filing:**  Unless electronically filed, an original and copy of all documents will be filed with the Clerk's Office, Wayne L. Morse Courthouse, 405 East Eighth Ave., Eugene, OR, 97401.

**(C)     Change to the Case Number:**  Effective immediately, Judge Kasubhai's initials (MK) will replace the previous judge's initials in this case.

**MARY L. MORAN**
**Clerk of Court**

cc:     Judge Kasubhai
        Counsel of Record

[1]*All United States Magistrate Judges in this District are certified to exercise civil jurisdiction in assigned cases and, with the consent of the parties, may also enter final orders on dispositive motions, conduct trial, and enter final judgment which may be appealed directly to the Ninth Circuit Court of Appeals (instead of to a District Judge). We strongly encourage the parties to consent to the jurisdiction of a U.S. Magistrate Judge over dispositive motions, trial, and entry of final judgment in this case by signing and filing a Consent to Jurisdiction by a United States Magistrate Judge. There are no adverse consequences for failure to file a Consent.*

Appx838

Alan J. Thayer, Jr., OSB No 853,428
Innovative Law Group
P.O. Box 1268
Eugene, Oregon 97440
(541) 345-2325
alan@thinkILG.com

Jonathan T. Suder (*pro hac vice*)
Brett M. Pinkus (*pro hac vice*)
Glenn S. Orman (*pro hac vice*)
Richard A. Wojcio, Jr. (*pro hac vice*)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX  76102
(817) 334-0400
(817) 334-0401 fax
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com
wojcio@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

**Eugene Division**

| | |
|---|---|
| **ADASA INC.,** | Case No.: 6:17-CV-01685-TC |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT** |
| **AVERY DENNISON CORPORATION,** | |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff ADASA INC. ("Plaintiff" or "ADASA") files this First Amended Complaint against Defendant AVERY DENNISON CORPORATION, alleging as follows:

1

Appx839

<table>
<tr><td><strong>From:</strong></td><td>info@ord.uscourts.gov</td></tr>
<tr><td><strong>To:</strong></td><td>nobody@ord.uscourts.gov</td></tr>
<tr><td><strong>Subject:</strong></td><td>Activity in Case 6:17-cv-01685-MK Adasa Inc. v. Avery Dennison Corporation Order on Motion for Judgment on the Pleadings</td></tr>
<tr><td><strong>Date:</strong></td><td>Tuesday, March 19, 2019 9:31:03 AM</td></tr>
</table>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Oregon

### Notice of Electronic Filing

The following transaction was entered on 3/19/2019 at 9:28 AM PDT and filed on 3/19/2019

**Case Name:**      Adasa Inc. v. Avery Dennison Corporation
**Case Number:**    6:17-cv-01685-MK
**Filer:**
**Document Number:** 78(No document attached)

**Docket Text:**
**ORDER: Denying as Moot Motion for Judgment on the Pleadings [17] as the parties have stipulated to filing new pleadings in this matter. Ordered by Magistrate Judge Mustafa T. Kasubhai. (jk)**

**6:17-cv-01685-MK Notice has been electronically mailed to:**

Alan J. Thayer , Jr    alan@thinkilg.com

Brenna Kristine Legaard     blegaard@schwabe.com, centraldocket@schwabe.com, docket@schwabe.com, jolmstead@schwabe.com

Brett M. Pinkus    pinkus@fsclaw.com, dunn@fsclaw.com, klein@fsclaw.com, putnam@fsclaw.com

Cristin A. Wagner     cwagner@schwabe.com, bmorrow@schwabe.com, docket@schwabe.com, sburnside@schwabe.com

Glenn S. Orman     orman@fsclaw.com

Jonathan T. Suder    jts@fsclaw.com, dunn@fsclaw.com, putnam@fsclaw.com

Appx904

CONFIDENTIAL DOCUMENT REDACTED

Appx1346-1357

Alan J. Thayer, Jr., OSB No. 853428
INNOVATIVE LAW GROUP
P.O. Box 1268
Eugene, OR  97440
(541) 345-2325
alan@thinkilg.com

Jonathan T. Suder (*pro hac vice*)
Brett M. Pinkus (*pro hac vice*)
Glenn S. Orman (*pro hac vice*)
Richard A. Wojcio, Jr. (*pro hac vice*)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX  76102
T:  (817) 334-0400
F:  (817) 334-0401
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com
wojcio@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| **ADASA INC.,**<br><br>        Plaintiff,<br><br>v.<br><br>**AVERY DENNISON CORPORATION,**<br><br>        Defendant. | Case No.: 6:17-cv-01685-MK<br><br>**PLAINTIFF'S MOTION TO COMPEL DISCOVERY**<br><br>**Expedited Consideration Requested**<br><br>**Request for Oral Argument**<br><br>**JURY TRIAL DEMANDED** |

Appx1823

In compliance with L.R. 7-1, Plaintiff ADASA, Inc. ("Plaintiff" or "ADASA") has attempted to meet and confer with Defendant Avery Dennison Corp. ("Defendant" or "Avery") to resolve these discovery disputes. ADASA also requests expedited consideration due to the upcoming fact discovery deadline of October 8, 2019 which is only 1 month away. ADASA asked Avery to provide a response or meet and confer by September 6, 2019 at 12 pm PDT before filing this motion, but Avery did not respond substantively by that deadline. ADASA therefore files this motion to bring the present matters to the Court's attention.

## I.    INTRODUCTION

ADASA is forced to now move for a third time to compel production by Avery Dennison of highly relevant and necessary documents to which ADASA is entitled. This is not a course of action that ADASA undertakes lightly, but ADASA's efforts to obtain the documents and information sought herein have thus far been unavailing and time is running short before the now twice-extended fact discovery deadline.

ADASA requests that production of the following documents be compelled:

- Agreements with Avery's customers detailing RFID transponder ("tag") for encoding operations;

- Documents detailing a bit by bid layout of the encoding schema employed by or for each of Avery's customers;

- The quantity and revenue for RFID tags encoded in accordance with each schema during the infringement period; and,

- A listing of the EPCs for all RFID tag encodings during infringement period.

The documents and information sought are critical for ADASA to prove infringement and damages. They speak directly to the central issues in this case – do the accused products meet the limitations of the asserted claims and, if so, what is the scope of infringement and what are the damages for such infringement.

PLAINTIFF'S MOTION TO COMPEL                                                    Page 1
DISCOVERY

Appx1824

Avery's 30(b)(6) witnesses have testified that the documents and information sought exist, are relevant and responsive to ADASA's requests, and can be easily gathered for production from a single, searchable database located in the U.S. and/or in electronic files accessible from the U.S. There is no excuse for Avery's improper withholding of the requested documents and information for well over a year as this case languished.

## II.  PROCEDURAL BACKGROUND AND DEMONSTRATION OF AVERY'S REFUSAL TO COMPLY WITH DISCOVERY

This section provides a brief summary of the ongoing difficulty in obtaining indisputably discoverable documents and information from Avery throughout this case.

In May of 2018, ADASA served its first set of discovery requests, which included three targeted requests for production and five interrogatories related to the encoding operations used to make the accused product.  During this time, full discovery was not open in the case and discovery was permitted only with respect to topics bearing on infringement.  In the 14 months since, full discovery has been opened but Avery has still not supplemented its answers to ADASA's first three RFPs addressed specifically to documents evidencing infringement by the accused products.

With respect to ADASA's first set of interrogatories, Avery waited nearly a year from service before finally supplementing its responses to interrogatory nos. 2-4.  The supplemented responses stated that Avery would answer by production of responsive documents under FRCP 33(d) without identifying a single responsive document produced.  Now, 16 months out from service of ADASA's first set of interrogatories and despite repeated requests, Avery still has not supplemented its responses to identify any responsive documents nor produced responsive documents and ADASA's first set of discovery requests remain unanswered.

ADASA has served five additional sets of requests for production requesting documents and information relating to the accused products and Avery's hardware and software for making

PLAINTIFF'S MOTION TO COMPEL                                                                    Page 2
DISCOVERY

Appx1825

the same, alleged prior art, and financial information related to the sales of the accused products. ADASA also served three additional sets of interrogatories also directed to these central issues in this case. In response to each, Avery has refused or failed to produce documents, intentionally stalled with baseless objections, or cited Rule 33(d) without producing any documentation to support its "answers."

ADASA has attached as Exhibit A hereto a table which highlights the requests for production ("RFP") at issue, the date they were served, and the current status of Avery's responses thereto. The table shows that ADASA has tried in vain for well over a year to get Avery to provide critical documentation and responses to proper discovery requests regarding Avery's use of infringing tags and the revenues related to those tags. Avery's blanket refusal to comply with its obligations under Rules 26, 33, and 34 and abject failure to provide meaningful responses forced ADASA to bring the issue to the attention of the Court several times.

In ruling on ADASA's Request for Discovery Hearing (Dkt. No. 81, 88), the Court gave Avery the benefit of the doubt with regard to its contentions regarding non-infringement and the difficulty in obtaining the information ADASA requested. The Court ordered the deposition of Mr. Kuhno, both in his personal capacity and as a 30(b)(6) corporate representative for the purpose of vetting Avery's contentions. But Mr. Kuhno was admittedly uniformed and ill-prepared to sufficiently address the issues for which he was designated. From the information Mr. Kuhno did provide, it became clear that the documents and information sought by ADASA's requests were easily obtainable and within a central database in the U.S. Mr. Kuhno also identified other Avery employees who would have been better suited to provide testimony on many of the most important topics for which he was designated.

These issues were promptly brought to the attention of the Court via ADASA's Emergency

PLAINTIFF'S MOTION TO COMPEL                                                         Page 3
DISCOVERY

Motion to Compel Discovery.  Dkt. No. 96.  That Motion is now fully briefed but has not been

decided by the Court with respect to the many discovery disputes detailed therein.  ADASA files

the present Motion seeking resolution of additional ongoing issues ahead of the impending close

of fact discovery in this case, twice extended and now set for October 8, 2019.

## III.    AVERY MUST BE FORCED TO PROPERLY RESPOND TO ADASA'S DISCOVERY REQUESTS

Discovery has already been delayed twice due to Avery's refusal to meet its obligations

under the Federal and this Court's rules. ADASA cannot simply wait any longer for Avery to

comply, especially given Avery's refusal to do so to date. Therefore, ADASA moves the Court to

compel Avery to comply with the following specific requests.

### A.    RFP Nos. 1-7 and 63 - Avery Must Immediately Produce Documents Related to Avery's Encoded RFID Tags and Avery's Customer Agreements

RFP Nos. 1-7 and 63 are addressed to documents showing how Avery encodes the accused

RFID tags, which were served almost 16 months ago.  RFP Nos. 1 and 2 are reproduced below:

**REQUEST NO. 1:** Documents sufficient to show your setup, implementation, configuration, and operation for commissioning RFID transponders for your customers; including, but not limited to, the EPCglobal encoding standards used and the source of data for each field within the standard, guides, instructions, handbooks, and manuals for configuration, programming, management, and operation related to encoding RFID transponders, and protocols, specifications, guidelines, flow charts, and diagrams for encoding RFID transponders.

**REQUEST NO. 2:** Documents sufficient to show how the serial numbers of EPCs are managed, allocated, and encoded for RFID transponders for your customers.

ADASA's Second Set of RFPs included additional requests targeted at specific types of

documents known to be authored and used by Avery in the course of its encoding operations for

Appx1827

its customers, including RFP Nos. 4-7 and 35, which were served nearly six months ago.  RFP

Nos. 4, 5, and 35 are reproduced below:

> **Request No. 4:**   Documents sufficient to identify all customers, resellers, distributors, vendors, affiliates, and the like of Avery making, using, selling, and/or importing RFID transponders commissioned with EPCs with serial numbers comprising a predefined sequence of most significant bits in or into the United States, whether such RFID transponders are commissioned by Avery or by another in accordance with instructions, guidance, proposals, or the like provided by Avery.

> **Request No. 5:**   For Avery as well as for each entity identified in your response to Request No. 4, all documents, including proposals, encoding standards, encoding schema, schematics, data sheets, specifications, engineering notebooks, flow charts, technical notes, instructions, or other guidance authored by Avery and showing or describing the setup, implementation, configuration, and operation for commissioning RFID transponders, whether such commissioning is performed by Avery or by the third party entity.

> **Request No. 35:**   Copies of any agreements to which Avery is a party under which Avery either grants or receives the right to make, use, or sell technology related to and/or included within any of Avery's commissioned RFID transponders or Avery's systems, hardware, firmware, or software modules or programs for commissioning RFID transponders, including, but not limited to, assignment agreements, royalty agreements, license agreements, and settlement agreements.

ADASA's Fourth Set of RFPs included RFP No. 63 which requested a listing of all EPC

encodings of RFID tags by Avery or its customers at Avery's direction during the infringing

period, broken out by customer and location, among other identifying indicia.  This request was

served four months ago.

ADASA is still awaiting full production of documents responsive to each of these requests

as, to date, Avery's production comprises almost exclusively documents that predate the

Appx1828

infringement period by several years and/or relate to label printing systems rather than RFID encoding operations. These documents were produced for the purpose of manufacturing a meritless prior use defense rather than to respond to ADASA's requests.

ADASA's requests are directed specifically to documents that will show infringement of the asserted claims by the accused products. More specifically, these requests target documents that will prove whether the accused RFID tags are encoded with serial numbers comprising a sequence of most significant bits ("MSBs") followed by remaining bits of lesser significance. ADASA has seen enough information from Avery's older documents and through deposition of two Avery engineers to know that many of Avery's encoding schemas employ MSBs, which Avery oftentimes refers to as "Commissioning Authority" and "PCTag ID." Armed with full production of the requested technical documents, ADASA can easily review each and identify all encoding schemas that yield infringing RFID tags. From there, the infringing schemas can be correlated to customers and the number of infringing RFID tags made, used, sold, or imported by or for each customer can be ascertained.

Avery's primary excuse for its failure to produce documents has been that gathering the requested documents would be difficult and unduly burdensome due to Avery's many encoding operations occurring at many locations around the world. Avery's proposed solution has been to have ADASA obtain this information through deposition and through Avery selectively producing only documents that *Avery believes* potentially infringe. The parties have pursued this course of action over the past several months and it has shown itself to be unworkable. The depositions of Michael Kuhno and Ray Blanchard made this abundantly clear.

Avery represented to the Court and ADASA that Mr. Kuhno would be knowledgeable and provide answers on topics mirroring those in Requests for Production Nos. 1-7, including: how

PLAINTIFF'S MOTION TO COMPEL                                                        Page 6
DISCOVERY

Appx1829

Avery and Avery's customers commission RFID tags and the encoding schemas for how serial numbers are allocated for Avery's customers. However, Mr. Kuhno's deposition failed to resolve the discovery issues between the parties and has only exacerbated them.

First, no amount of deposition testimony can substitute for production of documents demonstrating the highly technical aspects of Avery's encoding systems. Second, during Mr. Kuhno's deposition, he discussed some of the 57 encoding schemas used by Avery for encoding tags but was unable to map out an illustrative encoding made pursuant to any of the infringing schemas. This was because Mr. Kuhno did not know or bother to learn this information ahead of his deposition and because, according to Mr. Kuhno, the only documentation produced by Avery relating to those schemas failed to account for every bit of the data to be encoded such that infringement could not be ascertained therefrom. ADASA then further deposed Ray Blanchard regarding these schemas and the bit-by-bit mapping of the schemas, and while ADASA now generally understands how the schemas work, Avery has still not produced all of the documentation necessary to map the bits of the data for each of the schema.

Even more troubling was that Mr. Kuhno "verified" Avery's third supplemented response to Interrogatory No. 5 which purported to identify the five schemas used by Avery that use what it described as a "prepended" number in the serial number space. Avery sought to rely on this response to show that none of its other schemas use MSBs such that production of documents relating thereto is unduly burdensome and unnecessary, which is demonstrably false. Investigation of the Serialization Manager printouts produced the evening before the deposition of Mr. Kuhno showed that many of Avery's other schemas do, in fact, employ MSBs and would therefore infringe, but that the five particular schemas identified by Mr. Kuhno do not infringe the asserted claims due to non-use of MSBs and/or not satisfying other limitations in the asserted claims. This

PLAINTIFF'S MOTION TO COMPEL                                                    Page 7
DISCOVERY

demonstrates that Avery cannot be relied on to faithfully vet its operations to cull non-infringing schemas from its production obligation as it has attempted to intentionally deceive ADASA and hide many infringing schemas. Avery must be compelled to produce the necessary responsive documents so that ADASA can determine for itself which schemas infringe the asserted claims.

Mr. Kuhno and Mr. Blanchard both testified that Avery easily has the ability to produce such documents and can create logs of all EPCs encoded since the start of the infringement period. Both confirmed that much or all of the information needed to ascertain which schemas infringe and the extent of their use during the infringement period is contained in Serialization Manager, D2Comm, or Serialization Manager software databases and in documents memorializing the proposals, statements of work, and master agreements with each of Avery's customers, and that raw and summary data for all encodings are stored and available from a single, searchable database.

ADASA is not requesting this information out of harassment or for some tangential topic – infringement of ADASA's patent is the central claim in the entire litigation. Until Avery is forced to produce this documentation, ADASA cannot establish the full scope of which of Avery's products infringe and which do not. Therefore, to the extent not covered by ADASA's previous motion to compel, ADASA specifically requests that Avery immediately be ordered to produce:

- Agreements with Avery's customers detailing RFID transponder ("tag") encoding operations (*i.e.*, master agreements with customers, statements of work, and the like);
- Documents showing the encoding schema employed by or for each of Avery's customer (*i.e.*, Serialization Manager/D2Comm printouts and "format" documents mapping the location of each data field within the encoded memory of RFID tags); and
- A listing of the EPCs for all RFID tag encodings made, used, sold, or imported during infringement period, broken out by schema and customer.

**B. RFP Nos. 18-21, 54, 55, and 67 - Avery Cannot Continue to Refuse to Produce Damages Documents Related to Avery's Sales of the Infringing Products**

Because of Avery's nearly 6 month delay in producing any financial information whatsoever, ADASA has been unable to set a corporate representative deposition related to damages. ADASA sought this information as far back as March 2019 in requests for production numbers 18-21 as well as interrogatories number 9 and 10.  RFP No. 18 is reproduced below:

> **Request No. 18:**  Documents sufficient to show the revenues (gross and net of related expenses), costs, and profit/loss, relating to sales of commissioned RFID transponders commissioned with EPCs with serial numbers comprising a predefined sequence of most significant bits and relating to sales of hardware, firmware, software modules or programs, and systems configured, adaptable, or usable for commissioning RFID transponders with EPCs having serial numbers comprising a predefined sequence of most significant bits on a quarterly and yearly basis (total and on a per unit basis, where appropriate), including, but not limited to, financial statements, balance sheets, income statements, pro forma earnings statements, and cash flow statements for the years 2017 through the present.

Avery's responses indicated that it would produce the requested documents and that it would respond to ADASA's interrogatories via the production of such documents pursuant to Rule 33(d). Yet, after several months have passed such that multiple extensions of the discovery cutoff have been entered in the case schedule, Avery still has not produced any responsive documents nor supplemented its interrogatory responses to refuses to identify responsive documents by Bates Number.[1]

ADASA requests that the Court compel Avery to immediately produce sales and financial information for each customer of Avery that has made, used, purchased, or imported encoded

---

[1] The only bit of sales information that Avery has produced is a single spreadsheet that contains some of the requested sales data for RFID tags encoded for Target, which, if nothing else, demonstrates that Avery can produce a report providing sales information if it wanted to do so. But even this spreadsheet is missing important relevant sales information.  No other sales or financial information has been produced for any other of Avery's customers.

PLAINTIFF'S MOTION TO COMPEL                                                    Page 9
DISCOVERY

RFID tags encoded using Avery's D2Comm or Serialization Manager software since the issuance of the '967 Patent.  Armed with this information and the technical information detailed *supra*, ADASA will then be able to ascertain the scope of infringement and revenue related thereto, and depose Avery's appropriate corporate designee on the proper scope of damages.

Specifically, ADASA requests that Avery immediately be ordered to produce:

- The quantity and revenue, cost, and profit for RFID tags encoded in accordance with each schema during the infringement period.

### C.    Interrogatory Nos. 2, 3, 4, 6, 9, 10, 11, 12, 14, and 17 – Avery Cannot Hide Behind a Bare Recitation to FRCP 33(d)

Avery's responses to ADASA interrogatory numbers 2, 3, 4, 6, 9, 10, 11, 12, 14, and 17 all rely on Rule 33(d) for the totality of Avery's response. Even when Rule 33(d) is utilized, a responding party must "specify the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could." FRCP 33(d)(1). Avery has not done so to date, instead relying solely on the invocation of the rule without specifying a single document.

When invoking Rule 33(d), the responding party has the duty to specify, by category and location, the records from which answers can be derived. *See e.g. Memory Integrity, LLC v. Intel Corp.,* 308 F.R.D. 656, 663 (D. Or. 2015) (if a party relies on Rule 33(d) in answering an interrogatory, the responding party "then must make available to [ADASA] all records, email and otherwise, responsive to [ADASA]'s interrogatory"); *O'Connor v. Boeing N. Am., Inc.*, 185 F.R.D. 272 (Cal. C.D. 1999), *citing Rainbow Pioneer v. Hawaii Nevada Investment Corp.*, 711 F.2d. 902, 906 (9th Cir. 1983); *Bercut-Vandervoort & Co. v. Maison Tarride Ledroit & Cie*, 2006 U.S. Dist. LEXIS 93663, at \*10 (N.D. Cal. Dec. 13, 2006) (requiring providing specific bates numbers for the reference of documents under Rule 33(d)).

Appx1833

There is simply no excuse for Avery not to have produced documents that support its answers to these interrogatories, let alone for this failure to have continued for well over a year. Avery must be compelled to make a full document production of responsive documents and also to supplement its interrogatory responses to specifically identify all documents relied upon pursuant to Rule 33(d). Otherwise, Avery will continue to flout its discovery obligations by providing no meaningful responses to ADASA's interrogatories and keeping ADASA in the dark regarding Avery's positions on the central issues.

## IV.   REQUEST FOR ORAL ARGUMENT

ADASA requests oral argument to address these discovery disputes. Up until this point, Avery has been able to muddle the issues in briefing and oral argument, and it may be beneficial for ADASA to walk the Court through the issues and examples of the types of documents requested for proving infringement and damages in comparison with what Avery has produced to date to better understand why the documents are necessary.

## V.   CONCLUSION

ADASA simply cannot wait any longer for Avery to finally decide it wants to play by the Court's rules. With the discovery deadline rapidly approaching, Avery must be required to produce relevant and responsive documentation and supplement its interrogatory answers so that ADASA may finalize a list of infringing products, determine the relevant amount of damages, and schedule the requisite depositions to explore these topics.

DATED:  September 6, 2019.

Respectfully submitted,

By: */s/ Brett M. Pinkus*

Alan J. Thayer, Jr., OSB No. 853428
INNOVATIVE LAW GROUP
P.O. Box 1268
Eugene, OR  97440
(541) 345-2325
alan@thinkilg.com

Jonathan T. Suder (*pro hac vice*)
Brett M. Pinkus (*pro hac vice*)
Glenn S. Orman (*pro hac vice*)
Richard A. Wojcio, Jr. (*pro hac vice*
pending)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX  76102
(817) 334-0400
(817) 334-0401 fax
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com
wojcio@fsclaw.com

**ATTORNEYS FOR PLAINTIFF
ADASA INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2019, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, District of Oregon, Eugene Division, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

/s/ *Brett M. Pinkus*

## CERTIFICATE OF SERVICE

I hereby certify that this memorandum does not exceed the word-count limit of 3,000 words as provided in LR 7-2(b).

/s/ *Brett M. Pinkus*

PLAINTIFF'S MOTION TO COMPEL
DISCOVERY

Page 12

Appx1835

**EXHIBIT A**

**Table of ADASA's Requests for Production and Status of Avery's Responses**

| Discovery Request | Date Request Was Issued | "Answer" | Result | Time Elapsed |
|---|---|---|---|---|
| Request Nos. 1-3 | May 18, 2018 | Refused to produce documents. | Few, if any, responsive documents produced as production mostly comprises documents that pre-date the damages period. | Roughly 16 months |
| Request Nos. 4-7 | March 15, 2019 | Agreed to produce relevant, responsive, non-privileged documents | Few, if any, responsive documents produced as production mostly comprises documents that pre-date the damages period. | Roughly 6 months |
| Request Nos. 18-21 | March 15, 2019 | Agreed to produce relevant, responsive, non-privileged documents | No responsive documents produced | Roughly 6 months |
| Request Nos. 54, 55 | April 26, 2019 | Agreed to produce relevant, responsive, non-privileged documents | No responsive documents produced | Roughly 4 months |
| Request No. 63 | May 9, 2019 | Agreed to produce relevant, responsive, non-privileged documents | No responsive documents produced | Roughly 4 months |

1

Appx1836

| | | | | |
|---|---|---|---|---|
| Request No. 67 | May 10, 2019 | Agreed to produce relevant, responsive, non-privileged documents | No responsive documents produced | Roughly 4 months |
| Interrogatory Nos. 2-4 | May 18, 2018 | FRCP 33(d) | No documents produced; no supplemental answer | Roughly 16 months |
| Interrogatory Nos. 6, 9, 10, 11, 12 | March 14, 2019 | FRCP 33(d) | No documents produced; no supplemental answer | Roughly 5 months |
| Interrogatory Nos. 14, 17 | May 9, 2019 | FRCP 33(d) | No documents produced; no supplemental answer | Roughly 4 months |
| Interrogatory Nos. 15, 16 | May 9, 2019 | Refusal to answer | No answer provided | Roughly 4 months |

2

Appx1837

**Brenna K. Legaard,** OSB #001658
Email: blegaard@schwabe.com
**Cristin A. Wagner,** OSB #185822
Email: cwagner@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: (503) 222-9981
Facsimile: (503) 796-2900

*Attorneys for Defendant/Counterclaimant,
Avery Dennison Corporation*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **ADASA INC.,**<br><br>           Plaintiff,<br>           Counterclaim Defendant,<br><br>     **v.**<br><br>**AVERY DENNISON CORPORATION**,<br><br>           Defendant,<br>           Counterclaimant. | Case No.  6:17-cv-01685-MK<br><br>**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY**<br><br>**REQUEST FOR ORAL ARGUMENT** |

## I.     INTRODUCTION

With this most recent motion to compel, Adasa has clearly established a pattern of filing motions to compel without making any meaningful effort to identify and resolve any actual disputes.  The Court should deny this motion, in addition to any prior motions to compel that are still pending (*e.g.* Dkt. 96) for failure to confer, and award Avery Dennison its fees and costs in having to respond to these frivolous motions.

As to the substance of Adasa's motion, on August 9, 2019, Adasa itself committed to identifying possibly infringing schemas so that Avery Dennison could produce the requested

Appx1844

to confer, and it should explain to Adasa that conferral requires an actual effort to define and resolve the dispute, not a cursory email exchange, even if that effort requires several communications and takes several days. [1]

As for the substance of Adasa's demand as summarized on page 1 of its motion, Avery Dennison responds as follows:

1. Avery Dennison does not have master agreements with all customers, and few if any current master agreements detail RFID tag encoding operations. Avery Dennison has previously searched for any such agreements, and has produced all it has been able to find. As Adasa has now provided Avery Dennison with a list of customers for whom possibly infringing tags were encoded, Avery Dennison is in the process of searching again for master agreements that detail transponder encodings, and it will produce any such agreements that it locates after a reasonable search that have not already been produced.

2. Avery Dennison has completed an additional search for "documents detailing a bit by bid (sic) layout of the encoding schema employed by or for each of Avery's customers," and that search has not uncovered any documents that have not already been produced. Avery Dennison refers Adasa to the Serialization Manager screenshots and Mr. Blanchard's testimony.

3. As Adasa has now provided the promised identification of customers, Avery Dennison is gathering documents regarding quantity and revenue and anticipates having that completed this coming week.

---

[1] Other judges in this district, including Judges Simon and Beckerman, require parties to obtain authorization from the court before filing a motion to compel.

Page 6 - DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx1849

Alan J. Thayer, Jr., OSB No 853,428
Innovative Law Group
P.O. Box 1268
Eugene, Oregon 97440
(541) 345-2325
alan@thinkILG.com

Jonathan T. Suder (*pro hac vice*)
Brett M. Pinkus (*pro hac vice*)
Glenn S. Orman (*pro hac vice*)
Richard A. Wojcio, Jr. (*pro hac vice*)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX  76102
(817) 334-0400
(817) 334-0401 fax
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com
wojcio@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

### Eugene Division

| | |
|---|---|
| **ADASA INC.,**<br><br>  Plaintiff,<br>  v.<br><br>**AVERY DENNISON CORPORATION,**<br><br>  Defendant. | Case No.: 6:17-CV-01685-MK<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff ADASA INC. ("Plaintiff" or "ADASA") files this Second Amended Complaint

against Defendant AVERY DENNISON CORPORATION, alleging as follows:

1

Appx1931

## I.  THE PARTIES

1.      ADASA INC. is a corporation organized and existing under the laws of the State of Oregon, with a principal place of business in Eugene, Oregon.

2.      Upon information and belief, Defendant AVERY DENNISON CORPORATION ("Defendant" or "AVERY DENNISON") is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business in Glendale, CA.  AVERY DENNISON's Retail Branding and Information maintains an office in Beaverton, Oregon. AVERY DENNISON may be served with process through its registered agent, CT Corporation System located at 78 Commercial Street SE, Suite 100, Salem, OR  97301. Defendant has made an appearance through counsel and is presently before this Court.

## II.  JURISDICTION AND VENUE

3.      Plaintiff's claims for patent infringement against AVERY DENNISON arise under the patent laws of the United States, including 35 U.S.C. §§ 271 and 281. Consequently, this Court has exclusive jurisdiction of such action under Title 28 U.S.C. § 1331 and 1338.

4.      AVERY DENNISON is a company with offices throughout the United States. AVERY DENNISON is subject to both the specific and general personal jurisdiction of this Court because, among other things, it has established continuous and systematic contacts with Oregon and in this judicial district, including having a regular and established place of  business in the District of Oregon and throughout the State of Oregon via AVERY DENNISON's Retail Branding and Information Solutions located in Beaverton, Oregon, which includes, at least in part, its retail RFID business; it has committed acts of patent infringement within Oregon and this judicial district giving rise to this action; and it has minimum contacts with the forum such that the exercise of jurisdiction over it would not offend traditional notions of fair play and substantial justice. For all

2

Appx1932

of these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1), (2) and (c)(2) and 28 U.S.C. § 1400(b).

5.      Additionally, AVERY DENNISON has availed itself of the jurisdiction of this Court by way of its answering ADASA's Original and First Amended Complaints in this litigation.

### III.  PATENT-IN-SUIT

6.      On October 24, 2017, U.S. Patent No. 9,798,967 ("the '967 Patent") was duly and legally issued for "SYSTEMS, METHODS, AND DEVICES FOR COMMISSIONING WIRELESS SENSORS."   The '967 Patent was subject to an *ex parte* reexamination, Reexamination Request No. 90/014,052, filed by Defendant on November 29, 2017.   The reexamination proceeding resulted in the issuance of a Reexamination Certificate on July 30, 2018 indicating that all claims of the '967 Patent are patentable as presented in the Reexamination Certificate.   A true and correct copy of the '967 patent with the appended Reexamination Certificate is attached hereto as Exhibit A.   The '967 Patent claims priority dating back to Non-Provisional Patent Application No. 12/124,768, filed on May 21, 2008.

7.      Plaintiff is the owner of the '967 Patent with the exclusive right to enforce the '967 Patent against infringers, and collect damages for all relevant times, including the right to prosecute this action.

8.      The '967 Patent generally speaking, relates, in part, to systems for encoded and commissioned wireless radio frequency identification ("RFID") devices. The '967 Patent teaches an RFID transponder or inlay with an RFID integrated circuit chip ("IC chip") having encoded memory structure that ensures uniqueness within the serial number portion of the code.

Appx1933

**Brenna K. Legaard,** OSB #001658
Email: blegaard@schwabe.com
**Cristin A. Wagner,** OSB #185822
Email: cwagner@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: (503) 222-9981
Facsimile: (503) 796-2900

*Attorneys for Defendant and Counterclaimant,*
*Avery Dennison Corporation*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **ADASA INC.**, <br><br> Plaintiff, Counterclaim Defendant, <br><br> **v.** <br><br> **AVERY DENNISON CORPORATION**, <br><br> Defendant, Counter Claimant. | Case No.  6:17-cv-01685-MK <br><br> **AVERY DENNISON CORPORATION'S ANSWER TO ADASA, INC.'S SECOND AMENDED COMPLAINT AND COUNTERCLAIMS** <br><br> **JURY TRIAL DEMANDED** |

Defendant Avery Dennison Corporation ("Avery Dennison") answers Adasa, Inc.'s

("Adasa") First Amended Complaint as follows:

## I.  THE PARTIES

1.      Avery Dennison lacks knowledge or information sufficient to confirm or deny

ADASA's corporate status or principle place of business, and therefore denies the allegations in

paragraph 1.

2.      Admitted.

Page 1 -      AVERY DENNISON CORPORATION'S ANSWER TO
ADASA, INC.'S SECOND AMENDED COMPLAINT
AND COUNTERCLAIMS

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx1956

### FIRST AFFIRMATIVE DEFENSE
#### (Non-Infringement)

1.    Avery Dennison has not infringed any claim of the '967 patent, either literally or under the doctrine of equivalents.  Avery Dennison has not induced or contributed to any infringement of the '967 patent by others.

### SECOND AFFIRMATIVE DEFENSE
#### (Invalidity)

2.    The claims of the '967 patent are invalid for failure to comply with the conditions for patentability specified in 35 U.S.C. §§ 101, 102, 103, and/or 112.

### THIRD AFFIRMATIVE DEFENSE
#### (Failure to State a Claim)

3.    The Complaint fails to state a claim upon which relief can be granted.

### FOURTH AFFIRMATIVE DEFENSE
#### (No Irreparable Harm)

4.    Plaintiff is not entitled to injunctive relief because, *inter alia*, any alleged injury to Plaintiff is not immediate or irreparable, and Plaintiff has an adequate remedy at law.

### FIFTH AFFIRMATIVE DEFENSE
#### (Damages Limitations)

5.    Plaintiffs' claims for damages are barred in whole or in part under 35 U.S.C. §§ 286, 287, and 288.

### SIXTH AFFIRMATIVE DEFENSE
#### (Equitable Defenses)

6.    Plaintiff's claims for relief are barred in whole or in part by the doctrines of waiver, equitable estoppel, unclean hands, or other applicable equitable doctrines.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx1965

8. Avery Dennison has not infringed and does not infringe any valid claim of the '967 patent literally, under the doctrine of equivalents, directly, contributorily, by inducement, or in any other manner. Specifically, Avery Dennison has never made, offered for sale, sold, or imported into the US any RFID transponder encoded with one serial number from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, wherein the most significant bits uniquely correspond to the allocated block of serial numbers, as required by all claims of the '967 patent.

9. Accordingly, Avery Dennison is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 et seq. that it has not infringed and does not infringe any valid claim of the '967 patent.

**Count Two: Declaratory Judgment of Invalidity of the '967 Patent**

10. Each allegation in paragraphs 1-9 of these Counterclaims is re-alleged and incorporated by reference as though fully set forth herein.

11. The claims of the '967 patent are invalid for failure to comply with one or more of the conditions of patentability set forth in Title 35 of the United States Code, including, for example, §§ 101, 102, 103, and 112.

12. Specifically, the claimed innovation is a numbering method, which is an abstract idea, and therefore is not patentable subject matter under 35 U.S.C. § 101.

13. Additionally, the patented method was sold or offered for sale in the US by Adasa in late 2008 and early 2009, more than one year prior to the earliest priority date to which the claims are entitled. Additionally, the claimed advance was developed by Paxar Corp as early as 2002, and was offered for sale, sold, and used by Avery Dennison in the US to encode RFID tags in late 2008 and early 2009, more than one year prior to the earliest priority date to which the

Page 17 -  AVERY DENNISON CORPORATION'S ANSWER TO
ADASA, INC.'S SECOND AMENDED COMPLAINT
AND COUNTERCLAIMS

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx1972

claims are entitled.  For this and additional reasons, all claims of the '967 patent are invalid for failure to comply with the conditions of patentability set forth in 35 U.S.C. §§ 102 and/or 103.

14.    One or more terms of the '967 patent are indefinite, and the specification does not contain a description that enables the full scope of the claims of the '967 patent, and therefore the claims are invalid for failure to comply with the conditions of patentability set forth in 35 U.S.C. § 112.

15.    Accordingly, Avery Dennison is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 et seq. that the claims of the '967 patent are invalid.

### PRAYER FOR RELIEF

WHEREFORE, Avery Dennison respectfully prays for the following relief:

(a)    that Plaintiff takes nothing by their Complaint;

(b)    that Plaintiff's Complaint be dismissed in its entirety with prejudice;

(c)    a declaration and judgment that the claims of United States Patent No. 9,798,967 is not directly or indirectly infringed by Avery Dennison;

(d)    a declaration and judgment that the claims of United States Patent No. 9,798,967 are invalid;

(e)    a declaration and judgment that this case is an "exceptional" case within the meaning of 35 U.S.C. § 285;

(f)    an award of reasonable attorneys' fees, expenses and costs incurred by Avery Dennison in this action; and

(g)    such other and further relief to which Avery Dennison may be entitled, or which the Court deems just and proper.

Page 18 -    AVERY DENNISON CORPORATION'S ANSWER TO
ADASA, INC.'S SECOND AMENDED COMPLAINT
AND COUNTERCLAIMS

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx1973

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ADASA INC., | Case No.: 6:17-cv-01685-MK |
| Plaintiff, | OPINION AND ORDER |
| v. | RE: DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS UNDER 35 U.S.C. § 271(f) |
| AVERY DENNISON CORPORATION, | |
| Defendant. | |

**KASUBHAI, Magistrate Judge:**

Plaintiff brought this action alleging that Defendant infringed its patent in violation of 35 U.S.C. §§ 271(a), (b), (c), and (f). Second Am. Compl., ECF No. 112. Both parties consent to jurisdiction by a U.S. Magistrate Judge. ECF No. 29.

Before the Court is Defendant's Motion for Judgment on the Pleadings as to Plaintiff's claim under 35 U.S.C. § 271(f). Def.'s Mot. J., ECF No. 115. For the reasons set forth below, Defendant's Motion for Judgment on the Pleadings as to the claim under 35 U.S.C. § 271(f) (ECF No. 115) is DENIED.

1 – OPINION AND ORDER

Appx3200

## BACKGROUND

Plaintiff, an Oregon corporation, is the owner of the United States Patent No. 9,798,967 (the " '967 Patent"). Am. Compl. Ex. A, the '967 Patent, ECF No. 71-1.  The '967 Patent relates in part to systems for encoded and commissioned wireless radio frequency identification ("RFID") devices. Second Am. Compl. ¶ 8, ECF No. 112; Answer, ¶¶ 8, 11, ECF No. 114.  In the RFID industry and particularly for merchandise tracking applications, the memory bank of an RFID tag is encoded with an Electronic Product Code ("EPC"), which is an identifier for an item in the supply chain to uniquely identify that particular item. Second Am. Compl. ¶ 11, ECF No. 112; Answer ¶ 11, ECF No. 114.  The EPC can be serialized in a format following an EPC tag data standard. Second Am. Compl. ¶ 11, ECF No. 112; Answer ¶ 11, ECF No. 114.  One standard is known as Serialized Global Trade Item Number ("SGTIN"). Second Am. Compl. ¶ 11, ECF No. 112; Answer ¶ 11, ECF No. 114.

Where the SGTIN format is used for item identification, the EPC contains "object class" information and a "serial number." Second Am. Compl. ¶ 12, ECF No. 112; Answer ¶ 12, ECF No. 114.  The "object class" information includes, among other things, "company prefix," which identifies the brand owner and an "item reference number" which identifies the class of item offered by a brand owner (which generally corresponds to the UPC or SKU of a bar code). Second Am. Compl. ¶ 12, ECF No. 112; Answer ¶ 12, ECF No. 114.  The "object class" section of a SGTIN format uniquely identifies different classes of products sold by a particular brand owner. Second Am. Compl. ¶ 12, ECF No. 112; Answer ¶ 12, ECF No. 114.  The companies or brand owners are responsible for assigning a unique serial number for each item of an object class. Second Am. Compl. ¶ 12, ECF No. 112; Answer ¶ 12, ECF No. 114.  The combination of

2 – OPINION AND ORDER

an object class and a unique serial number provides a unique object number contained in the EPC. Second Am. Compl. ¶ 13, ECF No. 112; Answer ¶ 13, ECF No. 114.

The '967 Patent teaches an RFID transponder or inlay with an RFID integrated circuit chip ("IC chip") having encoded memory structure that ensures uniqueness with the serial number portion of the code. Am. Compl. Ex. A, the '967 Patent, ECF No. 71-1. Specifically, the '967 Patent teaches an RFID IC chip memory structure by delineating a section using the leading bits of the serial number section of the EPC binary encoding – referred to as the "most significant bits" in the '967 Patent. Am. Compl. Ex. A, the '967 Patent, ECF No. 71-1.

Plaintiff alleges that Defendant, a third-party encoder, "makes, encodes, sells, and offers to sell RFID tags and labels for customers that are RFID transponders that comprise a substrate, an antenna, and an RFID IC chip coupled to the antenna." Second Am. Compl. ¶ 22, ECF No. 112. Plaintiff alleges direct infringement of claims 1-6, 12-15 of the '967 Patent by using the format of the '967 Patent in violation of 35 U.S.C. § 271(a). *Id.* ¶¶ 26-35. Plaintiff also alleges indirect infringement of the '967 Patent in violation of 35 U.S.C. §§ 271(b), (c) and (f). *Id.* ¶¶ 36-41.

## LEGAL STANDARD

"A judgment on the pleadings is properly granted when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (quoting *Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998)). Procedural law of the regional circuit governs Rule 12(c) motions for judgment on the pleadings in patent cases. *Amdocs (Israel) Ltd. V. Openet Telecom, Inc.*, 841 F.3d 1288, 1293 (Fed. Cir. 2016). In the Ninth Circuit, a Rule 12(c) motion for judgment on the pleadings is "functionally identical" to a Rule 12(b)(6) motion to dismiss for

3 – OPINION AND ORDER

failure to state a claim upon which relief could be granted. *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989).

To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When assessing the sufficiency of any civil complaint, a court must distinguish factual contentions – which alleged behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In short, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* (citations and internal quotations omitted).

## DISCUSSION

Defendant seeks judgment on the pleadings as to Plaintiff's claim under 35 U.S.C. § 271(f). Def.'s Mot. J. 2, ECF No. 115.  The relevant portion of 35 U.S.C. § 271(f) provides:

> (2) Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

35 U.S.C. § 271(f)(2).

Plaintiff alleges that

> 42. … [Defendant] is liable under 35 U.S.C. § 271(f) … because it provides from the United States data files that include unique object numbers implementing the unique structure identified in the claims of the '967 Patent which are transmitted to foreign encoding locations operated by [Defendant] or by its customers at the direction of [Defendant].  The unique object numbers are provided with the intent that they be combined with uncommissioned RFID tags and labels to make infringing RFID tags and labels.

4 – OPINION AND ORDER

Appx3203

43. The unique object numbers are especially made or especially adapted for use in accordance with the inventions claimed in the '967 Patent. Upon information and belief, each data file comprising the unique object numbers is intended for use and used by only to commission RFID tags and labels.

44. The unique object numbers transmitted are not staple articles or commodities of commerce suitable for substantial noninfringing use. They are known to [Defendant] to be especially made or especially adapted for use in accordance with the inventions claimed in the '967 Patent …

Second Am. Compl. ¶¶ 42-44, ECF No. 112.

Defendant presents two arguments to support its position that the § 271(f) claim fails as a matter of law. Def.'s Mot. J. 6-7, ECF No. 115 (citing *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2006)); Def.'s Reply 2-6, ECF No. 124.  First, Plaintiff fails to allege a "component" as required under § 271(f). Def.'s Mot. J. 6, ECF No. 115.  Second, there can be no infringement under § 271(f) because the "component" combined with RFID tags are not supplied from the United States but are created in the foreign factories or service bureaus. *Id.* at 6-7.  The Court addresses the two issues in turn.

1. The "component" element under 35 U.S.C. § 271(f)

"Section 271(f) applies to the supply abroad of the 'components of a patented invention, where *such components* are uncombined in whole or in part, in such manner as to actively induce the combination of *such components*.' " *Microsoft*, 127 S.Ct. at 449 (citing § 271(f) with emphasis added).  In *Microsoft*, Microsoft supplied a master disk containing Windows software from the United States to foreign manufacturers, and copies of the master disk were made abroad and installed on foreign-made computers. *Id.* at 442.  There, the U.S. Supreme Court answered the question "when, or in what form, does software qualify as a 'component' under § 271(f)?" *Id.* at 447.  In answering this question, the Supreme Court explained:

5 – OPINION AND ORDER

Appx3204

> Until it is expressed as a computer-readable ''copy,'' *e.g.,* on a CD–ROM, Windows software — indeed any software detached from an activating medium — remains uncombinable. It cannot be inserted into a CD–ROM drive or downloaded from the Internet; it cannot be installed or executed on a computer. Abstract software code is an idea without physical embodiment, and as such, it does not match § 271(f)'s categorization: ''components'' amenable to ''combination.'' Windows abstracted from a tangible copy no doubt is information — a detailed set of instructions — and thus might be compared to a blueprint (or anything containing design information, *e.g.,* a schematic, template, or prototype). A blueprint may contain precise instructions for the construction and combination of the components of a patented device, but it is not itself a combinable component of that device.

*Id.* at 449. The Court further explained: "before software can be contained in and continuously performed by a computer, before it can be updated or deleted, an actual, physical copy of the software must be delivered by CD–ROM or some other means capable of interfacing with the computer." *Id.* at 451. The Court concluded: "In sum, a copy of Windows, not Windows in the abstract qualifies as a 'component' under § 271(f)." *Id.* at 451-52.

Here, Defendant contends that Plaintiff's allegation is that "[Defendant] 'provides from the United States data files that include unique object numbers,'" and "these numbers are 'components' supplied from the United States which are 'combined' with RFID tags." Def.'s Mot. J. 3, ECF No. 115 ((citing Second Am. Compl. ¶¶ 42-44, ECF No. 112)). Defendant agrees that data files are "components" under 35 U.S.C. § 271(f). *Id.* at 6; Pl.'s Resp. 6-9, ECF No. 118; *Ormco Corp. v. Align Technology, Inc.*, 609 F.Supp.2d 1057, 1072 (C.D.Cal. 2009) ("Under the plain meaning definition of the term 'component' adopted by the Court in *Microsoft*, the Court finds that the ADF file is a component of the patented claims at issue."). However, Defendant contends that Plaintiff "fails to allege that the data file, which is the only 'component' [Defendant] 'supplies' from the U.S., is combined with RFID transponders." Def.'s Mot. J. 6, ECF No. 115. Defendant claims that "[Plaintiff]'s claim is entirely focused on the numbers, not the data file." *Id.* Defendant relies on *Microsoft* and reasons: because "a number abstracted from

6 – OPINION AND ORDER

its tangible expression is without physical embodiment," "[i]t is information: an idea, not a 'component' amenable to 'combination.'" *Id.* (citing *Microsoft*, 550 U.S. at 449).

As an initial observation, Defendant mis-characterizes Plaintiff's allegations. Contrary to Defendant's suggestion, Plaintiff does not allege that "these numbers are 'components' supplied from the United States …" *See* Second Am. Compl. ¶¶ 42-44, ECF No. 112. Instead, Plaintiff alleges that Defendant "*provides* from the United States *data files* that *include unique object numbers*" and "[t]he unique object numbers are provided with the intent that they be combined … to make infringing RFID tags and labels." *Id.* ¶ 42 (emphasis added).

Furthermore, the Supreme Court held that the master disk containing the otherwise abstract Windows software is a "component" under § 271(f). *Microsoft*, 550 U.S. at 451-52. The *Ormco* court also affirmatively held that a data file containing information is a "component" under § 271(f). *Ormco*, 609 F.Supp.2d at 1071-72. Here, like the master disk containing Windows software in *Microsoft*, Plaintiff alleges that the data files contain the unique object numbers. Second Am. Compl ¶ 42, ECF No. 112. Defendant concedes that the data files are "components" under § 271(f) and that it supplied the data files to foreign factories or service bureaus. Def.'s Mot. J. 6, ECF No. 115. As the Supreme Court stated, "the very components supplied from the United States … trigger § 271(f) liability when combined abroad to form the patented invention at issue." *Microsoft*, 550 U.S. at 453. Therefore, the data files in this case – the very components supplied from the United States – trigger § 271(f) liability when combined abroad to form the '967 Patent. Thus, the question is whether the data files were *combined* abroad to form the '967 Patent. *See id.*

"[T]he term combination 'encompasses not only a combination of mechanical elements but also a combination of substances in a composition claim or steps in a process claim." *Ormco*,

7 – OPINION AND ORDER

609 F.Supp.2d at 1073 (citing *Black's Law Dictionary* 260 (1999)). The *Ormco* court held that the combination is present when it is undisputed that the file at issue was combined with other steps in the process. *Id.* Here, Plaintiff alleges that "[t]he unique object numbers are especially made or especially adapted for use in accordance with the inventions claimed in the '967 Patent" and "each *data file* comprising the unique object numbers *is* intended for use and used by [sic] *only to commission RFID tags and labels*." Second Am. Compl. ¶ 43, ECF No. 112 (emphasis added). Furthermore, Plaintiff alleges that Defendant provided the unique object numbers to foreign locations "with the intent that they be combined with uncommissioned RFID tags and labels to make infringing RFID tags and labels." *Id.* ¶ 42. Reading these allegations in combination, the Court finds that Plaintiff sufficiently alleges that the data files are combined with RFID transponders abroad.

For these reasons, Defendant's argument that Plaintiff fails to allege "components" under § 271(f) is unavailing.

### 2. The "combination" element under 35 U.S.C. § 271(f)

On the issue of "combination," Defendant explains that it supplies numbers from the United States in decimal form; however, binary form is required in order to encode the numbers onto RFID tags. Def.'s Mot. J. 6, ECF No. 115 (citing Answer ¶ 42, ECF No. 114). "These binary copies are made in the foreign factory or service bureau[.]" *Id.* Defendant then suggests: "Under *Microsoft v. AT&T*, there can be no infringement under 271(f) because the 'components' which are combined with RFID tags are not supplied from the U.S., but rather are created in the foreign factories or service bureaus." *Id.* at 6-7.

A complaint survives a motion to dismiss and a motion for judgment on the pleadings when it alleges "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550

8 – OPINION AND ORDER

U.S. at 570; *Dworkin*, 867 F.2d at 1192.  Here, Plaintiff alleges that Defendant provides from the

United States data files which are intended for use and used only to commission RFID tags and

labels. Second Am. Compl. ¶¶ 42-43, ECF No. 112.  Accepting the allegation as true, Plaintiff

has stated a claim for relief under § 271(f) that is plausible on its face. *See Ashcroft*, 556 U.S. at

678.  Defendant's arguments based on its factual dispute of Plaintiff's claim are inappropriate for

a motion for judgment on the pleadings.

Even if the Court accepts Defendant's facts as true, Defendant's arguments fail as a

matter of law.  In *Microsoft*, the Supreme Court found that "the copies of Windows actually

installed on the foreign computers were not themselves supplied from the United States.  Indeed,

those copies did not exist until they were generated by third parties outside the United States."

*Microsoft*, 550 U.S. at 453.  The court in *Ormco* relied on *Microsoft* and stated:

> [T]he [Supreme] Court held that the supply of a master disk containing source
> code was not the supply of a component, since the source code was copied from
> the master disk and these copies were later installed onto other foreign computers.
> The Supreme Court held that ''replication abroad of a master dispatched from the
> United States'' failed to meet the ''supplied from the United States'' requirement.
> Here, Align [defendant] itself provides the copy of the original ADF file to the
> Costa Rican computer server, and this copy is used by the individual computer
> running the ToothShaper program. *If Align supplied a copy of the file to Costa
> Rica, it is irrelevant what Align did with the original.*

*Ormco*, 609 F.Supp.2d at 1072 (emphasis added).  Like the defendant Align in *Ormco*, here

Defendant itself supplied the data files to foreign factories and service bureaus, who then used

the data files to encode onto RFID tags. Def.'s Mot. J. 6, ECF No. 115.  Therefore, it is irrelevant

whether the numbers in decimal form in the data files were copied into binary form. *See Ormco*,

609 F.Supp.2d at 1072.  Plaintiff has sufficiently alleged the "combination" element under

§ 271(f).

9 – OPINION AND ORDER

For the reasons stated above, Defendant's Motion for Judgment on the Pleadings as to the § 271(f) claim is denied.

### CONCLUSION

Defendant's Motion for Judgment on the Pleadings as to Plaintiff's claim under 35 U.S.C. § 271(f) (ECF No. 115) is DENIED.

DATED this <u>30th</u> day of April 2020.

<u>s/ Mustafa T. Kasubhai</u>
MUSTAFA T. KASUBHAI
United States Magistrate Judge

10 – OPINION AND ORDER

Appx3209

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

ADASA INC.,

Plaintiff,

v.

AVERY DENNISON CORPORATION,

Defendant.

Case No.: 6:17-cv-01685-MK

OPINION AND ORDER

RE: PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS;
DEFENDANT'S MOTION FOR
JUDGMENT ON THE PLEADINGS RE:
INTERVENING RIGHTS

**KASUBHAI, Magistrate Judge:**

Plaintiff brought this action alleging that Defendant infringed its patent in violation of 35

U.S.C. §§ 271(a), (b), (c), and (f). Second Am. Compl., ECF No. 112. Both parties consent to

jurisdiction by a U.S. Magistrate Judge. ECF No. 29.

Before the Court are (1) Plaintiff's Motion for Judgment on the Pleadings (ECF No. 121),

(2) Defendant's Request for Judicial Notice (ECF No. 128), and (3) Defendant's Motion for

Judgment on the Pleadings Regarding Intervening Rights (ECF No. 128). The Court heard oral

argument on February 25, 2020. ECF No. 155. For the reasons set forth below, Defendant's

Request for Judicial Notice (ECF No. 128) is GRANTED; Plaintiff's Motion for Judgment on

1 – OPINION AND ORDER

Appx3210

the Pleadings (ECF No. 121) is GRANTED; and Defendant's Motion for Judgment on the Pleadings Regarding Intervening Rights (ECF No. 128) is DENIED.

## BACKGROUND

Plaintiff filed the original Complaint alleging that Defendant infringed its U.S. Patent No. 9,798,967 (" '967 Patent"). ECF No. 1.  Defendant filed an Answer, raising a number of affirmative defenses. ECF No. 13.

The USPTO issued a Reexamination Certificate on July 30, 2018 indicating that all claims of the '967 Patent are patentable. Am. Compl. Ex. A, 42, Ex Parte Reexamination Certificate, ECF No. 71-1.  Plaintiff filed a First Amended Complaint asserting the claims from the '967 Patent as issued in the Reexamination Certificate. ECF No. 71.  Defendant filed an Answer to the First Amended Complaint asserting the same affirmative defenses and adding affirmative defenses nine and ten for absolute and equitable intervening rights. Answer 5-7, ECF No. 73.  Defendant later withdrew affirmative defenses three through eight at Plaintiff's challenge to their sufficiency. Stipulation to File First. Am. Answer and Counter Claims 2, ECF No. 75; Am. Answer 5-6, ECF No, 79.

Plaintiff then filed a Second Amended Complaint, which is the current operative Complaint. ECF No. 112.  Defendant filed an Answer, reasserting affirmative defenses three through eight and the affirmative defenses of absolute intervening rights and equitable intervening rights. Answer 10-11, ECF No 114.  Defendant's affirmative defenses three through eight are: (3) failure to state a claim upon which relief can be granted; (4) no irreparable harm for injunctive relief; (5) damages limitations under 35 U.S.C. §§ 286, 287, and 288; (6) equitable defenses including waiver, equitable estoppel, and unclean hands; (7) exceptional cases under 35 U.S.C. § 285; and (8) [Defendant]'s accused product having a substantial non-infringing use. *Id.*

2 – OPINION AND ORDER

Appx3211

## LEGAL STANDARD

"A judgment on the pleadings is properly granted when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (quoting *Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998)).  Procedural law of the regional circuit governs Rule 12(c) motions for judgment on the pleadings in patent cases. *Amdocs (Israel) Ltd. V. Openet Telecom, Inc.*, 841 F.3d 1288, 1293 (Fed. Cir. 2016).  In the Ninth Circuit, a Rule 12(c) motion for judgment on the pleadings is "functionally identical" to a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief could be granted. *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989).

To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When assessing the sufficiency of any civil complaint, a court must distinguish factual contentions – which alleged behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In short, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* (citations and internal quotations omitted).

## DISCUSSION

### I. Defendant's Request for Judicial Notice

Defendant requests the Court take judicial notice of Exhibits B, C, D, E, F, G, and H of the Declaration of Brenna K. Legaard in Support of Defendant's Reply to Plaintiff's Motion for Judgment on the Pleadings. Def.'s Mot. J. 1, ECF No. 128.  Exhibit B is the Non-Final Office

3 – OPINION AND ORDER

Action. Legaard Decl. ¶ 3, ECF No. 127.  Exhibit C is Plaintiff's Response to the Non-Final

Office Action in Exhibit B. *Id.* ¶ 4.  Exhibit D is the Final Rejection issued during the

reexamination. *Id.* ¶ 5.  Exhibit E is Plaintiff's Amendment and Argument in Response to the

Final Rejection. *Id.* ¶ 6.  Exhibit F is Plaintiff's Agenda for an Interview with the Examiner. *Id.*

¶ 7.  Exhibit G is the Examiner's Summary of the Interview with Plaintiff. *Id.* ¶ 8.  Exhibit H is

the Notice of Intent to Issue a Reexamination Certificate. *Id.* ¶ 9.

"The court must take judicial notice if a party requests it and the court is supplied with

the necessary information." Fed. R. Evid. 201(c)(2).  Courts "may take judicial notice of

undisputed matters of public record. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir.

2001).  Because these exhibits are available on the United States Patent and Trademark Office

website, the Court grants Defendant's request for judicial notice. *See Smith v. United States*, No.

17-CV-07068-LB, 2018 WL 2338797, at *1 (N.D. Cal. May 1, 2018), *report and

recommendation adopted*, No. 17-CV-07068-VC, 2018 WL 2335218 (N.D. Cal. May 23, 2018).

**II. Plaintiff's Motion for Judgment on the Pleadings**

### A. Affirmative Defenses Three Through Eight

Plaintiff contends that Defendant's affirmative defenses three through eight are

insufficiently pled and have been waived. Pl.'s Mot. J 12, ECF No. 121.  Specifically, these

affirmative defenses "are bare boned conclusions" without any supporting facts. *Id.*

Furthermore, Defendant's removal of these affirmative defenses in its Amended Answer to the

First Amended Complaint constitutes a "clear and unequivocal act" demonstrating its intention to

waive them. *Id.* at 13 (citing *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1318 (9th Cir.

1998) ("Most defenses, including the defense of lack of personal jurisdiction, may be waived as

a result of the course of conduct pursued by a party during litigation.")).

4 – OPINION AND ORDER

Defendant concedes that it "inadvertently" included affirmative defenses three through eight in its Answer to the Second Amended Complaint. Def.'s Resp. 2, ECF No. 126. Nevertheless, Defendant argues that Plaintiff's motion as to these affirmative defenses should be denied for failure to comply with LR 7-1. *Id.*  The Court finds Defendant's argument unavailing when Defendant had previously withdrawn these affirmative defenses and acknowledges that it "inadvertently" included them again.  The Court grants Plaintiff's motion against affirmative defenses three through eight.

**B. Intervening Rights**

Defendant's affirmative defenses nine and ten are absolute intervening rights and equitable intervening rights. Answer 11, ECF No. 114.  The doctrine of intervening rights was developed by courts to remedy the potential injustice "where a third party, having already begun to make, use, or sell a given article, finds its previously lawful activities rendered newly infringing under a modified patent." *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1361 (Fed. Cir. 2012) (en banc). In such situations, the accused infringer should be deemed to have "acquired at least a right to continue to use the [articles] as if it held a license therefor under the reissued patent." *Id.*

There are two types of intervening rights: (1) absolute intervening rights that abrogate liability for infringing claims added to or modified from the original patent during a reissue or reexamination; and (2) equitable intervening rights that may apply as a matter of judicial discretion to mitigate liability for infringing such claims if the accused infringer made substantial preparations for the infringing activities prior to reissue or reexamination. *Marine Polymer*, 672 F.3d at 1361-62.

5 – OPINION AND ORDER

For intervening rights to apply to preclude infringement damages for the time period prior to the issuance of the reexamination certificate, there must have been a substantial change in scope between the original and reexamined claims. *Convolve, Inc. v. Compaq Comp. Corp.*, 812 F.3d 1313, 1322-23 (Fed. Cir. 2016).

The Federal Circuit has held that "amendments made during reexamination do not necessarily compel a conclusion that the scope of the claims has been substantively changed." *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1322 (Fed. Cir. 2016) (citing *Bloom Eng'g Co. v. North American Manufacturing Company, Inc.,* 129 F.3d 1247, 1250 (Fed.Cir.1997) ("There is no absolute rule for determining whether an amended claim is legally identical to an original claim.")). "This is true even where the claims at issue were amended during reexamination after a rejection based on prior art." *Id.* (citing *Laitram Corp. v. NEC Corp.,* 952 F.2d 1357, 1362–63 (Fed.Cir.1991); *R & L Carriers, Inc. v. Qualcomm, Inc.*, 801 F.3d 1346, 1350–51 (Fed. Cir. 2015) (emphasizing that the reasoning for the amendment does not matter; the focus is on the scope of the claims)).

"To determine whether a claim change is substantive it is necessary to analyze the claims of the original and the reexamined patents in light of the particular facts, including the prior art, the prosecution history, other claims, and any other pertinent information." *Laitram Corp.,* 952 F.2d at 1362–63. In determining the scope of the claims, the Federal Circuit applies "the traditional claim construction principals[,]" "paying particular attention to the examiner's focus in allowing the claims after amendment." *Convolve, Inc.*, 812 F.3d at 1322-23 (internal quotation marks omitted).

Appx3215

The dispute at issue involves Claim 1 and Claim 13 which were amended during reexamination.  The amended Claim 1 is as follows, with the addition to the claim emphasized, and is also representative of the amended Claim 13.

> 1. An RFID transponder comprising:
> a substrate;
> an antenna structure formed on the substrate; and
> an RFID integrated circuit chip which is electrically coupled to the antenna structure,
> wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space,
> wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits,
> wherein the unique serial number space comprises the limited number of most significant bits *uniquely* corresponding to *the limited number of most significant bits of* the allocated block and of remaining bits of lesser significance that together comprise the one serial number instance.

Am. Compl. Ex. A, 42, Ex Parte Reexamination Certificate, ECF No. 71-1 (emphasis in original); *see also* Am. Resp. Final Office Action 2, ECF No. 57-3.

Plaintiff argues that the amendment was a clarifying amendment which does not change the scope of the claims. Pl.'s Mot. J. 8-12, ECF 121; Pl.'s Resp. 7, ECF No. 133. Plaintiff also takes the position that the Court has already held that the claim amendment during reexamination did not substantially change the scope of the claim. Pl.'s Mot. J. 8-10, ECF No. 121 (citing Order, ECF No. 68).

At claim construction, the Court found: "Adasa *made a clarifying amendment* to the claims of the '967 Patent *for the purpose of clarifying that the most significant bits uniquely correspond to the allocated block* in support of Adasa's position that the claimed serial number structure is a structural limitation of the claimed RFID transponders." Order 8, ECF No. 68 (emphasis added).  The Court further found:

7 – OPINION AND ORDER

Appx3216

> The positions taken by both Adasa and the Examiner with respect to the final rejection, clarifying amendment and subsequent confirmation of validity of the claims of the '967 Patent as presented in the Reexamination Certificate *do not relate at all to limitations* of the process for how the claimed RFID transponders are encoded. There is little to no discussion of continuous connection to a central database, autonomous or quasi-autonomous encoding, or how the allocated block is derived or assigned. *The discussion focuses solely on the novel feature* advanced throughout the reexamination by Adasa - that the claimed RFID transponders utilize a partitioned serial number space comprising most significant bits that was not present in any prior art references.

*Id.*

Defendant contends that the Court has not decided on the issue whether there is a substantial change in the scope of the claim. Def.'s Resp. 3-4, ECF No. 126. Defendant contends that Plaintiff's purpose for clarifying is irrelevant because the Court did not compare the original claim with the amended claim, and because the Court made the finding when addressing the issue of disavowal, not intervening rights. *Id.* at 4. Instead, Defendant argues that the plain and ordinary meaning of "uniquely" that Plaintiff successfully argued during claim construction narrows the scope of the original claim. *Id.* at 5-6. Additionally, Defendant claims that the amendments made to overcome a prior art rejection during reexamination supports a finding of a substantive change to the original claims. *Id.* at 6-9.

Where an amendment merely clarifies *what was already present in the specification and in the original claims*, the Federal Circuit found that "the reexamination claims are without substantive change from the original claims." *Kaufman Co., Inc. v. Lantech, Inc.*, 807 F.2d 970, 977 (Fed. Cir. 1984) (emphasis added). The question therefore is whether the "clarifying" amendment of " 'uniquely' corresponding" during reexamination was already present in the specification and the original claims. *See* Pl.'s Mot. J. 10, ECF No. 121; *see also* Def.'s Resp. 5, ECF No. 126.

8 – OPINION AND ORDER

Appx3217

Plaintiff argues that "uniquely corresponding" was already implicit or inherent in the specification and the original claim. In particular, the second to last element, which is the same as the original, provides that "there is a block of serial numbers that has been assigned a limited number of most significant bits, and as such, all of the serial numbers within that block would include the same sequence of most significant bits in their leading bits." Pl.'s Mot. J. 9, ECF No. 121. The last element in the original Claim 1 "provided detail to specify that the serial number that has been encoded in the unique serial number space in the memory of the RFID [Radio Frequency Identification] tag includes the same sequence of most significant bits as was assigned to all of the serial numbers within the allocated block." *Id.* at 10. The amended last element "merely makes more explicit what was always implicit or inherent in the claim – the concept that the most significant bits of the serial numbers in the block 'uniquely corresponds' to the most significant bits of the serial number that has been encoded into the RFID tag." *Id.*

The parties have previously disputed the issue whether "uniquely corresponding" was already implicit or inherent in the specification and submitted "extensive briefing" including this issue during claim construction. Order 2, ECF No. 68. There, Defendant argued that "uniquely corresponding" is not implicit or inherent in the specification. Def.'s Resp. 15, ECF No. 58. Defendant claimed that "[t]he 'uniquely corresponding' language is not found in the specification" and that "[i]ts ordinary meaning in the context of the amended claims is not readily apparent." *Id.* Plaintiff countered, as it argues here, that the "proposed additional limitations are couched in the process by which the RFID transponder is encoded and do not speak to limitations on characteristics of the RFID transponder, itself." Pl.'s Reply 4, ECF No. 61.

9 – OPINION AND ORDER

Appx3218

The Court reviewed the parties' "extensive briefing", heard oral argument and examined the prosecution history of reexamination covering the issue concerning whether "uniquely corresponding" was implicit or inherent in the specification. Order 2, 8, ECF No. 68. The Court then found that Plaintiff "made a clarifying amendment to the claims of the '967 Patent." *Id.* at 8. Therefore, the Court's finding of "clarifying" amendment during claim construction is a finding that the claim amendment did not substantially change the scope of the claim. *See Laitram Corp.*, 952 F.2d at 1362-63; *Convolve, Inc.*, 812 F.3d at 1322-23.

Based on the Court's previous finding, the Court finds that intervening rights do not apply and Defendant's affirmative defenses of intervening rights fail on their face. Plaintiff's Motion for Judgment on the Pleadings as to Defendant's affirmative defenses of intervening rights is granted. *See Ashcroft*, 556 U.S. at 678.

**III. Defendant's Motion for Judgment on the Pleadings Regarding Intervening Rights**

Because the Court grants Plaintiff's motion as to intervening rights, Defendant's Motion for Judgment on the Pleadings Regarding Intervening Rights is denied as moot. The Court does not reach Plaintiff's procedural challenge to Defendant's motion.

**CONCLUSION**

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 121) is GRANTED. Defendant's Request for Judicial Notice (ECF No. 128) is GRANTED. Defendant's Motion for Judgment on the Pleadings Regarding Intervening Rights (ECF No. 128) is DENIED.

DATED this <u>30th</u> day of April 2020.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI
United States Magistrate Judge

10 – OPINION AND ORDER

Appx3219

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ADASA INC., | Case No.: 6:17-cv-01685-MK |
| Plaintiff, | OPINION AND ORDER |
| v. | RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY; PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INVALIDITY |
| AVERY DENNISON CORPORATION, | |
| Defendant. | |

**KASUBHAI, Magistrate Judge:**

Plaintiff brought this action alleging that Defendant infringed its patent in violation of 35 U.S.C. §§ 271(a), (b), (c), and (f). Second Am. Compl., ECF No. 112. Both parties consent to jurisdiction by a U.S. Magistrate Judge. ECF No. 29.

Before the Court are Defendant's Motion for Summary Judgment of Invalidity (ECF No. 122) and Plaintiff's Cross Motion for Partial Summary Judgment of No Invalidity (ECF No. 145). The Court heard oral argument on February 25, 2020. ECF No. 155. For the reasons set forth below, Defendant's Motion for Summary Judgment of Invalidity (ECF No. 122) is

1 – OPINION AND ORDER

Appx3220

DENIED and Plaintiff's Motion for Partial Summary Judgment of No Invalidity (ECF No. 145) is GRANTED.

## BACKGROUND

**A. General Background**

Plaintiff, an Oregon corporation, is the owner of the United States Patent No. 9,798,967 (the " '967 Patent") under the patent law before the America Invents Act ("AIA") became effective in 2013. Am. Compl., Ex. A, the '967 Patent, ECF No. 71-1.  The inventor of the '967 Patent is Clarke McAllister ("McAllister"). *Id.*

The letters patent of the '967 Patent shows that the '967 Patent claims priority through a chain of patent applications. *Id.* at 1:6-21.  Relevant to the issues here, the '967 Patent claims priority as a continuation of U.S. Patent No. 9,272,805 filed on June 19, 2012, which is a continuation-in-part of U.S. Patent No. 8,228,198 filed on June 21, 2010 ("The '198 Patent" or "2010 Application"), which is a continuation-in-part of the U.S. Patent Application No. 12/124,768, filed on May 21, 2008 ("2008 Application"). *Id.*

In August and September of 2008, McAllister and Plaintiff ADASA worked to incorporate embodiments of his invention into a radio frequency identification ("RFID") encoding system as a project with Walmart, referred to as the "Ad Hoc Mode". Legaard Decl., Ex. E., McAllister Dep. 95:17-24, ECF No. 123-5; *see* Ex. G, Pl.'s Resp. to Def.'s Second Set of Interrogs. 3, ECF No. 123-7.  Plaintiff introduced the Ad Hoc feature commercially in February 2009 and sold the encoders and software implementing the Ad Hoc Mode to Walmart on April 20, 2009. *Id.* at Ex. G, 3-4.

Following Plaintiff's filing of this infringement action, Defendant filed a Request for Ex Parte Reexamination of the '967 Patent with the United States Patent and Trademark Office

2 – OPINION AND ORDER

Appx3221

("USPTO"). Pl.'s Reply, Ex. A 1-2, ECF No. 148-2.  The USPTO issued a Reexamination

Certificate on July 30, 2018 concluding that all claims of the '967 Patent are patentable. Am.

Compl. Ex. A, 42, Ex Parte Reexamination Certificate, ECF No. 71-1.

**B. The Technology Background of the '967 Patent**

The '967 Patent relates in part to systems for encoded and commissioned wireless RFID

devices. Second Am. Compl. ¶ 8, ECF No. 112; Answer, ¶¶ 8, 11, ECF No. 114.  In the RFID

industry and particularly for merchandise tracking applications, the memory bank of an RFID tag

is encoded with an Electronic Product Code ("EPC"), an identifier for an item in the supply

chain to uniquely identify that particular item. Second Am. Compl. ¶ 11, ECF No. 112; Answer

¶ 11, ECF No. 114.  The EPC can be serialized in a format following an EPC tag data standard.

Second Am. Compl. ¶ 11, ECF No. 112; Answer ¶ 11, ECF No. 114.  One standard is known as

Serialized Global Trade Item Number ("SGTIN"). Second Am. Compl. ¶ 11, ECF No. 112;

Answer ¶ 11, ECF No. 114.

Where the SGTIN format is used for item identification, the EPC contains "object class"

information and a "serial number." Second Am. Compl. ¶ 12, ECF No. 112; Answer ¶ 12, ECF

No. 114.  The "object class" information includes, among other things, a "company prefix,"

which identifies the brand owner and an "item reference number" which identifies the class of

item offered by a brand owner (which generally corresponds to the UPC or SKU of a bar code).

Second Am. Compl. ¶ 12, ECF No. 112; Answer ¶ 12, ECF No. 114.  The "object class" section

of a SGTIN format uniquely identifies different classes of products sold by a particular brand

owner. Second Am. Compl. ¶ 12, ECF No. 112; Answer ¶ 12, ECF No. 114.  The companies or

brand owners are responsible for assigning a unique serial number for each item of an object

class. Second Am. Compl. ¶ 12, ECF No. 112; Answer ¶ 12, ECF No. 114.  The combination of

3 – OPINION AND ORDER

an object class and a unique serial number provides a unique object number contained in the EPC. Second Am. Compl. ¶ 13, ECF No. 112; Answer ¶ 13, ECF No. 114.

The '967 Patent teaches an RFID transponder or inlay with an RFID integrated circuit chip ("IC chip") having an encoded memory structure that ensures uniqueness with the serial number portion of the code. Am. Compl. Ex. A, the '967 Patent, ECF No. 71-1.  Specifically, the '967 Patent teaches an RFID IC chip memory structure delineating a section using the leading bits of the serial number section of the EPC binary encoding – referred to as the "most significant bits" ("MSBs") in the '967 Patent. Am. Compl. Ex. A, the '967 Patent, ECF No. 71-1.

**C. Plaintiff's Claims**

Plaintiff alleges that Defendant "makes, encodes, sells, and offers to sell RFID tags and labels for customers that are RFID transponders that comprise a substrate, an antenna, and an RFID IC chip coupled to the antenna." Second Am. Compl. ¶ 22, ECF No. 112.  Plaintiff alleges direct infringement of claims 1-6, and 12-15 of the '967 Patent by using the format of the '967 Patent in violation of 35 U.S.C. § 271(a). *Id.* ¶¶ 26-35.  Plaintiff also alleges indirect infringement of the '967 Patent in violation of 35 U.S.C. §§ 271(b), (c) and (f). *Id.* ¶¶ 36-41.

**LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  In determining a motion for summary judgment, "the judge must view the evidence in the light most favorable to the nonmoving party." *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

4 – OPINION AND ORDER

Appx3223

**DISCUSSION**

Defendant's motion and Plaintiff's cross motion present two issues before the Court. First, whether the 2008 Application discloses the claimed invention in the '967 Patent in order for the '967 Patent to be entitled to the priority date of the 2008 Application. Def.'s Mot. Summ. J. 13-20, ECF No. 122; Pl.'s Cross Mot. Partial Summ. J. 7-25, ECF No. 145.

The second issue is based on Defendant's contention that the '967 Patent cannot claim the priority date of the 2008 Application because the 2008 Application does not disclose certain elements of the claims of the '967 Patent. Def.'s Mot. Summ. J. 13-20, ECF No. 122.  Defendant argues that the "2009 sales of Ad Hoc Mode are invalidating sales under 35 U.S.C. § 102(b) (pre-AIA)." *Id.* at 5, 20.

Plaintiff disagrees and opposes Defendant's position on both issues. Pl.'s Cross Mot. Partial Summ. J. 7-30, ECF No. 145.

## I. Relevant Pre-AIA Patent Law

### A. The "On-Sale Bar" to Patentability

Under 35 U.S.C. § 102(b) (pre-AIA), an inventor must file a patent application disclosing an invention within one year after the first public use or sale of the invention, otherwise the ability to obtain patent protection for that invention is forfeited.  This statutory bar is known as the "on-sale bar." *See Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 65 (1998).

### B. Priority Claims and Written Description Requirement

When an inventor applies for a patent, the inventor is entitled to a "priority" date, the date when the inventor is first given credit for inventing the invention based on the date the patent application is filed, subject to a few exceptions. 35 U.S.C. § 100(i); 35 U.S.C. § 120.  Section 120 of the patent law provides one exception.  Specifically, if an earlier filed patent application

5 – OPINION AND ORDER

discloses the entire invention and is pending, additional related patent applications that add or modify the portions describing the invention are entitled to claim the priority of the earlier patent application. 35 U.S.C. § 120.  That is, the "effective filing date" of the later filed patent applications is the filing date of the earlier filed patent application. *Id.*; 35 U.S.C. § 100(i).

In order to claim the priority of the earlier patent application, the claims in the later filed patent application must be supported by the written description of the earlier patent application. 35 U.S.C. § 112, first para.

**II. Issues Before the Court**

**A. Whether the 2008 Application Discloses the Claimed Invention in the '967 Patent**

"[T]he hallmark of written description is disclosure." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).  "[T]he test for sufficiency [of written description] is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.*  The test of whether the inventor had "possession as shown in the disclosure" "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Id.*  "Compliance with the written description requirement is a question of fact but is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).

Claim 1 of the '967 Patent encompasses the disputed claim elements.[1] *See* Def.'s Mot. Summ. J. 13-20, ECF No. 122; *see also* Pl.'s Cross Mot. Summ. J. 8, ECF No. 145.  The Court

---

[1] Claim 13 also includes these elements, as well as their respective dependent claims. *See* Am. Compl., Ex. A, the '967 Patent Reexam. Cert., 2:1-18, ECF No. 71-1.  The Court only discusses the elements in Claim 1 because the parties agree that the differences between Claim 1 and Claim 13 are irrelevant to the analysis at issue. Pl.'s Cross Mot. Summ. J. 8, ECF No. 145; *see* Def.'s Resp., ECF No. 146.

6 – OPINION AND ORDER

adopts Plaintiff's method of identifying the claim elements of Claim 1 for the ease of references and discussion.  Claim 1 states:

| Claim Element | Claim 1 |
|---|---|
| Preamble: | 1. An RFID transponder comprising: |
| Element A: | a substrate; |
| Element B: | an antenna structure formed on the substrate; and |
| Element C: | an RFID integrated circuit chip which is electrically coupled to the antenna structure, |
| Element D: | wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space, |
| Element E: | wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, *the allocated block being assigned a limited number of most significant bits*, |
| Element F: | wherein the unique serial number space comprises the limited number of most significant bits *uniquely corresponding* to the limited number of most significant bits of the allocated block and of *remaining bits of lesser significance* that together comprise the one serial number instance. |

Am. Compl., Ex. A, the '967 Patent Reexam. Cert., 1:21-39, ECF No. 71-1 (emphasis added for the disputed portions).

Defendant argues that the following portions in Element E and Element F of the 2008 Application fail to disclose: (1) "the allocated block being assigned a limited number of most significant bits," (2) "uniquely corresponding," (3) the requirement that the allocated block be assigned a limited number of most significant bits, and (4) "remaining bits of lesser significance." Def.'s Mot. Summ. J. 15-17, ECF No. 122.  Defendant does not challenge other parts of Claims 1 and 13 and the remaining claims in the '967 Patent. *See generally* Def.'s Mot. Summ. J., ECF No. 122; *see generally* Def.'s Resp., ECF No. 146 .

Plaintiff claims that the 2008 Application discloses every claim element in Claim 1, including the portions identified by Defendant. Pl.'s Resp. 7-27, ECF No. 130; Pl.'s Cross Mot.

7 – OPINION AND ORDER

Appx3226

Summ. J. 10-25, ECF No. 145.  Plaintiff supports its position with the declaration of Dr. Engels,

Ph.D., an expert in RFID technology. Engels Decl., ECF No. 130-4.  "In light of [his] education,

background, and extensive professional and practical experience with RFID technology," Dr.

Engels considers himself "to be one skilled in the art as it pertains to the subject matter of the

invention taught in the '967 Patent[.]" *Id.* ¶ 11.  Dr. Engels declares that he has "analyzed the

claims of the '967 Patent compared with the disclosure contained within the [2008] Application[2],

including the written specification, examples, and figures contained therein, to determine

whether there is sufficient written support for each limitation of the … [c]laims [of] the '967

Patent to be entitled to priority to the [2008 Application]." *Id.* ¶ 12.  Based on his analysis, Dr.

Engels concludes that the claims of the '967 Patent are adequately supported by the disclosure of

the 2008 Application. *Id.* ¶ 15.

It is well established that a patent is presumed valid. *PowerOasis, Inc. v. T-Mobile USA,*

*Inc.*, 522 F.3d 1299, 1303 (Fed. Cir. 2008).  "[A] challenger has the burden of persuasion to

show by clear and convincing evidence" that a patent is not entitled to priority. *Tech. Licensing*

*Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1329 (Fed. Cir. 2008).  Although "the patentee has the

burden of going forward with evidence and argument to the contrary[,]" the "ultimate burden

never shifts." *Id.* at 1328-29.

Here, in response to Defendant's motion challenging the priority of the '967 Patent,

Plaintiff offers Dr. Engels' opinion and argument to the contrary. *See* Pl.'s Resp., ECF No. 130.

Defendant challenges Dr. Engels' opinion, claiming that Dr. Engels is not an ordinary artisan in

the pertinent field because "his education and accomplishments clearly far surpasses that of the

ordinary artisan in this field." Def.'s Reply 4, ECF No. 137; Def.'s Resp. 4, ECF No. 146.

---

[2] Dr. Engels' declaration references the 2008 Application as the '768 Application.

8 – OPINION AND ORDER

The Federal Circuit has expressly rejected this argument made by Defendant.  The

Federal Circuit held: "Because the person having ordinary skill in the art is a 'theoretical

construct' and is 'not descriptive of some particular individual,' 'a person of *exceptional* skill in

the art' should not be disqualified because he or she is "not ordinary enough." *Norgren Inc. v.*

*Int'l Trade Comm'n*, 699 F.3d 1317, 1325 (Fed. Cir. 2012) (citation omitted; emphasis supplied).

Defendant agrees that Dr. Engels is skilled in the art. Def.'s Reply 4, ECF No. 137; Def.'s Resp.

4, ECF No. 146.  Defendant also does not raise any other argument to challenge Dr. Engels'

qualification as an ordinary artisan. *See* Def.'s Reply, ECF No. 137; *see also* Def.'s Resp., ECF

No. 146.  Thus, the Court follows the Federal Circuit and exercises its discretion to find that Dr.

Engels is a person of ordinary skill in the art and "to credit his testimony." *See Norgren Inc.*, 699

F.3d at 1325.

The written description must clearly allow persons of ordinary skill in the art to

recognize that the inventor invented what is claimed. *Ariad Pharm., Inc.*, 598 F.3d at 1351

(quotation marks omitted).  The Court next examines the disputed portions in Elements E and F

in turn to determine whether the 2008 Application clearly allows a person of ordinary skill in the

art to recognize that McAllister invented the claimed invention in the '967 Patent.

(1) "the allocated block being assigned a limited number of most significant bits"

*a. The 2008 Application and the Ad Hoc Mode*

Defendant first argues that the 2008 Application does not disclose the Ad Hoc Mode,

which is the claimed invention in the '967 Patent. Def.'s Mot. Summ. J. 15, ECF No. 122.

Defendant notes that the 2008 Application discloses that the MSBs were used to provide "large

blocks of pre-authorized blocks of object class serial numbers." 2008 Application [0049], ECF

No. 130-3.  Defendant also notes that in the Ad Hoc Mode, "[t]he MSBs could be assigned to an

9 – OPINION AND ORDER

encoder to create a block of serial numbers." Pl.'s Am. Resp. Def.'s Interrogs. 12, ECF No. 123-4. Therefore, Defendant contends that the 2008 Application discloses the use of MSBs to provide "blocks of blocks" of serial numbers and does not disclose "a single block of serial numbers" as practiced in the Ad Hoc Mode. Def.'s Mot. Summ. J. 15, ECF No. 122.

Plaintiff claims that the Ad Hoc Mode is not the claimed invention of the '967 Patent, but merely an embodiment of a particular aspect of the invention. McAllister Decl. ¶¶ 6-7, ECF No. 130-8; Engels Decl. ¶ 62, ECF No. 130-4. Specifically, the "Ad Hoc Mode was a mode of operation of ADASA's PAD3500 encoder." Engels Decl. ¶ 63, ECF No. 130-4; McAllister Decl. ¶¶ 6-7, ECF No. 130-8. Defendant does not refute that the Ad Hoc Mode was merely an embodiment of the '967 Patent. *See generally*, Def.'s Reply, ECF No. 137.

Because at issue is whether the claimed invention in the '967 Patent, not the Ad Hoc Mode, is disclosed by the 2008 Application, the Court does not address the issue related to the Ad Hoc Mode.[3] The Court compares the written description of the 2008 Application with the claims in the '967 Patent.

*b. "blocks of blocks" of serial numbers v. "blocks" of serial numbers*

According to Plaintiff, the following disclosure from the 2008 Application supports Element E:

> *Authorizations for one or more classes of objects are preferably loaded into* encoder 15, 30, or 60, where such *authorizations include* data fields such as manufacturer ID, item reference, manufacturer code lengths, filter values (that designate packaging levels such as item, case, pallet, etc.), *serial number starting point for a block*, and other predetermined parameters.

> A preferred embodiment for quasi-autonomous transponder encoding authority is realized when *large pre-authorized blocks of serial numbers* are made available to encoder 15 or 50 to *utilize on object classes as objects of a class are presented for*

---

[3] In its motion, Defendant makes the same argument based on the Ad Hoc Mode for "uniquely corresponding" and "assigned to an allocated block" in Element F. Def.'s Mot. 16-17, ECF No. 122. Because the analysis is the same, the Court does not address this issue separately.

10 – OPINION AND ORDER

*tagging*. A preferred method of providing large blocks of pre-authorized blocks of object class serial numbers is to *subdivide the entire* object class *serial number space into sectors that are defined by a limited number of MSB's* (Most Significant Bits) *of the serial number field*."

Engels Decl. ¶¶ 43-44, ECF No. 130-4 (citing 2008 Application [0015], [0049], ECF No. 130-3) (emphasis supplied in Engels Declaration).

Defendant contends that the last sentence of the above disclosure does not disclose a method of providing blocks of serial numbers; rather, it discloses a method of providing "blocks of blocks" of serial numbers. Def.'s Mot. Summ. J. 15, ECF No. 122; Engels Decl. ¶ 45, ECF No. 130-4. Defendant supports its argument with the testimony of Charles B. Williams, whom Plaintiff acknowledges as having "at least ordinary skill in the RFID field." Def.'s Reply 7, ECF No. 137; Pl.'s Resp. 8, ECF No. 19. According to Defendant, when Mr. Williams was asked what "blocks of blocks" is, he answered "I have no idea what they're trying to say in that sentence." Williams Dep. 48:22-49:3, ECF No. 139-4[4].

Plaintiff argues that Defendant's reliance on Mr. Williams' testimony is misplaced. Pl.'s Reply 5-6, ECF No. 148. Specifically, "Mr. Williams was not apprised of the requirements of 35 U.S.C. § 112 or the test for determining the sufficiency of a patent disclosure[.]" *Id.* at 6. Additionally, Mr. Williams "did not review the full disclosure of the 2008 Application" and "was shown a portion of one sentence from the 2008 Application and asked what a 'block of block' is." *Id.* The record before the Court does not show that Defendant counters this argument. Nor does Defendant dispute Plaintiff's contention during oral argument. The Court finds that Mr. Williams' testimony was not based on his review of the full disclosure of the 2008 Application.

---

[4] Defendant cites to but does not submit to the Court page 49 of the deposition transcript of Charles B. Williams. The Court relies on the citation provided in Defendant's Reply 10, ECF No. 137.

11 – OPINION AND ORDER

Appx3230

Defendant also argues that in the 2010 Application (*i.e.*, the '198 Patent), Plaintiff revised the sentence to read: "[a] preferred method of providing pre-authorized blocks of object class serial numbers is to subdivide the entire object class serial number space into sectors that are defined by a limited number of MSB's (Most Significant Bits) of the serial number field." The '198 Patent, 18:34-38, ECF No. 130-14.  Defendant claims that "[t]his revision is a clear admission that (1) 'blocks' of serial numbers and 'blocks of blocks' of serial numbers are not the same thing, and (2) 'blocks of blocks' of serial numbers does not describe the claimed invention" in the '967 Patent. Def.'s Reply 9, ECF No. 137.

The disclosure of the 2010 Application would be relevant if the issue is whether the 2010 Application discloses the claimed invention in the '967 Patent.  However, that is not the issue before the Court.  Rather, as stated above under the discussion concerning the Ad Hoc Mode, the issue is whether the *2008* Application discloses the claimed invention in the '967 Patent. Therefore, the Court does not accept Defendant's framing of the issue.

Plaintiff's argument is based on Dr. Engels' testimony.  Dr. Engels testified that the last sentence in the above disclosure "refers to 'large blocks' that are taken from the pre-authorized blocks that are created from the object class serial numbers." Engels Decl. ¶ 45, ECF No. 130-4. He explains:

> In other words, all of the serial numbers for a particular object class are divided up into pre-authorized blocks of serial numbers, and some or all of the blocks may be large.

> The creation of large pre-authorized blocks is effected by the method in which the serial numbers are partitioned into sectors, with the leading bits of a sector being the assigned sequence of most significant bits and the trailing bits of a sector being the remaining bits of lesser significance that complete the serial number.

12 – OPINION AND ORDER

Appx3231

*Id.* ¶¶ 45-46.  "The concept of a block of serial numbers, with each serial number in the block having the same set of most significant bits allocated to the block, is straightforwardly understood from this disclosure in the [2008] Application." *Id.* ¶ 49.

> (2) "uniquely corresponding," "remaining bits of lesser significance" and assigned to an allocated block

Element F of the '967 Patent requires: "wherein the unique serial number space comprises the limited number of most significant bits *uniquely corresponding* to the limited number of most significant bits of the allocated block and of *remaining bits of lesser significant* that together comprise the one serial number instance." Am. Compl., Ex. A, the '967 Patent Reexam. Cert., 1:21-39, ECF No. 71-1 (emphasis added for the disputed portions).  As provided above, "the allocated block being assigned a limited number of most significant bits" is part of Element E. *Supra*, III.A.

As noted in footnote 3, the Court does not address Defendant's Ad Hoc argument. Defendant, however, makes an alternative argument in its reply and in its response to Plaintiff's motion.  Defendant claims that the 2008 Application does not include the language Plaintiff has used in its argument to describe the claimed "uniquely corresponding" relationship between the most significant bits of the encoded serial number and the allocated block. Def.'s Resp. 11, ECF No. 146.  Specifically, the language of "share the same," "matching," "direct correlation," "uniquely correspond," "matching uniquely," or "one-to-one-relationship." *Id.*  Defendant also relies on this argument and contends that the 2008 Application similarly does not disclose the limitations of "assigned to an allocated block" and "remaining bits of lesser significance." *Id.* at 12.

Contrary to Defendant's argument, the Ninth Circuit has held: "*ipsis verbis* disclosure is not necessary to satisfy the written description requirement of section 112." *Fujikawa v.*

13 – OPINION AND ORDER

Appx3232

*Wattanasin*, 93 F.3d 1559, 1570 (Fed. Cir. 1996).  Therefore, the question is not whether the disclosure used the same words in the written description.  "Instead, the disclosure need only reasonably convey to persons skilled in the art that the inventor had possession of the subject matter in question." *Id.*

In addition to the above-cited 2008 Application disclosure supporting Element E, Plaintiff represents that the following disclosure from the 2008 Application supports Element F:

> A preferred embodiment for quasi-autonomous transponder encoding authority is realized when large pre-authorized blocks of serial numbers are made available to encoder 15 or 50 to utilize on object classes as objects of a class are presented for tagging. *A preferred method of providing large blocks of pre-authorized blocks of object class serial numbers is to subdivide the entire object class serial number space into sectors that are defined by a limited number of MSB's (Most Significant Bits) of the serial number field.* In a preferred embodiment *serial number block sizes are sufficient to operate encoder 15 or 50 for extended periods of time without any further external authorization steps*. For example autonomous operation for a week or more is possible with sufficiently large block sizes. Block allocations are preferably assigned with reference to how many encoders 15 or 50 are *authorized to operate within the facilities of the owner of certain object class numbers*.
>
> In a preferred embodiment, a block is allocated and managed using three numbers: *a starting number that is the first serialized instance of the block, a block size which represents the total number of instances in the block, and a counter or index that represents how much of the block has been used during an encoding process*. Using these three numbers and an optional block lock bit, a simple database of object class authorizations can be built.
>
> Authorizations for one or more classes of objects are preferably loaded into encoder 15, 30, or 60, where such authorizations include data fields such as manufacturer ID, item reference, manufacturer code lengths, filter values (that designate packaging levels such as item, case, pallet, etc.), *serial number starting point for a block*, and other pre-determined parameters. Such information is preferably loaded into the memory of the encoder in advance of tag commissioning operations. Thus if loaded with information for more than one object class, encoder 15, 30, or 60 does not have sufficient information to proceed with encoding a transponder until a single object class is selected for the present RFID transponder to receive a number from.

14 – OPINION AND ORDER

Engels Decl. ¶ 52, ECF No. 130-4 (citing the 2008 Application, [0049], [0051], [0015] ECF No. 130-3) (emphasis supplied in Engels Declaration).

At claim construction, the Court has held that "the phrase 'uniquely corresponding' is construed as having its plain and ordinary meaning as [P]laintiff Adasa suggests." Op. and Order 9, ECF No. 68.  The Court construed "being assigned a limited number of most significant bits" as "includes a limited, predefined sequence of higher order bits at the leading ends." *Id.* at 3. Additionally, the Court construed "remaining bits of lesser significance" as "the remaining lower order bits at the trailing end." *Id.*

Dr. Engels testifies:

48. *The existence of least significant bits in the serial number is implicit from the disclosure that the serial number has a set of most significant bits.* If the serial number has a predefined set of most significance bits at its leading end (read from higher order bits at the left to lower order bits at the right), the remaining bits of the serial number would intrinsically be the lower orders bits which follow to complete the serial number.

53. The [2008] Application discloses that a block of serial numbers is created in which all of the serial numbers have the same pre-assigned sequence of most significant bits. As a result, if a serial number instance is selected from this block of serial numbers which all have the same most significant bits, the selected serial number instance must necessarily have the "*matching*" set of most significant bits that was *assigned* to all of the serial numbers in that allocated block. …

54. … The manner disclosed by the [2008] Application to ensure uniqueness of the serial numbers for a particular object class is to partition the bits of the serial number space into two parts – the most significant bits and the remaining least significant bits – then to allocate the blocks of serial numbers (where all serial numbers within a block have the same MSB value) to be assigned to unique objects. …

Engels Decl. ¶¶ 48, 53-54, ECF No. 130-4 (emphasis added).

Based on his chart comparison and analysis, Dr. Engels declares that "the [c]laims of the '967 Patent are adequately supported by the disclosure of the [2008] Application[.]" *Id.* ¶ 15. Because Dr. Engels, an artisan with ordinary skill in the field, is able to recognize that the 2008

15 – OPINION AND ORDER

Application discloses the claimed invention in the '967 Patent, including Element E and Element F, and Defendant has not met its burden to show the contrary by clear and convincing evidence, the '967 Patent is entitled to the priority date of the 2008 Application. *See Tech. Licensing Corp.*, 545 F.3d at 1329.

### B. Whether the Ad Hoc Mode Sale Invalidates the '967 Patent Under § 102(b)

Because the Court finds that the 2008 Application discloses the claimed invention in the '967 Patent, the later-occurred Ad Hoc Mode sale cannot create an on-sale bar to the '967 Patent.

For the above reasons, Defendant's Motion for Summary Judgment of Invalidity is DENIED. Because a patent is presumed valid and Defendant has not met the burden of persuasion to show by clear and convincing evidence that the '967 Patent is not entitled to the priority of the 2008 Application, Plaintiff's Cross Motion for Partial Summary Judgment of No Invalidity is GRANTED. *See PowerOasis, Inc.*, 522 F.3d at 1303. 1329.

### CONCLUSION

Defendant's Motion for Summary Judgment of Invalidity (ECF No. 122) is DENIED. Plaintiff's Motion for Partial Summary Judgment of No Invalidity (ECF No. 145) is GRANTED.

DATED this 30th day of April 2020.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI
United States Magistrate Judge

16 – OPINION AND ORDER

Appx3235

Alan J. Thayer, Jr., OSB No. 853428
INNOVATIVE LAW GROUP
P.O. Box 1268
Eugene, OR  97440
(541) 345-2325
alan@thinkilg.com

Jonathan T. Suder (*pro hac vice*)
Glenn S. Orman (*pro hac vice*)
Richard A. Wojcio, Jr. (*pro hac vice*)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX  76102
T:  (817) 334-0400
F:  (817) 334-0401
jts@fsclaw.com
orman@fsclaw.com
wojcio@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION**

| | |
|---|---|
| **ADASA INC.,**<br><br>                    Plaintiff,<br><br>        v.<br><br>**AVERY DENNISON CORPORATION,**<br><br>                    Defendant. | Case No.: 6:17-cv-01685-MK<br><br>**PLAINTIFF ADASA INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Request for Oral Argument**<br><br>**JURY TRIAL DEMANDED** |

Appx3236

articulated teaching, suggestion, or motivation with some rational underpinning to support the legal conclusion of obviousness. *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1359 (Fed. Cir. 2019); *Microsoft Corp. v. Enfish, LLC*, 662 F. App'x 981, 989 (Fed. Cir. 2016). Prior references as a whole need to be considered, including aspects that teach away from a claimed invention which may rebut a showing of obviousness. *In re Enhanced Sec. Research, LLC*, 739 F.3d 1347, 1355 (Fed. Cir. 2014); *Hodosh v. Block Drug Co.*, 786 F.2d 1136, 1143 n.5 (Fed. Cir. 1986). Additionally, before the court invalidates a patent due to obviousness, the court must consider secondary evidence of non-obviousness, such as "commercial success, long[-]felt but unsolved needs, [and] failure of others." *Hitkansut LLC v. United States*, 130 Fed. Cl. 353, 382 (2017).

## V.    ARGUMENT AND AUTHORITIES

### A.    ADASA is Entitled to Summary Judgment on Infringement of the '967 Patent as a Matter of Law

According to Avery's own documentation and the deposition testimony of its witnesses, there is no issue of material fact regarding the infringement of claims 1-6 and 13-14 of the '967 Patent ("the Asserted Claims"). Dr. Daniel Engels, whom Avery describes a "genius" with more than sufficient "extraordinary skill and experience" in the RFID industry, agrees that every element of the asserted claims are met by the Accused RFID Tags.  Exh. G at 5-6; Exh. H at ¶ 26-27, ¶ 30-32, ¶ 171-72. This competent evidence establishes ADASA's right to have judgment on infringement granted in its favor and against Avery on its related counterclaim.

### 1.    The Asserted Independent Claims of the '967 Patent[6]

| Claim Element | Claim 1 |
|---|---|
| Preamble: | An RFID transponder comprising: |
| Element A: | a substrate; |
| Element B: | an antenna structure formed on the substrate; and |

---

[6] The Court used the following chart for Claim 1 in its previous opinion on the issue of validity and that chart has been used in its entirety here. *See* Dkt. No. 167 at 7, attached hereto as Exh. I. The same format has been used for Claim 13 herein.

Appx3249

| Element C: | an RFID integrated circuit chip which is electrically coupled to the antenna structure, |
|---|---|
| Element D: | wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space, |
| Element E: | wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, |
| Element F: | wherein the unique serial number space comprises the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block and of remaining bits of lesser significance that together comprise the one serial number instance. |

| Claim Element | Claim 13 |
|---|---|
| Preamble: | A RFID transponder comprising: |
| Element A: | a substrate; |
| Element B: | an antenna structure formed on the substrate; and |
| Element C: | an RFID integrated circuit chip which is electrically coupled to the antenna structure, |
| Element D: | wherein the RFID integrated circuit chip is encoded with a global trade item number including a unique object number, the unique object number comprising an object class information space including a block of at least 50 bits and a unique serial number space including a block of at least 38 bits, |
| Element E: | wherein the unique serial number space has one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and |
| Element F: | wherein the unique serial number space comprises at least 3 most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block. |

The Accused RFID tags meet all claim elements of both independent claims, as presented below.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 9

Appx3250

### 2.    Literal Infringement Under 35 U.S.C. § 271(a)

#### i.    An Example of Key Elements of Infringement

The asserted claims of the '967 Patent require an encoded RFID tag, with the encoded data (i.e., the unique object number) comprising two key segments – the "object class information space" and the "unique serial number space." The "unique serial number space" is configured to receive and store "one serial number instance" comprising MSBs and remaining bits of lesser significance. Exh. A at 43.  The below illustration is an example for the Court's ease of reference in analyzing the specifics of the independent claims:



For each set of infringing tags, ADASA will annotate these sections in a similar manner with the object class space being identified by a green box, the serial number space as a whole being identified by a red box and the MSBs being identified in blue.

#### ii.    The Accused RFID Tags Meet the Preamble and Elements (A) – (C) of Claims 1 and 13

The preamble and elements (A) – (C) of both claim 1 and 13 are the same. They require an RFID tag with: (1) a substrate; (2) an antenna on that substrate; and (3) an integrated circuit chip coupled to the antenna. Exh. A at 43.  The Accused RFID Tags satisfy each element. Exh. H at ¶ 48-70, 140-144; Exh. F at 208:11-211:4. Avery has confirmed as much in its Answer to the Second Amended Complaint, stating affirmatively that "Avery Dennison admits that it makes, encodes, sells, and offers to sell RFID tags to customers, which are RFID transponders that comprise a

Appx3251

substrate, an antenna, and an RFID IC chip coupled to the antenna." Exh. D at ¶ 22. This admission

was confirmed by Avery's corporate representative on topics relating to Avery's RFID products.

Exh. F at 208:11-211:4. Additionally, Dr. Engels has also opined following review of Avery's

online and product documents that the Accused RFID tags comprise these elements.  Exh. H at ¶

48-70, 140-144.

### iii.  The Accused RFID Tags Meet Element D of Claims 1 and 13

Element D of independent claim 1 of the '967 Patent requires:

> "wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space…"

while independent claim 13 similarly requires:

> "wherein the RFID integrated circuit chip is encoded with *a global trade item number including* a unique object number, the unique object number comprising an object class information space *including a block of at least 50 bits* and a unique serial number space *including a block of at least 38 bits*…"

Exh. A at 43 (emphasis added to highlight additional limitations in claim 13).  These elements are

satisfied by the Accused RFID tags.

With regard to the present infringement analysis, the differences between these respective

elements are minor and, as such, both claims are addressed in concert herein.  Notably, the SGTIN-

96 tag data standard sets out bit allocations for Serialized Global Trade Identification Numbers

comprising 96 total bits of memory space. Exh. J at 97. The first 8 bits are reserved for an EPC

header, followed by a 50-bit object class information section comprising: a filter value, a partition

value, a company prefix, and an item reference number. Exh. J at 97. The remaining 38 bits are

reserved for a serial number.  *See* Exh. H2 at 2; Exh. J at 97.  An RFID tag encoded in accordance

with the SGTIN-96 data structure would therefore satisfy the additional limitations within Element

D of claim 13 while also satisfying the broader Element D of claim 1 of the '967 Patent.  Exh. H

Appx3252

at ¶ 71-88; 140-144.

To encode their RFID tags, Avery uses "schemas" – or encoding blueprints – that are created by Avery and used to generate EPC encoding data and encode infringing RFID tags.[7] Within those "schemas" Avery identifies how each RFID tag will be encoded and identifies several sections within the total 96 bits that are allowed to be encoded on each finished RFID tag and how those sections are split up.[8]  More specifically, under the two categories of "schemas" which govern the Accused RFID Tags, 50 of the 96 bits comprise "object class information" and at least 38 of the 96 bits are used for a unique serial number. Exh. H at ¶ 23; Exhs. E1, E2.

An exemplary bit map showing how each schema identifies each of the 96 bits that will be encoded is below:



Exh. H2 at 8-9.[9] The colors in the example above are representative of different sections of the encoded tag – the green and red sections make up the "object class" number and the combination of the two green zeroes, plus the pink and blue numbers represent the "serial number." *Id.*  Each of Avery's schemas identifies these numbers with specificity:

---

[7] A chart identifying the Accused RFID tags and the particular schema used in connection therewith for each category of infringing tags is included with the Declaration of Daniel W. Engels, PhD.  This chart has is attached hereto as Exh. H1.

[8] Two categories of such schemas have been identified as yielding infringing RFID tags by Dr. Engels – Avery's "Commissioning Authority / PCTag Schemas" and its "Commissioning Authority Schemas," with these names being descriptive of the information types used by Avery to populate the MSB portion of the serial number instances of the Accused RFID tags. Exh. H at ¶ 23-32.  Dr. Engels also identified non-infringing schemas used by Avery and differentiated them from the Accused RFID tags in his expert report. Exh. H at ¶ 33-34. All of the accused schemas used in connection with the Accused RFID tags are part of the summary judgment record as Exhs. E1 and E2.

[9] Notably, the RFID tag is ultimately encoded in binary form; however, each of Avery's schemas shows each individual tag number as both a hexadecimal and binary. While each individual number can be expressed in both manners (hexadecimal is used to make the number more readable for human eyes), the unique number itself does not change.  The Court previously took note that the unique number is the same in hexadecimal and binary form. *See* Dkt. No. 165 at 9.



Exh. H3 at 1 (annotated).



Exh. H2 at 10 (annotated). As shown, each of these two schemas – which are representative of all

Accused RFID Tags – demonstrates that each individual tag contains an object class information

space including a block of at least 50 bits and a unique serial number space including a block of at

least 38 bits. *See, generally,* Exhs. E1, E2, H2, H3, and H at ¶ 85, 100, 102.  Because each of the

Appx3254

Accused RFID tags is encoded with one of the two identified sets of schemas that specify that each individual RFID tag is encoded with a unique object number that is at least 50 bits and a unique serial number of at least 38 bits, Element D of both independent claims are met. Exh. H at ¶ 71-88, 140-144.

### iv.    The Accused RFID Tags Meet Element E of Claims 1 and 13

Element E of Claims 1 and 13 are functionally the same for infringement purposes.  Exh. H at ¶ 89-108, 140-144. In independent Claim 1 this element requires:

> "wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, …" Exh. A at 43.

Similarly, in independent Claim 13 this element requires:

> "wherein the unique serial number space has one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and…" Exh. A at 43.

All of the Accused RFID tags meet these elements. Exh. H at ¶ 89-108, 140-144.  As noted by the above representative schemas, all of the Accused RFID tags are encoded with a unique serial number for each tag, which features a limited number of MSBs from an allocated block. Exh. H at ¶ 99, 140-144.  Each of those schemas treat segmenting the serial number space slightly differently, but both representative categories infringe the claims. Exh. H at ¶ 99-105, 140-144.

For the "Commissioning Authority/PCTag" schemas, the 38-bit serial number space is comprised of MSBs that make up the first 18 to 22 bits, which contains leading 2 to 6 bits correspond to a Commissioning Authority (binary code 00, 010000, or 001000) and the next 16 bits correspond to a PCTag ID. Exh. H at ¶ 100-101; Exh. E1; Exh. H2; Exh. F at 185:10-17.  This combination of the Commissioning Authority and PCTag ID constitutes the MSBs of the serial number space in this group of schemas. *Id.* The remaining trailing bits of the serial number space (e.g., the last 20 or 16 bits) are serialized with a sequential serial number. *Id.* The schema identifies

Appx3255

these elements:



Exh. H2 at 9 (annotated). Similarly, for the second category of schemas – the "Commissioning Authority" schemas – the 38-bit serial number space is comprised of MSBs that first include 2 to 14 bits which correspond to a commissioning authority, while the remaining 36 to 24 trailing bits of the serial number are serialized with a sequential serial number. Exh. H at ¶ 102-103; Exh. F at 185:10-17. A representative schema from this category identifies these elements and each schema within this group uses the same structure:

Appx3256



Exh. E2 at 9 (annotated). An annotated example of encoding data applying this schema is shown

below[10]:



Dr. Engels confirms, based on his review of all Avery schemas associated with the Accused RFID

tags that all of the Accused RFID Tags are each encoded with unique object numbers comprising

serial number instances taken from allocated blocks set off by a sequence of MSBs in the manner

---

[10] Generic designators for the header (H), company prefix (C), and item reference (R) bit locations are shown in the illustrative example.  The remaining bit values are set in accordance with the SGTIN-96 standard using the EPC partition and filter values designated in the preceding schema along with the commissioning authority bits specified.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                                    Page 16

required by the asserted claims. Exh. H at ¶ 104-105.  As such, all Accused RFID tags meet Element E of claims 1 and 13. Exh. H at ¶ 89-108, 140-144; Exh. F at 185:10-17; Exh. E2.

### v.    The Accused RFID Tags Meet Element F of Claims 1 and 13

Element F of both claims 1 and 13 requires that a single instance of most significant bits from an allocated block of the same set of most significant bits be used in combination with remaining lesser significant bits in order to create a unique serial number. Exh. A at 43; Exh. H at ¶ 113-114.[11]  Dr. Engels provided a pictorial example of how this element would work:



Exh. H at ¶ 113. Avery's Accused RFID tags practice this element by encoding tags that have a predefined, static sequence of most significant bits of the 38-bit serial number which are assigned and managed by Avery's internal EPC number management programs – "D2Comm" and "Serialization Manager." Exh. H at ¶ 115-117. More specifically, "D2Comm" is an umbrella term that Avery Dennison uses to describe the components within its serialization system to store and generate serialization information within a central repository. Exh. F at 13:17-16:1, 21:7-22:8. D2Comm also accesses Serialization Manager, which is a newer module used by Avery Dennison for serialization since around 2014, that is intended to provide for more flexible serialization methodologies. Exh. F at 14:9-15:8. These two programs internally manage the requests for new

---

[11] Claim 13 requires the most significant bits to be at least three bits long, but otherwise claims 1 and 13 are substantively the same.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                          Page 17

orders of serial numbers from Avery Dennison customers. Exh. R at 3-4, 10-16; Exh. F at 15:12-16:4, 21:7-15, 23:19-24:10. D2Comm accesses stored schema information – like the two categories of schemas referenced previously – and manages the encoding of a new serial number instance based on the appropriate schema. *Id.*

Under both of the Commissioning Authority/PCTag and Commissioning Authority only schemas, Avery encodes tags that have a predefined, static sequence of most significant bits of the 38-bit serial number that is assigned and managed by D2Comm and Serialization Manager. Exh. H at ¶ 116-117; Exh. R at 3-4, 10-16; Exh. F at 15:12-16:4, 21:7-15, 23:19-24:10. The static sequence of most significant bits that are assigned to be used in association with an object class creates an allocated block of serial numbers for use for encoding items within that object class for a brand owner. Exh. H at ¶ 117-118; Exh. R at 10, 14 (noting the EPC request must include SKU number identifying product type to be tagged). One serial number instance from the allocated block of serial numbers is encoded into the unique serial number space of an individual RFID tag's memory in connection with the object class information for the items of that object class to which the RFID tag is to be attached. Exh. H at ¶ 117-119; Exh. R at 10, 14 (noting the quantity of EPCs in response matches number requested for tagging job); Exh. F at 21:18-22:5.  Accordingly, the most significant bits of the serial number instance that is encoded in the RFID tag using Avery's systems uniquely corresponds to the most significant bits of the allocated block of serial numbers for that object class. Exh. H at ¶ 117-119; Exh. R at 10, 14; Exh. F at 21:18-22:5.

The trailing bits of lesser significant complete the serial number instance. Because the most significant bits of the serial number space contain a static sequence, this effectively allows the least significant bits to be used as a counter, or index, for serialization. Exh. H at ¶ 118-122.  By managing and encoding serial numbers in this manner as identified by the schemas associated with

the Accused RFID Tags, all of the Accused RFID Tags meet element F.  Exh. H at ¶ 122, 140-144. By meeting all of the elements of independent claims 1 and 13, ADASA is entitled to summary judgment of infringement under 35 U.S.C. §271(a).

### 3.    Infringement Under 35 U.S.C. § 271(b)

In addition to direct literal infringement, Avery's Accused RFID tags also infringe under 35 U.S.C. § 271(b) and (c) for indirect infringement. Under § 271(b), "[i]n order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 407 (Fed. Cir. 2018). "[I]nducement can be found where there is [e]vidence of active steps taken to encourage direct infringement, which can in turn be found in advertising an infringing use or instructing how to engage in an infringing use." *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1334 (Fed. Cir. 2019).

As shown through Avery's own documents and affirmed by its Rule 30(b)(6) corporate representative, Avery induces infringement by instructing its customers to encode RFID tags and labels in accordance with the specifications and schemas identified above by providing complete EPC numbers through Avery's in-plant printing management, which the customer then encodes within RFID tags or labels. Exh. H at ¶ 37, 46-47; Exh. R at 3-4, 9-16; Exh. F at 15:12-16:4, 21:7-15, 23:19-24:10; 171:9-172:5; Exhs. S1, S2, S3, S4 and S5.  Avery supplies its customers who wish to encode their own RFID tags pursuant to the claimed invention of the '967 Patent with all the necessary hardware (such as an Avery RFID printer), software (such as PCMate, which provides access to Avery's D2Comm system), and the RFID inlays and EPC numbers, and provides instruction on how to encode the "converted" RFID tag. *Id.*  Avery therefore provides all

the necessary information to encode the Accused RFID Tags from its D2Comm system, which is provided to PCMate to instruct the RFID encoder to encode the data into an RFID tag. *Id.*

More specifically, to begin the process, a customer of Avery's would request that a certain number and preselected style of RFID tags be printed within Avery's PCMate software client. Exh. H at ¶ 47; Exh. R at 3-4, 9-16.  The request is transmitted to Avery's D2Comm system hosted in a data center in Culpepper, Virginia. Exh. H at ¶ 47; Exh. R at 3-4, 9-16; Exh. F at 15:12-16:4. Avery's D2Comm system and/or the Serialization Manager component of D2Comm generates a file containing all of the data necessary for encoding the RFID tags in Culpepper, Virginia utilizing the specifications and schemas identified above and transmits that file from Culpepper, Virginia to the PCMate software client at the customer's location, which instructs the Avery supplied encoder to encode the RFID tag with that data. Exh. H at ¶ 47; Exh. R at 3-4, 9-16; Exh. F at 15:12-16:4.

The same procedure that is used by Avery in house and that directly infringes is the same procedure used by Avery's customers with the same end result of a commissioned RFID tag. Exh. F at 24:15-19; 25:12-18. The relationship between a customer that wants to do its own encoding using Avery's schemas and specifications is managed through a customer agreement, which is defined by Avery and even allows Avery technicians to come to a customer's facility, install the hardware and software, and provide help and maintenance throughout the duration of the agreement. Exh. F at 45:25-46:12.

Despite admitting that Avery had knowledge of ADASA's patent and ADASA's allegations of infringement as early as 2017 (prior to the filing of this lawsuit), Avery has made the conscious choice to continue offering these services to its customers and thus infringing the asserted claims of the '967 Patent and has never considered changing its product and service

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                                     Page 20

offerings despite their infringing nature. Exh. N at 12:24-13:2; 98:11-99:24. By providing these services and actively inducing their customers to infringe ADASA's patent in the same manner in which Avery directly infringes, summary judgment is appropriate under § 271(b).

### 4.      Infringement Under 35 U.S.C. § 271(f)

Similarly, ADASA is entitled to summary judgment on Avery Dennison's foreign sales of infringing RFID tags. Under the Patent Act, a company can be liable for patent infringement if it ships components of a patented invention overseas to be assembled there. See 35 U.S.C. § 271(f)(2). In order to prove infringement under this statute, ADASA must show that Avery "supplies or causes to be supplied in or from the United States" one or  more "components" of a patented invention "where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States." 35 U.S.C. § 271(f). Avery's own documentation and testimony, along with the Court's previous findings on this issue[12], demonstrates that summary judgment on RFID tags that are sold in the United States and then assembled abroad is appropriate for ADASA.

### i.      Avery Supplies "Complete EPC" RFID Tag Numbers From The United States to Foreign Manufacturers

In the Court's order on Avery's denied motion for judgment relevant to § 271(f) infringement, the Court found that "[Avery] itself supplie[s] the data files [containing unique EPC numbers] to foreign factories and service bureaus, who then used the data files to encode onto RFID tags." Dkt. No. 165 at 9. Avery readily admits the same in its answer that it supplies all "complete EPCs" (i.e. the individual unique serial numbers to be encoded onto blank RFID tags) to both domestic and foreign customers from its D2Comm and Serialization Manager systems that

---

[12] *See* Dkt. No. 165 at 5-10.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 21

Appx3262

are hosted in its data center in Culpepper, Virginia by sending data files with those complete EPCs to foreign factories and service bureaus. Exh. D at ¶ 29; Exh. R at 3, 9-10, 12-15; Exh. F at 15:12-16:4; *see also* Exh. H at ¶ 47. These EPCs are sometimes shipped abroad to "factories and service bureaus located outside the US." Exh. D at ¶ 29. Once the binary EPC number is encoded onto the blank tag, it becomes a finished product. *See* Exh. F at 211:1-8.

Avery also admits that these "complete EPCs" are encoded as a binary encodings within the memory structure of the RFID IC chip of the tag having an object class information space and a unique serial number space" and "that at times, the object class information space is encoded with the object class information for an item and the unique serial number space is encoded with a unique serial number for that specific item within that object class." Exh. D at ¶ 23.

These undisputed facts demonstrate that there is no material issue of fact that Avery causes "complete EPCs" to be created in Culpepper Virginia and then sent abroad to be encoded onto blank RFID tags.

### ii. Avery's data files are "components" under 35 U.S.C. §271(f)(2)

To qualify for infringement under § 271(f)(2), Avery must send a "component" of the invention from the United States to a foreign encoder to be combined into an infringing product. 35 U.S.C. § 271(f). Previously, on this issue, Avery argued that the data file that contains its "complete EPCs" cannot constitute a "component" under § 271(f) because the data files involved were in decimal form which was then converted into binary abroad before being encoded onto the finished product. Since making that argument, the Court has expressly rejected Avery's alleged distinction. *See* Dkt. No. 165 at 9 ("Like the defendant Align in *Ormco*, here Defendant itself supplied the data files to foreign factories and service bureaus, who then used the data files to encode onto RFID tags. Therefore, it is irrelevant whether the numbers in decimal form in the data files were copied into binary form."). In that order, the Court analogized the data files in this case

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 22

Appx3263

to a similar data file that was found to be infringing under 35 U.S.C. 271(f). *Id.* (citing *Ormco*

*Corp. v. Align Technology, Inc.*, 609 F.Supp.2d 1057, 1072 (C.D. Cal. 2009)).

Avery's own documentation and testimony confirms the Court's finding that data files with

complete and unique EPC numbers are sent from Virginia to foreign bureaus for encoding into

finished tags. Exh. R at 4, 9-10, 12-15; Exh. F at 15:12-16:4; 116:25-120:7; *see also* Exh. H at ¶

47.   In other words, each encoded RFID tag – the finished product according to Avery's own

testimony – receives a complete, unique object number which includes object class information

and a serial number instance comprising MSBs and bits of lesser significance taken from an

allocated block, as a "complete EPC" number via Avery's Serialization Manager and D2Comm

systems for encoding into an RFID tag using Avery's PCMate software. *Id.*

The facts here, as previously recognized by the Court, are analogous to those presented in

*Ormco*, which analyzed the applicability of a data file – here the complete EPC numbers – being

sent abroad for combination in order to create an infringing product. In *Ormco*, the defendant

company made clear plastic aligners to straighten a patient's teeth as an alternative to braces. *Id.*

at 1061. In order to create the plastic aligners, the defendant created a data file "from the scan of

the [patient's] impression" which was "used for no other purpose than as an input for" the aligner

making process which was performed in Costa Rica. *Id.* at 1062.

The *Ormco* court granted the plaintiff's motion for summary judgment for indirect

infringement under § 271(f)(2). *Id.* at 1075. The court analyzed whether or not the data file that

was used solely to produce the infringing plastic aligner would constitute a component under the

*Microsoft* framework:

> A data file like the ADF file does not merely instruct Align's Costa Rican
> subsidiary how to act in a manner that infringes on its patented claims. Rather it is
> information that is incorporated into other steps of the patented claims, without
> which the patented claim cannot fully be completed. It is the sole source of

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                        Page 23

Appx3264

information about a patient's teeth, not a generalized set of steps. Unlike a blueprint or "template," it is more like an "ingredient" in a recipe than the recipe card itself. Under the plain definition of the term "component" by the Court in *Microsoft*, the Court finds that the ADF file is a component of the patented claims at issue." *Id.* at 1071-72.

Here, much like *Ormco*, the data file sent from Virginia to foreign encoding facilities is the "sole source of information about [the encoded RFID tag" and is the main "ingredient" in the RFID tag recipe rather than the "recipe card itself." *Id.* Avery admits that its tags are "raw, unencoded, and unconverted" without the "complete EPC" number and that once the binary EPC number is applied to the tag, it becomes a "finished product." *See* Exh. F at 209:4-11, 211:1-8. This process is completed by using the "complete EPC" number sent from Virginia and encoding that number using Avery's PCMate software run by a foreign encoding entity. *See e.g.* Exh. H at ¶ 47; Exh. R at 3-4, 9-10, 12-15; Exh. F at 15:12-16:4; 116:25-120:7. As identified by Dr. Engels, this finished product – even though it was encoded abroad – infringes the asserted claims of the ADASA '967 Patent. *See e.g.* Exh. H at ¶ 47.

Additionally, Dr. Engels opines, based on his review of Avery's documentation and representative deposition testimony, that Avery induces infringement through this foreign encoding process, as described above. *See* Exh. H at ¶ 45-47. Dr. Engels opined on each specific requirement for foreign induced infringement under § 271(f)(2) and has found it present based on his review and understanding of Avery's D2Comm and PCMate systems that are used in conjunction to send "complete EPCs" from Virginia to foreign encoding facilities. *Id.*

### iii. Conclusion

Based on the above evidence and precedent, ADASA is entitled to summary judgment on its claims of infringement under 35 U.S.C. § 271(f)(2) based on Avery sending complete and unique EPC numbers in the form of a data file (the 271(f) "component") from Virginia to foreign

Appx3265

encoding facilities to be "combined" with a blank RFID tag to make an infringing product.

## B.   ADASA IS ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR ON ALL OF AVERY'S DEFENSES AND COUNTERCLAIMS

In its live Answer, Avery asserts eleven affirmative defenses along with counterclaims of non-infringement[13] and invalidity.  Dkt. No. 114.  As discussed previously, however, the Court has since issued orders that permanently removed several of Avery's alleged defenses – particularly failure to state a claim, no irreparable harm, damages limitations, equitable defenses (such as waiver, equitable estoppel, unclean hands), exceptional case, substantial non-infringing use, and absolute and equitable intervening rights – from the case. *See* Exh. U.

Additionally, the Court granted ADASA's Motion for Partial Summary Judgment of No Invalidity upon finding the asserted claims of the '967 Patent are entitled to a May 21, 2008 priority date.  *See* Dkt. No. 167, also attached as Exh. I.  This moots much of Avery's purported invalidity defense and counterclaim under 35 U.S.C. §§ 102, 103, which rely on disclosures from art developed after the priority date of the asserted claims.  Exh. I. The few remaining prior art references put forth by Avery fail to teach or render obvious any asserted claim of the '967 Patent.

Likewise, the Court's priority date finding moots Avery's inequitable conduct defense, which also relies wholly on events and/or omissions occurring well after the May 21, 2008 priority date.  These later occurring events can have no legal import with respect to the ***earlier occurring*** prosecution of the patent application issuing as the '967 Patent.  Avery's inequitable conduct defense, therefore, has no remaining legal or factual support.[14]  As such, each of Avery's remaining defenses and counterclaims are ripe for summary judgment in ADASA's favor.[15]

---

[13] Avery's affirmative defense and counterclaim have been previously addressed via the arguments and evidence presented in § V.A, *supra*, which demonstrate infringement of the asserted claims by each of the Accused Products.
[14] *See* correspondence among counsel confirming the same, attached hereto as Exh. P.
[15] Avery has presented no factual bases underpinning its invalidity defense and counterclaim pursuant to 35 U.S.C. § 101 (subject matter eligibility) and 112 (indefiniteness) in its Answer pleading (Dkt. No. 114) nor its discovery responses in this case.  *See* Exh. L (Avery's Response to Interrogatory No. 13 asking for all legal and factual bases

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                          Page 25

### 1.    The Asserted Claims Are Valid Over All Art of Record

#### a.    Several References Are Not Even Prior Art to the '967 Patent

Avery presents several purportedly invalidating prior art references in support of its invalidity defense and counterclaim in both its interrogatory responses and in its expert report on validity.  Among those asserted are several references which do not predate the May 21, 2008 priority date of the asserted claims of the '967 Patent, including: encoded RFID transponders made and sold by ADASA to Walmart using its "Ad Hoc" mode in April 2009; encoded RFID transponders made and sold by Avery to LeSportSac in February and March 2009; U.S. Patent Application Publication 2012/0013440 filed on July 27, 2010; RFID Journal Live! Presentation dated April 3-5, 2012; and, GS1 US Guideline entitled EPC-enabled RFID Serialization Management for SGTIN-96 dated May 9, 2012.  Because each of these references were first publicly available well after the priority date for the asserted claims of the '967 Patent of May 21, 2008 (Exh. I at 15-16), and because art by definition must be publicly disclosed or known ***before*** a claim's priority date to qualify as ***prior art*** under 35 U.S.C. §§ 102 and 103, Avery's invalidity defense and counterclaim fails as a matter of law to the extent they rely on any of these references. Because the Court's order on validity prevents these references from being prior art as a matter of law, ADASA is entitled to summary judgment that these references cannot be prior art to the '967 Patent.[16]

---

supporting its contention that the asserted claims are invalid or unenforceable).  Avery's expert report on the matter belatedly incorporated therein presents only conclusory opinions which fail to apply the correct legal tests under Federal Circuit case law and fail to apply the claim terms as they have been construed by the Court.  ADASA will therefore address these portions of Avery's purported invalidity counterclaim and defense in response to Avery's Motion for Summary Judgment, as necessary, and reserves the right to seek leave from the Court to cross move for summary judgment thereon in ADASA's favor at that time.

[16] Counsel for ADASA sought a stipulation that these references would no longer be viable prior art in light of the Court's validity ruling. Counsel for Avery would not unequivocally stipulate as such; therefore, the issue is presented for the Court. *See* Exh. P at 2-5, 7.

Appx3267

### b. U.S. Patent No. 8,857,221 to Kuhno Does Not Anticipate any Asserted Claim of the '967 Patent

Avery argues that U.S. Patent No. 8,857,221 ("the '221 Patent") anticipates the inventions claimed in claims 1-6, 13, and 14 of the '967 Patent. [17] Notably, this patent was not disclosed as prior art in this case by Avery at any time prior to its inclusion in its expert report on the subject, which was served on January 9, 2020, more than two years after this case began and several months after Avery filed its motion on invalidity. Additionally, the '221 Patent was only first disclosed in this case well after the close of fact discovery, despite the patent being authored by its 30(b)(6) corporate representative and Avery employee, Michael J. Kuhno. Further, Avery did not raise the '221 Patent as potentially invalidating prior art in its petition for *ex parte* reexamination of the '967 Patent claims despite having been aware of the '221 Patent and the scope of its disclosure from the outset. Avery waited until well after the deposition of Mr. Kuhno before first raising his '221 Patent as purportedly invalidating prior art in this case. The underlying reasoning is clear – even Avery did not believe this patent was invalidating prior art until it began to run out of other defenses.

Contrary to Avery's last-ditch assertions, and as confirmed by Dr. Engels, the '221 Patent fails to disclose at least Elements D-F of independent claims 1 and 13 of the '967 Patent and therefore cannot anticipate either of claims 1 or 13, nor any dependent claims thereof. Exh. H at ¶ 161-168; *see also Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (requiring "that the four corners of a single, prior art document describe every element of the claimed invention" for anticipation under 35 U.S.C. § 102).

---

[17] Avery does not contend that the '221 Patent, either standing alone or in combination with any other prior art reference(s), renders obvious any claim of the '967 Patent under 35 U.S.C. § 103. To the extent Avery seeks to assert the '221 Patent in connection with an obviousness challenge, ADASA will seek to have those assertions struck as not being unsupported and untimely raised in this case.

Appx3268

Elements D-F of independent claims 1 and 13 of the '967 Patent, reproduced above, generally require that the integrated circuit chip of the claimed RFID transponder be encoded with a unique object number comprising object class information along with a serial number instance from an allocated block of serial numbers.  Exh. A at 43. The serial number instance comprises a limited number of MSBs which uniquely correspond to the MSBs of the allocated block along with remaining bits of lesser significance. Exh. A at 43. This data structure is not taught in the specification of the '221 Patent.  Exh. H at ¶ 161-168.

In contrast, the '221 Patent is directed to systems for gathering and storing information corresponding to shipping pallets, cartons, and the like.  Exh. M at 70 (column 6, lines 5-11); Exh. H at ¶ 162.  The systems disclosed in the '221 Patent scan a printed label on a carton which may contain UPC, SKU, or other indicia, then creates or adds the information to a database of records corresponding to an identifier number assigned to the pallet or carton.  Exh. M at 70-71 (column 6 line 27- column 7, line 3).

While an RFID tag may be encoded with some of the data obtained and/or created, the '221 Patent is silent with regard to the contents and format of any data encoded into an RFID tag.  Exh. M at 70 (column 5, lines 22-29); Exh. H at ¶ 162.  In fact, the '221 Patent expressly states that "[t]he format and configuration of the RFID Printer Data depends on the requirements of the RFID printer and the protocols related to the barcode and RFID tag *and are therefore not discussed herein*."  Exh. M at 70 (column 6, line 66 through column 7, line 3) (emphasis added); Exh. H at ¶ 162.  There is no discussion whatsoever of using the specific data structure and arrangement claimed in elements D-F of the claims 1 and 13 of the '967 Patent nor any mention of most significant bits whatsoever.  Exh. H at ¶ 162-168.  As such, the '221 Patent does not teach or suggest encoding an RFID tag with object class information as construed by the Court and a serial

Appx3269

number instance comprising a limited number of MSBs along with remaining bits of lesser significance and a person of ordinary skill would not understand the '221 Patent as disclosing, teaching, or suggesting the specific data structures claimed in the '967 Patent. Exh. H at ¶ 161-168. Avery simply cannot meet its burden of making such a showing by clear and convincing evidence, as the law requires. *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1303 (Fed. Cir. 2008).

### c.  The *"RFID for Dummies"* Reference Does Not Anticipate or Render Obvious any Asserted Claim of the '967 Patent

Avery also asserts that excerpts from the book "*RFID for Dummies"* anticipate claims 2-6, 13, and 14 of the '967 Patent and renders obvious claim 1 of the '967 Patent when combined with the teachings of EPCglobal's EPC Generation 1 Tag Data Standards Version 1.1, Rev. 1.27. Neither of these references teach the specific data structure claimed in Elements D-F of independent claims 1 and 13 of the '967 Patent and, therefore, cannot anticipate or render obvious any claim.  Exh. H at ¶ 152-160.

To support its claimed defense, Avery cites to these references for the proposition that the prior art allegedly taught the use of MSBs within the unique serial number space of a unique object number encoded, citing that "Serialized data means that each item has its own unique identifier or serial number" and:

> An always-accessible central numbering authority isn't practical for many companies.  These companies can use an intelligent hierarchy imposed on the serial number allocation to decentralize and make feasible the allocation of unique serial numbers across all manufacturing lines.

> Here's an example of a decentralized, hierarchical approach to allocating serial numbers.  A range of serial numbers for each product is allocated to each manufacturing facility.  Within a facility, a range of numbers from those allocated is allocated to each line producing a particular product.  In this way, the serial number is effectively subdivided into facility number, line number, and subserial

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 29

Appx3270

number, in which the allocation hierarch is maintained between facility number and line number."

Exh. O at 12, 239-40. However, this excerpt from *RFID for Dummies* does not disclose, teach, or suggest the use of the data structure utilizing MSBs defining allocated blocks of serial numbers claimed in the '967 Patent. Exh. H at ¶ 153-54. Rather the scheme disclosed in *RFID for Dummies* is simply to divvy up available serial numbers ***by ranges*** per facility (i.e., numbers 1-1,000,000 to plant 1, numbers 1,000,001-2,000,000 to plant 2), then further allocate within a facility ***subranges*** of available serial numbers to each production line (i.e., numbers 1-100,000 to line 1, numbers 100,101-200,000 to line 2, and so on). Exh. H at ¶ 154 (emphasis added). As Dr. Engels confirms, this was a conventional methodology employed at the time for sequential allocation of batches of serial numbers and simply did not contemplate the elegant solution hardware-based solution claimed in the '967 Patent. Exh. H at ¶ 154. In contrast, the '967 Patent claims use of allocated blocks of serial numbers for a particular object class created using MSBs and imparting a partitioned data structure at the bit level within the memory of the claimed RFID tags. Exh. H at ¶ 154-55. To be sure, the purpose of *RFID for Dummies* was not to disclose new or innovative solutions in the RFID field, but rather to provide a simplified description of how RFID was being used at the time and the benefits that could be derived from its adoption.

The disclosure within *RFID for Dummies* that Avery now relies upon describes precisely the same method for allocating serial numbers that Avery previously tried to use during the *Ex Parte* Reexamination process and that the U.S. Patent and Trademark Office found was not described by the '967 Patent.[18] The asserted claims of the '967 Patent were recently confirmed to be patentably distinguishable over during *Ex Parte* Reexamination Control No. 90/014,052. Exh.

---

[18] Avery requested this reexamination of the validity of the '967 Patent claims asserted in this case shortly after filing of ADASA's Complaint.

V.  Specifically, in that reexamination, Avery presented U.S. Patent No. 7,827,200 as invalidating

prior art and described its disclosure as follows:

> "The '200 patent describes a number of embodiments for assigning serial
> numbers, including one where 'different manufacturer divisions that produce
> objects having the same object classification can be ***assigned a subset of numbers
> from a number pool of unassigned numbers to ensure that unique serial numbers
> are always generated***.' In that embodiment:
>
> a serial number generation function used by ... a first division can assign
> serial numbers ***in the range of one to a million and the second division can assign
> serial numbers in a range of three to four million***. It should be appreciated that
> the different divisions can be communicatively linked to a centralized system that
> assigns serial numbers, which would ensure that serial numbers are uniquely
> assigned per object classification."

Exh. V at 14-15 (internal citations omitted) (emphasis added).

The claims of the '967 Patent were ultimately found patentably distinguishable over the

'200 Patent and all other prior art of record in the reexamination proceeding.[19]  Exh. W at 4.

Specifically, the Examiner noted that none of the prior art disclosed Elements [D]-[F] of the claims

of the '967 Patent:

> The prior art of record, including 684 Publication, 200 Patent, 545 Patent,
> and 2006 EPC Standard, does not specifically disclose or fairly teach an RFID
> transponder (or an integrated circuit with an RF circuit) including all of the
> elements and limitations recited in claims 1-20 (and including all of the limitations
> of any respective parent claims), particularly including:
>
> a unique serial number space encoded with one serial number instance from
> an allocated block of serial numbers,
>
> the allocated block being assigned a limited number of most significant bits,
>
> wherein the unique serial number space comprises the limited number of
> most significant bits uniquely corresponding to the limited number of most
> significant bits of the allocated block.  *Id.*

---

[19] Notably, Avery did not raise the '221 Patent as potentially invalidating prior art in its petition for *ex parte*
reexamination of the '967 Patent claims despite having been aware of the '221 Patent and the scope of its disclosure
from the outset.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                      Page 31

Avery now seeks to take a second bite at the apple by presenting art that is cumulative of that which was overcome in the USPTO less than two years ago.  The art Avery raises this time around likewise fails to disclose the use of MSBs and cannot anticipate or render obvious any of claims 1-6, 13, or 14 of the '967 Patent.  Exh. H at ¶ 159-160. Also, again, Dr. Engels has also reviewed this reference and determined that the inventive features of the '967 Patent were not disclosed by these references.[20]

### 2.     Avery Cannot Maintain Its Inequitable Conduct Defense

Avery's inequitable conduct defense is solely premised on the false allegation that ADASA concealed from the United States Patent and Trademark Office ADASA's disclosure and/or sale to Walmart of RFID transponders encoded using "Ad Hoc Mode" in April 2009, more than one year prior to ADASA's 2010 patent application filing. Exh. D at 13-16.  This entire alleged defense relies on the claims of the '967 Patent being entitled to a priority date of June 21, 2010 as opposed to the now judicially confirmed May 21, 2008 priority date. Exh. D at 14 ("…Adasa's sales of Ad Hoc Mode to Wal-Mart USA in April of *2009* are prior art to the '967 patent because they occurred more than one year prior to *June 21, 2010*.") (emphasis added).

As noted above, however, the Court's April 30, 2020 order on invalidity unequivocally found that the claims of the '967 Patent are entitled to the earlier May 21, 2008 priority date, effectively disposed of Avery's inequitable conduct defense. *See* Exh. I at 17. Because each of the cited "Ad Hoc" sales and/or disclosures to Walmart occurred well after the priority date of the '967 Patent, they are immaterial to patentability and did not need to be disclosed to the PTO.  *See*

---

[20] Again, Avery has failed to set forth any legally sufficient obviousness challenge to the claims of the '967 Patent because Avery has provided no rationale supporting a motivation to combine this reference with any other prior art of record in this case.  ADASA reserves the right to present additional arguments and evidence refuting any such motivation, in the event Avery seeks to now, belatedly, attempt to show a motivation to combine exists within its summary judgment briefing.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                    Page 32

MPEP §2001.04 (there is no duty to submit information which is not material to patentability); 35 U.S.C. §102 (defining prior art as that which is known or disclosed *before* the time of invention or effective filing date of the subject patent application); *see, also,* MPEP §706.02(c)(2) (35 U.S.C. 102(b) is only applicable if the disclosure or sale occurred ***more than 1 year prior*** to the effective filing date).   Therefore, there is no legal or factual basis that ADASA committed inequitable conduct and Avery's defense cannot survive summary judgment.[21]

## VI.   CONCLUSION

For the foregoing reasons, ADASA respectfully requests that summary judgment be granted in its favor of:  infringement of the '967 Patent under 35 U.S.C. § 271(a), (b), (c) and (f) by the accused Avery RFID products; that no prior art of record that remains in the case anticipates or renders obvious any of claims 1-6, 13, or 14 of the '967 Patent; and of no inequitable conduct.

---

[21] After the Court's order on validity legally and factually effectively disposed of Avery's inequitable conduct defense, counsel for ADASA sought a stipulation from Avery that it would drop this defense so it did not have to be presented during summary judgment briefing. Counsel for Avery stated that they would not "assert inequitable conduct" or "present the issue to the jury" but refused to acknowledge that there was no remaining legal or factual basis for the alleged defense. Exh. P at 2-4. Therefore the issue is presented to the Court on summary judgment.

Appx3274

# EXHIBIT "B"

Case 6:17-cv-01685-TC    Document 164    Filed 05/24/20    Page 1 of 10

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| ADASA INC., | ) | |
| | ) | |
| Plaintiff, | ) | 6:17-cv-01685-TC |
| | ) | |
| v. | ) | Opinion and Order |
| | ) | |
| AVERY DENNISON CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

This is a patent action in which this court has full consent.

Presently before the court is the construction of the claims.

There have been no filings of motions for summary judgment at this

point in the litigation.

1 - OPINION AND ORDER

Case 6:17-cv-01658-HTC Document 1684 Filed 05/24/20 Page 3 of 10

DISCUSSION

The applicable Claim Terms as presented by the parties and this court's constructions thereof follow.

I.   TERMS WITH  AGREED UPON CONSTRUCTIONS


1.   object class information space

The parties agree such phrase  should be construed as "data field  within the memory of the RFID integrated circuit chip for information identifying the class of an  object, such as a company prefix, item reference code, partition value, and/or filter value."


2.   unique serial number space

The parties agree such phrase should be construed as " data field within the memory of the RFID integrated circuit for information identifying a unique serial number."


3.   being assigned a limited number of most significant bits

The parties agree such phrase should be construed as "includes a limited, predefined sequence of higher order bits at the leading end."

4. remaining bits of lesser significance

The parties agree such phrase should be construed as "the remaining lower order bits at the trailing end."


3 - OPINION AND ORDER


Appx3332

# EXHIBIT "C"

Appx3339

Case 6:17-cv-01685-MK    Document 116825    Filed 05/24/20    Page 12 of 120

Alan J. Thayer, Jr., OSB No 853,428
Innovative Law Group
P.O. Box 1268
Eugene, Oregon 97440
(541) 345-2325
alan@thinkILG.com

Jonathan T. Suder (*pro hac vice*)
Brett M. Pinkus (*pro hac vice*)
Glenn S. Orman (*pro hac vice*)
Richard A. Wojcio, Jr. (*pro hac vice*)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX  76102
(817) 334-0400
(817) 334-0401 fax
jts@fsclaw.com
pinkus@fsclaw.com
orman@fsclaw.com
wojcio@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

### Eugene Division

| | |
|---|---|
| **ADASA INC.,** | Case No.: 6:17-CV-01685-MK |
| Plaintiff, | |
| v. | **SECOND AMENDED COMPLAINT** |
| **AVERY DENNISON CORPORATION,** | |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff ADASA INC. ("Plaintiff" or "ADASA") files this Second Amended Complaint

against Defendant AVERY DENNISON CORPORATION, alleging as follows:

1

Appx3340

identifier or address while leaving it to end line users of those data formats to develop their own systems and methods for allocating the serialized portions to prevent duplicate allocations. In truth, the data structures serve only to create the problem to be solved by the inventions claimed in the '967 Patent and, as such, cannot anticipate nor render obvious any claim of the '967 Patent.

**B. *RFID for Dummies***

152.    *RFID for Dummies* does not teach or suggest each and every element of independent claims 1 and 13.

153.    *RFID for Dummies* does not teach or suggest at least the limitations that "the allocated block being assigned a limited number of most significant bits" or "the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block" which are required by each challenged claim of the '967 Patent.

154.    *RFID for Dummies* discloses an approach to allocating serial numbers in which a range of decimal serial numbers for each product is allocated to each manufacturing facility. Within a facility, a range of decimal numbers from those allocated to the facility is allocated to each production line producing a particular product. However, this is merely selecting a range of decimal numbers in a database and assigning those decimal numbers to a facility or a production line within a facility. This was a conventional methodology employed at the time for sequential allocation of batches of serial numbers from a central allocation authority. *RFID for Dummies* makes no mention of using most significant bits to allocate a block of serial numbers.

155.    Selecting and assigning a range of a series of decimal numbers is not the same and in no way discloses or suggests assigning an allocated block based on a limited number of most significant bits. In *RFID for Dummies*, the decimal serial number would be converted from decimal to binary for encoding on an RFID tag. The only consideration of the binary numbers is

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

the conversion from the decimal representation.  There is no disclosure of defining or allocating block based on a limited number of most significant bits.

156.    Correspondingly, because no most significant bits were used to create the block of serial numbers, *RFID for Dummies* also in no way discloses that a serial number instance was selected from an allocated block that was specifically assigned based on a limited number of most significant bits, or the most significant bits of the serial number uniquely correspond to the most significant bits of the allocated block.

157.    Sweeney does not contend that the EPCglobal's EPC Generation 1 Tag Data Standards Version 1.1 Rev. 1.27 teaches, suggests, or discloses any limitation of either of claim 1 or claim 13 of the '967 Patent in support of his obviousness opinions.  In my opinion, the EPCglobal EPC Generation 1 Tag Data Standards Version 1.1 Rev. 1.27 does not teach or suggest at least the limitations that "the allocated block being assigned a limited number of most significant bits" or "the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block" which are required by each challenged claim of the '967 Patent.

158.    Sweeney has not articulated any motivation or suggestion that one of ordinary skill in the art would have had to modify this decimal number assignment system in *RFID for Dummies* to instead utilize a binary system to assign the serial numbers or to use most significant bits to create blocks of serial numbers.

159.    For at least the reasons discussed above, it is my opinion that *RFID for Dummies* does not anticipate or render obvious independent claims 1 or 13 of the '967 Patent.  Nor does the proffered combination of *RFID for Dummies* and EPCglobal's EPC Generation 1 Tag Data

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

Standards Version 1.1 Rev. 1.27 anticipate or render obvious independent claims 1 or 13 of the '967 Patent.

160.    Because the dependent claims include the limitations of the independent claims, the dependent claims 2-6 and 14 of the '967 Patent are likewise not anticipated or rendered obvious for the same reasons as independent claims 1 and 13.

### C.  Kuhno Patent (U.S. Patent 7,857,221)

161.    In my opinion, Kuhno (U.S. Patent No. 7,857,221) does not teach, suggest, or disclose all limitations of the challenged claims and therefore cannot anticipate them.

162.    More specifically, Kuhno does not teach or suggest "wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space" as required by all of the challenged claims of the '967 Patent.  Instead, Kuhno is directed to systems for gathering and storing information corresponding to shipping pallets, cartons, and the like.  Exh. M at 6:5-11. The systems disclosed scan a printed label on a carton which may contain UPC, SKU, or other indicia, then create or add the information to a database of records corresponding to an identifier number assigned to the pallet or carton.  Exh. M at 6:27-7:3.  RFID tags are then encoded with information such as a serial number for a carton or pallet and affixed thereto.  The RFID tags may be include additional data, but Kuhno does not disclose any particular format or data structure for such an encoding that may include data beyond a serial number.  Exh. M at 5:22-29; 6:27-7:3.  In fact, Kuhno states that "[t]he format and configuration of the RFID Printer Data depends on the requirements of the RFID printer and the protocols related to the barcode and RFID tag *and are therefore not discussed herein*."  Exh. M at 6:66-7:3 (emphasis added).  Kuhno therefore does not

Appx3554

provide a unique object number for individual objects of an object class for item-level encoding, as would be the case with an EPC.

163.    For at least these same reasons, Kuhno also does not teach, suggest, or disclose that "the allocated block being assigned a limited number of most significant bits" or "the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block" as required by the challenged claims of the '967 Patent.  Kuhno discloses only that an individual serial number is assigned to a carton or pallet.  The serial numbers are assigned in decimal format.  Selecting a series of decimal numbers is not the same as assigning an allocated block based on a limited number of most significant bits.

164.    For example, consider a system with 11 bits available to encode values for 2000 different numbers divided evenly into two blocks of decimal values that are to be stored in these 11 bits. Consider a first block of decimal values ranging from 1 to 1000 (Block A) and a second block of decimal values ranging from 1001 to 2000 (Block B).  All decimal values in Block A require 10 or fewer bits to represent the decimal number.  However, decimal values in Block B require either 10 or 11 bits to represent the decimal number.  Decimal values 1001 through 1023 require only 10 bits to be represented in binary format while decimal values 1024 through 2000 require 11 bits to be represented in binary format. When storing binary values that are smaller than the available number of bits, it is common to prepend binary zero bits to the binary encoded number (i.e., make the most significant bits equal to binary zero)  so that the entire representation utilizes a fixed number of bits (11 in our example). Because the binary representation of the 1000 values in Block B require either 10 or 11 bits to represent in binary format, we cannot allocate the most significant bit (denoted as bit 11 when counting bits beginning from 1 or bit 10 when counting bits beginning from 0) to a fixed value to differentiate between Block A and Block B.  If we assign a

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

**Page 62 of 65**

Appx3555

fixed value of 0 to the MSB for Block A and a fixed value of 1 to the MSB for Block B, we are unable to encode the values 1000 through 1023 for Block B since the binary representation of these numbers using 11 bits requires the MSB to be 0. As this example illustrates, assigning decimal values to blocks is not equivalent to allocating blocks with a limited number of most significant bits.

165.    In Kuhno, a number of decimal numbers are selected and concatenated together (e.g., calendar date, production line number, a serial number value selected from a preassigned range of decimal numbers) to form an overall decimal serial number.  The overall decimal serial number is then converted from decimal to binary for encoding on an RFID tag.  The only consideration of the binary numbers is the conversion from the decimal representation.  Even if the decimal numbers have a fixed number of decimal digits for each portion of the number and are arranged in a fixed order, the resulting binary number does not maintain a fixed allocation of bits (either in position or in size) for each decimal portion.

166.    Assigning a serial number composed of concatenated decimal numbers in no way discloses or suggests assigning an allocated block based on a limited number of most significant bits.  No allocated block of serial numbers is created in Kuhno.  No set of most significant bits are assigned in Kuhno to define an allocated block.  Kuhno simply creates individual serial numbers using specific information for each carton or pallet.

167.    Correspondingly, because no block of serial numbers is created or allocated, Kuhno also in no way discloses that a serial number instance was selected from an allocated block that was specifically assigned based on a limited number of most significant bits, or the most significant bits of the serial number uniquely correspond to the most significant bits of the allocated block.

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

**Page 63 of 65**

Appx3556

# EXHIBIT "K"

# EXPERT REPORT OF PATRICK J. SWEENEY II

*Adasa, Inc.*,
Plaintiff,
v.
*Avery Dennison Corporation*,
Defendant.

U.S. District Court
District of Oregon
Case No.: 6:17-cv-01685

**Report Date:**
January 9, 2020

**Prepared For:**
Schwabe, Williamson & Wyatt, P.C.
1211 SW 5th Avenue.
Suites 1600-1900
Portland, OR  97204

**Prepared By:**
Patrick J. Sweeney II
51 Springs Rd
Bedford, MA 01730

Appx3811

42. As Dr. Engels explained, the Auto-ID Center adopted idea behind the UPC of partitioning the EPC into segments and employing a hierarchical allocation scheme because that was necessary in order for the system to be scalable. If the number were not partitioned, in order to ensure uniqueness "one entity [] has to assign every unique identifier in the world, and that becomes very hard to scale up." *Id.* at 19:21.

43. The structure they settled on for the EPC is depicted here:



44. In developing the EPC, the Auto-ID Center looked at other numbering systems. *Id.* 57: 6-10; 57:23-58:5 ("Lot to be learned by looking at what's been done successfully, so don't try and re-invent the wheel if it's already been invented."). They found that partitioning numbers into segments and employing hierarchical allocation schemes were near-universal approaches to the problem of ensuring uniqueness. This is true of MAC addresses (45:17-46:9), domain name systems (47:1-22), and phone numbers (65:11-19). It is also true of IP addresses (46:13-25):



Appx3822

45.    The Auto-ID Center also looked to license plate numbers, which are partitioned.

(62:22-63:4).  They looked at vehicle identification numbers, which are partitioned. (63:5-9).



Figure 2. The Vehicle Identification Numbers (VIN) identify vehicles and provide a condensed vehicle description.

46.    They considered social security numbers, which are partitioned. (63:10-14).



Figure 3. The Social Security Numbers are used in the United States for personal identification.

47.    They considered ISBN numbers, which are partitioned. (63:15-64:22).



Figure 4. The International Standard Book Number (ISBN) uniquely identifies the publication.

13

Appx3823

48.   They looked at zip codes, which are partitioned. (65:5-10).



Figure 5. The ZIP + 4 code appends four digits to the traditional ZIP code.

49.   These examples are all listed, depicted, and cited in a whitepaper authored by David Brock and published by the Auto-ID Center entitled "The Electronic Product Code (EPC): A Naming Scheme for Physical Objects."  This paper was published in 2001.

50.   One could add to this list routing numbers on checks, which are partitioned into routing number, account number, and check number. https://www.nationwide.com/lc/resources/personal-finance/articles/routing-and-account-numbers Credit card numbers are partitioned as well to identify the major industry, the issuer of the card, and the bank.  https://www.discover.com/credit-cards/resources/what-is-a-credit-card-number/

51.   As these examples and Dr. Engels' testimony illustrate, partitioning a number into segments and allocating those segments hierarchically are ideas which are employed virtually every time a numbering system is designed, particularly one which must be both decentralized and scalable.

52.   Following the development of the EPC at MIT, the organization EPCglobal was established to achieve worldwide adoption and standardization of the Electronic Product Code. EPCglobal has established standards and guidelines that govern the encoding of RFID transponders, including but not limited to GS1's Tag Data Standard.  The SGTIN96 scheme was

14

implement the numbering scheme described in that application, he or she would have absolutely no idea what he or she was being asked to do.

55.    The paragraph's reference to "most significant bits" would not be informative to one of ordinary skill in the art, as that term does not have a commonly understood meaning in the field of RFID, and it is not defined in the specification of this application. As I researched material from the 2002-2010 timeframe I looked for reference to "most significant bits" and found none in the available literature or working papers from industry meetings. Even assuming that this term refers to leading bits, this concept is relative—the leading bits in what field or of what number? -- and the specification does not further define it. In other words, one of ordinary skill in the art would not understand what the "most significant bits" are at the leading end of— the EPC, or some defined segment of the EPC. I do not understand how large blocks of pre-authorized blocks of serial numbers could be provided by subdividing the entire object class serial number space into sectors, and I do not believe that one of ordinary skill in the art would understand that either. The application provides no explanation. In short, I do not believe that this application provides written description support for the following claim limitations:

> wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and

> wherein the unique serial number space comprises the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block and remaining bits of lesser significance that together comprise the one serial number instance.

> wherein the unique serial number space has one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and

> wherein the unique serial number space comprises at least 3 most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block.

16

Appx3826

objective indicial of nonobviousness alters my conclusion that the claimed invention is obvious. Should ADASA offer some evidence of any objective indicia as listed above, I reserve the right to revisit this opinion.

### C.      RFID for Dummies

88.      It is further my opinion that claim 1 is anticipated by *RFID for Dummies,* and claims 2-6 and 13-14 are obvious in view of *RFID for Dummies* and the EPCglobal's EPC Generation 1 Tag Data Standards Version 1.1 Rev. 1.27, which was published on May 10, 2005. This Tag Data Standard contains a definition of the SGTIN-96 data structure. *RFID for Dummies* was published in 2005. Accordingly, both references are prior art to all claims of the '967 patent even if they were entitled to a priority date in 2008, although I believe they are not for the reasons stated above.

89.      In *RFID for Dummies*, I described segmentation of the serial number space to define a limited number of most significant bits assigned to allocated blocks of serial numbers as a decentralized, hierarchical approach to allocating serial numbers specifically for use when a central server could not be used to manage serialization. While I do not specifically disclose the use of this method with transponders encoded in accordance with the SGTIN-96 data structure, the serialization method I described is no less applicable for use with transponders encoded in accordance with the SGTIN-96 data structure than with any other serialized data structure. Doing so would involve the use of the serialization method I describe as I described it, along with the SGTIN-96 data structure as it was intended to be used.

90.      *RFID for Dummies* and the Tag Data Standard's disclosure of the SGTIN-96 data structure teach each and every limitation of the asserted claims, as is summarized in the table below:

30

Appx3840

| | |
|---|---|
| 1. An RFID transponder comprising:<br><br>    a substrate;<br><br>    an antenna structure formed on the substrate; and<br><br>    an RFID integrated circuit chip which is electrically coupled to the antenna structure,<br><br>    wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space,<br><br>    wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and<br><br>    wherein the unique serial number space comprises the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block and remaining bits of lesser significance that together comprise the one serial number instance. | P. 89 states that a passive tag consists of three components: an integrated circuit or chip, an antenna, and the substrate. Pages 90-91 contain additional disclosure regarding how the antenna is electrically coupled to the integrated circuit chip.<br><br>The components of an EPC, specifically an object class information space and a serial number space, are disclosed on page 46.<br><br>p. 12: "Serialized data means that each item has its own unique identifier or serial number."<br><br>pp. 239-240: "An always-accessible central numbering authority isn't practical for many companies. These companies can use an intelligent hierarchy imposed on the serial number allocation to decentralize and make feasible the allocation of unique serial numbers across all manufacturing lines.<br><br>Here's an example of a decentralized, hierarchical approach to allocating serial numbers. A range of serial numbers for each product is allocated to each manufacturing facility. Within a facility, a range of numbers from those allocated to the facility is allocated to each line producing a particular product. In this way, the serial number is effectively subdivided into a facility number, line number, and subserial number, in which the allocation hierarchy is maintained between facility number and line number." |
| 2. The RFID transponder of claim 1, wherein the object class information space is encoded with information comprising a company prefix, an item reference, a partition value, and a filter value. | The components of an EPC, specifically an object class information space and a serial number space, are disclosed on page 46. EPC Global Tag Data Standard at pp. 26-27, which defines the SGTIN-96 data structure. |
| 3. The RFID transponder of claim 1, wherein the unique object number is a portion of a serialized global trade item number. | EPC Global Tag Data Standard at pp. 26-27, which defines the SGTIN-96 data structure. |

Appx3841

| | |
|---|---|
| 4. The RFID transponder of claim 3, wherein the serialized global trade item number is an EPC SGTIN-96 encoding. | EPC Global Tag Data Standard at pp. 26-27, which defines the SGTIN-96 data structure. |
| 5. The RFID transponder of claim 1, wherein the unique serial number space is at least 38 bits. | EPC Global Tag Data Standard at pp. 26-27, which defines the SGTIN-96 data structure. |
| 6. The RFID transponder of claim 1, wherein the allocated block is defined by at least 3 most significant bits. | Inherently disclosed or obvious in view of pp. 239-240, as any number in excess of 3 requires three or more bits. |
| 13. A RFID transponder comprising:<br><br>a substrate;<br><br>an antenna structure formed on the substrate; and<br><br>an RFID integrated circuit chip which is electrically coupled to the antenna structure,<br><br>wherein the RFID integrated circuit chip is encoded with a global trade item number including a unique object number, the unique object number comprising an object class information space including a block of at least 50 bits and a unique serial number space including a block of at least 38 bits,<br><br>wherein the unique serial number space has one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and<br><br>wherein the unique serial number space comprises at least 3 most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block. | P. 89 states that a passive tag consists of three components: an integrated circuit or chip, an antenna, and the substrate. Pages 90-91 contain additional disclosure regarding how the antenna is electrically coupled to the integrated circuit chip.<br><br>The components of an EPC, specifically an object class information space and a serial number space, are disclosed on page 46.<br><br>pp. 239-240: "An always-accessible central numbering authority isn't practical for many companies. These companies can use an intelligent heirarchy imposed on the serial number allocation to decentralize and make feasible the allocation of unique serial numbers across all manufacturing lines.<br><br>Here's an example of a decentralized, hierachical approach to allocating serial numbers. A range of serial numbers for each product is allocated to each manufacturing facility. Within a facility, a range of numbers from those allocated to the facility is allocated to each line producing a particular product. In this way, the serial number is effectively subdivided into a facility number, line number, and subserial number, in which the allocation hierarchy is maintained between facility number and line number." |
| 14. The RFID transponder of claim 13, wherein the unique serial number space | Inherent in or obvious in view of above disclosure. |

32

Appx3842

| further comprises remaining bits of lesser significance that together with the at least 3 most significant bits comprise the one serial number instance. | |
| --- | --- |

91. It would have been well within the capability of one of ordinary skill in the art to use the serialization method I proposed to encode transponders in accordance with the SGTIN-96 data structure. One of ordinary skill in the art would have had reason to combine the serialization method I proposed whenever performing distributed serialization of transponders for consumer goods, in accordance with the SGTIN-96 data structure. My opinion regarding objective indicia of nonobviousness applies with equal force here. Accordingly, it is my opinion that all asserted claims are invalid over *RFID for Dummies* alone or in combination with the SGTIN-96 tag data standard.

### D.    Kuhno

92. It is further my opinion that all of the asserted claims are invalid because each and every limitation in these claims is disclosed in Kuhno, et al., U.S. Pat. No. 7,857,221. The table below lists where in the Kuhno disclosure each and every limitation can be found:

| 1. An RFID transponder comprising:<br><br>a substrate;<br><br>an antenna structure formed on the substrate; and<br><br>an RFID integrated circuit chip which is electrically coupled to the antenna structure,<br><br>wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space, | 5:12-19: "the terms "RFID tag" and "RFID label" refer to a programmable/encodable radio frequency device and antenna attached to a substrate so that the device and antenna can be secured to a desired object such as a carton."<br><br>One of ordinary skill in the art would understand that the RFID tags disclosed necessarily comprise RFID integrated circuit chips electrically coupled to the antenna structure, and that this is inherently disclosed<br><br>in the references to encoding RFID tags, e.g., 5:4. |
| --- | --- |

33

Appx3843

| | |
|---|---|
| 　　　wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and<br><br>　　　wherein the unique serial number space comprises the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block and remaining bits of lesser significance that together comprise the one serial number instance. | "RFID printer 20 formats and prints a barcode containing information specific to the cartons and pallets on which the label will be placed and, at the same time, encodes the embedded RFID tag with the same, and optionally, additional information." 5:25-29.<br><br>"Serial Number Setup defines the characteristics of the carton and pallet serial numbers. As described herein, the system application applies a unique serial number to each carton and each pallet." 14:20-23.<br><br>**Serial numbers are assigned in allocated blocks:**<br>"The system assigns serial numbers to pallets in a manner similar to cartons, and the Pallet Number, Serial Number Range Starting and Serial Number Range Ending variables operate similarly to the procedure discussed above with respect to the corresponding carton variables." 16:27-34.<br><br>**The encoded unique serial number comprises a limited number of most significant bits that uniquely corresponds to a limited number of most significant bits assigned to the allocated block. Specifically, the patent discloses assigning a unique number to a pallet, and incorporating that pallet number into unique serial number assigned to each carton on that pallet:**<br><br>"Serial Number Setup defines characteristics of the carton and pallet serial numbers. As described herein, the system application applies a unique number to each carton and each pallet. Preferably, the application maintains these numbers and increments the applicable number for each sequential carton and pallet. In one preferred embodiment, the carton serial number may include several components desired, for example including the Julian calendar date, the production line |

34

Appx3844

| | |
|---|---|
| | number and the carton number (described below)." 14:20-28.

"Carton information can be defined in screen 362 for a given production line as identified in Line Number textbox 366 The system application defines a serial number for each carton that is the combination of a predetermined number (discussed above), production line number 366 and an end portion within a range defined within Serial Number Range Starting and Ending values entered by user at textboxes 394 and 396." 16:7-13. |
| 2. The RFID transponder of claim 1, wherein the object class information space is encoded with information comprising a company prefix, an item reference, a partition value, and a filter value. | The patent discloses the use of a UPC barcode to generate object class information. Additionally, the patent discloses the encoding of tags for the SGTIN EPC type. 23:40-44. |
| 3. The RFID transponder of claim 1, wherein the unique object number is a portion of a serialized global trade item number. | The patent discloses the encoding of tags for the SGTIN EPC type. 23:40-44. |
| 4. The RFID transponder of claim 3, wherein the serialized global trade item number is an EPC SGTIN-96 encoding. | The patent discloses the encoding of tags for the SGTIN EPC type. 23:40-44. The patent also discloses the use of 96-bit tags. 15:67. |
| 5. The RFID transponder of claim 1, wherein the unique serial number space is at least 38 bits. | The patent discloses the encoding of tags for the SGTIN EPC type. 23:40-44. The patent also discloses the use of 96-bit tags. 15:67. |
| 6. The RFID transponder of claim 1, wherein the allocated block is defined by at least 3 most significant bits. | The patent discloses pallet serial numbers from 1 to 99999 in decimal. Numbers 3 through 99999 are more than three binary bits. Fig. 20A. |
| 13. A RFID transponder comprising:

        a substrate;

        an antenna structure formed on the substrate; and | 5:12-19: "the terms "RFID tag" and "RFID label" refer to a programmable/encodable radio frequency device and antenna attached to a substrate so that the device and antenna can be secured to a desired object such as a carton."

One of ordinary skill in the art would understand that the RFID tags disclosed |

35

Appx3845

| | |
|---|---|
| an RFID integrated circuit chip which is electrically coupled to the antenna structure, | necessarily comprise RFID integrated circuit chips electrically coupled to the antenna structure, and that this is inherently disclosed in the references to encoding RFID tags, e.g., 5:4. |
| wherein the RFID integrated circuit chip is encoded with a global trade item number including a unique object number, the unique object number comprising an object class information space including a block of at least 50 bits and a unique serial number space including a block of at least 38 bits, | The patent discloses the encoding of tags for the SGTIN EPC type.  23:40-44.  The patent also discloses the use of 96-bit tags.  15:67.  "RFID printer 20 formats and prints a barcode containing information specific to the cartons and pallets on which the label will be placed and, at the same time, encodes the embedded RFID tag with the same, and optionally, additional information."  5:25-29. |
| wherein the unique serial number space has one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and | "Serial Number Setup defines the characteristics of the carton and pallet serial numbers.  As described herein, the system application applies a unique serial number to each carton and each pallet."  14:20-23. |
| wherein the unique serial number space comprises at least 3 most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block. | **Serial numbers are assigned in allocated blocks:**<br>"The system assigns serial numbers to pallets in a manner similar to cartons, and the Pallet Number, Serial Number Range Starting and Serial Number Range Ending variables operate similarly to the procedure discussed above with respect to the corresponding carton variables."  16:27-34. |
| | **The encoded unique serial number comprises a limited number of most significant bits that uniquely corresponds to a limited number of most significant bits assigned to the allocated block. Specifically, the patent discloses assigning a unique number to a pallet, and incorporating that pallet number into unique serial number assigned to each carton on that pallet:** |
| | "Serial Number Setup defines characteristics of the carton and pallet serial numbers.  As |

36

| | |
|---|---|
| | described herein, the system application applies a unique number to each carton and each pallet.  Preferably, the application maintains these numbers and increments the applicable number for each sequential carton and pallet.  In one preferred embodiment, the carton serial number may include several components desired, for example including the Julian calendar date, the production line number and the carton number (described below)."  14:20-28.<br><br>"Carton information can be defined in screen 362 for a given production line as identified in Line Number textbox 366  The system application defines a serial number for each carton that is the combination of a predetermined number (discussed above), production line number 366 and an end portion within a range defined within Serial Number Range Starting and Ending values entered by user at textboxes 394 and 396."  16:7-13 |
| 14. The RFID transponder of claim 13, wherein the unique serial number space further comprises remaining bits of lesser significance that together with the at least 3 most significant bits comprise the one serial number instance. | "Carton information can be defined in screen 362 for a given production line as identified in Line Number textbox 366  The system application defines a serial number for each carton that is the combination of a predetermined number (discussed above), production line number 366 and an end portion within a range defined within Serial Number Range Starting and Ending values entered by user at textboxes 394 and 396."  16:7-13 |

E.     **LeSportSac Tags**

93.     Finally, it is further my opinion that the asserted claims are invalid over

transponders encoded for LeSportSac, which were offered for sale prior to February of 2009 and

encoded in March of 2009, more than one year prior to June, 2010, which is the earliest possible

priority date to which the '967 patent claims are entitled.  Claim 1 is anticipated by these

transponders, and the remaining claims are obvious because it would have been obvious to one

37

Appx3847

## APPENDIX C

**Excerpt from *RFID for Dummies***

Appx3867



Case: 22-1092    Document: 17-1    Page: 376    Filed: 04/01/2022
Case 6:17-cv-01685-MK    Document 168-17    Filed 05/14/20    Page 68 of 69

The general identifier of the electronic product code (EPC) is a good example: The general identifier EPC comprises three numbers whose combination uniquely identifies an item. Those three numbers are the manufacturer number, the product number, and the serial number. EPCglobal, the manager of the general identifier EPC, assigns a unique manufacturer number (also called an EPC Manager Number) to each of its member organizations. Each member organization is free to assign a product number (also called an Object Class) to each of that member's products. Similarly, each member is free to assign a serial number to each item manufactured by that member. Here's how you might take advantage of this hierarchy to uniquely identify an item:

- ✓ **Assign the same product number to all products with the same properties.** Thus, all 16-ounce blue bottles of Fabulous Fiber are assigned the same product number. All 24-ounce bottles are allocated a different product number. This is the basic approach used today by most product manufacturers.

- ✓ **Assign each item in a product line a unique serial number.** In this way, you can distinguish one 16-ounce blue bottle of Fabulous Fiber from another bottle just like it.

  Serial numbers are new to the fast-moving consumer goods market, but they have been in wide use in the electronics, automotive, and aerospace industries, among others, for a very long time.

## *Allocating unique numbers across many lines and locations*

Because all products of the same type receive the same product number, the serial numbers must be maintained in order to enable unique item identification. When a product is manufactured on exactly one production line at exactly one location, assigning unique serial numbers to every item manufactured is straightforward. A central numbering allocation authority may be used. Difficulties arise when multiple lines, potentially at multiple locations, are used to manufacture the same product.

When multiple manufacturing lines are used to manufacture the same product, a centralized numbering authority is more difficult to manage. The centralized authority must be consulted every time an item is produced, requiring that it be accessible over the network whenever production runs are in process. A centralized authority that is always reachable and is able to assign numbers at production speeds can efficiently use the numbering space. Additionally, careful details must also be maintained about which line an item was produced on.



An always-accessible central numbering authority isn't practical for many companies. These companies can use an intelligent hierarchy imposed on the serial number allocation to decentralize and make feasible the allocation of unique serial numbers across all manufacturing lines.

Appx3877

*240*    **Part IV: Raising the Beams for Your Network** _____

Here's a simple example of a decentralized, hierarchical approach to allocating serial numbers. A range of serial numbers for each product is allocated to each manufacturing facility. Within a facility, a range of numbers from those allocated to the facility is allocated to each line producing a particular product. In this way, the serial number is effectively subdivided into a facility number, line number, and subserial number, in which the allocation hierarchy is maintained between facility number and line number.



Remember to assign a line number for hand-applied tags that replace damaged or nonfunctioning tags. You need to look at your business processes to determine the best way to incorporate this.

# Applying Tags to Objects

Eventually, all tags will be placed on products automatically, either on the packaging prior to receiving it or on-line within your facility. Until then, tags need to be manually placed on items.



When you apply tags to objects (or train staff to do so), you need to keep two important factors in mind:

✓ **Be sure you handle tags in a way that doesn't put stress on the tag's connections and parts.** Broken tags don't communicate well (if at all) and thus make your system less effective. See the sidebar, "Armor-plated tags," for details on emerging solutions to these vulnerabilities.

✓ **Place the tag in the optimal spot on the object.** During your testing (see Part III), you determine where the tag antenna can best couple (communicate) with the reader antenna. Some of the early adopters have already started printing tag outlines on their case boxes so that workers applying them know exactly where the tag goes and what the correct orientation is.

The following sections explain how you can work around these two factors as you apply the tags.

## Applying tags without breaking them

Manually manipulating tags always has the potential hazard of physically damaging them. You can minimize the physical stress placed upon the tags by always following these steps when applying tags by hand:

1. **Place the label face down on a flat surface with the backing paper face up; the face of the label is therefore down on the table or flat surface.**

2. **Peel the backing paper away from the label while keeping the label flat on the surface.**

# EXHIBIT "M"

Appx3889



US007857221B2

(12) **United States Patent**
Kuhno et al.

(10) **Patent No.:** **US 7,857,221 B2**
(45) **Date of Patent:** **Dec. 28, 2010**

(54) **RFID TAG SYSTEM**

(75) Inventors: **Michael J. Kuhno**, Allentown, PA (US); **Troy R. Herman**, Barto, PA (US); **Anthony M. DiMauro**, West Conshohocken, PA (US); **James N. Cox**, Green Lane, PA (US)

(73) Assignee: **Accu-Sort Systems, Inc.**, Telford, PA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1096 days.

(21) Appl. No.: **11/496,101**

(22) Filed: **Jul. 28, 2006**

(65) **Prior Publication Data**

US 2007/0057050 A1       Mar. 15, 2007

**Related U.S. Application Data**

(60) Provisional application No. 60/703,539, filed on Jul. 29, 2005.

(51) **Int. Cl.**
*G06K 7/10* (2006.01)
*G06K 9/36* (2006.01)
*G06K 9/80* (2006.01)

(52) **U.S. Cl.** ................ **235/462.1**; 235/375; 235/472.02

(58) **Field of Classification Search** ............ 235/462.01, 235/454, 375, 472.01, 462.45, 487, 462.14
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,550,745 A | 8/1996 | Wurz | |
| 5,705,021 A | 1/1998 | Wurz et al. | |
| 5,750,004 A | 5/1998 | Wurz et al. | |
| 5,940,305 A | 8/1999 | Wurz | |
| 5,954,913 A | 9/1999 | Wurz et al. | |
| 2005/0007252 A1 | 1/2005 | Arneson et al. | |
| 2005/0231370 A1* | 10/2005 | Tagato | 340/572.1 |
| 2005/0252596 A1* | 11/2005 | Olsen et al. | 156/64 |

* cited by examiner

*Primary Examiner*—Edwyn Labaze
(74) *Attorney, Agent, or Firm*—Nelson Mullins Riley & Scarborough, LLP

(57) **ABSTRACT**

A system for applying radio frequency identification tags on which are disposed respective barcodes includes a processor and a plurality of representations of the items accessible by the processor. Each representation is associated with at least one of the barcodes and includes an indication of a predetermined position for placement of the radio frequency identification tag on an item corresponding to the barcode. A barcode reader and a display are in communication with the processor. When the barcode reader detects a first barcode on a first item, the barcode reader outputs a first signal to the processor identifying the first barcode. The processor receives the first signal, identifies a first representation that is associated with the first barcode, and outputs to the display a second signal associated with the first representation. The display receives the second signal associated with the first representation and displays the first representation.

**25 Claims, 65 Drawing Sheets**





Appx3890

US 7,857,221 B2

**5**

includes a battery system integrated into cart **24**, cart **24** and battery system **30** do not have to be so combined and may be separate components.

RFID printers, which encode RFID devices disposed on respective tags as the tags are dispensed from a feed roll, should also be understood in this art, and any suitable RFID printer may be used, e.g. the MONARCH 9855 RFID printer also available from Paxar Corporation. It should also be understood that while an RFID printer may print alphanumeric and/or barcode characters on a label carrying the encoded RFID tag, the phrase "RFID printer" may encompass a device that encodes RFID tags without printing either or both of alphanumeric and barcode characters on the tag and that RFID tags dispensed from an RFID printer need not be disposed on printable label stock. It should also be understood that the terms "RFID tag" and "RFID label" refer to a programmable/encodable radio frequency device and antenna attached to a substrate so that the device and antenna can be secured to a desired object such as a carton. "Label" refers generally to a substrate capable of attachment to a carton or pallet and upon which information regarding the carton or pallet is disposed through a barcode, an RFID tag, or both. In the presently described embodiment, RFID printer **20** uses printable label stock that contains an embedded RFID tag. RFID printer **20** formats and prints a barcode containing information specific to the cartons and pallets on which the label will be placed and, at the same time, encodes the embedded RFID tag with the same and, optionally, additional information. In addition, handheld barcode scanners should be well understood in this art, and any suitable scanner may be used, for example the SYMBOL PHASER available from Symbol Technologies Corporation of Holtsville, N.Y.

In another embodiment, multiple scanners and RFID printers may be connected to computer **12**. As discussed below, an option of the system allows a user to "verify" a barcode label after it is attached to a carton by performing a barcode verification scan. A user may employ a second or additional scanner to perform this verification without impeding the scanning of product codes for which the primary scanner is used. Connecting additional RFID printers allows the system to simultaneously print carton and pallet label/tags.

Referring to FIG. **3A**, in the presently described embodiment, computer **12** is a personal ("PC") or industrial computer and includes a PENTIUM equivalent processor running the WINDOWS 2000 operating system. Touch screen **14** may overlay the PC monitor screen and is preferably secured in the same housing **13** as the monitor and processor. Keyboard **16**, mouse **18**, RFID printer **20** and scanner **22** are connected to the processor through housing **13**. The construction and operation of personal and industrial computers and touch screens should be well understood and are therefore not described in more detail herein. While PC **12** and touch screen **14** are disposed in common housing **13** in the presently described embodiment, PC **12** and touch screen **14** may also be separate components. Furthermore, it should also be understood that mobile unit **10** employs touch screen **14** in order to facilitate input by a user. In another embodiment, however, the touch screen overlay is omitted, so that the user views information and options at a cathode ray tube ("CRT") screen, or other type of screen, and interacts with the system via keyboard **16**, mouse **18** and barcode scanner **22**. In these alternative embodiments, CRT monitor **14**, keyboard **16**, mouse **18**, RFID printer **20** and scanner **22** are also operatively connected to PC **12**.

An application running on PC **12** and written under the MICROSOFT VISUAL STUDIO suite in the MS VISUAL BASIC language controls the mobile RFID labeling system,

**6**

as described in more detail below. It should be understood that the application can be written in any suitable language and operate on any suitable operating system on any processing machine capable of communicating with the input devices and RFID printer as described above. Referring to FIG. **3B**, data and information relating to products, cartons and pallets are stored in database **54**. Other data and information used by the application, such as settings, user identities, label formats, label graphics and application events, are stored in a database **52**, a registry **48**, and files **50**. Referring again to FIG. **3A**, battery system **30** provides AC power to PC **12**, RFID printer **20** and scanner **22** from AC power line input **31** via a surge protector **38** or, alternatively, from a battery and a DC/AC converter **36**. PC **12** receives information from mouse **18**, keyboard **16** and barcode scanner **22** over communication lines **44**, **46** and **42**, respectively, and outputs data to RFID printer **20** over communication line **40**. PC **12** is also connected to battery system **30** via connection line **41**. Battery system **30** transmits a message to the user via PC **12** when battery system **30** is low on power. Optionally, battery system **30** can also shut down PC **12** when available power drops below a predetermined level. The interaction between computers and battery systems, which should be well-known in the art, is generally controlled by a computer's operating system.

Referring again to FIGS. **2A** and **2B**, mobile unit **10** is used to identify information relating to a product and, in response, print a detailed barcode label that includes an embedded RFID tag to be placed on the carton containing the product or products. As described above, when a product or products are initially packaged into cartons, a barcode label containing minimal information, such as identification of the manufacturer and a product code in the product's UPC, is affixed to the carton, such as a barcode label **34** on carton **32**. Additionally, the manufacturer may palletize the cartons.

A retailer or wholesaler may send data to the manufacturer to be included within each label affixed to cartons and pallets of a given product the manufacturer will send to that retailer/wholesaler. The content of the retailer/wholesaler information may depend on the specific needs of the retailer/wholesaler and may be product specific. Such information, optionally along with information relevant to the product or the label that is provided by the manufacturer and/or generated by system **10** as described below (collectively "Product Label Information"), is stored in a Product table **56** within database **54** (FIG. **3B**) in association with the product's unique UPC product code. It should be understood, however, that a unique product identifier other than the UPC product code could be used.

When a carton, such as a carton **32**, is brought to mobile unit **10** manually or via conveyor, an operator of station **10** scans the carton's initial barcode label **34** using barcode scanner **22**. The system application receives the scanner data, derives the product's product code from the UPC data contained in barcode **34**, associates the product code with the Product Label Information stored in Product table **56**, and converts some or all of the associated Product Label Information to data ("RFID Printer Data") configured to drive RFID printer **20**. The application then outputs the RFID Printer Data to RFID printer **20**, which in turn (a) prints a label with a barcode embodying the RFID Printer Data and (b) encodes an RFID tag in the label with the RFID Printer Data. The operator retrieves the printed label, such as a label **28**, from RFID printer **20** and affixes the label to the carton. The format and configuration of the RFID Printer Data depends

Appx3958

US 7,857,221 B2

7

on the requirements of the RFID printer and the protocols related to the barcode and RFID tag and are therefore not discussed herein.

Referring again to FIG. 3B, when the system scans a carton and prints a corresponding label, the system application adds a row to a Carton table **58** within database **54**. The entry is specific to the newly scanned and labeled carton and includes the product code (or other unique carton identifier) identifying the carton's contents, the RFID Printer Data included in the label, a production date and a unique carton identifier. The production date is a date associated with the carton and preferably may be the actual date the carton's label is printed, as defined by a clock maintained by computer **12**. Alternatively, and as described in more detail below, the production date may be predefined, e.g. as the day a predefined group of cartons begins processing through station **10**. Thus, even if more than one day is required to process the entire group, the initial date is the production date for all cartons in the group. The carton identifier is a serial number generated by the system application that is unique to each carton. Preferably the system application increments the carton identifier with each carton so that successive cartons have sequential carton identifiers. The production date and the carton identifier may be included in the RFID Printer Data comprising the associated label's printed barcode and encoded RFID information. Preferably, the carton identifier is printed in alphanumeric characters on the RFID label so as to be visible on the label when it is attached to the carton.

System **10** may also be configured to track cartons as they relate to pallets. If cartons are palletized prior to being presented to station **10**, the cartons are removed from their pallet and processed through station **10**, as described above, in the same manner as non-palletized cartons. As with non-palletized cartons, the system application creates an entry in Carton table **58** for each of the palletized cartons, but when palletizing is enabled, a pallet identification is also included in the Carton table entry for that carton. When the pallet opens, the application adds a row to a Pallet table **60** that is specific to the present pallet. Each entry includes an identifier unique to the pallet to which a given group of cartons belongs and the number of cartons that have been scanned and labeled by system **10** under the present pallet number. When the pallet closes, in a manner as discussed below, the application updates Pallet table **60** and instructs RFID printer **20** to produce a label with barcode and/or RFID information corresponding to desired information stored in Pallet table **60** for the present pallet identifier. After processing through station **10**, the cartons are re-palletized.

The entire group of cartons and pallets to be scanned and labeled by one station, such as mobile unit **10**, is referred to as a "production line." All of the combined production lines to be scanned and labeled during a given time period, regardless of the number of stations to be used, is referred to as a "production run." When mobile unit **10** operates independently and is the only station used to scan and print labels, the "production run" and "production line" are equivalent.

Where a given carton contains products that may interfere with reading of an RFID tag, the Product Label information associated with the corresponding product code in Product table **56** preferably includes an image of the carton that indicates a preferred placement of the label on the carton to reduce, minimize or eliminate such interference. Simultaneously with driving RFID printer **20** to produce the label, the system application displays the image on the screen of computer **12** to thereby prompt the operator to affix the resulting label on the carton at the preferred position.

8

Mobile unit **10** can be a stand-alone system, as described above, or may be integrated within a larger conveyor system. Referring to FIG. **4**, for example, mobile unit **10** is integrated with a conveyor system **66**. In the illustrated arrangement, PC **12** communicates with a remote data server **92**, which includes a database **94** having Product, Carton and Pallet tables as described above with respect to database **54** (FIG. 3B). That is, database **54** is replaced by database **94**, and the system application on PC **12** accesses the Product Label Information contained in the Product table within database **94**, and saves information to the Carton table and to the Pallet table in database **94** through data server **92**. The application running on stations **75**, **76** and **77** update the tables within database **94** in a manner identical to the description above, which is therefore not repeated.

Still referring to FIG. **4**, assume that cartons **70**, **84** and **90** contain identical products and are loaded onto conveyor system **66** at an entry location denoted by arrow **68**. If the cartons were previously palletized, they may be unpacked from the pallet at this point. A barcode scanner **72** reads the initial barcode label affixed to a given carton and forwards the retrieved product barcode to a personal or industrial computer at a station **75**. Based on the product code, station **75** retrieves the associated Product Label Information from database **94**, generates RFID Printer Data from the Product Label Information, and outputs the RFID Printer Data to an RFID printer **74**. In this instance, the RFID printer encodes and dispenses RFID tags but does not print barcode information on the label, although it should be understood that an RFID printer that performs both functions could be used. RFID printer **74** dispenses the label so that the label is affixed to the carton as the carton passes under the printer. A barcode printer downstream from the RFID printer also receives the RFID Printer Data and, responsively thereto, prints a corresponding barcode label and dispenses the barcode label on or near the RFID label.

A barcode reader and an RFID reader (collectively indicated at **78**) read the barcode and RFID labels applied to cartons **70**, **84** and **90**. If readers **78** successfully read both the barcode label and RFID label affixed to the cartons, the cartons (such as carton **90**) continue down conveyor system **66** and are repacked into their corresponding pallets, such as a pallet **86** or **88**. Upon the successful barcode/RFID confirmation, an application running at station **75** updates the Carton table and, for the first carton in a pallet, the Pallet table accordingly, as discussed above with respect to system **10**.

If either of the readers **78** fails to successfully read the barcode label or RFID label affixed to a given carton, however, the Carton and Pallet tables are not updated at this point, and a diverter **80** redirects the affected carton (e.g., carton **84**) down a conveyor corridor **82** to mobile station **10**. The operator at station **10** scans the original barcode label to acquire the product code, and system **10** produces a new label as discussed below with respect to FIG. 29A. The system application at computer **12** updates the Carton table and, if the carton is the first carton in a pallet, the Pallet table at database **94** accordingly. If carton **84** was previously palletized, it is then repacked into its corresponding pallet, such as pallet **88**.

Conveyor system **66** may divert a carton down corridor **82** for reasons other than a failure to read a barcode label or an RFID tag. For example, after a carton **70** is scanned by apparatus **72**, station **75** may determine from the Product Label Information corresponding to the product code that carton **70** contains a product or material that may interfere with the reading of RFID tags. Station **75** does not generate a label for the carton but instead sends instructions to diverter **80** so that, when carton **70** reaches diverter **80**, diverter **80** pushes carton

Appx3959

US 7,857,221 B2

13

FIG. **12**E, through which the user may monitor the port associated with the RFID printer and any data passing through that port.

Activation of an Activate Debug Log button **226** causes the application to create a log file of each communication enacted upon by the application. The log file is stored as part of files **50** on PC **12** (FIG. **3**B) or in databases **52** or **54**. When button **226** is activated, its graphic and title change to "Deactivate Debug Log," and the application thereafter stores each serial message until the user activates button **226** a second time, returning the button to its "Activate Debug Log" title.

Activation of a Port Activation button **228** displays a Port Activation screen **256**, as shown in FIG. **13**, through which the user specifies the number of available activatable ports of PC **12**. This information is stored in registry **48** (FIG. **3**B).

Activation of a Communication Monitor button **230** displays a screen **258**, as shown in FIG. **14**, that allows the user to view real-time communications between computer **12** and any external devices connected to the computer, such as barcode scanner **22** and RFID printer **20**.

Activation of a Scanner Groups button **232** displays a Scanner Groups screen **260**, as shown in FIG. **15**, through which the user may enable barcode scanner grouping. Scanner grouping allows the user to group barcode scanner **22** and any other available scanners into respective groups, such that input from any scanner in the group is treated as incoming from the same scanner. Scanner information, along with scanner grouping information, is stored in registry **48**.

Activation of an Events panel **288** displays an Event Log button **290**, as shown in FIG. **16**. Activation of button **290** displays a screen **292** listing all events previously logged by the application, including any associated errors. The event information is stored in database **52**. The event log stored in database **52** is distinct from the debug log stored in files **50**. Each error the application detects with an external device, whether it be RFID printer **20**, or scanner **22**, is written to the event log stored in database **52**. Alternately, every communication message executed by the application is written to the debug log stored in files **50**.

Activation of an Options panel **294** displays buttons **296**, **298**, **300**, **302** and **304**, as shown in FIG. **17**. Activation of a Workstation Setup button **296** displays a screen **306** listing setup information regarding PC **12** and allowing the user to modify certain settings corresponding to the computer. Information relating to PC **12** is stored in registry **48**. Through screen **306**, the user may back up registry **48** to a file or restore the registry from a file. Using screen **306**, the user can modify how often statistics are collected by the application, how much statistical history should be saved, and how often these statistics are archived. The application stores this information in database **52**.

Activation of a System Setup button **298** displays a screen **326**, as shown in FIG. **18**, through which the user enters identification information regarding the entity using mobile unit **10** (FIG. **1**A). The user enters general corporate information to database **54** through screen **326**. The user can change the number of access levels from five (5) to ten (10) by making a choice at a radio button **330** in screen **326** and can also modify weight precision options, such as how many decimal places should be displayed by the application on screens and on reports relating to product weight by modifying numeric boxes **332** and **334**, respectively. The operator can also define the maximum number of characters expected in the UPC product code or UPC-related data in a carton's original barcode label by modifying a numeric box **336**. The entity information may be available for reports and/or printing on the carton label **28** (FIGS. **1**A and **2**A).

14

Screen **326** also identifies an "Automatic Process Control Handler" ("APCH") computer in a display box **338**. The APCH monitors the starting and ending of production shifts, which is described in more detail below. When mobile unit **10** is part of conveyor system **66** (FIG. **4**), any computer that is part of conveyor system **66** can be the APCH. When mobile unit **10** (FIGS. **1**A & **2**) is used independently, PC **12** is the APCH.

Activation of a FAST TAG Setup button **300** displays a screen **342**, as shown in FIG. **19**, through which the user may modify settings regarding labels to be printed by the mobile unit. The user can either enter a file path in a textbox **344** or activate a button **346** to use a WINDOWS file box to locate the file directory on PC **12** wherein label format files are to be located. These format files are part of files **50** and instruct RFID printer **20** how alphanumeric and barcode characters and graphics are to be printed on the label **28**. (FIG. **1**A). That is, the files define the label format and are used by the application in printing each label.

Serial Number Setup defines characteristics of the carton and pallet serial numbers. As described herein, the system application applies a unique number to each carton and each pallet. Preferably, the application maintains these numbers and increments the applicable number for each sequential carton and pallet. In one preferred embodiment, the carton serial number may include several components desired, for example including the Julian calendar date, the production line number and the carton number (described below). A Manual Weight Enabled button allows the operator to manually enter a package weight if carton weight is maintained in the system. Carton Serial Length defines the number of digits in the carton serial number, whereas Pallet Serial Length defines the number of digits in the pallet serial number. Carton Sequence Length is the number of digits in the carton number.

Under "System Operation Setup," the user can define a Production Schedule Cleanup variable from a pull-down box **358**, which relates to a production schedule screen that monitors the number of cartons of a given product type processed by system **10** over a given period of time. Referring also to FIG. **27**, activation of a Production Schedule button **580** displays a screen **588**, through which the user may assign products to be displayed in the production schedule. Through repeated entry of product codes between activations of an Add New button **598** and an Apply button **604**, the user can add as many product codes to a window **588** as desired. For each product code entered in a textbox **592** or selected in a pull-down box **594**, the user also enters the number of products it is desired to process through system **10** during the given time period in a textbox **596**, and this number is displayed in the "scheduled" column of a list box **590**. Initially, when no cartons have yet been scanned, this number also appears in the "needed" column of list box **590**. As the operator scans and labels cartons having product codes listed in the production schedule, however, the application increments the number in the "produced" column for the given product code and decrements the "needed" number. If the "needed" number reaches zero, further increases in the number of processed cartons of that product code increment both the "produced" and "overage" columns of list box **590**.

In the illustrated embodiment, the production schedule is saved to database **54**. The production schedule, which the user may view on the screen of computer **12**, serves as a running total monitor for selected product codes. The system application resets the production schedule based on the Production Schedule Cleanup pull-down box **358** (FIG. **19**). If this variable is set to "none," the application does not reset the

US 7,857,221 B2

15

production schedule, which will continue to run as described herein until the operator cancels the production schedule or deletes one or more product codes through screen **588** in FIG. **27**. Alternatively, Production Schedule Cleanup **358** may be set to clear all variables in the schedule, except product codes, at the end of each calendar day. Thus, the operator must re-enter the quantity variable **596** (FIG. **27**) each day if a running production schedule is desired for that day. Finally, Production Schedule Cleanup **358** may be set to clear the "produced" and "overage" columns to zero, and to set the "needed" column to the same number as in the "scheduled" column, at the end of each day. Thus, assuming the amount of cartons desired for processing remains the same from day to day, the operator need not reset the production schedule settings in order to automatically restart a daily production schedule.

If it is required that all cartons in a pallet have the same production date, the operator sets an "Allow Multiple Dates On Pallet" toggle switch **388** in screen **362** (FIG. **20**A) to "OFF." Under this condition, the system application defines a carton's production date based on a Single Day Dating field **356** (FIG. **19**), at which the operator chooses a desired day of the week. The production date is the date of the most recent calendar day selected in the pull-down list. Thus, Single Day Dating field **356** is preferably set to the first day system **10** processes cartons from the pallet. If Allow Multiple Dates toggle **388** is set to "ON" at screen **362**, the Single Day Dating field **356** in screen **342** is ignored, and the production date for each carton is the present day.

Activation of a Line Setup button **302** displays a screen **362**, as shown in FIG. **20**A, through which the user may enter and modify information describing a production line—i.e. a group of cartons to be scanned and labeled by station **10**. The production line setup information includes the network address of PC **12** in a non-editable textbox **364**. Because computer **12** processes cartons from one production line at a time, certain parameters relating to cartons and pallets within a given production line are defined for PC **12** at the production line level at screen **342** (FIG. **19**), and the information in screen **362** is associated with PC **12** in database **54** in a Production Line table **64** (FIG. **3**B). Since only one production line can be set up for PC **12** at any one time, Production Line table **64** governs the production of carton labels and pallet labels by PC **12** until the operator changes the information on screen **362**, for example because there is a change from one production line to another or because mobile system **10** is being moved from one production line to another. The line number in a textbox **366** is entered manually by the operator and is included in the Product Label Information. The combination of the workstation ID and the line number comprises the production line's unique identifier. If desired, the user can enter in a textbox **370** a lot ID, which is used to associate products in a current production run together into one "lot" run.

The user can also enter a station group to which PC **12** belongs in a textbox **372** if so desired. The station group is a name applied to multiple stations that scan and apply labels to cartons in a given production line, for example where mobile system **10** is used in a larger conveyor system as discussed above. In the presently described embodiment, station **10** is the only station of the station group. Specific products can be assigned to specific station groups using the Product Table. Configuring the current line's station group to that matching the assignment in the Product Table allows this line to process products in that group. A drop-down box **374** is used to select the encoding type of the RFID tags used in the system: 64 Bits or 96 Bits. This configuration indicates to the application

16

what types of tags are loaded in the RFID printer and how the information should be encoded to properly fit in the tag's memory space. For example, a configuration supporting 96 bits will not write to a tag whose memory space would only allow 64 bits, causing an invalid configuration and an error in the system.

Carton information can be defined in screen **362** for a given production line as identified in Line Number textbox **366**. The system application defines a serial number for each carton that is the combination of a predetermined number (discussed above), production line number **366** and an end portion within a range defined within Serial Number Range Starting and Ending values entered by the user at textboxes **394** and **396**. The next carton number to be used as the least significant portion of the serial number is equal to a value entered by the operator into a Carton Number textbox **390**. As each carton in the production line is processed by system **10**, the system application increments the serial number end portion, until the serial number end portion reaches the Serial Number Range Ending value, at which point the serial number end portion switches to the Serial Number Range starting point and starts again. The Label Reprint Count defines the maximum number of labels the operator may attempt to reprint on the system in the event a reprint is needed. The operator can reprint a label if it becomes damaged for any reason (e.g. if the carton is damaged) that would necessitate repacking the carton's contents and re-labeling.

Screen **362** also defines pallet data. The system assigns serial numbers to pallets in a manner similar to cartons, and the Pallet Number, Serial Number Range Starting and Serial Number Range Ending variables (textboxes **376**, **382** and **384**, respectively) operate similarly to the procedure discussed above with respect to the corresponding carton variables. Also similarly, a Label Reprint Count **380** defines the number of labels the system application will cause RFID printer **20** to print out in the event a pallet label reprint is needed. Pallet Setup also includes, however, a Label Count field **378**, in which the operator may define the number of labels the application will instruct RFID printer **20** to print when printing of a pallet label is triggered at the close of a pallet, as described below. The Pallet Label drop-down box **386** allows the operator to define the particular format file (among the multiple possible format files) configured in screen **882** (FIG. **23**) that will define the pallet label format. Whereas carton label formats are defined on a product basis, pallet formats are defined on a system wide basis.

The user may select a toggle button **388** to allow pallets to include cartons with mixed production dates—i.e. cartons in the same pallet can have different production dates. When "closing" a pallet, whether manually as described herein or automatically at the completed full pallet quantity specified for the product in the Product Table, the application increments the pallet serial number, so that any further palletized cartons are recorded in the Pallet table under the new number, and causes RFID printer **20** to print out a pallet label. A toggle button **398** allows the user to define separate RFID printers attached to PC **12** that the application will thereafter select to print carton and pallet labels. Drop-down boxes **400** and **402** select which RFID printer attached to PC **12** will print carton labels and pallet labels, respectively.

Activation of a Mode Setup button **304** displays a screen **408**, as shown in FIG. **21**, through which the user may modify settings relating to the labeling system. An Automatic Weigh toggle button **410** determines whether a carton is weighed as soon as it is placed on a static scale that outputs to PC **12**. If toggle button **410** is set to 'ON,' the carton is automatically weighed when placed on the static scale. If toggle button **410**

**Brenna K. Legaard,** OSB #001658
Email: blegaard@schwabe.com
**Balazs Takacs**, OSB #184578
Email: btakacs@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: (503) 222-9981
Facsimile: (503) 796-2900

**William F. Abrams** (Admitted *Pro Hac Vice)*
Email: wabrams@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone: (206) 826-7779

*Attorneys for Defendant/Counterclaimant,*
*Avery Dennison Corporation*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **ADASA INC.**,<br><br>          Plaintiff, Counterclaim<br>          Defendant,<br><br>     **v.**<br><br>**AVERY DENNISON CORPORATION**,<br><br>          Defendant,<br>          Counter Claimant. | Case No.:  6:17-cv-01685-MK<br><br>**DEFENDANT AVERY DENNISON CORPORATION'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT; CONTINGENT MOTION FOR JUDGMENT OF INVALIDITY UNDER 35 U.S.C. § 103 AND 35 U.S.C. § 101**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**FILED UNDER SEAL** |

Page 1 -   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
          OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4256

*Venue Labs, Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001)).  Avery Dennison can satisfy this burden by identifying the claim requirements that its accused RFID transponders lack.  *Id.*  The burden then shifts to ADASA to designate specific facts showing that there is a genuine issue for trial.  *Id.* (quoting *Novartis*, 271 F.3d at 1046).  As explained below, Avery Dennison's motion relies on undisputed facts:  that its systems assign PC Tag numbers in decimal, and that its systems assign the same commissioning authority number to every single block of serial numbers allocated pursuant to at least one and often many different schemas.  Because ADASA's own expert has opined that the claims do not cover numbers assigned in decimal, and because the plain language of the claims require unique correspondence between a transponder and a single allocated block, Avery Dennison is entitled to judgment of noninfringement as to all of the accused products.

**B.    Argument**

**1.    The Requirements of the Asserted Claims**

Claim 1 of the '967 Patent is as follows:

1. An RFID transponder comprising:

a substrate;

an antenna structure formed on the substrate; and

an RFID integrated circuit chip which is electrically coupled to the antenna structure,

wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space,

wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits, and

wherein the unique serial number space comprises the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of

Page 5 -    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4260

the allocated block and remaining bits of lesser significance that together comprise the one serial number instance.

'967 Patent Ex Parte Reexamination Certificate issued July 30, 2018 ("'967 Reexamination Certificate"), claim 1, Exhibit A to Declaration of Brenna K. Legaard ("Legaard Decl."). In order to meet each and every requirement of claim 1, an RFID transponder must be encoded with a serial number from an allocated block of serial numbers. The allocated block of serial numbers must have been assigned a limited number of most significant bits, such that the serial number encoded onto the transponder contains most significant bits that uniquely correspond to the most significant bits of the allocated block. Under the plain language of the claim, it is not enough that the serial number include a limited number of most significant bits. It is not enough that those most significant bits were assigned to a block of serial numbers. The claim requires that the limited number of most significant bits were assigned to an ***allocated block*** of serial numbers. The Court construed "allocated block" to mean "a pre-authorized range of serial numbers." Dkt. 68 at p. 9. In his deposition, Plaintiff's expert Dr. Daniel Engels testified that under the Court's claim construction, an "allocated block" is "an assigned block of numbers." May 8, 2020 Deposition of Dr. Daniel W. Engels ("Engels May Depo.") at p. 37:19-21, Exhibit B to Legaard Decl. Thus, for there to be infringement, a limited number of most significant bits must have been assigned to a block of serial numbers that was assigned, i.e., to a local computer, an encoder, etc. The same requirements are included in independent claim 13. '967 Reexamination Certificate. Consequently, every claim of the '967 Patent includes those requirements.

### 2.    Avery Dennison's Serialization Systems

Avery Dennison's systems create and allocate blocks of serial numbers in two different ways: centrally and locally. Blanchard Decl. at ¶ 4; Deposition of Michael Kuhno ("Kuhno

Page 6 -    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4261

Depo.") pp. 188:2-189:19, Exhibit C to Legaard Decl.; Deposition of Raymond A. Blanchard

("Blanchard Depo") pp. 18:23-19:3, Exhibit D to Legaard Decl.

When serial numbers are created and allocated centrally, a block of serial numbers is

generated by the central system (D2Comm or Serialization Manager) in response to each and

every customer order.  Blanchard Decl. at ¶ 5. Once a block of serial numbers has been assigned

centrally to a local computer, those numbers have been pre-authorized for use by that local

computer and will never be sent to any other local computer requesting quantities for the same

UPC or product type.  The local computer will then use that assigned block of serial numbers to

encode transponders until it has completed the order.  *Id.*

For example, a Levis supplier may order transponders for 5,000 pairs of a certain type,

size, and color of jeans by entering an order in a local computer.  That local computer will

transmit that order to the central system, and the central system will identify a block of serial

numbers that has not been allocated to any other local computer for use with that particular

product type.  By way of illustration, the system might determine that the next block of available

serial numbers for that product is numbers 10,000 through 15,000.  It will then allocate that

block of serial numbers to the local computer that placed the order, meaning it will pre-authorize

that block of serial numbers for use by that computer, and it will not assign those serial numbers

to any other local computer to use for the same product type.  The local computer may only

initially encode numbers 10,000 through 12,000 onto RFID transponders.  Regardless, the entire

pre-authorized range of serial numbers will remain assigned to that local computer, which will

draw upon that allocated block until all 5,000 numbers are used up.  Blanchard Decl. ¶ 6;

Blanchard Depo. p. 65:20-24.

Page 7 -    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
            OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4262

When serialization is done locally, serial numbers are created by the local computers using PC Mate, and not by the central systems. Kuhno Depo. p. 188:24 to 189:19; Blanchard Decl. ¶ 7.  Local serialization is sometimes called distributed serialization. *Id.*  During local serialization, when a local computer receives its first order for a given brand owner, it sends a communication to D2Comm specifying the brand owner and asking for a PC Tag number.  *Id.*  D2Comm looks up the next available PC Tag number for that brand owner and sends it to the local computer.  The local computer then creates a block of serial numbers that all contain the PC Tag number at their leading ends.  *Id.* Because every serial number in that block contains the PC Tag number, so long as D2Comm ensures that no two local computers use the same PC Tag number for the same brand owner, serial numbers will be unique for a given brand owner.  *Id.*

### 3. Transponders containing PC Tag numbers do not meet the claim requirements

ADASA alleges that PC Tag numbers constitute most significant bits for purposes of the asserted claims.  On that basis, ADASA accuses transponders encoded pursuant to the schemas listed in paragraph 37 of Dr. Engels' opening expert report.  However, while PC Tag numbers are assigned to allocated blocks of serial numbers, they do not meet the "limited number of most significant bits" requirement.

PC Tag numbers are assigned in decimal, not in binary. Blanchard Decl. at ¶ 8; Blanchard Depo. pp. 73:17-18. The PC Tag number is combined (concatenated) with an incrementing number, also in decimal, to create each serial number. Blanchard Decl. at ¶ 8. This concatenated decimal number is then converted to binary format and encoded onto an RFID transponder.  *Id.* As Dr. Engels himself explains, the resulting serial numbers do not meet the requirements of any of the asserted claims:

> Assigning a serial number composed of concatenated decimal numbers in no way discloses or suggests assigning an allocated block based on a limited number of most

Page 8 -    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4263

significant bits. ***No set of most significant bits are assigned to define an allocated block, as all of the digits were assigned in decimal digits rather than bits.*** Concatenating a series of decimal numbers and converting it to binary is not the same as assigning an allocated block based on a limited number of most significant bits.

Rebuttal Expert Report of Daniel W. Engels, Ph.D. ("Engels Rebuttal Report") at ¶ 108, Exhibit E to Legaard Decl. *See also id.* at ¶ 94 ("***Assigning a serial number composed of concatenated decimal numbers in no way discloses or suggests assigning an allocated block based on a limited number of most significant bits***.").

Nor do transponders encoded with PC Tag numbers infringe the claims under the Doctrine of Equivalents. Dr. Engels does not opine that assigning a decimal number to a block of serial numbers is equivalent to the claimed invention. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1365–66 (Fed. Cir. 2008) (vacating jury verdict finding infringement under the doctrine of equivalents as "mere generalized testimony as to equivalence is insufficient as a matter of law to support a jury verdict finding infringement under the doctrine of equivalents.") (citing *Texas Instruments, Inc. v. Cypress Semiconductor Corp.,* 90 F.3d 1558, 1567, (Fed.Cir.1996)). Moreover, in his deposition, Dr. Engels testified unequivocally that assigning a decimal number to a block of serial numbers is ***not*** the equivalent of assigning a limited number of most significant bits. Engels May Depo at 60:4-6 (dealing with decimal numbers "is not equivalent to dealing with most significant bits in the allocation of blocks.").

Accordingly, Avery Dennison is entitled to summary judgment that transponders encoded pursuant to the schemas listed in paragraph 37 of Dr. Engels' opening report do not infringe any claim of the '967 patent, either literally or under the doctrine of equivalents. Opening Expert Report of Daniel W. Engels, Ph.D. ("Engels Opening Report") ¶ 37, Exhibit F to Legaard Decl.

Page 9 -   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4264

### 4.    Transponders containing commissioning authority numbers do not meet the claim requirements

The other category of transponders accused of infringement by ADASA are those that contain commissioning authority numbers.  Commissioning authority numbers are a sequence of bits that are to be used at the beginning of each and every serial number encoded pursuant to a given schema. Blanchard Decl. ¶ 10. In other words, every single allocated block of serial numbers created under a given schema that includes commissioning authority will be assigned the same sequence of most significant bits.  *Id.*  For example, very single allocated block of serial numbers created for both Wal-Mart and H&M is assigned "01."[1] Expert Report of Raymond A. Blanchard ("Blanchard Expert Report") ¶¶ 75-76, Exhibit G to Legaard Decl.

All of the claims require the most significant bits in a serial number to "uniquely correspond" to the most significant bits assigned to the allocated block.  *See* '967 Reexamination Certificate, claims 1 and 13.  The Court construed the phrase "uniquely corresponding" as having its ordinary meaning.  Dkt. 68 at p. 9.  The inventor, Clarke McAllister, testified that the ordinary meaning of "uniquely corresponding" is "matching uniquely." Deposition of Clarke W. McAllister p. 200:9-13, Exhibit H to Legaard Decl.  Dr. Engels testified to the same understanding, stating that the "uniquely corresponding" requirement means that "if it is part of the block, it's part of the block.  If it's part of a different block, it has a different set of most significant bits."  Engels May Depo. p. 104:19-105:8.  In other words, the claims require that no two allocated blocks used for the same product type can be assigned the same most significant bits.  Otherwise, the claimed invention could not ensure that serial numbers are unique.

Commissioning authority does not meet the "uniquely corresponding" claim requirement.  Every single allocated block of serial numbers encoded pursuant to a given schema is assigned

---

[1] ADASA does not contend that use of the commissioning authority number 00 infringes the claims.  Engels Opening Report at ¶ 44.

Page 10 -   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
            OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4265

the same commissioning authority, including blocks that are allocated for encoding the same product type. Blanchard Decl. ¶ 10; Blanchard Expert Report ¶ 76-77. Consequently, the commissioning authority in the serial number of the accused transponders does not "uniquely correspond" to any allocated block of serial numbers. *Id.* By way of example, every single transponder encoded pursuant to the two accused Macy's schemas has a serial number that begins with 010000. Thousands of blocks of serial numbers have been allocated under each of those schemas, and every single one of those blocks was assigned the same commissioning authority. Blanchard Expert Report ¶ 73. The "uniquely corresponding" claim requirement is not met, and therefore these transponders do not infringe any claim of the '967 Patent.

Not only is there no literal infringement, there is no infringement by Doctrine of Equivalents, either. Dr. Engels has not opined that a sequence of most significant bits that is assigned to thousands of allocated blocks functions in any way equivalent to a sequence of most significant bits that is assigned to a single allocated block. And it is not. A series of most significant bits that uniquely corresponds to an allocated block of serial numbers can be used to ensure that serial numbers are unique by ensuring that every block contains different serial numbers. A series of most significant bits that is assigned to every single allocated block cannot be used to differentiate one allocated block from another.

Because commissioning authority does not meet the claim requirements, Avery Dennison is entitled to summary judgment that the transponders encoded pursuant to the remaining accused schemas, listed in paragraphs 40, 41, and 42 of the Engels Opening Report, do not infringe any claim of the '967 Patent, literally or under the doctrine of equivalents.

Page 11 -    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
                OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4266

## IV.    CONTINGENT MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

In the event that the Court does not grant in full Avery Dennison's motion for judgment of noninfringement, Avery Dennison moves for judgment that all of the asserted claims are invalid under 35 U.S.C. §103(a) and §101.

### A.    35 U.S.C. §103

Under 35 U.S.C. § 103(a), the asserted claims are invalid if "the differences between the subject matter… patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a) (2006).

The ultimate judgment of obviousness is a legal determination. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007). "[I]t is based on underlying factual inquiries, including (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) any secondary considerations of non-obviousness." *ZUP, LLC v. Nash Mfg.*, 896 F.3d 1365, 1371 (Fed. Cir. 2018). Where "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." *KSR*, 550 U.S. at 427.

As described in the  Blanchard Expert Report, Paxar Corp. began assigning unique serial numbers to Adidas shoes in 2002 using D2Comm and PC Mate. Blanchard Expert Report at ¶¶ 22-24. Paxar initially accomplished this by assigning a number it called the PC Batch ID to every pre-authorized range of serial numbers that was assigned to a local computer for printing. Blanchard Report at ¶ 28. PC Batch ID numbers were sometimes accidentally repeated, *id.* at ¶ 29, so in May of 2005 Paxar Corp. replaced PC Batch ID numbers with what it called Secure

Page 12 -    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
             OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Batch ID numbers, which were composed of a PCID number assigned to the local computer and a batch number that was assigned to a particular allocated block of serial numbers. *Id.* at ¶ 30. As Mr. Blanchard explains, the Secure Batch ID number was assigned to each block of serial numbers (which Paxar referred to as a batch).  Every serial number in a block would begin with the same Secure Batch ID number followed by an incrementing sub-serial number.  *Id.* at ¶¶ 30-33.  The result was a printed label that contained a unique serial number from an allocated block of serial numbers.  The allocated block of serial numbers was assigned a limited number of leading digits, and the unique serial number contained a leading number of unique digits that uniquely corresponded to the digits that had been assigned to that allocated block.  *Id.* at ¶ 36.

These tags printed with Secure Batch ID serial numbers are prior art to the '967 Patent because they were sold by Paxar years prior to May of 2008.  The only meaningful difference between the Secure Batch ID prior art and the claimed subject matter is that Secure Batch ID was not used to generate serial numbers for EPCs encoded onto RFID transponders in accordance with the SGTIN-96 tag data standard prior to May of 2008.  Rather, the serial numbers generated by Secure Batch ID were printed onto tags.  But as the '967 Patent itself establishes, transponders having substrates, antennas, the SGTIN-96 data standard, and RFID integrated circuit chips encoded with EPC numbers all existed prior to 2008, and therefore are all prior art to the asserted claims.   U.S. Patent No. 9,789,967 ("'967 Patent"), 1:40-50; 8:16-21, Exhibit I to Legaard Decl.

Thus, each and every element of the asserted claims is found in the prior art, as summarized in the table attached as Appendix A.

The level of ordinary skill in the art is described in the Rebuttal Report of Dr. Engels. As Dr. Engels explains, a person of ordinary skill in the art as of 2008 would not only know how to

Page 13 -    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
                OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

use the existing EPC tag data standard, he or she "would also possess working knowledge relating to programming, the field of microprocessors, and the use or application of RFID technologies within a larger information system and application domain in order to create a new data format for the memory of an RFID tag…. This is in addition to being familiar with tag data standards and RFID standards used in RFID applications." Engels Rebuttal Report at ¶ 38.

As there are no material disputes regarding the scope and content of the prior art, the differences between the prior art and the claimed invention, or the skill level of one of ordinary skill in the art, the validity of the claims under §103(a) comes down to the question of whether one of ordinary skill in the art would have been motivated to use the Secure Batch ID serialization system to generate serial numbers for EPCs encoded onto RFID transponders in accordance with the SGTIN-96 data standard. In other words, does the record reflect a "motivation to combine" the Secure Batch ID system with existing RFID transponders and the SGTIN-96 data standard.

"A 'motivation to combine may be found explicitly or implicitly in market forces; design incentives; the 'interrelated teachings of multiple patents'; 'any need or problem known in the field of endeavor at the time of invention and addressed by the patent'; and the background knowledge, creativity, and common sense of the person of ordinary skill." *ZUP, LLC*, 896 F.3d at 1371 (quoting *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013) (citing *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1328 (Fed. Cir. 2009) (quoting *KSR*, 550 U.S. at 418-21)).

In this case, the motivation to combine is readily apparent. Market forces in the form of customer requests provide a motivation to sell RFID transponders encoded with EPCs that complied with the SGTIN-96 data standard. Kuhno Depo. p. 64:1-5 (customers ask for "RFID

Page 14 - DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

tags that conform to the global standards."). The motivation to use the Secure Batch ID system to create serial numbers for those transponders is found in the background knowledge and common sense of those of ordinary skill in the art such as Mr. Blanchard and his team.  As Mr. Blanchard explains, as of 2008 he and his colleagues at Paxar "knew from [their] long experience with Adidas that [the Secure Batch ID system] yielded a serialization system that was reliable and scalable." Blanchard Expert Report at ¶ 37.  "Using this serialization system to serialize RFID transponders was the obvious thing to do."  *Id.*  As Dr. Engels himself noted, there is a "[l]ot to be learned by looking at what's been done successfully, so don't try to re-invent the wheel if it's already been invented."  September 13, 2019 Deposition of Daniel Engels 56:22-58:5, Exhibit J to Legaard Decl.; *see also* Kuhno Depo. 99:22-100:1.

Under the Court's recent rulings the transponders Avery Dennison encoded for LeSportSac are not statutory prior art.  However, it is undisputed that in late 2008 Avery Dennison was offering for sale RFID transponders encoded with serial numbers generated using Secure Batch ID.  Blanchard Expert Report at ¶¶ 37-50.  This evidence confirms Mr. Blanchard's testimony that in 2008, persons of ordinary skill in the art were interested in using Secure Batch ID to serialize RFID transponders, and had a reasonable expectation that doing so would be successful.  *In Re: Copaxone Consol. Cases*, 906 F.3d 1013, 1025-26 (Fed. Cir. 2018) (holding that a study that was not statutory prior art because it did not predate the priority date was properly relied upon to show that POSITAs were interested in pursuing less frequent dosing regimens and would have had a reasonable expectation of success in pursuing less frequent dosing regimens.).  Therefore, there is no material dispute that a person of ordinary skill in the art in 2008 would not only have been fully capable of using Secure Batch ID to generate serial

Page 15 -   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

numbers for RFID transponders, he or she would have been motivated to do, and would have expected to be successful.

The content of the prior art, the scope of the patent claims, and the level of ordinary skill in the art are not in material dispute. The obviousness of the claimed invention is apparent in light of these factors. Avery Dennison should be granted summary judgment that all of the claims in the asserted patent are invalid as obvious under 35 U.S.C. §103(a). *See ZUP, LLC*, 896 F.3d at 1370 (affirming grant of summary judgment of obviousness).

ADASA may argue in response that Secure Batch ID serial numbers are concatenated decimal numbers that are then converted to binary, and "concatenating a series of decimal numbers and converting it to binary is not the same as assigning an allocated block based on a limited number of most significant bits." Engels Rebuttal Report at ¶ 108. However, serial numbers that include PC Tag numbers are created in exactly the same way: PC Tag numbers are assigned in decimal by D2 Comm, just like Secure Batch ID numbers. Blanchard Expert Report at ¶ 55, Blanchard Decl. ¶¶ 8-9. A claim must be interpreted the same for both validity and infringement. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, n. 7 (Fed. Cir. 1995), aff'd, 517 U.S. 370, (1996). If the fact that a number is assigned in decimal removes it from the scope of the claim for purposes of invalidity, then it removes it from the scope of the claim for purposes of infringement as well. If the Court determines that transponders encoded with PC Tag serial numbers fall within the scope of the claims for infringement purposes, then serial numbers containing Secure Batch ID numbers must also fall within the scope of the claims, and the claims are invalid.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4271

**B.     35 U.S.C. §101**

Section 101 of the patent statute defines patentable subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. §101. The Supreme Court has "long held that this provision contains an important exception: laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)). This is because abstract ideas are "the basic tools of scientific and technological work." *Alice*, 573 U.S. at 216 (quoting *Myriad*, 569 U.S. at 589). "'Monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws." *Alice*, 573 U.S. at 216 (quoting *Mayo Collaborative Services v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012); citing U.S. Const., Art. I, § 8, cl. 8).

Accordingly, in *Alice*, the Supreme Court held that "in applying the §101 exception, we must distinguish between patents that claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into something more, thereby 'transform[ing]' them into a patent-eligible invention." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 89, 72).

To determine whether the asserted claims are patent-eligible, the Court follows a test articulated by the Supreme Court in *Alice.* It first determines whether the claims at issue are directed to an abstract idea. *Alice,* 573 U.S. at 208. If that threshold determination is met, the Court then moves to the second step of the inquiry and considers the elements of each claim both individually and as an ordered combination to determine whether additional elements transform the nature of the claim into a patent-eligible application of the abstract idea, rather than the abstract idea itself. *Id.*

Page 17 -   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
          OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4272

"In effect, *Alice* articulated a technological arts test for patent eligibility, concluding that the asserted method and system claims were patent ineligible because they did not improve the functioning of the computer itself or effect an improvement in any other technology or technical field." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 721 (Fed. Cir. 2014) (cite omitted). In other words, patent eligibility often comes down to a determination of whether the asserted claims are directed toward a specific improvement in the way RFID transponders operate, or whether they are directed toward the use of an abstract idea—segmenting a number space—in the context of an RFID transponder. *See id.*

### 1.    *Alice*, step 1.

At the first, "abstract idea" step, the Court looks at "the focus of the claimed advance over the prior art to determine if the claim's 'character as a whole' is directed to excluded subject matter." *Affinity Labs*, 838 F.3d at 1257-56 (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375-76 (Fed. Cir. 2016); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)).

Looking to the focus of the claimed advance over the prior art means focusing on what the inventor claims to have invented, and not its technological context. "Limiting the invention to a technological environment does not make an abstract concept any less abstract under step one." *Berkheimer v. HP, Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018). If the claims are directed to nothing more than segmenting a number space, the fact that the claims limit that segmented number space to the serial number of an RFID tag merely imposes a technological environment. It does not make the idea of segmenting a number space any less abstract.

Page 18 -    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

At the beginning of this case, Avery Dennison moved for judgment on the pleadings that the claims of the '967 Patent were invalid under 35 U.S.C. §101 because the claims were directed to the abstract idea of partitioning a number space in the context of an RFID transponder.  Dkt. 17.  Plaintiff opposed, arguing that the claims were patent-eligible because they were directed to an improvement in the way the RFID transponders operate:

> Several cases subsequent to *DDR Holdings II* have recognized and applied the "computer improvement" principle. The court in *Cal. Inst. of Tech. v. Hughes Communs., Inc.,* 2014 U.S. Dist. LEXIS 156763 at *20 (C.D. Cal. 2014), explained the principle as follows: "The Supreme Court [in *Alice]* clarified some aspects of the doctrine ... perhaps most significantly, it left open the possibility that claims which improve the functioning of the computer itself or any other technology are patentable." The court then found the claims at issue eligible for patentability in part because they present a "unique computing solution that addresses a unique computing problem." *Id.* at *62.

> Dkt. 19 at p. 27

To argue that the claims were directed to technological improvements and not merely an abstract idea, ADASA contended that:

> The claimed invention of the '967 Patent provides a distinct hardware-based approach for generating serialized [] EPCs at the encoder level which simultaneously ensures uniqueness across all operations of a company and eliminates the need for constant communication with a database. Dkt. No. 1-2 at 3:27-35; Williams Decl. at ¶22. To accomplish this, the '967 Patent teaches manipulation of the binary bits of the serial number portion of the EPC to partition the serial number space into a first section comprising a limited number of most significant bits along with a second section comprising bits of lesser significance. Dkt. No. 1-2 at 8:4-15, 8:21-32, 33:20-23; Williams Decl. at ¶22. A unique string of most significant bits is assigned for encoding into the first section, which delineates the size and range of a block of serial numbers and which can also be used to identify each encoder. Dkt. No. 1-2 at 8:11-15, 8:23-32; Williams Decl. at ¶22. The encoder, itself, then generates unique strings of bits of lesser significance to create unique serial numbers within the block for encoding into the second section, without having to coordinate with the database. Dkt. No. 1-2 at 8:32-37; Williams Decl. at ¶22. The RFID transponders commissioned using this approach comprise a data configuration not previously known in the RFID field, comprising a partitioned serial number configuration. Williams Decl. at ¶24.

> The hardware-based approach taught by the '967 Patent is accomplished by managing assignment of the serial number at the binary bit level, rather than sequential allocation of decimal or hexadecimal number strings later implemented in machine-readable binary

Page 19 -   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4274

form.  Williams Decl. at ¶24.  Assignment and commissioning both occur in the binary realm.

Dkt. 19 at p. 14.

Importantly, in order for these aspects of the invention to establish that the claims are directed toward a technological improvement and not an abstract idea, they must be reflected in the claim language itself.  *Enfish LLC v. Microsoft Corp.*, 822 F.3d at 1337 (finding claims to be valid under §101 because the claim language itself was directed to a self-referential database, not to any form of storing tabular data.).  If the claim language itself does not require a limited number of most significant bits to be assigned to an allocated block of serial numbers in binary, then the claimed invention is not directed to a hardware-based approach accomplished by managing assignment of serial numbers at the binary bit level.

Similarly, if the claims encompass commissioning authority, which cannot be used to identify an encoder and cannot eliminate the need for constant communication with a database because it is contained in every single serial number encoded under a given schema, then the claims are not directed to a means of enabling quasi-autonomous commissioning, as commissioning authority does not enable quasi-autonomous commissioning.

In short, if the claims encompass PC Tag numbers and/or commissioning authority numbers, then they broadly encompass virtually any use of segmented serial numbers in RFID transponders and are directed to the abstract idea of segmenting a number space.

### 2.    *Alice*, Step 2.

At step 2, the Court "consider[s] the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the claim into a patent-eligible application."  *Alice,* 573 U.S. at 217 (cite omitted).  "The second step of the *Alice* test is satisfied when the claim limitations involve more than performance of well-understood,

Page 20 -    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4275

routine, and conventional activities previously known in the industry." *Berkheimer,* 881 F.3d at 1368 (cite omitted). Critically, "to save a patent at step two, an inventive concept must be evident in the claims." *Id.* (citing *RecogniCorp. LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017)). Moreover, the inventive concept necessary at step two cannot be furnished by the abstract idea itself. *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d at 1376 ("The inventive concept necessary at step two of the *Mayo/Alice* analysis cannot be furnished by the unpatentable law of nature (or natural phenomenon or abstract idea) itself.").

The remaining limitations of the asserted claims, considered individually or as an ordered combination, recite only things that had been invented by others and had become standard in the industry well before 2008, such as the components of generic RFID tags and the requirements of data standards including the EPC data structure developed by the Auto-ID Center and the SGTIN-96 standard developed by GS1. They contain no inventive concept required to save them at *Alice*, step 2.

For these reasons, if the claims are read so broadly as to support a denial of Avery Dennison's motion for summary judgment of noninfringement, they are invalid under §101.

## V.    CONCLUSION

For the foregoing reasons, Avery Dennison does not infringe any claim of the '967 Patent. Alternatively, the asserted claims are invalid because they encompass Avery Dennison's own serialization systems, which are prior art to the '976 Patent, and are broadly directed at segmentation of a number space, which is not patentable subject matter.

Page 21 -    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
             OF NONINFRINGEMENT, ETC.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4276

**Brenna K. Legaard,** OSB #001658
Email: blegaard@schwabe.com
**Balazs Takacs**, OSB #184578
Email: btakacs@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: (503) 222-9981
Facsimile: (503) 796-2900

**William F. Abrams** (Admitted *Pro Hac Vice)*
Email: wabrams@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1420 5th Avenue, Suite 3400
Seattle, WA 98101
Telephone: (206) 826-7779

*Attorneys for Defendant/Counterclaimant,*
*Avery Dennison Corporation*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **ADASA INC.**, <br><br>       Plaintiff, Counterclaim <br>       Defendant, <br><br> **v.** <br><br> **AVERY DENNISON CORPORATION**, <br><br>       Defendant, <br>       Counter Claimant. | Case No.:  6:17-cv-01685-MK <br><br> **DECLARATION OF BRENNA K. LEGAARD IN SUPPORT OF DEFENDANT AVERY DENNISON CORPORATION'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT; CONTINGENT MOTION FOR JUDGMENT OF INVALIDITY UNDER 35 U.S.C. § 103 AND 35 U.S.C. § 101** <br><br> **FILED UNDER SEAL** |

I, Brenna K. Legaard, declare as follows:

1.    I am one of the attorneys for Defendant Avery Dennison Corporation ("Avery Dennison") in the above-captioned case.  I make this declaration based upon my personal knowledge in support of Defendant Avery Dennison Corporation's Motion for Summary

Page 1 -    DEC OF LEGAARD ISO DEFENDANT'S MOTION FOR
              SUMMARY JUDGMENT OF NONINFRINGEMENT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4282



Deposition of:
# Highly Confidential AEO Daniel Engels , Ph.D.

*May 8, 2020*

In the Matter of:

# Adasa, Inc. v. Avery Dennison Corporation

Veritext Legal Solutions

Exhibit B - Page 1 of 5

Appx4287

64

**MICHAEL KUHNO**
**July 17, 2019**

So when they -- when they order an RFID tag to go on a specific piece of apparel, accessory, et cetera, they ask us to generate RFID tags that conform to the global standards, and they provide the information to us.  And by information, I mean the item code, item description, color, style, size that gets printed on the item to -- to generate an RFID tag or that's printed on the item which includes an RFID tag.

They don't sit down and say, we need this particular schema.  They say, we need -- we need RFID tags that conform to the global standards that we can -- the interoperable global standards so that we can, you know, sell this product and sell it within the -- and, again, this is the customer selling their product in the marketplace and ensure that the RFID tags conform to the global standards that have been agreed upon by the retailers and brands in the marketplace.

So they -- so they don't necessarily say, do this schema, do that schema.

Q.    So there are multiple global standards within -- like, there's a global standard and multiple schemas within the global standard, correct?

Exhibit C - Page 2 of 6

Appx4293

8.    PC Tag numbers are created and assigned to local computers in decimal.  The local computer then concatenates them with an incrementing number, also in decimal.  These decimal numbers are then converted to binary for encoding onto RFID transponders.

9.    In a previous serialization method I developed at Paxar which was used at Avery Dennison to generate unique serial numbers for Adidas in 2005 and used to generate unique serial numbers for RFID transponders sold to LeSportSac in 2008, D2 Comm assigned a decimal number called the PCID to a local computer.  PCID and PC Tag numbers were both generated and assigned by D2Comm in decimal, and they were both used by local computers running PC Mate to locally create and control unique serial numbers in essentially the same way.

10.    Avery Dennison's systems also encode transponders with serial numbers that contain "commissioning authority."  When a schema calls for commissioning authority, every single serial number, regardless of product type, includes that commissioning authority.  That means that every single block of serial numbers assigned to a local computer or printer includes the same commissioning authority.  Where different brand owners use the same commissioning authority, every single serial number, and therefore every single block of serial numbers encoded for each of those brand owners contains the same commissioning authority.

11.    For that reason, Avery Dennison does not and cannot use commissioning authority to differentiate between blocks of serial numbers.  The only way commissioning authority could be used to identify an encoder is if there were only one encoder being used to encode transponders for a given brand owner, and if there were only one encoder in use, there would be no benefit to identifying it.

12.    Because commissioning authority is used in every single serial number encoded under a given schema, it does not enable autonomous or quasi-autonomous commissioning.

Page 5 -    DECLARATION OF RAY BLANCHARD

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Appx4556

Alan J. Thayer, Jr., OSB No. 853428
INNOVATIVE LAW GROUP
P.O. Box 1268
Eugene, OR  97440
(541) 345-2325
alan@thinkilg.com

Jonathan T. Suder (*pro hac vice*)
Glenn S. Orman (*pro hac vice*)
Richard A. Wojcio, Jr. (*pro hac vice*)
FRIEDMAN, SUDER & COOKE
604 E. Fourth Street, Suite 200
Fort Worth, TX  76102
T:  (817) 334-0400
F:  (817) 334-0401
jts@fsclaw.com
orman@fsclaw.com
wojcio@fsclaw.com

ATTORNEYS FOR PLAINTIFF
ADASA INC.

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION**

| | |
|---|---|
| **ADASA INC.,** | Case No.: 6:17-cv-01685-MK |
| Plaintiff, | |
| | **PLAINTIFF ADASA INC.'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **AVERY DENNISON CORPORATION,** | |
| Defendant. | **Request for Oral Argument** |

Appx4558

the art in furtherance of its conclusory finding. Again, Avery's motion cannot be granted as there is no legally sufficient summary judgment evidence to support its conclusory argument. Further, Avery's ineligibility position is expressly couched in the proposition that "[i]f the claim language itself does not require a limited number of most significant bits to be assigned to an allocated block of serial numbers in binary, then the claimed invention is not directed to a hardware-based approach accomplished by managing assignment of serial numbers at the binary bit level." Dkt. No. 169 at 20. This is simply another repackaging of Avery's "decimal versus binary" assignment position discussed above that has been repeatedly rejected by the Court. Dkt. No. 165 at 9; Dkt. No. 68 at 8. Avery's conclusory argument cannot overcome that the asserted claims expressly contemplate *bits* throughout (i.e., most significant bits, bits of lesser significance, which are by definition in binary) and are directed to an *encoded* RFID transponder, rather than to a process for assigning most significant bits for creating the allocated blocks. Dkt. No. 174 at ¶ 88-89.

Similarly, Avery's bald contention that the claims "are not directed to a means of enabling quasi-autonomous commissioning" if they are interpreted to cover Avery's RFID tags encoded using a Commissioning Authority schema fails. The specification and Dr. Engels both state that the use of most significant bits as claimed in the asserted claims of the '967 Patent are usable to effect quasi-autonomous encoding operations. Dkt. No. 174 at ¶ 90; Exh. B at 8:4-15; 21-32; 33:20-23. As such, the claims may be directed to systems enabling quasi-autonomous operation even if there is no express requirement within them that they be used within a quasi-autonomous implementation. Stated another way, whether Avery chooses to configure its schemas and encoding operations to realize the benefit of quasi-autonomous encoding operations is immaterial to the patent eligibility analysis.

Appx4595

For at least these reasons, the asserted claims of the '967 Patent are directed to patent eligible subject matter at step one of *Alice*. *Visual Memory*, 867 F.3d at 1259; *Ancora Techs.*, 2018 U.S. App. LEXIS 32433, at *1, 13-14. The Court does not need to proceed to step two of the § 101 analysis here based on the analysis of "step 1" but even if it did, Avery would still not be entitled to summary judgment.

### 2. The Asserted Claims Include an Inventive Concept

The second step involves a determining if the patented subject matter comprises an "inventive concept" sufficient to "transform" the ineligible matter into a patent-eligible application. *Alice*, 573 U.S. at 221; *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) ("we have described… the second-stage inquiry (where reached) as looking more precisely at what the claim elements add—specifically, whether, in the Supreme Court's terms, they identify an 'inventive concept' in the application of the ineligible matter to which (by assumption at stage two) the claim is directed."). At this stage, the elements of each challenged claim are considered both individually and as an ordered combination. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018). Simply focusing on each element in isolation or focusing only on whether certain elements recite a patentable invention is insufficient. *See BASCOM*, 827 F.3d at 1349-50.

"The second step of the *Alice* test is satisfied when the claim limitations 'involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Id.*; *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014). Whether the claim elements or the claimed combination are well-understood, routine, or conventional is a question of fact. *Aatrix*, 882 F.3d at 1128; *Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F. App'x 989, 992 (Fed. Cir. 2018). Courts have looked to the opinions of experts to aid in the determination of whether a claimed combination

33

Appx4596

is well-understood, routine, or conventional. *Vaporstream, Inc. v. Snap, Inc.*, 2017 U.S. Dist. LEXIS 32884 at \*15 (C.D. Cal. February 27, 2018).

Avery again provides no analysis or support for its contention that the asserted claims of the '967 Patent do not include an "inventive concept" at step two of *Alice*. No opinions from a person of ordinary skill in the art or any supporting evidence are provided whatsoever. Rather, Avery's attorneys state in a completely conclusory manner that all limitations of the asserted claims "recite only things that had been invented by others and had become standard in the industry well before 2008." Dkt. No. 169 at 26. The arguments presented above in connection with obviousness as well as the opinions of Dr. Engels, attached hereto, counsel otherwise. Dkt. No. 174 at ¶ 90-91. Additionally, Avery has been unable to present any prior art either during this litigation or during *ex parte* reexamination of the '967 Patent showing *any* use of the data structure claimed in the '967 Patent in connection with encoded RFID transponders, much less show that such use was routine, well understood, and conventional in the art as of early 2008. *Id.* Indeed, Dr. Engels confirms that the RFID encoded tags described in the '967 Patent were novel at that time, and that none of the RFID or EPC standards then developed by Auto-ID Center or by GS1 contemplated the use of most significant bits within the serial number space of an encoded RFID tag. *Id.*

The claims of the '967 Patent capture this novel and unconventional data structure utilizing MSBs within the serial number space of an encoded RFID tag to aid in ensuring global uniqueness of the encoded data while accommodating encoding operations without the need for a constant connection to a central database. This use of the claimed data structure thereby embodies an inventive concept sufficient to confer patent eligibility at step two of *Alice*. *BASCOM*, 827 F.3d at 1349-50 ("an inventive concept can be found in the non-conventional and non-generic

34

Appx4597

arrangement of known, conventional pieces"). There is no evidence of record that suggests otherwise. To the contrary, Dr. Engels found that the claims of the '967 Patent describe an "inventive concept" because the use of the data structure claimed within the unique serial number space comprising a sequence of MSBs followed by bits of lesser significance for ensuring uniqueness of the claimed encoded RFID tag provided a novel improvement to RFID tagging operations. Dkt. No. 174 at ¶91. Avery's own failure to create a working RFID serialization system implementing the data structure claimed in the '967 Patent, discussed above, further evidences the inventiveness of the claimed subject matter. For this additional reason, Avery cannot be successful in its attempts at Step 2 to find the claims of the '967 Patent invalid.

III.    **CONCLUSION**

For at least the foregoing reasons, Avery's Motion should be rejected in its entirety. Additionally, the claims of the '967 Patent should be found directed to patent eligible subject matter as a matter of law, and ADASA's pending Motion for Summary Judgment should be granted with respect to at least ADASA's claims of direct infringement against Avery.

Appx4598

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

ADASA INC.,

                    Plaintiff,                          Case No.: 6:17-cv-01685-TC

          v.

AVERY DENNISON CORPORATION,

                    Defendant.

**DECLARATION OF DANIEL W. ENGELS, Ph.D. IN SUPPORT OF ADASA INC.'S OPPOSITION TO AVERY'S MOTION FOR SUMMARY JUDGMENT**

I, Daniel W. Engels, Ph.D., hereby declare as follows:

1.      My name is Daniel W. Engles, Ph.D. I have been retained by the law firm of Friedman, Suder & Cooke, P.C. ("FSC") on behalf of their client ADASA, Inc. ("ADASA"), to provide expert technical analysis and to opine on all technical aspects of the above-referenced matter. I am of sound mind, capable of making this affidavit, and have personal knowledge of the facts herein state and said facts are true and correct.

2.      My education and professional experience have been set forth in previous declarations and expert reports that I have provided in the above-styled litigation.  More specifically, this information has been set out in my Declaration in Support of ADASA's Motion for Summary Judgment ([Exh. C [Dkt. No. 168-11]) as well as in my Opening Expert Report and Rebuttal Expert Report.  The contents of each of these submissions is incorporated herein for all purposes.

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

                                                                    **Page 1 of 34**

Appx5231

3.     This Court has held that I am a person of ordinary skill in the art with respect to the subject matter at issue in this case in connection with the Court's Opinion and Order on Defendant's Motion for Summary Judgment of Invalidity [Dkt. No. 167].

4.     For at least these reasons, including consideration of my education, background, and extensive professional and practical experience with RFID and other AIDC technologies and their many applications, I meet the requirements of a person skilled in the art related to inventions disclosed and claimed in the '967 Patent. As a person of skill in the art, I have an understanding of RFID technology, how RFID transponders are encoded, and systems for unique object identification, security, and inventory management.

## OVERVIEW OF THE TECHNOLOGY OF THE '967 PATENT

5.     The '967 Patent was filed on February 12, 2016 and issued on October 24, 2017. As I have opined in a declaration in support of ADASA's opposition to Avery Dennison's motion for summary judgment of invalidity dated December 4, 2019, which is incorporated herein by reference, the earliest effective filing date of the '967 Patent is May 21, 2008.  I understand that the Court has since entered an order in this case affirming this finding.  Dkt. No. 167.

6.     The '967 Patent relates to systems for encoded and commissioned wireless Radio Frequency IDentification (RFID) devices.  The technology at issue is discussed in detail in my Declaration in Support of ADASA's Motion for Summary Judgment (Exh. C [Dkt. No. 168-11]) which is incorporated herein for all purposes.

## INFRINGEMENT OF THE '967 PATENT BY THE ACCUSED PRODUCTS

7.     My opinions on infringement of the asserted claims of the '967 Patent, including claims 1-6, 13 and 14, by the Accused RFID Tags of Avery Dennison are presented and explained in detail in my Declaration in Support of ADASA's Motion for Summary Judgment (Exh. C [Dkt.

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

No. 168-11]) which is incorporated herein for all purposes.  I have reviewed Avery's pending Motion for Summary Judgement of Noninfringement [Dkt. No. 169], the supporting Declaration of Raymond Blanchard (Exh. T [Dkt. No. 171]), and all other evidence cited therein.  I find the arguments and positions on noninfringement presented therein to be incorrect and unpersuasive, as discussed below.  I therefore maintain my opinions on infringement as presented in my Declaration in Support of ADASA's Motion for Summary Judgment (Exh. C [Dkt. No. 168-11]).

8.      First, Avery contends that its Accused RFID Tags commissioned in accordance with a "PCTag schema" do not infringe because "its systems assign PC Tag numbers in decimal." Dkt. No. 169 at 5.

9.      As discussed in my Declaration in Support of ADASA's Motion for Summary Judgment (Exh. C [Dkt. No. 168-11]), however, the accused PCTag ID schemas utilize a 16-bit binary sequence encoded at predefined most significant bit locations within the serial number space portion of the RFID tag memory.  A bit map of an encoding made using an exemplary PCTag ID schema is shown below with the PCTag ID sequence, representing a sequence of most significant bits within the serial number space annotated in the red box:



Exh. E at AD003277 (annotations added).

This bit map clearly shows that the PCTag ID portion is implemented as a sequence of most significant bits within the serial number space portion of the encoding, following two "filler" zeros.

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

Page 3 of 34

Appx5233

Its location is specified by the format and is consistent within all RFID tags encoded using this schema.  While the particular sequence of most significant bits representing the PCTag ID may be alternatively expressed in accordance with any number system (binary, decimal, hexadecimal), it is designed as and encoded as a binary sequence set apart from the other data fields within the encoded memory of the infringing RFID tags with the intentional maintenance of clean, consistent bit boundaries in the assigned values.  In the above, for example, the MSBs comprising the PCTag ID padded with two "filler" zeros will always occupy the leftmost 18-bits of memory space shown, with the PCTag portion always occupying the particular 16-bits of memory space shown.  The PCTag schemas are thus configured to maintain clean and consistent bit boundaries within the MSBs comprising a portion of the serial number space and distinct from all other encoded data.

10.     Avery confirms this to be the case through its description of its PCTag ID schemas, noting that:

> "During local serialization, when a local computer wants to print/encode a job for a brand owner for the very first time, it sends a communication to D2Comm specifying the brand owner and asking for a PC Tag number. ***D2Comm looks up the next available PC Tag number for that brand owner and sends it to PC Mate. PC Mate then creates a block of serial numbers that all contain the PC Tag number at their leading ends. Each and every serial number in this block consists of the PC Tag number plus an incrementing number that was generated by the local computer. That block is allocated to that local computer***. Because every serial number in that block contains the PC Tag number, so long as D2Comm ensures that no two local computers use the same PC Tag number for the same brand owner, serial numbers will be unique for a given brand owner."

Exh. T at ¶ 7; Dkt. No. 169 at 8 (emphasis added).  Accordingly, all RFID tags encoded using PCTag schemas infringe the asserted claims of the '967 Patent.

11.     Whether the PCTag ID values are *assigned* as decimal values (or any other numerical format, for that matter) is immaterial to infringement.  The particular format that the PCTag value is or may be expressed at assignment does not alter that the value is utilized as

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

**Page 4 of 34**

Appx5234

a strong need to practice the inventions claimed in the '967 Patent and the commercial success achieved by those in the RFID industry practicing the inventions claimed in the '967 Patent.

76.    I also understand from documents produced in this litigation that other prominent entities have copied the inventions claimed in the '967 Patent.  Walmart for example requires that all of its suppliers to tag goods sold in Walmart stores with RFID tags that would infringe the claims of the '967 Patent.  Exh. R at AD000004.  Not coincidentally, I understand that Walmart enacted this requirement after concluding work with Clarke McAllister to develop its RFID tagging program.

77.    Based upon at least the foregoing, in my opinion, objective indicia of nonobviousness exist that impact the obviousness analysis and would preclude a finding of obviousness of any claim of the '967 Patent with respect to all prior art and purported prior art raised in this case.

### VALIDITY ANALYSIS – PATENT ELIGBILE SUBJECT MATTER

78.    Avery contends that the claims of the '967 Patent are invalid pursuant to 35 U.S.C. § 101 as not being directed to patent eligible subject matter.  More specifically, Avery contends that the '967 Patent claims are directed to the purported abstract idea of "segmenting a number space." Dkt. No. 169 at 20.  I disagree.

79.    The claims of the '967 Patent are directed to encoded RFID transponders comprising a memory structure accommodating a specific hardware-based number scheme. Further, the claims of the '967 Patent capture an "inventive concept" through their requiring use of the specific data structure claimed comprising MSBs and bits of lesser significance within the unique serial number space.  Use of this data structure was not well-understood, routine, or conventional in the RFID field in 2008.

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

80.     I understand that anyone who invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof may obtain a patent thereto.

81.     I further understand that the current test for determining whether the subject matter of a patent is patent-eligible is a two-step process. The first step involves determination of whether the challenged claim is directed to patent eligible subject matter. If it is, the inquiry ends there. If not, the second step evaluates whether the claim contains an "inventive concept" sufficient to "transform" the ineligible matter into a patent-eligible application of the otherwise ineligible subject matter.

82.     I further understand that the purpose of the first step of the subject matter eligibility analysis is to avoid claims that preempt non-eligible subject matter, such as abstract ideas, mathematical formulae, and physical phenomena. In computer implemented inventions, I understand that it is not permissible to patent an abstract idea, such as a generic function or capability of computing technology. I also understand that claims directed to specific improvements in computing technology that function differently and better than conventional computing technology may be found to be non-abstract, and therefore patent eligible at the first step of the test. I understand that much of the advancement made in computer technology consists of improvements to software that may be defined by logical structures and processes rather than particular physical features.

83.     I further understand that to transform the nature of the claim into a patent-eligible application in step two of the test, the claims must include additional features that are significantly beyond well understood, routine, conventional activity or that merely computerize a previously

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

manually performed process. I understand that claims that present a unique computing solution to address a unique computing problem may be patentable.

84. In RFID applications in which retail items are tracked, whether that item is at the individual salable item level, the case level, or the pallet level, a critical aspect to proper function of RFID systems is ensuring that each RFID tag is encoded with a unique object number (which in retail is often referred to as an Electronic Product Code (EPC)) for the item to which the RFID tag is attached. EPCs comprise object class information identifying the brand owner or manufacturer and class of item combined with a serial number for a specific item. The combination of the object class information (e.g., the combination of the brand owner or manufacturer and the class of item) and the serial number is encoded within an EPC which is meant to uniquely identify each item. Each item is assigned a unique EPC that, in turn, is encoded within the affixed RFID tag.

85. RFID tags containing globally unique EPC information provide many benefits over printed bar codes in retail applications. These benefits include at least the ability to quickly read many tags at once, at long distances and even if not in direct line of sight, which allows for items to be tracked and traced through the retail chain. The result is provision of a system for rapid and accurate inventory management. It is the global uniqueness of each EPC identifier encoded within the memory of an RFID tag that enables these improved operational efficiencies; consequently, the operational systems rely upon the uniqueness of each EPC identifier to operate correctly.

86. The '967 Patent discloses and claims improvements to RFID systems "that enable point-of-use and on-demand commissioning of RFID transponder-equipped wireless sensors" which solved a problem faced in the industry while accommodating improvements in RFID transponder commissioning efficiency. Exh. B at 1:27-31. The inventions claimed in the '967 Patent

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

implement a memory structure for the RFID tag, which when encoded ensures that all serial numbers assigned within a particular object class are unique. E x h . B at 3:27-35. This memory structure utilizes a partitioned serial number space comprising a first portion of most significant bits and a second portion of lesser significance with a serialized sequence. Exh. B at 8:4-15, 8:21-32, 33:20-23. Through use of this partitioned serial number structure, a brand owner can ensure uniqueness across its many operations, for example, by having a block of serial numbers comprising a unique sequence of most significant bits allocated to each encoder, product line, facility, or service bureau that encodes RFID transponders. This allows encoders to generate and assign serial numbers with no risk of inadvertently assigning a duplicate serial number that has been assigned by another encoder, product line, facility, or service bureau. Exh. B at 8:32- 37.

87.    Prior art approaches to ensuring uniqueness relied entirely on IT-based systems connected to a central system and database to generate and supply entire EPCs in pure identity format to individual encoders to commission an RFID transponder. These prior art schemes rely upon the encoding system's access to a central database to ensure that redundant serial numbers are not assigned. The central system assigning EPCs ensures uniqueness because all serial numbers were assigned sequentially by the system and database upon request from an encoder or its proxy. The inventions disclosed and claimed in the '967 Patent improved the operation of RFID systems to address this potential vulnerability, among others, by adding a further layer for ensuring uniqueness of the serial number of the EPC at the machine level of the encoding without necessarily requiring the system to be connected to a central system and/or database.

88.    Here, the claims of the '967 Patent are directed to encoded RFID transponders having a specific and intentional memory structure. By their express language, the apparatus claims of the '967 Patent are addressed to patent eligible subject matter.  More specifically, the

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

**Page 29 of 34**

Appx5259

claims are addressed to RFID transponders encoded with a particular memory structure that addressed a need in the RFID industry – ensuring global uniqueness of encoded RFID identifier data in a manner that does not require constant communication with a central database.

89.    Avery's patent ineligibility challenge ignores the highlighted portions of the following limitations of claim 1 of the '967 Patent (which is also representative of claim 13):

1. ***An RFID transponder*** comprising:

a substrate;

an antenna structure formed on the substrate; and

***an RFID integrated circuit chip*** which is electrically coupled to the antenna structure,

wherein ***the RFID integrated circuit chip is encoded with a unique object number***, the unique object number comprising an object class information space and a unique serial number space,

wherein ***the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers***, ***the allocated block being assigned a limited number of most significant bits***, and

wherein the unique serial number space comprises ***the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block*** and of remaining bits of lesser significance that together comprise the one serial number instance

90.    These limitations demonstrate that the challenged claims are directed to an encoded RFID transponder implemented with a memory structure accommodating a specific hardware-based number scheme.  The novel data structure solution is claimed in these highlighted elements of independent claims 1 and 13 of the '967 Patent, which require use of a partitioned unique serial number space comprising a first section of MSBs followed by a second section of bits of lesser significance.

91.    As made clear in the specification, the claimed inventions, and in particular the highlighted limitations, the Asserted Claims set out a novel solution for ensuring uniqueness across

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

a retailer's worldwide operations that does not require constant communication with a central database. The specification notes that the prior art's requirement of constant connectivity meant that any electrical or telecommunication system disruption, which commonly occurred, resulted in a stoppage of RFID tagging operations. This was a significant hindrance in the RFID industry because internet connectivity was not nearly as reliable, available, nor as fast in the 2000s as it has become today. The claims are therefore addressed to solving a specific technological problem in the RFID industry and claim a particular RFID tag and data structure for solving that problem, rendering them patent eligible at step one.

92. The use of the data structure claimed within the unique serial number space comprising a sequence of MSBs followed by bits of lesser significance for ensuring uniqueness of the claimed encoded RFID tag captures an inventive concept. The use of this claimed data structure was not well-understood, routine, or conventional in the RFID field in 2008.

93. I understand this to be true based on my knowledge as an expert in the RFID industry and based upon my review of all art raised by Avery in this litigation and in the *ex parte* reexamination of the claims of the '967 Patent by the PTO. None of this art demonstrates use of MSBs in accordance with the particular data structure of the serial number space of an RFID tag claimed. As such, in my opinion, the use of the data structure claimed in the '967 Patent claims comprises an "inventive concept" that was not well understood, routine, or conventional in the RFID field in 2008 and therefore these claims are directed to patent eligible subject matter.

## CONCLUSIONS

94. Based on the analysis above, none of the references identified and relied on by Avery in its Motion for Summary Judgment, whether alone or in combination, anticipate or render obvious claims 1-6 and 13-14 of the '967 Patent. This is because none of the references, either

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY