**Appeal No. 2022-1092**

# In the
# United States Court of Appeals
# for the Federal Circuit

ADASA, INC.,

*Plaintiff-Appellee,*

v.

AVERY DENNISON CORPORATION,

*Defendant-Appellant.*

Appeal from the United States District Court
for the District of Oregon, No. 6:17-cv-01685-MK.
The Honorable **Mustafa T. Kasubhai**, Judge Presiding.

## CORRECTED NON-CONFIDENTIAL BRIEF OF PLAINTIFF-APPELLEE ADASA, INC.

JONATHAN T. SUDER
GLENN S. ORMAN
FRIEDMAN, SUDER & COOKE, P.C.
604 E. 4th St., Suite 200
Fort Worth, TX 76102
(817) 334-0400
jts@fsclaw.com
orman@fsclaw.com

ROBERT P. GREENSPOON
WILLIAM W. FLACHSBART
DUNLAP BENNETT & LUDWIG PLLC
333 N. Michigan Ave., Suite 2700
Chicago, IL 60601
(312) 551-9500
rgreenspoon@dbllawyers.com
wflachsbart@dbllawyers.com

*Attorneys for Plaintiff-Appellee ADASA, Inc.*

COUNSEL PRESS · (866) 703-9373 PRINTED ON RECYCLED PAPER

Claim 1. An RFID transponder comprising:

a substrate;

an antenna structure formed on the substrate; and

an RFID integrated circuit chip which is electrically coupled to the antenna structure,

wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space,

wherein the unique serial number space is encoded with one serial number instance from an allocated block of serial numbers, the allocated block being assigned a limited number of most significant bits,

wherein the unique serial number space comprises the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block and of remaining bits of lesser significance that together comprise the one serial number instance.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1092

**Short Case Caption** Adasa Inc. v. Avery Dennison Corporation

**Filing Party/Entity** Adasa Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/03/2021

Signature: /s/ Robert Greenspoon

Name: Robert Greenspoon

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Adasa Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Richard A. Wojcio, Jr. | Alan J. Thayer, Jr. | Brett M. Pinkus |
| Johnathan E. Mansfield | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ vii

STATEMENT OF RELATED CASES ........ xii

INTRODUCTORY STATEMENT ........ 1

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 2

A. Subject Matter Eligibility ........ 3

B. Nonanticipation ........ 4

C. Damages Jury Instructions/Forms ........ 4

D. Factual Background of Discovery Sanctions ........ 5

1. Avery's Pre-Suit Hostility Toward ADASA By Mr. Maier ........ 5

2. Discovery Motions and Avery's Resulting Misstatements ........ 6

3. "Discovery Supplement" After Trial ........ 6

4. ADASA Seeks Redress ........ 7

5. Avery's Shifting Story at Two Post-Trial Evidentiary Hearings ........ 8

6. Avery's Final Post-Trial Timeline of Pre-Trial Discovery Failures ........ 9

7. The District Court's Thoughtful and Restrained Sanction Orders ........ 11

SUMMARY OF THE ARGUMENT ........ 13

ARGUMENT ........ 13

I. THE DISTRICT COURT CORRECTLY HELD ADASA'S CLAIMS PATENT-ELIGIBLE ........ 14

A. Avery Is Limited To The Summary Judgment Record, Did Not Preserve Its Appeal, and Failed to Meet Its Shifted Rule 56 Burden ............ 15

B. Patent Eligibility Legal Standards ............ 17

C. The ’967 Patent Focuses the Claimed Advance on a Hardware Instance of a Field Added to a Pre-Existing Coding Format, Resulting in a New Format That Obviates the Need for Constant Realtime Connection to a Serialization Database to Maintain Global Serial Number Uniqueness ............ 21

D. Avery’s Misleading Description of the Invention Does Not Support Reversal ............ 25

E. Avery’s Cases Are Distinguishable ............ 28

F. This Court May Also Decide Step Two for ADASA as an Alternative Ground ............ 30

II. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT THAT KUHNO AND *RFID FOR DUMMIES* DO NOT INVALIDATE THE ’967 PATENT ............ 32

III. AVERY’S JURY INSTRUCTION AND VERDICT FORM ARGUMENTS DO NOT JUSTIFY REVERSING THE DENIAL OF ITS NEW TRIAL MOTION ON DAMAGES ............ 39

A. Licenses Considered by the Jury ............ 40

B. Avery’s Damages Expert Testimony ............ 41

C. The District Court’s Rejection of the Late-Proffered Lump Sum Instruction and Verdict Form Question ............ 43

D. Avery Shows No Abuse of Discretion ............ 44

IV. AVERY’S APPEAL OF THE EXCLUSION OF NON-COMPARABLE LICENSES LACKS MERIT ............ 48

V. THE DISTRICT COURT’S RULE 37(c)(1) SANCTION WAS NOT AN ABUSE OF DISCRETION ............ 53

A. Avery Had Proper Notice ............ 54

B. A Rule 37(c)(1) Monetary Award is Not an Additur ............ 57

C. The Monetary Award Was Not Case Dispositive, Nor Would It Matter If It Were .......... 58

D. Sanctions Never Depended on the Liability Judgment .......... 61

CONCLUSION .......... 62

On pages 9, 10 and 12, the identity of one Avery employee is redacted after designation by Avery under the Protective Order.

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018) .......................................................31

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014)....................................................................... *passim*

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
841 F.3d 1288 (Fed. Cir. 2016) .......................................................20

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) .......................................................38

*Ancora Techs., Inc. v. HTC America, Inc.*,
908 F.3d 1343 (Fed. Cir. 2018) .......................................................18

*Apple Inc. v. Wi-LAN Inc.*,
__ F.4th __ (Fed. Cir. Feb. 4, 2022) ........................................... 52, 53

*Atlantic Thermoplastics Company, Inc. v. Faytex Corp.*,
5 F.3d 1477 (Fed. Cir. 1993) ...........................................................45

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) .......................................................20

*Berkheimer v. Hewlett-Packard Co.*,
881 F.3d 1360 (Fed. Cir. 2018) .......................................................20

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1996)...........................................................................58

*City of Almaty v. Ablyazov*,
2020 U.S. Dist. LEXIS 161546 (S.D.N.Y. Sept. 3, 2020) ..............61

*Content Extraction & Transmission LLC v. Wells Fargo Bank, National Association*,
776 F.3d 1343 (Fed. Cir. 2014) .......................................................29

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990)...........................................................................61

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
880 F.3d 1356 (Fed. Cir. 2018) .......................................................18

*Cosmokey Sols. GMBH & Co. KG v. Duo Sec. LLC*,
15 F.4th 1091 (Fed. Cir. 2021) .............................................................. 19, 20

*Digitech Image Techs., LLC v. Elecs. For Imaging, Inc.*,
758 F.3d 1344 (Fed. Cir. 2014) ..................................................................29

*Dynacore Holdings Corp. v. U.S. Phillips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004) ..................................................................34

*Energy Transp. Grp., Inc. v. William Demant Hldg. A/S*,
697 F.3d 1342 (Fed. Cir. 2012) ..................................................................45

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ............................................................ 18, 26

*ESN, LLC v. Cisco Sys., Inc.*,
685 F. Supp. 2d 631 (E.D. Tex. 2009) .................................................. 59, 61

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
702 F.2d 770 (9th Cir. 1983) ................................................................ 55, 56

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) ............................................................ 50, 51

*Fujifilm Corp. v. Benum*,
605 F.3d 1366 (Fed. Cir. 2010) ..................................................................45

*Gantt v. City of Los Angeles*,
717 F.3d 702 (9th Cir. 2013) ......................................................................39

*In re Exxon Valdez*,
102 F.3d 429 (9th Cir. 1996) ......................................................................61

*In re Gleaves*,
560 F.3d 1331 (Fed. Cir. 2009) ..................................................................33

*In re Lowry*,
32 F.3d 1579 (Fed. Cir. 1994) ....................................................................28

*In re Nordt Dev't Co., LLC*,
881 F.3d 1371 (Fed. Cir. 2018) ..................................................................38

*In re Tutu Wells Contamination Litig.*,
120 F.3d 368 (3d Cir. 1997) .......................................................................56

*Intellectual Ventures I LLC v. Capital One Financial Corp.*,
850 F.3d 1332 (Fed. Cir. 2017) ..................................................................29

*Juan Gonzalez Mercedes v. Tito Trans. Corp.*,
2017 U.S. Dist. LEXIS 33376 (S.D.N.Y. Mar. 7, 2017)........................ 58, 59

*Kirshner v. Uniden Corp. of Am.*,
842 F.2d 1074 (9th Cir. 1988) ....................................................................20

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ......................................................... 46, 49, 51

*Lucent Technologies, Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ................................................ 47, 49, 51, 52

*Maxwell v. J. Bake, Inc.*,
86 F.3d 1098 (Fed. Cir. 1996) ....................................................................45

*Mentone Sol'ns LLC v. Digi Int'l Inc.*,
No. 2021-1202, 2021 U.S. App. LEXIS 33793
(Fed. Cir. Nov. 15, 2021)........................................................................ 18, 26

*Merchant v. Corizon Health, Inc.*,
993 F.3d 733 (9th Cir. 2020) ................................................................. 59, 60

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
210 F.3d 1099 (9th Cir. 2000) ....................................................................16

*Odg-Ou v. Co. V.*,
2016 U.S. Dist. LEXIS 201805 (W.D. Ok. Apr. 27, 2016) ..........................59

*Packet Intelligence LLC v. NetScout Sys., Inc.*,
965 F.3d 1299 (Fed. Cir. 2020) ..................................................................26

*Padgett v. Wright*,
516 Fed. Appx. 609 (9th Cir. 2013) ....................................................... 20, 21

*PersonalWeb Technologies LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ................................................................ 28, 29

*Purdue Pharma L.P. v. Epic Pharma, LLC*,
811 F.3d 1345 (Fed. Cir. 2016) ..................................................................37

*R&R Sails, Inc. v. Ins. Co. of Penn.*,
673 F.3d 1240 (9th Cir. 2012) ....................................................................60

*RecogniCorp, LLC v. Nintendo Co.*,
855 F.3d 1322 (Fed. Cir. 2017) ..................................................................29

*ResQNet.com, Inc. v. Lansa, Inc*,
594 F.3d 860 (Fed. Cir. 2010) .......................................................................51

*Secured Mail Sols., LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) ........................................................ 14, 24, 30

*Security Bank of Sioux City v. Jones Day*,
800 F.3d 936 (8th Cir. 2015) .........................................................................56

*Smart Systems Innovations, LLC v. Chicago Transit Auth.*,
873 F.3d 1364 (Fed. Cir. 2017) .....................................................................29

*SmithKline Diagnostics, Inc. v. Helena Laboratories Corp*.,
926 F.2d 1161 (Fed. Cir. 1991) .....................................................................45

*Synqor, Inc. v. Artesyn Techs., Inc.*,
709 F.3d 1365 (Fed. Cir. 2013) ............................................................. 57, 58

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) ........................................................ 16, 18, 20

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001) .....................................................................34

*Trell v. Marlee Electronics Corp*.,
912 F.2d 1443 (Fed. Cir. 1990) .....................................................................52

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
957 F.3d 1303 (Fed. Cir. 2020) ............................................................ *passim*

*Unisplay, S.A. v. American Electric Sign Co.*,
69 F.3d 512 (Fed. Cir. 1995) .........................................................................45

*Universal Secure Registry LLC v. Apple Inc.*,
10 F.4th 1342 (Fed. Cir. 2021) .......................................................................29

*Vir2us, Inc. v. Invincea, Inc.*,
235 F. Supp. 3d 766 (E.D. Va. 2017) ............................................................59

*VirnetX, Inc. v. Cisco Systems, Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) .....................................................................49

*Visual Memory LLC v. Nvidia Corp.*,
867 F.3d 1253 (Fed. Cir. 2017) ............................................................. 18, 26

*Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*,
609 F.3d 1308 (Fed. Cir. 2010) .....................................................................50

*Yan Fang Du v. Allstate Ins. Co.*,
697 F.3d 753 (9th Cir. 2012) ....................................................................39

**Statutes & Other Authorities:**

35 U.S.C. § 101 .......................................................................... 3, 17, 21, 27

35 U.S.C. § 285 ........................................................................................ 41, 60

Fed. R. Civ. P. 11 ..........................................................................................61

Fed. R. Civ. P. 26(e).......................................................................................53

Fed. R. Civ. P. 37 ...................................................................................... 7, 55, 61

Fed. R. Civ. P. 37(c)(1)............................................................................ *passim*

Fed. R. Civ. P. 50 ............................................................................................3

Fed. R. Civ. P. 56 ...................................................................................... 15, 16

Fed. R. Civ. P. 58 ...................................................................................... 57, 61

U.S. Patent No. 9,798,967.......................................................................... *passim*

## STATEMENT OF RELATED CASES

Appellee is not aware of any case meeting the definition of a related case under either Fed. Cir. Rule 45.7(a) or 45.7(b).

## INTRODUCTORY STATEMENT

Avery Dennison Corporation ("Avery") raises four appellate issues seeking to erase the justice it received from a Eugene, Oregon jury. But Avery cannot identify any District Court error, and by not appealing them, concedes the vast majority of decided issues (*e.g.*, findings of Avery litigation misconduct). For reasons discussed herein, Avery's appellate challenges, many of which are unpreserved, lack merit. This Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether a "contingent" *Alice* motion preserves for appeal a patent eligibility challenge, and if so, whether a narrowly claimed hardware instance of a new RFID code memory format that beneficially adds a new data field is patent ineligible.

2. Whether anticipation was triable when two prior art documents lacked claim limitation disclosures, and the gap-filling expert report was "conclusory."

3. Whether the trial court abused its discretion (a) to deny an infringer a lump sum jury instruction and verdict form when it had offered no lump sum damages theory, or (b) to exclude two portfolio licenses in the absence of a comparability showing.

4. Whether the trial court abused its discretion in sanctioning undisputed infringer misconduct involving a multi-year "reckless" practice to withhold infringing product discovery, revealed after trial.

## STATEMENT OF THE CASE

ADASA Inc.'s ("ADASA's") inventor Clarke McAllister invented a new hardware instance of an RFID tag. The resulting patent (U.S. Patent No. 9,798,967) survived Avery's reexamination challenge. After a jury trial, the jury awarded damages at a royalty rate of \$0.0045/tag, which was half of the \$0.009/tag rate that ADASA sought, which amount was itself discounted from the penny-per-tag rate reflected in the comparable license evidence.

During four years of litigation, Avery scorched the earth, challenging every aspect of ADASA's patent infringement claim. But it failed every time because each challenge lacked merit. Avery's improper tactics instead earned it a litigation misconduct finding and full-case fee shifting, which Avery does not challenge on appeal. (Appx14571-14572, Appx14605-14608).

Though the issues now are few, and despite empty apologies, Avery brings an appeal that disregards its conduct in the District Court. Avery raises only four

issues: subject matter eligibility, validity, damages jury instructions/forms, and discovery misconduct sanctions.[1]

### A. Subject Matter Eligibility

Avery elides the fact that its *Alice* theory in this case was "contingent" on the District Court issuing an extremely broad claim construction that it never actually issued. The word "CONTINGENT" was even in the title of Avery's summary judgment motion. (Appx4256). In Avery's words: "If the claim language itself does not require a limited number of most significant bits to be assigned to an allocated block of serial numbers in binary, then the claimed invention is not directed to a hardware-based approach accomplished by managing assignment of serial numbers at the binary bit level." (Appx4275). Avery confirmed in its Reply: "Avery Dennison has brought a contingent motion for summary judgment under § 101 . . . ." (Appx5603). Avery then admitted that the claims as the District Court construed them: "would constitute '***specific language*** limiting the claims to a certain process, component arrangement, or methodology for effecting ***a desired result have been found*** [sic] ***patent eligible***.'" (Appx5603, first emphasis Avery's).

---

[1] Avery's Rule 50 motion shows more than a dozen issues Avery dropped for appeal, including infringement, priority date, enablement, royalty rate, intervening rights and more. (Appx11931-11932).

Avery's summary judgment position thus conceded the proper outcome for this appeal—that claim 1 is not directed to an abstract idea. ADASA added a new field to a memory structure that brought real improvement to a technology, a scenario this Court's decisions already hold non-abstract. Technologically improving the RFID industry with a new code format and a new field in physical memory makes the claimed physical tag instance patent eligible.

### B. Nonanticipation

ADASA moved for summary judgment of no invalidity by the Kuhno patent or *RFID for Dummies*—two references Avery's expert admitted are silent about allocating blocks of serial numbers based on most significant bits. Avery itself confirmed: "the claims as written and as construed by the Court require a serial number taken from an allocated block that was defined through the assignment of a limited number of most significant bits." (Appx5603). Expert report claim charts limited the claim 1 challenge to anticipation (not obviousness), attempting to read this limitation of claim 1 onto those references. But those charts did not indicate any such disclosure in the references. (Appx3840-3845). This evidentiary gap made this prior art amenable to summary judgment.

### C. Damages Jury Instructions/Forms

This Court will not find Avery's proposed lump sum jury instruction or verdict form in the record. Avery emailed them on the last day of trial but never

lodged them in the record, and never filed a motion to supplement the record. Remarkable as it is that Avery alleges error in a trial court denial of an instruction and form whose wording cannot be ascertained from the record, more remarkable is that the instruction and form reflect a damages theory repudiated by Avery and its expert at trial. (Appx15649, Appx15654, Appx15658-15659, Appx15675, Appx15688).

Avery's expert did not include a lump sum opinion in his report and did not testify to one at trial. The trial evidence only supported a running royalty damages opinion, based on analysis of several *Georgia Pacific* factors. Avery not only failed to show evidence to the jury that in-evidence licenses might lead to a lump sum verdict, it also affirmatively called them unhelpful for that damages assessment, putting all eggs in the "design around costs" damages basket.

### D. Factual Background of Discovery Sanctions

Facts omitted by Avery explain the context of the sanction award.

#### 1. Avery's Pre-Suit Hostility Toward ADASA By Mr. Maier

Before suit, an in-house attorney from Avery (Michael Maier) asked Mr. McAllister to meet. (Appx15305-15039). Mr. McAllister believed this Avery meeting was to be a business and licensing meeting, to discuss a business relationship. (Appx15039). The meeting was instead an "ambush." (Appx15040). Accompanied by counsel from Avery's outside law firm, Mr. Maier told Mr.

McAllister (who attended unrepresented) to stay away from Avery's customers. (Appx15040-15041).

**2. Discovery Motions and Avery's Resulting Misstatements**

Throughout years of litigation, ADASA counsel noticed inconsistencies suggesting Avery's failure to comply with accused product discovery obligations. ADASA brought motions to compel (Appx1346-1357, Appx1823-1837), which were resolved through Avery's affirmative representation that it had performed additional searches that did not uncover additional documents, such that all infringing schemas had been produced. (Appx1849; Appx23, ECF#111 denying motions as "moot;" *see also* Appx11614-11619, Section 285 briefing listing discovery motions and their outcomes).

Trial lasted from May 10 to 14, 2021. Avery's trial strategy emphasized the relative unimportance of Mr. McAllister's inventions by contending—based on its own production of infringing schemas—that 79-80% of its tag sales were noninfringing. (Appx14796, Appx15200, Appx15450-15451, Appx15672-15673). As a result, the jury halved royalty rate sought by ADASA. (Appx11532-11534).

**3. "Discovery Supplement" After Trial**

Revelations regarding Avery's production of infringing schemas began on June 10, 2021, when Avery notified ADASA that it needed to supplement accused product discovery. (Appx13741). Avery consented at that time to a supplemental

judgment to include any additionally identified infringing tags at the rate set by the jury. (Appx13746). The process involved Avery retaining Ernst & Young to validate the number of previously-undisclosed infringing tags. (Appx14169-14173).

**4. ADASA Seeks Redress**

Less than two weeks after that initial revelation, ADASA moved for an order to show cause, for Rule 37 sanctions, and for an evidentiary hearing. (Appx13733-13737). ADASA also pointed to the new revelation in its Section 285 motion reply, noting how Avery's trial strategy hinged on emphasizing the proportion on non-infringing to infringing tags to reduce the adjudged rate. (Appx13749-13752). ADASA gave notice in its sanctions reply brief (filed July 14, 2021) that, to the extent not already apparent, ADASA was seeking a "significant" monetary award tied to Avery's contamination of the "rate" evidence, and that augmenting the base alone would be "insufficient":

> Simply undertaking now, after trial, to finally ascertain an accurate accounting of Avery's infringement is insufficient and significant sanctions are therefore appropriate. Avery cannot be permitted to "hide the ball" throughout only to benefit through obtaining a lower royalty award that would not have been realized but-for Avery's discovery misconduct.

(Appx14082-14084). Indeed, just truing up the base as if no misconduct had occurred would make discovery obstruction a winning proposition for Avery—it could put only a fraction of infringing schemas before the jury, reap the benefits of

arguing that the extent of its infringement was *de minimis* in the form of a lower royalty rate, and then apply that artificially depressed royalty rate to the full royalty base post-trial.

The District Court subsequently convened two evidentiary hearings to probe how Avery failed to produce all infringing schemas and when Avery's trial counsel first discovered such failure.

**5. Avery's Shifting Story at Two Post-Trial Evidentiary Hearings**

In the first evidentiary hearing, Avery contended that a former Avery employee who had attended trial as a witness (Raymond Blanchard) first pointed out to counsel on May 20, 2021 that trial financials did not include D2Comm schemas. (Appx14274). ADASA questioned inconsistencies in this story—why was Mr. Blanchard (who had retired 12 years earlier) at Avery facilities after his duties as a trial witness had ended? (Appx14361). No answer emerged.

Other Avery statements suggested that an April 16, 2021 message from ADASA clued Avery into discrepancies that required investigation. (Appx14082-14083). Then at the final hearing, Avery admitted to knowing of "red flags" about data incompleteness in December 2019. (Appx14518). To this day, Avery has not resolved these inconsistencies.

The District Court exposed more and graver Avery inconsistencies. At the first hearing, the only witnesses were Ernst & Young personnel who came onto the

scene after-the-fact, so the District Court convened a second hearing to focus on who initially did the discovery searching and collection. (Appx14450-14458). The named employee was Employee Name Yet when Employee Name appeared to testify at the second hearing, Avery clarified that Employee Name was never involved with the initial searching; he only handled a supplemental search in an unspecified later litigation period. (Appx14517-14519).

**6. Avery's Final Post-Trial Timeline of Pre-Trial Discovery Failures**

The final timeline Avery offered explained that the initial discovery search occurred under Mr. Maier's direction (*i.e.*, the same lawyer who met Mr. McAllister). (Appx14519-14520). Mr. Maier had instructed yet a different never-before-named Avery employee (Andrew Nguyen) to collect material for production, whereupon Mr. Nguyen unambiguously told Mr. Maier that he could only list and locate schemas in the Serialization Manager repository because that was all he had access to. (Appx14520).

Mr. Maier did nothing to find D2Comm materials, though it was a "living, breathing" database sourcing billions of dollars of tag encodings per year. (Appx14534). Later, when Employee Name was tasked to supplement (since Mr. Nguyen had left the company), he did as he was instructed and supplemented only the original list from Serialization Manager that Mr. Nguyen had first made.

(Appx14519). D2Comm went ignored, even though Employee Name daily responsibilities included operating D2Comm. (Appx14417).

Ernst & Young's investigation confirmed that Mr. Maier's suppression of D2Comm was avoidable. Ernst & Young personnel quickly learned in only "a couple of hours in total" of conversations with Avery people what process was needed to extract D2Comm schemas for searching and collection. (Appx14399-14400). People at Avery already knew how to do such extraction. (Appx14402). Ernst & Young's validation process simply performed a task that Avery personnel had already done and already knew how to do had Avery met minimum ethical and professional standards. (Appx14407-14408).

At the September 16 hearing, ADASA put everyone on notice of the possible sanctions that might come down on October 1:

> [MR. SUDER]: I mean, I could tell Your Honor with a straight face, you should give us the difference between .45 and .9 [of a penny] as a sanction, because look what happened. I don't think you're going to go there, but I'm just saying, I could do that.
>
> THE COURT: Not as an ongoing royalty rate, but as a sanction.
>
> MR. SUDER: Just sanction.

(Appx14452-14453). ADASA repeated this same request for $0.0045/tag at the October 1 hearing, after which Avery counsel was permitted further argument to state and defend its position. (Appx14536). ADASA never asked for case dispositive sanctions, declining to ask for a default judgment. (Appx14535).

### 7. The District Court's Thoughtful and Restrained Sanction Orders

It would be impossible in a few appeal pages to convey the District Court's care in arriving at a just $0.0025/tag sanction result—about half the amount ADASA requested. The District Court lived through numerous infringement-scope discovery disputes involving three motions to compel, resolved only by Avery's repeated assurances that it had located all allegedly infringing schemas. (Appx1849). In presiding over the trial, the District Court saw firsthand how Avery misled the jury as to the actual extent of its infringement, and understood how that key trial theme impacted the royalty rate it awarded. (Appx14796, Appx15200, Appx15450-15451, Appx15672-15673). And post-trial, the District Court convened two lengthy hearings to learn the truth, where two witnesses testified live and a third witness prepared to testify live until revelations that he was not, after all, a percipient witness. (Appx14347-14510; Appx14511-14579).

The District Court's own summation of its "recklessness" fault findings states it eloquently:

> Had [Avery] acted the way that they needed to act, should have acted, but refused and failed and, I think, were reckless in not acting appropriately . . . I think . . . they've put [trial counsel] in a very difficult place to have to come to court and carry water for Avery Dennison on this.
>
> * * *

> Why they chose to treat this in as careless a way and as reckless a way is beyond me, but they did, and they didn't take litigation seriously, and now they're accountable for it.

(Appx14577). The District Court's later written ruling contains yet more detail. (Appx14625-14628). Reflecting on its "great deal of patience and extended professional courtesies to both parties through several years of litigation," the ruling observed:

> yet, even on the final day of post-trial hearings, Defendant could not assure the court that it had ever reliably sought the discovery to which Plaintiff was entitled—its own purported expert who would be able to explain how the search for potentially infringing tags had been conducted [redacted] was withdrawn because Defendant had to acknowledge the expert was never asked to conduct a search in the first place.

(Appx14627).

The District Court considered but rejected lesser sanctions, noting that "the default remedy of exclusion is unavailable given the procedural posture of this case." (Appx14626). Contrary to Avery's suggestion on appeal that the sanction somehow alters the jury's findings, the Court confirmed that it "is not revising the royalty rate the jury awarded," and was instead simply using factual metrics about the quantum of infringing tags that should have been put before the jury as a starting point for an "appropriate remedy" under Rule 37(c)(1). (Appx14627).

## SUMMARY OF THE ARGUMENT

To the extent Avery preserved any of its four appellate issues, Avery has shown no legal error or abuse of discretion by the District Court.

## ARGUMENT

Avery's *Alice* challenge is both unpreserved and wrong. Avery presented its defense at summary judgment as a "contingent" one, and the contingency never occurred. On the merits, claim 1 is precisely the type of claim that this Court's precedents find directed to a technological improvement, not an abstract idea, as acknowledged by Avery's own "contingency" condition. Unaddressed at the District Court, the *Alice* step two analysis would also militate toward patent eligibility.

Avery's anticipation challenge suffers from the irredeemable flaw that the prior art does not disclose a claim limitation—in this case, an RFID tag serial number having most significant bits ("MSBs") uniquely corresponding to those of an allocated block.

Avery's new trial challenge misstates the highly deferential standard of review, ignores its repudiation of any lump sum damages theory, and points to no true "comparable" excluded license evidence.

Finally, the discovery sanction must stand. Avery had full notice of the possible monetary remedy and its rationale, the remedy did not change the jury

award and is thus not an "additur," Avery's "recklessness" constitutes "fault," lesser remedies were considered but were insufficient, and discovery sanctions do not and should not depend on who wins or loses.

## I. THE DISTRICT COURT CORRECTLY HELD ADASA'S CLAIMS PATENT-ELIGIBLE

Flouting preservation of error, Avery argues that the '967 Patent claims ineligible subject matter. Yet Avery cites no decision holding that a claim to a structural hardware instance of a novel and beneficial encoding format is patent ineligible. Indeed, Avery's own cited case confirms that such a claim *is* patent eligible.[2] And in any event, Avery errs in its application of the two-step *Alice* framework.

Though acknowledging under step one of *Alice* that the Court evaluates the focus of the claimed advance over the prior art (Blue Br. 24-25), Avery conducts no such analysis. Avery avoids searching the specification for the inventor's statement about what *benefit* or *advantage* the claimed invention brings. Performing the *Alice* analysis correctly—as the District Court did—makes clear that this Court should affirm.

---

[2] *Secured Mail Sols., LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 910 (Fed. Cir. 2017) (discussed at Blue Br. 29) (contrasting an ineligible claim that merely applied a barcode, with a claim that would be eligible at step one, if "directed to a new barcode format" or "specific details of the barcode," or specifying "how the unique identifier is generated or how a unique identifier is different from [conventional types]").

### A. Avery Is Limited To The Summary Judgment Record, Did Not Preserve Its Appeal, and Failed to Meet Its Shifted Rule 56 Burden

Avery's only ineligibility argument was based on a condition that never took place. Avery's *Alice* appeal is thus foreclosed under this Court's precedent. More specifically, Avery conditioned its ineligibility argument on a claim construction rejected by the trial court and not requested here on appeal. Avery therefore cannot challenge the District Court's *Alice* decision on appeal.

Both sides moved for summary judgment on patent eligibility. (Appx3266, Appx4272-4276). Avery's five-page motion only advanced a conditional argument. If and only "[i]f the claim language itself does ***not*** require a limited number of most significant bits to be assigned to an allocated block of serial numbers in binary," then Avery would contend that the alleged abstract idea was "segmenting a numbering space." (Appx4275, emphasis added). Avery also expressly conceded that, if the claim language ***did*** contain such a requirement, then "the claimed invention [would be] directed to a hardware-based approach accomplished by managing assignment of serial numbers at the binary bit level," and thus not "directed to" something abstract. (Appx4275).[3] Avery's conditional ineligibility defense, as presented at summary judgment, hinged on the District

[3] Avery's step two assertions were, if anything, less substantive, consisting of a single attorney argument paragraph that failed to make a single citation to any piece of evidence (intrinsic, documentary, expert, or otherwise). (Appx4276).

Court making a particular claim construction ruling that the District Court did not make.

The eligibility summary judgment that Avery appeals "should be judged on the record made on its motion for summary judgment." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020) (affirming summary judgment of no patent ineligibility). That record shows that Avery only made a "conditional" request for an ineligibility determination, and that the named condition never came to pass. Thus, Avery never actually moved for summary judgment (or defended ADASA's motion) on Section 101 under the actual claim construction, hence the patent eligibility portion of its appeal is unpreserved.

The rest of summary judgment briefing accords. For example, Avery's opposition to ADASA's "no evidence" motion regarding ineligibility under Rule 56 was a single sentence complaining that ADASA's argument appeared in a footnote (Appx5291), failing to recognize that ADASA had no Rule 56 burden to make a factual showing in that motion. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). Meanwhile, ADASA opposed Avery's motion by pointing out that the step one argument was "couched" as conditional on a claim construction not adopted by the District Court, and that Avery used only attorney argument (not evidence) at both steps one and two. (Appx4595-4598).

Avery's Reply also doubled down on the "conditional" nature of its defense. Avery headed its entire *Alice* section with the bolded text: "Subject matter eligibility comes down to claim scope." (Appx5602). In the body, Avery was explicit, stating that it had raised its ineligibility defense within a "contingent motion" requiring a claim construction that the claims were ***not*** limited to "a serial number taken from an allocated block that was defined through assignment of a limited number of most significant bits." (Appx5603).

The contingent and conditional trigger for Avery's *Alice* defense did not exist. The claims ***are*** limited to "a serial number taken from an allocated block that was defined through assignment of a limited number of most significant bits." (Appx101, Appx829-837, Appx6129-6132). The District Court paid proper and close attention to the conditional nature of the eligibility defense as Avery litigated it, rejecting "Defendant's unsupported assertion that the claims 'broadly encompass virtually any use of segmented serial numbers in RFID transponders,'" while noting the "if . . . then" formulation of Avery's argument. (Appx6131-6132).

### B. Patent Eligibility Legal Standards

Avery now conveniently forgets and neglects to mention in its brief how it framed the issue below. If Avery can somehow overcome its failure to preserve its Section 101 challenge, determining patent eligibility follows the two-step framework taught by *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014).

At step one, in the context of technology that relates to computers, the Court answers whether the claim "directed to an abstract idea," or is otherwise "an improvement to computer functionality." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). "[I]t is appropriate to consider the technological improvement embodied in the claims at step one, [] because *Alice* does not 'broadly hold that all improvements in computer-related technology are inherently abstract and, therefore, must be considered at step two.'" *Visual Memory LLC v. Nvidia Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017) (quoting *Enfish*, 822 F.3d at 1335). Thus when "the claims focus on specific asserted improvements in computer capabilities," that forecloses a conclusion that the claims focus "on a process or system that qualifies as an abstract idea for which computers are invoked merely as a tool." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1306 (Fed. Cir. 2020).

Ignored by Avery, this Court analyzes the specification to determine whether the claims focus on specific improvements.[4] In *Uniloc*, this Court considered a

---

[4] Cases are legion where the Court analyzed the specification at step one to discern the focus of the claimed advance, finding the claims were directed to an improvement in computer technology and not an abstract idea. *Mentone Sol'ns LLC v. Digi Int'l Inc.*, No. 2021-1202, -1203, 2021 U.S. App. LEXIS 33793, at *8-12 (Fed. Cir. Nov. 15, 2021) (nonprecedential); *TecSec*, 978 F.3d at 1294-95; *Ancora Techs., Inc. v. HTC America, Inc.*, 908 F.3 1343, 1348-49 (Fed. Cir. 2018); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1363 (Fed. Cir. 2018); *Visual Memory*, 867 F.3d at 1259-60 (Fed. Cir. 2017).

claim recting transmission of "an additional data field for polling at least one secondary station." *Id.* The specification explained that such invention "improves conventional communication systems by including a data field for polling as part of the inquiry message, thereby allowing primary stations to send inquiry messages and conduct polling simultaneously." *Id.* This added field improved computer functionality by reducing latency in a type of prior art polling system. *Id.* at 1307. This Court rejected the challenger's attempt to characterize the addition of a field as mere "data manipulation," *id.* at 1308, and rejected the argument "that the claims themselves must expressly mention the [advantages of the claimed combinations] achieved by the claimed system," *id.* at 1309.

At step two, this Court "consider[s] the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Cosmokey Sols. GMBH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1096 (Fed. Cir. 2021) (quoting *Alice*, 573 U.S. at 218) (cleaned up). Step two tests whether the claim is a patent-eligible application of the named and articulated abstract idea. Here, the District Court did not need to reach step two after finding for ADASA at step one, though the record contains expert testimony showing the claim limitations were not routine, conventional or well understood. (Appx5256-5261).

This Court might address step two by assuming *arguendo* Avery's characterization of step one. *Id.* at 1097 (citing *Amdocs (Israel) Ltd. V. Openet Telecom, Inc.*, 841 F.3d 1288, 1303 (Fed. Cir. 2016)). If an "inventive concept" is "significantly more than the abstract idea itself" and not "simply [] an instruction to implement or apply the abstract idea on a computer," then it has "transform[ed] the abstract idea into a patent-eligible invention." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016). Patent specification descriptions of how the claim limitations provide a technical improvement over conventional means will render a claim eligible at step two, just like at step one. *See Cosmokey*, 15 F.4th at 1098-99. A challenger's clear and convincing burden to establish lack of inventive step is not satisfied merely by pointing to an isolated prior art reference having a relevant disclosure. *Berkheimer v. Hewlett-Packard Co.*, 881 F. 3d 1360, 1369 (Fed. Cir. 2018) ("mere fact" that item of prior art discloses something does not suffice).

Finally, under both Federal Circuit and Ninth Circuit law, a dispositive ruling against a challenger's eligibility defense on summary judgment (such as occurred here) "should be judged on the record made on its motion for summary judgment." *TecSec*, 978 F.3d at 1292; *Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077 (9th Cir. 1988); *see also Padgett v. Wright*, 516 Fed. Appx. 609, 610-

11 (9th Cir. 2013) (nonprecedential) ("We do not consider [trial testimony] when reviewing the grant of summary judgment.").[5]

### C. The '967 Patent Focuses the Claimed Advance on a Hardware Instance of a Field Added to a Pre-Existing Coding Format, Resulting in a New Format That Obviates the Need for Constant Realtime Connection to a Serialization Database to Maintain Global Serial Number Uniqueness

There can be no doubt that the '967 Patent focuses its claimed advance on an improvement in RFID technology, and thus passes the eligibility test at step one. Before the '967 Patent, global RFID tag uniqueness could only be guaranteed using a constant, uninterrupted connection to an online database. The '967 Patent improves computer functionality by guaranteeing the global uniqueness of RFID tags encoded under the preexisting SGTIN-96 standard *without the need for constant real time database connectivity*. ADASA's added data field, bitwise-allocated serial number blocks and tag memory "space" structure therefore realized the longstanding goal of guaranteeing unique RFID tags worldwide where no prior art, including the SGTIN-96 standard, had before.

The '967 Patent's specification explains prior serialization techniques in the RFID industry, and that "[g]enerating a unique serial number is imperative, and is

---

[5]Avery cites portions of the trial record, rather than the summary judgment record, to make its arguments. *See, e.g.,* Blue Br. 25-27, 29-30, 36. Avery also cites evidence never presented to the trial court. Blue Br. 35, notes 3-5. All of this evidence should be disregarded by this Court if, despite Avery's failure to preserve, it addresses Avery's Section 101 challenge on the merits.

required for EPCglobal RFID tagging implementations." (Appx81, 2:21-22). "The uniqueness of an identifier is critical to the success of almost any tracking system." (Appx81, 2:48-49). The '967 Patent thus explained that "the state-of-the-art does not fully address the needs of . . . high-volume, reliable deployment and commissioning of RFID transponders," insofar as the state-of-the-art lacked "processes for efficient commissioning of batches of RFID transponders, without the need for realtime wireless connectivity." (Appx82, 3:21-23). ADASA's expert Dr. Engels corroborated that the existing art lacked such a system. (Appx5256-5261).

Mr. McAllister's claimed invention provided those benefits and advantages. With the claimed invention, "[t]here is no absolute need to query a database in real time; hence there is no need for continuous wireless network connectivity." (Appx82, 3:65-67; *see also* Appx60, Abstract: "without requiring a realtime connection to a serialization database"). As the '967 Patent describes, not requiring a real time connection circumvents delays that could occur during tag commissioning processes arising from database connection lapses. (Appx82, 4:2-8). Removing the need for real time database queries reduced or outright eliminated delays, "help[ing] manual labor operate at maximum efficiency, allowing them to achieve a regular and dependable cadence in their transponder application process." (Appx82, 4:8-12).

The structure by which the preferred embodiment achieved these benefits and advantages involved re-formatting the tag serial number space to take into account what are called "blocks" of serial numbers that would become "allocated." (Appx84, 8:4-51). "[S]erial number block sizes are sufficient to operate encoder 175 or 30 for extended periods of time without any further external authorization steps." (Appx84, 8:37-39). The specification gives one example of a person encoding tags "for up to 1677 days or over four years without receiving future authorizations from a higher level authority." (Appx84, 8:45-48).

This change of the serial number space would become realized when the "external number issuance authority allocates to the encoder blocks of numbers for specific object classes," with a "preferred method" being "to subdivide the entire object class serial number space into sectors that are defined by a limited number of MSBs (Most Significant Bits) of the serial number field." (Appx84, 8:5-15). Using SGTIN-96 and its 38-bit serial number field as a starting example, the '967 Patent explained that "the upper 14 bits could be designated as the most significant bits for a particular embodiment. In that case the object class serial number space would be comprised of 16,384 sectors." (Appx84, 8:23-26). Carrying forward this example, "the lower 24 bits [of the prior 38-bit space] represent 16,777,216 unique serial number values." (Appx84, 8:29-31). In this way, a whole new data field in memory now exists, altering the original code format.

Avery does not dispute that the claims recite these concepts within an instance of an already-encoded tag having a "serial number space" (a structure in memory) deployed according to this improved code format. The claims recite:

> 1. An RFID transponder comprising:
>
> a substrate;
>
> an antenna structure formed on the substrate; and
>
> an RFID integrated circuit chip which is electrically coupled to the antenna structure,
>
> wherein the RFID integrated circuit chip is encoded with a unique object number, the unique object number comprising an object class information space and a unique serial number space,
>
> wherein the unique serial number space is encoded with ***one serial number instance from an allocated block of serial numbers***, the allocated block being assigned a limited number of ***most significant bits***,
>
> wherein the unique serial number ***space*** comprises ***the limited number of most significant bits uniquely corresponding to the limited number of most significant bits of the allocated block*** and of remaining bits of lesser significance that together comprise the ***one serial number instance***.

(Appx101, emphasis added). This claim language embodies a specific instance of a new code format, which Avery's own case holds sufficient at step one. *See Secured Mail,* 873 F.3d at 910 ("new barcode format" would pass step one).

Dr. Engels (who spearheaded the creation of the original SGTIN-96 standard while at MIT) described the reformatting of the tag code within ADASA's

invention as a true advance, both in his summary judgment testimony and at trial. (Appx5256-5261; Appx14869-14878, Appx14882-14891). Though trial evidence is unavailable to urge reversal, affirmance is proper on any alternative ground supported by the record, and Dr. Engels told the jury that Mr. McAllister's improvement taught away from the conventional RFID structure at the time. It converted a "dumb" serial number space into a "smart" one, bringing additional benefits that even the patent specification did not originally state. (Appx14882-14891).

### D. Avery's Misleading Description of the Invention Does Not Support Reversal

In arguing patent eligibility (Blue Brief pp. 23-27), Avery never addresses the '967 Patent specification's discussion of the technological advantages and benefits of the claimed invention mentioned above, all of which make claim 1 inventive.

As in *Uniloc*, claim 1 is directed to the addition of a particular data field that brings about beneficial results in an overall computer-based system, such that it would be "misplaced" to characterize this as mere "data manipulation." 957 F.3d at 1306-08. If Avery's current argument that a claim is abstract when it subdivides data into a sequence of bits held any weight, this Court would have characterized the data field addition in *Uniloc* (which reduced transmission latency) as mere "addition of bits," and held it abstract at step one. ADASA's hardware-instance

invention is less abstract than in *Uniloc*, which claimed its new data field in an over-the-air transmission.

As in *Enfish*, the claimed alteration of the code format imparts "a specific type of data structure designed to improve" an overall computing system. 822 F.3d at 1338-39. If Avery's current argument held weight, this Court would have characterized the *Enfish* changes (making a database table "self-referential" via addition of a new kind of row) as mere "mentally sub-dividing one section of an already-divided piece of data" (Blue Br. 25), and held it abstract at step one.

As in *Visual Memory*, a new memory data structure avoided performance problems of the prior art. 867 F.3d at 1258-59. Similar to *Packet Intelligence LLC v. NetScout Sys., Inc.*, where the claim solved a challenge unique to computer networks and provided detail on how the solution was achieved, the claim here solves a challenge unique to RFID commissioning technology, providing detail on how to solve it. 965 F.3d 1299, 1309 (Fed. Cir. 2020). And as in *Mentone Solutions*, a change in data format permitted a system to do things it was previously incapable of doing. 2021 U.S. App. LEXIS at *8-10 (shifting a flag to allow a mobile station to use an otherwise impermissible configuration). *Mentone Systems* (like *Uniloc*) is particularly apt, for rejecting a characterization of a claim as mere "data manipulation on a generic computer." *Id.* at *10. This Court decided

all of the cases discussed above in favor of the patentee, but they would have all come out the other way if Avery's Section 101 arguments were correct.

Beyond overgeneralizing what the invention is directed to, Avery also cites ADASA's demonstrative figures. Avery alleges that every "0" and "1" is "the same" between a typical tag and a tag of the invention. Blue Br. 1-2. But those were simply demonstrative figures, for teaching color-coded concepts of the EPC SGTIN-96 structure by coloring over the memory field space of several SGTIN-96 fields (where the particular "0" and "1" instances were not important to what was being taught). (Appx246-259). Had Avery performed an electron microscope analysis of one of its actual infringing tags, it would *never* be able to show every "0" and "1" of 96 bits identical to those of a prior art SGTIN-96 programmed tag. ADASA's demonstratives do not cure Avery's lack of proof.

Avery also advances a waived printed matter argument lacking any merit.[6] The claim elements (particularly the final "wherein" clause) conclude that a particular unique serial number space comprises "a serial number instance." However, the invention is claimed not in terms of what content gets communicated, but in terms of physical space in the tag memory structure and how

---

[6] The District Court held that Avery's reliance on a printed matter claim construction was waived, appearing for the first time in post-trial motions. (Appx14615). Avery attempts to resuscitate such waived "printed matter" theories in its principal brief, without referring to (much less appealing) this bar. (Blue Br. 31-32).

it has been arranged (*i.e.*, specifics regarding the most significant bits and allocated blocks). That is why the claims refer to "space." *In re Lowry*, 32 F.3d 1579, 1583 (Fed. Cir. 1994) (new arrangement of physical memory space, thus "printed matter cases have no factual relevance here").

The District Court therefore did not err in its summary judgment that ADASA's claimed invention is patent eligible at step one, particularly in view of Avery's contingency limiting its *Alice* theory.

**E. Avery's Cases Are Distinguishable**

Avery's cases concern patents where the focus of the claimed advance was a longstanding human practice, and the claimed improvement simply computerized it. Its lead case, *PersonalWeb Technologies LLC v. Google LLC*, 8 F.4th 1310 (Fed. Cir. 2021), does not (as argued) reflect this Court holding that "assigning meaning to a sub-section of a data field is an abstract idea ineligible for patenting." Blue Br. 27. The focus of the *PersonalWeb* claim was use of a "content based identifier" (a conventional hash) to perform application level tasks that had been done for ages: to authorize or deny access or otherwise manage data linked with such identifiers. *Id.* at 1315-16. In *PersonalWeb*, the hash itself was acknowledged as a conventional identifier and not the focus of the claimed advance in the art, but instead, the focus of the claimed advance was a longstanding practice of (1) using the conventional identifier, (2) comparing it against something else, and (3)

providing or denying access (or deleting) in response. *Id.* at 1315. These were mere mental processes performed long before computers existed. *Id.* at 1316. *PersonalWeb* is inapposite, unlike *Uniloc*, where new code formats, or the addition of previously nonexistent data fields, brought about a specific improvement to computer functionality.

Avery also cites cases where, on their unique facts, the claims were directed to the collection, storage and recognition of data (*Smart Systems Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364 (Fed. Cir. 2017); *Content Extraction & Transmission LLC v. Wells Fargo Bank, National Association*, 776 F.3d 1343 (Fed. Cir. 2014)), the collection, display and manipulation of data (*Intellectual Ventures I LLC v. Capital One Financial Corp.*, 850 F.3d 1332 (Fed. Cir. 2017)), collecting and examining data to enable authentication (*Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342 (Fed. Cir. 2021), encoding and decoding image data (*RecogniCorp, LLC v. Nintendo Co.*, 855 F.3 1322 (Fed. Cir. 2017)), and organizing information through mathematical correlations (*Digitech Image Techs., LLC v. Elecs. For Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014)). These cases do not apply where the facts show (as they do here) that the focus of the claimed advance was a technological hardware improvement and modification of a code format, adding a never-before-extant data field that improves technology.

Lastly, Avery ironically cites *Secured Mail*. It held ineligibility at step one, but its reasoning supports ADASA. As noted, the Court in *Secured Mail* held that a "new barcode format" or a claim to "specific details of the [new] barcode" would pass the *Alice* test at step one. 873 F.3d at 910. That is closer to what the '967 Patent claims: a new code format, claimed in a hardware instance.

### F. This Court May Also Decide Step Two for ADASA as an Alternative Ground

Although there is no need to reach such analysis given Avery's failure to preserve and the merits of ADASA's case at step one, the Court may alternatively rule in ADASA's favor at step two. Avery argues, without citation to any evidence, that the "only allegedly novel limitations involve partitioning the already-familiar serial number section of the unique object." Blue Br. 34. But accepting Avery's argument that "partitioning a serial number" is the abstract idea (or any of its other phrasings), the '967 Patent claims possess an inventive step.[7]

Step two involves determining if the patented subject matter comprises an "inventive concept" sufficient to "transform" the ineligible matter into a patent-

[7] Analogies at Blue Brief pp. 35-36 to VIN numbers, credit card numbers or ISBN numbers are not only unpreserved arguments, they also hinge on citations to evidence in Avery's footnotes 3-5 never presented to the District Court. The analogies also fail on the merits. Such examples do not improve computer functionality, and do not exist in the backdrop of a patent specification that explains the benefits and advantages of implementing a new coding format, using a particular means never contemplated by industry.

eligible application. *Alice*, 573 U.S. at 221. "The second step of the *Alice* test is satisfied when the claim limitations 'involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Id.* Whether that is so is a question of fact. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

In its summary judgment motion and opposition to ADASA's motion and evidence, Avery provided no opinions of what a person of ordinary skill in the art would know, nor any supporting evidence under a step two analysis. Instead, Avery's attorneys stated in a conclusory manner that all limitations of the asserted claims "recite only things that had been invented by others and had become standard in the industry well before 2008." (Appx4276). In contrast, during summary judgment cross-motion proceedings, Dr. Engels confirmed that the RFID encoded tags described in the '967 Patent were novel, and that none of the RFID or EPC standards then developed by Auto-ID Center or by GS1 contemplated the use of most significant bits within the serial number space of an encoded RFID tag as claimed. (Appx5256-5261). For this additional alternative reason, Avery's appeal cannot succeed. This Court should affirm the summary judgment ruling for ADASA.[8]

---

[8] As an afterthought, Avery invokes preemption. But while Avery is correct that the policy behind limiting patent eligibility for abstract ideas is to prevent monopolies over the basic building blocks of ingenuity and human thought. (Blue Br. 36-37),

## II. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT THAT KUHNO AND *RFID FOR DUMMIES* DO NOT INVALIDATE THE ’967 PATENT

Though Avery purports to appeal summary judgment of “no invalidity,” alluding to both anticipation and obviousness challenges, only anticipation is truly at issue. With respect to Kuhno and *RFID For Dummies* (hereafter, “*RFID4D*”), this appeal only preserves an anticipation issue. This is because only claim 1 is in this case. (Appx7381-7382, motion to sever all but claim 1; Appx41, granting motion; Appx14589-14590, dismissal of severed claims). Avery’s expert report did not assert obviousness theories under Kuhno against any patent claim, only anticipation. (Appx3843-3847). And its *RFID4D* assertions included obviousness only against claim 1’s dependent claims, expressly asserting solely anticipation against claim 1. (Appx3840 ¶ 88). Avery’s mention of “obviousness” on appeal is gratuitous. Blue Br. 37 (“. . . under Sections 102 or 103 . . .”); Blue Br. 38 (stating “obviousness” standard of review).

Avery’s “evidence” on anticipation was conclusory. Avery’s expert Sweeney asserted anticipation by placing the entire text of claim 1 in one column of a claim chart, and a small amount of quoted text of each reference in the

---

fully half of Avery’s encoded tags do not infringe. (Appx14301-14303). Although Avery corrected itself post-trial that this figure is not the 80% proportion described to the jury (discussed in greater detail later), the 50% figure does at least show that this case does not present preemption concerns.

adjacent column. (Appx3841, Appx3843-3845). This might be sufficient if a reference's relevance is plain. But that was not the case here.

ADASA moved for summary judgment because neither reference anywhere disclosed the claimed requirement of a serial number instance comprising a limited number of MSBs which uniquely correspond to the MSBs of an allocated block of serial numbers. (Appx3269-3272). A prior art reference must teach every limitation of a claim to anticipate. *In re Gleaves*, 560 F.3d 1331, 1334 (Fed. Cir. 2009). With respect to Kuhno, the reference was "silent with regard to the contents and format of any data encoded into an RFID tag," and made "no mention of most significant bits whatsoever." (Appx3269, citing and quoting Kuhno). With respect to *RFID4D*, "the scheme disclosed . . . is simply to divvy up available serial numbers ***by ranges*** per facility (*i.e.*, numbers 1-1,000,000 to plant 1, numbers 1,000,001-2,000,000 to plant 2), then further allocate within a facility subranges of available serial numbers to each production line." (Appx3271, citing and quoting *RFID4D*). ADASA summarized the contrast with the '967 Patent, which "claims use of allocated blocks of serial numbers for a particular object class created using MSBs and imparting a partitioned data structure at the bit level within the memory of the claimed RFID tags." (Appx3271). Divvying by decimal ranges was cumulative of reexamination art, which also did not anticipate. (Appx3271-3273).

The District Court ruled correctly in holding no genuine issue of material fact existed as to invalidity over these references. (Appx6133-6138). The District Court agreed that Kunho disclosed no particular RFID data format, as "Sweeney's opinion does not identify which part of the [Kunho] patent teaches the concept of most significant bits." (Appx6135-6136; *see also* ADASA expert testimony at Appx3554-3555, citing Appx3958-3959). Calling Sweeney's testimony "conclusory," the District Court also found that Avery's argument and Sweeney's report on *RFID4D* were "insufficient to establish a dispute of a material fact." (Appx6136-6137). *See Dynacore Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) (conclusory testimony did not generate factual dispute) (collecting authority); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001) (same).

On appeal, Avery points to column 16 of Kuhno. Blue Br. 43-45 (citing Appx3963 16:8-18). However, this Kunho citation at most shows concatenation of decimal ranges (a pallet number with an incrementing carton number) on an encoding computer's human interface. Text not reproduced in Avery's brief shows that when the carton number increments beyond the programmed range, it simply rolls over (*i.e.*, repeats) back to the bottom of the programmed range. (Appx3963 16:18-23). Kunho not only fails to disclose any bit-level binary encoding format on

a tag itself involving unique assignment of MSBs to allocated blocks, but also fails to disclose unique serial numbers at all.[9]

Avery's attempt to generate an appellate issue over *RFID4D* also fails. Avery excuses Sweeney's "walk through" snippets of his book as nonconclusory, just because he himself authored it. Blue Br. 41-42. To the contrary, Sweeney's chart exposed his misunderstanding of the legal requirements for anticipation, as he quoted text that discloses nothing about MSBs as claimed.

Worse, Avery distorts the testimony of *its own fact witness*, Charles Williams. ADASA was not using Mr. Williams as an expert at that time (though previously it did), and he attended a deposition noticed by Avery to provide fact testimony on prior RFID business engagements with ADASA's inventor. Despite being goaded into creating on-the-fly expert opinions for Avery, Mr. Williams held firm and gave testimony far different from Avery's current characterizations.

Citing to page 93 of Mr. Williams' deposition among a group of appendix pages that selectively omits page 94, Avery contends that he agreed to Avery's

[9] Kuhno also lacked the "object class information space" limitation, which the parties agreed "should be construed as 'data field within the memory of the RFID integrated circuit chip for information identifying the class of an object, such as company prefix, item reference code, partition value and/or filter value.'" (Appx3332, claim construction; Appx16776, "object class" specification). None of the contemplated concatenated information in Kuhno (Julian calendar date, workstation ID, production line number, pallet number, carton number) constitutes "object class information" so defined.

expert's reading of *RFID4D*. Blue Br. 40 (quoting Appx5311, deposition page 93). The District Court looked at the complete testimony, and was not misled:

> Mr. Williams testified that *RFID for Dummies* does not state the use of most significant bits. Williams Dep. 93:23-25, ECF No. 180-1 [Appx5488]. He also testified that *RFID for Dummies* does not mention anything about bits of a serial number, nor could there be a conclusion from reading *RFID for Dummies* that using most significant bits of the serial number could be accomplished. *Id.* at 94:9-16 [Appx5489].

(Appx6137-6138). Avery avoids acknowledging this District Court analysis on appeal, which guts its attempt to use the page 93 testimony. This analysis cites deposition testimony on page 94 that (moments after Avery's quoted answer) revealed Mr. Williams' actual understandings:

> Q. But there – there's not a necessary conclusion from reading this that you would accomplish that by using most significant bits of the serial number?
>
> A. No.
>
> Q. And in fact this doesn't mention anything about bits of a serial number at all, correct?
>
> A. It does not.

(Appx5489).

Avery's appellate arguments also overlook its own factual concessions. Avery admitted that "[i]t is true that [Kuhno] discloses assigning numbers in decimal and then converting them to binary for encoding on an RFID transponder, as ADASA contends." (Appx5278). And Avery's expert Sweeney (the author of

*RFID4D*) also confirmed: "As I researched material from the 2002-2010 timeframe I looked for reference to 'most significant bits' and found none in the available literature or working papers from industry meetings." (Appx3826). These concessions, too, confirm the correctness of the District Court's rulings.

For the first time on appeal, Avery contends that some limitations that distinguish the prior art are "a process or source limitation that cannot salvage its apparatus claim" and as such have no patentable weight. Blue Br. 39-40. Avery did not contest summary judgment on this ground. The argument is waived.

It is also incorrect. For example, Avery's two cited decisions are inapposite. Its first citation involved an "oral dosage" product claim in which one subcomponent was "derived from" a certain physical source. *Purdue Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345, 1353-54 (Fed. Cir. 2016). This Court assigned no patentable weight to the "derived from" language because there was no evidence that a subcomponent so-derived imparted a structural or functional difference in the overall product as compared to prior art products. *Id.* at 1354. Here in contrast, encoding a serial number instance with MSBs uniquely corresponding to that of an allocated block defines a structural characteristic, and creates a discernible structural and functional effect on the resulting tag. For example, tags of two different allocated blocks according to the invention would always have unique MSBs compared to each other, while tags of two allocated

***ranges*** according to the prior art can never ***rule out*** overlapping MSBs.[10] *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354 n.20 (Fed. Cir. 2003) is even less relevant, since it simply remanded for a determination of structural or functional distinctness imparted by process limitations. *See, e.g., In re Nordt Dev't Co., LLC*, 881 F.3d 1371, 1372 (Fed. Cir. 2018) (finding distinctness, reversing Board).

Avery also speculates that forcing ADASA to distinguish prior art in front of the jury would have revealed gaps in ADASA's infringement case. Blue Br. 42-43. But Avery had a remedy if ADASA's expert were inconsistent: cross-examination and impeachment. And there was no inconsistency. Expert testimony explained what *RFID4D* fails to disclose, that is present in Avery tags: "There is no disclosure [in *RFID4D*] of defining or allocating block[s] based on a limited number of most significant bits." (Appx6136, quoting Appx3552-3553). Avery does not appeal claim construction or infringement, establishing that ADASA

---

[10] Decimal serial numbers may have overlapping MSBs. For example, the blocks 0 to 1 million and 1 to 2 million overlap into the binary MSB space called 00001. Overlaps would also occur at each other higher boundary between decimal blocks that are divisible by 1 million as follows:

0 to 999,999 (decimal): 0x00000 to 0xF423F (hex) MSBs: 00000
1,000,000 to 1,999,999: 0xF4240 to 0x1E847F MSBs: 00000 and 00001
2,000,000 to 2,999,999: 0x1E8480 to 0x2DC6BF MSBs: 00001 and 00010
3,000,000 to 3,999,999: 0x2DC6C0 to 0x3D08ff MSBs: 00010 and 000011.

proved, for Avery's accused tags, that they "define[] or allocate[] blocks based on a limited number of most significant bits."

The District Court correctly granted summary judgment that Kunho and *RFID4D* do not invalidate.

## III. AVERY'S JURY INSTRUCTION AND VERDICT FORM ARGUMENTS DO NOT JUSTIFY REVERSING THE DENIAL OF ITS NEW TRIAL MOTION ON DAMAGES

Avery did not put forth a lump sum damages theory at trial. Lump sum licenses were in evidence, but a lump sum damages theory was not. Avery nevertheless seeks a new trial on grounds of a supposedly missing lump sum jury instruction and verdict form question.

Under longstanding Ninth Circuit law, this Court reviews the trial court's determination whether a theory has foundation in the evidence for an instruction or verdict form for abuse of discretion (not *de novo* as Avery suggests). *Gantt v. City of Los Angeles*, 717 F.3d 702, 706-07 (9th Cir. 2013); *Yan Fang Du v. Allstate Ins. Co.*, 697 F.3d 753, 757 (9th Cir. 2012). Here, Avery overlooks its own trial counsel telling the jury that "neither of ADASA's license agreements helps us figure out what a reasonable royalty would have been," and its own expert saying, "I don't think the Agron license provides a basis for a royalty rate." (Appx15654, Appx15658). These parts of the record (and others) supported the District Court's

discretion to keep out an instruction and jury question untethered to the evidence at trial.

**A. Licenses Considered by the Jury**

Three agreements admitted into evidence provide context here.

Avery contended at the District Court, but no longer does on appeal, that the Agron agreement lacked a running royalty component. Agron and ADASA, as contracting parties, both expressly used $0.01 per tag as the royalty rate for calculation of the ultimate payment. (Appx15950-15958). The Agron agreement did not permit Agron unfettered future production of infringing parts post-payment. Avery argues otherwise based on covenant-not-to-sue language, but that text was sharply limited and conditional.

Agron could, without future payment to ADASA, provide otherwise-infringing tags to a customer that had specified the infringement to Agron. The contract states the limitation as follows: "so long as such business activities are or were performed to meet the specifications, requests or requirements of [an Agron] customer." (Appx15951). Tag products themselves under this language would never be licensed, even if Agron manufactured them. Thus, customers would remain exposed to liability to ADASA under the contract's language. And presumably, such customer-exposure would revert to Agron itself, under typical commercial warranties of title. Relatedly, if Agron made its own decision to

infringe in the future without a customer request, that would also fall outside the covenant language.

Avery calls a second contract—one between Polk Audio and ADASA—a lump sum license, but that, too, is inaccurate. The Polk contract was purely a release for past conduct, and expressly contained no license nor covenant language. (Appx15944-15949). Polk's post-effective date activities enjoy no rights under any ADASA patent. And Avery's expert at trial did not discuss the Polk-ADASA agreement at all.

A third contract (Appx15936-15942—Goodyear Tire, a manufacturer but not a tag supplier) is a lump sum license, but its single payment was negotiated based on the same $0.01/tag rate as the Agron license. (Appx15073).

**B. Avery's Damages Expert Testimony**

The presence of lump sum agreements in evidence does not mean that a lump sum damages theory was actually in evidence. To the contrary, Avery's expert testimony made clear that Avery was not actually advancing a lump sum damages theory. Even Avery's eve-of-trial, eventually-excluded supplemental damages expert report that partially justified Section 285 sanctions (Appx13791, Appx14606) did not include lump sum theories. (Appx10533-10587, esp. Appx10548).

At trial, Avery's expert Yurkerwich offered no lump sum calculation as part of his expert opinion. The District Court observed this fact when denying Avery's late request to add a lump sum jury instruction and verdict form question. (Appx15747). Yurkerwich was blunt in his disdain for the licenses in evidence. When asked on direct examination if the Agron agreement helps understand the value of the patent-in-suit in the hypothetical negotiation, he answered "No, I don't think it is helpful at all" and "I don't think the Agron license provides a basis for a royalty rate." (Appx15649, Appx15654). Avery's trial counsel asked on direct examination what can be done when "neither of ADASA's license agreements helps us figure out what a reasonable royalty would have been." (Appx15658, referring to Agron and Goodyear, since Yurkerwich never discussed Polk). Yurkerwich answered with his view of what Avery "would put on the table": "what's the alternative going to cost, that's how much I'm going to pay." (Appx15659).

Thus, having repudiated use of in-evidence license agreements for any purpose, Avery went forward instead with a theory centered on design-around costs. And even that theory was limited. Avery presented its "alternatives" framework not as a negotiation outcome, but as a starting point for negotiations. Yurkerwich offered no final outcome opinion. After calculations, Yurkerwich

announced that "the number that Avery Dennison would have in mind at the negotiation" was "about $337,000." (Appx15662)

If Yurkerwich's answers (and counsel's questions) on direct examination had not already done so, his answers on cross-examination closed the "lump sum license theory" doors for Avery:

> Q. You have no opinions that there would be a lump sum payment as a result of this hypothetical negotiation? There's no opinion in your report about a lump sum payment, is there?
>
> A. There is not.

(Appx15675).

> Q. . . . You don't have an opinion as to what the amounts would be at this hypothetical negotiation, did you?
>
> A. I'm leaving that in the hands of the jury.

(Appx15688).

### C. The District Court's Rejection of the Late-Proffered Lump Sum Instruction and Verdict Form Question

Literally minutes after Yurkerwich stepped down, the District Court held the final charge conference. Over objections from ADASA that the proffer was too late in view of Avery's prior missed deadlines, the District Court heard Avery's new request to add a lump sum reasonable royalty jury instruction, and corresponding verdict form question. The District Court ruled as follows:

> And I'm not hearing, as well, that this $336,000 was offered in any way, shape, or form for calculating a lump-sum payment for damages but as a starting point for discussions at this hypothetical negotiation to come up with some royalty rate or a running royalty rate.
>
> So the evidence is insufficient to address -- or for the jury to be able to conclude that a lump-sum payment would be an appropriate form of damages. All right.

(Appx15747).

**D. Avery Shows No Abuse of Discretion**

Contrary to Avery's own statements at trial downplaying the in-evidence licenses as unhelpful to determining a reasonable royalty, Avery now argues that it was legal error for the District Court to withhold any instruction as to the availability of lump sum damages. Blue Br. 46. Avery argues that "[a]ll three licenses that ADASA admitted into evidence were for lump sum amounts." Blue Br. 47. But these were still the same licenses that both counsel and Yurkerwich told the jury were unhelpful, and which were therefore never used in any Avery damages opinion. Avery offered a starting point, not a negotiation outcome opinion.

Avery also misstates events at trial. Avery now says that the trial record merely reflects that its "damages expert had not specifically proposed a lump sum amount." Blue Br. 47. Avery relies on cases where this Court permitted a final jury calculation of damages in a range supported by the record at trial. Blue Br. 48. But

these cases are inapposite. No case permits a jury instruction on a damage theory (or royalty framework) never presented as an opinion to the jury, or that was expressly repudiated by the party's own expert. *Unisplay, S.A. v. American Electric Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995) (royalty found by the jury characterized as either 14% or 10% plus a $200,000 up front fee unsupported as outside the range encompassed by the record of license agreements up to 10% with no up-front fee); *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1167-68 (Fed. Cir. 1991) (holding damages "not restricted to selecting either the 48% or 3% figures advanced respectively by SKD and Helena," and thus could be 25%).[11]

Avery champions *Atlantic Thermoplastics Company, Inc. v. Faytex Corp.*, 5 F.3d 1477, 1482 (Fed. Cir. 1993), as holding that expert calculations need not underlie a damages award, since that case "affirm[ed] damages solely by reference

[11] Avery cites other decisions that are equally limited to the inapposite scenario of one or both sides presenting evidence-grounded theories giving an upper bound to a jury's decision. *Energy Transp. Grp., Inc. v. William Demant Hldg. A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) (both sides presented admissible analyses); *Fujifilm Corp. v. Benum*, 605 F.3d 1366, 1372-73 (Fed. Cir. 2010) ($2.00 jury rate within the range of admitted testimony supporting up to a $2.21 rate when considering bundling and convoyed sales issues, thus supported by substantial evidence; "similar logic" supporting lump sum component); *Maxwell v. J. Bake, Inc.*, 86 F.3d 1098, 1110 (Fed. Cir. 1996) (just under $0.10 per unit effective rate in line with expert testimony of $0.10 per unit). By contrast, this appeal involves a party's request for a jury instruction unaligned with any proffered calculation framework or ranges.

to license offers in the record." Blue Br. 48. But this case actually supports ADASA. There, a patent owner's documented offer to third parties of $0.25 per unit as a royalty rate supported an eventual finding of that reasonable royalty rate, without expert support. *Id.* While this case might therefore relieve ADASA of needing expert testimony to support a proffered royalty rate of $0.01 per tag, it does not help Avery, as Avery presented no evidence of a particular offer to third parties it would rely upon, presented no particular hypothetical negotiation result, did not supply any lump sum framework, and whose expert and counsel repudiated reliance on in-evidence licenses as probative.

All of which makes more extraordinary Avery's appellate argument that "this record contains comparable lump-sum licenses offered by ADASA, [] manifestly support[ing] a lump sum award." Blue Br. 49. Those licenses were overtly not helpful in Avery's view. Avery is of course correct to quote this Court's observation in *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79-80 (Fed. Cir. 2012), that "[a]ctual licenses to the patents-in-suit are probative not only of the proper amount of a reasonable royalty, but also of the proper form of the royalty structure." Blue Br. 49. However, citing the general principle does nothing for Avery because Avery's trial strategy (as discussed) repudiated the very same licenses that it now argues lend "manifest support" to a

lump sum damages theory. Discretionary exclusion was therefore proper, at least for requiring Avery to live with the consequences of its own trial strategy.

Avery lastly cites *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329-30 (Fed. Cir. 2009), as representative of this Court having "long warned against using a lump-sum license as a basis for a running-royalty award." Blue Br. 49. This is both backwards and incomplete. The full holding of this Court in *Lucent* cautions in the other direction—against using running royalty agreements to award lump-sum damages—but includes a caveat: unless "a basis for comparison [] exist[s] in the evidence presented to the jury." *Id.* At worst, this language justified ADASA relying on the Agron agreement's express statement that its calculations were for a running royalty of $0.01 per tag, constituting the proper "basis for comparison" for the jury's eventual award. *Lucent* also highlights Avery's failings here, since it holds that one framework (running royalty) will not necessarily support another (lump sum) without competent explanatory evidence. *Id.* at 1332. Avery presents an even worse case than Lucent did. At least Lucent's expert opined on a recognized framework (running royalty), whereas Avery used none except design-around costs, proffered solely as a negotiation starting point.

As a result, the District Court's decision to deny a jury instruction or verdict form on a lump sum damages theory was correct, not an abuse of discretion.

## IV. AVERY'S APPEAL OF THE EXCLUSION OF NON-COMPARABLE LICENSES LACKS MERIT

Avery also cannot show that the District Court abused its discretion in excluding the Round Rock and Intermec portfolio licenses.

On appeal, Avery asserts that Yurkerwich (a damages expert) gave comparability testimony, while Sweeney (a technical expert) "corroborated Mr. Yurkerwich's account." Blue Br. 51. In fact, Yurkerwich relied on Sweeney for all technical comparability factors, repeatedly citing "Sweeney Rebuttal Report, February 7, 2020, p. 16." (Appx6263, Appx6266). In doing so, Yurkerwich cited the otherwise-blank signature page of Sweeney's report. (Appx5767).

Giving full credit to what was intended, one page earlier (Appx5766), Sweeney made statements on comparability. But the mismatch between Sweeney's opinions and Yurkerwich's reliance is stark. For example, Yurkerwich claimed, with respect to both Intermec and Round Rock, that Avery could not make or sell the accused tag products without those licenses. (Appx6263, Appx6266, nn. 172, 193 respectively citing Sweeney). Avery repeats this assertion on appeal, even relying on it as the "hallmark of comparability" under this Court's caselaw. Blue Br. 51, 53.

But Avery miscites the record. The actual evidence never contained this "hallmark of comparability." Sweeney's opinion did not state that the Intermec and Round Rock patents covered this case's accused tags. (Appx5766). Sweeney

instead stated that ADASA's expert "does not opine" that Avery could sell the accused tags "without infringing any of the licensed Round Rock or Intermec patents." (Appx5766). Yurkerwich took Sweeney's burden of proof sidestep as positive evidence that Avery could not make or sell the accused tag products without those licenses. The District Court committed no error to exclude such ill-supported contentions, much less abused its discretion.

The District Court acted well within the law to keep such opinions out of the trial. The relevant *Georgia-Pacific* factor examines whether "the licenses relied on by the patentee in proving damages are sufficiently comparable to the hypothetical license at issue in suit." *Lucent*, 580 F.3d at 1325. As part of a trial court's gate-keeping function, the District Court had to account for differences in the technologies and economic circumstances of the contracting parties. *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014). "[A] critical prerequisite is that the underlying methodology be sound." *Id.* at 1328. If an expert in a patent case does not follow sound methodology, his or her testimony should be excluded. *Id.* "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc.*, 694 F.3d at 79.

Here, neither the Intermec nor the Round Rock license involved the '967 Patent, or any of the patents in the same family, and neither license related solely

to RFID tag technology. Instead, the Intermec license implicates over 100 patents and covers "RFID products" including "RFID inserts" and "RFID Printers," which are different technologies from what is claimed in the '967 Patent. Likewise, the Round Rock license covers over 3,600 patents but only "several hundred" of those patents are "related to RFID" and a large portion relate to "RFID reader products." (Appx6185).

"Comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them." *Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010); *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010) ("[U]se of past patent licenses under factors 1 and 2 must account for differences in the technologies and economic circumstances of the contracting parties.").

For technological comparability, Yurkerwich relied entirely on Sweeney for an analysis of the technology and patents covered by each agreement. (Appx6184 ¶ 77, Appx6187 ¶ 86). As already mentioned, Yurkerwich misunderstood Sweeney's opinion on the "hallmark of comparability"— mistakenly believing that Sweeney supported the notion that the Avery tags in this case would infringe these third-party rights absent the Intermec or Round Rock licenses. But there is more. Sweeney shouldered a burden to provide testimony on the comparison of the patents in each of the Intermec and Round Rock licenses to the technology of the

’967 Patent, for Yurkerwich’s opinion to be sufficient. *LaserDynamics*, 694 F.3d at 79. Rather than do that, Sweeney opined that the patents in the Intermec and Round Rock licenses were “***significant[ly]” different*** from the ’967 Patent. (Appx5766 “[t]here are also significant differences between the Intermec and Round Rock portfolios and ADASA’s ’967 patent.”) (emphasis added). Avery’s expert thus admitted that the licenses are not comparable, such that any reliance on these two licenses must be struck. *Lucent*, 580 F.3d at 1327 (excluding patent licenses when the alleged agreements “are radically different from the hypothetical agreement under consideration.”).

Yurkerwich did nothing to solve this deficiency, as he also did not compare any of the patents within either the Intermec or Round Rock licenses to the ’967 Patent. Where even “loose or vague comparability between different technologies or licenses does not suffice” and cannot be a legal basis for damages, then the same must also be said where there is no showing of comparability whatsoever, as was the case here. *LaserDynamics*, 694 F.3d at 79; *see also Lucent,* 580 F.3d at 1328; *Finjan*, 626 F.3d at 1211 (reliable expert testimony “must account for differences in the technologies and economic circumstances of the contracting parties,”); *ResQNet.com, Inc. v. Lansa, Inc*, 594 F.3d 860, 871 (Fed. Cir. 2010).

The Intermec and Round Rock licenses are also not economically comparable to the hypothetical negotiation. As described by Yurkerwich, the

Intermec license covered "RFID Inserts, RFID Tags, and RFID Printers" and the license included 138 United States patents. (Appx6183-6184 ¶ 75). Yurkerwich did not attempt to break down which of the 138 patents provide the requisite value he assigns to the license as a whole, and did not provide any analysis for how many of the 138 patents deal with "RFID Inserts" versus "RFID Tags" versus "RFID Printers." (Appx6183-6184 ¶ 75-78).

Yurkerwich's analysis of the Round Rock license fared no better. Yurkerwich identified that the Round Rock license includes over 3,600 patents but only "several hundred" of those patents "related to RFID." (Appx6185 ¶ 80). Even within the limited "RFID" subset, Yurkerwich admitted that a substantial portion of that group is made up of patents that cover "RFID reader products," a category of RFID product that has no bearing on this case. (Appx6185 ¶ 80).

This is precisely the type of conclusory analysis that is insufficient to present to a jury. *Lucent*, 580 F.3d at 1327, 1339. This Court has deemed it appropriate to exclude patent license agreements that include a large number of patents when the hypothetical negotiation in the case at hand would only include one patent or a family of patents that includes the patent-in-suit. *Trell v. Marlee Electronics Corp.*, 912 F.2d 1443, 1446-47 (Fed. Cir. 1990); *Lucent*, 580 F.3d at 1327; *cf. Apple Inc. v. Wi-LAN Inc.*, __ F.4th __ (Fed. Cir. Feb. 4, 2022) (Slip op. 17-21) (even where licenses were admissible as comparable, testimony on licenses was inadmissible as

methodologically unsound when failing to take comparative-valuation factors into account).

The District Court therefore did not abuse its discretion by excluding these licenses, as the defects were extreme and would have confounded any attempt by an expert to guide the jury with reasoned discounting and weighing. This Court should therefore affirm.

## V. THE DISTRICT COURT'S RULE 37(c)(1) SANCTION WAS NOT AN ABUSE OF DISCRETION

Finally, the District Court did not err in any respect to award discretionary discovery sanctions based on $0.0025/tag. Avery did not produce necessary accused product discovery, then capitalized on its discovery failings at trial. Avery urged the jury to reduce ADASA's damages verdict below Mr. Pellegrino's $0.009/tag rate because only 20% of its tag products infringed. (Appx14796, Appx15200, Appx15450-15451, Appx15672-15673). After post-trial revelations, Avery had to admit the real proportion: 50/50. (Appx14301-14303). The District Court called it "a sizable change in percentage." (Appx14303).

Avery does not dispute on appeal, and did not dispute in the District Court, that it deserved to be sanctioned under Rule 37(c)(1) for its discovery violations. Avery does not dispute (**a**) lack of "substantial justification" to withhold D2Comm schema discovery; (**b**) "harm" to ADASA; (**c**) that the underlying conduct violated Rule 26(e) obligations to supplement, thus empowering use of Rule 37(c)(1); (**d**)

that Rule 37(c)(1) permits standalone monetary awards (not only exclusion orders); nor (**e**) that the final monetary award was civil and not criminal. Avery instead contends that its eventual true-up of the trial's royalty base (under the jury-awarded $0.0045 rate, which was itself the fruit of Avery's discovery misconduct) was an appropriate lesser sanction to make ADASA whole.

Avery argues that (1) it lacked notice and an opportunity to be heard, (2) the sanction is an impermissible additur, (3) the District Court omitted "case dispositive" sanction protections, and (4) its hypothetical win on liability here would extinguish the sanction. Blue Br. 54-60. Avery is incorrect on all points. This Court should affirm the monetary award because the District Court acted well within its broad discretion.

### A. Avery Had Proper Notice

Avery misstated the truth to the District Court to "moot" three motions to compel, then capitalized on those misstatements to obtain unwarranted leniency from the jury in the form of a royalty rate discount. Yet Avery now contends it "was denied any pre-argument notice of the form or amount of sanctions the Court was considering, which ADASA never specifically requested." (Blue Br. 56). Avery does not explain how this allegedly missing notice matters—it had every incentive to justify itself already.

Avery's argument is also not plausible. Avery knew that ADASA viewed as insufficient Avery's initial overture simply to supplement the judgment base, which would have been no sanction at all, as the additional infringing tags in the D2Comm database should have been in the case all along, as Avery readily acknowledged by agreeing to add such tags to the verdict amount when first informing ADASA of their existence.

Immediately after being apprised of the discovery abuse, ADASA sought remedies to mitigate contamination of the jury's rate. And two evidentiary hearings lent Avery ample opportunity to state its case as to the sanctions the District Court was considering. At the September 16, 2021 hearing, the District Court held colloquy with Avery counsel specifically discussing the prospective "sanctions award" that might be "compensatory," both knowing that Avery's supplemental judgment on offer corrected only the royalty base. (Appx14426-14427). When granularity became important, and after more facts came out, ADASA specifically named $0.0045/tag, multiplied against tag volumes from the jury-verdict period. (Appx14452-14453, Appx14536). In response, the District Court awarded only $0.0025/tag.

Avery's due process authorities are therefore inapposite. *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 783 n.8 (9th Cir. 1983), states that "the use of Rule 37 sanctions must be tempered by due process." But the seven

authorities cited in that footnote (and *Falstaff Brewing* itself) stand for the proposition that due process prohibits sanctioning based on "circumstances beyond the disobedient party's control." *Id.* Avery makes no such claim to match that legal standard, as its discovery failures were always within its own control.

The Third Circuit in *In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 379 (3d Cir. 1997), considered only an attorney suspension, not monetary sanctions. *Tutu Wells* explains that a party facing sanctions "is entitled to notice" of the "form" of the sanctions, but this requirement is met when a request for relief puts the party on notice that a type of relief was "possible," particularly in "the context or factual background of the case." *Id.* at 379-80. Here, Avery always knew a monetary sanction for contaminating the royalty rate was "possible."

And in *Security Bank of Sioux City v. Jones Day*, 800 F.3d 936, 945 (8th Cir. 2015), another attorney punishment case, a court unexpectedly required a lawyer to produce "an instructional video addressing the impropriety of" things the lawyer had done to obstruct one deposition. *Id.* The "particularized notice" requirement applied because this was "[s]o unusual a sanction." *Id.* Here, the same "particularized notice" trigger is absent, as monetary sanctions are commonplace, and as Avery always knew that the possibility of such an award was on the table.

### B. A Rule 37(c)(1) Monetary Award is Not an Additur

Nor does the $20 million sanction reflect an impermissible additur. The District Court itself dispelled Avery's additur argument with its statement: "To be clear, the Court is not revising the royalty rate the jury awarded." (Appx14627). In addition, the final Rule 58 Judgment does not mix the jury verdict with sanctions, but keeps them separate. (Appx3). Sanctions were an authorized monetary award for discovery misconduct.

Avery's own authority confirms that no Seventh Amendment conflict exists when a court enters a post-trial Rule 37 monetary award in addition to a corrective supplemental judgment in a patent case, and the supplemental judgment mitigates only contamination of the royalty base. That is what happened in *Synqor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1386 (Fed. Cir. 2013). There, "undisclosed sales" resulted in an award of $507,779 in a supplemental judgment, plus an additional sanction of $500,000 plus attorneys' fees and costs to compensate and deter. *Id.* ("As the district court noted, '[n]o court can function if its discovery rules are disregarded.'"). These facts are strikingly similar. Here, the District Court entered a supplemental judgment (restoring the base), and additionally entered a monetary sanction award at roughly the same order as that agreed $9.4 million.

That the District Court referred to the jury verdict for factual metrics to help make its calculation only confirms its soundness. Avery's *Synqor* decision cites

Supreme Court law that the "sanctions awarded bear a 'reasonable relationship' to the harm that occurred." *Id.*, quoting *BMW of N. Am. v. Gore*, 517 U.S. 559, 580-81 (1996) (overturning punitive damages 500 times that of compensatory damages). If *Synqor* properly stacked a sanction proportional at 1:1 to the jury shortfall caused by the discovery abuse, the District Court here was within its discretion to stack a sanction proportional at 5:9 to the jury shortfall (factoring in both base and rate contamination caused by Avery's discovery abuse).

### C. The Monetary Award Was Not Case Dispositive, Nor Would It Matter If It Were

Avery next argues that Ninth Circuit standards limited the District Court's discretion, as its discovery sanction was "case dispositive," thus requiring a finding (either willfulness, fault or bad faith), and consideration of lesser sanctions. Blue Br. 57-59. But such standards do not apply; if they did apply, the District Court met them; and if the District Court did not meet them, Avery failed to preserve this issue for appeal.

First, nothing about the monetary award indicates it was "case dispositive" or acted as a default. ADASA expressly argued that it was asking for $0.0045/tag as a monetary remedy, not for a default judgment or striking of pleadings. (Appx14535). The District Court awarded about half this request. A monetary award is a lesser sanction than default or dismissal. *Juan Gonzalez Mercedes v.*

*Tito Trans. Corp.*, 2017 U.S. Dist. LEXIS 33376, *6 (S.D.N.Y. Mar. 7, 2017); *Odg-Ou v. Co. V.*, 2016 U.S. Dist. LEXIS 201805, *15 (W.D. Ok. Apr. 27, 2016).

If heightened protections did trigger, the District Court gave them. Avery states that "no such finding was made, nor could one be squared with [Avery's] good faith." Blue Br. 58. But the District Court expressly and repeatedly found that Avery's conduct was "reckless." (Appx14573-14577). That is "fault" enough. *See Merchant v. Corizon Health, Inc.*, 993 F.3d 733, 742 n.2 (9th Cir. 2020) ("fault" in the Ninth Circuit under Rule 37(c)(1) when "disclosure failures were within [a party's] control" and they were "easily avoidable").

The District Court also considered lesser sanctions but found them wanting because trial was over. (Appx14627). Courts recognize monetary discovery sanctions are particularly appropriate when trial-related sanctions are impossible because a case is ended. *Vir2us, Inc. v. Invincea, Inc.*, 235 F. Supp. 3d 766, 779 (E.D. Va. 2017) (Rule 37(c)(1) monetary award after settlement, "[t]rial-related sanctions are inappropriate now"); *ESN, LLC v. Cisco Sys., Inc.*, 685 F. Supp. 2d 631, 650 (E.D. Tex. 2009) (Rule 37(c)(1) monetary award against defendant after defense win, "case-oriented sanctions are unavailable because the Court . . . lacks subject matter jurisdiction"). And nothing forced the District Court to stop at the voluntary supplemental judgment that added $9.4 million—an outcome that would

make discovery misconduct of the type Avery did here a no-lose bet for any accused infringer.

For the first time on appeal, Avery now argues that the sanction should have been "peg[ged] to the costs or fees associated with the post-trial production or [another] aspect of discovery." Blue Br. 58. This offer is illogical and meaningless. ADASA already recovers its attorneys' fees through the unappealed Section 285 ruling, making this "lesser sanction" no sanction at all, as would have been the case with any sanction that simply trued up the royalty base.

Avery also failed to preserve its "case dispositive" protections argument, to the extent the "lesser sanctions" it seeks go beyond the royalty base true-up (which the District Court held insufficient). Under Ninth Circuit law, Avery was required to make its own formal request to the District Court for whatever "lesser sanctions" it wanted imposed. *Merchant*, 993 F.3d at 740-42. In *Merchant*, the sanctioned party "neither moved for an alternative sanction nor moved for reconsideration of the district court's ruling on Corizon's motion." *Id.* at 942. For that reason, the sanctioned party on appeal could not avail itself of the extra protections requiring findings of fault and consideration of lesser sanctions when case dispositive sanctions apply. *Id.* (distinguishing on this ground Avery's case, *R&R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1246-48 (9th Cir. 2012)). Same with Avery. It never moved the District Court in this way.

**D. Sanctions Never Depended on the Liability Judgment**

Finally, citing no authority, Avery contends that granting any of its other appeal arguments requires *a fortiori* that this Court vacate the sanction. Blue Br. 55. Avery is simply wrong. Longstanding authority holds that discovery sanctions stand on their own merit no matter who wins a case. *In re Exxon Valdez*, 102 F.3d 429, 431 (9th Cir. 1996) (upholding Rule 37 sanctions despite the fact removal was improper and the court lacked subject matter jurisdiction); *City of Almaty v. Ablyazov*, 2020 U.S. Dist. LEXIS 161546, *9-11 (S.D.N.Y. Sept. 3, 2020) (imposing Rule 37 sanctions on winning defendant post-judgment to punish winner's discovery obstruction); *ESN, LLC v. Cisco Sys., Inc.*, 685 F. Supp. 2d 631, 650 (E.D. Tex. 2009) (Rule 37(c)(1) monetary award against defendant after defense win); *see also Cooter & Gell v.Hartmarx Corp.*, 496 U.S. 384, 395 (1990) ("It is well established that a federal court may consider collateral issues after an action is no longer pending," holding that courts retain authority to impose Rule 11 sanctions even after all claims are dismissed). Siloing the sanctions award in this manner vindicates important policies favoring obedience to the rules of discovery by all litigants, both winners and losers.

Nor does any language in the Rule 58 Judgment convey that the sanctions award will extinguish if the jury verdict is reversed. Judgment language states that the "appropriate sanction is $0.0025 per tag for the total number of tags included in

the merits judgment above," which multiplied to "$20,032,889.80." (Appx3). Such language monetized a number, and was agnostic to a tag's status as "infringing" or otherwise liability-inducing. Even the wording in the later-entered written opinion that recaps this calculation framework ("tied to the number of infringing tags determined to exist as of the date of the verdict") does not help Avery. (Appx14626). At "the date of the verdict," such tags were determined to be infringing, regardless of later events. The sanctions award therefore remains valid even if this Court were to vacate or reverse the liability judgment.

## CONCLUSION

For the foregoing reasons, this Court should affirm in full.

Dated: March 4, 2022

Respectfully submitted,

*/s/ Robert P. Greenspoon*
Robert P. Greenspoon
William W. Flachsbart
DUNLAP BENNETT & LUDWIG PLLC
333 N. Michigan Ave., Suite 2700
Chicago, IL 60601
(312) 551-9500
rgreenspoon@dbllawyers.com
wflachsbart@dbllawyers.com

Jonathan T. Suder
Glenn S. Orman
FRIEDMAN, SUDER & COOKE, P.C.
604 E. 4th St., Suite 200
Fort Worth, TX 76102
(817) 334-0400
jts@fsclaw.com
orman@fsclaw.com

*Attorneys for Plaintiff-Appellee*
*ADASA, Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-1092

**Short Case Caption:** ADASA Inc. v. Avery Dennison Corporation

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13,995 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ______ lines of text.
- [ ] the filing contains ______ pages / ______ words / ______ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ______).

Date: 03/04/2022

Signature: /s/ Robert Greenspoon

Name: Robert Greenspoon

Save for Filing